# EXHIBIT A

**PCA Case No. 2019-15**

**IN THE MATTER OF AN ARBITRATION UNDER THE TREATY BETWEEN THE UNITED STATES OF AMERICA AND THE REPUBLIC OF ECUADOR CONCERNING THE ENCOURAGEMENT AND RECIPROCAL PROTECTION OF INVESTMENT, SIGNED ON AUGUST 27, 1993 AND ENTERED INTO FORCE ON MAY 11, 1997**

**- and -**

**THE ARBITRATION RULES OF THE UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW, 1976 (the "UNCITRAL Rules")**

**- between -**

**WORLEY INTERNATIONAL SERVICES INC. (USA)**

**(the "Claimant" or "Worley")**

**- and -**

**THE REPUBLIC OF ECUADOR**

**(the "Respondent" or "Ecuador", and together with the Claimant, the "Parties")**

_____

**FINAL AWARD**
_____

**The Arbitral Tribunal**

Dr. Andrés Rigo Sureda (Presiding Arbitrator)
Prof. Bernard Hanotiau
Prof. Brigitte Stern

**Secretary to the Tribunal**

Mr. José Luis Aragón Cardiel
*Permanent Court of Arbitration*

**December 22, 2023**

*This page is intentionally left blank*

## TABLE OF CONTENTS

| | | |
|---|---|---|
| **I.** | **INTRODUCTION** | **1** |
| 1. | The Parties | 1 |
| 2. | The Dispute | 2 |
| **II.** | **PROCEDURAL HISTORY** | **4** |
| 1. | Decision on Request to Produce (Procedural Order No. 4) | 4 |
| 2. | Decision on Request to Cure (Procedural Order No. 5) | 5 |
| 3. | Second Decision on Request to Cure (Procedural Order No. 6) | 6 |
| 4. | Written Pleadings | 7 |
| 5. | Hearing | 7 |
| 6. | Post-Hearing Matters | 11 |
| **III.** | **STATEMENT OF FACTS** | **12** |
| 1. | The Parties and Other Related Entities | 12 |
| | 1) The Claimant and Related Entities | 12 |
| | 2) The Respondent and Related Entities | 13 |
| | 3) Other Entities | 14 |
| 2. | The Projects | 14 |
| | 1) Introduction | 14 |
| | 2) The Pacific Refinery Project | 15 |
| | 3) The Esmeraldas Refinery Project | 18 |
| | 4) The Machala Plant Project | 21 |
| | 5) The Monteverde Project | 23 |
| 3. | The Suspension of Payments to Worley | 23 |
| 4. | The Judicial and Administrative Proceedings Involving the Parties | 28 |
| | 1) Comptroller General Reviews Worley's Projects in Ecuador | 29 |
| | 2) SRI Audits Worley's Income Tax Statements | 30 |
| | 3) Criminal Proceedings against Worley in Ecuador | 31 |
| | 4) Civil Proceedings against Worley before United States Courts | 32 |
| 5. | The Allegations of Corruption and Illegality | 33 |
| | 1) Information from the Panama Papers and the Respondent's Investigations | 34 |
| |    i. Tecnazul | 34 |
| |    ii. MMR Group | 38 |
| |    iii. OSS | 38 |
| |    iv. Galileo | 39 |
| |    v. Odebrecht | 40 |
| | 2) Purported Corruption and Illegality at the Time of the Investment | 40 |

|      |      | i.    | Trafficking in Confidential Information | 41 |
|      |      | ii.   | Misrepresentation of the 30% Subcontracting Limit | 42 |
|      | 3)   |       | Purported Corruption and Illegality during the Operation of the Investment | 44 |
|      |      | i.    | June 2012 | 46 |
|      |      | ii.   | August and September 2012 | 47 |
|      |      | iii.  | October 2012 | 48 |
|      |      | iv.   | March 2013 | 50 |
|      |      | v.    | April 2013 | 51 |
|      |      | vi.   | May 2013 | 52 |
|      |      | vii.  | September 2013 | 53 |
|      |      | viii. | September to December 2014 | 53 |
|      |      | ix.   | August 2013 to May 2015 | 54 |
|      |      | x.    | December 2011 to February 2016 | 55 |

**IV.   REQUESTS FOR RELIEF** ........................................................................... **58**

1.    The Claimant's Request for Relief ................................................................ 58

2.    The Respondent's Request for Relief ........................................................... 60

**V.    JURISDICTION AND ADMISSIBILITY** ................................................. **62**

1.    The Respondent's Position .......................................................................... 63

|      | 1)   | Ecuadorian Law | 64 |
|      | 2)   | French Law / International Public Policy | 67 |
|      | 3)   | International Law | 69 |
|      | 4)   | US Law | 71 |
|      | 5)   | Worley's Executive Directive on Gifts | 72 |
|      | 6)   | Corruption as a Bar to Admissibility | 73 |

2.    The Claimant's Position ............................................................................... 74

|      | 1)   | Applicable Standard | 74 |
|      | 2)   | Evidence of Corruption | 75 |
|      | 3)   | Applicable Legal Framework | 77 |
|      | 4)   | Corruption as a Bar to Admissibility | 82 |

**VI.   THE TRIBUNAL'S ANALYSIS ON JURISDICTION AND ADMISSIBILITY** ... **84**

1.    Preliminary Matters ..................................................................................... 84

|      | 1)   | Compliance with the Law of the Host Country | 84 |
|      | 2)   | Timing of the Illegality and its Consequences | 86 |

2.    Illegality at the Making of the Investment .................................................... 89

|      | 1)   | Trafficking in Confidential Information | 89 |
|      |      | i.    | Introduction | 89 |
|      |      | ii.   | Timeline | 90 |

|  |  | iii.  Analysis ............................................................................................... | 95 |
|  | 2) | Misrepresentation of the 30% Subcontracting Limit ....................................... | 98 |
|  |  | i.    Introduction ......................................................................................... | 98 |
|  |  | ii.   Esmeraldas Refinery Agreement ......................................................... | 101 |
|  |  | iii.  Machala Plant Agreement I ................................................................ | 108 |
|  |  | iv.   Actual Violations of 30% Subcontracting Limit ................................. | 111 |
|  | 3) | Conclusions on Illegality at the Making of the Investment ........................... | 115 |
| 3. |  | Illegality during the Operation of the Investment ................................................ | 117 |
|  | 1) | The Esmeraldas Refinery Complementary Agreements and Related Bribery ............... | 118 |
|  |  | i.    Standard of Proof for Corruption Allegations ......................................... | 119 |
|  |  | ii.   Conduct Amounting to Corruption ...................................................... | 120 |
|  |  | iii.  Timeline .............................................................................................. | 121 |
|  |  | iv.   Analysis of Evidence on Corruption ................................................... | 130 |
|  |  | v.    Conclusion ......................................................................................... | 135 |
|  | 2) | The Claimant's "Willful Blindness" towards Tecnazul's Corruption ........................... | 138 |
| 4. |  | The Tribunal's Conclusion on Jurisdiction and Admissibility ................................. | 142 |
| **VII.** | **COSTS** ................................................................................................ | **143** |
| 1. | The Claimant's Position ............................................................................................. | 143 |
| 2. | The Respondent's Position ........................................................................................ | 146 |
| 3. | The Tribunal's Analysis ............................................................................................. | 148 |
|  | 1) | Allocation of Costs ....................................................................................... | 148 |
|  | 2) | Quantification of Costs and Determination on Costs ..................................... | 149 |
|  | 3) | Interest on Costs ............................................................................................ | 151 |
| **VIII.** | **DECISION** ........................................................................................... | **152** |

**DEFINED TERMS**

| | |
|---|---|
| **§ 1782 Proceedings** | Proceedings initiated by an e*x parte* application filed by Petroecuador on August 26, 2019 before the US District Court for the Southern District of Texas (Houston Division) under 28 U.S.C. § 1782. |
| **Andrade Report I** | The first expert report of Fabián Andrade Narváez, dated September 5, 2021 (RER-1). |
| **Andrade Report II** | The second expert report of Fabián Andrade Narváez, dated June 25, 2022 (RER-4). |
| **Agreements** | Agreements between Petroecuador, RDP, and Worley concerning the Pacific Refinery, the Esmeraldas Refinery, the Machala Liquefaction Plant and the Monteverde Project concluded between November 2011 and April 2015. |
| **Attorney General** | The *Procurador General del Estado* of the Republic of Ecuador. |
| **Azul Group** | Grupo Azul, the corporate group of which Tecnazul is part. |
| **Branch Report** | The first expert report of Douglas E. Branch, CPA/ABV/CFF of PriceWaterhouseCoopers dated November 4, 2019 (CER-2). |
| **Claimant** or **Worley** | Worley International Services Inc. (formerly WorleyParsons International Inc.). |
| **Claimant's PHB** | The Claimant's Post-Hearing Brief, dated February 28, 2023. |
| **Claimant's Response and Request to Cure** | The Claimant's response to the Respondent's Request to Cure, and its request for the Tribunal to order the Respondent to cure deficiencies in its production, dated February 25, 2022. |
| **Claimant's Statement on Costs** | The Claimant's Statement on Costs, dated May 26, 2023. |
| **Comptroller General** | The *Contraloría General del Estado* of the Republic of Ecuador. |

| | |
|---|---|
| **Comptroller General's Resolutions** | Various rulings issued by the Comptroller General starting in 2016 determining that the Claimant is liable for certain actions and omissions related to its performance of the Agreements. |
| **Elizondo Statement** | Witness Statement of Mr. Carlos Elizondo, dated November 4, 2019 (CWS-1). |
| **ESCART** | ESCART, S.A. |
| **Esmeraldas Refinery Agreement** | Agreement between Petroecuador and Worley for the oversight and management of the refurbishment program of the Esmeraldas Refinery, dated November 14, 2011. |
| **Esmeraldas Refinery Complementary Agreements** | Complementary Agreements to the Esmeraldas Refinery Agreement concluded between September 2012 and October 2015. |
| **Esmeraldas Refinery Project** | Project for the refurbishment of the Esmeraldas Refinery in the Province of Esmeraldas, Ecuador. |
| **Executive Directive** | Worley's Executive Directive on Gifts. |
| **Falcon Statement I** | The first witness statement of Raymond Falcon, dated November 4, 2019 (CWS-2). |
| **Falcon Statement II** | The second witness statement of Raymond Falcon, dated January 18, 2022 (CWS-5). |
| **Falcon Statement III** | The third witness statement of Raymond Falcon, dated October 12, 2022 (CWS-7). |
| **FCPA** | The Foreign Corrupt Practices Act of the United States, 15 U.S.C. § 78dd-1(a). |
| **FCPA Guide** | Resource Guide to the FCPA, published by the Criminal Division of the U.S. Department of Justice and the Enforcement Division of the U.S. Securities and Exchange Commission. |
| **Formula 1 Trip** | A four-day trip that took place in October 2013 and was attended by several Petroecuador employees to see the 2012 Formula One World Championship in Austin, Texas. |

| | |
|---|---|
| **Galileo** | GalileoEnergy, S.A. |
| **GIRBRA** | GIRBRA, S.A. |
| **Hearing** | Hearing on jurisdiction, merits and quantum held on December 8-16, 2022. |
| **Herrera Statement** | Witness statement of José R. Herrera Falcones, dated September 5, 2021 (RWS-1). |
| **Isla Tolita Project** | Project of US$ 2.7 million on Isla Tolita Pampa de Oro, which, according to the Claimant, was a charitable project to rebuild a school and dock. |
| **Machala Plant Agreement I** | Agreement between Petroecuador and Worley for specialized technical consultancy for the Machala Project, dated March 5, 2014. |
| **Machala Plant Agreement II** | Agreement between Petroecuador and Worley for the provision of specialized technical assistance of the Machala Project, dated June 6, 2015. |
| **Machala Plant Agreements** | The Machala Plant Agreement I and Machala Plant Agreement II. |
| **Machala Plant Complementary Agreements** | Complementary Agreements to the Machala Plant Agreement I, dated August 1 and November 14, 2014. |
| **Machala Plant Project** | Project for the technical inspection and supervision of the works conducted in the liquefied natural gas plant located in Bajo Alto, Province of El Oro, Ecuador. |
| **MMR Group** | MMR Group, Inc. |
| **Monteverde Project** | Project for the construction of a complex dedicated to the reception, storage, transport and distribution of liquefied natural gas in the province of Santa Elena, Ecuador. |
| **Odebrecht** | Constructora Norberto Odebrecht, S.A. |
| **OSS** | Oil Services & Solutions, S.A. |

| | |
|---|---|
| **Pacific Refinery Agreement** | Project Management Consultancy Support Services Agreement between RDP and Worley, dated November 22, 2011. |
| **Pacific Refinery Project** | Project for the construction of an oil refinery with a processing capacity of 300,000 barrels of crude oil per day in El Aromo, Province of Manabí, Ecuador. |
| **Panama Papers** | 11.5 million leaked documents from Panamanian law firm Mossack Fonseca that were reported by the International Consortium of Investigative Journalists in April 2016. |
| **Parker Statement II** | The second witness statement of Mr. Christopher Parker, dated January 18, 2022 (CWS-4). |
| **Partial Award** | Partial Award on Preliminary Objections, issued by the Tribunal on March 18, 2021. |
| **Parties** | The Claimant and the Respondent. |
| **PCA** | Permanent Court of Arbitration. |
| **PDVSA Ecuador** | PDVSA Ecuador, S.A. |
| **Petroecuador** | Respondent's public oil and gas company, *Empresa Pública de Hidrocarburos del Ecuador EP Petroecuador*. |
| **Petroecuador Memorandum** | An October 28, 2016 memorandum, issued by the Superintendent of the Esmeraldas Refinery pursuant to *Oficio* 16-624 (*i.e.* the Presidential Communication). |
| **PMC** | Project Management Consultancy. |
| **Preliminary Objections** | Respondent's *ratione personae* and *ratione materiae* preliminary objections. |
| **Presidential Communication** | *Oficio* 16-624, issued by the Office of the President of the Republic of Ecuador, which ordered the cessation of payment by Government agencies and State-owned entities to certain businesses, while "interim measures" remained in place. |

vii

PCA Case No. 2019-15
Final Award

| | |
|---|---|
| **Projects** | Esmeraldas Refinery Project, Machala Plant Project Monteverde Project, and Pacific Refinery Project. |
| **Prosecutor General's Office** | The *Fiscalía del Estado* of the Republic of Ecuador. |
| **Public Procurement Law** | Ecuador's *Ley Orgánica del Sistema Nacional de Contratación Pública*. |
| **Public Procurement Regulation** | Ecuador's *Reglamento General de la Ley Orgánica del Sistema Nacional de Contratación Pública* |
| **RDP** | Respondent's public oil and gas company, *Refinería del Pacífico RDP Compañía de Economía Mixta*. |
| **Rejoinder** | The Respondent's Rejoinder and Reply on Jurisdiction, dated June 25, 2022. |
| **Rejoinder on Jurisdiction** | The Claimant's Rejoinder on Jurisdiction, dated October 12, 2021. |
| **Reply** | The Claimant's Reply on the Merits and Response on Jurisdiction, dated January 18, 2022. |
| **Respondent** or **Ecuador** | The Republic of Ecuador. |
| **Respondent's PHB** | Respondent's Post-Hearing Brief, dated February 28, 2023. |
| **Respondent's Request to Cure** | The Respondent's request for the Tribunal to order the Claimant to fully comply with Procedural No. 4 and cure deficiencies in its production, dated February 18, 2022. |
| **Respondent's Statement on Costs** | The Respondent's Statement on Costs, dated May 26, 2023. |
| **Rodeo Trip** | A two-day trip attended by Mr. Pareja, Mr. Bravo and Mr. Reyes, as well as their spouses, to see the Houston Livestock Show and Rodeo in Houston, Texas, in March 2013. |
| **Shaw** | Shaw Consultants International. |

viii

| | |
|---|---|
| **Special Contracting Procedure** | Government procurement procedure called *giro específico del negocio* pursuant to which the Esmeraldas Refinery Agreement, the Pacific Refinery Agreement, and the Machala Plant Agreements were procured. |
| **SRI** | The *Servicio de Rentas Internas* (Internal Revenue Service) of the Republic of Ecuador. |
| **Statement of Claim** | The Claimant's Statement of Claim, dated November 4, 2019. |
| **Statement of Defense** | The Respondent's Statement of Defense, dated September 7, 2021. |
| **Tecnazul** | Tecnazul Cia. Ltda. |
| **Tejada Statement** | Witness statement of Mauro R. Tejada, dated September 2, 2021 (RWS-2). |
| **Terms of Appointment** | The Terms of Appointment, adopted on November 1, 2019. |
| **Treaty** | Treaty between the United States of America and the Republic of Ecuador concerning the Encouragement and Reciprocal Protection of Investment, signed on August 27, 1993 and entered into force on May 11, 1997. |
| **UNCITRAL Rules** | Arbitration Rules of the United Nations Commission on International Trade Law, 1976. |
| **UNCAC** | United Nations Convention Against Corruption. |
| **Worley SPVI** | Worley SPVI Pty, Ltd. |
| **WorleyParsons Ecuador** | WorleyParsons Ecuador S.A. |
| **WorleyParsons US** | WorleyParsons US Holding Corporation. |

## DRAMATIS PERSONAE

| | |
|---|---|
| **Baquerizo, Juan Andrés** | Juan Andrés Baquerizo, owner of OSS. |
| **Bock, Gabriela** | Gabriela Bock, Office Manager and Manager of Public Relations at Worley. |
| **Bravo, Álex** | Álex Bravo, Petroecuador Project Coordinator for the Esmeraldas Refinery Project at the Refining Division from 2011 to 2015 and General Manager from November 2015 to April 2016, Contract Administrator for all of the Esmeraldas Refinery Complementary Agreements and owner of GIRBRA. |
| **Calvopiña, Marco** | Marco Calvopiña, General Manager of Petroecuador on the date Worley was awarded the Esmeraldas Refinery Agreement. |
| **Céli de la Torre, Pablo** | Pablo Céli de la Torre, Comptroller General of Ecuador from 2017 to 2021. |
| **Elizondo, Carlos** | Carlos Elizondo, Vice President and Project Director at Worley. |
| **Escobar, Arturo** | Arturo Escobar, General Coordinator of Business Management at the Refining Division of Petroecuador from March 2012 to September 2014, Advisor of Shared Services from May to November 2013, and Advisor to the Refining Division from November 2013 to September 2014; and owner of ESCART. |
| **Faidutti Navarrette, Carlos** | Carlos Faidutti Navarrette, alleged full-time employee of the Esmeraldas Refinery Project. |
| **Falcon, Raymond** | Raymond Falcon, Worley's Program Manager and Project Director of the Esmeraldas Refinery Project from 2012. |
| **Glas, Jorge** | Jorge Glas, former Vice President and Minister of Strategic Sectors of Ecuador. |
| **Guarderas, Humberto** | Humberto Guarderas, Principal of Tecnazul. |
| **Guerrero, Alejandro** | Alejandro Guerrero, Worley's employee, subordinate of Mr. Falcon. |
| **Hooper, Robert** | Robert Hooper, Worley Manager, superior of Mr. Falcon. |
| **Luque, Ramiro** | Ramiro Luque, owner of Galileo. |

x

| | |
|---|---|
| **Merizalde, Pedro** | Pedro Merizalde, former General Manager of RDP, former General Manager of Petroecuador and former Minister of Non-Renewable Natural Resources of Ecuador. |
| **Pareja, Carlos** | Carlos Pareja, Manager at the Refining Division of Petroecuador from March 2012 to July 2015 and General Manager from July 2015 to November 2015, former Minister of Hydrocarbons of Ecuador and owner of CAPAYA, S.A. |
| **Pareja, Carlos Andrés** | Carlos Andrés Pareja, son of Mr. Pareja. |
| **Pareja, Yolanda Rosa** | Yolanda Rosa Pareja, wife of Mr. Pareja. |
| **Park, Guillermo** | Guillermo Park, Contract Administrator of the Pacific Refinery Agreement. |
| **Parker, Christopher** | Christopher Parker, Worley's Group Director of Major Projects since 2014 and Regional Managing Director for the Americas from 2015 to 2017. |
| **Phillips, William** | William Phillips, owner of Tecnazul. |
| **Pinzón, Arturo** | Arturo Pinzón, Principal of MMR Group. |
| **Plummer, George** | George Plummer, Shaw's Senior Executive Consultant. |
| **Pólit, Carlos** | Carlos Pólit, Comptroller General of Ecuador from 2007 to 2017. |
| **Reyes, Marcelo** | Marcelo Reyes, in-house attorney at Petroecuador and General Coordinator of Contracts for the Refining Management from March 2012 to May 2013. |
| **Tapia, Diego** | Diego Tapia, Manager at the Refining Division of Petroecuador from 2015 to 2016 and Operations Manager. |
| **Villegas, Mauricio** | Mauricio Villegas, Business Development Manager at Worley. |

*This page is intentionally left blank*

## I.    INTRODUCTION

### 1.    THE PARTIES

1.    The Claimant is Worley International Services Inc. (formerly WorleyParsons International Inc.) (the "**Claimant**" or "**Worley**"), a corporation organized and existing under the laws of the State of Delaware, United States of America.[1] The Claimant is represented in this arbitration by:

> **Silvia Marchili**
> White & Case LLP
> 609 Main Street, Suite 2900
> Houston, TX 770002
> United States of America

> **Estefanía San Juan**
> **Michael García**
> White & Case LLP
> South Biscayne Boulevard, Suite 4900
> Miami, FL 33131-2352
> United States of America

> **Andrea Menaker**
> White & Case LLP
> 5 Old Broad Street
> London, EC2N 1DW
> United Kingdom

> **Jonathan Ulrich**
> White & Case LLP
> 701 13th St NW,
> Washington, DC 20005
> United States of America

> **Javier Robalino**
> **Paola Gachet**[2]
> Robalino Law
> Avenida 12 de Octubre No. 26-48, y Lincoln Edificio Mirage, Piso 16
> Quito, 170525, Ecuador

---

[1]    The Claimant asserts that it was originally incorporated as Parsons E&C International, Inc. on January 4, 2002. On June 15, 2005, the Claimant amended its certificate of incorporation to change its name to WorleyParsons International, Inc. On June 12, 2019, the Claimant amended again its certificate of incorporation to change its name to Worley International Services, Inc. Certificate of Incorporation of Parsons E&C International, Inc., January 4, 2002, and Certificate of Amendment of Certificate of Incorporation, June 15, 2005 (**C-11**); State of Delaware, Certificate of Name Amendment, June 12, 2019 (**C-53**).

[2]    No longer at the firm.

2.     The Respondent in this arbitration is the Republic of Ecuador, a sovereign State ("**Ecuador**" or the "**Respondent**", and together with the Claimant, the "**Parties**"). The Respondent is represented in this arbitration by:

> **Ab. Juan Carlos Larrea Valencia**
> *Procurador General del Estado*
>
> **Dra. Ana María Larrea**
> *Directora Nacional de Asuntos Internacionales y Arbitraje*
>
> **Ab. Lily Díaz Granados**
> *Subdirectora de Asuntos Internacionales y Arbitraje*
>
> **Dra. Amparo Miranda**
> *Abogada de Asuntos Internacionales*
>
> **Ab. Nicole Vásconez**
> *Abogada de Asuntos Internacionales*
> Procuraduría General del Estado
> Av. Amazonas No 39-123 y Arizaga,
> Edificio Amazonas Plaza
> Quito, 170135
> Ecuador
>
> **Raúl B. Mañón**
> **Digna B. French**
> **María Gómez**
> Squire Patton Boggs (US) LLP
> 200 South Biscayne Boulevard
> Suite 3400
> Miami, FL 33131
> United States of America
>
> **Rostislav Pekař**
> **David Seidl**
> Squire Patton Boggs (UK) LLP
> 7 rue du Général Foy
> Paris, 75008
> France
>
> **Francisco J. Batlle**
> Squire Patton Boggs Peña Prieto Gamundi
> Av. Pedro Henríquez Ureña No. 157
> Santo Domingo, 10108
> Dominican Republic

## 2.     THE DISPUTE

3.     The dispute arises from the Respondent's alleged acts and omissions, including those of several of its instrumentalities and agencies, in connection with several agreements for the development

of four oil and gas infrastructure projects in Ecuador (together, the "**Agreements**"), referred to as the Esmeraldas Refinery Refurbishment Project (the "**Esmeraldas Refinery Project**"), the Eloy Alfaro Pacific Refinery Project (the "**Pacific Refinery Project**"), the Machala Gas Liquefaction Plant (the "**Machala Plant Project**") and the Santa Elena Monteverde Project (the "**Monteverde Project**", and together with the other projects, the "**Projects**").

4.   According to the Claimant, those acts and omissions include: (i) the alleged non-payment of amounts due under the Agreements by the Respondent's public oil and gas companies *Empresa Pública de Hidrocarburos del Ecuador EP Petroecuador* ("**Petroecuador**") and *Refinería del Pacífico Eloy Alfaro RDP Compañía de Economía Mixta* ("**RDP**") against the backdrop of a corruption scandal involving a third company named Tecnazul Cia. Ltda. ("**Tecnazul**") – a subcontractor for the Agreements; (ii) a "harassment campaign" against the Claimant conducted by the *Contraloría General del Estado of Ecuador* (the "**Comptroller General**"); and (iii) unwarranted tax liabilities allegedly threatened by the Respondent's tax authority, *Servicio de Rentas Internas* (the "**SRI**") against the Claimant.[3]

5.   The Claimant claims that the Respondent, through these acts and omissions, violated its obligations under the Treaty between the United States of America and the Republic of Ecuador concerning the Encouragement and Reciprocal Protection of Investment, signed on August 27, 1993, and entered into force on May 11, 1997 (the "**Treaty**").

6.   The Respondent has raised several objections to the jurisdiction of the Tribunal and the admissibility of the Claimant's claims, as further described below.[4] On the merits, the Respondent denies any breaches of the Treaty generally on the basis that (i) the Claimant has brought its claims against the wrong party, as Ecuador is not responsible for the actions of Petroecuador or RDP; (ii) the Claimant's claim is commercial and contractual in nature and, as such, it does not belong to the investment treaty sphere; (iii) there were problems with the Claimant's performance under the Agreements; and (iv) the Claimant's damages claim is unsubstantiated.[5]

7.   On March 18, 2021, the Tribunal issued its Partial Award on Preliminary Objections (the "**Partial Award**"), whereby it rejected two preliminary objections raised by the Respondent (the "**Preliminary Objections**"). In this Final Award, and for the reasons set out below, the Tribunal dismisses the entirety of the Claimant's claims.

---

[3]   Statement of Claim, paras. 196, 212-216.
[4]   *See* para. 241 below.
[5]   Rejoinder, paras. 10-16.

## II.   PROCEDURAL HISTORY

8.   For the sake of good order and ease of reference, the Tribunal reproduces below the basic details of the arbitration:

(i)   The Tribunal is composed by Prof. Bernard Hanotiau, a Belgian national (appointed by the Claimant on February 14, 2019); Prof. Brigitte Stern, a French national (appointed by the Respondent on March 18, 2019) and Dr. Andrés Rigo Sureda, a Spanish national (appointed as presiding arbitrator by the Secretary-General of the Permanent Court of Arbitration (the "**PCA**") on July 31, 2019).

(ii)   Pursuant to Section 3.1 of the Terms of Appointment adopted by the Parties on November 1, 2019 (the "**Terms of Appointment**"), the UNCITRAL Rules, 1976 (the "**UNCITRAL Rules**") govern this arbitration.

(iii)   Under Section 3.2 of the Terms of Appointment, the Secretary-General of the PCA acts as the appointing authority in this arbitration for all purposes under the UNCITRAL Rules.

(iv)   In accordance with Section 6.2 of the Terms of Appointment, the legal place (or "seat") of the arbitration is Paris, France.

(v)   As per Section 8.1 of the Terms of Appointment, the PCA administers these proceedings. Mr. José Luis Aragón Cardiel, PCA Legal Counsel, was designated to act as Registrar and Secretary to the Tribunal.

(vi)   Pursuant to Section 3.1 of Procedural Order No. 1, the languages of the arbitration are English and Spanish. In accordance with Section 3.3 thereof, this Final Award is issued simultaneously in English and Spanish.

9.   The procedural history leading to the issuance of the Partial Award is recounted in that Award and shall not be repeated here. For the sake of simplicity, the Tribunal hereby incorporates by reference Section II of the Partial Award and sets out below the history of these proceedings following the issuance of the Partial Award.

### 1.   DECISION ON REQUEST TO PRODUCE (PROCEDURAL ORDER NO. 4)

10.   On September 22, 2021, the Claimant submitted an application concerning certain exhibits enclosed with the Respondent's Request for Production of Documents, which was sent by the

Respondent to the Claimant by an *inter partes* communication on September 21, 2021. On September 29, 2021, the Respondent requested that the Tribunal reject the Claimant's application.

11.   On October 1, 2021, the Tribunal dismissed the Claimant's September 21, 2021 application as premature, while also reminding the Parties "that any application for an order on the production of documents must comply with the procedure and format set forth in Section 5 of Procedural Order No. 1" and recalling its determination at paragraph 28(ii) of Procedural Order No. 2, pursuant to which "documents obtained through discovery procedures other than those provided for in Section 5 of Procedural Order No. 1, if resubmitted in this proceeding, shall be subject to the requirements of that Procedural Order."

12.   On November 1, 2021, the Tribunal issued Procedural Order No. 4, by which it ruled on (i) the Claimant's September 21, 2021 application; and (ii) the Parties' outstanding requests for document production set forth in the Parties' Redfern/Stern Schedules filed with the Tribunal on October 18, 2021.

13.   On November 10, 2021, the Claimant requested that the Tribunal allow the Claimant to produce a list identifying any documents responsive to the Respondent's document production request no. 14 (which was granted by the Tribunal by its Procedural Order No. 4) instead of producing those documents to the Respondent.

14.   On November 16, 2021, the Respondent provided its comments on the Claimant's November 10, 2021 request.

15.   On November 19, 2021, the Tribunal granted the Claimant's November 10, 2021 request.

**2.   DECISION ON REQUEST TO CURE (PROCEDURAL ORDER NO. 5)**

16.   On February 18, 2022, the Respondent requested that the Tribunal order the Claimant "fully to comply with [Procedural Order No. 4]" and cure certain "deficiencies in its production" as more fully set out therein (the "**Respondent's Request to Cure**").

17.   On February 25, 2022, at the Tribunal's invitation, the Claimant (i) requested that the Tribunal order the Respondent "to cure the deficiencies in its production" as more fully set out therein; and (ii) provided its comments on the Respondent's Request to Cure (the "**Claimant's Response and Request to Cure**").

18.     On March 4, 2022, at the Tribunal's invitation, the Respondent provided its comments on the Claimant's request that the Tribunal order the Respondent "to cure the deficiencies in its production."

19.     On March 14, 2022, the Tribunal issued Procedural Order No. 5, deciding the Respondent's Request to Cure and the Claimant's Response and Request to Cure.

20.     The Claimant sent additional communications on March 18 and 25, 2022 concerning document production as ordered pursuant to Procedural Order No. 5, to which the Respondent replied on March 23, 2022.

21.     On March 28, 2022, the Tribunal sent a letter to the Parties (i) noting the Respondent's explanation as to why it was not in possession of certain internal Petroecuador communications falling within the scope of the production as ordered by Procedural Order No. 4, and (ii) granting the Claimant's request to produce "communications with Petroecuador employees" in bulk and without categorization.

22.     On April 4, 2022, the Respondent requested that the Claimant produce the abovementioned "communications with Petroecuador employees" and their attachments as native files, including all associated metadata.

23.     On April 7, 2022, the Claimant provided its comments on the Respondent's April 4, 2022 request.

24.     On April 14, 2022, the Tribunal ordered the Claimant to produce the abovementioned "communications with Petroecuador employees" in their native format.

**3.      SECOND DECISION ON REQUEST TO CURE (PROCEDURAL ORDER NO. 6)**

25.     On April 29, 2022, the Respondent requested that the Tribunal order the Claimant to produce a series of documents that had been withheld on privilege and/or confidentiality grounds and to cure alleged deficiencies in the Claimant's document production under Procedural Order No. 5.

26.     On May 6, 2022, the Claimant submitted its response to the Respondent's April 29, 2022 request.

27.     On May 10, 2022, the Respondent submitted a communication (i) noting that it trusted that the Tribunal was "sufficiently informed on the issues in dispute" as set out in the Respondent's request and the Claimant's response; and (ii) providing comments on certain observations made by the Claimant in its response regarding past contact between the Respondent's Counsel and a former Worley employee.

28.     On May 13, 2022, the Claimant provided its response to the Respondent's communication of May 10, 2022.

29.     On May 20, 2022, the Tribunal issued Procedural Order No. 6, deciding the Respondent's April 29, 2022 request.

### 4.     WRITTEN PLEADINGS

30.     While the Parties have filed further written pleadings in this arbitration during the Preliminary Objections phase that led to the Partial Award, the following pleadings address the specific issues that are decided in this Final Award.

31.     On November 4, 2019, the Claimant filed its Statement of Claim (the "**Statement of Claim**").

32.     On September 7, 2021, the Respondent submitted its Statement of Defense (the "**Statement of Defense**").

33.     On January 18, 2022, the Claimant submitted its Reply on the Merits and Response on Jurisdiction (the "**Reply**").

34.     On June 25, 2022, the Respondent submitted its Rejoinder and Reply on Jurisdiction (the "**Rejoinder**").

35.     On October 12, 2022, the Claimant submitted its Rejoinder on Jurisdiction (the "**Rejoinder on Jurisdiction**").

36.     On February 28, 2023, the Claimant and the Respondent submitted their Post-Hearing Briefs (the "**Claimant's PHB**" and the "**Respondent's PHB**", respectively).

### 5.     HEARING

37.     On April 28, 2021, the Tribunal reserved the period between December 12 and December 20, 2022 to hold a hearing on all outstanding jurisdiction, merits and quantum issues (the "**Hearing**") and confirmed Miami, Florida as the venue of the Hearing.

38.     On March 25, 2022, after several exchanges with the Parties, the Tribunal re-scheduled the Hearing for the period between December 8 and December 16, 2022 (excluding the intervening weekend).

39.     On August 19, 2022, the Tribunal determined that the Hearing would take place at the Mandarin Oriental Hotel in Miami, Florida.

40.     On October 11, 2022, the Tribunal circulated a draft Procedural Order No. 7, seeking to convene the Hearing and address all other technical and ancillary aspects thereof, and invited the Parties' comments on the draft.

41.     On October 22, 2022, the Parties submitted their comments on draft Procedural Order No. 7.

42.     On October 24, 2022, the Tribunal, the Parties and the PCA held a pre-hearing conference.

43.     On November 1, 2022, the Tribunal circulated an updated version of draft Procedural Order No. 7, revised by the Tribunal following the pre-hearing conference, noting that the Parties should deem its contents to be final subject to fixing the schedule for the Hearing.

44.     On November 2, 2022, the Parties notified their respective lists of witnesses and experts called for cross-examination at the Hearing.

45.     On November 3, 2022, the Parties indicated the order in which their respective witnesses were to appear for examination.

46.     On November 11, 2022, the Parties circulated their respective proposed Hearing schedules.

47.     On November 16, 2022, the Tribunal issued Procedural Order No. 7.

48.     The Hearing was held between December 8 and December 16, 2022 (excluding the intervening weekend) at the Mandarin Oriental Hotel (500 Brickell Key Dr. Miami, FL 33131) and simultaneously by videoconference. The following persons attended the Hearing:

**The Tribunal**

Dr. Andrés Rigo Sureda (Presiding Arbitrator)
Professor Bernard Hanotiau
Professor Brigitte Stern

**The Claimant**

Fabiola Cespedes
Larry Kalban
(*Party representatives*)

Silvia M. Marchili
Andrea Menaker
Michael Garcia
Jonathan Ulrich

8

Estefanía San Juan
Isabella Bellera Landa
Patty Garcia-Linares
Julieta Monteroni
Jacob Bachmaier
Nils Ivars
Arianna Talaie
Dara Jeffries
Erodita Herrera
Patricio Varela Laso
Guillermo Cuevas
Carlos Canellas
Raul Valdez
(*White & Case LLP*)

Javier Robalino
Paola Gachet
Skary Francisco Yépez (*remote*)
(*Robalino Law*)

Fernando Escobar
Christopher Parker
Raymond Falcon
(*Witnesses*)

Ramiro Mendoza
Pedro Aguerrea
Douglas Branch
Amy Meyer
Christopher Sullivan
Jacob Hammond (*remote*)
(*Experts*)

**<u>The Respondent</u>**

Juan Carlos Larrea Valencia
Claudia Salgado Levy
Mauricio Guim
Lily Díaz Granados (*remote*)
Nicole Vásconez (*remote*)
Amparo Miranda (*remote*)
(*Procuraduría General del Estado de la República del Ecuador*)

Raúl B. Mañón
Rostislav Pekař
Digna B. French
Francisco Batlle
David Seidl
María Gómez
Carmen Haché
Joseph Rosa
Alexis Martinez (*remote*)
Fëllënza Limani (*remote*)
Paweł Bukiel (*remote*)
(*Squire Patton Boggs LLP*)

José R. Herrera Falcones
Mauro R. Tejada
(*Witnesses*)

Fabián Andrade Narváez
Tiago Duarte-Silva
Isabel Serrano Salas (*remote*)
Bradley D. Wolf
Andrés Alva
(*Experts*)

**Permanent Court of Arbitration**

José Luis Aragón Cardiel
Javier René Comparini-Cuetto
Luis Popoli (*remote*)

**Court reporters**

David Kasdan
(*Worldwide Reporting*)

Dante Rinaldi (*remote*)
(*D-R Esteno*)

**Interpreters**

Silvia Colla
Daniel Giglio

**Technical support**

Nicholas Wilson
Kurt Dilweg
Iffat Nawaz (*remote*)
Andrew Ramero (*remote*)
(*Law in Order*)

**6.   POST-HEARING MATTERS**

49.   On December 23, 2022, the Parties (i) communicated their agreement regarding the dates for the Parties to submit their proposed corrections to the Hearing transcripts, and (ii) set out their respective positions regarding the format and deadline for the submission of Post-Hearing Briefs.

50.   On January 2, 2023, the Tribunal (i) confirmed the Parties' agreement regarding the procedure for the correction of the Hearing transcripts; and (ii) issued directions for the filing of Post-Hearing Briefs. As noted above, the Claimant's PHB and the Respondent's PHB were filed on February 28, 2023.

51.   On May 12, 2023, the Tribunal invited the Parties to file statements on costs.

52.   On May 26, 2023, the Parties filed their statements on costs (respectively, the "**Claimant's Statement on Costs**" and the "**Respondent's Statement on Costs**").

### III.   STATEMENT OF FACTS

54.   The events described below are a summary of the factual background of the dispute as alleged by the Parties in their submissions. They do not constitute factual findings of the Tribunal. The below summary is also not intended to set out all the facts as alleged by the Parties or all of the Parties' submissions but solely to provide context for the Tribunal's Final Award. Any controverted facts will be noted as they arise.

### 1.   THE PARTIES AND OTHER RELATED ENTITIES

#### 1)   The Claimant and Related Entities

55.   The Claimant was registered in the State of Delaware, United States on January 4, 2002.[6] The Claimant is part of the Worley Group, a global provider of Project Management Consultancy ("**PMC**") services.[7]

56.   The Claimant is wholly owned by Worley Group, Inc., a company incorporated in the State of Delaware.[8] Worley Group, Inc. is 100% owned by WorleyParsons Corporation, also incorporated in the State of Delaware.[9] WorleyParsons Corporation is in turn wholly owned by WorleyParsons US Holding Corporation ("**WorleyParsons US**"), also incorporated in Delaware.[10] Lastly, WorleyParsons US is owned by Worley Limited, a company incorporated in Australia.[11]

57.   WorleyParsons Ecuador S.A. ("**WorleyParsons Ecuador**") was incorporated in Ecuador on July 15, 2014, with WorleyParsons South America Holdings Pty Limited holding 99% ownership and

---

[6]   Certificate of Incorporation of Parsons E&C International Inc., January 4, 2002, and Certificate of Amendment of Certificate of Incorporation, June 15, 2005 (**C-11**); State of Delaware, Certificate of Name Amendment, June 12, 2019 (**C-53**).

[7]   What We Do, Worley (**C-55**).

[8]   Report from the Texas Secretary of State for Worley Group, Inc., March 27, 2020 (**R-10**); Report from the Texas Secretary of State on Worley Group, Inc.'s Prior Names, March 27, 2020 (**R-11**); 2019 Texas Franchise Tax Public Information Report for WPI, May 14, 2019 (**R-12**); DNBi Risk Management Report for WPI, November 21, 2019, p. 4 (**R-31**).

[9]   Report from the Texas Secretary of State for WorleyParsons Corporation, March 26, 2020 (**R-13**); 2019 Texas Franchise Tax Public Information Report for WorleyParsons Corporation, May 14, 2019 (**R-14**); DNBi Risk Management Report for WPI, November 21, 2019, p. 4 (**R-31**).

[10]   2019 Texas Franchise Tax Public Information Report for WorleyParsons US Holding Corporation, May 14, 2019 (**R-15**).

[11]   2019 Texas Franchise Tax Public Information Report for WorleyParsons US Holding Corporation, May 14, 2019 (**R-15**).

Worley SPVI Pty Ltd ("**Worley SPVI**") owning the remaining 1%.[12] Worley Limited directly owns Worley SPVI.[13]

58.     Pursuant to its articles of incorporation, WorleyParsons Ecuador's corporate purpose is the provision of all kinds of professional and technical services to industries dedicated to the generation and distribution of energy, extraction and processing of natural resources, development of infrastructure and environmental management and protection.[14]

### 2)  The Respondent and Related Entities

59.     **Petroecuador** is a public enterprise dedicated to the management of Ecuador's non-renewable natural resources and was established pursuant to Ecuador's Executive Decree No. 315, dated April 6, 2010.[15]

60.     **RDP** is a mixed economy company (*compañía de economía mixta*) organized and incorporated under the laws of Ecuador, 51% of which is owned by Petroecuador and 49% by PDVSA Ecuador, S.A. ("**PDVSA Ecuador**") a wholly owned Ecuadorian subsidiary of Petróleos de Venezuela S.A., the State-owned oil company of Venezuela.[16] RDP's primary activity is the design, construction, operation and maintenance of oil refineries and the production of petrochemicals.[17]

61.     The **Comptroller General** is an officer within the Republic of Ecuador tasked with the supervision of State finances, including initiating administrative proceedings to audit entities that use, or benefit from the use of, public funds.[18]

62.     The **Prosecutor General's Office** (*Fiscalía General del Estado*) is an office within the Republic of Ecuador tasked with the prosecution of criminal charges on behalf of Respondent. It is an autonomous body created under Ecuador's Constitution and enjoys administrative, economic and financial independence.[19]

---

[12]     Incorporation Documents of WorleyParsons Ecuador, July 16, 2014, pp. 1-18 (**R-1(a)**); Incorporation Documents of WorleyParsons Ecuador, August 9, 2014, p. 1 (**R-1(b)**).

[13]     Worley Limited, 2019 Annual Report, 2019, p. 109 (**R-9**); OneStop Report for Worley Limited, November 11, 2019, pp. 21-22 (**R-30**).

[14]     Incorporation documents of WorleyParsons Ecuador, July 16, 2014, First Chapter, Article 4 (**R-1(a)**).

[15]     Esmeraldas Refinery Agreement, p. 23 (**C-3**).

[16]     Constitution of the Company "Refinería del Pacífico RDP Companía de Economía Mixta," Public Deed No. 2,732, July 15, 2008 (**C-79**); PDVSA Ecuador, Shareholder Minutes, May 15, 2008 (**C-80**).

[17]     RDP Bylaws, July 15, 2008 (**R-116**).

[18]     Organic Law of the Comptroller General's Office of the State, published on the Official Gazette No. 595, June 12, 2022, Articles 1, 6, 18 (**C-177**).

[19]     Constitution of the Republic of Ecuador, Article 194 (**RLA-216**).

63.    The **Attorney General's Office** (*Procuraduría General del Estado*) is an office within the Republic of Ecuador that represents Ecuador in judicial proceedings, including in this arbitration. It has no law enforcement or prosecutorial functions.[20]

64.    The **SRI** ("*Servicio de Rentas Internas*") is an administrative agency within the Republic of Ecuador responsible for the collection of taxes and ensuring compliance with the country's tax laws.[21]

### 3)  Other Entities

65.    Tecnazul is a company incorporated in Ecuador that was retained by the Claimant as a subcontractor for most of the Agreements, as further described below.

## 2.    THE PROJECTS

### 1)  Introduction

66.    In the years leading up to Worley's involvement in Ecuador, *via* an initiative dubbed the National Development Plan (*Plan Nacional de Desarrollo*), Ecuador implemented economic policies to develop certain sectors that were deemed strategic, including oil and gas, mining and energy. By focusing on these sectors, Ecuador sought to achieve greater control over its energy resources and to power development in other areas with the aim of attaining energy sovereignty.[22] Among the Projects organized under this initiative were the construction of the Pacific Refinery and the refurbishment of the Esmeraldas Refinery.

67.    The US$ 12 billion Pacific Refinery in El Aromo, Province of Manabí, Ecuador, was designed to have the capacity to produce 300,000 barrels of crude oil per day. The oil processed in the Pacific Refinery would be used in the production of petroleum byproducts for sale.[23] Petroecuador and PDVSA Ecuador established RDP with the purpose of developing this project.[24] Construction began in March 2009.[25]

---

[20]    Constitution of the Republic of Ecuador, Article 237 (**RLA-216**).

[21]    Statement of Defense, para. 269.

[22]    Statement of Claim, paras. 6, 24-31; Reply, paras. 9, 56-73.

[23]    Ministry of Energy and Non-Renewable Natural Resources, *Refinería del Pacífico* (video), February 28, 2011, at 00:01:49-00:02:45, 00:04:33-00:05:34 (**C-70**); Miriam Lucero, "*Refinería del Pacífico Eoy Alfaro", Primer complejo refinador y petroquímico del Ecuador*", Acta Oceanografica del Pacífico. Vol. 17, No. 1, 2012, August 3, 2015 (**C-73**).

[24]    Constitution of the Company "Refinería del Pacífico RDP Companía de Economía Mixta," Public Deed No. 2,732, July 15, 2008, p. 48 (**C-79**).

[25]    RDP's Invitation to Manifest Interest in PMC Contract, September 13, 2010 (**C-90**).

68.    The refurbishment of the Esmeraldas Refinery aimed to overhaul and extend the life of Ecuador's largest refinery, which had fallen into disrepair and was producing at only 80-85% of its capacity.[26]

69.    In order to execute these projects effectively, Ecuador launched an international bidding process to recruit a foreign investor with expertise in the energy industry to serve as project manager and to provide engineering studies and technical assistance.[27]

### 2)   The Pacific Refinery Project

70.    On September 13, 2010, RDP invited Worley to participate in the bid to act as project manager for the construction of the Pacific Refinery.[28] RDP also invited Jacobs Engineering Group Inc., SNC Lavalin Group Inc. and KBR Inc. to submit bids.[29]

71.    Worley submitted its bid in January 2011.[30] Worley planned to complete the project jointly with Tecnazul, an Ecuadorian company that had previous experience in engineering and construction and with other international companies active in Ecuador in the energy and mining sectors.[31]

72.    On March 5, 2011, the President of Ecuador publicly announced the selection of Worley as project manager for the Pacific Refinery Project.[32] Worley's offer had received the highest cumulative score of all those made to Ecuador.[33]

73.    On November 22, 2011, RDP and the Claimant entered into a project management services agreement pursuant to a Government procurement procedure called *giro específico de negocio* (the "**Special Contracting Procedure**").[34] Pursuant to this agreement (the "**Pacific Refinery Agreement**"), the Claimant agreed to "provide all management services necessary for the proper execution of the [construction of the Pacific Refinery]."[35]

---

[26]    Statement of Claim, paras. 8, 32, 40-42; Reply, paras. 13, 15; *Plan Nacional Para el Buen Vivir 2009-2013*, pp. 114, 264-265 (**C-57**); Petroecuador, Master Plan for 2009-2015, March 2010, p. 81 (**C-360**).

[27]    Statement of Claim, para. 9; Reply, para. 18.

[28]    Statement of Claim, para. 45; RDP's Invitation to Manifest Interest in PMC Contract, September 13, 2010 (**C-90**); Elizondo Statement, paras. 11-12 (**CWS-1**).

[29]    Statement of Claim, para. 45; Pacific Refinery Agreement, p. 141 (**C-8**).

[30]    Statement of Claim, para. 46; Commercial Proposal submitted for the Pacific Refinery Agreement, Schedule 4: Mobilization, Re-mobilization, and De-mobilization Cost, June 21, 2011 (**C-31**).

[31]    Statement of Claim, para. 46; Elizondo Statement, para. 14 (**CWS-1**).

[32]    Statement of Claim, para. 47; Republic of Ecuador, *President Address No. 211* (video), at 2:22:24 (**C-144**).

[33]    Statement of Claim, para. 48; Pacific Refinery Agreement, p. C_8_175 (**C-8**).

[34]    Pacific Refinery Agreement, pp. C_8_005-006 (**C-8**).

[35]    Pacific Refinery Agreement, Exhibit A, Clause 5.1 (**C-8**).

74. In particular, Worley's role as project manager entailed the following responsibilities: project management, project control, engineering management, quality management, health, safety, and environment management; contract administration, procurement management, change order management, construction management and commissioning management.[36] Worley was, however, not responsible for managing the project's budget or acting as guarantor for the work of all third parties hired by RDP during the life of the project.[37]

75. As required by the Pacific Refinery Agreement, Worley conducted these activities in two phases.[38] The first phase covered the period from the award and execution of the Pacific Refinery Agreement to completion of the design and commencement of the works.[39] Several contractors were already involved with the first phase when Worley arrived, including SK, Linde and Shaw Consultants International ("**Shaw**").[40] The scope of work for the second phase included engineering, procurement, construction work and support with pre-commissioning, commissioning and start-up.[41] As the sole project manager, Worley supported RDP's efforts in selecting contractors for the second phase and reviewed and commented on deliverables issued by the contractors.[42]

76. In exchange for its efforts, RDP was to compensate the Claimant based on agreed hourly rates with a maximum contract price of approximately US$ 205,574,772.20.[43] The Claimant states that it is also entitled to receive reimbursement of all direct costs incurred by Worley personnel while performing activities for the project.[44]

77. According to the Claimant, Worley fulfilled its obligations under the Pacific Refinery Agreement in a timely and compliant manner.[45] The Claimant maintains that at no point during the execution

---

[36] Statement of Claim, para. 60; Pacific Refinery Agreement, Exhibit A, Clauses 5.1, 5.2, 5.4-5.11 (**C-8**).

[37] Statement of Claim, para. 60; Rejoinder on Jurisdiction, para. 127; Pacific Refinery Agreement, Clause 2.1 and Exhibit A, paras. 214, 237 (**C-8**); Petroecuador Memorandum No. 00944-PRY-DPP-TRA-2014, August, 15 2014 (**C-1111**); Quality Audit Checklist, Agreement No. 2011030, August 25, 2015 (**C-1157**); Letter from Worley to Petroecuador No. 408005-00445-00-PM-LTR-WPI-EPP-5081, July 2, 2014 (**C-1175**); Letter from Worley to Tesca 408005-00445-93.2-PC-LTR-WPI-TES-8656, June 2, 2015 (**C-1176**); Transference Report (excerpt), June 22, 2016 (**C-1177**); Transference Report (excerpt), June 30, 2016 (**C-1178**); Letter from Worley to Petroecuador attaching Transference Reports (excerpt), June 6, 2016 (**C-1179**); Transference Report (excerpt), May 18, 2016 (**C-1194**).

[38] Statement of Claim, para. 61; Pacific Refinery Agreement, Clause 2.1 (**C-8**).

[39] Statement of Claim, para. 61; Elizondo Statement, para. 19 (**CWS-1**).

[40] Statement of Claim, para. 61; RDP Instructions to Bidders, December 17, 2010, para. 1.1 (**C-87**).

[41] Statement of Claim, para. 61; Elizondo Statement, para. 19 (**CWS-1**).

[42] Statement of Claim, para. 61; Elizondo Statement, para. 19 (**CWS-1**).

[43] Statement of Claim, para. 63; Pacific Refinery Agreement, Clauses 4.1, 4.1.3 (**C-8**).

[44] Statement of Claim, para. 63; Pacific Refinery Agreement, Clause 4.1.2 (**C-8**).

[45] Statement of Claim, para. 64.

of the Pacific Refinery Agreement did the Respondent express any dissatisfaction with Worley's work product or any doubts about whether Worley ought to be paid.[46]

78.  On January 10, 2017, RDP notified the Claimant of the suspension of the Pacific Refinery Agreement pursuant to its clause 10.6 (Suspension by owner for convenience).[47]

79.  On July 24, 2018, RDP was ordered to dissolve and forced to enter liquidation by Ecuador's Superintendence of Companies, Securities, and Insurance due to its failure to file shareholder-approved general balances of operations for two consecutive years.[48]

80.  On March 22, 2019, Guillermo Park ("**Mr. Park**"), Contract Administrator of the Pacific Refinery Agreement, executed with Worley a document titled "*Acta de Determinación de Valores Facturados, Pendientes por Facturar y Pendientes de Pago del Contrato* 'Project Management Consultancy (PMC) Support Service Agreement'", which purported to reflect RDP's acknowledgement of the sums owed to Worley under the Pacific Refinery Agreement.[49] Ecuador alleges that Mr. Park did not have the authority to bind RDP to the contents of that document.[50] At this point in time, according to Ecuador, such authority was vested exclusively in RDP's liquidator.[51]

81.  On April 23, 2019, Worley filed a claim in the RDP liquidation process, as required under the Companies Law and RDP's Liquidation Resolution.[52] Worley delivered its claim at an RDP location in Quito, not to the principal office in the canton of Manta, as the Respondent states was required by the RDP Liquidation Resolution.[53] For this reason, according to the Respondent, Worley's debts do not have priority in the liquidation process.[54]

---

[46]  Statement of Claim, paras. 64-67.

[47]  Letter from RDP to Worley No. RDP-GGE-WPR-2017-0017-OFI, January 10, 2017 (**C-111**); Letter from Worley to RDP, No. RDP-WPR-ADC-2017-1266-0FI, January 12, 2017 (**C-112**).

[48]  Resolution No. SCVS-IRP-2018-00006404, July 24, 2018 (**R-238**).

[49]  RDP Minutes on the Determination of Amounts, March 22, 2019 (**C-117**).

[50]  Statement of Defense, para. 97; Herrera Statement, paras. 10-11 (**RWS-1**); Andrade Report I, paras. 51-53 (**RER-1**).

[51]  Statement of Defense, para. 97; Ecuador Companies Law, Articles 367, 369 (**RLA-72**); Herrera, para. 11 (**RWS-1**); Andrade Report I, paras. 51-53 (**RER-1**).

[52]  Letter from Worley to RDP, RDP-WPR-ADC-2019-005-0H, April 23, 2019 (**C-167**); Liquidation Resolution for Refinería del Pacífico, March 12, 2019, p. 2 (**R-95**); Companies Law, Articles 362-364 (**RLA-72**).

[53]  Statement of Defense, para. 103; Liquidation Resolution for Refinería del Pacífico, March 12, 2019 (**R-95**).

[54]  Statement of Defense, para. 104.

### 3) The Esmeraldas Refinery Project

82. On April 29, 2011, Petroecuador requested approval from Ecuador's National Institute for Public Procurement (*Instituto Nacional de Contratación Pública*) to use the public contracting regime for the hiring of a project manager for the Esmeraldas Refinery Project,[55] which it obtained on June 6, 2011.[56]

83. On July 5, 2011, Petroecuador sent a letter to the Claimant inviting it to participate, alongside SNC Lavalin, KBR, and Jacobs Engineering, in the bidding process for the award of a project management agreement for the Esmeraldas Refinery Project.[57]

84. On August 2, 2011, Worley submitted its proposal,[58] wherein the Claimant stated its plan to work with Tecnazul as an Ecuadorian subcontractor.[59]

85. On September 20, 2011, Petroecuador's Technical Commission in charge of the evaluation process determined that Worley's offer met all the legal, technical, and economic requirements for developing the project.[60] On this basis, the Technical Commission recommended that Petroecuador award the contract to Worley.[61]

86. On November 14, 2011, pursuant to the Special Contracting Procedure, the Claimant and Petroecuador entered into a contract for the oversight and management of the refurbishment program of the Esmeraldas Refinery (the "**Esmeraldas Refinery Agreement**").[62] The Claimant thereby agreed to provide the services set out in its offer bid within 24 months from the execution of the agreement.[63]

87. The services rendered by Worley pursuant to the Esmeraldas Refinery Agreement included the management of the engineering, procurement and construction works.[64] Worley also hired a

---

[55] Esmeraldas Refinery Agreement, Clause 1.2 (**C-3**).

[56] Proposal Evaluation for the Esmeraldas Agreement, Memorandum No. 25155-RCTR-CTE-2011, September 20, 2011, para. 1.6 (**C-93**).

[57] Proposal Evaluation for the Esmeraldas Agreement, Memorandum No. 25155-RCTR-CTE-2011, September 20, 2011, para. 1.7 (**C-93**); Letter No. 1327-RGER-CTR-2011, July 5, 2011 (**C-294**).

[58] Proposal Evaluation for the Esmeraldas Agreement, Memorandum No. 25155-RCTR-CTE-2011, September 20, 2011, para. 1.24 (**C-93**).

[59] Commercial Proposal for the Esmeraldas Agreement, July 26, 2011, pp. R-28_350-395 (**R-28**).

[60] Proposal Evaluation for the Esmeraldas Agreement, Memorandum No. 25155-RCTR-CTE-2011, September 20, 2011, Section 2 (**C-93**).

[61] Proposal Evaluation for the Esmeraldas Agreement, Memorandum No. 25155-RCTR-CTE-2011, September 20, 2011, Section 3 (**C-93**).

[62] Esmeraldas Refinery Agreement, Clause 1.4 (**C-3**).

[63] Esmeraldas Refinery Agreement, Clauses 4, 7.1 (**C-3**).

[64] Esmeraldas Refinery Agreement, p. C_3_068 (**C-3**).

project manager, auditor, procurement supervisor, engineering manager and construction manager, among others.[65] In addition, Worley was tasked with transferring information and training local personnel.[66]

88.   In exchange for the aforementioned services, Petroecuador was to compensate the Claimant for its services with an estimated amount of US$ 38,600,764, plus a number of reimbursable costs.[67] Under the Esmeraldas Refinery Agreement, Worley was also entitled to receive reimbursement for relocation costs incurred by Worley's personnel, including business travel, business meals, and certain living expenses.[68]

89.   Worley's role as project manager did not include managing the project's budget or acting as guarantor for work completed by third parties hired by Petroecuador.[69] According to the Claimant, under the Esmeraldas Refinery Agreement[70] and Ecuadorian law[71] Petroecuador was to designate a contract administrator responsible for ensuring full and timely compliance with the execution of the works and, in the event of non-compliance, impose sanctions and penalties.

90.   Under the Esmeraldas Refinery Agreement, Worley could not subcontract all or part of its services without Petroecuador's "prior written authorization" and any subcontracting, when authorized, could "not exceed 30% of the total value of the principal contract."[72] For any work it validly subcontracted, Worley remained "exclusively responsible to [Petroecuador] for the acts or omission of its subcontractors and the persons directly or indirectly employed by them."[73]

91.   The Esmeraldas Refinery Agreement also provided that the parties were allowed to enter into complementary agreements to overcome technical difficulties and unforeseen circumstances.[74] The parties did so on six occasions between September 2012 and October 2015 (the "**Esmeraldas**

---

[65]   Statement of Claim, para. 71; Esmeraldas Refinery Agreement, p. C_3_277 (**C-3**).

[66]   Statement of Claim, para. 71; Esmeraldas Refinery Agreement, p. C_3_274 (**C-3**).

[67]   Esmeraldas Refinery Agreement, Clauses 15-16 (**C-3**); Refurbishment Complementary Agreement No. 2014051, October 17, 2014, Clause 1 (**C-23**).

[68]   Statement of Claim, para. 73; Esmeraldas Refinery Agreement, Annex 1, Clauses 3.3, 4.1 (**C-3**).

[69]   Statement of Claim, para. 72; Esmeraldas Refinery Agreement, Clause 20 and Annex 3 (**C-3**).

[70]   Esmeraldas Refinery Agreement, Clauses 20, 21 (**C-3**).

[71]   Public Procurement Regulation, Article 121 (**C-179**).

[72]   Esmeraldas Refinery Agreement, Clause 21 (**C-3**).

[73]   Esmeraldas Refinery Agreement, Clause 21 (**C-3**).

[74]   Esmeraldas Refinery Agreement, Clause 15 (**C-3**).

**Refinery Complementary Agreements**").[75] The stated purpose of these Complementary Agreements was to:

(i)   Provide additional support, including quality control, industrial safety, management and engineering, organizational assessment and inspection of critical equipment, estimated at US$ 25.5 million;[76]

(ii)   Supervise agreements executed between Petroecuador and the companies Tesca, KBC Eagleburgmann and provide a plan for improving fuels in the Refinery, estimated at US$ 37 million;[77]

(iii)   Manage and supervise the electrical improvement plan and a study of the quality of asphalt produced in the refinery, estimated at US$ 12.5 million;[78]

(iv)   Manage and supervise additional projects, including the disposal of dangerous material, maintenance of tanks for the storage of crude oil, design and construction of facility for scrap material and a plant for the treatment of hazardous material, estimated at US$ 19.7 million;[79] and

(v)   Manage and supervise existing and new projects related to operative issues, maintenance, and technical criteria requiring additional man-hours and employees, estimated at US$ 57.4 million.[80]

---

[75]   Statement of Claim, para. 79; Refurbishment Complementary Agreement No. 2012036, September 28, 2012, Clauses 3, 4.1 (**C-19**); Refurbishment Complementary Agreement No. 2013027, August 28, 2013, Clauses 3, 4 (**C-20**); Refurbishment Complementary Agreement No. 2014015, April 2, 2014, Clauses 3, 4 (**C-21**); Refurbishment Complementary Agreement No. 2014048, October 9, 2014, Clauses 3, 4 (**C-22**); Refurbishment Complementary Agreement No. 2014051, October 17, 2014, Clause 3 (**C-23**); Refurbishment Complementary Agreement No. 2015205, October 29, 2015, Clauses 3, 4 (**C-24**).

[76]   Statement of Claim, para. 79; Refurbishment Complementary Agreement No. 2012036, September 28, 2012, Clauses 3, 4.1 (**C-19**).

[77]   Statement of Claim, para. 79; Refurbishment Complementary Agreement No. 2013027, August 28, 2013, Clauses 3, 4 (**C-20**).

[78]   Statement of Claim, para. 79; Refurbishment Complementary Agreement No. 2014015, April 2, 2014, Clauses 3, 4 (**C-21**).

[79]   Statement of Claim, para. 79; Refurbishment Complementary Agreement No. 2014048, October 9, 2014, Clauses 3, 4 (**C-22**).

[80]   Statement of Claim, para. 79; Refurbishment Complementary Agreement No. 2015205, October 29, 2015, Clauses 3, 4 (**C-24**).

92.     Five of the six aforementioned Complementary Agreements entailed expanding the scope of work for which the Claimant was responsible. Together, they increased the value of the Esmeraldas Refinery Agreement approximately by US$ 150 million.[81]

93.     The Esmeraldas Refinery Project was concluded on December 17, 2015, with the reopening of the Esmeraldas Refinery at full capacity.[82] By letters dated June 30, 2016, and July 15, 2016, Petroecuador and the Claimant agreed to terminate the Esmeraldas Refinery Agreement and its Complementary Agreements.[83]

### 4)   The Machala Plant Project

94.     The Machala Plant Project is located in Bajo Alto, Province of El Oro, in northwest Ecuador. It supplies liquefied petroleum gas to three of Ecuador's largest cities.[84]

95.     Pursuant to Resolution No. 396-ARCH-2013 of Ecuador's Hydrocarbon Regulation and Control Agency (*Agencia de Regulación y Control Hidrocarburífero*), Petroecuador was charged with executing a technical inspection and supervision of the works conducted in the Machala Plant Project.[85]

96.     In February 2014, Petroecuador pre-selected and invited Worley to submit a bid for an agreement to conduct the technical inspection and supervision of works in the Machala Plant Project on Petroecuador's behalf.[86] Worley submitted its bid on February 20, 2014.[87]

---

[81]    Agreement No. 2014187 between Petroecuador and the Claimant for the Study of the Re-Engineering and Construction of the Drainage System of the Esmeraldas Refinery, July 25, 2014 (**C-4**); Agreement for Detail Engineering of Merox 200, Merox 300 and Waste Waters Z3, No. 2014070, December 20, 2014 (**C-5**); Refurbishment Complementary Agreement No. 2012036, September 28, 2012, Clause 3.1 (**C-19**); Refurbishment Complementary Agreement No. 2013027, August 28, 2013, Clause 4 (**C-20**); Refurbishment Complementary Agreement No. 2014015, April 2, 2014, Clause 4 (**C-21**); Refurbishment Complementary Agreement No. 2014048, October 9, 2014, Clause 4(**C-22**); Refurbishment Complementary Agreement No. 2015205, October 29, 2015, Clause 4 (**C-24**); Drainage Complementary Agreement No. 2015449, November 26, 2015 (**C-25**); Merox Complementary Agreement No. 2015197, October 20, 2015 (**C-26**).

[82]    El Comercio, *Refinería Esmeraldas, a máxima capacidad tras 7 años de rehabilitación*, December 18, 2015 (**C-85**).

[83]    Letter from Petroecuador to Worley, No. 18396-CCI-OSC-2016, June 30, 2016 (**C-168**); Letter from Worley to Petroecuador, No. 408005-00445-00.0-PM-LTR-WPI-EPP-13055, July 15, 2016 (**C-169**).

[84]    La Hora, Bajo Alto cuenta con la primera Planta de Licuefacción en Latinoamérica, January 21, 2011 (**C-128**).

[85]    Machala Plant Agreement I, Clauses 1.4-1.5 (**C-6**); La Hora, *Bajo Alto cuenta con la primera Planta de Licuefacción en Latinoamérica*, January 21, 2011 (**C-128**).

[86]    Machala Plant Agreement I, Clause 21 (**C-6**); Bidding papers for the Specialized Technical Assistance of the Natural Liquefied Gas, RE-005-EPP-OSC-S-14, February 20, 2014, pp. C-127_005-009 (**C-127**).

[87]    Worley's Commercial Proposal for the Specialized Technical Assistance of the Natural Liquefied Gas Plant, February 20, 2014, p. 1 (**C-129**).

97.  On March 5, 2014, through the Special Contracting Procedure, Petroecuador and Worley entered into an agreement under which Worley would provide the aforementioned services (the "**Machala Plant Agreement I**").[88] Under the Machala Plant Agreement I, Petroecuador agreed to compensate the Claimant for activities conducted on a monthly basis, with a maximum contract price of approximately US$ 1,057,286.[89]

98.  The Machala Plant Agreement I provided that the parties to the agreement could conclude complementary agreements under justified circumstances.[90] In accordance with this provision, Petroecuador and the Claimant concluded two complementary agreements on August 1 and November 14, 2014 (the "**Machala Plant Complementary Agreements**"), which increased the Claimant's compensation by US$ 250,740.00 and US$ 489,169.84, respectively.[91]

99.  On July 3, 2018, Petroecuador and the Claimant signed a certificate confirming the final receipt of the technical services provided by the Claimant in accordance with the Machala Plant Agreement I and its Complementary Agreements.[92]

100. On June 6, 2015, following the Special Contracting Procedure,[93] Petroecuador and the Claimant entered into a second agreement for the provision of specialized technical assistance at the Liquefaction Plant (the "**Machala Plant Agreement II**;" together with the Machala Plant Agreement I, the "**Machala Plant Agreements**").[94] The Machala Plant Agreement II provided that its term would be 365 days and that the maximum price of the contract would be US$ 1,799,660.00.[95]

101. On June 25, 2018, Petroecuador and the Claimant signed a certificate confirming the final receipt of the technical services provided by the Claimant in accordance with the Machala Plant Agreement II.[96]

---

[88]  Machala Plant Agreement I, Clause 4 (**C-6**).

[89]  Machala Plant Agreement I, Clauses 5-6 (**C-6**).

[90]  Machala Plant Agreement I, Clause 17.1 (**C-6**).

[91]  Machala Payment Agreement No. 2015006, December 4, 2015 (**C-9**); Machala Plant I Complementary Agreement No. 2014191, August 1, 2014, Clauses 2-4 (**C-27**); Machala Plant I Complementary Agreement No. 2014286, November 14, 2014, Clauses 2-3 (**C-28**).

[92]  Machala Plant I Termination Agreement, July 3, 2018 (**C-173**).

[93]  Machala Plant Agreement II, Clauses 1.4-1.8, 1.12-1.15 (**C-7**).

[94]  Machala Plant Agreement II (**C-7**).

[95]  Machala Plant Agreement II, Clause 1.24 (**C-7**).

[96]  Machala Plant II Termination Agreement, June 25, 2018 (**C-174**).

### 5) The Monteverde Project

102. The Monteverde Project, located in the province of Santa Elena, involved the construction of a gas terminal with a dock for the discharge of propane and butane.[97]

103. On August 13, 2015, Worley submitted a proposal to Petroecuador detailing the works that would be required to bring the project to completion.[98]

104. On August 27, 2015, Petroecuador accepted Worley's proposal and asked that Worley provide a Personnel Authorization Assignment Form, which would identify the personnel participating in the Monteverde Project.[99]

105. Despite the Claimant's involvement in this project from December 2015 to April 2016,[100] Worley and Petroecuador never entered into a formal agreement to establish the terms and conditions of the contract. According to the Claimant, no written agreement was adopted because Petroecuador repeatedly ignored Worley's requests that the parties do so.[101] The Respondent rebuts that no written agreement entered into force because the Claimant did not secure the assent of an employee authorized to bind Petroecuador.[102]

106. The Claimant submits that its works for the Monteverde Project were prematurely terminated at Petroecuador's request on April 29, 2016.[103]

107. According to the Claimant, approximately US$ 615,000 are due to Worley for the provision of its services in connection with the Monteverde Project.[104]

### 3. THE SUSPENSION OF PAYMENTS TO WORLEY

108. In April 2016, the International Consortium of Investigative Journalists issued a report with findings from a trove of 11.5 million leaked documents from Panamanian law firm, Mossack

---

97   Ekosnegocios.com, Sistema de GLP, Monteverde-Chorrillo, Una megaobra que beneficia a todo el Ecuador, November 2014, p. C-18_31 (**C-18**).

98   Letter from Worley to Petroecuador, August 13, 2018, pp. 35-40 (**C-10**).

99   Letter from Worley to Petroecuador, August 13, 2018, pp. 35, 59 (**C-10**).

100  Statement of Claim, para. 97.

101  Statement of Claim, para. 95.

102  Rejoinder, para. 297.

103  Statement of Claim, para. 124; Monteverde Closing Report, May 5, 2016, p. 4 (**C-175**).

104  Letter from Worley to Petroecuador, August 13, 2018, p. 5 (**C-10**).

PCA Case No. 2019-15
Final Award

Fonseca (the "**Panama Papers**").[105] The report identified Panamanian and other offshore entities owned by Petroecuador employees, Carlos Pareja ("**Mr. Pareja**") and Álex Bravo ("**Mr. Bravo**"), among others.[106]

109.    Beginning in April 2016, Ecuador's National Assembly launched investigations in connection with the corruption scandal stemming from the Panama Papers.

110.    On October 21, 2016, the Legal Secretary of the Office of the President of the Republic of Ecuador sent a communication to Petroecuador's General Manager, Pedro Merizalde ("**Mr. Merizalde**"), describing preliminary measures issued by an Ecuadorian court in corruption-related criminal proceedings involving former Petroecuador employees and on that basis requesting that he instruct his personnel to halt any payments to any of the entities that appeared listed in the communication or their "related companies" (the "**Presidential Communication**").[107] Tecnazul appeared as a listed company. To explain the decision to halt payment to several contractors, including Tecnazul, in the wake of the Panama Papers, the Parties recount the information concerning these contractors that came to light, which is summarized in the next section.[108]

111.    On October 27, 2016, Petroecuador notified the Claimant that it was suspending any negotiations and payments to Worley as well, more precisely that it was suspending payment under the Esmeraldas Refinery Agreement and the Esmeraldas Refinery Complementary Agreements.[109] Petroecuador based this decision on the Presidential Communication, as well as a decision by the Superintendent of the Esmeraldas Refinery, which categorized the Claimant as a company "related to" Tecnazul.[110]

112.    While Worley's name was not included in the Presidential Communication, its name was added by hand to a hard copy of that communication (the "**Petroecuador Memorandum**").[111] The Claimant submits that no explanation has been provided for the addition of Worley's name, of the

---

[105]    International Consortium of Investigative Journalists, *The Panama Papers: Exposing the Rogue Offshore Finance Industry*, August 21, 2019 (**R-207**); The Guardian, *What You Need to Know About the Panama Papers*, April 5, 2016 (**R-208**).

[106]    Statement of Defense, para. 234.

[107]    Letter from Alexis Mera No. T.J.901-SGJ-16-624, October 21, 2016 (**C-36**).

[108]    Statement of Defense, para. 236-268.

[109]    Email from Leoncio Córdova (Petroecuador) to Azdrubal Calero, Alejandro Guerrero, October 27, 2016 (**C-149**).

[110]    Report on the Status of the Refurbishment Agreement and its Complementary Agreements, Memorandum No. 00261-OPE-REE-MAN-PMR-2017, March 30, 2017, pp. 25-26 (**C-38**); Email from Leoncio Córdova (Petroecuador) to Azdrubal Calero, Alejandro Guerrero, October 27, 2016 (**C-149**).

[111]    Petroecuador Memorandum No. 00402-RREF-REE-IRE-2016, October 28, 2016 (**C-406**).

criteria used to establish that Worley was "related to" Tecnazul, or why relatedness justified the termination of payments.[112]

113.   The Respondent claims not to know why Worley's name was added in handwriting to the list of entities to whom no payment could be made but maintains that the decision to add Worley's name was the result of a "unilateral interpretation" from the Superintendent of the Esmeraldas Refinery rather than of undue influence emanating from the Office of the President.[113] Worley replies that the Respondent has not proved that any particular official wrote Worley's name on the memorandum, notwithstanding the fact that the memorandum came from the office of the Superintendent.[114]

114.   According to the Claimant, the following payments for services it provided remain outstanding further to the Presidential Communication:

   (i)     Payments due under the Pacific Refinery Agreement amount approximately to US$ 37,000,000.[115]

   (ii)    Outstanding payments in connection with the Esmeraldas Refinery Project exceed US$ 40,000,000.[116]

   (iii)   Outstanding payments under the Machala Plant Agreements amount to US$ 2,048,424.[117]

   (iv)    Payment of works performed for the Monteverde Project exceed US$ 615,000.[118]

115.   The Parties disagree on whether the Presidential Communication is the cause of the alleged non-payments and the liability that arises out of it.

---

[112]   Statement of Claim, paras. 106, 112; Reply, para. 268; Rejoinder on Jurisdiction, para. 88.

[113]   Rejoinder, paras. 316-317.

[114]   Reply, para. 269.

[115]   Notice of Arbitration, para. 30; Statement of Claim, para. 117; RDP Minutes on the Determination of Amounts, March 22, 2019, Clause 3 (**C-117**).

[116]   Statement of Claim, para. 121; Branch Report, para. 6 (**CER-2**).

[117]   Statement of Claim, paras. 122-123; Machala Plant I Termination Agreement, p. 3 (**C-173**); Machala Plant II Termination Agreement, June 25, 2018, p. 3 (**C-174**).

[118]   Statement of Claim, para. 124; Branch Report, para. 6 (**CER-2**).

116. The Claimant maintains that the issuance of the Presidential Communication triggered the cessation of payments to Worley by RDP and Petroecuador under the Agreements between the parties, thus rendering Ecuador liable for any non-payment.[119]

117. First, according to the Claimant, the Presidential Communication did instruct Petroecuador and RDP to stop making payments to Worley.[120] In its view, the Respondent has failed to provide evidence to support its position that the decision not to compensate Worley resulted from the unilateral interpretation of the Superintendent of the Esmeraldas Refinery (as expressed in the Petroecuador Memorandum) rather than of orders from the President of the Republic.[121] In fact, says Worley, several documents prove that Petroecuador and RDP interpreted the Presidential Communication as an order to cease payment.[122]

118. Second, for the Claimant, the misnamed and purported "illiquidity" experienced by RDP and Petroecuador, which the Respondent cites as the central reason for the failure to make the above payments, allegedly derives from the Ministry of Economy and Finance's refusal to disburse funds previously approved and allocated for Worley's compensation.[123]

119. Lastly, regarding liability, the Claimant holds that the Respondent maintains *de facto* control over RDP and Petroecuador, such that the Respondent can be made to answer for their debts.[124]

120. The Respondent disagrees with the Claimant's position.[125] For the Respondent, the omission of Worley's name from the Presidential Communication implies that Worley is wrongly attempting to hold Ecuador accountable for Petroecuador's independent interpretation of the

---

[119]  Statement of Claim, paras. 106-125; Reply, paras. 265-276.

[120]  Statement of Claim, paras. 106-125; Reply, para. 267; Rejoinder on Jurisdiction, para. 3; Letter from Alexis Mera No. T.J.901-SGJ-16-624, October 21, 2016 (**C-36**).

[121]  Reply, para. 269.

[122]  Statement of Claim, paras. 109-110, 112; Reply, paras. 270-273; Final Technical and Economic Report for the Refurbishment Agreement, Memorandum No. 00518-OPE-REE-MAN-PMR-2017, August 1, 2017, p. 29 (**C-34**); Report on the Status of the Refurbishment Agreement and its Complementary Agreements, Memorandum No. 00261-OPE-REE-MAN-PMR-2017, March 30, 2017, paras. 25-26 (**C-38**); WorleyParsons Exchange of Emails with Subject Oficio No. T.J.901-SGJ-16-624, November 10, 2016, Worley Email (**R-231**); Petroecuador Memorandum No. 00010-RREF-REE-IRE-2017, January 9, 2017, p. 4 (**R-262**); Petroecuador Memorandum No. 00402-RREF-REE-IRE-2016, October 28, 2016 (**C-406**); Report on the Status of the Refurbishment Agreement and its Complementary Agreements, Memorandum No. 00794-OPE-REE-MAN-PMR-2017, December 4, 2017, p. 25 (**C-576**); Petroecuador Accountability Report for 2018, 2018, p. 61 (**C-691**); Petroecuador Memorandum, November 8, 2016 (**C-835**).

[123]  Reply, paras. 228-230; Resolution Minute No. 008, April 14, 2016 (**C-500**); Petroecuador's Audited Financial Statements for 2017 and 2018, December 23, 2018, p. 31 (**C-690**); El Universo, *Although Ecuador Offered the Oil as Collateral, Interest Rates Were Not Reduced*, December 11, 2017 (**C-874**); Parker Statement II, para. 25 (**CWS-4**).

[124]  Statement of Claim, paras. 276-300.

[125]  Statement of Defense, paras. 393-400; Rejoinder, paras. 229-243, 309-325.

Communication;[126] in its view, none of the documents submitted by the Claimant express any order to stop payment to Worley.[127]

121.   First, the Respondent observes that RDP made a US$ 5 million payment to Worley in January 2017 (*i.e.* months after the issuance of the Presidential Communication).[128] If the Presidential Communication had actually ordered the termination of all payments to Worley, Ecuador reflects, Petroecuador would not have attempted to negotiate with Worley in order to find a mutually agreeable means of liquidating the contract.[129]

122.   Second, the Respondent also submits that the reasons for suspension of payments were unrelated to the Presidential Communication: the principal reason for RDP's and Petroecuador's failures to pay their debts to Worley is that both entities are and have been experiencing liquidity problems, of which Worley was aware.[130] The Respondent notes that approximately five months before the Presidential Communication was issued, Petroecuador recommended terminating the Esmeraldas Refinery Agreement due to its "inability to sustain further work exceeding the contract's budget during year 2016."[131] According to the Respondent, this termination would have entailed the suspension of payments to Worley.[132]

123.   In this respect, the Respondent considers baseless the Claimant's suggestion that the refusal by the Ministry of Finance to disburse funds to Petroecuador and RDP was the cause of the alleged illiquidity and, even if, *arguendo*, the Ministry of Finance had provided such funds, it could not have controlled how Petroecuador used them.[133]

---

[126]   Rejoinder, para. 315.

[127]   Rejoinder, paras. 319-321; WorleyParsons Exchange of Emails with Subject *Oficio No. T.J.901-SGJ-16-624*, November 11, 2016 (**R-231**); Petroecuador's Certification regarding the Officio 16-624 and the Superintendent's Memorandum, May 30, 2022, pp. 1, 2, 4 (**R-409**); Petroecuador's Esmeraldas Status Report, August 1, 2017, p. 29 (**C-34**); Report on the Status of the Refurbishment Agreement and its Complementary Agreements, Memorandum No. 00261-OPE-REE-MAN-PMR-2017, March 30, 2017, p. 26 (**C-38**); Report on the Status of the Refurbishment Agreement and its Complementary Agreements, Memorandum No. 00794-OPE-REE-MAN-PMR-2017, December 4, 2017, p. 26 (**C-576**); Petroecuador Memorandum, November 8, 2016, pp. 1, 2 (**C-835**).

[128]   Statement of Defense, para. 397; Rejoinder, para. 232; Elizondo Statement, paras. 22, 24 (**CWS-1**).

[129]   Rejoinder, para. 325; Andrade Report II, paras. 107-108 (**RER-4**).

[130]   Rejoinder, para. 217.

[131]   Statement of Defense, para. 157; Rejoinder, para. 311; Petroecuador Memo 00356-OPE-REE-MAN-PMR-2016, May 24, 2016, p. 7 (**R-151**).

[132]   Rejoinder, para. 311.

[133]   Rejoinder, paras. 225-227, 300; RDP's Bank Receipts Showing the Source of the USD $5 Million Payment to Worley, October 3, 2017 (**R-479**).

124.   The Respondent cites other reasons for non-payment, such as (i) the Claimant's failure to fulfil mandatory requirements to obtain payment;[134] (ii) several of the Agreements exceeding the maximum subcontracting limit under Ecuador's *Ley Orgánica del Sistema Nacional de Contratación Pública* (the "**Public Procurement Law**");[135] (iii) Worley's subcontracting of Tecnazul without Petroecuador's prior authorization;[136] (iv) the Claimant's requesting payment for services outside of the scope of the Agreements or for which no payroll is on file;[137] and (v) the inexistence of a right to payment until any dispute as to amounts is resolved through the mandatory procedure foreseen in Ecuador's Public Procurement Law.[138]

125.   Lastly, the Respondent notes that the Presidential Communication has no legal force under Ecuadorian law, such that RDP and Petroecuador were not obliged to comply with it.[139] In any case, the Respondent argues that it was not party to Worley's Agreements and that the actions of RDP or Petroecuador are not attributable to it; accordingly, Ecuador could not comply with those entities' contractual obligations or be liable for their actions.[140]

**4.    THE JUDICIAL AND ADMINISTRATIVE PROCEEDINGS INVOLVING THE PARTIES**

126.    The Claimant alleges that the Respondent held a "harassment campaign" against it through proceedings and investigations launched by the Comptroller General, the Prosecutor General and the SRI.[141] According to the Claimant, those actions amount to breaches of several standards in the Treaty, including fair and equitable treatment – Article II(3)(a) –[142] the prohibition against unlawful expropriation – Article III(1) –[143] full protection and security – Article III(3)(a) –[144] and

---

[134]    Rejoinder, paras. 244-249, 259.

[135]    Rejoinder, para. 291; Public Procurement Law, Article 79 (**RLA-52**).

[136]    Rejoinder, para. 291; Machala Plant Agreement I, Clause 13.1 (**C-6**); Letter from Worley to Petroecuador, August 13, 2018, p. C-10_31 (**C-10**); Contraloría General del Estado Audit Report No. DASE-0066-2015, December 18, 2015, p. 34 (**R-62**); Machala Plant Agreement II, Clause 12.1 (**R-186**).

[137]    Rejoinder, paras. 261, 287.

[138]    Rejoinder, para. 289.

[139]    Statement of Defense, para. 395; Andrade Report I, para. 103 (**RER-1**).

[140]    Statement of Defense, para. 468; Rejoinder, paras. 192-195, 198-199, 201-204, 208, 250-254, 307; RDP Bylaws, July 15, 2008, Articles 13, 16, 19(2)-(3),(8), 39 (**R-116**); RDP's Communication No. 00104-RDP-2011, January 26, 2011 (**R-125**); Decreto Ejecutivo No. 315, Article 1 (**R-143**); Decreto Ejecutivo 1221, Article 1 (**R-144**); RDP Refinery Contract, p. C_8_173 (**C-8**); *Plan Nacional de Desarrollo 2007-2010*, p. 42 (**C-56**); Andrade Report I, para. 16 (**RER-1**).

[141]    Statement of Claim, paras. 171, 186, 215-216, 251-255, 329; Reply, paras. 39, 575, 624.

[142]    Statement of Claim, para. 259; Reply, paras. 612-617.

[143]    Statement of Claim, paras. 311, 329.

[144]    Statement of Claim, paras. 351-352; Reply, para. 703.

non-impairment – Article II(3)(b) –.[145] The Respondent rejects the Claimant's narrative of the underlying events and of each of these proceedings.[146]

127.   The events surrounding those proceedings and related discovery proceedings initiated by Petroecuador against Worley before United States courts are relevantly summarized below.

### 1)   Comptroller General Reviews Worley's Projects in Ecuador

128.   Starting in 2016, the Comptroller General of Ecuador issued a number of rulings determining that the Claimant is liable for certain actions and omissions related to its performance of the Agreements with RDP and Petroecuador (the "**Comptroller General's Resolutions**").[147]

129.   According to the Claimant, the Comptroller General's Resolutions found Worley liable for millions of dollars, *inter alia* on the following grounds: (i) a category of work awarded by Petroecuador in one of the Esmeraldas Refinery Complementary Agreements was already included within the scope of the Esmeraldas Refinery Agreement;[148] (ii) the price of an agreement for engineering work related to water plants at the Esmeraldas Refinery was higher than the estimated budget for the project complemented thereunder;[149] (iii) Worley recommended third-party contractors who, after being approved and hired, charged in excess of Petroecuador's estimated budget for services rendered;[150] and (iv) Worley failed properly to perform its role as project manager with respect to the supervision of subcontractors.[151]

130.   The Claimant is generally critical of these proceedings.[152] According to the Claimant, the Comptroller General commenced these proceedings in order for Ecuador to avoid fulfilling its payment obligations to Worley, even though the Claimant contends that there is no legal basis for suspending payment under a contract because of an ongoing audit or investigation.[153] Also, the

---

[145]   Statement of Claim, paras. 363-364; Reply, paras. 714, 720.

[146]   Statement of Defense, paras. 366-373, 407-410, 438, 484-501; Rejoinder, para. 562.

[147]   Statement of Claim, paras. 126-164.

[148]   Statement of Claim, para. 136; Comptroller Resolution 15447, November 21, 2018 (**C-186**); Comptroller General's Office Resolution No. 15446, November 21, 2018 (**C-216**).

[149]   Comptroller General's Office Resolution 15339, November 15, 2018 (**C-185**).

[150]   Comptroller General's Office Resolution No. 15112, October 24, 2018 (**C-49**); Comptroller General's Office Resolution No. 15346, November 15, 2018 (**C-181**); Comptroller General's Office Resolution No. 15615, December 26, 2018, p. 3 (**C-184**); Comptroller General's Office Resolution No. 5438, November 21, 2018 (**C-341**); Comptroller General's Office Resolution No. 5437, November 21, 2018 (**C-342**); Comptroller General's Office Resolution No. 20834, November 4, 2021 (**C-543**).

[151]   Comptroller General's Office Resolution No. 15346, November 15, 2018 (**C-181**).

[152]   Rejoinder on Jurisdiction, para. 278.

[153]   Statement of Claim, paras. 126-127; Letter from RDP to Worley, No. RDP-ADC-WPR-111011-0509-OFI, January 29, 2019 (**C-166**).

Claimant notes that the Comptrollers General who approved the issuance of contingencies against Worley, Carlos Pólit and Pablo Céli de la Torre, have been subject to investigation and prosecution for corruption.[154]

131. Regarding the substance of the Comptroller General's Resolutions, the Claimant avers that most of the findings of liability disregard time limits imposed by Ecuadorian law.[155] It also submits that the Comptroller General did not perform an analysis as to causation and damages, but rather set arbitrary liabilities without explanation.[156]

132. The Respondent calls Worley's claims "selective."[157] It indicates that many other RDP and Petroecuador contractors had their agreements and services audited.[158] The Respondent also notes that the Claimant has challenged the Comptroller General's decisions before Ecuadorian courts and received favorable rulings in two cases.[159] Lastly, the Respondent mentions that in one audit the Comptroller General found that Worley was due an additional US$ 10.3 million.[160]

### 2) SRI Audits Worley's Income Tax Statements

133. The SRI conducted audits on Worley's tax returns of 2012, 2014, 2015, and 2016.[161] While in the first audit the SRI concluded that Worley had correctly reported its expenses and was entitled to a tax credit,[162] on the latter three it found the Claimant liable and issued corresponding fines.[163]

---

[154] Statement of Claim, paras. 102, 133, 194, 252; Reply, para. 310; El Universo, *A Preparatory Hearing for Las Torres Trial Was not set up; there Were Requests from Lawyers*, September 21, 2021 (**C-417**); El Universo, *Office of the Attorney General Requested the Execution of the Sentence by Conclusion against Former Comptroller Carlos Pólit*, August 8, 2021 (**C-591**); Associated Press, *Ecuador Comptroller General Resigns from Prison*, July 5, 2021 (**C-592**); El Comercio, *Public Prosecutor Salazar Announces that there Are 18 Investigations against Former Comptroller Pablo Céli*, July 24, 2021 (**C-593**).

[155] Reply, paras. 284, 300, and 303; Ecuadorian Court of Justice, Resolution No. 10-2021, September 29, 2021, Articles 2, 3 (**C-514**).

[156] Statement of Claim, para. 141; Reply, para. 306.

[157] Rejoinder, para. 341.

[158] Statement of Defense, para. 226.

[159] Statement of Defense, para. 231.

[160] Statement of Defense, para. 100; Contraloría General del Estado Report DAPyA-0005-2016, January 22, 2016, p. 43 (**R-138**).

[161] SRI Final Determination Minutes No. 17201524900942704, July 10, 2015 (**C-188**); SRI Determination Minutes No. 17201824901226744, November 6, 2018 (**C-190**); SRI Complementary Determination Order No. DZ9-DEVABCC20-00000003-M, March 6, 2020 (**C-453**); SRI Final Determination Minutes No. 17201924902740585, December 24, 2019 (**R-230**).

[162] SRI Final Determination Minutes No. 17201524900942704, July 10, 2015, p. C-188_18 (**C-188**); SRI Determination Minutes No. 17201824901226744, November 6, 2018 (**C-190**); SRI Final Determination Minutes No. 17201924902740585, December 24, 2019 (**R-230**); Tejada Statement, paras. 14-15 (**RWS-2**).

[163] SRI Determination Minutes No. 17201824901226744, November 6, 2018, p. C-190_068 (**C-190**).

Worley has been found to owe Ecuador US$ 40.5 million in unpaid taxes and penalties.[164] Due to the interest that has accumulated on these liabilities, the Claimant now owes US$ 63 million.[165]

134.   Worley asserts that these audits were "suspicious" and central to its difficulties in securing payment of its services, as they occurred after the issuance of the Presidential Communication.[166] It posits that the SRI unjustifiably dismissed the evidence it submitted.[167]

135.   The Claimant also asserts that the Respondent has failed to comply with the Tribunal's orders regarding the production of documents which pertain to the SRI's decision to audit Worley. Specifically, Worley requested, and claims not to have received: (i) documents explaining how the SRI selected those taxpayers who would be subject to audits; (ii) documents indicating the correct tax rate for Worley for fiscal years 2011-2016; and (iii) the final report issued by the SRI at the close of an audit conducted on 2012 of Worley's tax returns.[168] According to the Claimant, the refusal to produce these documents hinders the Tribunal's understanding of the relevant issues.[169]

136.   The Respondent contends that there is no evidence of any type of collusion between the SRI and other agencies of the Government[170] and avers that the audit process followed the SRI's normal procedures.[171] According to the Respondent, the SRI did not ignore any evidence, but merely disagreed with Worley on the weight which ought to be afforded to it.[172]

### 3)   Criminal Proceedings against Worley in Ecuador

137.   Ecuador's Prosecutor General initiated a number of criminal investigations against the Claimant and its employees regarding the alleged abuse and misappropriation of State funds.[173] The Claimant maintains that Ecuador has initiated at least 24 criminal investigations against Worley's

---

[164]   SRI Determination Minutes No. 17201824901226744, November 6, 2018 (**C-190**); SRI Final Determination Minutes No. 17201924902740585, December 24, 2019 (**R-230**); SRI Complementary Determination Order No. DZ9-DEVABCC20-00000003-M, March 6, 2020 (**C-453**).

[165]   Worley Consultation of Disputed Transaction, January 17, 2022 (**C-948**).

[166]   Statement of Claim, para. 181; Reply, paras. 322, 324, 327.

[167]   Statement of Claim, paras. 184-185; Reply, para. 322; SRI Determination Minutes No. 17201824901226744, November 6, 2018, p. C-190_74 (**C-190**).

[168]   Reply, paras. 328-329; Procedural Order No. 4, paras. 144, 147, 149, 150.

[169]   Reply, para. 329.

[170]   Rejoinder, para. 327.

[171]   Statement of Defense, paras. 272-273; SRI Determination Minutes No. 17201824901226744, November 6, 2018 (**C-190**); SRI Final Determination Minutes No. 17201924902740585, December 24, 2019 (**R-230**).

[172]   Rejoinder, para. 334.

[173]   Notification from District Attorney to Raymond Falcon, March 23, 2017 (**C-50**); Criminal Courts Notification of District Attorney's Decision Related to Raymond Falcon, July 26, 2017 (**C-51**).

officers, including Worley International Services Inc.'s Program Manager, Raymond Falcon ("**Mr. Falcon**"), against whom the Ecuadorian authorities requested that Interpol issue a red notice.[174]

138.   The Claimant asserts that Mr. Falcon is only being targeted because he is Worley's legal representative in Ecuador, not because he has violated the law.[175] Worley further argues that although four of the criminal investigations against Mr. Falcon have already been dismissed and the one case in which charges against him had been introduced was dropped, Mr. Falcon's life "has been severely disrupted" and further investigations could be opened at any time.[176]

139.   The Prosecutor General has also opened several criminal investigations based on reports of "indicia of criminal liability" issued by the Comptroller General following its audits and resolutions, and on reports from the SRI and the Transitory Council of Citizen Participation and Social Control (*Consejo Transitorio de Participación Ciudadana y Control Social*).[177]

140.   Worley claims that the investigations, many of which are still ongoing, "[lack] any semblance of due process" or any factual or legal basis.[178] Additionally, the Claimant asserts that the Respondent and its State entities attempt to transform contractual disputes into criminal issues and impute liability to Worley for the actions and omissions of other parties, including third-party contractors, over whom Worley had no control.[179]

141.   According to the Respondent, much of the information related to these criminal investigations is confidential under Ecuadorian law, such that the Respondent is limited in its ability to respond to the Claimant's accusations.[180]

### 4)   Civil Proceedings against Worley before United States Courts

142.   On August 26, 2019, Petroecuador initiated proceedings against the Claimant by an *ex parte* application before the US District Court for the Southern District of Texas (Houston Division)

---

[174]   Statement of Claim, paras. 165, 169; Rejoinder on Jurisdiction, para. 84; Notification from District Attorney to Raymond Falcon, March 23, 2017 (**C-50**).

[175]   Statement of Claim, para. 169.

[176]   Statement of Claim, para. 169; Reply, para. 315; Notification from District Attorney to Raymond Falcon, March 23, 2017 (**C-50**); Criminal Courts Notification of District Attorney's Decision Related to Raymond Falcon, July 26, 2017 (**C-51**); Criminal Court Decision Not to Prosecute Raymond Falcon, Case No. 17294-2017-00003, August 2, 2017 (**C-443**).

[177]   Statement of Claim, paras. 166, 170-171; Reply, para. 314.

[178]   Statement of Claim, paras. 166, 174-175; Reply, para. 315.

[179]   Statement of Claim, paras. 167-168.

[180]   Statement of Defense, para. 233.

under 28 U.S.C. § 1782 (the "**§ 1782 Proceedings**").[181] Petroecuador sought an order requiring the Claimant to provide testimony and produce documents for use in "proceedings and investigations ongoing in Ecuador related to a complex, cross-border illegal bribery and corruption scheme perpetrated against Petroecuador."[182]

143.  As a result of Petroecuador's § 1782 application, the District Court issued a document production order against Worley, which the *Procurador General* of Ecuador described as a "favorable sentence for the State."[183]

144.  The Claimant submits that Respondent attempted to gain access to such documents not for the purposes of the § 1782 Proceedings themselves, but so as to strengthen its position in the present arbitration.[184] It also recalls that several of the exhibits filed by the Respondent in the present arbitration were obtained *via* the § 1782 Proceedings; to the extent that the Respondent uses these documents to allege that Worley was involved in corruption, the Claimant maintains that the documents are being taken out of context.[185]

145.  During the pendency of this arbitration, the Claimant has on several occasions characterized the § 1782 Proceedings as a "fishing expedition and harassment" against the Claimant and has requested in that connection that the Tribunal order the Respondent to "refrain from aggravating the dispute." In response to such requests, the Tribunal has on several occasions directed the Parties to avoid aggravating their dispute,[186] while reserving its decision on whether the continued pursuit of such proceedings is in violation of this direction.[187]

**5.  THE ALLEGATIONS OF CORRUPTION AND ILLEGALITY**

146.  The Respondent points to several instances of corrupt and illegal acts allegedly committed by Worley, which are denied by the Claimant. As more fully set out in Section V below, these allegations form the basis for (i) the Respondent's objection to the jurisdiction of the Tribunal on the basis that the Claimant's purported investments were tainted by corruption, fraud and bad faith and are therefore not protected under the Treaty; and (ii) the Respondent's objection to the

---

[181]   Petroecuador's Ex Parte Application for Order under 28 U.S.C. § 1782(a), p. C-52_002 (**C-52**).

[182]   Petroecuador's Ex Parte Application for Order under 28 U.S.C. § 1782(a), p. C-52_002 (**C-52**).

[183]   Office of the State Attorney General, Accountability Report for 2020, 2020, Section 2.2.1.2 (**C-729**).

[184]   Reply, para. 35.

[185]   Reply, para. 386.

[186]   Procedural Order No. 2, January 13, 2020, para. 28(i); Procedural Order No. 4, November 1, 2021, paras. 13-14; Procedural Order No. 5, March 14, 2022, para. 127(iv); Partial Award, para. 243(iii).

[187]   Procedural Order No. 4, November 1, 2021, paras. 13-14.

admissibility of the Claimant's claims also on the basis of the Claimant's purported corrupt conduct.

147. This section first summarizes the information that came to light as a result of the Panama Papers and the Respondent's investigations that led to the halting of payments to several entities on grounds of corruption. It is followed by a recount of the facts underlying the Claimant's purported corruption and illegality *at the time of the making* of its alleged investment, following by the facts supporting the allegation of corrupt conduct *during the operation* of said investment.

**1)   Information from the Panama Papers and the Respondent's Investigations**

148. Following the release of the Panama Papers, the Respondent initiated investigations against several entities with presence in Ecuador on grounds of corruption. According to the Respondent, as further recounted below, such entities are linked in relevant ways to the Claimant, one or more of its representatives or other Worley personnel.

    i.   Tecnazul

149. According to the Respondent, the investigations that followed the release of the Panama Papers showed that Tecnazul used offshore accounts in Panama and Switzerland to pay more than US$ 1 million in bribes to several former Petroecuador employees, including:[188]

(i)   **Mr. Pareja**, Manager of the Refining Division from 2012–2015, who negotiated and approved Worley' Esmeraldas Refinery Agreement and executed five of its Complementary Agreements.[189]

(ii)   **Mr. Bravo**, Project Coordinator of the Refining Division from 2011–2015. Mr. Bravo was the "contract administrator" for the Esmeraldas Refinery Agreement and its Complementary Agreements.[190]

(iii)   Marco Calvopiña ("**Mr. Calvopiña**"), Petroecuador's General Manager in November 2011, at which time Worley was awarded the Esmeraldas Refinery Agreement.[191]

---

[188]   Statement of Defense, para. 239.
[189]   Statement of Defense, para. 240.
[190]   Statement of Defense, para. 240.
[191]   Statement of Defense, para. 240.

(iv)    Diego Tapia ("**Mr. Tapia**"), Manager of the Refining Division, who executed the fifth addenda to Worley's Esmeraldas Refinery Agreement[192] and the Machala Plant Agreements.[193]

(v)    Arturo Escobar ("**Mr. A. Escobar**"), General Coordinator of Business Management at the Division of Refining from March 2012 to September 2014.[194]

150.    The Respondent submits that Tecnazul transferred funds from offshore entities owned by its principals to other entities owned or controlled by the abovementioned Petroecuador employees. The entities allegedly receiving the bribes included: (i) GIRBRA, a Panamanian entity owned by Mr. Bravo ("**GIRBRA**"); and (ii) ESCART, S.A., a Panamanian entity owned by Mr. A. Escobar ("**ESCART**").[195]

151.    According to the Respondent, subsequent investigations also established that Mr. Bravo's company, GIRBRA, transferred some of the funds it received. It alleges that from 2013 to 2015, GIRBRA made the following transfers from its account at Helm Bank in Panama:[196]

(i)    US$ 375,500 to Carlos Andrés Pareja (Mr. Pareja's son) at an account in Bank of America.

(ii)    US$ 462,500 to Yolanda Rosa Pareja (Mr. Pareja's wife) at an account in Bank of America.

(iii)    US$ 50,000 to CAPAYA, S.A., an entity owned by Mr. Pareja, at an account in Capital Bank in Panama;

(iv)    US$ 676,500 to ESCART at an account in Capital Bank in Panama; and

(v)    US$ 3.9 million to GIRBRA's other bank account at Capital Bank in Panama.

152.    In August 2016, Worley stopped paying Tecnazul for its subcontracted services under the Agreements on the grounds that "Tecnazul [m]aterially [b]reached the [s]ubcontract by [engaging] in corrupt practices."[197] While no charges were pending against Tecnazul in Ecuador,

---

[192]    Statement of Defense, para. 240.
[193]    Statement of Defense, para. 240.
[194]    Statement of Defense, para. 240.
[195]    Statement of Defense, para. 241.
[196]    Statement of Defense, para. 243.
[197]    Tecnazul's Notice of Arbitration, March 22, 2017, para. 9 (**R-284**); WorleyParsons' Statement of Defense, July 22, 2019, para. 65 (**R-285**).

Worley cited the "allegations of [Tecnazul] being involved in the Scandal of Corruption."[198] Worley later agreed to resume payments to Tecnazul if it represented to have "fully complied with Worley's Code of Conduct."[199]

153.   On March 22, 2017, Tecnazul brought an arbitration against Worley claiming US$ 34 million "as compensation for the work performed by Tecnazul pursuant to the Pacific Refinery Subcontract, the Esmeraldas Refinery Subcontract, the Machala Subcontracts, and the Drainage Subcontract."[200] Of this amount, US$ 10.8 million was for work allegedly carried out for the Pacific Refinery Project, while the remaining US$ 23.2 million was for work carried out under the other projects.[201] According to the Respondent, Worley obtained dismissal on jurisdictional grounds of the claims related to the Petroecuador projects.[202]

154.   In the arbitration against Worley, Tecnazul argued that US$ 7.9 million of the approximately US$ 10.8 million Pacific Refinery claim are at issue in this arbitration.[203] If Tecnazul is correct, according to the Respondent, Worley seeks payment in this arbitration of at least US$ 7.9 million that it refuses to pay to Tecnazul in connection with the Pacific Refinery Project. Tecnazul further argued that RDP already paid Worley the difference between the two amounts: US$ 2.9 million.[204]

155.   In response to Ecuador's account of the corrupt practices in which Tecnazul was involved, as well as of Tecnazul's alleged links to Worley, the Claimant argues that Ecuador has wrongly omitted discussion of Tecnazul's many decades of experience working on infrastructure projects in Ecuador, including with other multinational corporations.[205]

156.   The Claimant notes that at no point during the bidding process did any of the involved State organs, agencies, or instrumentalities object to the selection of Tecnazul as subcontractor. On the contrary, according to the Claimant, RDP and Petroecuador's Instructions to Bidders listed the participation of Tecnazul as a "member company."[206] Similarly, it observes that technical

---

[198]   WorleyParsons' Statement of Defense, July 22, 2019, paras. 36-37 (**R-285**).

[199]   WorleyParsons' Statement of Defense, July 22, 2019, para. 36 (**R-285**).

[200]   Tecnazul's Notice of Arbitration, March 22, 2017, para. 16(a) (**R-284**).

[201]   Tecnazul's Statement of Claim, May 6, 2019, para. 70 (**R-286**).

[202]   Statement of Defense, para. 248.

[203]   Tecnazul's Reply, December 6, 2019, para. 92 (**R-287**).

[204]   Statement of Defense, para. 249.

[205]   Reply, paras. 104-110.

[206]   Reply, para. 104; Esmeraldas Refinery Agreement, pp. C_3_056, 208, 214, 268, 275 (**C-3**); Pacific Refinery Agreement, Clause 16.19 (**C-8**); RDP Instructions to Bidders, December 17, 2010, paras. 3.1.1.5, 3.5 (**C-87**); Commercial Proposal for the Esmeraldas Agreement, July 26, 2011, pp. R-28_325-395 (**R-28**); Commercial Proposal for the RPD Agreement (excerpt), January 28, 2011, p. 3 (**R-60**); RDP Instructions to Bidders, December 17, 2010, Clauses 3.1.1.5, 3.5 (**R-136**).

commissions at RDP and Petroecuador reviewed its proposals and recommended that Worley be awarded the Agreements, without raising any concerns about Tecnazul.[207]

157.    The Claimant also disputes the notion that Tecnazul was inexperienced at the time of its hiring. According to Worley, the Respondent's own evidence shows that Worley submitted more than 70 pages describing the previous experience of Grupo Azul (the "**Azul Group**"), as well as a letter from Azul Group's legal representative in its proposal to RDP, which reflected that Azul Group was the largest provider in Ecuador for the energy, mining and infrastructure sectors and had participated as local contractor in most of the major infrastructure projects completed in Ecuador.[208] Azul Group's previous work experience, according to the Claimant, included construction and exploration in three of Ecuador's largest oil fields, engineering at a major energy plant, building access roads, camps, and platforms for major wells and expanding and servicing Ecuador's largest oil pipelines.[209]

158.    The Claimant also notes the pre-existing relationship between Tecnazul and Petroecuador.[210] According to Worley, by the time it became involved in Ecuador, Petroecuador had already

---

[207]    Pacific Refinery Agreement, pp. C_8_141, 175 (**C-8**); RDP Technical Commission Report, February 2011 (**C-375**).

[208]    Azul, Company Profile, Bnamericas, November 13, 2018 (**C-748**); Commercial Proposal for the Esmeraldas Agreement, July 26, 2011, pp. R-28_325-395 (**R-28**); Commercial Proposal for the RPD Agreement (excerpt), January 28, 2011, p. 5 (**R-60**).

[209]    Worley Technical Proposal RDP for Project Management Consulting Services, January 31, 2011, pp. 251-445 (**C-457**); William W. Phillips, Curriculum Vitae, p. 1 (**C-470**); U.S. Energy Information Administration, Country Executive Analysis, U.S. Energy Information Administration (EIA), September 17, 2021 (**C-471**); Azul Group Presentation (**C-522**); Azul Projects, October 7, 2021 (**C-728**); Azul, Company Profile, Bnamericas, November 13, 2018 (**C-748**).

[210]    Reply, para. 108; Conduto Ecuador S.A. Certificate awarded to Azulec S.A., December 11, 2009 (**C-384**); Petroecuador Certificate of Completion of Construction of the Riobamba Clean Products Terminal, Contract No. 2008187 between Petroecuador and Azulec-Tesca, June 15, 2010 (**C-385**); Petrobras Certificate awarded to Urazul S.A. for Project CPF Palo Azul 40KBOPD de Ecuador TLC S.A., July 2005 - December 2006 (**C-386**); Perenco Ecuador LTD Certificate awarded to Urazul S.A., November 24, 2008 (**C-387**); Occidental Exploration and Production Company Certificate of Completion Contract No. CO1232, April 3, 2003 (**C-388**); AEC Ecuador LTD Certificate awarded to Urazul S.A., December 17, 2002 (**C-389**); Repsol-YPF Ecuador Inc. Certificate awarded to Urazul S.A., June 21, 2001 (**C-390**); Agip Oil Ecuador B.V. Certificate Awarded to Urazul S.A, October 25, 2000 (**C-391**); Arco Oriente Inc. Certificates Awarded to Azul for Villano Development Project (Villano Process Facilities and Baeza Terminal), June 12, 2007 (**C-394**); SK E&C Consultadores S.A. Certificate Awarded to Tecnazul, November 22, 2010 (**C-472**); Repsol-YPF Certificate Awarded to Urazul S.A., January 31, 2006 (**C-473**); Perez Compac Ecuador Certificate Awarded to Azul, October 22, 2002 (**C-474**); Kerr-McGeee Ecuador Energy Corp. Certificate Awarded to Urazul S.A., February 6, 2012 (**C-475**); Williams Brothers Engineering Company Certificate Awarded to Azul, March 24, 1999 (**C-476**); City Investing Company Ltd. Certificate Awarded to Urazul S.A., March 18, 1999 (**C-477**); Oryx Ecuador Energy Company Certificate Awarded to Urazul S.A., November 21, 1997 (**C-478**); Petrolera Santa Fe (Ecuador) Ltd. Certificate Awarded to Urazul S.A., June 20, 1997 (**C-479**); Triton Ecuador Inc, LLC Certificate Awarded to Urazul S.A., June 16, 1997 (**C-480**).

entered into several contracts with Tecnazul and other Azul Group companies.[211] In fact, in 2011, Petroecuador deemed Tecnazul the top technical bidder and awarded it a pipeline studies contract to increase pipeline capacity at Libertad-Pascuales Guayas, Libertad-Manta Guayas Manabí and Tres Bocas-Pascuales pipelines.[212]

### ii.   MMR Group

159.  According to the Respondent, the investigations triggered by the Panama Papers showed that MMR Group, Inc. ("**MMR Group**"), one of the contractors the Claimant invited and recommended for hire, paid approximately US$ 500,000 in bribes to Mr. Bravo and others at Petroecuador.[213]

160.  Worley was responsible for overseeing procurement activities related to Petroecuador's subcontract with the MMR Group, including having sole responsibility for "reviewing and commenting," "executing," and "approving … Vendor List[s], Material Requisitions, Technical Evaluations of Vendors [and] Award Recommendation for Vendors."[214]

161.  The Respondent notes that, on several occasions, Worley approved MMR's services and invoices, and recommended payment by Petroecuador.[215] The Claimant disputes this, arguing that it was simply complying with its duty as provider of PMC services to conduct technical evaluations of vendors, according to which MMR had no known history of corruption before the Panama Papers and was a highly regarded international company.[216]

### iii.   OSS

162.  Oil Services & Solutions, S.A. ("**OSS**") is an Ecuadorian company owned by Juan Andrés Baquerizo ("**Mr. Baquerizo**"). Between December 2013 and December 2015, Petroecuador

---

[211]  Petroecuador Certificate of Completion of Construction of the Riobamba Clean Products Terminal, Contract No. 2008187 between Petroecuador and Azulec-Tesca, June 15, 2010 (**C-385**); *Tecnazul Lands Pipeline System Studies Contract*, BN Americas, September 29, 2011 (**C-483**); Letter from Petroamazonas and Petroecuador to Azul Group No. 2231-PAM-CON-2009, June 30, 2009 (**C-927**).

[212]  Tecnazul Lands Pipeline System Studies Contract, BN Americas, September 29, 2011 (**C-483**).

[213]  La República, *Detienen en Panamá a otro contratista de Petroecuador*, November 11, 2016 (**R-214**); Composite Offshore Wire Transfers from Arturo Pinzón (MMR Group, Inc.'s principal) to GIRBRA, S.A. (owned by A. Bravo), 2015 (**R-94**).

[214]  Statement of Defense, para. 252; Esmeraldas Refinery Agreement, Annex 3 (**C-3**).

[215]  Statement of Defense, para. 253.

[216]  Rejoinder on Jurisdiction, para. 124; MMR Group Named ENR Texas & Louisiana's 2013 Specialty Contractor of the Year, ENRTexas & Louisiana, September 3, 2013 (**C-1081**); Worley's report on the evaluation of MMR International's proposal for the Esmeraldas Refinery (No. 408005-00445-00-REP-WPI-EPP-0199), September 24, 2013, pp. 8, 45-50 (**R-448**).

awarded OSS US$ 43.4 million in contracts, much of which the Respondent says was performed under Worley' oversight and supervision.[217]

163.    According to the Respondent, the Panama Papers enabled the Prosecutor General to discover an agency agreement between a shell company owned by Mr. Baquerizo and Mr. Bravo's GIRBRA.[218] Under this agreement, Mr. Baquerizo allegedly agreed to pay Mr. Bravo US$ 600,000 and "a commission of 10% ... of [the g]ross [i]nvoices amount of each contract."[219] The Prosecutor General also claims to have discovered that OSS paid more than US$ 300,000 in bribes to Mr. Bravo through GIRBRA.[220]

   iv.    Galileo

164.    GalileoEnergy, S.A. ("**Galileo**") is an Ecuadorian company owned by Ramiro Luque ("**Mr. Luque**") and incorporated in May 2012.[221] Between December 2012 and August 2015, Petroecuador awarded Galileo US$ 38.8 million in contracts, most of which were performed under Worley's oversight and supervision.[222]

165.    According to the Respondent, Mr. Luque paid US$ 796,000 to Mr. Bravo.[223] Ecuador further notes that local proceedings determined that Galileo secured the aforementioned contracts by holding itself out as "the representative of" two subsidiaries of the French multinational SARPI-Veolia.[224] Local proceedings also came to the conclusion that Galileo overcharged more than US$ 21.7 million under its three largest contracts.[225] Galileo received US$ 26.4 million under those contracts, but allegedly subcontracted the entirety of those services to others at a lesser cost.[226]

---

[217]    Statement of Defense, para. 254.

[218]    Statement of Defense, para. 256; Baquerizo-Bravo Agency Agreement, February 10, 2014 (**R-216**).

[219]    Statement of Defense, para. 256; Baquerizo-Bravo Agency Agreement, February 10, 2014, Article 6(1) (**R-216**).

[220]    Statement of Defense, para. 257.

[221]    *United States v. Luque*, Criminal Information, October 6, 2017, paras. 5, 17 (**R-217**).

[222]    Petroecuador Oficio No. 20571-RGER-RCTR-2013, June 27, 2013 (**R-218**); GalileoEnergy Contract No. 2012065, December 26, 2012 (**R-219**); GalileoEnergy Contract Addendum No. 2013023, June 10, 2013 (**R-220**); GalileoEnergy Contract Addendum No. 2014012, March 12, 2014 (**R-221**); GalileoEnergy Contract Addendum No. 2015043, September 16, 2015 (**R-222**).

[223]    Statement of Defense, para. 259.

[224]    GalileoEnergy Contract No. 2012065, December 26, 2012, p. 1 (**R-219**); GalileoEnergy Contract Addendum No. 2013023, June 10, 2013 (**R-220**); GalileoEnergy Contract Addendum No. 2014012, March 12, 2014, p. 1 (**R-221**); GalileoEnergy Contract Addendum No. 2015043, September 16, 2015 (**R-222**).

[225]    Contraloría Report DASE-0008-2017, February 9, 2017, p. 46 (**R-225**).

[226]    Contraloría Report DASE-0008-2017, February 9, 2017, p. 46 (**R-225**).

PCA Case No. 2019-15
Final Award

v.    Odebrecht

166. In 2012, Constructora Norberto Odebrecht, S.A. ("**Odebrecht**") secured a US$ 229,995,260 contract with RDP to prepare and build the site where the Pacific Refinery was to be constructed. On September 25, 2013, Odebrecht secured a separate US$ 259.9 million contract with RDP to construct the La Esperanza Aqueduct,[227] which was to supply water to the Pacific Refinery and the surrounding community.[228]

167. In March 2014, Brazilian authorities began investigating suspected money laundering activities at carwashes and gasoline stations.[229] Those investigations eventually led to the discovery of a bribery scheme in which Odebrecht would pay bribes to employees of Brazil's State-owned oil company, Petróleo Brasileiro, S.A.[230] The bribes were sourced from an Odebrecht designated bribery department, known as the Division of Structured Operations, which funded bribes for most of Odebrecht's projects worldwide.[231]

168. Investigations in Ecuador and the United States have established that Odebrecht paid bribes in connection with the Pacific Refinery Agreement and during the period that Worley was serving as Project Manager thereunder.[232]

### 2)  Purported Corruption and Illegality at the Time of the Investment

169. The allegations of corruption and illegality at the time of the investment relate to two different set of facts summarized below: (**i**) the Claimant's supposed trafficking in confidential information; and (**ii**) its alleged misrepresentation of the 30% subcontracting limit under the Esmeraldas Refinery Agreement.

---

[227]   RDP Letter to Odebrecht, December 27, 2013 (**R-96**).

[228]   Reply, paras. 23, 124; Tele Ciudadana, *Inauguration of the Esperanza Aqueduct – Refinería del Pacífico* (video), December 15, 2016, at 22:20-24:00 (**C-401**); Gobierno del Encuentro, Ecuador Vice-President, Mr. Glas, *Inaugurated La Esperanza Multipurpose Aqueduct, another step towards the Pacific Refinery*, 2016 (**C-823**).

[229]   The Guardian, *Operation Car Wash: Is this the biggest corruption scandal in history?*, June 1, 2017 (**R-226**).

[230]   The Guardian, *Operation Car Wash: Is this the biggest corruption scandal in history?*, June 1, 2017 (**R-226**).

[231]   The Guardian, *Operation Car Wash: Is this the biggest corruption scandal in history?*, June 1, 2017 (**R-226**).

[232]   Statement of Defense, para. 266; *United States v. F. Chatburn*, Case No. 18-CR-20312, Dist. Ct. S.D. Fla., Superseding Indictment, December 13, 2018, para. 9 (**R-79**).

i.    Trafficking in Confidential Information

170.    According to the Respondent, the Claimant violated Ecuadorian law at the time of the investment by trafficking in confidential information.[233]

171.    Ecuador states that Worley won the bid for the Pacific Refinery Project because it received outside help from George Plummer ("**Mr. Plummer**"), a senior executive consultant from Shaw, which was advising on the bidding process for the Pacific Refinery Project.[234] It argues that Mr. Plummer provided confidential information to Worley and influenced the bidding and contract negotiations; in exchange for this "trafficking in information", says the Respondent, Worley awarded Shaw a US$ 1.2 million contract.[235]

172.    The Claimant counters that the Respondent has misrepresented documents and denies that it received help from Mr. Plummer or exchanged any confidential information; in its submission, the relevant sharing of information occurred after it had been awarded the contract – reiterating that it obtained the highest score in all bids.[236] The Claimant further argues that the Respondent incorrectly describes the contract that Worley celebrated with Shaw, which was executed one-and-a-half years after the so-called "confidential information" was exchanged, only after RDP so required and which contains no reference to the purportedly claimed amount of US$ 1.2 million.[237]

---

[233]    Respondent's PHB, para. 130.

[234]    Rejoinder, para. 21.

[235]    Rejoinder, paras. 21-30, 365; G. Plummer email to Worley, September 13, 2010 (**R-304**); M. Villegas email to G. Plummer, October 11, 2010 (**R-305**); M. Villegas email to G. Plummer, May 24, 2011 (**R-308**); M. Villegas email to G. Plummer, May 24, 2011 (**R-310**); G. Plummer email to M. Villegas, June 8, 2011 (**R-311**); Shaw's Proposal to Worley, August 8, 2012, p. 4 (**R-319**).

[236]    Rejoinder on Jurisdiction, paras. 99-104; Claimant's PHB, para. 113; RDP, Commission Report on the Total Evaluation of Tenders for PMC Selection, February 25 2011, p. 7 (**C-645**); RDP Board of Directors Meeting Minutes No. 002-DIR-2011-RDPEA, April 1, 2011, p. 3 (**C-780**); RDP's Communication No. 00104-RDP-2011, January 26, 2011 (**R-125**); G. Plummer email to M. Villegas, April 8, 2011 (**R-307**); M. Villegas email to G. Plummer, May 24, 2011 (**R-310**); G. Plummer email to M. Villegas, June 8, 2011 (**R-311**); G. Plummer email to M. Villegas, July 21, 2011 (**R-315**); G. Plummer email to M. Villegas, July 25, 2011 (**R-316**); G. Plummer email to Worley, July 25, 2011 (**R-317**).

[237]    Rejoinder on Jurisdiction, para. 104; WorleyParsons' C. Elizondo's email to P. Merizalde, February 26, 2013 (**R-301**);Shaw's Proposal to Worley, August 8, 2012 (**R-319**); Consulting Agreement between Worley and Shaw, September 19, 2012, p. 1 (**R-318**); G. Plummer email to P. Merizalde, April 20, 2012 (**R-326**); C. Elizondo email to G. Plummer, August 6, 2012 (**R-499**); RDP Board of Directors Minutes No. 003-DIR-2012-RDP, May 9, 2012, p. 4 (**C-751**).

ii.    Misrepresentation of the 30% Subcontracting Limit

173.  The Respondent submits that Worley also violated Ecuadorian law prior to the conclusion of the Agreements by misrepresenting to Petroecuador and RDP its intention to comply with the 30% subcontracting limit required under the Public Procurement Law and subsequently breaching the same.[238]

174.  As a matter of law, while the Claimant acknowledges that contracts under the Special Contracting Procedure generally do not have a subcontracting limit, it notes that the Esmeraldas Refinery Agreement references the Public Procurement Law.[239] In this respect, the Respondent explains that Article 79 of the Public Procurement Law, applicable to and referenced in the Agreements, disallows subcontracting in excess of 30% of the value of a "main contract" without prior written approval from Petroecuador and RDP.[240]

175.  Further, the Claimant points out that while Article 79 of Ecuador's Public Procurement Law (governing consultancy services) provides for a 30% subcontracting limit,[241] Article 35 of the General Regulation for the Public Procurement Law (the "**Public Procurement Regulation**") (governing services to support consultancy) does not.[242] The Respondent counters that Article 35 of the regulation does not eliminate the 30% limitation set forth in Article 79 of the law.[243] Under the Respondent's reading, Article 35 only applies to consulting contracts that require "support services that cannot be provided directly by the consultant", meaning that the services provided by Tecnazul do not fall into this category.[244] The Respondent argues, furthermore, that Worley's "artificial distinction" would render the 30% subcontracting limit meaningless by allowing a contractor to outsource work to a subcontractor in excess of the 30% limit and subsequently mischaracterize part of that work as "support services."[245]

176.  As a matter of fact, while the Respondent argues that Worley would not have acquired *any* of the Agreements absent its misrepresentation to comply with the 30% subcontracting limit under

---

[238]  Respondent's PHB, para. 42.

[239]  Reply, para. 174 and fn. 535; Rejoinder on Jurisdiction, para. 109; Esmeraldas Refinery Agreement, Clauses 1.3, 21 (**C-3**); Public Procurement Law, Article 79 (**C-64**).

[240]  Respondent's PHB, para. 40 and fn. 118; Public Procurement Law, Article 79 (**RLA-52**); Public Procurement Regulation, Article 120 (**C-179**).

[241]  Public Procurement Law, Article 79 (**C-64**).

[242]  Public Procurement Regulation, Article 35 (**C-179**).

[243]  Andrade Report II, para. 91 (**RER-4**).

[244]  Rejoinder, paras. 35, 72(ii); Public Procurement Regulation, Article 35 (**C-179**).

[245]  Rejoinder, para. 72(ii).

Ecuadorian law,[246] it focuses specifically on evidence of alleged misrepresentation during the negotiations for the Esmeraldas Refinery Agreement and the Machala Plant Agreements.[247] It states that Worley schemed with Tecnazul to misrepresent its real involvement.[248] Thus, Worley's subsequent breach of the requirement, Ecuador contends, was both knowing[249] and premeditated,[250] as evidenced by the correspondence between Worley and Tecnazul.

177. In particular, Ecuador considers that several e-mails between personnel of Worley and Tecnazul[251] confirm that the Claimant:

> (*i*) understood the 30% subcontracting limit; (*ii*) always intended to subcontract Tecnazul's services in excess of the 30% limit; (*iii*) knew that such subcontracting would violate Ecuadorian law; and (*iv*) schemed with Tecnazul to hide the level of Tecnazul's involvement and misrepresent the same to Petroecuador.[252]

178. According to the Claimant, the Respondent mischaracterizes these e-mails because, in fact, they show an intent and confirmation to comply with the subcontracting limit;[253] they represent, at best, a misleading and isolated snapshot – mainly focused on conversations surrounding the Machala Plant Agreement I – not useful for assessing overall compliance.[254]

179. For the Respondent, Worley's surpassing of the 30% subcontracting limit in the execution of the Esmeraldas Refinery Agreement, Machala Plant Agreement I and Pacific Refinery Agreement

---

[246]   Respondent's PHB, para. 188.

[247]   Respondent's PHB, paras. 49-51, 188.

[248]   Respondent's PHB, para. 49.

[249]   Rejoinder, paras. 4, 31-73; Worley Letter PC-2014047-LTR-WPI-EPP-0146, July 8, 2015 (**R-191**); M. Sandoval email to R. Falcon, June 16, 2014 (**R-332**); M. Sandoval email to R. Falcon, November 20, 2014 (**R-333**); M. Sandoval email to R. Falcon, May 14, 2015 (**R-334**); R. Falcon email to W. Phillips, May 28, 2015 (**R-335**); M. Sandoval email to R. Falcon, June 18, 2015, p. 336_001-005 (**R- 336**); M. Sandoval email to W. Garcia, June 30, 2015, pp. R-337_001-003, 011-012 (**R-337**); Excel Sheet with Man-Hour Breakdown, June 25, 2015 (**R-338**); W. Garcia email to M. Sandoval, July 7, 2015, p. C-339_002 (**R-339**).

[250]   Rejoinder, paras. 4, 31-73. The Respondent cites the following communications as evidence that the breach was premeditated: WorleyParsons' C Elizondo's email to Azul Group, July 21, 2011 (**R-300**); H. Guarderas email to C. Elizondo, July, 21 2011 (**R-327**); H. Guarderas email to C. Elizondo, July 27, 2011 (**R-328**); C. Elizondo email to H. Guarderas, July 27, 2011 (**R-329**); R. Falcon email to W. Phillips, February 24, 2014 (**R-330**); J. Bennet email to W. Phillips, February 24, 2014 (**R-331**).

[251]   Respondent's PHB, paras. 49-50; email from H. Guarderas to C. Elizondo, July 28, 2011 (**R-289-1**); WorleyParsons' C Elizondo's email to Azul Group, July 21, 2011 (**R-300**); H. Guarderas email to C. Elizondo, July 21, 2011 (**R-327**); H. Guarderas email to C. Elizondo, July 27, 2011 (**R-328**); C. Elizondo email to H. Guarderas, July 27, 2011 (**R-329**); R. Falcon email to W. Phillips, February 24, 2014 (**R-330**); J. Bennet email to W. Phillips, February 24, 2014 (**R-331**).

[252]   Respondent's PHB, para. 51.

[253]   Claimant's PHB, para. 116; Hearing Transcript, Day 7, 1374:5-1375:1; Worley Parsons' C. Elizondo's email to Azul Group, July 21, 2011 (**R-300**); H. Guarderas email to C. Elizondo, 27 July, 2011 (**R-328**); C. Elizondo email to H. Guarderas, July 27, 2011 (**R-329**).

[254]   Claimant's PHB, para. 118.

validates its argument on misrepresentation. The Respondent holds that there is "no genuine dispute" that Worley subcontracted more than 30% of the value under the three Agreements, in breach of Article 35 of the Public Procurement Law and the provisions of the Agreements that stipulate the same subcontracting limit.[255] In particular, the Respondent states that Worley subcontracted to Tecnazul 172,9% of the original contract price of the Esmeraldas Refinery Agreement, 49% of the original contract price of the Machala Plant Agreement I and 32,9% of the Pacific Refinery Agreement.[256]

180. The Claimant denies violating the subcontracting limit, even less so intentionally, and submits that the premeditation argument is just an attempt by the Respondent to bring its allegations closer in time to the inception of the investment.[257] According to Worley, there cannot be a misrepresentation scheme to violate subcontracting limits without an actual violation.[258] Consequently, it states that the Respondent's argument fails because the subcontracting limit was either inapplicable, not surpassed or the excess was accepted by Petroecuador implicitly.[259] In any case, the Respondent indicates that the amount that surpassed the limit is marginal (19% for Machala Plant Agreement I, 4.99% for Esmeraldas Refinery Agreement and 2.94% for the Pacific Refinery Agreement).[260]

### 3) Purported Corruption and Illegality during the Operation of the Investment

181. According to the Respondent, during the operation of the Agreements Worley committed additional corrupt and illegal acts. In particular, it points to connections between Tecnazul's bribes to Petroecuador and RDP employees and the awarding of the Esmeraldas Refinery Agreement and its six Complementary Agreements without any competitive or other bidding

---

[255]   Rejoinder, para. 70; Respondent's PHB, para. 42; Petroecuador Oficio 05332-OPE-REE-MAN-PMR-2017, February 22, 2017 (**R-167**); Machala Plant I Subcontract with Tecnazul (**C-686**).

[256]   Respondent's PHB, para. 42.

[257]   Rejoinder on Jurisdiction, paras. 105-108; WorleyParsons' C. Elizondo's email to Azul Group, July 21, 2011 (**R-300**); C. Elizondo email to H. Guarderas, July 27, 2011 (**R-329**).

[258]   Claimant's PHB, para. 118.

[259]   Reply, para. 173; Rejoinder on Jurisdiction, paras. 109-110; Claimant's PHB, para. 117; Esmeraldas Refinery Agreement, Clauses 2.5.21, 3.1.1.3 and pp. C_3_056, 208, 214, 268, 275 (**C-3**); Pacific Refinery Agreement, p. C_8_207 (**C-8**); Final Technical and Economic Report for the Refurbishment Agreement, Memorandum No. 00518-OPE-REE-MAN-PMR-2017, August 1, 2017, p. 1 (**C-34**); Report on the Status of the Refurbishment Agreement and its Complementary Agreements, Memorandum No. 00261-OPE-REE-MAN-PMR-2017, March 30, 2017, pp. 27-28 (**C-38**); Public Procurement Law, Articles 6.8, 6.30, 79 (**C-64**); Letter from Petroecuador to the Office of the Comptroller General No. 3217-RRREFREE-IRE-2016, November 18, 2016, p. 4 (**C-1184**); Commercial Proposal for the Esmeraldas Agreement, July 26, 2011, pp. R-28_325-395 (**R-28**).

[260]   Claimant's PHB, paras. 55, 115, 119.

process by the same employees who received gifts and trips from Worley (including Mr. Pareja and Mr. Bravo).[261]

182. Furthermore, the Respondent claims that Mr. Pareja and Mr. Bravo, who were convicted in Ecuador for corruption within Tecnazul, frequently received improper benefits from Worley.[262] According to the Respondent, this conduct was in breach the applicable anti-corruption laws, corporate policies and the Agreements themselves.[263]

183. Conversely, the Claimant observes that the Respondent does not advance any allegations of any bribe payments by Worley.[264] Accordingly, Worley contends that it was its impressive credentials – not bribery – that secured the Esmeraldas Refinery and Pacific Refinery Agreements and that it did not resort to improper means to secure additional contracts.[265] The Claimant defends that these alleged benefits are nothing but regular business activities that are neither unusual nor illegal.[266] In particular, it emphasizes that Worley always intended to be reimbursed by RDP and Petroecuador – making it impossible to confer a benefit – and that the Respondent cannot characterize as gifts its refusal to repay the expenses.[267]

184. Additionally, Ecuador submits that the value of the Esmeraldas Refinery Agreement raised from US$ 38.6 million to 145.9 million due to all the illegally obtained addenda.[268] In its submission,

---

[261] Respondent's PHB, paras. 52, 206; Hearing Transcript, Day 1, 122:15-25, 180:9-16; Refurbishment Complementary Agreement No. 2012036, September 28, 2012, Clause 3.1 (**C-19**); Refurbishment Complementary Agreement No. 2013027, August 28, 2013, Clause 4 (**C-20**); Refurbishment Complementary Agreement No. 2014015, April 2, 2014, Clause 4 (**C-21**); Refurbishment Complementary Agreement No. 2014048, October 9, 2014, Clause 4 (**C-22**); Refurbishment Complementary Agreement No. 2015205, October 29, 2015, Clause 4 (**C-24**); Respondent's Opening Statement Presentation, p. 157 (**RD-1**).

[262] Respondent's PHB, para. 55.

[263] Statement of Defense, para. 20; Rejoinder, paras. 74-134.

[264] Claimant's PHB, para. 121.

[265] Claimant's PHB, para. 121.

[266] Rejoinder on Jurisdiction, paras. 134-141.

[267] Rejoinder on Jurisdiction, paras. 135-137; Esmeraldas Refinery Agreement, Clause 2.5 (**C-3**); Pacific Refinery Agreement, Clause 4.1.2 (**C-8**); Petroecuador Memorandum No. 00473-PPRO-RASC-2012, October 16, 2012 (**C-976**); RDP Emails, October 2, 2018 (**C-1095**); Petroecuador Memorandum No. 00698-RREF-REE-IRE-2015, November 4, 2015 (**C-1096**); Petroecuador Technical-Economic Evaluation of the Offer Submitted by Worley for the Inspection and Management of the Esmeraldas Project, Period January-December 2016, 2016 (**C-1108**); Falcon Statement III, paras. 23-24 (**CWS-7**).

[268] Respondent's PHB, paras. 52, 206; Hearing Transcript, Day 1, 122:15-25, 180:9-16; Refurbishment Complementary Agreement No. 2012036, September 28, 2012, Clause 3.1 (**C-19**); Refurbishment Complementary Agreement No. 2013027, August 28, 2013, Clause 4 (**C-20**); Refurbishment Complementary Agreement No. 2014015, April 2, 2014, Clause 4 (**C-21**); Refurbishment Complementary Agreement No. 2014048, October 9, 2014, Clause 4 (**C-22**); Refurbishment Complementary Agreement No. 2015205, October 29, 2015, Clause 4 (**C-24**).

this was in breach of Article 87 of the Public Procurement Law, pursuant to which the value of complementary agreements cannot exceed the 70% value of the main contract.[269]

185.  The Claimant explains that Article 87 of the Public Procurement Law specifically exempts contracts in the hydrocarbons sector from subcontracting limitations, noting that the Esmeraldas Refinery Agreement expressly refers to that provision.[270] Even if such provision was applicable, the Claimant considers that Petroecuador's approval of the budget certifications for each addendum and the legal opinions confirming compliance with public procurement requirements belie any allegation by Ecuador as to a 70% limit violation.[271]

186.  The following sections further detail the "improper means" to which the Claimant allegedly resorted to secure additional addenda in breach of the 70% limitation, along with the Parties' respective positions.

   i.   June 2012

187.  According to the Respondent, in June 2012 Worley paid for Mr. Merizalde and several other RDP officials to fly first class to Beijing, China to meet with representatives of the China National Petroleum Corporation.[272] In flights alone, the known costs incurred for the RDP employees allegedly exceeded US$ 20,000.[273] Worley is said to have charged that amount to RDP as a reimbursable expense.[274]

188.  The Claimant explains that these meetings sought to discuss plans for financing and developing the Pacific Refinery Project – meaning that the trips were in furtherance of the services it

---

[269]  Respondent's PHB, para. 52; Public Procurement Law, Articles 85, 87 (**C-64**).

[270]  Claimant's PHB, para. 139; Esmeraldas Refinery Agreement, Clause 15 (**C-3**); Public Procurement Law, Article 87 (**C-64**).

[271]  Claimant's PHB, paras. 139-140; Budget Certification Contract 2012036, September 13, 2011 (**C-583**); Budget Certification Contract 2014015, January 29, 2014 (**C-584**); Budget Certification Contract 2014187, June 26, 2014 (**C-585**); Budget Certification 2014048, July 28, 2014 (**C-586**); Budget Certification 2014070, November 29, 2014 (**C-587**); Budget Certification 2015197, August 14, 2015 (**C-588**); Budget Certification 2015205, October 29, 2015 (**C-589**); Petroecuador Memorandum 0253-PPRO-RASC-2013, July 10, 2013 (**C-761**); Budget Certification 2015449, November 24, 2015 (**C-783**).

[272]  Rejoinder, para. 92; C. Elizondo email to Worley Travel Agency, June 27, 2012 (**R-351**); C. Elizondo email to L. Han, June 28, 2012 (**R-353**).

[273]  Rejoinder, para. 92; American Express Statement on Travel Itinerary for Rafael Alexis Poveda Bonilla, June 25, 2012 (**R-349**); American Express Business Travel Account statement, August 1, 2012 (**R-350**); American Express Statement on Travel Arrangements for Luis Rafael Bocigalupo Alava, June 27, 2012 (**R-352**).

[274]  Rejoinder, para. 92; C. Elizondo email to L. Han, June 29, 2012 (**R-353**); C. Elizondo email to Worley travel agency, June 27, 2012 (**R-351**).

performed.[275] It states that RDP approved and reimbursed these expenses, which the Claimant contends it incurred in order to assist with coordinating the trip.[276]

ii.    August and September 2012

189.    According to the Respondent, Worley paid for two weekend trips in Miami and Miami Beach for Petroecuador employees, including Mr. Bravo, Mr. A. Escobar and Marcelo Reyes ("**Mr. Reyes**"), in-house attorney and General Coordinator of Contracts at Petroecuador.[277] The Respondent contends that Worley billed Petroecuador for these expenses even though they had no legitimate business purpose.[278]

190.    The employees' first trip to Miami allegedly took place during the weekend of August 31 to September 2, 2012, on first-class tickets.[279] Worley denies that the trip took place and clarifies that it was postponed, becoming what Ecuador calls the second trip.[280]

191.    Their second trip to Miami purportedly took place during the weekend of September 7 to September 9, 2012.[281] This time, the Respondent says, the employees travelled on business class tickets.[282] Worley's Mr. Falcon e-mailed the Miami Beach hotel at which the employees stayed to request to cover all of Mr. Bravo's and Mr. A. Escobar's charges.[283] According to the Respondent, Worley later billed Petroecuador for these expenses as a "Best Practices Contractor Visit."[284] However, no one from Worley attended the interviews and Mr. Falcon ignores the

---

[275]    Rejoinder on Jurisdiction, para. 137.

[276]    Rejoinder on Jurisdiction, para. 137; Letter from RDP to Comptroller General No. RDP-ADC-CGE-111011-0075-OFI, August 23, 2018, p. 13 (**C-614**); Letter from Worley to RDP, March 24, 2015 (**C-718**); Email from Ministry of Strategic Sectors, June 25, 2012 (**C-969**); Letter from Worley to RDP, April 8, 2015 (**C-1087**); Elizondo Statement, para. 22 (**CWS-1**).

[277]    Respondent's PHB, para. 58.

[278]    Rejoinder, paras. 82.

[279]    Rejoinder, para. 83; A. Guerrero email to A. Bravo, August 20, 2012 (**R-405**); El Universo, *El excoordinador jurídico de Petroecuador, Marcelo Reyes, fue el "contacto" para sobornos, según juicio que se siguió en Estados Unidos*, February 16, 2021 (**R-424**).

[280]    Claimant's PHB, para. 130; Hearing Transcript, Day 3, 472:5-9 (Falcon); Worley Expense Report SCV-IE673517, October 24, 2012 (**R-354**); Travel arrangement confirmations for A. Escobar and A. Bravo, August 27-28, 2012 (**R-355**); Worley expense Report SVC-IE661969, October 2, 2012 (**R-356**); R. Falcon email to A. Bravo, September 8, 2012 (**R-406**); Proforma R-11, November 29, 2012 (**C-932**); Petroecuador Proof of Payment No. 0006890, November 30, 2012 (**C-980**).

[281]    Rejoinder, para. 84; Respondent's PHB, para. 60.

[282]    Worley Expense Report SVC-IE661969, October 2, 2012 (**R-356**); Travel arrangement confirmations for A. Escobar and A. Bravo, August 27-28, 2012 (**R-355**).

[283]    Rejoinder, para. 84; R. Falcon email to A. Bravo, September 8, 2012 (**R-406**).

[284]    Rejoinder, para. 85; Worley expense Report SVC-IE661969, October 2, 2012 (**R-356**).

PCA Case No. 2019-15
Final Award

names of the contractors that were interviewed or even if the interviews took place – according to the Respondent.[285]

192. The Claimant states that this was a legitimate business trip with the purpose of interviewing contractors in Miami.[286] As stated in Worley's expense report and invoice to Petroecuador, this was a "Personnel-Best Practices Contractors Visit" for which the Claimant states Petroecuador made reimbursements.[287] While Worley did not participate, it understands that meetings did take place.[288]

    iii.    October 2012

193. The Respondent contends that Worley purchased tickets for Mr. Bravo to travel to Las Vegas on October 24, 2012 and then billed Petroecuador for these tickets as costs incurred in connection with services provided to Ecuador.[289] Additionally, according to the Respondent, Worley spent at least US$ 22,391 in October 2012 to have Petroecuador employees Mr. Pareja, Mr. Reyes and Mr. Bravo, as well as some of their spouses, fly from Quito to Miami and then onwards to Houston to attend the three-day Formula 1 World Championship race in Austin, Texas (the "**Formula 1 Trip**").[290] The trip itself lasted four days.[291]

194. The Respondent asserts that the Petroecuador employees who received this benefit were in charge of the Agreements and awarded the Claimant more than US$ 148.34 million in additional no-bid contracts and addenda between 2012 and 2015.[292] Allegedly, they also controlled payment of

---

[285]    Respondent's PHB, paras. 61-62; Hearing Transcript, Day 3, 474:9-14, 474:21-25, 475:22-25, 476:1-4 (Falcon).

[286]    Claimant's PHB, para. 137; Hearing Transcript, Day 3, 469:22-470:9 (Falcon).

[287]    Rejoinder on Jurisdiction, para. 137; Worley expense Report SVC-IE661969, October 2, 2012, p. 1 (**R-356**); Petroecuador Proof of Payment No. 0006890, November 30, 2012, pp. 1, 209, 216-219 (**C-980**).

[288]    Claimant's PHB, para. 125; Hearing Transcript, Day 3, 474:4-475:8, 476:5-11 (Falcon).

[289]    Rejoinder, para. 88.

[290]    Statement of Defense, para. 3; Rejoinder, para. 103; R. Falcon Email, October 13, 2012 (**R-269**); H. Guarderas email to R. Falcon, October 31, 2012 (**R-410**); Worley Expense Report SVC-IE673983, October 24, 2012, pp. 1, 12 (**C-719**); Falcon Statement III, para. 26 (**CWS-7**).

[291]    Statement of Defense, para. 3; Rejoinder, para. 105.

[292]    Rejoinder, para. 104; Refurbishment Complementary Agreement No. 2012036, September 28, 2012, Clauses 3, 4.1 (**C-19**); Complementary Agreement No. 2013027, August 28, 2013 (**C-20**); Refurbishment Complementary Agreement No. 2014015, April 2, 2014 (**C-21**); Refurbishment Complementary Agreement No. 2014048, October 9, 2014 (**C-22**); Refurbishment Complementary Agreement No. 2014051, October 17, 2014 (**C-23**); Refurbishment Complementary Agreement No. 2015205, October 29, 2015 (**C-24**); Drainage Complementary Agreement No. 2015449, November 26, 2015 (**C-25**); Merox Complementary Agreement No. 2015197, October 20, 2015 (**C-26**); Machala Plant I Complementary Agreement No. 2014191, August 1, 2014, Clauses 2-4 (**C-27**); Machala Plant I Complementary Agreement No. 2014191, August 1, 2014 (**C-28**).

Worley's US$ 45.4 million in outstanding invoices under the two Agreements that had been awarded at the time.[293]

195. The US$ 22,391 Worley allegedly spent on this trip includes premium tickets to all three days of the event and lodging at an event-designated hotel for four nights.[294] It does not include what Tecnazul spent on tickets for the Petroecuador employees or expenses for dinners, meals and entertainment during the four-day stay in Austin.[295]

196. The Claimant rejects the Las Vegas trip claim, arguing that the Respondent treats requests for itineraries, quotes and other information as actual trips, even when Claimant's records confirm that there is no evidence of a Las Vegas trip or of Worley's payment of it.[296]

197. Regarding the Formula 1 Trip, the Claimant states that it was a "company-sponsored, client-engagement" event in which it had participated for several years.[297]

198. Worley notes that because it had already given "gold-level" tickets to this event to other clients and no additional tickets were available at that level it purchased less expensive tickets for the Petroecuador and RDP employees who attended the event.[298] According to the Claimant, Worley's Mr. Falcon requested and received approval from his superiors for this expense[299] and submitted the expense as "Esmeraldas Project Teambuilding with Petroecuador client and Minister of Downstream Refining."[300]

199. The Claimant also points out that this event took place after Worley invested in Ecuador, which allegedly defeats any suggestion of a *quid pro quo*.[301] Had it intended to secure benefits in subsequent years, Worley reflects, it would have invited Petroecuador more than once as it hosts the event on an annual basis for various clients.[302]

---

[293]   Rejoinder, para. 104; Liquidación Económica del Contrato 2011030, April 18, 2016 (**R-495**); Liquidación Económica del Contrato Complementario 2012036, May 19, 2016 (**R-496**).

[294]   Worley Expense Report SVC-IE673983, October 24, 2012, pp. 3, 7-8 (**C-719**).

[295]   R. Falcon Email, October 13, 2012 (**R-269**).

[296]   Rejoinder on Jurisdiction, para. 140; Claimant's PHB, para. 130; Falcon Statement II, para. 33 (**CWS-5**); A. Guerrero email to R. Falcon and R. Hooper, October 16, 2012 (**R-359**); Email from A. Bravo to A. Guerrero, October 17, 2012 (**R-360**); R. Hooper email to W. Phillips, April 2, 2013 (**R-433**).

[297]   Reply, para. 392; Rejoinder on Jurisdiction, para. 139; Worley Invitations for the Formula 1 Trip, 2013 (**C-721**).

[298]   Reply, para. 392; Falcon Statement II, para. 33 (**CWS-5**).

[299]   Reply, para. 392; Worley Email, October 22, 2012 (**C-736**).

[300]   Reply, para. 392; Worley Expense Report SVC-IE673983, October 24, 2012 (**C-719**).

[301]   Reply, para. 392; Falcon Statement II, para. 33 (**CWS-5**).

[302]   Claimant's PHB, para. 127.

200.    In response, Ecuador submits that the issue is not whether Worley purchased the more or less expensive option, but whether it conveyed an improper benefit to Petroecuador employees in the first instance.[303] The Respondent refutes the argument of it being a team-building or relationship-building event, as there is no evidence of any contact between Petroecuador and Worley employees.[304] Notwithstanding this, Ecuador also argues that Worley's intentions as to this trip (*i.e.* that it was a "client-engagement event" and "team-building activity") and willingness to invite other clients are irrelevant.[305] According to the Respondent, Ecuadorian law does not recognize these as justifications for conferring material benefits in the context of a contractual relationship.[306]

201.    Lastly, in response to the Claimant's suggestion that there was no *quid pro quo*, Ecuador claims that following the trip in question Worley received more than US$ 100 million in additional contracts with Petroecuador. Allegedly, the employees who visited Houston continued to be in charge of Worley's Agreements and payment thereunder.[307]

   iv.    March 2013

202.    According to the Respondent, on March 14, 2013 Worley purchased six tickets to an NBA game between the San Antonio Spurs and Dallas Mavericks played that same day in San Antonio, Texas.[308] It submits that the tickets were for Mr. Bravo and Mr. Reyes, one personal friend of each and two unidentified persons.[309] In the Respondent's submission, this trip lacked any business justification and no one from Worley even attended it.[310]

203.    The trip was allegedly scheduled for two days, from March 14 to March 16, 2013.[311] Mr. Falcon confirmed that Worley paid only for the game tickets.[312] The Respondent claims that Worley also purchased business class tickets for Mr. Bravo and his guests to fly to San Antonio from Ecuador

---

[303]    Rejoinder, para. 107.

[304]    Respondent's PHB, paras. 65-68; Hearing Transcript, Day 2, 328:18-25, 332:1-4 (Parker).

[305]    Rejoinder, para. 109.

[306]    Rejoinder, para. 109.

[307]    Rejoinder, para. 153.

[308]    Rejoinder, paras. 89, 111 and fn. 193; Worley Expense Report submitted by R. Falcon, February 7, 2013 (**R-416**); Worley Expense Report SVC-IE729098, February 13, 2013 (**R-417**); Worley Expense Report SVC-IE745047, March 21, 2013 (**R-418**).

[309]    Rejoinder, para. 113; H. Guarderas email to R. Falcon, March 14, 2013 (**R-412**).

[310]    Respondent's PHB, para. 76; Hearing Transcript, Day 3, 502:4-11 (Falcon).

[311]    Rejoinder, para. 90.

[312]    Hearing Transcript, Day 3, 501:24-504:22 (Falcon).

and back.[313] The Respondent also alleges that Worley offered to pay for Mr. Bravo's two-day hotel stay.[314]

204.   Likewise, the Respondent posits that Worley spent US$ 8,063.60 on tickets for Petroecuador employees Mr. Pareja, Mr. Bravo and Mr. Reyes, as well as their spouses, to attend the 2013 Houston Livestock Show and Rodeo on March 16-17, 2013 (the "**Rodeo Trip**").[315] For the Rodeo Trip, Worley allegedly spent US$ 1,244.91 on meals, including dinners, and transportation to the event.[316]

205.   The Respondent alleges that none of Worley's expenses incurred in connection with the Rodeo Trip were included in its gift register, as is normally required under its internal directives.[317]

206.   The Claimant clarifies that Worley obtained the tickets to those events for Petroecuador officials who were in the United States for a project meeting in Houston and that they made and paid their own travel arrangements and hotel bookings.[318] Mr. Falcon asserted that the NBA game served a legitimate team-building purpose and that Worley officials were not present because those from Petroecuador had been unable to join them at the original game they were planning to attend together.[319]

v.   April 2013

207.   According to the Respondent, in April 2013 Mr. Pareja asked Worley, by private e-mail, to hire Mr. Carlos Faidutti Navarrete ("**Mr. Faidutti**"), who would be "charged to the WP contract" and be paid US$ 5,000, but report to Mr. Pareja.[320] The Personnel Assignment Authorization Form (PAAF) Log for the Esmeraldas Refinery Project, which lists the individuals assigned to that

---

[313]   Rejoinder, paras. 90, 114; R. Falcon email to R. Hooper, March 14, 2013 (**R-370**); A. Bravo email to R. Falcon, February 28, 2013 (**R-425**).

[314]   Rejoinder, para. 91; R. Hooper email to W. Phillips, March 11, 2013 (**R-426**).

[315]   Rejoinder, para. 116; Worley Expense Report submitted by R. Falcon, February 7, 2013 (**R-416**); Worley Expense Report SVC-IE729098, February 13, 2013, p. 2 (**R-417**).

[316]   Rejoinder, para. 117; Worley Expense Report SVC-1E745047, March 17, 2013 (**R-418**).

[317]   Rejoinder, para. 117; Executive Directive (**C-746**).

[318]   Rejoinder on Jurisdiction, para. 139; Falcon Statement III, para. 26 (**CWS-7**).

[319]   Hearing Transcript, Day 3, 505:24-506:12 (Falcon).

[320]   Statement of Defense, para. 10; Rejoinder, para. 118; Respondent's Post-Hearing Brief, para. 78; R. Hooper email to W. Phillips, April 2, 2013 (**R-433**).

project, reflects that Mr. Faidutti was employed full-time for eight months from April 9, 2013, to December 31, 2014.[321]

208.  The Claimant maintains that it has no record of hiring Mr. Faidutti or paying him a salary.[322] The Respondent notes, however, that on April 9, 2013 Worley wrote to Mr. Bravo seeking authorization to charge Mr. Faidutti as an "Electrical Consultant."[323] According to the Respondent, Mr. Faidutti, a trained economist, was not qualified to serve in that position, as he did not have an engineering degree.[324]

209.  The Respondent also claims that Worley hired Gabriela Bock ("**Ms. Bock**") as a "Public Relations Officer" on the basis of her "friendship" with Mr. Pareja." This is rejected by the Claimant: it explains that it was unaware of any relationship she had with Petroecuador and was instead hired as Office Manager and Manager of Public Relations due to her profile meeting Worley's needs.[325]

vi.    May 2013

210.  According to the Respondent, during the period from May 6 to May 10, 2013 Worley paid for former Vice-President of Ecuador, Jorge Glas, Mr. Calvopiña, Mr. Pareja, Mr. Bravo, Mr. Tapia and Mr. Reyes to travel to Houston to attend the Offshore Technology Conference.[326] Worley allegedly secured six tickets to the conference and spent US$ 11,150 for six hotel rooms for two adults each for four nights.[327] The Respondent claims that Worley charged these expenses (but not any others related to the same trip) to Petroecuador as a cost of providing its services.[328]

---

[321]    Rejoinder, para. 121; Petroecuador Esmeraldas Refinery Revamp 408005-00431 Personnel Assignment Authorization Form – PAAF LOG, p. 5 (**C-551**).

[322]    Reply, para. 395; Rejoinder on Jurisdiction, para. 140; Petroecuador Esmeraldas Refinery Revamp 408005-00431 Personnel Assignment Authorization Form – PAAF LOG (**C-551**); Letter from Worley to Petroecuador No. 408005-00445-00-AD-LTR-WPI-EPP-1672, April 9, 2013, p. 1 (**C-552**); Letter from Worley to Ecuador, February 7, 2022, para. 12 (**R-435**).

[323]    Letter from Worley to Petroecuador No. 408005-00445-00-AD-LTR-WPI-EPP-1672, April 9, 2013, pp. 1, 19 (**C-552**).

[324]    Rejoinder, para. 120; Letter from Worley to Petroecuador No. 408005-00445-00-AD-LTR-WPI-EPP-1672, April 9, 2013, p. 20 (**C-552**).

[325]    Rejoinder on Jurisdiction, para. 140; Falcon Statement III, para. 19 (**CWS-7**).

[326]    Rejoinder, para. 100; R. Falcon email to C. Stoltz, April 3, 2013 (**R-378**).

[327]    Rejoinder, para. 102; R. Falcon email to C. Stoltz, April 3, 2013 (**R-378**); R. Falcon email to A. Bravo, April 8, 2013 (**R-381**).

[328]    Rejoinder, para. 102; A. Guerrero email to A. Bravo, April 4, 2013 (**R-380**).

vii.    September 2013

211.    On September 18, 2013, Worley financed a dinner party in Ecuador to celebrate Mr. Calvopiña's birthday.[329] According to the Respondent, no Worley employee attended this event.[330]

212.    The Claimant confirms that the only birthday dinner it paid for was at a restaurant in Quito and that it spent for 20 attendees a total of US$ 1,314.94 including tax and gratuities.[331]

viii.    September to December 2014

213.    According to the Respondent, Worley gifted numerous works of art and other things of value to Petroecuador employees.[332]

214.    In September and October 2014, Worley gifted "original [works of] art by [an] Ecuadorian artist," each of which was valued at US$ 600, to Petroecuador employees Mr. Pareja, Mr. Calvopiña, Marcelo Robalino and Gonzalo Flores.[333]

215.    In December 2014, Worley gifted "hand carved horse statute[s]," each of which was valued at US$ 275, to 16 Petroecuador employees, for a total expense of USD 4,400.[334]

216.    The Claimant clarifies that the local art, which it registered as gifts, was given either as holiday gifts or, in the case of desk adornments, due to the impossibility of using them for their original purpose.[335]

217.    The Respondent cites an e-mail from Mr. Falcon as evidence that these are not the only gifts that Worley gave to Petroecuador and RDP employees, but merely the most recent ones.[336]

---

[329]    Worley Expense Report SVC-IE829315, September 23, 2013 (**R-420**); R. Falcon email to A. Guerrero, September 19, 2013 (**R-421**).

[330]    Rejoinder, para. 133; R. Falcon email to A. Guerrero, September 19, 2013 (**R-421**).

[331]    Rejoinder on Jurisdiction, para. 139; Worley Expense Report SVC-IE829315, September 23, 2013 p. 1 (**R-420**); R. Falcon email to A. Guerrero, September 19, 2013 (**R-421**).

[332]    Rejoinder, para. 129.

[333]    R. Falcon email to W. Gurry, attaching Worley Gift Register for 2014, May 8, 2017 (**R-444**).

[334]    R. Falcon email to W. Gurry, attaching Worley Gift Register for 2014, May 8, 2017 (**R-444**).

[335]    Rejoinder on Jurisdiction, para. 139; Falcon Statement III, para. 29 (**CWS-7**); R. Falcon email to W. Gurry, attaching Worley Gift Register for 2014, May 8, 2017 (**R-444**). The Claimant clarifies that it gave away the local art, consisting of desk adornments, because they were originally intended to be gifted to celebrate Worley opening a local office in Quito, but it never materialized.

[336]    Rejoinder, para. 131; R. Falcon email to W. Gurry, attaching Worley Gift Register for 2014, May 8, 2017 (**R-444**).

ix.    August 2013 to May 2015

218.   According to the Respondent, during this period Worley gifted numerous works of art and other things of value to Petroecuador employees.[337]

219.   The Respondent also impugns Worley's role in recommending that Petroecuador hire the MMR Group, which the Respondent contends is tied to corruption within Ecuador.[338] In particular, it observes that Worley supported the MMR Group as the sole bidder for three Petroecuador contracts, which were worth a total of US$ 133.5 million.[339] According to the Respondent, in return for hiring MMR Group, Petroecuador's Mr. Pareja and Mr. Bravo received approximately US$ 500,000 in bribes from MMR Group's principal, Mr. Arturo Pinzón ("**Mr. Pinzón**").[340]

220.   The Respondent mentions the following encounter as evidence of the allegedly inappropriate relationship between Worley and MMR Group: after MMR Group secured its first contract for US$ 98 million, Mr. Pinzón attempted to deliver gifts to Worley's Mr. Falcon, who had helped MMR Group secure work from Petroecuador. Mr. Falcon was not at his office at the time, so Alejandro Guerrero, his subordinate, collected the delivery and sent another employee to put the gifts in Mr. Falcon's personal apartment.[341]

221.   In October 2013, Worley made an offer to Mr. Pareja to initiate a US$ 2.7 million project on the Isla Tolita Pampa de Oro (the "**Isla Tolita Project**"), where Mr. Pareja had his family "hacienda."[342] According to the Respondent, Worley promised to fund the project and sought a "commitment" from MMR Group to complete the necessary construction.[343] As Worley secured more work from Petroecuador and MMR Group received its US$ 98 million contract, says the Respondent, the Isla Tolita Project grew more ambitious. Over time, the budget allegedly increased to US$ 6 million.[344]

---

[337]   Rejoinder, paras. 129-131.

[338]   Reply, para. 191 and fn. 594; Worley's Report 409070-00005-94.1-EG-REP-WPI-EPP-0003, December 10, 2015 (**R-177**).

[339]   MMR Group Contract No. 2014027, July 30, 2014 (**R-212**); MMR Group Addendum Contract No. 2015029, June 16, 2015 (**R-213**); MMR Group Contract No. 2015161, December 10, 2015 (**R-277**).

[340]   Rejoinder, para. 135.

[341]   Rejoinder, para. 136; R. Falcon email to A. Guerrero, October 16, 2014 (**R-454**).

[342]   G. Bock email to A. Guerrero, December 5, 2014 (**R-441**); C. Pareja email to R. Hooper, October 25, 2013 (**R-455**); El Telégrafo, *Horamen revela el vacío y colapso de la historia*, June 6, 2017 (**R-456**); El Universo, *Tolita Pampa de Oro, histórico y olvidado*, August 15, 2002 (**R-458**).

[343]   C. Pareja email to R. Hooper, October 25, 2013 (**R-455**).

[344]   G. Bock email to A. Guerrero, December 5, 2014 (**R-441**).

222.  According to the Respondent, on May 2015, Worley and MMR Group chartered a private plane and boat to take Mr. Pareja to the Isla Tolita Project so that he could see its progress.[345] Worley's Robert Hooper ("**Mr. Hooper**") and Mr. Pinzón allegedly joined the trip as well.[346]

223.  In response to Ecuador's allegations that Worley's relationship with and recommendation of MMR Group were improper, the Claimant emphasizes that at the time recommendation was made it was not aware of MMR Group's links to corruption. According to the Claimant, the Respondent "speaks with the benefit of hindsight."[347]

          x.      December 2011 to February 2016

224.  According to the Respondent, during the course of its Agreements with Petroecuador and RDP, Worley several times purchased flights to Houston for its contacts at those companies.[348] The Respondent alleges that those trips continued through early February 2016 and included expenses for flights, hotels, meals and other entertainment.[349]

225.  The Respondent's records show at least 29 trips between December 2011 and February 2016, but Respondent contends that there were probably additional trips, about which no information has been revealed due to defects in document production.[350] Ecuador claims that Worley spent at least US$ 128,261.13 on these trips, which it then billed to Petroecuador and RDP as reimbursable costs for its services.[351]

226.  The Respondent notes that the Petroecuador employees who were invited to Houston often travelled with their spouses or "friends", Worley paid expenses incurred by those individuals as well as those for the employees themselves and it later billed these expenses to Petroecuador as costs incurred for its services.[352] Ecuador alleges that Worley's employees several times brought their own spouses to dinner with Petroecuador employees while the latter were in Houston; the expenses associated with these dinners were later billed to Petroecuador.[353]

---

[345]  Rejoinder, para. 141; J. Courville email to R. Hooper, May 29, 2015 (**R-457**).
[346]  J. Courville email to R. Hooper, May 29, 2015 (**R-457**).
[347]  Reply, fn. 594.
[348]  Rejoinder, para. 93.
[349]  Rejoinder, para. 93.
[350]  Rejoinder, para. 95.
[351]  Rejoinder, para. 96.
[352]  Rejoinder, para. 98.
[353]  Rejoinder, para. 99; Worley Expense Report SVC-IE608142, June 19, 2012 (**R-415**); R. Hooper email to R. Falcon, July 4, 2013 (**R-419**).

227. According to the Claimant, there is nothing "remarkable" or "illicit" about these trips and the related expenses.[354] The Claimant states that it was natural for most trips to occur in Houston, Texas, where Worley and other contractors were located, and that these trips had legitimate business purposes.[355] Worley further maintains that neither the laws of Ecuador nor those of the United States prohibit the payment of reasonable business expenses for public officials for a legitimate business purpose, such as "project meetings".[356] The Claimant allegedly expected that Petroecuador and RDP would reimburse expenses incurred for these trips and notes that RDP, for example, did so.[357]

228. The Claimant also defends the propriety of specific expenses in respect of each of the following trips for Petroecuador and RDP employees to Houston:[358]

    (i)    Mr. Pareja and Mr. Tapia's September 2012 trip. The Claimant characterizes these as hotel and transportation-related expenses.

    (ii)    Mr. Pareja's January 2013 five-day trip. The Claimant calls this trip "unremarkable" and "legitimate."

    (iii)    Mr. Bravo and Pareja's February 2013 three-day trip. The Claimant defends its choice of accommodation for the visiting employees.

    (iv)    Mr. Castro's November 2013 trip. The Claimant defends expenses related to this trip on the grounds that its client proactively approved them.

229. Lastly, the Claimant responds to Ecuador's citation of an e-mail, on which Worley personnel were copied, in which a Tecnazul employee suggested billing travel expenses as man-hours worked.

---

[354] Reply, para. 393.

[355] Rejoinder on Jurisdiction, para. 137; Worley Emails, February 13, 2013 (**C-981**) Worley, Petroecuador, SK and others Meeting Minutes, March 20-21, 2013 (**C-1086**); Summaries of the Meetings between Petroecuador, Worley, Azul, SK, UOP, May 24, 2012 (**R-348**).

[356] Reply, para. 393; FCPA (**C-887**).

[357] Falcon Statement II, para. 34 (**CWS-5**); Proforma R-11, November 29, 2012, p. 36, 47 (**C-932**); Contract 2011030, Reimbursable Expenses - January 2013, January 2013 (**C-724**); Worley, Non-Labor Travel Expenses (US) for Period, January - December 2013, RDP Petrochemical Complex Project, March 24, 2013 (**C-933**); Worley, Expense Report, p. C-939_7 (**C-939**).

[358] Reply, para. 393.

The Claimant submits that the only man-hours invoiced under this trip were for "the actual work performed."[359]

230. Fabián Andrade Narváez ("**Mr. Andrade**"), the Respondent's legal expert, takes the position that the stated business purpose of these trips to Houston (*i.e.* "project meetings") (i) does not render them legal under Ecuadorian administrative law; (ii) does not enable Worley to charge expenses incurred to the Projects with RDP and Petroecuador; and (iii) does not exempt Worley of administrative liability.[360]

---

[359]   Reply, para. 393 and fn. 1132; Respondent's Redfern Request No. 7; Procedural Order No. 4; Worksheet 25 of Contract 2011030, sent in letter No. 2013408005-0045-00-PC-LTR-WP1-EPP-3406, December 17, 2013, p. 259 (**C-429**); Worksheet 15 of Contract 2012035, which was included in the payment request contained in letter 408005-0045-00.0-PC-LTR-WP1-EPP-4101 3637, January 24, 2014, p. 3 (**C-430**); Azul Payroll Invoice No. 0002412, February 4, 2014 (**C-431**); Worksheet 17 of Contract 2012036 of Contract 2012035, February 28, 2014, p. 123 (**C-432**).

[360]   Rejoinder, para. 97; Andrade Report II, paras. 52-53, 57-58 (**RER-4**).

## IV.   REQUESTS FOR RELIEF

### 1.   THE CLAIMANT'S REQUEST FOR RELIEF

231.   In its Statement of Claim, the Claimant requests the following relief:

> For the reasons stated herein, Worley requests an award granting it the following relief:
>
> - A declaration that the dispute is within the jurisdiction and competence of the Tribunal;
>
> - A declaration that Ecuador has violated the Treaty, the investment agreements, and international law with respect to Worley's investment:
>
> - A declaration that Ecuador's actions and omissions at issue and those of its organs and instrumentalities for which it is internationally responsible failed to provide fair and equitable treatment; failed to observe obligations entered into with regard to Worley's investment; constituted an expropriation or measures tantamount to expropriation without prompt, adequate, and effective compensation; failed to provide full protection and security; impaired Worley's investment through arbitrary measures; and failed to provide effective means of enforcing rights with respect to Worley's investment and investment agreements, in breach of Articles II(3), II(7), and III(1) of the Treaty, and breached the Agreements, which qualify as "investment agreements;"
>
> - An order for Ecuador to cease its wrongful acts, desist from continuing the wrongful acts, and re-establish the situation that existed before its wrongful acts;
>
> - An award to Worley of restitution or the monetary equivalent of all damages caused to its investment as set forth in Section VI, and as may be further developed and quantified in the course of this proceeding, including enhanced and moral damages;
>
> - Pre- and post-award interest until the date of Ecuador's full and effective payment;
>
> - An award to Worley for all costs of these proceedings and Ecuador's unlawful proceedings, including attorneys' fees and expenses; and
>
> - Any other relief the Tribunal may deem just and proper.[361]

232.   In its Reply, the Claimant requests the following relief:

> For the reasons stated herein, Worley requests an award granting it the following relief:
>
> - A declaration that the dispute is within the jurisdiction and competence of the Tribunal;
>
> - A declaration that Ecuador has violated the Treaty, the investment agreements, and international law with respect to Worley's investment;
>
> - A declaration that Ecuador's actions and omissions at issue and those of its organs and instrumentalities for which it is internationally responsible failed to

---

[361]   Statement of Claim, para. 418.

provide fair and equitable treatment; failed to observe obligations entered into with regard to Worley's investment; constituted an expropriation or measures tantamount to expropriation without prompt, adequate, and effective compensation; failed to provide full protection and security; impaired Worley's investment through arbitrary measures; and failed to provide effective means of enforcing rights with respect Worley's investment and investment agreements, in breach of Articles II(3), II(7), and III(1) of the Treaty, and breached the Agreements, which qualify as "investment agreements;"

▪ An order for Ecuador to cease its wrongful acts, desist from continuing the wrongful acts, and re-establish the situation that existed before its wrongful acts;

▪ An award to Worley of restitution or the monetary equivalent of all damages caused to its investment as set forth in Section V, and as may be further developed and quantified in the course of this proceeding, including enhanced and moral damages

▪ Pre- and post-award interest until the date of Ecuador's full and effective payment;

▪ An award to Worley for all costs of these proceedings and Ecuador's unlawful proceedings, including attorneys' fees and expenses;

▪ An order for Ecuador to cease aggravating the dispute; and

▪ Any other relief the Tribunal may deem just and proper.[362]

233. In its Rejoinder on Jurisdiction, the Claimant requests the following relief:

For the reasons set forth herein and in its prior submissions, Worley respectfully requests that the Tribunal issue an award:

▪ Declaring that the dispute is within the jurisdiction and competence of the Tribunal;

▪ Ordering Respondent to cease aggravating the dispute, especially by fabricating corruption accusations;

▪ Ordering Respondent to pay all the costs of this arbitration including, without limitation, Claimant's legal costs, expert fees and in-house costs, and fees and expenses of the Tribunal; and

▪ Ordering any further relief the Tribunal may deem just and proper.[363]

234. In its PHB, the Claimant requests the following relief:

For the reasons set forth herein and in its prior submissions, Worley respectfully requests that the Tribunal issue an award:

a) Declaring that the dispute is within the jurisdiction and competence of the Tribunal;

---

[362] Reply, para. 456.
[363] Rejoinder on Jurisdiction, para. 160.

b)      Declaring that Ecuador has violated the Treaty, the investment agreements, and
        international law with respect to Worley's investment;

c)      Awarding Worley restitution and damages caused to its investment, and pre- and
        post-award interest until the date of Ecuador's full and effective payment;

d)      Ordering Respondent to pay all the costs of this arbitration; and

e)      Ordering any further relief the Tribunal may deem just and proper.[364]

235.    In its Statement on Costs, the Claimant requests the following relief:

> For the reasons stated herein, Claimant requests that the Tribunal include in its Award an
> order that:

(a)     Respondent reimburse Claimant's costs of the Arbitration, including without
        limitation, Claimant's legal costs, expert fees, the fees and expenses of the
        Tribunal, and PCA's costs, as well as those relating to the baseless audits,
        investigations, and proceedings that the State continues to pursue against Worley
        in Ecuador and the 1782 Proceeding, as itemized in the Statement of Costs
        attached to this Submission as Annex A;

(b)     Respondent pay interest on such costs as the Tribunal awards at such rate as the
        Tribunal deems appropriate; and

(c)     Award any further or other relief to which the Tribunal considers that Claimant
        has proved an entitlement.[365]

## 2.      THE RESPONDENT'S REQUEST FOR RELIEF

236.    In its Statement of Defense, the Respondent requests the following relief:

> For the foregoing reasons, Ecuador respectfully requests the following relief:

(i)     A declaration that WorleyParsons is not entitled to protection under the U.S.-
        Ecuador Treaty because it engaged in corruption of Ecuadorian officials.

(ii)    An award dismissing WorleyParsons's claims.

(iii)   An award that WorleyParsons pay the costs of these arbitral proceedings,
        including the cost of the Arbitral Tribunal and the legal and other costs incurred
        by Ecuador, on a full indemnity basis.

(iv)    An award that WorleyParsons pay interest on any costs awarded to Ecuador, in
        an amount to be determined by the Tribunal.[366]

---

[364]   Claimant's PHB, para. 168.

[365]   Claimant's Statement on Costs, para. 25.

[366]   Statement of Defense, para. 576.

237.   In its Rejoinder, the Respondent requests the following relief:

> For the foregoing reasons, Ecuador respectfully requests the following relief:

> (A)   A declaration that Worley is not entitled to protection under the U.S.-Ecuador Treaty because it engaged in corruption of Ecuadorian officials.

> (B)   An award dismissing Worley's claims.

> (C)   An award that Worley pay the costs of these arbitral proceedings, including the cost of the Arbitral Tribunal and the legal and other costs incurred by Ecuador, on a full indemnity basis.

> (D)   An award that Worley pay interest on any costs awarded to Ecuador, in an amount to be determined by the Tribunal.[367]

238.   In its PHB, the Respondent requests the following relief:

> For the foregoing reasons, and the evidence and authority on record, Ecuador respectfully requests that the Tribunal enter an Award granting the relief set out in Ecuador's Rejoinder at ¶¶ 730–31.[368]

239.   In its Statement on Costs, the Respondent requests the following relief:

> For the foregoing reasons, Ecuador requests the following relief:

> a)   An order that Worley pay the costs of these arbitral proceedings, including the cost of the Tribunal and the legal and other costs incurred by Ecuador, on a full indemnity basis, in the total amount of USD 6,158,161.65; and

> b)   Interest on any costs awarded to Ecuador, in an amount to be determined by the Tribunal.[369]

---

[367]   Rejoinder, para. 730.

[368]   Respondent's PHB, para. 217.

[369]   Respondent's Statement on Costs, para. 31.

## V.    JURISDICTION AND ADMISSIBILITY

240.    By its Partial Award, the Tribunal rejected the Preliminary Objections that had been bifurcated for preliminary consideration, namely: (i) the Respondent's objection to the Tribunal's jurisdiction *ratione personae* under Article I(2) of the Treaty; and (ii) the Respondent's contention that the Claimant's alleged investments do not qualify as "investments" under Article I(1)(a) of the Treaty because these are not "owned or controlled directly or indirectly by nationals or companies of the other Party," and that, as a result, the Tribunal lacks jurisdiction *ratione materiae* to decide over the Claimant's claims.

241.    This Respondent's remaining jurisdictional objections are as follows:

(i)      The Tribunal lacks jurisdiction *ratione personae* over all claims because Worley is controlled by an Australian corporation not protected under the Treaty, which is the investment's beneficial owner;

(ii)     The Tribunal lacks jurisdiction *ratione materiae* because the Claimant has not made a qualifying "investment" within the meaning of the Treaty and customary international law and therefore there is no dispute related to an "investment agreement" or "with respect to an investment" under Article I(1) and Article VI(1) of the Treaty;[370]

(iii)    Even if the Tribunal were to find that the Claimant made a qualifying investment in Ecuador, those investments were tainted by illegality, corruption, fraud and bad faith and are therefore not protected under the Treaty;

(iv)     Concerning the admissibility of the Claimant's claims:

a)     The Claimant's claims relating to the SRI's tax audits and administrative proceedings, Comptroller General's Resolutions and non-payment under the Esmeraldas Refinery Agreement were brought before a different *fora* and are therefore barred under Article VI(2) of the Treaty;

b)     The Tribunal also lacks jurisdiction *ratione voluntatis* because the Claimant's FET, FPS and impairment clause claims relate to taxation measures and are therefore excluded under Article X(2) of the Treaty;

---

[370]    Request for Bifurcation, paras. 49, 51.

c) The Claimant is precluded from invoking the umbrella clause in Article II(3)(c) of the Treaty for alleged breaches of the Agreements because the Agreements were entered into by RDP and Petroecuador, which are not protected under the Treaty; and

d) In the alternative that the Tribunal upholds its jurisdiction, the Respondent contends that the Claimant's bribery and bad faith acts would still render the claims inadmissible.

242. For the reasons stated below, the Tribunal has decided to uphold the Respondent's objections to the jurisdiction of the Tribunal and to the admissibility of the Claimant's claims based on corruption and illegality. It is therefore unnecessary for the Tribunal to decide the Respondent's remaining jurisdictional and admissibility objections or the merits of the Claimant's claims. For reasons of arbitral economy, the Tribunal declines to address these matters. It will now turn to its analysis of the Respondent's jurisdictional and admissibility objections based on corruption and illegality.

### 1.   THE RESPONDENT'S POSITION

243. In the Respondent's submission, even if the Tribunal were to find that the Claimant made a qualifying investment in Ecuador, those investments were tainted by corruption, fraud and bad faith and are therefore not protected under the Treaty.[371]

244. In particular, according to the Respondent, the Claimant's allegedly corrupt conduct as described in Section III.5 above independently violated international law and the laws of Ecuador, France and the United States, as well as Worley and Petroecuador's international policies and procedures.[372] Flowing from these allegations of illegality, the Respondent states that the Claimant's corruption deprives the Tribunal of its jurisdiction under the Treaty or, at the very least, renders all of the Claimant's claims inadmissible.[373]

---

[371]   Statement of Defense, para. 294, Rejoinder, para. 347.
[372]   Rejoinder, para. 142.
[373]   Rejoinder, para. 348.

245. Independently of the findings of corruption implicating the Claimant, the Respondent requests that the Tribunal decline jurisdiction based on the corruption committed by the Claimant's subcontractors and the Claimant's breaches of the Public Procurement Law.[374]

**1) Ecuadorian Law**

246. First, the Respondent submits that the Claimant's conduct in respect of its alleged investment in Ecuador is in breach of Ecuadorian law.

247. The Respondent relies principally on the expert testimony of Mr. Andrade to argue that Worley violated Ecuadorian administrative law.[375] In response to the Claimant's argument that it never intended to engage in corruption or retain an improper benefit, the Respondent submits that Ecuadorian administrative law does not require corrupt intent or a showing of *quid pro quo* for there to be a sanctionable violation of administrative law.[376]

248. Mr. Andrade opines that Worley's conduct had both an illicit cause ("*causa*") and an illicit object ("*objeto*"), rendering the underlying contracts null and void.[377]

249. In the Respondent's submission, the Claimant's conduct was also in violation of Article 233 of the Constitution of Ecuador, which reads:

> The public servants and the delegates or representatives of the collegiate bodies to the institutions of the State, will be subject to the sanctions established for crimes of embezzlement, bribery, extortion and illicit enrichment. The action to prosecute them and the corresponding penalties will be imprescriptible and in these cases, the trials will begin and continue even in the absence of the accused. These rules will also apply to those who participate in these crimes, even if they do not have the aforementioned qualities.[378]

250. Similarly, according to the Respondent, the Claimant's conduct breached Article 280 of Ecuador's Criminal Code,[379] which states:

> The person who, by any modality, offers, gives, or promises to a public servant a donation, gift, promise, advantage or undue economic benefit or other material good to do, omit,

---

[374] Rejoinder, para. 348. In respect of the purported breaches of the Ecuadorian Public Procurement Law *see* Section III.5.2)(ii) above.

[375] Rejoinder, paras. 143-145.

[376] Rejoinder, para. 143; Andrade Report II, paras. 9, 27 (**RER-4**).

[377] Rejoinder, paras. 144-145; Andrade Report II, paras. 8, 10 (**RER-4**).

[378] Rejoinder, paras. 146; Constitution of the Republic of Ecuador, Article 233 (**RLA-216**) (Respondent's translation).

[379] Rejoinder, paras. 146-150.

expedite, delay or condition issues related to their functions, or to commit a crime, will be sanctioned with the same penalties indicated for public servants.[380]

251. The Respondent also cites as relevant Article 369 of the Ecuadorian Criminal Code, which sanctions the agreement by two or more persons to form a group "for the purpose of committing one or more crimes" and that "has as its final objective securing economic benefits." Article 370 of the Code further punishes an "illicit association," as one formed by "two or more people who associate for the purpose of [committing] crimes."[381]

252. The Respondent further notes that Ecuadorian law allows the use of circumstantial evidence to prove the commission of a crime.[382] Circumstantial evidence has purportedly been used to sustain convictions for corruption, criminal organization and illicit association. According to the Respondent, Ecuadorian courts and prosecutors cannot ignore circumstantial evidence due to the risk that illegal conduct might go unpunished.[383]

253. Second, and also under the purview of Ecuadorian law, the Respondent submits that the Claimant's conduct was in breach of the Agreements – all governed by Ecuadorian law – and Petroecuador's Ethics Code.[384]

254. In respect, firstly, of the Agreements, the Respondent asserts that Worley violated the contractual provisions that follow by conferring benefits on RDP and Petroecuador employees.[385]

255. The Respondent refers first to the "corrupt practices" clause of the Pacific Refinery Agreement, under which Worley undertook:

> [T]o take all actions necessary to ensure that all Consultant Representatives do not give, authorize, promise or offer any gift, gratuity, commission, bribe, pay-off, kickback, money or anything of value directly or indirectly to (i) any Government Official or to a political party or candidate for political office or (ii) third party intermediary, such as an agent or sales representative, for the purpose of influencing any official act or decision, inducing such a person to use his or her influence or violate duty, securing any improper advantage to assist

---

[380]   Ecuador Integral Criminal Code, Article 280 (**RLA-225**); Rejoinder, para. 147, fn 247 (Respondent's translation).

[381]   Rejoinder, para. 148.

[382]   Rejoinder, para. 149; Corte Nacional de Justicia, Sala Especializada de lo Penal, Penal Militar, Penal Policial y Tránsito, *Resolución en casación No. 1323-2017*, August 16, 2017, p. 136 (**RLA-339**).

[383]   Rejoinder, para. 149; E. Alvear Tobar, *La validez de la prueba indiciaria en el proceso penal* (2020), p. 89 (**RLA-338**).

[384]   Rejoinder, paras. 150, 367.

[385]   Rejoinder, para. 164-167; Esmeraldas Refinery Agreement, Clause 11.1 (**C-3**); Pacific Refinery Agreement, Clauses 16.2.2, 16.2.3 (**C-8**). The provision was copied verbatim in every addenda.

any person or entity to obtain or retain business or influence or affecting Owner's or Consultant's obligations under this Agreement.[386]

256.   The Claimant further undertook that it would "at its own expense, defend, indemnify and save harmless" Petroecuador and its "Affiliates … and assigns, from and against all Damages assessed against or suffered by them as a result of" any "breach of any representation set forth in this Section 16.2," whether by the Claimant or its "Subcontractors and the employees or independent contractors of any of them."[387]

257.   Under the Agreements, Worley also undertook to provide its services in compliance with Ecuadorian law and best industry practice.[388]

258.   In this respect, according to the Respondent, Petroecuador's Ethics Code prohibits its employees from accepting any gifts or benefits, regardless of the intent surrounding the gift or benefit.[389] As part of their commitment to "integrity," Petroecuador employees are bound to "not provide opportunities for corrupt practices of any nature: bribery, fraud, perks, abusive use of public resources, among others."[390]

259.   Flowing from the above, the Respondent asserts that the Constitution and the Criminal Code of Ecuador provide a comprehensive legal framework that prohibits corruption by domestic Government officials as well as any person doing business in Ecuador.[391] On this basis, the Respondent submits that the Claimant agreed to provide services to RDP in accordance with Ecuador's administrative and criminal laws,[392] and subsequently violated these laws when it

---

[386]   Pacific Refinery Agreement, Clause 16.2.2 (**C-8**); Rejoinder, para. 164 (Respondent's translation).

[387]   Pacific Refinery Agreement, Clause 16.2.3 (**C-8**).

[388]   Esmeraldas Refinery Agreement, Clause 11.1 (**C-3**); Agreement No. 2014187 between Petroecuador and the Claimant for the Study of the Re-Engineering and Construction of the Drainage System of the Esmeraldas Refinery, July 25, 2014, Clause 13.14 (**C-4**); Agreement for Detail Engineering of Merox 200, Merox 300 and Waste Waters Z3, No. 2014070, December 20, 2014, Clause 16.3 (**C-5**); Machala Plant Agreement I, Clause 27. 2 (**C-6**); Refurbishment Complementary Agreement No. 2012036, September 28, 2012, Clause 7 (**C-19**); Complementary Agreement No. 2013027, August 28, 2013, Clause 8 (**C-20**); Refurbishment Complementary Agreement No. 2014015, April 2, 2014, Clause 7 (**C-21**); Refurbishment Complementary Agreement No. 2014048, October 9, 2014, Clause 8 (**C-22**); Refurbishment Complementary Agreement No. 2014051, October 17, 2014, Clause 3 (**C-23**); Refurbishment Complementary Agreement No. 2015205, October 29, 2015, Clause 9 (**C-24**); Machala Plant Agreement II, Clause 25.2 (**R-175**).

[389]   Rejoinder, para. 166; Petroecuador Ethics Code, October 14, 2013, Article 8(q) (**R-460**).

[390]   Petroecuador Ethics Code, October 14, 2013, Article 4(d) (**R-460**).

[391]   Statement of Defense, paras. 299-301; Constitution of the Republic of Ecuador, Articles 3(8), 83 (**C-62**).

[392]   Statement of Defense, para. 302; Pacific Refinery Agreement, Clauses 16.2, 16.2.3 and Exhibit A, para. 5.1(l) (**C-8**).

provided gifts and special treatment to Petroecuador and RDP employees who awarded the Agreements, approved payments and supervised its services.[393]

260.   Independently of the findings on corruption implicating the Claimant, the Respondent submits that the Tribunal should deny jurisdiction on account of the corruption committed by the Claimant's subcontractors as well as the Claimant's own violations of Ecuador's Public Procurement Law.[394] The Respondent affirms that it is undisputed that Tecnazul paid bribes to Petroecuador and RDP in respect of the Agreements: accordingly, the Claimant is responsible under the Agreements and Ecuadorian law to RDP and Petroecuador[395] because the Claimant had the obligation to monitor and control the behavior of its subcontractors under the Agreements.[396]

261.   The Respondent relies on the tribunal's holding in *Churchill Mining v. Indonesia* to substantiate its contention that an important aspect of due diligence is for investors to ensure that their investments comply with the law and the principle of good faith.[397] Accordingly, the Respondent argues that, at the very least, the Claimant is responsible for the corrupt acts of Tecnazul and MMR Group given their direct relationship.[398]

### 2)  French Law / International Public Policy

262.   By reference to French law – the law of the seat of this arbitration[399] – the Respondent further argues that any award in favor of the Claimant would be rendered unenforceable by the Claimant's corrupt conduct in accordance with international public policy.[400]

263.   According to the Respondent, the Tribunal is mandated under French law to weigh Worley's allegedly improper conduct under principles of international public policy. It posits, in particular, that French law requires tribunals to exercise "maximalist control" when considering allegations

---

[393]   Rejoinder, para. 364-367.

[394]   Rejoinder, para. 390.

[395]   Rejoinder, para. 393; Esmeraldas Refinery Agreement, Annex 3, Clause 26.1 (**C-3**); Public Procurement Law, Article 79 (**RLA-52**).

[396]   Statement of Defense, paras. 317-319.

[397]   Statement of Defense, paras. 314-315; *Churchill Mining PLC and Planet Mining Pty Ltd v. Republic of Indonesia*, ICSID Case No. ARB/12/14 and 12/40, Award, December 6, 2016, paras. 504-508 (**RLA-132**). According to the Respondent, the tribunal concluded that the good faith principle in international law and international public policy provide a sufficient basis for declining to entertain claims based on the wrongdoing of a business partner, regardless of whether the wrongdoing can be positively attributed to the partner.

[398]   Statement of Defense, paras. 318-318.

[399]   Rejoinder, para. 154.

[400]   Statement of Defense, paras. 303-308.

of corruption in an arbitration.[401] As a result, it says, French courts have consistently held that any arbitral award that hinders the objective of fighting corruption and money laundering must be annulled because it breaches France's international public order under Article 1520(5) of the French Code of Civil Procedure.[402] The Respondent contends that a review of the court's case law reveals that the courts have broad investigatory powers and are therefore not bound by the underlying arbitral decision when reviewing awards involving contracts tainted by fraud and corruption.[403]

264.    For example, the Respondent cites a case in which the French *Cour de Cassation* upheld a decision of the Court of Appeal setting aside an arbitration award against Kyrgyzstan on international public policy grounds. In the Respondent's reading, the original tribunal, which found that Kyrgyzstan had not sufficiently established its allegations of fraud and money laundering, was overruled by the Court of Appeal, which considered extrinsic evidence that surfaced after the issuance of the award. The *Cour de Cassation* ruled on the basis that courts must not limit themselves to the evidence that was before the arbitral tribunal or to its findings.[404]

265.    The Respondent also argues that French law does not permit the use of "waiver" arguments when allegations of corruption are involved.[405] For support, the Respondent cites *SORELEC v. Libya*, in which the Paris Court of Appeal held that French law requires courts to review an award's conformity with the international public order even if a party knowingly fails to raise the defense of corruption in the arbitration.[406]

---

[401]    Statement of Defense, para. 305.

[402]    Statement of Defense, para. 304; Rejoinder, para. 154; J. Jourdan-Marques, *Chronique d'arbitrage: compétence et corruption – le recours en annulation à rude épreuve*, December 24, 2020, p. 23 (**RLA-123**).

[403]    Statement of Defense, paras. 304-305; *Société MK Group v. Société Financial Iniciative Onix*, Paris Court of Appeal, No. 15/21703, Judgment, January 16, 2018, pp. 5-6 (**RLA-117**); *Valeriy Belokon v. Kyrgyz Republic*, Paris Court of Appeal, No. 15/01650, Judgment, February 21, 2017, p. 7 (**RLA-118**); *Alstom Transport SA & Alstom Network UK LTD v. Alexander Brothers Ltd*, Paris Court of Appeal, No. 16/11182, Judgment, May 28, 2019, pp. 6-7 (**RLA-122**); *Webcor ITP Limited & Grand Marche De v. Gabonese Republic*, Paris Court of Appeal, International Chamber, No. 18/18708, Judgment, May 25, 2021, pp. 9-11 (**RLA-124**). The Respondent further contends that the case law demonstrates that strong circumstantial evidence, rather than direct evidence, is sufficient for the Court to set aside an award on the basis of corruption. *Samwell International Holdings Limited v. Airbus Helicopters*, Paris Court of Appeal, No. 19/09058, Judgment, September 15, 2020, paras. 27-46 (**RLA-119**); *Sorelec v. State of Lybia*, Paris Court of Appeal, No. 18/02568, Judgment, November 17, 2020, pp. 6-10 (**RLA-120**); *Securiport v. Benin*, Paris Court of Appeal, No. 19/04177, Judgment, October 27, 2020, pp. 6-9 (**RLA-121**).

[404]    Statement of Defense, para. 306; Rejoinder, para. 155; *Valeriy Belokon v. Kyrgyz Republic*, Paris Court of Appeal, No. 15/01650, Judgment, February 21, 2017, p. 7 (**RLA-118**).

[405]    Rejoinder, para. 156.

[406]    Rejoinder, para. 156; *Sorelec v. State of Lybia*, Paris Court of Appeal, No. 18/02568, Judgment, November 17, 2020, pp. 7-9 (**RLA-333**).

### 3) International Law

266. Third, the Respondent relies on various instruments of international law[407] and arbitral awards such as *World Duty Free v. Kenya*[408] to support the proposition that corruption violates international public policy. According to the Respondent, investment treaty tribunals have also extended this principle to investments tainted by the corrupt practices of a third party whose conduct the investor unreasonably ignored when measuring the investors' conduct against a "standard of willful blindness."[409] The Respondent affirms that some arbitral tribunals have found that the wrongdoing of a business partner forms a sufficient basis for declining jurisdiction, while other arbitral tribunals have emphasized that prudent investment practice requires that any investor exercise due diligence prior to investing.[410]

267. The Respondent rejects the Claimant's contention that international investment treaties provide protection to investments made in bad faith in the absence of an express legality clause, citing to arbitral jurisprudence supporting the proposition that investments are not protected if they violate

---

[407] Statement of Defense, paras. 295-298; Rejoinder, paras. 368-371. Specifically, the Respondent points to the following instruments: the UNCAC (ratified by Ecuador in 2005); the Inter-American Convention Against Corruption; the OECD Convention on Combating Bribery of Foreign Officials in International Business Transactions; and the Uniform Framework for Combatting Fraud and Corruption.

[408] Statement of Defense, para. 309-312; Rejoinder, paras. 371-373; *Inceysa Vallisoletana, S.L. v. Republic of El Salvador,*, ICSID Case No. ARB/03/26, Award, August 2, 2006, paras. 245-252 (**RLA-22**); *Gustav F W Hamester GmbH & Co KG v. Republic of Ghana*, ICSID Case No. ARB/07/24, Award, June 18, 2010, paras. 123-124 (**RLA-23**); *Phoenix Action, Ltd. v. Czech Republic,* ICSID Case No. ARB/06/5, Award, April 15, 2009, paras. 100, 106 (**RLA-88**); *World Duty Free Company Limited v. Repubic of Kenya*, ICSID Case No. ARB/00/7, Award, October 4, 2006, paras. 105-106, 142, 157 (**RLA-126**); ICC Case No. 1110, Award, XXI YCA 47 (1996), paras. 20, 23 (**RLA-127**); *SAUR International SA v. Republic of Argentina,* ICSID Case No. ARB/04/4, Decision on Jurisdiction and Liability, June 6, 2012, para. 308 (**RLA-128**); *Cortec Mining Kenya Limited, Cortec (Pty) Limited and Stirling Capital Limited v. Republic of Kenya*, ICSID Case No. ARB/15/29, Award, October 22, 2018, para. 333(a) (**RLA-129**); *Littop Enterprises Limited, Bridgemont Ventures Limited and Bordo Management Limited v. Ukraine*, SCC Case No. V 2015/092, Final Award, February 4, 2021, paras. 442, 485 (**RLA-131**); *Wena Hotels Ltd. v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Award, December 8, 2000, para. 111 (**CLA-133**).

[409] Statement of Defense, paras. 313-316; *Alasdair Ross Anderson et al. v. Republic of Costa Rica*, ICSID Case No. ARB(AF)/07/03, Award, May 19, 2010, paras. 58-59 (**RLA-21**); *Littop Enterprises Limited, Bridgemont Ventures Limited and Bordo Management Limited v. Ukraine*, SCC Case No. V 2015/092, Final Award, February 4, 2021, para. 654 (**RLA-131**); *Churchill Mining PLC and Planet Mining Pty Ltd v. Republic of Indonesia*, ICSID Case No. ARB/12/14 and 12/40, Award, December 6, 2016, paras. 504-506, 508 (**RLA-132**).

[410] Statement of Defense, para. 315 and fn. 572; *Alasdair Ross Anderson et al. v. Republic of Costa Rica*, ICSID Case No. ARB(AF)/07/03, Award, May 19, 2010, paras. 58-59 (**RLA-21**); *Littop Enterprises Limited, Bridgemont Ventures Limited and Bordo Management Limited v. Ukraine*, SCC Case No. V 2015/092, Final Award, February 4, 2021, paras. 448-449, 654 (**RLA-131**).

the host State's domestic law and the principle of good faith.[411] Rather, the Respondent asserts that the implicit legality requirement applies even more so when the investor commits corruption, and objects to Claimant's reliance on *Fraport v. Philippines* because the tribunal applied a treaty containing different language to a less severe form of illegality than corruption.[412] While the Respondent acknowledges that investment tribunals tend to distinguish between illegality committed during the making of an investment – divesting the tribunal of jurisdiction – and illegality committed during the lifetime of the investment – affecting the merits of the investment claim – it nonetheless contends that corruption occurred at every stage of the investment in the instant case.[413] As a result of the condemnable nature of corruption, the Respondent contends that the Treaty does not encompass disputes resulting from investments that have been tainted by corruption at any stage of the investment's existence, as it has been stated in other cases.[414]

268. Accordingly, the Respondent contends that the bribery of Ecuadorian officials by various subcontractors under the Claimant's supervision satisfies the definition of corruption under international law.[415] It further argues that because RDP and Petroecuador delegated on the Claimant the role of monitoring and controlling the procurement activities, the Claimant was responsible for failing to report corruption.[416] Likewise, the Respondent affirms that the bribes

---

[411]   Rejoinder, paras. 377-380; *Gustav F W Hamester GmbH & Co KG v. Republic of Ghana,* ICSID Case No. ARB/07/24, Award, June 18, 2010, paras. 123-124 (**RLA-23**); *Plama Consortium Limited v. Republic of Bulgaria,* ICSID Case No. ARB/03/24, Award, August 27, 2008, para. 138 (**RLA-24**); *SAUR International SA v. Republic of Argentina,* ICSID Case No. ARB/04/4, Decision on Jurisdiction and Liability, June 6, 2012, paras. 306-308 (**RLA-128**); *Phoenix Action, Ltd. v. Czech Republic*, ICSID Case No. ARB/06/5, Award, April 15, 2009, para. 101 (**CLA-178**); *Liman Caspian Oil BV and NCL Dutch Investment BV v. Republic of Kazakhstan*, ICSID Case No. ARB/07/14, Award (excerpt), June 22, 2010, para. 193-194 (**CLA-208**).

[412]   Rejoinder, paras. 382, 389; G. Bottini, *Legality of Investment under ICSID Jurisprudence*, in M. Waibel, A. Kaushal et al. (eds.), *The Backlash Against Investment Arbitration* (2010), pp. 298-299 (**RLA-130**); *Littop Enterprises Limited, Bridgemont Ventures Limited and Bordo Management Limited v. Ukraine*, SCC Case No. V 2015/092, Final Award, February 4, 2021, para. 442 (**RLA-131**); *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines (II),* ICSID Case No. ARB/11/12, Award, 10 December 2004, paras. 321-338 (**CLA-342**).

[413]   Rejoinder, paras. 384-385. The Respondent makes specific reference to the search for confidential information during the RDP bidding process, the conspiring with Tecnazul to breach the subcontracting limit, and the continuous and extensive gifts granted throughout the Projects' unfolding.

[414]   Rejoinder, paras. 386-387; UNCAC, Article 16 (**RLA-112**); *Littop Enterprises Limited, Bridgemont Ventures Limited and Bordo Management Limited v. Ukraine*, SCC Case No. V 2015/092, Final Award, February 4, 2021, para. 442 (**RLA-131**).

[415]   Statement of Defense, para. 320.

[416]   Statement of Defense, paras. 317-319. The Respondent contends that the Claimant had knowledge of corruption based on its decision to halt payments to Tecnazul for the Pacific Refinery Project on such grounds.

paid by the Claimant's subcontractors to secure contracts qualify as corruption under international law.[417]

### 4) US Law

269. Fourth, the Respondent considers that United States law, and in particular, the United States' Foreign Corrupt Practices Act (the "**FCPA**") sheds light on the impropriety of Worley's conduct.[418]

270. The Respondent refers to the FCPA's sanctioning of the "giving of anything of value", noting that the act does not set a minimum threshold amount.[419] The Respondent cites the following language from the statute: "What might be considered a modest payment in the United States could be a larger and much more significant amount in a foreign country."[420] Ecuador also points out that several FCPA enforcement actions have involved the payment of travel and entertainment expenses.[421]

271. In particular, the Respondent relies on the Resource Guide to the FCPA (the "**FCPA Guide**"), in which the US Department of Justice also provides examples of "Improper Travel and Entertainment" payments.[422] The Respondent submits that the payments at issue in this arbitration are analogous to those provided by the Department of Justice in its guidance documents,[423] including, in particular, the attendance by Petroecuador and RDP employees to the Formula 1 Trip[424] and the trip made by Petroecuador and RDP employees to Las Vegas.[425]

272. According to the Respondent, the Claimant also violated the United States' criminal conspiracy statute (18 U.S.C. § 371) when it agreed to confer benefits to several Petroecuador employees.[426]

---

[417]   Statement of Defense, para. 318.
[418]   Statement of Defense, para. 8; Reply, para. 393; Rejoinder, para. 157.
[419]   FCPA, Section 78dd-1(a).
[420]   Rejoinder, para. 157; FCPA Guide, p. R-459_024 (**R-459**).
[421]   FCPA Guide, p. R-459_024 (**R-459**).
[422]   FCPA Guide, p. R-459_025 (**R-459**).
[423]   Rejoinder, para. 159.
[424]   Rejoinder, paras. 160-161.
[425]   Rejoinder, para. 163.
[426]   FCPA Guide, p. R-459_043 (**R-459**).

**5) Worley's Executive Directive on Gifts**

273. Fifth, and last, the Respondent states that while the Claimant relies on its Executive Directive on Gifts (the "**Executive Directive**") to justify expenses incurred with respect to "trips for project meetings" the Executive Directive actually illustrates the impropriety of Worley's actions.[427]

274. The Respondent cites as relevant the following passages and provisions from the Executive Directive:[428]

(i)     The Executive Directive "does not distinguish between gifts, entertainment or hospitality," all of which "are treated as the same thing."[429]

(ii)    Under the section addressing "excessive, unreasonable or unacceptable gifts," the Executive Directive notes that "[g]ifts, entertainment and hospitality may be or be perceived to be bribes in certain circumstances" and asks that employees "[t]ake extra care with Gifts involving Government officials. Refer to clauses 11 and 12."[430]

(iii)   Clause 11 provides: "Many countries have special rules as to gifts, entertainment and hospitality for Government officials because gifts, entertainment and hospitality may be or be perceived to be bribes in certain circumstances."[431] It also states that Worley employees "must seek local advice to make sure that gifts, entertainment and hospitality are permitted by law."[432]

(iv)    The Executive Directive "requires all Gifts offered to … a Government official" to be "permitted by law in the local jurisdiction," "of an appropriate value and nature considering the local custom and all the circumstances," and "registered in [Worley's] gift register … if the estimated or actual value exceeds US$ 200 per person."[433]

(v)     The Executive Directive informs employees that "a breach of [these rules] may result in performance management action."[434]

---

[427]   Rejoinder, para. 169.
[428]   Rejoinder, paras. 170-171.
[429]   Executive Directive, Section 4 (**C-746**).
[430]   Executive Directive, Section 16 (**C-746**); Worley Code of Conduct, 2014, pp. 8-9 (**R-251**).
[431]   Executive Directive, Section 11 (**C-746**).
[432]   Executive Directive, Section 11 (**C-746**).
[433]   Executive Directive, Section 11 (**C-746**).
[434]   Executive Directive, Section 26 (**C-746**).

275. The Respondent contends that there is "no evidence" that Worley and its employees sought "local advice to make sure that gifts, entertainment and hospitality [were] permitted by law" and that this precaution was especially necessary for gifts of a "substantial value or that were not part of every-day business activities."[435]

276. According to the Respondent, there is also no evidence that Worley or its employees registered the aforementioned benefits on Worley's gift register, as was required under the Executive Directive when, as here, the majority of the benefits were valued in excess of the US$ 200 threshold.[436]

277. Lastly, the Respondent submits that Worley has never taken disciplinary action against the employees who conferred the aforementioned benefits; in so doing, it also failed to observe the Executive Directive.[437]

### 6) Corruption as a Bar to Admissibility

278. In the alternative that the Tribunal upholds its jurisdiction, the Respondent contends that the Claimant's bribery and bad faith acts would still render the claims inadmissible.[438] The Respondent cites jurisprudence and other authorities stating that an investor's failure to comply with "fundamental rules of domestic law and/or international public policy" during the lifetime of the investment renders a claim inadmissible, especially in cases dealing with acts such as bribery and fraud.[439] The Respondent also claims that investment tribunals have held that investors cannot rely on their own wrongdoing in bringing their claims, *i.e.* in accordance with the unclean hands doctrine.[440]

---

[435] Rejoinder, para. 172.

[436] Rejoinder, para. 173.

[437] Rejoinder, para. 174.

[438] Rejoinder, para. 397.

[439] Rejoinder, paras. 398-403; *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No ARB/03/24, Award, August 27, 2008, para. 143 (**RLA-24**); *Churchill Mining PLC and Planet Mining Pty Ltd v. Republic of Indonesia*, ICSID Case No. ARB/12/14 and 12/40, Award, December 6, 2016, paras. 488, 508 (**RLA-132**); *Bank Melli Iran and Bank Saderat Iran v. Kingdom of Bahrain*, PCA Case No. 2017-25, Award, November 9, 2021, paras. 365, 368 (**RLA-301**); Z. Douglas, *The Plea of Illegality in Investment Treaty Arbitration*, 29 (1) ICSID Review 155, p. 180 (**RLA-302**); Z. Douglas, *The International Law of Investment Claims* (2009), pp. 53-54 (**CLA-296**).

[440] Rejoinder, paras. 404-406; *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No ARB/03/24, Award, August 27, 2008, para. 143 (**RLA-24**); *Hesham Talaat M. Al-Warraq v. Republic of Indonesia*, ad hoc, Final Award, December 15, 2014, paras. 645-646 (**RLA-304**).

### 2.   THE CLAIMANT'S POSITION

279.   The Claimant submits that Respondent's "disingenuous corruption concerns" are unsubstantiated by the factual record and are contrary to established principles of international law; in the Claimant's view, they are nothing more than a "litigation strategy" orchestrated by the Respondent to avoid its Treaty obligations.[441] The Claimant emphasizes that the Respondent has not managed to charge or even establish that the Claimant engaged in any acts of corruption.[442]

#### 1)   Applicable Standard

280.   As a preliminary matter, the Claimant clarifies that both Petroecuador and RDP are State organs, or at the very least, State entities exercising elements of State authority, such that Petroecuador's and RDP's acts are attributable to Ecuador as they relate to the Claimant's claims.[443]

281.   With respect to the applicable evidentiary standard for the Respondent's corruption allegations, the Claimant rejects the Respondent's contention that the standard is "reasonable certainty" or "preponderance of the evidence": it asserts that it is a "minority view" rejected by many tribunals and even the United States and Ecuador.[444] Instead, the Claimant identifies a large consensus amongst international tribunals in that the establishment of corruption requires a high standard of proof,[445] observing that some tribunals require a standard of "clear and convincing" evidence[446]

---

[441]   Reply, paras. 366-367, 390.

[442]   Reply, para. 385.

[443]   Reply, para. 365.

[444]   Rejoinder on Jurisdiction, paras. 75-77; *Karkey Karadeniz Elektrik Uretim A.S. v. Islamic Republic of Pakistan,* ICSID Case No. ARB/13/1, Award, August 22, 2017, para. 492 (**CLA-65**); M. Hwang and K. Lim, *Corruption in Arbitration - Law and Reality*, 8 (1) Asian International Arbitration Journal 1, p. 24 (**CLA-399**); A. Llamzon and A. Charles Sinclair, *Investor Wrongdoing in Investment Arbitration: Standards Governing Issues of Corruption, Fraud, Misrepresentation and Other Investor Misconduct*, in in A. Van den Berg (ed.), *Legitimacy: Myths, Realities, Challenges*, 18 ICCA Congress Series 451, pp. 492-493 (**CLA-400**); *Merck Sharpe & Dohme (I.A.) LLC v. Republic of Ecuador*, PCA Case No. 2012-10, Respondent's Rejoinder, February 20, 2015, paras. 324, 331, 338, 341, 344, 613 (**CLA-401**); *Bridgestone Licensing Services, Inc. and Bridgestone Americas, Inc. v. Republic of Panama*, ICSID Case No. ARB/16/34, Hearing on Merits Transcript, Day 1 (Opening Statement by Counsel for the United States), July 29, 2019, 26:4-22 (**CLA-423**).

[445]   Reply, paras. 401; *Karkey Karadeniz Elektrik Uretim A.S. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/13/1, Award, August 22, 2017, para. 492 (**CLA-65**); *Sanum Investments Limited v. Lao People's Democratic Republic*, PCA Case No. 2013-13, Award, August 6, 2019, para. 108 (**CLA-341**).

[446]   Reply, para. 401; Rejoinder on Jurisdiction, paras. 73, 75; *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award, October 8, 2009, para. 221 (**CLA-39**); *Karkey Karadeniz Elektrik Uretim A.S. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/13/1, Award, August 22, 2017, para. 492 (**CLA-65**); *Waguih Elie George Siag and Clorinda Vecchi v. Arab Republic of Egypt*, ICSID Case No. ARB/05/15, Award, June 1, 2009, para. 326 (**CLA-131**); *Sanum Investments Limited v. Lao People's Democratic Republic*, PCA Case No. 2013-13, Award, August 6, 2019, para. 108 (**CLA-341**); *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines (II)*, ICSID Case No. ARB/11/12, Award, 10 December 2004, para. 481 (**CLA-342**).

while other tribunals demand a "more rigorous" standard applied in criminal proceedings.[447] In this sense, the Claimant posits that arbitral tribunals have failed to draw conclusions of corruption based on generalized allegations, citing to various cases in which, in its reading, a party made considerably greater showings to substantiate allegations of corruption but the tribunal ultimately found no corruption.[448] Additionally, the Claimant asserts that the Paris Court of Appeals has similarly ruled that such signs of corruption must be "sufficiently serious, precise, and concordant" for setting aside an award on policy grounds.[449] Finally, the Claimant considers the Respondent's proposal for a reversal of the burden of proof to be unsubstantiated and contrary to what various tribunals and Ecuador itself have stated.[450]

### 2) Evidence of Corruption

282. Applying the 'clear and convincing' evidentiary standard to the evidence put forth by the Respondent, the Claimant submits that the Respondent's corruption defense fails as a matter of fact.[451]

---

[447]   Reply, para. 401; Rejoinder on Jurisdiction, para. 75; *African Holding Company of America, Inc. and Société Africaine de Construction au Congo S.A.R.L. v. Democratic Republic of the Congo*, ICSID Case No. ARB/05/21, Decision on Jurisdiction and Admissibility, July 29, 2008, paras. 52, 55 (**CLA-273**); *Fraport A.G. Frankfurt Airport Services Worldwide v. Republic of the Philippines (I)*, ICSID Case No. ARB/03/25, Award, August 16, 2007, para. 399 (**CLA-343**).

[448]   Reply, paras. 402-405; Rejoinder on Jurisdiction, para. 79; *Karkey Karadeniz Elektrik Uretim A.S. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/13/1, Award, August 22, 2017, paras. 512-517 (**CLA-65**); *African Holding Company of America, Inc. and Société Africaine de Construction au Congo S.A.R.L. v. Democratic Republic of the Congo*, ICSID Case No. ARB/05/21, Decision on Jurisdiction and Admissibility, July 29, 2008, para. 53 (**CLA-273**); *Sanum Investments Limited v. Lao People's Democratic Republic*, PCA Case No. 2013-13, Award, August 6, 2019, paras. 122, 134-138, 147, 153-161 (**CLA-341**); *ECE Projektmanagement International GmbH and Kommanditgesellschaft PANTA Achtundsechzigste Grundstückgesellschaft mbH & Co v. Czech Republic*, PCA Case No. 2010-05, Award, September 19, 2013, para. 4.879 (**CLA-344**); *Jan Oostergetel and Theodora Laurentius v. Slovak Republic*, ad hoc, Final Award, April 23, 2012, paras. 302-303 (**CLA-345**); *Niko Resources (Bangladesh) Ltd. v. Bangladesh Petroleum Exploration & Production Company Limited ("Bapex") and Bangladesh Oil Gas and Mineral Corporation ("Petrobangla")*, ICSID Case No. ARB/10/18, Decision on the Corruption Claim, February 25, 2019, paras. 8, 2004 (**CLA-346**); *Sistem Mühendislik İnşaat Sanayi ve Ticaret A.Ş v. Kyrgyz Republic*, ICSID Case No. ARB(AF)/06/1, Award, September 2009, para. 43 (**CLA-361**); *Gustav F W Hamester GmbH v. Republic of Ghana*, ICSID Case No. ARB/07/24, Award, June 18, 2010, paras. 134-135 (**RLA-23**).

[449]   Reply, para. 406; Rejoinder, para. 154.

[450]   Rejoinder on Jurisdiction, para. 78; Procedural Order No. 1, para. 5; UNCITRAL Rules, Article 24; *Liman Caspian Oil BV and NCL Dutch Investment BV v. Republic of Kazakhstan*, ICSID Case No. ARB/07/14, Award (excerpt), June 22, 2010, para. 194 (**CLA-208**); *Quiborax S.A., Non Metallic Minerals S.A. and Allan Fosk Kaplún v. Plurinational State of Bolivia*, ICSID Case No. ARB/06/2, Decision on Jurisdiction, September 27, 2012, para. 259 (**CLA-294**); *Tethyan Copper Company Pty Limited v. Islamic Republic of Pakistan*, ICSID Case No. ARB/12/1, Decision on the Respondent's Application to Dismiss the Claims (with reasons), November 10, 2017, para. 318 (**CLA-403**); *Vito G. Gallo v. Canada*, PCA Case No. 2008-03, Award, September 15, 2011, para. 277 (**CLA-404**); *Merck Sharpe & Dohme (I.A.) LLC v. Republic of Ecuador*, PCA Case No. 2012-10, Respondent's Counter-Memorial, February 27, 2014, para. 279 (**CLA-406**).

[451]   Reply, para. 411.

283.  According to the Claimant, a relevant evidentiary issue identified by other investment tribunals is the respondent State's efforts in investigating and prosecuting the corruption alleged in the treaty arbitration.[452] In this respect, the Claimant states that Ecuador has invested ample resources into investigating the Pacific Refinery and Esmeraldas Refinery Projects but has failed to provide any evidence of wrongdoing.[453] Even more so, it notes that the Respondent has failed to ascertain evidence of bribery by the Claimant despite all the evidence and convictions obtained from Ecuador's investigations and prosecutions dating back to 2016, as well as from the § 1782 Proceedings initiated in the United States.[454]

284.  As to the evidence that actually surfaced on which the Respondent bases its corruption allegations – including the Claimant's alleged gifts to Petroecuador and RDP employees, business travel expenses to Ecuadorian officials and other "false" accusations, mostly obtained from the § 1782 Proceedings – the Claimant avers that it has been misrepresented or misused for the purpose of implicating the Claimant, as previously mentioned.[455]

285.  Further, the Claimant contends that the Respondent's investigations related to the Comptroller General's reports containing supposed "indicia of criminal liability" against Worley, as well as the subsequent State conduct stemming from those investigations, should be treated as elements of a Treaty breach and cannot serve as a basis for precluding the adjudication of those breaches.[456] According to the Claimant, the Respondent "downplays" its Treaty violations by making slanderous corruption allegations against the Claimant. Acknowledging that corruption is contrary to the rule of law and economic development, the Claimant submits that it is a *bona fide* investor that established anti-corruption policies and provided anti-corruption training to Tecnazul. The Claimant also refers to the steps it took upon learning about the corruption scandal

---

[452]  Reply, para. 407; *Glencore International A.G. and C.I. Prodeco S.A. v. Republic of Colombia*, ICSID Case No. ARB/16/6, Award, August 27, 2019, para. 738 (**CLA-53**); *Karkey Karadeniz Elektrik Uretim A.S. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/13/1, Award, August 22, 2017, paras. 537-539 (**CLA-65**); *Niko Resources (Bangladesh) Ltd. v. Bangladesh Petroleum Exploration & Production Company Limited ("Bapex") and Bangladesh Oil Gas and Mineral Corporation ("Petrobangla")*, ICSID Case No. ARB/10/18, Decision on Jurisdiction, August 19, 2013, paras. 425-426 (**CLA-350**).

[453]  Reply, para. 408; Rejoinder on Jurisdiction, para. 73; Petroecuador's Ex Parte Application for Order under 28 U.S.C. § 1782(a), August 26, 2019, paras. 2-3 (**C-52**); Letter from the Attorney General to the State Prosecutor No. 13023, March 16, 2021 (**C-732**); Letter from Worley to the Attorney General, May 7, 2021 (**C-745**); Letter from Attorney General to Prosecutor General No. 14057, May 27, 2021 (**C-941**).

[454]  Reply, paras. 383-390; 408; Rejoinder on Jurisdiction, paras. 80, 82-85, 88, 132, 153; Petroecuador's Ex Parte Application for Order under 28 U.S.C. § 1782(a), August 26, 2019, p. C-52_31 (**C-52**); Letter from Worley's Counsel to Ecuador's Counsel in § 1782 Proceeding re Production Volumes, December 17, 2021 (**C-1015**); Email from Worley's Counsel to Ecuador's Counsel relating to Production Volumes, May 27, 2022 (**C-1019**).

[455]  Reply, paras. 391-397; Rejoinder on Jurisdiction, paras. 134-141; *see* Section III.5.3) above.

[456]  Reply, paras. 375, 411.

in 2016 resulting from Panama Papers: it terminated its subcontracts with Tecnazul, halted payments to Tecnazul after that company was unable to demonstrate that it did not engage in wrongdoing and initiated § 1782 Proceedings to obtain evidence for the set-aside proceedings in Chile of the two arbitral awards issued in favor of Tecnazul.[457]

286.  In sum, the Claimant argues that Ecuador has abused the State's police powers to advance its litigation strategy, confirming that its corruption concerns are "disingenuous."[458] The Claimant further recounts in detail Ecuador's efforts – through investigation, audits, prosecutions and administrative proceedings – to "fabricate" evidence that Claimant engaged in corruption.[459]

287.  As a corollary, the Claimant requests that the Tribunal reject the Respondent's allegation that it withheld evidence and the corresponding request that it draw adverse inferences against Worley because the Claimant has acted in good faith and transparently throughout the proceedings.[460]

### 3)  Applicable Legal Framework

288.  As a matter of law, the Claimant submits that the Respondent's jurisdictional defense based on corruption also fails. As a preliminary matter, the Claimant highlights that the Treaty does not contain a clause concerning compliance with host State or other law or require such compliance

---

[457]  Reply, paras. 369-370, 373-374; Rejoinder on Jurisdiction, paras. 116, 119-120; *Consultora Tecnazul Cía. Ltda. v. WorleyParsons International, Inc.*, Arbitration and Mediation Center of the Chamber of Commerce of Quito Arbitral Process No. 044- 20, Award, December 23, 2021 (**C-413**); *Consultora Tecnazul Cía. Ltda. v. Worley International Services, Inc.*, PCA Case No. 2017-39, Final Award, April 27, 2021 (**C-414**); Worley's Application to Obtain Discovery under 28 U.S.C. § 1782, October 5, 2021, p. 2 (**C-694**); Worley's Application to Set Aside Tecnazul's Award, Honorable Court of Appeals of Santiago, July 9, 2021, pp. 2, 11 (**C-794**); Worley Email, February 7, 2013 (**C-983**); Anti-Bribery Training Invitation, December 11, 2014 (**C-997**); Worley Emails, December 26, 2014 (**C-1038**); Parker Statement II, paras. 20-22 (**CWS-4**); Falcon Statement III, paras. 9, 11 (**CWS-7**); Worley Code of Conduct, 2014, pp. 8-9 (**R-251**).

[458]  Reply, para. 376.

[459]  Reply, paras. 376-382; Rejoinder on Jurisdiction, para. 88. Specifically, the Claimant references the following events: (i) Ecuador's criminal investigations in 2016 had not implicated the Claimant in Petroecuador's corruption scandal when the Claimant submitted its Notice of Arbitration; (ii) the Respondent filed the 1782 Application six months later to obtain US-style discovery to fabricate its claims; (iii) the criminal investigations launched by Ecuador constitute an attempt to hold the Claimant vicariously liable in the projects in which it was acting as PMC and therefore consist of contractual disputes that do not relate to bribery or related charges; (iv) Ecuador's Office of Attorney General directs Ecuadorian prosecutors to initiate criminal investigations into the Claimant; and (v) Ecuador's document production requests relevant to establishing corruption, illegality or bad faith.

[460]  Rejoinder on Jurisdiction, para. 87; *Metal-Tech Ltd. v. Republic of Uzbekistan*, ICSID Case No. ARB/10/3, Award, October 4, 2013, paras. 263-265 (**CLA-363**); T. Mitra and K. Duggal, *Adverse Inference*, JUS MUNDI, March 17, 2022 (last updated), para. 11 (**CLA-396**); *Indian Metals & Ferro Alloys Ltd v. Republic of Indonesia*, PCA Case No. 2015-40, Award, March 29, 2019, paras. 238-239 (**CLA-397**); J. Sharpe, *Drawing Adverse Inferences from Non-Production of Evidence*, 2(4) Arb. Intl. 549, p. 557 (2006) (**CLA-398**); *H.A. Spalding, Inc. v. Ministry of Roads and Transport of the Islamic Republic of Iran and the Islamic Republic of Iran*, IUSCT Case No. 437, Award No. 212-437-3, February 24, 1986, para. 29 (**CLA-451**).

as a condition for the protection of investments.[461] In this regard, the Claimant cites to arbitral jurisprudence supporting the notion of the impermissibility of introducing requirements that are not contained in the treaty text.[462] While the Claimant acknowledges the applicability of a jurisdictional defense predicated on the illegality of an investment, it rejects the Respondent's suggestion of its far-reaching scope. The Claimant argues instead that the defense is limited "only" to illegality that occurs in the "initial making or acquisition" of the investment, as gleaned from the Respondent's own authorities,[463] as well as cases in which the treaty at issue contained a clause requiring compliance with the host State law.[464] The Claimant considers that this purported consensus amongst arbitral tribunals significantly weighs against the Respondent's reliance on the fragmented excerpts of the tribunal's decision in *Littop v. Ukraine*.[465] The Claimant highlights that "blanket condemnatory allegations" contain a lack of credible evidence

---

[461]   Reply, para. 413; Rejoinder on Jurisdiction, para. 90.

[462]   Reply, para. 413; Rejoinder on Jurisdiction, para. 90; *Anatolie Stati, Gabriel Stati, Ascom Group SA and Terra Raf Trans Traiding Ltd v. Republic of Kazakhstan*, SCC Case No. V 116/2010, Award, December 19, 2013, para. 812 (**CLA-9**); *Saba Fakes v. Republic of Türkiye*, ICSID Case No. ARB/07/20, Award, July 14, 2010, paras. 114, 119 (**CLA-295**); *Achmea B.V. (formerly Eureko B.V.) v. Slovak Republic [I]*, PCA Case No. 2008-13, Final Award, December 7, 2012, paras. 168, 170 (**CLA-351**); *MNSS B.V. and Recupero Credito Acciaio N.V. v. Montenegro*, ICSID Case No. ARB(AF)/12/8, Award, May 4, 2016, paras. 211-212 (**CLA-352**); *Capital Financial Hldgs. Luxembourg S.A. v. Republic of Cameroon*, ICSID Case No. ARB/15/18, Award, June 22, 2017, para. 467 (**CLA-353**); *Bear Creek Mining Corporation v. Republic of Peru*, ICSID Case No. ARB/14/21, Award, November 30, 2017, para. 320 (**CLA-378**).

[463]   Reply, paras. 414-415; Rejoinder on Jurisdiction, paras. 73, 90; *Bernhard von Pezold and others v. Republic of Zimbabwe*, ICSID Case No. ARB/10/15, Award, July 28, 2015, para. 420 (**CLA-12**); *Khan Resources Inc., Khan Resources B.V., and Cauc Holding Company Ltd. v. Mongolia*, PCA Case No. 2011-09, Decision on Jurisdiction, paras. 383-384 (**CLA-335**); *Hulley Enterprises Limited (Cyprus) v. Russian Federation*, PCA Case No. 2005-05, Final Award, July 18, 2014, paras. 1364-1365 (**CLA-356**); *David R. Aven et al. v. Republic of Costa Rica*, Case No. UNCT/15/3, Final Award, September 18, 2018, para. 342 (**CLA-357**); *Vannessa Ventures Ltd. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)04/6, Award, January 16, 2013, para. 167 (**CLA-358**); *Urbaser S.A. and Consorcio de Aguas Bilbao Bizkaia, Bilbao Biskaia Ur Partzuergoa v. Argentine Republic*, ICSID Case No. ARB/07/26, Decision on Jurisdiction, December 19, 2012, para. 260 (**CLA-359**); *Alasdair Ross Anderson et al. v. Republic of Costa Rica*, ICSID Case No. ARB(AF)/07/03, Award, May 19, 2010, para. 57 (**RLA-21**); *Oxus Gold v. Republic of Uzbekistan*, ad hoc, Final Award, December 17, 2015, para. 707 (**RLA-172**); *Infinito Gold Ltd. v. Republic of Costa Rica*, ICSID Case No. ARB/14/5, Award, June 3, 2021, para. 180 (**RLA-212**); *Quiborax S.A., Non Metallic Minerals S.A. and Allan Fosk Kaplún v. Plurinational State of Bolivia*, ICSID Case No. ARB/06/2, Award, September 16, 2015, paras. 129 (**RLA-276**).

[464]   Reply, paras. 416-419; Rejoinder on Jurisdiction, paras. 73, 90, 129; *Copper Mesa Mining Corporation v. Republic of Ecuador*, PCA No. 2012-02, Award, March 15, 2016, paras. 5.29-5.30, 5.54-5.55, 5.59, 5.64 (**CLA-159**); *Cairn Energy PLC and Cairn UK Holdings Limited (CUHL) v. Republic of India*, PCA Case No. 2016-07, Award, December 21, 2020, paras. 675-676, 710-711, 713 (**CLA-221**); *Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v. Argentine Republic*, ICSID Case No. ARB/09/1, Decision on Jurisdiction, December 21, 2012, paras. 294-295, 325-326 (**CLA-271**); *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines (II)*, ICSID Case No. ARB/11/12, Award, 10 December 2004, paras. 471-481 (**CLA-342**).

[465]   Reply, paras. 421-422; Rejoinder on Jurisdiction, para. 92; *Littop Enterprises Limited, Bridgemont Ventures Limited and Bordo Management Limited v. Ukraine*, SCC Case No. V 2015/092, Final Award, February 4, 2021, paras. 363-390, 442, 455, 486-488, 492-535 (**RLA-131**).

of bribery by the Claimant at any time during the course of its investment, and particularly not during its initial investment in 2011.[466]

289. Similarly, the Claimant argues that the Respondent relies on generalities and unsubstantiated allegations on the effects of an investment "tainted" by corruption, contrary to the well-established principle in arbitral jurisprudence that the illegality of an investment may preclude jurisdiction only if it concerns serious violations by the investor at the time the initial investment was made.[467] The Respondent's only two allegations concerning the inception of the investment – the alleged trafficking in confidential information with Mr. Plummer and violation of the 30% subcontracting limit – are not only unsupported but would not defeat jurisdiction, says the Claimant, as they do not rise to the necessary level of severity required by arbitral jurisprudence.[468]

290. According to the Claimant, the Respondent fails to consider that third-party wrongdoing is not relevant to jurisdictional determinations except in exceptional circumstances where the claimant engaged in willful ignorance or where it deliberately disregarded that wrongdoing.[469] More specifically, the Claimant considers that "significant, deliberate failings" by a claimant with respect to the unlawful conduct of third parties is required in order to divest it of protections under the treaty. In this respect, the Claimant rejects the Respondent's contention that the jurisdictional defense extends to instances in which the investor acted "unreasonably" with respect to wrongful acts of third parties.[470] The Claimant submits that when measuring the evidence against this higher

---

[466] The Claimant further posits that arbitral tribunals have long warned against such unsubstantiated allegations of corruption and that the Respondent has not attempted to prove a connecting link between the alleged corruption and the claimed benefit to the Claimant. Reply, para. 424; *ECE Projektmanagement International GmbH and Kommanditgesellschaft PANTA Achtundsechzigste Grundstückgesellschaft mbH & Co v. Czech Republic*, PCA Case No. 2010-05, Award, September 19, 2013, para. 4.879 (**CLA-344**).

[467] Reply, para. 425; Rejoinder on Jurisdiction, para. 93.

[468] Rejoinder on Jurisdiction, para. 93-97; *Bank Melli Iran and Bank Saderat Iran v. Kingdom of Bahrain*, PCA Case No. 2017-25, Award, November 9, 2021, paras. 376-379, 453, 504 507 (**RLA-301**); *Infracapital F1 S.à r.l. and Infracapital Solar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/16/18, Decision on Jurisdiction, Liability and Directions on Quantum, September 13, 2021, paras. 468, 473, 476-477 (**CLA-319**); *ECE Projektmanagement International GmbH and Kommanditgesellschaft PANTA Achtundsechzigste Grundstückgesellschaft mbH & Co v. Czech Republic*, PCA Case No. 2010-05, Award, September 19, 2013, paras. 3.169-3.171 (**CLA-344**); *Vladislav Kim and others v. Republic of Uzbekistan*, ICSID Case No. ARB/13/6, Decision on Jurisdiction, March 8 2017, paras. 394, 541 (**CLA-407**); *Álvarez y Marín Corporación S.A. and others v. Republic of Panama*, ICSID Case No. ARB/15/14, Award, October 12, 2018, paras. 151, 156 (**CLA-410**).

[469] Rejoinder on Jurisdiction, paras. 73, 111-114; FCPA, Section 78dd-2(h)(3)(A) (**C-1079**); FCPA Guide, p. R-459_024, p. R-459_23 (**R-459**).

[470] Reply, paras. 426-431; Rejoinder, para. 111; *Alasdair Ross Anderson et al. v. Republic of Costa Rica*, ICSID Case No. ARB(AF)/07/03, Award, May 19, 2010, paras. 22-24, 57-59 (**RLA-21**); *Churchill Mining PLC and Planet Mining Pty Ltd v. Republic of Indonesia*, ICSID Case No. ARB/12/14 and 12/40, Award, December 6, 2016, para. 504, 510, 515-527 (**RLA-132**); *David Minnotte & Robert Lewis v. Republic of Poland*, ICSID Case No. ARB (AF)/10/1, Award, May 16, 2014, para. 128, 135, 139, 163 (**CLA-362**).

threshold, the evidence does not support a finding that the Claimant acted with "willful blindness" or "deliberate disregard" of the known corruption.[471] Moreover, Claimant asserts that it cannot be held responsible for other third parties with which it held no contractual relationship.[472]

291. The Claimant adds that many sources of law cited by the Respondent, specifically other treaties and local law of different countries, are inapposite to the present matter.[473] The Claimant avers that multilateral treaties that define corruption require a *quid pro quo* that never materialized in any of Worley's actions.[474] As further elaborated in the paragraphs that follow, the Claimant argues that under a "proper and complete" reading of the laws of the Ecuador, France and the United States it is not possible for the Respondent to prove any corruption.[475]

292. First, the Claimant maintains that the laws of Ecuador do not "prohibit the payment of reasonable business expenses for public officials for a legitimate business purpose."[476] Worley also states that Ecuador has not shown any connection between the allegedly problematic conduct and a *quid pro quo* or unfair business advantage.[477]

293. As regards Ecuadorian criminal law, the Claimant further states that the legal standard for a conviction of corruption is "beyond a reasonable doubt", meaning that circumstantial evidence alone cannot support a finding of corruption.[478] Also in respect of criminal law, the Claimant

---

[471]   Reply, para. 432; Rejoinder, para. 112. The Claimant further notes that this applies to the Respondent unsubstantiated allegations that the Claimant failed to adequately monitor or inspect the third parties that the public oil and gas companies retained for the Projects, in violation of the Agreements.

[472]   Rejoinder on Jurisdiction, paras. 124-127; Petroecuador Memorandum No. 00944-PRY-DPP-TRA-2014, August, 15 2014 (**C-1111**); Quality Audit Checklist, Agreement No. 2011030, August 25, 2015 (**C-1157**); Letter from Worley to Petroecuador No. 408005-00445-00-PM-LTR-WPI-EPP-5081, July 2, 2014 (**C-1175**); Letter from Worley to Tesca 408005-00445-93.2-PC-LTR-WPI-TES-8656, June 2, 2015 (**C-1176**); Transference Report (excerpt), June 22, 2016 (**C-1177**); Transference Report (excerpt), June 30, 2016 (**C-1178**); Letter from Worley to Petroecuador attaching Transference Reports (excerpt), June 6, 2016 (**C-1179**); Transference Report (excerpt), May 18, 2016 (**C-1194**); RDP Board of Directors Meeting Minutes No. RDP-GE-2013-DIR-AC-0003-0, August 28, 2013, paras. 6-8 (**C-756**).

[473]   Rejoinder on Jurisdiction, paras. 142, 157.

[474]   Rejoinder on Jurisdiction, paras. 143-144; UNCAC, Article 16 (**RLA-112**); OECD Convention on Combating Bribery of Foreign Officials in International Business Transactions, Article 1(1) (**RLA-114**); Inter-American Convention Against Corruption, Article VI(1)(a) (**RLA-113**).

[475]   Rejoinder on Jurisdiction, paras. 145-156.

[476]   Reply, para. 393; Rejoinder on Jurisdiction, para. 151; Ecuador Organic Public Service Law, Article 24 (**RLA-221**); Organic Law of the Comptroller General's Office of the State, Article 45 (**C-177**); Public Procurement Law, as amended by Law 0, October 14, 2013, Article 99 (**C-1067**).

[477]   Reply, para. 398; Rejoinder on Jurisdiction, para. 151.

[478]   Rejoinder on Jurisdiction, para. 152; Ecuador Integral Criminal Code, Articles 5(3), 280 (**C-202**).

recalls that while the Respondent is accusing the Claimant of violating its own criminal law, the Government has not brought any charges against Worley.[479]

294.  Second, in respect of French law, the Claimant asserts that "the Paris Court of Appeals has repeatedly ruled that indications of corruption must be 'sufficiently serious, precise, and concordant' in order to warrant set-aside of an award on public policy grounds."[480] In the Claimant's view, the Respondent has not met this high bar.[481]

295.  Third, the Claimant asserts that the laws of the United States do not "prohibit the payment of reasonable business expenses for public officials for a legitimate business purpose."[482] It is critical of the Respondent's "highly misleading partial quotation" of the FCPA, which prohibits corruptly giving anything of value "for the purpose of … influencing any act or decision of such foreign official in his official capacity, (ii) inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official, or (iii) securing any improper advantage."[483] The Claimant recalls that the same definitional provision affirms that reasonable, *bona fide* expenditures (such as the business trips and other expenses that the Respondent has identified) do not violate the FCPA.[484] In the Claimant's view, the "safeguards" provided under the FCPA Guide to determine whether a particular expenditure is appropriate lead to the same conclusion.[485]

296.  Lastly, the Claimant rejects the Respondent's assertion that it violated the Executive Directive. According to the Claimant, only local gifts needed to be registered in the gift register, while business meals with Government officials only needed to be registered in the gift register if they exceeded US$ 200 per person.[486]

297.  In sum, the Claimant considers that the Respondent's case of corruption, involving the illegal conduct of its own State officials, is meant as a jurisdictional bar to evade liability for the Treaty violations, which go to the merits of the case.[487] The Claimant expresses its concern, as have other tribunals, that the Respondent's corruption defense aims at preserving the benefits it received

---

[479]   Rejoinder on Jurisdiction, para. 153.

[480]   Reply, para. 406; Rejoinder on Jurisdiction, para. 154.

[481]   Reply, para. 424; Rejoinder on Jurisdiction, paras. 154-156.

[482]   Reply, para. 393; Rejoinder on Jurisdiction, paras. 147-148; FCPA, Sections 78dd-1(a)(1), 1(c) (**C-1079**); FCPA Guide, pp. R-459_015-018, 025 (**R-459**).

[483]   Rejoinder on Jurisdiction, para. 146; FCPA, Section 78dd-1(a)(1) (**C-1079**).

[484]   Rejoinder on Jurisdiction, para. 147; FCPA, Section 78dd-1(c) (**C-1079**).

[485]   Rejoinder on Jurisdiction, paras. 148-149; FCPA Guide, p. R-459_024, p. R-459_25 (**R-459**).

[486]   Rejoinder on Jurisdiction, fn. 414; Executive Directive, Sections 11, 12, 15 (**C-746**); Falcon Statement III, para. 29 (**CWS-7**).

[487]   Reply, para. 433; Rejoinder on Jurisdiction, paras. 2, 159.

from the Claimant while avoiding payment – which is further exacerbated by the fact that Ecuador's own public officials participated in the corruption.[488] According to the Claimant, this goes against the well-established principle that only illegality in the initial making of an investment deprives a tribunal of jurisdiction, while illegality in the performance of the investment is a matter determined as part of the merits of the proceedings.[489]

### 4)  Corruption as a Bar to Admissibility

298.  The Claimant argues that it is untimely for the Respondent to raise illegality as a new admissibility objection in its Rejoinder.[490] Given that admissibility objections must be raised at the earliest opportunity, the Claimant states that this objection has been waived and should be rejected on that basis.[491]

299.  In any case, the Claimant considers this objection an unfounded tactic with the sole intention to extend its defense over the lifetime of Worley's investment, a position tribunals have already

---

[488]    Reply, paras. 434-435; Rejoinder on Jurisdiction, paras. 3, 123, 157-159; *In re Empresa Pública de Hidrocarburos del Ecuador*, Court of Appeals of the Eleventh Circuit, Decision on Petition for Mandamus from the United States District Court for the Southern District of Florida, 2020 U.S. App. LEXIS 16722 (**C-454**); *United States v. Juan Andres Baquerizo Escobar*, Southern District Court of Florida, ECF No. 97 (**C-574**); *In re Empresa Pública de Hidrocarburos*, Eleventh Circuit Court, 2020 U.S. App. LEXIS 16721 (**C-861**); *Karkey Karadeniz Elektrik Uretim A.S. v. Islamic Republic of Pakistan,* ICSID Case No. ARB/13/1, Award, August 22, 2017, para. 534 (**CLA-65**); *Niko Resources (Bangladesh) Ltd. v. Bangladesh Petroleum Exploration & Production Company Limited ("Bapex") and Bangladesh Oil Gas and Mineral Corporation ("Petrobangla")*, ICSID Case No. ARB/10/18, Decision on the Corruption Claim, February 25, 2019, para. 2008 (**CLA-346**); *Sistem Mühendislik İnşaat Sanayi ve Ticaret A.Ş v. Kyrgyz Republic*, ICSID Case No. ARB(AF)/06/1, Award, September 2009, para. 45 (**CLA-361**); *Metal-Tech Ltd. v. Republic of Uzbekistan*, ICSID Case No. ARB/10/3, Award, October 4, 2013, para. 389 (**CLA-363**); Technical Guide to the UNCAC, United Nations, pp. 109-110 (**CLA-418**); UNCAC, Article 34 (**RLA-112**).

[489]    Reply, para. 433; Rejoinder on Jurisdiction, paras. 73, 90, 129; *Copper Mesa Mining Corporation v. Republic of Ecuador*, PCA No. 2012-02, Award, March 15, 2016, para. 5.65 (**CLA-159**); *Khan Resources Inc., Khan Resources B.V., and Cauc Holding Company Ltd. v. Mongolia*, PCA Case No. 2011-09, Decision on Jurisdiction, paras. 383-384 (**CLA-335**); *Hulley Enterprises Limited (Cyprus) v. Russian Federation*, PCA Case No. 2005-05, Final Award, July 18, 2014, paras. 1355, 1633 (**CLA-356**); *Vladislav Kim and others v. Republic of Uzbekistan*, ICSID Case No. ARB/13/6, Decision on Jurisdiction, March 8 2017, para. 553 (**CLA-407**); *Infinito Gold Ltd. v. Republic of Costa Rica*, ICSID Case No. ARB/14/5, Award, June 3, 2021, para. 180 (**CLA-415**).

[490]    Rejoinder on Jurisdiction, paras. 128.

[491]    Rejoinder on Jurisdiction, paras. 128; *Copper Mesa Mining Corporation v. Republic of Ecuador*, PCA No. 2012-02, Award, March 15, 2016, paras. 5.63-5.64 (**CLA-159**); G. Zeiler, *Jurisdiction, Competence, and Admissibility*, in C. Binder et al., *International Investment Law for the 21ˢᵗ Century* (2009), p. 89 (**CLA-411**); *Mohamed Abdel Raouf Bahgat v. Arab Republic of Egypt (I)*, PCA Case No. 2012-07, Procedural Order No. 5 (On Claimant's Request to Rule as Inadmissible Respondent's New Jurisdictional Objections) (excerpt), May 17, 2017, paras. 39-46 (**CLA-456**).

rejected.[492] While the cases cited by the Respondent based their findings on treaty text and the existence of pervasive and systematic illegality, the Claimant concludes that the Treaty has no illegality provision, the facts as alleged by the Respondent do not rise to the same level of severity, and none of those allegations has been substantiated by evidence.[493]

---

[492]   Rejoinder on Jurisdiction, paras. 129-131; *Vladislav Kim and others v. Republic of Uzbekistan*, ICSID Case No. ARB/13/6, Decision on Jurisdiction, March 8 2017, para. 553 (**CLA-407**); *Vestey Group Ltd. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/06/4, Award, April 15, 2016, paras. 131-132, 140-141, 147, 149, 150 (**CLA-414**); *Infinito Gold Ltd. v. Republic of Costa Rica*, ICSID Case No. ARB/14/5, Award, June 3, 2021, para. 180 (**CLA-415**); *Hesham Talaat M. Al-Warraq v. Republic of Indonesia*, ad hoc, Final Award, December 15, 2014, paras. 631, 634-648 (**RLA-304**).

[493]   Rejoinder on Jurisdiction, para. 131.

## VI.   THE TRIBUNAL'S ANALYSIS ON JURISDICTION AND ADMISSIBILITY

### 1. PRELIMINARY MATTERS

300.   The Parties' submissions on illegality raise preliminary issues concerning (i) the applicability of a requirement of compliance of an investment with the law of the host country; and (ii) the timing of any purported illegality vis-à-vis the making of investment and its consequences. The Tribunal will address these questions before turning to the substance of the Parties' arguments on illegality.

### 1)   Compliance with the Law of the Host Country

301.   The Parties differ on whether an investment treaty must include express language requiring compliance of the investment with the law of the host country for such requirement to apply or, conversely, whether such requirement applies even if the treaty contains no express legality clause, as it is the case here.

302.   The Respondent cites *Plama v. Bulgaria* and *Phoenix v. Czech Republic* for the principle that investments made in disregard of national legal requirements may be excluded from the scope of protection of the applicable treaty even if there is no express treaty provision requiring investments to be made legally or in good faith. By necessary implication, says the Respondent, such protection is only available for investments made in accordance with national law and in good faith.[494] A similar conclusion was reached by the *SAUR v. Argentina* tribunal: whether or not the applicable investment treaty contains an express legality clause is irrelevant because the condition that the investor must not commit a serious violation of the legal order is inherent to any investment treaty:

> [The tribunal] is aware that the finality of the investment arbitration system is to protect only lawful and *bona fide* investments. Whether or not the BIT between France and Argentina mentions the requirement that the investor act in conformity with domestic legislation does not constitute a relevant factor. The condition of not committing a serious violation of the legal order is a tacit condition, inherent to any BIT as, in any event, it is incomprehensible that a State offer the benefit of protection through arbitration if the investor, in order to obtain such protection, has acted contrary to the law.[495]

303.   The Claimant argues against reading a requirement of legality into the Treaty. It relies on several decisions in which tribunals ruled that absent "express treaty language, illegality of an investment

---

[494]   Rejoinder, paras. 377-380; *Plama Consortium Limited v. Republic of Bulgaria,* ICSID Case No. ARB/03/24, Award, August 27, 2008, para. 138 (**RLA-24**); *Phoenix Action, Ltd. v. Czech Republic,* ICSID Case No. ARB/06/5, Award, April 15, 2009, para. 101 (**CLA-178**).

[495]   *SAUR International SA v. Republic of Argentina,* ICSID Case No. ARB/04/4, Decision on Jurisdiction and Liability, June 6, 2012, para. 308 (**RLA-128**).

cannot act as a bar to jurisdiction."[496] In the Claimant's submission, "to the extent that an implicit legality requirement may be read into the Treaty, it is well established that allegedly unlawful conduct may be relevant to jurisdiction only if it occurred in the initial making of the investment …"[497]

304.    In the Tribunal's view, the crucial question is not whether it should read a legality requirement into the Treaty, but rather whether a tribunal should assume that a State would have given its consent to arbitration to protect investments that breached its own law. This question must clearly be answered in the negative:

> There is no doubt that the requirement of the conformity with law is important in respect of the access to the substantive provisions on the protection of the investor under the BIT. This access can be denied through a decision on the merits. However, if it is manifest that the investment has been performed in violation of the law, it is in line with judicial economy not to assert jurisdiction.[498]

305.    The same conclusion was reached by the *Inceysa v. El Salvador* tribunal:

> Having specified the above guidelines, it is necessary to concretely examine the arguments on which El Salvador bases its objection, maintaining that disputes arising from an investment made illegally are not subject to the jurisdiction of the Centre because they are not included within the premises for which the consent was given…
>
> Based on the foregoing arguments, this Arbitral Tribunal considers that the consent granted by Spain and El Salvador in the BIT is limited to investments made in accordance with the laws of the host State of the investment. Consequently, this Tribunal decides that the disputes that arise from an investment made illegally are outside the consent granted by the parties and, consequently, are not subject to the jurisdiction of the Centre, and that this Tribunal is not competent to resolve them, for failure to meet the requirements of Article 25 of the Convention and those of the BIT.[499]

306.    And, similarly, the *Plama* tribunal ruled – albeit not as a question of jurisdiction – that the substantive protections of the ECT cannot apply to investments that are made contrary to law:

> Unlike a number of Bilateral Investment Treaties, the ECT does not contain a provision requiring the conformity of the Investment with a particular law. This does not mean,

---

[496]    Rejoinder on Jurisdiction, para. 90; *Anatolie Stati v. Kazakhstan*, SCC Case No. V 116/2010, Award, December 19, 2013, para. 812 (**CLA-9**); *Saba Fakes v. Republic of Turkey*, ICSID Case No. ARB/07/20, Award, July 14, 2010, paras. 114, 119 (**CLA-295**); *Achmea B.V. (formerly Eureko B.V.) v. Slovak Republic [I]*, PCA Case No. 2008-13, Final Award, December 7, 2012, paras. 168, 170 (**CLA-351**); *Bear Creek Mining Corporation v. Republic of Peru*, ICSID Case No. ARB/14/21, Award, November 30, 2017, para. 320 (**CLA-378**).

[497]    Rejoinder on Jurisdiction, para. 90.

[498]    *Phoenix Action, Ltd. v. Czech Republic,* ICSID Case No. ARB/06/5, Award, April 15, 2009, para. 104 (**CLA-178**).

[499]    *Inceysa Vallisoletana, S.L. v. Republic of El Salvador*, ICSID Case No. ARB/03/26, Award, August 2, 2006, paras. 182, 207 (**RLA-22**).

> however, that the protections provided for by the ECT cover all kinds of investments, including those contrary to domestic or international law…
>
> In accordance with the introductory note to the ECT "[t]he fundamental aim of the Energy Charter Treaty is to strengthen the rule of law on energy issues [ ... ]". Consequently, the ECT should be interpreted in a manner consistent with the aim of encouraging respect for the rule of law. The Arbitral Tribunal concludes that the substantive protections of the ECT cannot apply to investments that are made contrary to law.[500]

307. Accordingly, the Tribunal concludes that the absence of an express legality clause in the Treaty does not preclude an enquiry into whether the Claimant's alleged investment complied with the law. Any such illegality may impact the adjudication of this dispute in several ways. In particular, existing illegalities may deprive the Claimant's alleged investment from the substantive protections of the Treaty or – as further elaborated in the following section – bar the jurisdiction of the Tribunal or the admissibility of the Claimant's claims.

### 2)  Timing of the Illegality and its Consequences

308. Having determined that it is empowered to assess compliance of the Claimant's purported investment with the law, the subsequent question that must be addressed by the Tribunal is whether unlawful activities display different consequences depending on the stage at which they are committed – at the inception of the investment or at a later point in time, during the operation of the investment.

309. The Parties agree that illegality may be relevant to jurisdiction at the time an investment is made.[501] However, in respect of illegalities occurring *after* an investment is made, the Claimant states that they are an issue only for the merits,[502] while the Respondent states that they are capable both of rendering the Claimant's claims inadmissible[503] and depriving the Tribunal of jurisdiction "because corruption bars jurisdiction whenever it is committed."[504]

---

[500]   *Plama Consortium Limited v. Republic of Bulgaria,* ICSID Case No. ARB/03/24, Award, August 27, 2008, paras. 138-139 (**RLA-24**).

[501]   Claimant's PHB, para. 106; Respondent's PHB, para. 126.

[502]   Rejoinder on Jurisdiction, para. 129.

[503]   Rejoinder, paras. 398-400.

[504]   Respondent's PHB, para. 126.

310. The Tribunal considers it generally recognized that illegality affecting the making of the investment may deprive an investment treaty tribunal of jurisdiction.[505] It recalls, however, that only illegalities of a particularly serious nature are capable of meeting this threshold:

> The Parties debated at some length the extent to which illegality connected with an investment might affect the jurisdiction of a Tribunal to rule upon a claim more generally, even in the absence of express language in the relevant bilateral investment treaty requiring compliance with domestic law. However, the cases in which tribunals have found that they are without jurisdiction on the basis of illegality, on analysis, have all concerned illegality of a particularly serious nature connected with the initial making of the investment, such as corruption, or fraud.[506]

311. In the instant case, the Respondent refers to two instances of illegality at the time of the making of the alleged investment: (i) Mr. Plummer's purported trafficking in confidential information in the lead-up to the award of the Pacific Refinery Agreement to Worley; and (ii) Worley's alleged misrepresentation of its intention to comply with the 30% subcontracting limit required under Ecuadorian law during the tender of the Esmeraldas Refinery, Machala Plant and Pacific Refinery Agreements.[507] The Claimant also characterizes these allegations as "concerning the inception of the investment."[508]

312. Thus, the question that the Tribunal must answer in respect of these two instances of alleged illegality is whether they are of a sufficiently serious nature so as to deprive the Tribunal of jurisdiction. The Tribunal will perform this analysis in Section VI.2 below.

313. The Tribunal recalls, however, that the Respondent's allegations of illegality are not restricted to conduct arising strictly at the inception of the Claimant's investment. The Respondent further alleges that Worley engaged in illegal behavior during the operation of the investment by obtaining the six Esmeraldas Refinery Complementary Agreements in breach of Article 87 of the Public Procurement Law, pursuant to which the value of the addenda to the Esmeraldas Refinery Agreement could not exceed 70% of the value of the main contract. The Respondent

---

[505] *See, e.g., Fraport AG Frankfurt Airport Services Worldwide v. Republic of Philippines (II)*, ICSID Case No. ARB/11/12, Award, December 10, 2014, para. 473 (**CLA-342**); *Littop Enterprises Limited, Bridgemont Ventures Limited and Bordo Management Limited v. Ukraine*, Award, February 4, 2021, para. 442 (**RLA-131**).

[506] *ECE Projektmanagement International GmbH and Kommanditgesellschaft PANTA Achtundsechzigste Grundstückgesellschaft mbH & Co v. Czech Republic*, PCA Case No. 2010-05, Award, September 19, 2013, paras. 3.169 (**CLA-344**). *See also Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, August 27, 2008, para. 143 (**RLA-24**).

[507] *See* Section III.5.2 above.

[508] Rejoinder on Jurisdiction, para. 93.

also refers to a broader pattern of corruption consisting in the bribing of Petroecuador officials by Worley and Tecnazul.[509]

314.    In this connection, the Tribunal observes that illegalities occurring during the life of the Claimant's investment may also have an impact on the adjudication of the Claimant's claims. While any such illegalities may be addressed as part of the merits of a claim, particularly serious illegalities concerning violations of international public policy may have the effect of barring the admissibility of claims according to a majority of the Tribunal. As explained by the *Bank Melli* tribunal:

> the rationale for the temporal restriction of the jurisdictional legality defence, which is not to grant treaty protection to an investment made illegally, does not apply to an admissibility defence under the doctrines of international public policy and unclean hands. The reason why serious violations such as a breach of international public policy may bar the admissibility of claims is that international adjudicatory bodies have a duty not to entertain claims tainted by violations of certain universally accepted norms pursuant to general principles of good faith and *nemo auditur propiam turpitudinem allegans*.
>
> …
>
> While in investment arbitration, international public policy has primarily been invoked in the context of illegalities affecting the making of the investment, the underlying rationale also applies to subsequent illegalities, if they are severe and taint the claims in arbitration. According to Douglas, an investor whose claims are tainted by a breach of international public policy must not be "assisted in any way by the arbitral process".[510]

315.    *Bank Melli* established further requirements for the inadmissibility of claims based on illegal conduct: the unlawful activity in question must be (i) serious and widespread and (ii) bear a close relationship to the claims:

> That being so, not every unlawful activity will render an investor's claims inadmissible in international adjudications. To have this effect, the illegal conduct must be (i) serious and widespread and (ii) bear a close relationship to the claims. On the one hand, sporadic and trivial violations of the law will not trigger the inadmissibility of the claims. On the other hand, the fact that an investor has committed serious violations of the law does not mean that such investor must be denied access to international treaty arbitration as a blanket measure even in a situation where the particular claims do not arise out of these illegal activities. To warrant a sanction as stringent as the inadmissibility of the claims, the two requirements of seriousness and connexity must be cumulatively satisfied.[511]

---

[509]    *See* Section III.5.3 above

[510]    *Bank Melli Iran and Bank Saderat Iran v. Kingdom of Bahrain*, PCA Case No. 2017-25, Award, November 9, 2021, paras. 365, 367 (**RLA-301**). *See also Churchill Mining PLC and Planet Mining Pty Ltd v. Republic of Indonesia*, ICSID Case No. ARB/12/14 and 12/40, Award, December 6, 2016, paras. 507-508 (**RLA-132**).

[511]    *Bank Melli Iran and Bank Saderat Iran v. Kingdom of Bahrain*, PCA Case No. 2017-25, Award, November 9, 2021, para. 376 (**RLA-301**).

316. According to Arbitrator Stern, although the end result is the same, illegalities occurring during the life of the Claimant's investment should rather be addressed as part of the merits of a claim. If the Tribunal finds corruption or grave illegalities, it should decide that the claim is dismissed because the investment is not a protected investment. Admissibility should be a concept limited to procedural defects of a claim that can possibly be corrected, while a claim based on an investment tainted by corruption can never be cured.

317. The Tribunal will assess whether the Respondent's illegality allegations meet the *Bank Melli* threshold in Section VI.3 below.

## 2. ILLEGALITY AT THE MAKING OF THE INVESTMENT

318. The Tribunal will now address the two instances of alleged illegality at the time of the inception of the Claimant's investment: (**1**) Worley's purported trafficking in confidential information; and (**2**) the alleged misrepresentation of the intention to comply with the 30% subcontracting limit required under Ecuadorian law during the tender of several of the Agreements.

### 1) Trafficking in Confidential Information

i.   Introduction

319. In essence, Worley's so-called trafficking in confidential information concerns certain exchanges of information between the Claimant and Mr. Plummer of Shaw, a consulting firm operating in Ecuador, while Mr. Plummer simultaneously assisted RDP with the selection of a PMC for the Pacific Refinery Project and thereafter with the negotiation of the terms of the Pacific Refinery Agreement. Shaw was eventually hired by the Claimant as a consultant after Worley was awarded the Pacific Refinery Agreement – allegedly, as a result of Mr. Plummer's "trafficking".

320. The Claimant denies these allegations of trafficking in confidential information. According to the Claimant:

> (i) these allegations concern a time months **after** RDP had already elected Worley as PMC, so could have had **no** impact on the decision to award Worley the contract; (ii) RDP was well aware that Mr. Plummer acted as an intermediary between RDP and Worley, as shown by several emails; (iii) Shaw entered into the contract with Worley only after **RDP instructed** it to do so; (iv) the subcontract was concluded **eighteen months after** the alleged "trafficking"; (v) the emails do not reveal **any** confidential email transferred from Mr. Plummer to Worley; and (vi) Worley made **no payments** under the subcontract because no work orders were ever placed.[512]

---

[512]   Claimant's PHB, para. 113 (emphasis in the original).

321. The Tribunal will assess the Respondent's allegations of "trafficking" in confidential information by reference to the contemporaneous documents reflecting the discussions between Mr. Plummer and Worley and illustrating their broader context.

ii. Timeline

322. *September 13, 2010*: RDP invited Worley to participate in the bid to act as project manager for the construction of the Pacific Refinery.[513] The invitation was sent by Mr. Plummer in his capacity as Senior Executive Consultant of Shaw. In his cover e-mail, he explained that "Shaw Consultants International is assisting Refineria del Pacific [*sic*] and are forwarding the attached invitation at their request."[514]

323. Upon receiving Mr. Shaw's invitation to bid, Mr. Doug Eberhart of Worley said in an internal e-mail that same day: "I can see we would be interested in making a presentation for PMC capabilities but hopefully we can get some good intelligence in advance of spending $ on a bid." He also wrote: "Shaw looks to be involved but not clear how?"[515]

324. *January 2011*: Worley submitted its bid for the Pacific Refinery Project.[516]

325. *March 5, 2011*: The President of Ecuador publicly announced the selection of Worley as PMC for the Pacific Refinery Project.[517] The RDP technical committee that was established to advise RDP on the bidding process – comprised, among others, of Shaw[518] – gave Worley the highest cumulative score amongst all bidders.[519] During this process, Shaw had assisted with drafting the terms of reference for the bidding process to engage Worley and had also reviewed Worley's proposal.[520]

326. *April 8, 2011*: Mr. Plummer, on behalf of RDP, invited Worley "to meet with RDP at their offices in Manta, Ecuador on April 19 and 20, 2011 to discuss [its] recent proposal."[521]

---

[513]   RDP's Invitation to Manifest Interest in PMC Contract, September 13, 2010 (**C-90**).

[514]   G. Plummer email to Worley, September 13, 2010 (**R-304**).

[515]   D. Eberhart email to M. Villegas, September 13, 2020 (**R-306**).

[516]   Elizondo Statement, para. 13 (**CWS-1**).

[517]   Republic of Ecuador, *President Address No. 211* (video), at 2:22:24 (**C-144**).

[518]   Reply, para. 80; Rejoinder, para. 23.

[519]   Pacific Refinery Agreement, p. 141 (**C-8**).

[520]   Reply, para 80; Rejoinder, para. 21.

[521]   G. Plummer email to M. Villegas, April 8, 2011 (**R-307**).

327. *May 13, 2011*: RDP formed a committee to negotiate the terms of the Pacific Refinery Agreement with Worley, of which Shaw also formed part.[522]

328. *May 24 and 25, 2011*: In e-mail correspondence, Mauricio Villegas ("**Mr. Villegas**"), a Business Development Manager at Worley, discussed certain draft documents meant for submission to RDP with Mr. Plummer without copying anyone else. In particular, on May 24, 2011 Mr. Villegas sent to Mr. Plummer "our draft NTP [Notice to Proceed] letter for your review and comment." Mr. Plummer promptly sent "suggested modifications" that same day. These were appreciated by Mr. Villegas, "especially the one about the taxes." Mr. Plummer replied: "No problem – you owe me a beer (or Cuba Libre if we ever meet in Venezuela!)."[523]

329. The Tribunal is unable to ascertain the exact scope of Mr. Plummer's proposed modifications to Worley's documents on the basis of the evidence before it. However, the only reference to "taxes" in the final draft of the Notice to Proceed referenced in the abovementioned exchange (which would allow Worley to commence work "pending finalization of the formal contract") is found in a provision concerning payment of an advance on costs. In relevant part, such provision determines that *RDP, at no cost to Worley*, would pay all Ecuadorian taxes relating to this work – a substantive insertion materially favoring Worley:

> Refineria del Pacifico Eloy Alfaro CEM authorizes WorleyParsons to invoice up to eight hundred and seventy five thousand dollars USD ($875,000) for services and related reimbursable costs pertaining to the performance of Scope of Work as described in Attachment 1-"60 day Execution Plan". *For the avoidance of doubt, this sum excludes all Ecuadorian taxes and any such Ecuadorian taxes relating to this work will be paid by Refineria del Pacifico Eloy Alfaro CEM at no cost to WorleyParsons.*[524]

330. The following day, Mr. Villegas again requested Mr. Plummer's input on "the final package to be sent to RDP." Mr. Villegas suggested that, once the package was "good to go" (*i.e.* after the implementation of Mr. Plummer's input) it should be sent to Mr. Plummer and not to RDP, as Mr. Plummer "[is] the neutral party". Again, Mr. Plummer obliged as "[he] could not resist making mod[ifications]", but advised that Worley should send over the package directly to RDP. Some of the additional suggestions made by Mr. Plummer concerned the split of work as between Worley and Tecnazul: "But take care showing the split Azul in case it complicates the tax question. What happens if RDP wants separate invoices from Azul because they are liable for

---

[522] Pacific Refinery Agreement, p. 167 (**C-8**); RDP Negotiation Commission Report on Worley's bid for the Selection of the PMC, June 16, 2011, p. 3 (**C-824**).

[523] M. Villegas email to G. Plummer, May 24, 2011 (**R-308**); M. Villegas email to G. Plummer, May 24, 2011 (**R-310**).

[524] Letter from Worley to RDP transmitting Notice to Proceed, May 24, 2011, p. 3 (**R-309**) (emphasis by the Tribunal).

Ecuadorian taxes. Ask Azul about this or maybe do not define what portion of the hours will be from Azul." Mr. Villegas then instructed his team to consider the comment made by Mr. Plummer, which "[had] some merit."[525] No RDP officials were copied on this correspondence.

331. According to the Claimant, in these exchanges Mr. Plummer merely "[r]ecommends that Worley send a document package directly to RDP and makes non-material suggestions to the draft documentation, such as inclusion of a worksheet."[526] The Tribunal disagrees with this characterization. Self-evidently, Mr. Plummer provided substantive input seeking to enhance Worley's materials meant for submission to RDP, including input on RDP's potential reaction to certain elements of Worley's proposal. It is apparent that Worley implemented Mr. Plummer's comments to a great extent and only then submitted a negotiating "package" to RDP, the content of which would in all likelihood have been different absent Mr. Plummer's input. The impropriety of this behavior lies in Mr. Plummer's simultaneous role as a member of the committee assisting RDP in the same negotiation with Worley – a purported "neutral party", as depicted by Mr. Villegas in his May 25, 2011 e-mail, which, patently, he was not. Indeed, the familiar tone and willingness that are apparent in Mr. Plummer's above correspondence, which remain unchanged in subsequent communications that are addressed in the paragraphs that follow, suggest that Mr. Plummer regularly provided similar, substantive input to Worley, at the very least within the ambit of the negotiations of the Pacific Refinery Agreement.

332. *June 2011*: In a similar vein, in advance of a meeting between Worley and RDP, Mr. Villegas sent a draft agenda to Mr. Plummer requesting that he add "those point [*sic*] which RDP would like to discuss so we capture points from both sides." In response, Mr. Plummer provided Mr. Villegas with "a document [he] passed on the RDP [meeting] last week when they were thinking about topics to be discussed", which he hoped would give Worley "some idea of what they have in their minds now." In particular, Mr. Plummer advised Mr. Villegas that one concern RDP had about the Claimant was its "capacity to take this work and are your people still available????"[527]

333. The Tribunal considers it highly unusual for a "neutral party" in a negotiation to provide to one side internal deliberative documents showing the state of mind of the other side in advance of a meeting. There is no indication that Mr. Plummer shared this information at the request or with the approval of RDP.

---

[525]   M. Villegas email to G. Plummer, May 24, 2011 (**R-308**); M. Villegas email to G. Plummer, May 24, 2011 (**R-310**).

[526]   Rejoinder on Jurisdiction, para. 102.

[527]   G. Plummer email to M. Villegas, June 8, 2011 (**R-311**).

334. *June 29, 2011*: Two weeks thereafter, Mr. Plummer thanked Mr. Villegas for a "fine lunch", sending him his "very best wishes for a quick confirmation of your contract and every success as you try to guide RDP to the paths of wisdom."[528]

335. *June 30, 2011*: The following day, Mr. Plummer provided Mr. Villegas and Mr. Carlos Elizondo, Vice President and Project Director at Worley ("**Mr. Elizondo**"), with internal information he had received from a Petroecuador employee named Hugo about the Esmeraldas Refinery Project, which was running in parallel. Mr. Plummer was likely referring to Mr. Hugo Espinosa, a Petroecuador engineer who, together with several Shaw employees, had been appointed to an RDP technical commission in charge of assessing the bids for the Pacific Refinery Project.[529]

336. The information shared by Mr. Plummer in this e-mail about the Esmeraldas Refinery Project included: (i) the expected date on which Petroecuador would issue invitations to bid (ITBs) (July 4) and the anticipated submission date (July 25), stressing that the bid period would be short; (ii) who the competing bidder was (KBR); and (iii) certain anticipated requirements for the bid and some internal "priorities" regarding the expected performance of the winning PMC, listed as items (a) through (c).

337. Mr. Elizondo conveyed this information to his team, noting that Mr. Plummer's observations "will assist us preparing a solid proposal and confirm that items (a) through (c) below are critical to give PetroEcuador a good feel that we understand the task at hand."[530] In the Tribunal's view, this confirms the valuable nature of the information provided by Mr. Plummer to Worley. Aside from insight on the substantive requirements for the bid, Mr. Plummer's early warning gave Worley a 4-day head start to prepare its offer for the Esmeraldas Refinery Project, which was key in view of the anticipated short period to make a submission.

338. *July 11, 2011*: Worley notified its intention to submit a bid for the Esmeraldas Refinery Project.[531]

339. *July 21, 2011*: In an e-mail with subject line "Esmeralda", Mr. Elizondo of Worley informed Mr. Plummer, copying Mr. Villegas, that he had "heard a rumor that they invited other Korean companies to bid [but] could not confirm the rumor." Mr. Plummer promised that he would "make inquiries about the mythical Korean bidder."[532] That day, Mr. Plummer wrote separately to

---

[528]   G. Plummer email to M. Villegas, June 29, 2011 (**R-312**).

[529]   RDP's Communication No. 00104-RDP-2011, January 26, 2011 (**R-125**).

[530]   G. Plummer email to Worley, July 5, 2011 (**R-313**).

[531]   Proposal Evaluation for the Esmeraldas Agreement, Memorandum No. 25155-RCTR-CTE-2011, September 20, 2011, para. 1.12 (**C-93**).

[532]   C. Elizondo email to G. Plummer, July 21, 2011 (**R-314**).

Mr. Villegas noting that Petroecuador employee Hugo "is very concerned that your bid for Esmeraldas meets all the requirements … if you don't dot every 'I' and cross every 't' then he may be forced to ignore your bid since KBR has dropped out and you are now the only bidder."[533]

340. *July 25, 2011*: Mr. Plummer informed Mr. Villegas that no "extension of time [had] been given" – presumably, for the submission of Worley's bid for the Esmeraldas Refinery Project. Mr. Plummer further noted that "Hugo's bosses were concerned that you have not asked any questions … we explained to Hugo that … we did not consider it noteworthy that you had not asked too many questions and we expected your bid to be complete."[534]

341. *August 2, 2011*: Worley submitted its bid for the Esmeraldas Refinery Project.[535]

342. *September 20, 2011*: The Technical Commission in charge of the evaluation process of the bids for the Esmeraldas Refinery Project recommended that Petroecuador award the contract to Worley.[536]

343. *November 2011*: The Esmeraldas Refinery Agreement was eventually concluded on November 14, 2011.[537] The Pacific Refinery Agreement was concluded a few days thereafter, on November 22, 2011.[538]

344. *September 19, 2012*: Almost a year thereafter, Worley entered into a "Consulting Agreement" with Shaw, pursuant to which Shaw would "furnish Technical and Business Consulting services … in accordance with one or more task orders … issued from time to time by [Worley]."[539] While this agreement did not indicate a specific amount of compensation in exchange for Shaw's services – as the compensation due was to be fixed in each individual task order –[540] the original agreement proposal submitted by Mr. Plummer to Mr. Elizondo foresaw payment of US\$ 1,000,000 in professional fees and US\$ 200,000 in travel costs.[541] The transmittal e-mail of said

---

[533]   G. Plummer email to M. Villegas, July 21, 2011 (**R-315**).

[534]   G. Plummer email to M. Villegas, July 25, 2011 (**R-316**).

[535]   Proposal Evaluation for the Esmeraldas Agreement, Memorandum No. 25155-RCTR-CTE-2011, September 20, 2011, para. 1.24 (**C-93**).

[536]   Proposal Evaluation for the Esmeraldas Agreement, Memorandum No. 25155-RCTR-CTE-2011, September 20, 2011, para. 3 (**C-93**)

[537]   Esmeraldas Refinery Agreement (**C-3**).

[538]   Pacific Refinery Agreement (**C-8**).

[539]   Consulting Agreement between Worley and Shaw Consultants, September 19, 2012, p. 1 (**R-318**).

[540]   Consulting Agreement between Worley and Shaw Consultants, September 19, 2012, para. 3.1 (**R-318**).

[541]   Shaw's Proposal to Worley, August 8, 2012, p. 4 (**R-319**).

proposal indicated that Shaw's services were meant "for continued technical support to the Refineria del Pacific [*sic*] (RDP) Project in Ecuador."[542]

iii.   Analysis

345.   Having reviewed this evidence, the Tribunal is unable to conclude that Shaw's role during the process leading to the conclusion of the Pacific Refinery Agreement was that of a mere intermediary, as the Claimant would seem to imply. In particular, the Tribunal is unable to reconcile the Claimant's characterization of Mr. Plummer as a "neutral party"[543] as between RDP and Worley with Mr. Plummer's (i) substantive (and eventually implemented) input into documents prepared by Worley for submission to RDP within the context of the negotiations of the Pacific Refinery Agreement;[544] and (ii) facilitating internal RDP documents to Worley in advance of a meeting seeking to give Worley "some idea of what is in [RDP's officials] minds now" as regards the terms of the Pacific Refinery Agreement, which were under discussion at the time.[545]

346.   While the Tribunal remains mindful that Worley had already been selected as PMC for the Pacific Refinery Project at the time these exchanges took place, the terms of the Pacific Refinery Agreement were still being negotiated. Mr. Plummer gave active, substantial assistance to Worley within the context of those negotiations by providing, among other things, internal RDP information. The reactions of Worley's employees signaling the usefulness of this information strongly support the conclusion that Worley obtained some form of advantage as a result. Shaw's simultaneous involvement as a member of the committee assisting RDP within the context of these same negotiations underscores the impropriety of Mr. Plummer's one-sided interactions with Worley.[546] For these reasons, the Tribunal concludes that the negotiations of the Pacific Refinery Agreement were not an arm's length transaction. It is questionable whether RDP would have ultimately acceded to formalize the Pacific Refinery Agreement had it been aware of Mr. Plummer's sharing of insider information.

---

[542]   Shaw's Proposal to Worley, August 8, 2012, p. 1 (**R-319**).

[543]   M. Villegas email to G. Plummer, May 24, 2011 (**R-308**); M. Villegas email to G. Plummer, May 24, 2011 (**R-310**). *See also* Claimant's PHB, fn 453.

[544]   M. Villegas email to G. Plummer, May 24, 2011 (**R-308**); M. Villegas Email to G. Plummer, May 24, 2011 (**R-310**).

[545]   G. Plummer email to M. Villegas, June 8, 2011 (**R-311**).

[546]   Pacific Refinery Agreement, p. 167 (**C-8**); RDP Negotiation Commission Report on Worley's bid for the Selection of the PMC, June 16, 2011, p. 3 (**C-824**).

347.    Mr. Plummer's parallel involvement in the bid for the Esmeraldas Refinery Agreement merits a separate analysis, as, unlike in the case of RDP, there is no indication in the record that Shaw or Mr. Plummer formed part of a committee within Petroecuador tasked with analyzing Worley's proposals for the Esmeraldas Refinery Project. However, Mr. Plummer's exchanges during the Esmeraldas Refinery bidding process do illustrate a pattern of sharing of internal information meant to result in an advantage for Worley, lending further support to the conclusion that he provided assistance of the same kind to Worley during the negotiations of the Pacific Refinery Agreement described above.

348.    In particular, Mr. Plummer's June 30, 2011 e-mail to Worley contains key information concerning the bid for the Esmeraldas Refinery Project obtained from a Petroecuador employee ("Hugo"), including the identity of the other bidder (KBR) and Petroecuador's internal planning about the deadlines for the awarding of the project and the scope of the works. Mr. Elizondo of Worley considered that "[Mr. Plummer's] observations" would "assist [them in] preparing a solid proposal."[547] Similarly, Mr. Plummer's subsequent e-mails of July 21[548] and July 25, 2011[549] purport to share elements of Petroecuador's internal thinking in the lead-up to the award of the Esmeraldas Refinery Agreement later that year, in September 2011. These are, once again, instances of Mr. Plummer providing internal, substantive information to Worley during a public procurement process.

349.    While it is clear that Mr. Plummer provided improper assistance to Worley, the Tribunal nonetheless lacks a basis on which to conclude that Worley meant for the "Consulting Agreement" to be a *quid pro quo* for Mr. Plummer's support, as the Respondent would seem to imply.[550]

350.    From among several exchanges on record concerning the background to the Consulting Agreement,[551] an e-mail dated August 6, 2012 from Mr. Plummer to Worley is particularly

[547]    G. Plummer email to Worley, July 5, 2011 (**R-313**).

[548]    G. Plummer email to M. Villegas, July 21, 2011 (**R-315**).

[549]    G. Plummer email to M. Villegas, July 25, 2011 (**R-316**).

[550]    Rejoinder, para. 30: "[the engagement of Shaw] brought the matter full circle. Mr. Plummer and Shaw went from advising RDP in a tender process and its negotiations with Worley—while actively assisting Worley in those negotiations and providing key information—to then being hired by Worley as a subcontractor for the very project it had previously helped to tender and shepherd Worley's way".

[551]    *See e.g.*, P. Merizalde email to C. Elizondo, April 5, 2012 (**R-321**); G. Plummer email to C. Elizondo, May 3, 2012 (**R-326**); C. Elizondo email to G. Plummer, May 9, 2012 (**R-322**); RDP Board of Directors Minutes No. 003-DIR-2012-RDP, May 9, 2012, p. 4 (**C-751**); C. Elizondo email to G. Plummer, June 25, 2012 (**C-1071**); Shaw's Proposal to Worley, August 8, 2012, p. 4 (**R-319**).

illustrative. Mr. Plummer there proposed to Worley that Shaw be engaged as a subcontractor for the Pacific Refinery Project after consulting the matter with RDP:

> As you probably have heard, Shaw Consultants International and RDP did not sign an agreement when Pedro was in town last Monday. Our "friends" in Ecuador decided that the contract terms used for the previous agreements are no longer acceptable and Sabrina sent us a totally new contract. Internally, Shaw Consultants have moved to a different Shaw division following the sale of Shaw Energy and Chemical to Technip. These two events combined and as I mentioned to Pedro, it will be time-consuming to educate lawyers, etc. to move ahead with a contract between Shaw Consultants and RDP. (I have ignored any effect of the announcement that CB&I will purchase the Shaw Group. That is still too far in the future to affect our day-to-day operations.) Pedro understood the dilemma. On Tuesday, I heard from Quito and was asked to consider working as a sub-contractor to W-P under the agreement you have with RDP. I was asked to discuss the matter with Freddy as technically, he and the PDVSA team are the administrators of that contract.[552]

351. Mr. Plummer continues:

> To bring you up to speed, the concept of Shaw Consultants working as a sub-contractor to W-P for the RDP project is acceptable. We are not in competition and our efforts complementary. We understand that RDP intends to use the subcontract approach is a way to try to minimize delays.[553]

352. Lastly, Mr. Plummer explains the rationale for this proposed "business decision", noting his expectation that the arrangement should raise no practical complications "given the nature of our services and the good working relationship that we have developed since we first added W-P [WorleyParsons] to the PMC bid list":

> Freddy and Pedro assured me that they are not aware of any financial concerns for W-P as your agreement provided for a gross-up for Ecuador taxes so our costs are essentially a pass through. Nevertheless, I can understand if W-P has some reticence. All I can say is that in similar situation, PDVSA asked both JGC and Toyo to accept these same terms and conditions and contract Shaw Consultants for similar supporting services. Both those contractors accepted these standard T&Cs and signed a subcontract with us as a service to the Client. There were no contractual disputes in either case, we did the work, kept JGC and Toyo informed and everyone was happy. I hope W-P can take a similar "business decision" for their client, RDP. In practical terms, any risk to W-P from differences in obligations or remedies is minimal given the nature of our services and the good working relationship that we have developed since we first added W-P to the PMC bid list.[554]

353. The "Consulting Agreement" was concluded in September 2012, a month after the above communication was sent. The Claimant observes that no work orders were ever placed under the agreement, meaning that no payments were ever made under the agreement to Shaw.[555]

---

[552]   C. Elizondo email to G. Plummer, August 6, 2012 (**R-499**).
[553]   C. Elizondo email to G. Plummer, August 6, 2012 (**R-499**).
[554]   C. Elizondo email to G. Plummer, August 6, 2012 (**R-499**).
[555]   Claimant's PHB, para. 113.

354. In sum, having failed to renew a consultancy contract directly with RDP, Shaw turned to Worley and proposed an alternative arrangement whereby Shaw would be hired as a subcontractor by Worley and its costs would be "a pass through" – meaning that RDP, as the client, would ultimately pay Shaw's services. Mr. Plummer proposed the arrangement after obtaining RDP's assent and wielded several arguments to convince Worley to take the deal. Central among these is Mr. Plummer's reference to the "good working relationship that we have developed since we first added W-P to the PMC bid list",[556] which could provide a possible explanation for why Mr. Plummer provided improper assistance to Worley in the first place – he sought to earn the favor of a renowned PMC operating in Ecuador that could eventually bring business to Shaw. Ultimately, however, the Tribunal lacks the elements to draw this particular inference or a broader inference of dishonest intent. There is no proof that Worley sought to confer or actually conferred a benefit on Mr. Plummer through the signing of the "Consultancy Agreement". While this is an unusual set of circumstances, it lacks the hallmarks of a corrupt arrangement. This, however, has no bearing on the inappropriate nature of Mr. Plummer's behavior as described above.

355. As a whole, the evidence on record supports the inference that Mr. Plummer provided improper assistance to Worley at least during the negotiation phase of the Pacific Refinery Agreement. While the Tribunal lacks the elements to determine what precise advantages were obtained by Worley as a result, the Tribunal infers that Worley likely secured more favorable terms under the Pacific Refinery Agreement than it would have obtained in an arm's length transaction.

356. The Tribunal will address the impact of this conclusion on its jurisdiction over the Claimant's claims in Section VI.2.3) below. The Tribunal will now turn to the Respondent's second allegation of illegality in the making of the investment.

### 2)   Misrepresentation of the 30% Subcontracting Limit

####    i.   Introduction

357. The second ground of illegality at the inception of the investment invoked by the Respondent is the Claimant's alleged misrepresentation of its intention to comply with the limit imposed under Article 79 of Ecuador's Public Procurement Law, which prohibits subcontracting in excess of

---

[556]   C. Elizondo email to G. Plummer, August 6, 2012 (**R-499**).

30% of the amount of the public contract.[557] At the Hearing, the Respondent explained that the goal of this provision is to ensure that the winner of the tender provides a substantial part of the contractually agreed services – which is particularly important in the realm of consultancy contracts:

> This is not some capricious requirement put into Ecuadorian law. The purpose for it is that when I hire a consultant, obviously I am interested in the quality of the services provided by the Consultant. Consultancy services have a very important personal component or organizational component when it's a large organization with its processes and quality of its know-how. Obviously, I do not want to lose that benefit by allowing that Contractor to become a mere frontman for the work of other consultants.[558]

358.   The Public Procurement Law is supplemented by the Public Procurement Regulation, which the Parties also cite as relevant. Article 35 of the Public Procurement Regulation governs subcontracting for consultancy services and introduces an exception on the limit established for subcontracting in respect of the execution of support services that cannot be provided directly by a consultant, which are not subject to any limitation.[559] In turn, Article 120 of the Public Procurement Regulation requires public contracting entities to approve any subcontracting in advance and in writing.[560]

359.   The Tribunal notes, for context, that the Esmeraldas Refinery Agreement expressly requires that any subcontracting be in accordance with Article 79 of the Public Procurement Law and also includes a similar limitation: subcontracting under the Agreement would be allowed "provided that the amount of the totality of what was subcontracted does not exceed 30% of the value of the

---

[557]   Public Procurement Law, Article 79, para. 3 (**RLA-52**) ("Subcontracting may not be carried out with persons disqualified from contracting under this Law, nor may it exceed thirty (30%) percent of the amount of the readjusted contract.") (Tribunal's translation). According to Mr. Andrade, legal expert for the Respondent, the reference to a "readjusted" contract in the third paragraph of this provision is with regard to the system for the readjustment of the prices of public contracts in accordance with a pre-fixed formula set out in Articles 126 to 143 of the Public Procurement Law. Mr. Andrade explains that the compliance of any proposed subcontracting with the rule set out in Article 79 of the Public Procurement Law must be verified on the date on which the contracting public entity authorizes any form of subcontracting. If a contractor failed to obtain such authorization, says Mr. Andrade, it would be in breach of Article 79 ab initio, meaning that any infraction of the 30% limit would have no impact on the situation of the contractor in question, who would already be in breach of the law. *See* Andrade Report II, paras. 92-100 (**RER-4**).

[558]   Hearing Transcript, Day 7, 1318:13-24.

[559]   Public Procurement Regulation, Article 35 (**C-179**) ("Subcontracting in consulting.- Consulting contracts that foresee the execution of support services that cannot be provided directly by the consultant may be subcontracted without limit in the percentages foreseen in the negotiation .") (Tribunal's translation).

[560]   Public Procurement Regulation, Article 120 (**C-179**) ("Subcontracting.- Pursuant to Article 79 of the Law, the contractor may subcontract with third parties, registered and authorized in the RUP, part of its services, provided that the contracting entity previously approves the subcontracting in writing. The approval shall be given by the highest ranked authority, its delegate or by the official with sufficient authority to do so.") (Tribunal's translation).

main contract."[561] The Machala Plant Agreement I is also subject expressly to a 30% limitation on subcontracting.[562]

360.  Furthermore, the Esmeraldas Refinery Agreement and the Machala Plant Agreements each contain a provision requiring prior authorization from Petroecuador to subcontract any services, echoing Article 120 of the Public Procurement Regulation.[563]

361.  The Pacific Refinery Agreement, however, contains no similar provisions.[564] With respect to this Agreement, the Claimant refers to a communication from INCOP (*Instituto Nacional de Contratación Pública*) enclosed with the Pacific Refinery Agreement which, in the Claimant's reading, "confirmed that the 30% legal limit on subcontracting does not apply" to the Agreement.[565] The Respondent disputes this assertion relying on the expert opinion of Mr. Andrade, according to whom (i) all of the Agreements were subject to Article 79 of the Public Procurement Law; and (ii) neither Petroecuador nor RDP could waive that legal limitation.[566]

362.  For present purposes, the Tribunal does not need to decide whether the Pacific Refinery Agreement was subject to Article 79 of the Public Procurement Law. While the Respondent contends that Worley violated the 30% subcontracting limit during the performance of several of the Agreements, its evidence on misrepresentation at the inception of the investment concerns principally the procurement process of the Esmeraldas Refinery Agreement and the Machala Plant Agreement I. The Tribunal notes that the Claimant does not dispute the application of a 30% subcontracting limit to either of these Agreements.[567] The Tribunal's further analysis will therefore focus on the relevant events leading up to the conclusion of these two Agreements.

363.  Reduced to its essence, the Respondent's argument on misrepresentation is that prior to entering into the Agreements, Worley understood the need to comply with the 30% subcontracting limit foreseen under Ecuadorian law and schemed with Tecnazul to violate it without Petroecuador or

---

[561]   Esmeraldas Refinery Agreement, Clause 21 (**C-3**) (Tribunal's translation).

[562]   Machala Plant Agreement I, Clause 13.1 (**C-6**).

[563]   Esmeraldas Refinery Agreement, Clause 21 (**C-3**); Machala Plant Agreement I, Clause 13.1 (**C-6**); Machala Plant Agreement II, Clause 12.1 (**C-7**).

[564]   Reply, paras. 144, 192.

[565]   Reply, para. 143; Pacific Refinery Agreement, p. 207 (**C-8**): "it is possible for contractors to subcontract with national suppliers the works, goods and services (including consulting) that are necessary to fulfil the corporate purpose of Refinería del Pacífico Eloy Alfaro RDP CEM, beyond the limit provided in Article 79 of the LOSNCP [i.e. the Public Contracting Law] in the case of goods, works and services that are not consulting services ... the practical effect of using [the Special Contracting Procedure] is that it is not subject to the precontractual rules of the LOSNC" (Tribunal's translation).

[566]   Rejoinder, para. 35; Andrade Report II, para. 87 (**RER-4**).

[567]   Reply, para. 174

RDP's knowledge. In the Respondent's view, such "misrepresentation" is a serious violation of Ecuadorian law because Worley would not have been eligible to obtain the Agreements had it revealed its true intentions.[568] The Claimant denies misrepresenting its intention to comply with the subcontracting limit or subsequently violating the limit and argues that, in any event, any such violation would not be serious enough so as to deprive the Tribunal of jurisdiction.[569]

364.   The Tribunal will address first the evidence on misrepresentation in connection with the Esmeraldas Refinery Agreement, followed by that concerning the Machala Plant Agreement I.

ii.   Esmeraldas Refinery Agreement

365.   For context, the Tribunal recalls that Petroecuador invited Worley to participate in the bidding process for the Esmeraldas Refinery Project on July 5, 2011.[570] Worley subsequently submitted its offer on August 2, 2011.[571] The exchanges that follow pertain to the interim period between Petroecuador's invitation and Worley's ensuing bid.

366.   *July 21, 2011*: In an e-mail with subject line "*Rumores REE PE Licitación*" – which the Tribunal understands is a reference to Petroecuador's (PE) tender for the Esmeraldas Refinery Project (REE) – the principal of Tecnazul, William Phillips ("**Mr. Phillips**") alerted Mr. Elizondo, then Vice President and Project Director at Worley, that other companies may be interested in submitting bids for the Esmeraldas Refinery Project. He insisted that Worley's presentation should follow the terms of the tender to the letter so that Petroecuador would find no excuse not to award them the contract ("*en la presentacion cumplir a pie de la letra con todito lo que pida las bases de la licitación … no dar ningun pretexto por no ajudicarnos*" [*sic*]). He further advised that it was important to "paint" their proposal in such way that it would not be apparent that Azul would "make a contract" of more than 30% of the total value because it could be interpreted as illegal ("*es importante pintarlo de alguna manera que en la oferta no parece que Azul va hacer un contrato de mas de 30% del valor total porque este puede ser interpretado como illegal*" [*sic*]).[572] The use of the Spanish term "paint" ("*pintarlo*") is significant. In its context, to "paint"

---

[568]   Hearing Transcript, Day 7, 1317:6-1322:10.

[569]   Rejoinder on Jurisdiction, paras. 105-110; Hearing Transcript, Day 7, 1268:18-1273:12.

[570]   Proposal Evaluation for the Esmeraldas Agreement, Memorandum No. 25155-RCTR-CTE-2011, September 20, 2011, para. 1.11 (**C-93**); Letter No. 1327-RGER-CTR-2011, July 5, 2011 (**C-294**).

[571]   Proposal Evaluation for the Esmeraldas Agreement, Memorandum No. 25155-RCTR-CTE-2011, September 20, 2011, para. 1.24 (**C-93**).

[572]   WorleyParsons' C. Elizondo's email to Azul Group, July 21, 2011 (**R-300**).

means to represent falsely that the "contract" involving Azul will not exceed 30% of the total value of the final agreement for the Esmeraldas Refinery Project.

367. In a reply e-mail of the same date, Mr. Elizondo strongly agreed that they should give no excuses to Petroecuador to declare the Esmeraldas Refinery tender void ("*Estamos sumamente de acuerdo … no vamos a dar excusas a PetroEcuador para que declaren este proceso desierto*"). He stated that Worley would "verify the numbers" to ensure they would remain within 30% of the total contract value but warned that the works allocated to Azul might ultimately surpass 30% of the total man-hours ("*El lunes chequearemos los números para estar dentro de 30% del valor pero es posible que Azul tenga más de 30% de las horas.*"). He observed that they had received the same advice from Mr. Plummer ("*Recibimos un correo de George Plummer dando nos* [*sic*] *los mismos consejos*").[573]

368. Later that day, in a reply e-mail to Mr. Elizondo and Mr. Phillips' prior exchange, Mr. Humberto Guarderas ("**Mr. Guarderas**"), principal of Tecnazul, stated: "*Al momento declaramos de manera que no tengamos problemas con la licitación*". Read in its proper context, the Tribunal understands Mr. Guarderas' message to relay that Worley and Tecnazul's bid should make any representations necessary to ensure that these companies would be awarded the Esmeraldas Refinery Project. Mr. Guarderas further noted that "this problem" (*i.e.* the need to represent to Petroecuador at the bidding stage that Worley would comply with the 30% subcontracting limit) could be handled during the execution of the Project ("*Durante la ejecución del Proyecto resolveremos este problema, hay varias alternativas*").[574]

369. The Tribunal extracts several conclusions from these exchanges. First, Mr. Phillips and Mr. Guarderas of Tecnazul and Mr. Elizondo of Worley all agreed that Worley's bid for the Esmeraldas Refinery Project should represent that the 30% subcontracting limit would be respected.

370. Second, Mr. Phillips and Mr. Guarderas – albeit not necessarily Mr. Elizondo – insisted that such representation should be made regardless of whether the subcontracting limit was to be respected as a matter of fact during the execution of the Project. In the Tribunal's reading, Mr. Elizondo's e-mail refers solely to the percentages be indicated *in the bid for the Project* for subcontracting (which would be brought down to 30% of the contract value) and for the corresponding man-hours (which *might* exceed 30% of the total amount of man-hours). He does not imply – or reject

---

[573] WorleyParsons' C. Elizondo's email to Azul Group, July 21, 2011 (**R-300**).

[574] H. Guarderas email to C. Elizondo, July 21, 2011, p. 1 (**R-327**) (Tribunal's translation).

the proposition – that the 30% limit would be surpassed during the performance of the Esmeraldas Refinery Agreement.

371. Third, Mr. Phillips and Mr. Guarderas convey with reasonable certainty that the 30% subcontracting limit would not be respected as a matter of fact. Indeed, there would otherwise be no reason to characterize the need to respect the 30% limit as a "problem" which, to be solved, required the bid to be "painted" in a certain way.

372. *July 27, 2011*: In an e-mail with subject "*PMC REE: Subcontratacion*" Mr. Guarderas provides to Mr. Elizondo certain information he had requested regarding the 30% subcontracting limit ("*De acuerdo a tu llamada telefonica, te envio la información solicitada con respecto de porque solo debemos poner 30% para el subcontratista*" [*sic*]).[575] The information in question includes, first, a copy of page 151 of the tender document for the Esmeraldas Refinery Project, which foresees the insertion of a clause in the final agreement requiring compliance with Article 79 of the Public Procurement Law and Article 120 of the Public Procurement Regulation:

> 26.1 This contract is non-assignable and may not be assigned to third parties in whole or in part, pursuant to what articles 78 of the LOSNCP state. Subcontracting may be carried out in accordance with the second section of Article 79 of the Law Ibidem and 120 of the General Regulation.[576]

373. Second, Mr. Guarderas provided a copy of the Public Procurement Law to Mr. Elizondo.[577] In his cover e-mail, he reproduced the text of Article 79 of the Law, governing the 30% subcontracting limit.[578]

374. In closing, Mr. Guarderas stressed again that the "matter" – that is, the 30% subcontracting limit – could be handled during the execution phase ("*Te recalco que durante la ejecución, este tema es manejable*").[579]

375. Later that day, Mr. Elizondo replied to Mr. Guarderas as follows:

> I need to present to my management what will be submitted to the client; thus, we are going to move man hours to produce a split of 70/30 and upon award of contract a development of the execution plan and concurrence with PetroEcuador additional hours at lower rate can be put on the table for PetroEcuador to decide if they want the savings that larger participation by Azul without diminishing WorleyParsons responsibility of holding the prime Contract.[580]

---

[575]   H. Guarderas email to C. Elizondo, July 27, 2011 (**R-328**).

[576]   H. Guarderas email to C. Elizondo, July 27, 2011, p. R-328_0039 (**R-328**) (Tribunal's translation).

[577]   H. Guarderas email to C. Elizondo, July 27, 2011, pp. R-328_0002-0037 (**R-328**).

[578]   H. Guarderas email to C. Elizondo, July 27, 2011, p. R-328_0001 (**R-328**).

[579]   H. Guarderas email to C. Elizondo, July 27, 2011, p. R-328_0001 (**R-328**).

[580]   C. Elizondo email to H. Guarderas, July 27, 2011, p. R-328_0001 (**R-329**).

376.   Here, Mr. Elizondo confirmed that Worley would move man-hours in the bid that would be submitted to the client (*i.e.* Petroecuador) to produce a 70/30 per cent split as suggested initially in his July 21, 2011 e-mail. He then suggests a way forward: once Worley is awarded the contract the company would "put on the table" a proposal to Petroecuador that additional hours be allocated to Azul, resulting in a lower rate as compared to hours carried out by Worley personnel.

377.   According to the Claimant, "[c]larifying that it was complying with the subcontracting limit under the Petroecuador projects, Worley explained in that email that if Tecnazul was assigned additional hours at a lower rate, it might be able to spend more hours without superseding the 30% of the total amount of the contract."[581] The Respondent's reading of this e-mail is simply that "Mr. Elizondo responded with a clear understanding of the 30% subcontracting limitation."[582]

378.   In response to Mr. Elizondo, Mr. Marcelo Asanza of Tecnazul ("**Mr. Asanza**") wrote:

> In order to accomplish with the laws for subcontractors (LOSNCP), we propose to include a footnote on every affected spreadsheet, as shown in the attached file (it is highlighted in red / yellow). The proponed [*sic*] text is as follows: "*Parte del personal seleccionado corresponde a la nómina de WP a ser contratado en Ecuador, con las mismas tarifas del subcontratista local (Azul).*"
>
> If so, WP does not require move the Man-Hours spreadsheet. In the summary table of the commercial offer, WP changes the amounts for reflecting the 70/30 balance, including the same footnote.
>
> Please analyse this and comment us in order to prepare accordingly the documents.[583]

379.   In the Tribunal's reading of this e-mail, Mr. Asanza is proposing that Worley misrepresent Tecnazul's employees as its own and indicate that the hours of those employees would be charged at Tecnazul's – not Worley's – rates. This would allow Worley to leave the originally planned man-hours distribution unchanged ("If so, WP does not require move the Man-Hours spreadsheet." [*sic*])

380.   Mr. Elizondo replied to Mr. Asanza's prior proposal as follows:

> I cannot put this note unless I discuss it internally to WorleyParsons that this could be a possibility. Therefore, we have reduced the number of engineering hours for WorleyParsons in Korea and Azul to accomplish the desired outcome.[584]

---

581   Rejoinder on Jurisdiction, para. 107.

582   Rejoinder, para. 43.

583   Email from H. Guarderas to C. Elizondo, July 28, 2011, pp. 1-2 (**R-289-1**) (the portion of this e-mail in Spanish in the original, which has been italicized by the Tribunal, can be translated as follows: "Part of the selected personnel corresponds to the WP payroll to be hired in Ecuador, at the same rates as the local subcontractor (Azul)"). *See also* the enclosed Excel spreadsheet (**R-289-2**).

584   Email from H. Guarderas to C. Elizondo, July 28, 2011, p. 1 (**R-289-1**).

381. The Tribunal understands Mr. Elizondo's e-mail to say that he will not include Mr. Asanza's proposed footnote in Worley's bid – he would need to "discuss it internally" within Worley to assess whether "this could be a possibility" – and instead indicated that they had "reduced the number of engineering hours for WorleyParsons in … Azul to accomplish the desired outcome."[585]

382. A few hours later, Mr. Guarderas replied to Mr. Elizondo's e-mail explaining that compliance with the 30% limit was just a question of presentation: ultimately, all personnel during the execution phase would be employed by Tecnazul (*"Como te dije, este es un tema de presentación, durante la ejecución toda la gente será de Azul"*). He insisted that the bid should comply with the 30% subcontracting limit so as to avoid disqualification (*"Debemos cuidar de cumplir con los requisitos para que no nos descalifiquen"*). Instead of inserting the proposed footnote, he suggested that the "manpower deployment schedule" (*"cuadros de manpower"*) where Mr. Asanza had proposed to insert a footnote identify instead the personnel assigned to the project site indistinctively as "Construction Contractor – Site WorleyParsons/Azul." By doing so, he said, they would not be assigned a score and could instead represent that Tecnazul's portion of the works would be no larger than 30% (*"De esta manera no tenemos calificación y podemos decir que Azul solo tiene el 30%"*).[586]

383. The record contains no further communications directly responding to these exchanges in the lead up to the submission of Worley's bid for the Esmeraldas Refinery Project six days thereafter.

384. *August 2, 2011*: On this date, Worley submitted its final bid for the Esmeraldas Refinery Project.[587] The Tribunal has sought to verify whether the bid document ultimately included Mr. Asanza's proposed footnote[588] or Mr. Guarderas' proposed title for the manpower deployment schedules conflating WorleyParsons and Tecnazul personnel.[589] The Tribunal has been unable to do so: the version of the bid filed with the Tribunal is missing the relevant pages.

385. In this respect, the Tribunal observes that the PDF version of the bid document filed in the arbitration is 683 pages long, including its numerous annexes. However, the pagination of the original document itself ends at page 726,[590] meaning that the version of the document filed with the Tribunal omits pages that were present in the original document. The relevant "manpower

[585] Email from H. Guarderas to C. Elizondo, July 28, 2011, p. 1 (**R-289-1**).
[586] Email from H. Guarderas to C. Elizondo, July 28, 2011, p. 1 (**R-289-1**).
[587] *See* Commercial Proposal for the Esmeraldas Agreement, July 26, 2011 (**R-28**).
[588] *See* para. 378 above.
[589] *See* para. 382 above
[590] Commercial Proposal for the Esmeraldas Agreement, July 26, 2011, p. R-28_683 (**R-28**).

105

deployment schedules" can be found at pages 480-486 of the PDF version of the document.[591] However, the affected spreadsheets where Mr. Asanza and Mr. Guarderas proposed to insert false information, titled "Construction Contractor – Site Azul" and "Construction Contractor – Site WP" (as shown in the Excel sheet provided by Mr. Asanza on July 27, 2011)[592] are omitted from the PDF version of the document. Instead, several pages of the "manpower deployment schedules" are repeated in the file.[593]

386.   The Tribunal finds this gap in the evidence troubling. The Tribunal recalls that Worley's Esmeraldas Refinery bid document was filed in the arbitration by the Respondent (not by Worley) on April 4, 2020, during the Preliminary Objections phase of the proceedings.[594] The Respondent has nonetheless failed to address this omission in its pleadings. At the same time, however, the Claimant has had ample opportunity to file these missing pages to prove that Mr. Asanza and Mr. Guarderas' proposed misrepresentations were never implemented. It has also failed to do so.

387.   In spite of this evidentiary gap, the record does contain the minutes of meetings held between Petroecuador and Worley during the evaluation of Worley's bid providing partial insight into the contents of the bid document. In particular, in a meeting held on August 17, 2011, Petroecuador indicated that it had "no clarity" regarding Worley's proposed personnel organizational chart enclosed with the bid. It requested clarifications in this regard and in particular an assurance that all directors and mid-level management working on the Project would be Worley employees, while all remaining personnel could come from Tecnazul. Worley insisted on recruiting certain mid-level employees from Tecnazul's ranks, but ultimately agreed to submit a revised organizational chart.[595] Petroecuador's requested clarifications suggest, albeit not conclusively,

---

[591]   *See* Commercial Proposal for the Esmeraldas Agreement, July 26, 2011, pp. R-28_480-486 (**R-28**).

[592]   Email from H. Guarderas to C. Elizondo, July 28, 2011, pp. 1-2 (**R-289-1**). *See also* the enclosed Excel spreadsheet (**R-289-2**).

[593]   The pages that are repeated in the document correspond to document pages 510 (pages 480 and 484 of the PDF), 511 (pages 481 and 485 of the PDF) and 512 (pages 482 and 486 of the PDF). These repeated pages appear to replace pages 514, 515 and 516 of the original document, which are missing in the PDF version and would appear to correspond to the schedules for "Construction Contractor – Site Azul" and "Construction Contractor – Site WP" – the key spreadsheets where Mr. Guarderas and Mr. Asanza sought to insert modifications.

[594]   Memorial on Preliminary Objections – Consolidated List of Exhibits, April 3, 2020, p. 4.

[595]   Proposal Evaluation for the Esmeraldas Agreement, Memorandum No. 25155-RCTR-CTE-2011, September 20, 2011, p. 13, item 2 (**C-93**): "Refining Management, not having clarity on the organizational chart, requested clarification on the organizational chart and presented an organizational chart that meets the needs of Refining Management and [is] applicable to the EPC contractors. Refining Management requests that Management and Middle Management must necessarily be W.P. personnel and the remaining personnel can be from Azul ... W.P. explained the reasons why it prepared the proposed organization chart. W.P. insists that they will analyze that some middle management positions must be Azul personnel ... W.P. must present a new organizational chart based on the organization chart proposed by the Refining Management and the clarification of the scope of the project." (Tribunal's translation).

that the Claimant's bid did not clearly distinguish between Worley and Tecnazul personnel, echoing Mr. Guarderas' and Mr. Asanza's proposed misrepresentations.

388. The Tribunal has confirmed that the manpower deployment schedules filed with the final version of the Esmeraldas Refinery Agreement did not include Mr. Asanza or Mr. Guarderas' proposed misrepresentations.[596] However, they do not provide further insight as to whether Worley effectively misrepresented its intention to comply with the 30% subcontracting limit.

389. *Analysis*: In sum, on the basis of this contemporaneous evidence, the Tribunal has satisfied itself with sufficient confidence that Worley and Tecnazul understood clearly that Worley would not be awarded the Esmeraldas Refinery Project unless the terms of Worley's bid were in compliance with the 30% subcontracting limit foreseen under Article 79 of the Public Procurement Law. The record also shows Tecnazul's unequivocal understanding that such limit would be heavily surpassed – as evinced, in particular, by Mr. Guarderas' July 28, 2011 e-mail stating that during the execution of the Esmeraldas Refinery Project *all* personnel would be provided by Tecnazul.[597] This is why Tecnazul proposed several approaches to Worley by which to misrepresent compliance with the 30% limit in the Esmeraldas Refinery bid while leaving the door open for Tecnazul's participation to exceed that limit during the execution phase of the Project.

390. While Tecnazul's intention to misrepresent compliance with the 30% subcontracting limit has been established beyond reasonable doubt, the Tribunal is reluctant to draw the same conclusion as regards *Worley* on the sole basis of the above contemporaneous documents. Mr. Elizondo's several e-mails convey, to a certain degree, a reluctance to carry out Tecnazul's several plans to misrepresent compliance with the limit on subcontracting.

391. At the same time, however, the Tribunal is troubled by the fact that Mr. Elizondo failed to reject in strong terms Tecnazul's plainly deceitful proposals. Instead, he asserted that he would need to consult his superiors at Worley to assess whether Tecnazul's suggested misrepresentation "could be a possibility."[598] The Tribunal also considers it highly unlikely that Tecnazul would have insisted repeatedly on misrepresenting its level of involvement in the Esmeraldas Refinery Project unless Worley and Tecnazul's previously agreed involvement of Tecnazul personnel actually surpassed the 30% subcontracting limit by a significant margin – as strongly suggested by Mr. Guarderas' statement that all personnel during the execution phase would be employed by

---

[596]   Esmeraldas Refinery Agreement, pp. 302-308 (**C-3**).

[597]   Email from H. Guarderas to C. Elizondo, July 28, 2011, p. 1 (**R-289-1**).

[598]   Email from H. Guarderas to C. Elizondo, July 28, 2011, p. 1 (**R-289-1**).

Tecnazul.[599] Lastly, Worley has failed to provide the relevant pages of the bid document that could have disproved that Mr. Guarderas and Mr. Asanza's proposed misrepresentations – or any other form of misrepresentation – were ultimately implemented. However, the contemporaneous minutes of meetings between representatives of Petroecuador and Worley representatives support such inference.

392.     Thus, as a whole, the Tribunal requires further corroborating evidence to confirm that Worley ultimately decided to misrepresent compliance with the limit on subcontracting at the time of submitting its bid for the Esmeraldas Refinery Project. Such conclusive evidence is nonetheless found in exchanges between Worley and Tecnazul in connection with the Machala Plant Project, as further elaborated below.

iii.     Machala Plant Agreement I

393.     The Tribunal turns now to the Respondent's argument on misrepresentation in connection with the Machala Plant Project. Worley submitted its first bid for this project on February 20, 2014[600] and was awarded the Machala Plant Agreement I on March 5, 2014.[601]

394.     On February 24, 2014 (that is, after Worley had submitted its bid, but before it was awarded the Machala Plant Agreement I) in an e-mail with subject "Machala", Mr. Falcon of Worley requested to discuss several topics with Mr. Phillips of Tecnazul over the phone, one of which was the 30% subcontracting limit – more precisely, the fact that Worley's quotation for the project heavily surpassed that limit: "Contract limits involvement of a subcontractor (Azul) to 30%. We quoted based on closer to 60% Azul involvement."[602]

395.     Mr. Phillips replied that same day, noting that he was in a meeting, among others with Mr. Elizondo – who, as already noted above, had also been involved in the preparation of Worley's bid for the Esmeraldas Refinery Project. Mr. Phillips said: "all in agreement and before it is too late."[603]

---

[599]     Email from H. Guarderas to C. Elizondo, July 28, 2011, p. 1 (**R-289-1**).

[600]     Worley's Commercial Proposal for the Specialized Technical Assistance of the Natural Liquefied Gas Plant, February 20, 2014, p. 1 (**C-129**).

[601]     Machala Plant Agreement I, Clause 4 (**C-6**).

[602]     J. Bennet email to W. Phillips, February 24, 2014 (**R-331**).

[603]     J. Bennet email to W. Phillips, February 24, 2014 (**R-331**).

396. Other than characterizing this correspondence as an "isolated snapshot", the Claimant has provided no explanations for Mr. Falcon's statement.[604] While it is true that the evidence on misrepresentation in connection with the Machala Plant Project is circumscribed to this exchange, the Tribunal is in a position to analyze this correspondence through the lens of the above exchanges pertaining to the procurement process for the Esmeraldas Refinery Project, which concern the same subject matter and involve several of the same individuals (Mr. Phillips of Tecnazul and Mr. Elizondo and Mr. Falcon of Worley, who the Tribunal recalls had also acted as a Project Director for the Esmeraldas Refinery Project).[605]

397. Those exchanges, which took place less than three years before Worley submitted its bid for the Machala Plant Project and while the Esmeraldas Refinery Project was still underway,[606] demonstrate prior knowledge from Worley and Tecnazul of the 30% subcontracting limit under Ecuadorian law – and, critically, of the fact that representing compliance with such limit in the tender documents was a necessary condition to obtain the contract.

398. Thus, Mr. Falcon's assertion that Worley "quoted based on closer to 60% Azul involvement" for the Machala Plant Project means, in context, that Worley misrepresented its intention to comply with the 30% subcontracting limit in its bid for the Machala Plant Agreement I – which, as pointed out by Mr. Falcon, was recorded in the relevant tender documents[607] – and sought Mr. Phillips' views on how to address this circumstance before the Agreement was formally concluded.

399. Critically, as advanced in paragraph 392 above, Mr. Falcon's assertions in his February 24, 2014 e-mail provide a conclusive basis for the inference that Worley had successfully misrepresented its intention to comply with the 30% subcontracting limit in 2011 in connection with the Esmeraldas Refinery Agreement, which is why adopting the same approach for the Machala Plant Project remained a practicable proposition in Worley's thinking in 2014. Indeed, Worley's

---

[604] Claimant's PHB, para. 118. *See also* Hearing Transcript, Day 1, 187:2-13, where counsel for the Respondent notes: "February 2014. Now, this is pre-investment on a different contract, the Machala I Contract; and, in that email, and this is a series of emails from February 2014, Worley submits an offer for the Machala I Contract, and the email acknowledges that the Contract includes the 30 percent limitation and that Worley signed the contract as such but structured its quote "based on close to 60 percent Azul involvement." Members of the Tribunal, this is an unequivocal admission that in submitting its offer for the Machala I Contract Worley misrepresented Tecnazul's involvement. Worley says nothing of this email in any of its Briefs. Nothing whatsoever."

[605] *See e.g.,* Letter from Worley to Petroecuador No.408005-00445-00.0-PC-LTR-WPI-EPP-10010, September 4, 2015 (**C-803**), where Mr. Falcon signs as a Project Director of Esmeraldas.

[606] Worley's work at the Esmeraldas Refinery Project ended on June 30, 2016. *See* Report on the Status of the Refurbishment Agreement and its Complementary Agreements, Memorandum No. 00261-OPE-REE-MAN-PMR-2017, March 30, 2017, p. 7 (**C-38**).

[607] Bidding papers for the Specialized Technical Assistance of the Natural Liquefied Gas, RE-005-EPP-OSC-S-14, February 20, 2014, Clause 13.01 (**C-127**). *See also* Machala Plant Agreement I, Clause 13.1 (**C-6**).

compliance with the 30% subcontracting limit in the performance of the Agreements was not distinctly addressed by the relevant authorities at least until 2015.[608]

400.    In sum, the Tribunal concludes that the Claimant deliberately misrepresented its intention to comply with the 30% subcontracting limit foreseen under Article 79 of the Public Procurement Law in connection with the Esmeraldas Refinery Agreement and the Machala Plant Agreement I. It did so with the clear understanding that it would have otherwise not been awarded the contracts for those projects. The Tribunal considers that this deceitful conduct represents a clear violation of the principle of good faith in international law.

401.    Other investment tribunals have reached similar conclusions when confronted with analogous scenarios. For instance, the *Inceysa* tribunal ruled as follows:

> Among Inceysa's violations of the principle of good faith, as demonstrated in chapter IV of this award, the Tribunal emphasizes the following: (i) Inceysa' presentation of false financial information as part of the tender made by it to participate in the bid; (ii) false representations during the bidding process, in connection with the experience and capacity necessary to comply with the terms of the Contract, particularly concerning its alleged strategic partner; (iii) falsity of the documents by which Inceysa sought to prove the professionalism of Mr. Antonio Felipe Martinez Lavado, on whose career in large measure it based its alleged aptness to perform the functions entrusted to it when winning the bid; and (iv) the fact that it had hidden the existing relationship between Inceysa and ICASUR, in clear violation of one of the fundamental pillars of the bidding rules.
>
> The conduct mentioned above constitutes an obvious violation of the principle of good faith that must prevail in any legal relationship. This Tribunal considers that these transgressions of this principle committed by Inceysa represent violations of the fundamental rules of the bid that made it possible for Inceysa to make the investment that generated the present dispute. It is clear to this Tribunal that, had it known the aforementioned violations of Inceysa, the host State, in this case El Salvador, would not have allowed it to make its investment.[609]

402.    Similarly, the *Plama* tribunal said:

> Claimant, in the present case, is requesting the Tribunal to grant its investment in Bulgaria the protections provided by the ECT. However, the Tribunal has decided that the investment was obtained by deceitful conduct that is in violation of Bulgarian law. The Tribunal is of the view that granting the ECT's protections to Claimant's investment would be contrary to the principle *nemo auditur propriam turpitudinem allegans* invoked above. It would also be contrary to the basic notion of international public policy - that a contract obtained by wrongful means (fraudulent misrepresentation) should not be enforced by a tribunal.

---

[608]    *See e.g.*, R. Falcon email to W. Phillips, May 28, 2015 (**R-335**): "As you know, Azul hours on Machala are around 50% or more of the total. I am happy with the cooperation and team we have provided. However, the contract states that WP can only subcontract up to 30% of the hours. Controloria is asking for an explanation." *See also* Letter from Worley to Comptroller General, October 5, 2016, pp. 2-3 (**C-580**); Letter from Worley to the Comptroller General No. 408005-00445-00-0-PC-LTR-WPI-CGE-13587, November 18, 2016, p. 32 (**C-403**).

[609]    *Inceysa Vallisoletana, S.L. v. Republic of El Salvador*, ICSID Case No. ARB/03/26, Award, August 2, 2006, paras. 236-237 (**RLA-22**).

The Tribunal finds that Claimant's conduct is contrary to the principle of good faith which is part not only of Bulgarian law - as indicated above at paragraphs 135-136 - but also of international law - as noted by the tribunal in the Inceysa case. The principle of good faith encompasses, inter alia, the obligation for the investor to provide the host State with relevant and material information concerning the investor and the investment. This obligation is particularly important when the information is necessary for obtaining the State's approval of the investment.

Claimant contended that it had no obligation to disclose to Respondent who its real shareholders were. This may be acceptable in some cases but not under the present circumstances in which the State's approval of the investment was required as a matter of law and dependant on the financial and technical qualifications of the investor. If a material change occurred in the investor's shareholding that could have an effect on the host State's approval, the investor was, by virtue of the principle of good faith, obliged to inform the host State of such change. Intentional withholding of this information is therefore contrary to the principle of good faith.[610]

iv.    Actual Violations of 30% Subcontracting Limit

403.   The Tribunal has concluded that Worley deliberately misrepresented its intention to comply with the 30% subcontracting limit foreseen under Article 79 of the Public Procurement Law in connection with the Esmeraldas Refinery Agreement and the Machala Plant Agreement I. The Claimant, however, denies that there can be a "'misrepresentation' with respect to a 'scheme' to violate subcontracting limits without an actual violation."[611]

404.   A distinction can nonetheless be drawn between failing to comply with the 30% subcontracting limit during the performance of these Agreements – which *per se* is a question of breach of contract and/or public procurement regulations bearing no relevance to the Tribunal's jurisdiction – and deliberately misrepresenting Tecnazul's planned involvement in the execution of the projects at the bidding stage, thereby securing in bad faith an unfair advantage in the tender process. To the extent that such misrepresentation was a necessary condition for Worley to obtain the Esmeraldas Refinery Agreement and the Machala Plant Agreement I – and the Tribunal has already concluded that it was – it amounts to a serious illegality affecting directly the inception of the Claimant's investment in Ecuador and thus the Tribunal's jurisdiction, as further explained below.

405.   In any event, to the extent that an actual violation might be relevant for the Tribunal's analysis, the Tribunal is satisfied that Worley breached the 30% subcontracting limit to a significant extent during the execution of the Esmeraldas Refinery Agreement and the Machala Plant Agreement I.

---

[610]   *Plama Consortium Limited v. Republic of Bulgaria,* ICSID Case No. ARB/03/24, Award, August 27, 2008, paras. 143-145 (**RLA-24**).

[611]   Claimant's PHB, para. 118.

For present purposes, the Tribunal need not determine the exact extent of the violations of the subcontracting limit: it only seeks to confirm Worley's initial intention to exceed the limit.

406. First, in respect of the *Machala Plant Agreement I*, an e-mail from Mario Sandoval of Worley ("**Mr. Sandoval**") to Mr. Falcon dated June 16, 2014 – three months after Worley was awarded the Agreement – explicitly states that the contemporaneous amount of subcontracting had reached a staggering level of 77.5%. Mr. Sandoval's e-mail otherwise speaks for itself:

> Today during the drive back home from the plant, Efren Vintimilla, head advisor for Rafael Poveda, Ministro Coordinador de Sectores Estratégicos, called Guillermo out of the blue to find out about the make-up of the WP team at the Machala LNG Project. Guillermo informed him that in the team there was only one WP professional, the project manager, and that all the rest were from Ecuador and from Azul. Guillermo mentioned that WP had only foreign personnel and that all locals (Ecuadorians) involved in its projects were Azul personnel. The conversation was short.
>
> That information was not correct, as the project team has used a variety of resources, many of which were from WP. Nevertheless, most resources used in the project were Azul's.
>
> The contract establishes a maximum of 30% of non-WP resources. The current amount is 77.5% (half month in June) and has been very high throughout. Based on that, I am seeking more support from our Esmeralda resources but their tendency is to supply Azul personnel instead of WP personnel (e.g. Guido Bedón).
>
> Please, let me know whether this is an important subject that must be managed in order to maintain the percentage within a certain level.
>
> In any case, I think that WP is greatly enhancing the image of Azul locally and is transferring business practices and know how and it would not surprise me that there will be a day in the near term that Azul will be a competitor and not a partner. Certainly, I am not aware of the history behind this relationship and why this scheme was preferred over establishing a fully functional local operation. However, it seems to me that as a consequence the presence of WP in Ecuador might be fragile and highly dependent on Azul.[612]

407. In a similar vein, in May 2015 Mr. Falcon informed Mr. Phillips that the Comptroller General had asked for an explanation for Worley's contemporaneous level of subcontracting. He noted: "Azul hours on Machala are around 50% or more of the total … However, the contract states that WP [*i.e.* WorleyParsons] can only subcontract up to 30% of the hours … Can you give us some advice on how to address this with the Controloria [*i.e.* the Comptroller General]?"[613] Another e-mail, dated a month thereafter, reports a 52% level of subcontracting.[614]

408. In a later communication, dated June 18, 2015, Mr. Sandoval explained to Mr. Falcon that "[t]he amount to be invoiced to EPP for Azul work surpasses the 30% limit".[615] He then relayed

---

[612]   M. Sandoval email to R. Falcon, June 16, 2014, p. R-332_0001 (**R-332**).
[613]   R. Falcon email to W. Phillips, May 28, 2015 (**R-335**).
[614]   *See e.g.*, M. Sandoval email to R. Falcon, June 18, 2015, p. R-336_0005 (**R-336**).
[615]   M. Sandoval email to R. Falcon, June 18, 2015, pp. R-336_0001-0002 (**R-336**).

Tecnazul's proposed approach to address the situation: labelling part of Tecnazul's personnel as support services in the sense of the Public Contracting Regulation, which fixes no limit for subcontracting of such services.[616] One negative outcome of such approach, Mr. Sandoval noted, "is that the client has had the view that these hours were in general consultancy work hours"[617] – which, in the Tribunal's view, is indicative of a misrepresentation. The relevant portion of the e-mail reads:

> With regards to the second issue, Azul argues that there is no limit for subcontracting support services (article 120 of the reglamento de ley) but there is a 30% limit for subcontracting consulting services (article 35 of the reglamento). Therefore, Azul proposes to identify some of their people which acted as support … and deduct them from the total. In that way, 29% of the value represents the consulting services and 23% support services. One negative outcome of this approach is that client has had the view that these hours were in general consultancy work hours. If we add the stated 23% support services percentage to the WP project management percentage (32% of total value or 10 months by 160 hours per month by US$ 360 per hour), we have that 55% of the contract would be management or support services and 45% consultancy. So, conveying that message has some pitfalls.
>
> In addition, Gabriel Velasco considers that the Reglamento de la Ley, article 120, says "in compliance with article 79 of Law" which states the 30% limit. Therefore, the limit exists in all cases. However, there might not be a limit for subcontracting support services not directly invoiced to client (e.g. accounting, transport, logistics, etc).
>
> According to Gabriel, there exists a non-negligible risk that Contraloria recommends unilateral termination in next week's report. My perception is that EPP would swiftly proceed in case this recommendation is given. I understand from Humberto that this is unlikely. Low probability very severe consequences this is a mid to high risk scenario, therefore unacceptable if let uncontrolled.[618]

409.  In other communications on record, several Worley and Tecnazul officials explored similar formulas to address the situation.[619] The Tribunal reads these communications as discussing potential ex-post facto justifications for Worley's evident breach of the 30% subcontracting limit after the relevant Ecuadorian authorities initiated an enquiry.

410.  Second, as regards the actual percentage of subcontracting under the *Esmeraldas Refinery Agreement*, the Claimant relies on a letter prepared by Mr. Falcon on behalf of Worley dated October 5, 2016 in response to a query raised by the Comptroller General's office regarding Worley's compliance with the 30% subcontracting limit. Mr. Falcon reports a 20.71% level of subcontracting by splitting up the amounts corresponding to Tecnazul's "support" services and "technical consultancy" services. The report explains that Tecnazul's support services are subject

---

[616]  *See* para. 358 above.

[617]  M. Sandoval email to R. Falcon, June 18, 2015, pp. R-336_0001-0002 (**R-336**).

[618]  M. Sandoval email to R. Falcon, June 18, 2015, pp. R-336_0001-0002 (**R-336**).

[619]  M. Sandoval email to R. Falcon, June 18, 2015, pp. R-336_0002-0007 (**R-336**); M. Sandoval email to W. Garcia, June 30, 2015 (**R-337**).

to Article 35 of the Public Procurement Regulation, meaning that they should not be accounted for the purposes of determining compliance with the 30% subcontracting limit foreseen under Article 79 of the Public Procurement Law.[620]

411.  The Tribunal doubts that Mr. Falcon's reported level of subcontracting represents reality. It echoes the same ex-post facto justification for the violation of the subcontracting limit recorded in Mr. Sandoval's e-mail to the very same Mr. Falcon regarding the Machala Plant Project, reproduced at paragraph 408 above. In the Tribunal's view, Mr. Falcon's reported figure is very likely to be based on a misapplication of Article 35 of the Public Procurement Regulation and thus does not represent the actual amount of consultancy services subcontracted under the Esmeraldas Refinery Agreement. In all likelihood, all, or at least a very significant portion, of Tecnazul's reported work under the Agreement constituted consultancy services as a matter of fact.

412.  In this connection, the Tribunal notes that the total amount of Tecnazul's reported services in Mr. Falcon's letter, without distinguishing between consultancy and support services (US$ 66,753,678,68) represents approximately 38% of the total invoiced value of the Agreement stated in that report (US$ 175,233,488,37).[621] As already noted, a very significant portion of this 38% of Tecnazul work is likely to represent consultancy services. That would bring this figure close to that provided by the Respondent's expert BRG (34.99%), which is calculated assuming that all of Tecnazul's services constitute subcontract services for purposes of Article 79 of the Public Procurement Law (US$ 66,753,678,68) by reference to a higher Agreement amount measured several months later, in March 2017 (US$ 190,795,445.85).[622] While these figures translate into a seemingly marginal 4.99% breach of the subcontracting limit, they also result in a very significant subcontracted amount, in absolute terms, in excess of the limit (US$ 9,515,044.93).[623] The Tribunal considers this figure to be a reasonable approximation of Worley's actual violation of the 30% subcontracting limit under the Esmeraldas Refinery Agreement.

---

[620]  Letter from Worley to Comptroller General, October 5, 2016, p. 3 (**C-580**): "As gleaned from the above table, the consulting services subcontracted by WorleyParsons with Consultora Tecnazul Cía. Ltda. amount to 20.71% in relation to the total amount of the contracts, meaning that we have complied with Article 79 of the Organic Law of the National Public Procurement System; consulting support services cannot be considered for this calculation, since they do not fall within the norm's limit, for which subcontracting has no limit in accordance with the provision contained in Article 35 of the Regulation to the Organic Law of the National Public Procurement System."

[621]  Letter from Worley to Comptroller General, October 5, 2016, p. 3 (**C-580**).

[622]  BRG Report, para. 187 and Attachment 8, p. 12 (**RER-3**); Hearing Transcript, Day 5, 973:17.

[623]  BRG Report, para. 187 (**RER-3**).

413.    In sum, the Tribunal's finding that Worley deliberately misrepresented its intention to comply with the 30% subcontracting limit foreseen under Article 79 of the Public Procurement Law in connection with the Esmeraldas Refinery Agreement and the Machala Plant Agreement I is confirmed by Worley's actual violation of such limit during the performance of these Agreements.

### 3)  Conclusions on Illegality at the Making of the Investment

414.    In the previous sections, the Tribunal has reached the following conclusions:

> (i)    In respect of the Pacific Refinery Agreement, the Tribunal has determined that Worley sought and accepted Mr. Plummer's assistance in bad faith during the negotiation phase of the Pacific Refinery Agreement, thus likely securing more favorable terms under the Pacific Refinery Agreement than it would have obtained in an arm's length transaction.

> (ii)   In respect of the Esmeraldas Refinery Agreement and the Machala Plant Agreement I, the Tribunal has concluded that Worley's deliberate misrepresentation of Tecnazul's planned involvement at the bidding stage was a necessary condition for Worley to be awarded these Agreements.

415.    While the Tribunal's findings of illegality are circumscribed to the above two items, in the special circumstances of this case the Tribunal considers that these illegalities deprive the Tribunal of jurisdiction over the entirety of the Claimant's claims in this arbitration.

416.    First, the Tribunal considers particularly relevant that the Esmeraldas Refinery Agreement and the Pacific Refinery Agreement are both tainted by illegalities *ab initio*. These two Agreements represent the bulk of the Claimant's investment in Ecuador: the Pacific Refinery Agreement had a maximum contract price in excess of US$ 205 million,[624] while the estimated value of the Esmeraldas Refinery Agreement (even excluding its Complementary Agreements) was in excess of US$ 38 million.[625] Comparatively, the Machala Plant Agreements, the Machala Plant Complementary Agreements and Worley's claims in connection with the Monteverde Project have a cumulative value of less than US$ 10 million.[626]

417.    The Esmeraldas Refinery Agreement and the Pacific Refinery Agreement also represent the inception of the Claimant's investment in Ecuador. As stated by the Claimant, all remaining Agreements forming the basis of its investment ultimately flow from these two contracts:

---

[624]    Pacific Refinery Agreement, Clause 4.1.3 (**C-8**).

[625]    Esmeraldas Refinery Agreement, Clause 5.1 (**C-3**).

[626]    *See* Section III.2 above.

> As a matter of fact, Worley first made its investment in Ecuador no later than the conclusion of the Esmeraldas and RDP Agreements in November 2011. Those two principal contracts are what brought Worley to Ecuador, further to Ecuador's invitation. The contracts were bid, awarded, and negotiated in parallel, and concluded within days of one another. Subsequent contracts over the next five years, including various addenda, all flowed from those first contracts and the PMC services that Worley successfully performed under them. The Esmeraldas and RDP Agreements thus form the foundation, the necessary predicate, for all of Worley's subsequent investments. They are the initial investments for purposes of Ecuador's illegality defense.[627]

418.    Thus, it is precisely the two Agreements forming the foundation for the entirety of the Claimant's investment in Ecuador that are tainted by illegality and bad faith, albeit for different reasons. Subsequent contracts concluded by Worley are also tainted by illegalities at their inception: as concluded above, the award of the Machala Plant Agreement I was also premised on Worley's deliberate misrepresentation of Tecnazul's involvement during the execution phase of the Project. The two Machala Plant Complementary Agreements were concluded on the basis of the Machala Plant Agreement I complementary agreements clause and are therefore also tainted by illegality *ab initio*.[628] A similar conclusion can be reached in respect of the Esmeraldas Refinery Complementary Agreements, as they are premised on another contract – the Esmeraldas Refinery Agreement – that was also obtained by Worley on the basis of a misrepresentation.[629]

419.    The Tribunal is therefore faced with a widespread pattern of illegality and bad faith affecting the centerpieces of the Claimant's investment from their origination and flowing into the Claimant's subsequent investments in Ecuador. In the Tribunal's view, such circumstance is sufficiently serious so as to deprive it of jurisdiction. This conclusion is dispositive of the entirety of the Claimant's claims.

420.    The Tribunal could stop its analysis at this juncture. However, the Tribunal has also been briefed extensively on corruption during the operation of the Claimant's investment, which, according to the Respondent, renders Worley's claims inadmissible regardless of the timing of the violation as

---

[627]    Claimant's PHB, para. 107.

[628]    Machala Plant Agreement I, Clause 17.1 (**C-6**); Machala Plant I Complementary Agreement No. 2014191, August 1, 2014, Clause 1.1 (**C-27**); Machala Plant I Complementary Agreement No. 2014286, November 14, 2014, Clause 1.1 (**C-28**).

[629]    Refurbishment Complementary Agreement No. 2012036, September 28, 2012, Clause 1.1 (**C-19**); Refurbishment Complementary Agreement No. 2013027, August 28, 2013, Clause 1 (**C-20**); Refurbishment Complementary Agreement No. 2014015, April 2, 2014, Clause 1 (**C-21**); Refurbishment Complementary Agreement No. 2014048, October 9, 2014, Clause 1 (**C-22**); Refurbishment Complementary Agreement No. 2014051, October 17, 2014, Clause 1 (**C-23**); Refurbishment Complementary Agreement No. 2015205, October 29, 2015, Clause 1.1 (**C-24**).

a matter of international public policy.[630] In view of the seriousness of these allegations, and for the sake of completeness, the Tribunal will also address those arguments in this Final Award.

### 3. ILLEGALITY DURING THE OPERATION OF THE INVESTMENT

421. The Tribunal now turns to the Respondent's allegations of illegality arising during the operation of the Claimant's investment, which concern three sets of facts:

   (i)   The Claimant's securing of the six Esmeraldas Refinery Complementary Agreements in alleged breach of Article 87 of the Public Procurement Law, pursuant to which the value of the addenda to the Esmeraldas Refinery Agreement could not exceed 70% of the value of the main contract;

   (ii)  The Claimant's alleged bribery of Petroecuador officials between 2012 and 2015; and

   (iii) The Claimant's "willful blindness" to Tecnazul's corruption of Petroecuador's officials.[631]

422. As already noted, unlike serious illegalities arising at the *inception* of the investment, the Tribunal does not consider that the three above instances of illegality arising during the *operation* of the investment are capable of affecting the Tribunal's jurisdiction. However, a majority of the Tribunal is prepared to address these allegations as questions of *admissibility* of the Claimant's claims through the prism of the *Bank Melli v. Iran* standard, pursuant to which particularly serious illegalities concerning violations of international public policy have the effect of barring the admissibility of claims regardless of when they are committed, while Arbitrator Stern is prepared to address these allegations in order to decide whether the claims must be dismissed because the investment is not a protected investment under the Treaty.[632] However, to render the claims inadmissible or to have them dismissed, the unlawful activity in question must be (i) serious and widespread; and (ii) bear a close relationship to the claims.[633]

423. Before analyzing the Respondent's allegations of illegality in accordance with this standard, the Tribunal will address the Claimant's argument that the Respondent waived its right to submit its admissibility objections based on illegality and corruption because it failed to raise them until the

---

[630]   Respondent's PHB, paras. 135, 136.

[631]   Respondent's PHB, paras. 52-119.

[632]   *See* paras. 314-315 above; *Bank Melli Iran and Bank Saderat Iran v. Kingdom of Bahrain*, PCA Case No. 2017-25, Award, November 9, 2021, paras. 365, 367 (**RLA-301**).

[633]   *See* paras. 314-315 above; *Bank Melli Iran and Bank Saderat Iran v. Kingdom of Bahrain*, PCA Case No. 2017-25, Award, November 9, 2021, paras. 376 (**RLA-301**).

filing of its Rejoinder.[634] While the Tribunal agrees with the principle that any jurisdictional or admissibility objections should be raised at the earliest available opportunity, in this instance the Respondent's admissibility objections draw from the same factual bases as its jurisdictional objections on illegality and corruption, which were timely filed with the Statement of Defense.[635] In other words, the Respondent's admissibility objections are a legal elaboration upon its jurisdictional defenses and as such are admissible. In any event, the Claimant has suffered no prejudice as a result of this purportedly late submission: it had ample opportunity to address the objection in its Rejoinder on Jurisdiction, at the Hearing and later in its Post-Hearing Brief. Accordingly, the Tribunal rejects this argument.

424. With that preamble, the Tribunal turns to the Respondent's allegations of illegality and corruption committed by Worley during the operation of the investment. Under this heading, the Tribunal will address as an ensemble Worley's alleged improper securing of the six Esmeraldas Refinery Complementary Agreements and bribery of Petroecuador officials in Section VI.3.1) below. The Claimant's "willful blindness" to Tecnazul's corruption of Petroecuador's officials will be addressed separately in Section VI.3.2).

### 1) The Esmeraldas Refinery Complementary Agreements and Related Bribery

425. According to the Respondent, the award of the six Esmeraldas Refinery Complementary Agreements to Worley and its bribery of Petroecuador officials during that same period are interconnected. As stated by the Attorney General of Ecuador at the Hearing:

> On the other hand, Tecnazul, the Subcontractor selected by Worley, with whom they conspired to violate the 30 percent cap law, paid millions of dollars in bribes to Petroecuador and RDP employees. These bribes coincide along the same timeline with the supplementary contracts that Worley obtained from Petroecuador and that raised the value from 38 million to more than $184.5 million, with the aggravating factor that all of those supplementary contracts were awarded without any competitive contracting practices and they were awarded by the same employees who enjoyed those trips and gifts.[636]

426. In connection with these arguments, the Respondent also submits that the award of the six Esmeraldas Refinery Complementary Agreements to Worley breached Article 87 of the Public Procurement Law, pursuant to which the aggregated value of any complementary agreements cannot exceed 70 % of the value of the main contract.[637]

---

[634]   Rejoinder on Jurisdiction, para. 128.
[635]   Rejoinder, para. 397.
[636]   Hearing Transcript, Day 1, 128:1-11.
[637]   Public Procurement Law, Article 87 (**RLA-52**).

427. The Claimant denies all allegations of corruption and characterizes the purportedly corrupt acts as "making reimbursable business travel arrangements and hosting a limited number of sporting events and meals."[638] In respect of the purported breach of the 70% limit on the value of addenda, the Claimant submits that (i) Article 87 of the Public Procurement Law does not apply to contracts in the hydrocarbons sector, including the Esmeraldas Refinery Agreement; and (ii) Petroecuador contemporaneously validated all addenda, thus disproving any *ex post facto* allegation as to a violation.[639]

428. The Parties' arguments raise preliminary questions regarding (i) the standard of proof applicable to allegations of corruption; and (ii) what type of conduct can be said to amount to corruption. The Tribunal will address these questions before turning to (iii) the substance of the Respondent's allegations of corruption and (iv) its overall conclusions under this heading.

    i.    Standard of Proof for Corruption Allegations

429. To a large extent, the Respondent's arguments rest upon allegations of corrupt behavior on the part of the Claimant and third parties. The Parties agree that the Respondent bears the burden of proof on these corruption allegations.[640] They disagree, however, on the applicable standard of proof – *i.e.* whether a determination based on a balance of probabilities is sufficient or whether corruption must be established against the more demanding standard of "clear and convincing evidence."

430. The Tribunal adopts the more balanced standard set forth in *Sanum v. Laos*:

> In the Tribunal's view, there need not be "clear and convincing evidence" on every element of every allegation of corruption, but such "clear and convincing evidence" as exists must point clearly to corruption. An assessment must then be made of which elements of the alleged act of corruption have been established by clear and convincing evidence, and which elements are left to reasonable inference, and on the whole whether the alleged act of corruption is established to a standard higher than the balance of probabilities but less than the criminal standard of beyond reasonable doubt, although, of course proof beyond reasonable doubt would be conclusive. This approach reflects the general proposition that the "graver the charge, the more confidence there must be in the evidence relied on".[641]

---

[638]   Claimant's PHB, para. 121.

[639]   Claimant's PHB, para. 139.

[640]   Rejoinder, paras. 361-362; Rejoinder on Jurisdiction, para. 78.

[641]   *Sanum Investments Limited v. Lao People's Democratic Republic*, PCA Case No. 2013-13, Award, August 6, 2019, para. 108 (**CLA-341**).

ii.    Conduct Amounting to Corruption

431.   In its submissions, the Respondent has referred to several legal sources concerning corrupt practices – including the Claimant's internal policies – which, in its view, support the proposition that Worley's conduct during the operation of its investment amounts to corruption. The Claimant submits that none of those sources are relevant in the present case as a matter of international law and, in any event, they cannot "salvage Ecuador's failed illegality defense."[642]

432.   Several of the sources considered by the Parties may assist the Tribunal in its analysis by shedding light on the propriety of the Claimant's conduct. Ultimately, however, the Tribunal's determinations on corruption will be made through the purview of the Treaty and international law.

433.   First, the Parties have referred to Article 16 of the United Nations Convention Against Corruption ("**UNCAC**"), which defines bribery of foreign public officials as:

> [the intentional] promise, offering or giving to a foreign public official or an official of a public international organization, directly or indirectly, of an undue advantage, for the official himself or herself or another person or entity, in order that the official act or refrain from acting in the exercise of his or her official duties, in order to obtain or retain business or other undue advantage in relation to the conduct of international business.[643]

434.   To establish the element of intent, Article 28 of UNCAC states:

> Knowledge, intent or purpose required as an element of an offence established in accordance with this Convention may be inferred from objective factual circumstances.[644]

435.   The Parties have also made reference to the FCPA, which applies directly to US-based companies such as the Claimant. Section 78dd-1 of the FCPA states:

> It shall be unlawful for any issuer which has a class of securities registered pursuant to section 78l of this title or which is required to file reports under section 78o(d) of this title, or for any officer, director, employee, or agent of such issuer or any stockholder thereof acting on behalf of such issuer, to make use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to
>
> (1) any foreign official for purposes of
>
>> (A) (i) influencing any act or decision of such foreign official in his official capacity, (ii) inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official, or (iii) securing any improper advantage; or

---

> (B) inducing such foreign official to use his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality,
>
> in order to assist such issuer in obtaining or retaining business for or with, or directing business to, any person[.][645]

436. Lastly, the Criminal Code of Ecuador is also particularly relevant in the instant case, as the purported corrupt conduct concerns Petroecuador officials – who it is undisputed are also State officials.[646] Article 280 of the Criminal Code provides in relevant part as follows:

> Any person who, under any modality, offers, gives or promises to a public servant a donation, gift, promise, advantage or undue economic benefit or any other material good in order to make, omit, expedite, delay or condition matters related to their functions or to commit a crime, shall be punished with the same penalties established for public servants.[647]

437. As a whole, these materials support the proposition that corrupt conduct is defined by three key features: (i) a promise, offering or giving of an undue advantage (*e.g.*, a gift, donation, etc.); (ii) made to a public officer; (iii) in order for them to act or refrain from acting in the exercise of their duties to obtain or retain business or an undue advantage.

438. The Tribunal will now determine whether these features are present in the conduct underlying the Respondent's allegations of corruption.

   iii.    Timeline

439. The Respondent's allegations of corruption encompass incidents starting after the conclusion of the Esmeraldas Refinery and Pacific Refinery Agreements in 2011 and ending in 2015. Several key individuals were involved in these incidents, including, chiefly, Petroecuador officials who had frequent and direct contact with Worley employees, particularly within the ambit of the Esmeraldas Refinery Project.

440. According to the Respondent, several of those individuals have also been convicted for corruption in Ecuador against the backdrop of an illegal bribery scheme within Petroecuador, whereby Tecnazul paid them over US$ 1.2 million in bribes while it acted as a subcontractor under

---

[645] FCPA, Section 78dd-1 (**C-1079**).

[646] Reply, para. 521; Hearing Transcript, Day 1, 212:6–213:23; Petroecuador Ethics Code, October 14, 2013, Glossary (**R-460**); Ecuador Organic Law of Public Companies (LOEP), Article 18 (**RLA-218**); Ecuador Organic Public Service Law, Article 4 (**RLA-221**).

[647] Ecuador Integral Criminal Code, Article 280 (**RLA-225**) (Tribunal's translation).

Worley's Agreements.[648] The Claimant does not dispute the existence of this illegal scheme to the extent it involves Tecnazul.[649]

441.   For ease of reference, the Petroecuador officials involved in the Tecnazul bribery scheme include:

(i)      Mr. Carlos Pareja, Manager of the Refining Division of Petroecuador from 2012–2015 and General Manager from July 2015 to November 2015 (and later Minister for Hydrocarbons), who negotiated and approved Worley' Esmeraldas Refinery Agreement and executed five of its Complementary Agreements.[650] He was convicted for corruption in Ecuador.[651]

(ii)     Mr. Alex Bravo, Project Coordinator of the Refining Division from 2011–2015 and General Manager from November 2015 to April 2016. Mr. Bravo was the "contract administrator" for the Esmeraldas Refinery Agreement and its Complementary Agreements.[652] He was convicted for corruption in Ecuador.[653]

(iii)    Mr. Marco Calvopiña, Petroecuador General Manager in November 2011, at which time Worley was awarded the Esmeraldas Refinery Agreement.[654] He was convicted for corruption in Ecuador.[655]

(iv)    Mr. Diego Tapia, Manager of the Refining Division of Petroecuador from 2015 to 2016 and Operations Manager, who executed the fifth addenda to Worley's Esmeraldas Refinery Agreement[656] and the Machala Plant Agreements.[657] He was convicted in Ecuador to 20 months of imprisonment.[658]

---

[648]    Statement of Defense, paras. 237-246.

[649]    Reply, para. 33.

[650]    Statement of Defense, para. 240.

[651]    Petroecuador's Memorandum in Support of its 28 U.S.C. § 1782(a) Discovery Application, pp. 10-11 (**R-2**).

[652]    Statement of Defense, para. 240.

[653]    Petroecuador's Memorandum in Support of its 28 U.S.C. § 1782(a) Discovery Application, pp. 10-11 (**R-2**).

[654]    Statement of Defense, para. 240.

[655]    El Comercio, *Exgerente de Petroecuador sentenciado por corrupción dejó la cárcel; el resto de su condena la pagará en libertad*, February 12, 2021 (**R-209**).

[656]    Statement of Defense, para. 240.

[657]    Statement of Defense, para. 240.

[658]    Statement of Defense, para. 240.

(v)     Mr. Marcelo Reyes, a former legal coordinator at Petroecuador.[659] According to the Respondent, he was convicted in the United States for laundering bribe money.[660]

442.   The Tribunal will now address in chronological order selected instances of purported bribery which, in its view, are sufficiently egregious so as to qualify as corruption under the abovementioned standards. For context purposes, the Tribunal will also mark in this timeline the conclusion of the relevant agreements obtained by the Claimant during this period.

**2012**

443.   *September 7-9, 2012*: Mr. Bravo, Mr. Escobar and Mr. Reyes flew from Houston to Miami on a trip paid for and invoiced by the Claimant for US$ 3,637.81.[661] As evidenced by the relevant expense report, during the weekend of September 7-9, 2012 they stayed in a hotel in Miami Beach. The trip was invoiced as a "Personnel-Best Practices Contractors Visit", as its alleged purpose was to help Petroecuador find contractors for a project through interviews.[662] The Claimant charged Petroecuador for these reimbursable costs, which, under the Esmeraldas Refinery Agreement, is permissible only to the extent those costs were "directly necessary for the rendering of its services."[663]

444.   The Tribunal finds no basis for the proposition that this weekend trip to Miami Beach was a legitimate business trip directly necessary for the rendering of Worley's services under the Esmeraldas Refinery Agreement.

445.   First, Mr. Falcon testified at the Hearing that no Worley employee (i) attended or provided any services in connection with those interviews; (ii) was aware of the names of the contractors who were to be interviewed; (iii) knew whether interviews in fact occurred; or (iv) knew whether any active tender process required contractors to be interviewed, as required under Ecuadorian law.[664] Had this been a legitimate business trip, the Tribunal would have expected Worley employees to be present at any interviews with potential contractors or, at the very least, to gather the relevant information from these Petroecuador officials and be in a position to share that information with

---

[659]   Respondent's PHB, para. 58.

[660]   El Universo, *El excoordinador jurídico de Petroecuador, Marcelo Reyes, fue el "contacto" para sobornos, según juicio que se siguió en Estados Unido*s, February 16, 2021 (**R-424**).

[661]   Worley expense Report SVC-IE661969, October 2, 2012 (**R-356**).

[662]   Worley expense Report SVC-IE661969, October 2, 2012 (**R-356**).

[663]   Esmeraldas Refinery Agreement, Clause 2.5.13 (**C-3**).

[664]   Hearing Transcript, Day 3, 474:2-476:16

the Tribunal at this juncture, including its precise connection with the Esmeraldas Refinery Agreement. The Claimant's inability to do so undermines its explanations.

446. The Claimant's defense that Petroecuador ultimately reimbursed the travel expenses also has no merit:[665] there is credible evidence that, as argued by the Respondent, "Worley knew very little about the trip and acted merely as a conduit to facilitate an all-expenses paid weekend getaway for the corrupt employees."[666]

447. *September 28, 2012*: A month after the Miami trip, Worley concluded the first Esmeraldas Refinery Complementary Agreement with Petroecuador, with a contract price of almost US$ 25.5 million, without a bid or a competitive process. The Complementary Agreement was signed by Mr. Pareja on behalf of Petroecuador.[667] Mr. Bravo, acting as administrator of the Esmeraldas Refinery Agreement, had recommended the adoption of this addendum over a month earlier, in August 2012.[668]

448. *November 16-18, 2012*: A few weeks thereafter, Mr. Bravo, Mr. Reyes, Mr. Pareja, together with Mr. Guarderas of Tecnazul and Mr. Hooper of Worley (and, in some cases, their spouses) attended the Formula 1 Trip in Austin, Texas. The Claimant recorded the costs of this trip as a non-reimbursable entertainment expense for "Teambuilding", paying over US$ 22,000 just for the event.[669] The "Business Development" event included accommodation, transportation and hospitality.[670] Christopher Parker ("**Mr. Parker**"), Worley's Group Director of Major Projects and Regional Managing Director for the Americas, explained during cross-examination that the purpose of this trip was "mostly getting to know people and relationship-building."[671]

449. A contemporaneous e-mail from Mr. Falcon to another Worley employee, dated October 22, 2012, sheds further light on the purported goal of this trip:

> I just wanted to let you know what [*sic*] we are planning a team building weekend with PetroEcuador and the Minister (5 folks). We want to spend the weekend with them at the Formula 1 Grand Prix in Austin since they are not so interested in US sports.
>
> Azul will split the costs.

---

[665]   Rejoinder on Jurisdiction, para. 137; Claimant's PHB, para. 125.

[666]   Respondent's PHB, para. 60.

[667]   Refurbishment Complementary Agreement No. 2012036, September 28, 2012, p. 4 (**C-19**).

[668]   Refurbishment Complementary Agreement No. 2012036, September 28, 2012, Clause 1.4 (**C-19**).

[669]   Worley Expense Report SVC-IE673983, October 24, 2012 (**C-719**).

[670]   Worley Expense Report SVC-IE673983, October 24, 2012, p. 7 (**C-719**).

[671]   Hearing Transcript, Day 2, 336:11-12.

Do you see any issues with this? Do I have to ask for special authorization? This is the only thing we could come up with that they get charged up about and that we could support.[672]

450.  Several aspects of the trip thwart the Claimant's characterization of this event as a business trip. First, the Claimant has no offices in Austin where business meetings or presentations outside of the Formula 1 event could take place.[673] Second, Mr. Bravo and Mr. Reyes brought their spouses with them and their expenses were also paid.[674] Third, Tecnazul paid for the flight tickets, including those of the spouses, despite there being no apparent objective commercial reason for it.[675] Fourth, the cost of the trip (upwards of US$ 22,000), which does not include the costs paid by Tecnazul, suggests extravagance.

451.  Tellingly, this fact pattern bears a close resemblance with a hypothetical scenario described in the FCPA Guide to assist in identifying improper gifts that amount to corruption:

> Two years ago, Company A won a long-term contract to supply goods and services to the state-owned Electricity Commission in Foreign Country. The Electricity Commission is 100% owned, controlled, and operated by the government of Foreign Country, and employees of the Electricity Commission are subject to Foreign Country's domestic bribery laws…
>
> … Company A periodically provides training to Electricity Commission employees at its facilities in Michigan. The training is paid for by the Electricity Commission as part of the contract. Senior officials of the Electricity Commission inform Company A that they want to inspect the facilities and ensure that the training is working well. Company A pays for the airfare, hotel, and transportation for the Electricity Commission senior officials to travel to Michigan to inspect Company A's facilities. Because it is a lengthy international flight, Company A agrees to pay for business class airfare, to which its own employees are entitled for lengthy flights. The foreign officials visit Michigan for several days, during which the senior officials perform an appropriate inspection. Company A executives take the officials to a moderately priced dinner, a baseball game, and a play. Do any of these actions violate the FCPA?
>
> No…
>
> *Would this analysis be different if Company A instead paid for the senior officials to travel first-class with their spouses for an all-expenses-paid, week-long trip to Las Vegas, where Company A has no facilities?*
>
> *Yes. This conduct almost certainly violates the FCPA because it evinces a corrupt intent. Here, the trip does not appear to be designed for any legitimate business purpose, is extravagant, includes expenses for the officials' spouses, and therefore appears to be designed to corruptly curry favor with the foreign government officials. Moreover, if the trip were booked as a legitimate business expense—such as the provision of training at its*

---

[672]  Worley Email, October 22, 2012 (**C-736**).

[673]  Hearing Transcript, Day 2, 335:14-19.

[674]  R. Falcon email, October 13, 2012 (**R-269**); H. Guarderas email to R. Falcon, October 31, 2012 (**R-410**); Worley Expense Report SVC-IE673983, October 24, 2012, p. 12 (**C-719**).

[675]  R. Falcon Email, October 13, 2012 (**R-269**); Worley Expense Report SVC-IE673983, October 24, 2012, p. 12 (**C-719**).

> *facilities—Company A would also be in violation of the FCPA's accounting provisions. Furthermore, this conduct suggests deficiencies in Company A's internal controls.*[676]

452. In view of the above, the Tribunal can only conclude that the Formula 1 Trip represents an undue advantage conferred by Worley upon Petroecuador employees evincing a corrupt intent.

**2013**

453. *March 14, 2013*: Mr. Bravo, through Mr. Guarderas, requested that Worley purchase 6 tickets to an NBA game in San Antonio, Texas occurring that same night.[677] Shortly thereafter, Mr. Falcon sent the tickets directly to Mr. Bravo with the cover message "*A la orden! Disfruten!*" (At your service! Enjoy!).[678] The attendees included Mr. Reyes, Mr. Bravo, "a friend" of theirs and two more unidentified persons.[679] Mr. Guarderas of Tecnazul, who had coordinated the purchase, ultimately remained in Houston.[680] Mr. Falcon confirmed at the Hearing that no Worley employees attended the game.[681] He explained that these Petroecuador officials had originally been invited to a game in Houston, where Worley officials would be present, but Mr. Bravo and Mr. Reyes ultimately could not attend. Worley thus purchased tickets for the San Antonio game instead.[682]

454. The Claimant, relying on the witness testimony of Mr. Falcon, states that it bought the tickets so that these Petroecuador officials could attend the NBA game during a visit to Houston for coordination meetings with Worley and Petroecuador's other US-based contractor UOP. The Claimant states that Petroecuador made its own travel arrangements and hotel bookings.[683] On this basis, the Claimant asserts that this event had a team-building purpose.[684]

455. Once again, the facts do not support the Claimant's characterization of this event. The absence of Worley officials at the game, the fact a "friend" of Mr. Pareja and Mr. Bravo was present and other factors as described above speak for themselves: the purchase of these tickets represents an undue advantage conferred by Worley upon Petroecuador employees evincing a corrupt intent.

---

[676]   FCPA Guide, p. R-459_0025 (**R-459**) (emphasis by the Tribunal).
[677]   R. Falcon email to H. Guarderas, March 14, 2013 (**R-413**).
[678]   R. Falcon email to A. Bravo, March 14, 2013 (**R-411**).
[679]   R. Falcon email to H. Guarderas, March 14, 2013 (**R-413**).
[680]   A. Bravo email to R. Falcon, March 14, 2013 (**R-431**).
[681]   Hearing Transcript, Day 3, 508:3-5.
[682]   Hearing Transcript, Day 3, 505:16-506:4.
[683]   Rejoinder on Jurisdiction, para. 139; Falcon Statement III, para. 26 (**CWS-7**).
[684]   Claimant's PHB, para. 127.

456.     *April 2, 2013*: Mr. Bravo wrote to the Claimant asking it to hire Mr. Faidutti, who had worked in Petroecuador from 2011 to 2012.[685] The Claimant denies that there exists any record of employment.[686]

457.     The evidence on record reveals a seriously questionable situation. Mr. Bravo asked for Mr. Faidutti to report directly to Petroecuador's Mr. Pareja, but would nonetheless be paid a monthly salary of US$ 5,000 by Worley.[687] In an e-mail to Tecnazul's Mr. Phillips, Worley's Mr. Hooper shared his misgivings about this arrangement:

> Bill, see the below email chain. Normally I would not have a problem with this but the email states that he [Mr. Faidutti] will be reporting to Mr. Pareja but on WorleyParsons's payroll. Don't understand why they did not come directly to you for this but be it may [*sic*], could you check with your legal just to make sure that Pareja nor WorleyParsons are infringing on the law. Thanks.[688]

458.     In spite of Mr. Hooper's expressed concerns, the Claimant ultimately requested authorization to assign Mr. Faidutti to the Esmeraldas Refinery Project.[689] In his capacity as an "Electrical Consultant", Mr. Faidutti would "support the WP Contract, under the direction of the WP Project Director."[690] Strikingly, Mr. Faidutti was a trained economist and did not have an engineering degree.[691] The PAAF Log for the Esmeraldas Refinery Project confirms that Mr. Faidutti was authorized to work full-time in that capacity for more than a year and a half.[692]

459.     The Tribunal is persuaded that the dubious circumstances of this hire indicate a lack of any reasonable business justification and are part and parcel of the Claimant's overall corrupt conduct.

460.     *August 28, 2013*: On this date, the Claimant and Petroecuador concluded the second Esmeraldas Refinery Complementary Agreement, once again, through a non-bid process. The aggregated value of the first (US$ 25.5 million) and second (US$ 34 million) Esmeraldas Refinery

---

[685]     Email from Petroecuador to Azul and Worley, April 2, 2013 (**C-940**).

[686]     Reply, para. 395; Rejoinder on Jurisdiction, para. 140; Claimant's PHB, para. 130.

[687]     R. Hooper email to W. Phillips, April 2, 2013 (**R-433**).

[688]     R. Hooper email to W. Phillips, April 2, 2013 (**R-433**).

[689]     Letter from Worley to Petroecuador No. 408005-00445-00-AD-LTR-WPI-EPP-1672, April 9, 2013, p. 2 (**C-552**).

[690]     Letter from Worley to PetroecuadorNo. 408005-00445-00-AD-LTR-WPI-EPP-1672, April 9, 2013, p. 19 (**C-552**).

[691]     Email from Petroecuador to Azul and Worley, April 2, 2013, pp. C-940_003-005 (**C-940**).

[692]     Petroecuador Esmeraldas Refinery Revamp 408005-00431 Personnel Assignment Authorization Form – PAAF LOG, p. 5 (**C-551**).

Complementary Agreements surpassed that of the Esmeraldas Refinery Agreement itself (US$ 38 million).[693]

461.   As the first Esmeraldas Refinery Complementary Agreement, this second Complementary Agreement was signed by Mr. Pareja on behalf of Petroecuador. Mr. Bravo, acting as contract administrator, had requested authorization to conclude this agreement on May 13 and June 12, 2013.[694]

462.   *September 18, 2013*: Mr. Bravo requested Mr. Falcon to pay for a dinner party to celebrate the birthday of Mr. Calvopiña with 20 other people.[695] The Claimant agreed and paid for a dinner in Quito, including meals, a birthday cake and expensive bottles of alcohol, amounting to approximately US$ 1,200.[696] Only 20 Petroecuador employees and their spouses attended the birthday party; no Worley employees were present.[697]

463.   According to the Claimant, this was no lavish party but a business dinner.[698] Mr. Falcon explained that the intention behind this dinner was to have Mr. Calvopiña (who was General Manager of Petroecuador at the time) meet other high-level Government officials to align their interests and discuss the risk management of the Esmeraldas Refinery Project and other matters for which he considered they "were running out of time."[699] Mr. Falcon paid for the meal and reportedly left before anyone arrived due to tiredness and a concern that no one would attend.[700]

464.   Mr. Falcon and Mr. Parker acknowledged during cross-examination that the Claimant could not pay a non-business meal for a Government official.[701] On the evidence before it, the Tribunal concludes that this is exactly what happened. Mr. Calvopiña's birthday is another instance of Worley conferring an undue advantage upon an official evincing a corrupt intent.

---

[693]   Refurbishment Complementary Agreement No. 2013027, August 28, 2013, Clauses 1, 4 (**C-20**).

[694]   Refurbishment Complementary Agreement No. 2013027, August 28, 2013, Clause 1 (**C-20**).

[695]   R. Falcon email to A. Guerrero, September 19, 2013 (**R-421**).

[696]   Worley Expense Report SVC-IE829315, September 23, 2013 (**R-420**); R. Falcon email to A. Guerrero, September 19, 2013 (**R-421**).

[697]   R. Falcon email to A. Guerrero, September 19, 2013 (**R-421**).

[698]   Rejoinder on Jurisdiction, para. 139.

[699]   Hearing Transcript, Day 3, 501:24-503:17.

[700]   R. Falcon email to A. Guerrero, September 19, 2013 (**R-421**); Hearing Transcript, Day 3, 504:4-22.

[701]   Hearing Transcript, Day 2, 314:1-3; Hearing Transcript, Day 3, 501:9-17.

**2014**

465. *April 2, 2014*: On this date, the Claimant and Petroecuador concluded the third Esmeraldas Refinery Complementary Agreement through a non-bid process for a contract price of approximately US$ 11.5 million excluding VAT and reimbursable costs.[702] The agreement was proposed by Mr. Bravo in his capacity as contract administrator and was signed by Mr. Pareja on behalf of Petroecuador.[703]

466. *October 9, 2014*: On this date, the Claimant and Petroecuador concluded the fourth Esmeraldas Refinery Complementary Agreement through a non-bid process for a contract price of approximately US$ 17.5 million excluding VAT and reimbursable costs.[704] The agreement was proposed by Mr. Bravo in his capacity as contract administrator and was signed by Mr. Pareja on behalf of Petroecuador.[705]

467. *October 17, 2014*: On this date, the Claimant and Petroecuador concluded the fifth Esmeraldas Refinery Complementary Agreement. The parties there sought to amend the Esmeraldas Refinery Agreement so as to include a provision of US$ 1,939,226 for reimbursable expenses.[706] The agreement was proposed by Mr. Bravo in his capacity as contract administrator and was signed by Mr. Pareja on behalf of Petroecuador.[707]

**2015**

468. *October 29, 2015*: On this date, the Claimant and Petroecuador concluded the sixth Esmeraldas Refinery Complementary Agreement for a contract price of approximately US$ 52 million excluding reimbursable costs.[708] The agreement was proposed by Mr. Bravo in his capacity as contract administrator and was signed by Mr. Tapia on behalf of Petroecuador.[709]

---

[702]   Refurbishment Complementary Agreement No. 2014015, April 2, 2014, Clause 4 (**C-21**).

[703]   Refurbishment Complementary Agreement No. 2014015, April 2, 2014, Clauses 1, 8 (**C-21**).

[704]   Refurbishment Complementary Agreement No. 2014048, October 9, 2014, Clause 4 (**C-22**).

[705]   Refurbishment Complementary Agreement No. 2014048, October 9, 2014, Clauses 1, 9 (**C-22**).

[706]   Refurbishment Complementary Agreement No. 2014051, October 17, 2014, Clause 1 (**C-23**).

[707]   Refurbishment Complementary Agreement No. 2014051, October 17, 2014, Clauses 1, 5 (**C-23**).

[708]   Refurbishment Complementary Agreement No. 2015205, October 29, 2015, Clause 3.1 (**C-24**).

[709]   Refurbishment Complementary Agreement No. 2015205, October 29, 2015, Clauses 1.2, 9.1 (**C-24**).

iv.   Analysis of Evidence on Corruption

469.   Having examined the facts set out in the above timeline together with other relevant circumstances, the Tribunal considers that all of the hallmarks of corruption are present in this case.

470.   First, as discussed above, the record is replete with examples of Worley giving undue advantages to Petroecuador officials, who as noted above are also State officials. In reaching such conclusion, the Tribunal finds useful the following guideline of the FCPA Guide:

> In sum, while certain expenditures are more likely to raise red flags, they will not give rise to prosecution if they are: (1) reasonable, (2) bona fide and (3) directly related to (4) the promotion, demonstration, or explanation of products or services or the execution or performance of a contract.[710]

471.   None of the trips and events analyzed in the above timeline meet these requirements. They were not designed for any legitimate business purpose. There is no apparent or implied connection between the benefits conferred upon the Petroecuador officials, which in some cases were extravagant, and Worley's performance of its contractual obligations or business development plans. The same conclusion can be extended to Mr. Faidutti's highly questionable hiring by Worley, for which the Claimant has provided no explanation.

472.   There is also a pattern of misrepresentation of the above expenses in the Claimant's records seeking falsely to suggest a legitimate business purpose. The Miami trip was reported as a "Personnel-Best Practices Contractors Visit".[711] The Formula 1 Trip was labelled as a "teambuilding exercise".[712] Mr. Faidutti was hired as an "Electrical Consultant".[713] As explained above, none of these representations were true, which supports the inference that these were undue advantages.[714] The same conclusion can be reached in view of Worley's failure to provide the registers for any of the above described entertainment expenses required under its Executive Directive, pursuant to which any gifts, meals, entertainment and hospitality meant for

---

[710]   FCPA Guide, p. R-459_0033 (**R-459**).

[711]   Worley expense Report SVC-IE661969, October 2, 2012 (**R-356**).

[712]   Worley Expense Report SVC-IE673983, October 24, 2012 (**C-719**).

[713]   Letter from Worley to Petroecuador No. 408005-00445-00-AD-LTR-WPI-EPP-1672, April 9, 2013, p. 19 (**C-552**).

[714]   FCPA Guide, pp. R-459_0032-0033 (**R-459**): "Moreover, when expenditures, bona fide or not, are mischaracterized in a company's books and records, or where unauthorized or improper expenditures occur due to a failure to implement adequate internal controls, they may also violate the FCPA's accounting provisions. Purposeful mischaracterization of expenditures may also, of course, indicate a corrupt intent."

130

Government officials must be recorded in a dedicated gift register if the estimated or actual value exceeds US$ 200 per person.[715]

473. Similarly, the acceptance of the above-described advantages contravenes several legal instruments governing the conduct of Petroecuador officials, further underscoring their inappropriateness. Among others, the Tribunal notes that the Ecuadorian Law of Public Companies proscribes Ecuadorian public officials from accepting any gift or benefit offered in consideration of their office, regardless of the underlying intent.[716] Petroecuador's Ethics Code contains a similar prohibition directed specifically at Petroecuador officials.[717]

474. Second, the evidence on record also supports the proposition that Worley sought to "obtain or retain business or other undue advantage" through the giving of advantages to Petroecuador officials.

475. In this respect, the Tribunal observes that there need not be a direct causal link between the giving of an advantage to a public official and the subsequent receiving of an advantage to establish corrupt intent on the part of Worley. Objective factual circumstances may permit such inference.[718] This is particularly the case where, as here, the benefits are conferred during an extended period to curry favor with Government officials, meaning that a *quid pro quo* might not be apparent. As noted by the tribunal in *Sistem v. Kyrgyzstan*:

---

[715]   Executive Directive, Section 11 (**C-746**). In relevant part, it reads: "Many countries have special rules as to gifts, entertainment and hospitality for government officials because gifts, entertainment and hospitality may be or be perceived to be bribes in certain circumstances. You must seek local advice to make sure that gifts, entertainment and hospitality are permitted by law wherever you are located. WorleyParsons requires all Gifts offered to or given by a government official to satisfy the following: a) It is permitted by law in the local jurisdiction, is not a facilitation payment and is not only the local custom; b) It is for a proper business purpose; c) It does not seek to influence the government official and could not be perceived to seek to influence the government official; d) It is of an appropriate value and nature considering the local custom and all the circumstances and will not damage the reputation of WorleyParsons; e) It is registered in the gift register or the ExCo gift register, including all business meals as per clause 12 below, if the estimated or actual value exceeds USD200 per person; and f) otherwise complies with this executive directive and the Code of Conduct."

[716]   Ecuador Organic Law of Public Companies (LOEP), Article 31(5) (**RLA-218**): "In addition to the prohibitions set forth in the Codification of the Labor Code, which shall apply to career civil servants and workers of the state-owned company, the following are established... 5. To request, accept or receive, in any way, gifts, rewards, presents or contributions in kind, goods or money, privileges and advantages in connection with their work, for themselves, their superiors or from their subordinates." (Tribunal's translation).

[717]   Petroecuador Code of Ethics, October 14, 2013, Article 8(q) (**R-460**): "The public servants of EP PETROECUADOR, in the exercise of their functions, must commit to observe the following general rules:... q) Not to accept presents from third parties, except for those presents without significant commercial value. In the case of objects of value that cannot be returned, they shall be incorporated as assets of EP PETROECUADOR." (Tribunal's translation).

[718]   UNCAC, Article 28 (**RLA-112**).

> In some circumstances it may happen that regular payments over a period of time effectively "buy" the long-term goodwill of the recipient, so as to make it difficult to establish a causal link between the bribe and the advantage that it procures.[719]

476.  Several elements that are present in this case support a strong inference that Worley sought to "buy" the long-term good will of several Petroecuador officials to secure an undue advantage. Chief among them is the fact that the same Petroecuador employees who oversaw the operation of the Esmeraldas Refinery Agreement and had the authority to conclude complementary agreements on behalf of Petroecuador (Mr. Pareja, Mr. Bravo and Mr. Tapia) were convicted for receiving bribes from Tecnazul, the very same subcontractor engaged by Worley in the Esmeraldas Refinery Project. While there are no records of Worley making discreditable payments in the same manner as Tecnazul, the Tribunal has already concluded that the undue advantages provided by Worley to these individuals during the operation of the Esmeraldas Refinery Project evince a corrupt intent. Furthermore, as the Respondent puts it, "the facts of corruption in this case match precisely with [the] continuum of the Contracts",[720] all of which were concluded without a public bidding procedure. This constellation of circumstances points clearly to corruption in the conclusion of the Esmeraldas Refinery Complementary Agreements.

477.  On this basis, the Tribunal infers that the Claimant's prolonged and repeated giving of undue advantages to Petroecuador officials during the performance of the Esmeraldas Refinery Agreement served to curry favor with those officials and had the ultimate effect of securing an undue advantage for Worley: the award of the six Esmeraldas Refinery Complementary Agreements through a non-competitive procurement process.

478.  Another key factor lending support to this inference of corrupt intent is the fact that the six Esmeraldas Refinery Agreements were awarded by Petroecuador in blatant disregard of Article 87 of the Public Procurement Law, pursuant to which the aggregated value of any complementary agreements for consultancy contracts cannot exceed 70% of the value of the main contract:

> The total sum of the amounts of the complementary contracts referred to in articles 85 and 86, except for consulting and hydrocarbon sector contracts, shall not exceed thirty-five (35%) percent of the updated or readjusted value of the main contract on the date on which the Contracting Agency decides to execute the complementary contract. This update shall be made by applying the price readjustment formula contained in the respective main contracts.

---

[719]  *Sistem Mühendislik İnşaat Sanayi ve Ticaret A.Ş v. Kyrgyz Republic*, ICSID Case No. ARB(AF)/06/1, Award, September 2009, para. 44 (**CLA-361**).

[720]  Ecuador's Opening Statement Presentation, pp. 59, 157, 201, 205, 214, 240, 272 (**RD-1**); Hearing Transcript, Day 1, 152:16-18.

> *The value of the complementary consulting contracts may not exceed seventy (70%) percent of the updated or readjusted value of the main contract.*[721]

479.  The Claimant denies the proposition that Article 87 of the Public Procurement Law applies to the Esmeraldas Refinery Agreement. It relies on (i) the text of Article 87 itself, which, in its reading, excludes contracts in the hydrocarbons sector from the 70% limit; (ii) the decision to remove a reference to a 70% limit from a draft of the Esmeraldas Refinery Agreement during its negotiation; and (iii) the fact that Petroecuador contemporaneously approved budget certifications and legal opinions in respect of each of the Esmeraldas Refinery Complementary Agreements.[722]

480.  The Tribunal disagrees with the Claimant's interpretation of this provision. The plain terms of Article 87 of the Public Procurement Law introduce an exemption for consultancy contracts *and* contracts in the hydrocarbons sector from the 35% limit on the value of the total contract set out in the first sentence of this provision. As a logical proposition, the dual exemption in the first sentence of Article 87 cannot apply to the last sentence of the same provision, which specifically *requires* the application of a 70% limit to one of the contract categories included in the exemption – consultancy contracts.

481.  Conceivably, therefore, to the extent the Esmeraldas Refinery Agreement requires compliance with Article 87 "in relation to the hydrocarbons sector" when concluding complementary agreements, it echoes the exemption from the 35% limit referred to in the first sentence of this provision. The reference to Article 87 in the Esmeraldas Refinery Agreement otherwise confirms the applicability of the 70% limit to this Agreement.[723]

482.  Having established that the 70% limit in Article 87 of the Public Procurement Law applied to the Esmeraldas Refinery Agreement, the Tribunal must highlight the astonishing violation of this limit. The original value of the Esmeraldas Refinery Agreement was US$ 38,600,764.[724] The six Esmeraldas Refinery Complementary Agreements were respectively awarded for the following

---

[721]  Public Procurement Law, Article 87 (**RLA-52**) (emphasis and translation by the Tribunal). According to the Respondent, "[t]he reason for the limitation on the 70 percent is to avoid Petroecuador from awarding contracts and a provider from benefiting from additional Scopes of Services without there being a Public Procurement process." Hearing Transcript, Day 7, 1296:2-11.

[722]  Claimant's PHB, para. 139.

[723]  Esmeraldas Refinery Agreement, Clause 15 (**C-3**): "The content of Article 87 of the LOSNCP shall apply in relation to the hydrocarbons sector. In all cases, prior to entering the complementary contracts, the corresponding budgetary certification shall be required; and if applicable, THE CONTRACTOR shall produce additional guarantees in accordance with the Organic Law of the Public Procurement System." (Tribunal's translation).

[724]  Esmeraldas Refinery Agreement, Clause 5.1 (**C-3**).

amounts excluding VAT: US$ 25,462,312.29,[725] US$ 34,053,531.55,[726] US$ 11,505,070.31,[727] US$ 17,488,133.36,[728] US$ 1,939,226[729] and US$ 57,433,404.38, totaling US$ 147,881,677.89. The value of the addenda therefore represents almost 380% of the value of the main Esmeraldas Refinery Agreement – that is, 310% above the Article 87 limit, which translates into an approximate amount of US$ 120 million above the limit in absolute terms.

483.   As a practical proposition, a breach of this extraordinary magnitude could only have gone undetected within a sophisticated oil company as Petroecuador through a complex corrupt scheme affecting multiple levels of the organization and designed to evade internal controls. This is consistent with the description of the underlying scheme made under oath by the Chief Litigation Counsel of Petroecuador within the context of the § 1782 Proceedings:

> The investigations and judicial proceedings ongoing in Ecuador described below have confirmed that fraud's implementation required a close coordination between the involved providers and former employees to circumvent and evade the company's internal controls. Among other things, the contracting Special Regime was abused by means of the improper and unjustified use of the exceptional contracting procedure of the specific line of business [*giro específico de negocio*] for almost all contracts. This is the case for the large majority of contracts awarded to providers in respect of which the payment of bribes has been established, as is the case of Galileo, OSS, Tecnazul, and MMR Group.
>
> Abusing the special regime of the specific line of business [*giro específico de negocio*], Mr. Pareja Yannuzzelli, then Refining Manager, and Mr. Bravo Panchano, then Project Coordinator in the Refining Division, as expenditure approvers [*ordenadores de gastos*] and individuals in charge of all contracts with said Refining Division up to the amount of USD $50 million, freely selected the providers of their preference and requested bids from them to participate in a pseudo tender process behind closed doors. To ensure the success of the scheme, they appointed the three members of the technical commissions charged with reviewing and evaluating offers from the predetermined providers, and, having selected the provider of their preference, they would approve the award of the contracts, ensuring not to exceed the USD $50 million threshold for each main contract. An amount higher than USD $50 million for main contracts required approval of the company's General Manager, although as of that date, that limitation did not apply to contracts supplemental to the main contract.
>
> In order to cover their tracks and facilitate the continuation of the fraud, the corrupt former employees appointed the supervisors [*fiscalizadores*] and administrators of the rigged contracts. With that, they contributed to maintaining absolute control over the contracts' performance and facilitated the concealment of the fraud from the company's internal controls

---

[725]   Refurbishment Complementary Agreement No. 2012036, September 28, 2012, Clause 4.1 (**C-19**).

[726]   Refurbishment Complementary Agreement No. 2013027, August 28, 2013, Clause 4 (**C-20**).

[727]   Refurbishment Complementary Agreement No. 2014015, April 2, 2014, Clause 4 (**C-21**).

[728]   Refurbishment Complementary Agreement No. 2014048, October 9, 2014, Clause 4 (**C-22**).

[729]   Refurbishment Complementary Agreement No. 2014051, October 17, 2014, Clause 1, 3 (**C-23**). The Tribunal observes that, unlike the other addenda, the fifth Esmeraldas Refinery Complementary Agreement does not concern the rendering of a service, but rather purports to modify the main contract so as to include a provision of US$ 1,939,226 for reimbursable expenses. For the sake of completeness, the Tribunal has accounted for this amount in its determination of the violation of the 70% limit under Article 87 of the Public Procurement Law. The stated values for the remaining addenda in this paragraph are exclusive of provisions for reimbursable expenses.

departments. Furthermore, as previously stated, the bribe payments were received by the corrupt former employees through foreign accounts in the name of their offshore companies, thereby facilitating the concealment of the scheme and ensuring its continuity.

This scheme was implemented in most of the contracts awarded to providers involved in the corruption scheme.[730]

484.  It follows that the award of the six Esmeraldas Refinery Complementary Agreements to Worley would not have been possible but for the corrupt scheme put in place by Mr. Pareja and Mr. Bravo. Conceivably, under normal circumstances, Petroecuador's internal controls would have otherwise detected and corrected any prospective or actual violations of the 70% limit in Article 87 of the Public Procurement Law. By necessary implication, therefore, the Tribunal confirms its initial conclusion that the Esmeraldas Refinery Complementary Agreements are the product of a corrupt arrangement.

485.  In sum, for the above reasons, the Tribunal concludes that the Claimant corruptly offered undue advantages to Mr. Pareja, Mr. Bravo, Mr. Calvopiña and Mr. Reyes in order for Mr. Pareja and Mr. Bravo to secure the Esmeraldas Refinery Complementary Agreements for Worley. This conduct is of a particularly serious nature in light of its connection with a much larger fraudulent scheme within Petroecuador, without which the Claimant would not have been awarded upwards of US$ 120 million dollars' worth of complementary agreements.

    v.  Conclusion

486.  As discussed above, the dispositive question is whether the Claimant's illegal activities are (i) serious and widespread (as opposed to sporadic and trivial) and (ii) bear a close relationship to the claims.[731] As noted by the *Bank Melli* tribunal, "[t]he reason why serious violations such as a breach of international public policy may bar the admissibility of claims is that international adjudicatory bodies have a duty not to entertain claims tainted by violations of certain universally accepted norms pursuant to general principles of good faith and *nemo auditur propiam turpitudinem allegans*."[732]

487.  Earlier in this Final Award, the Tribunal has established that the Claimant corruptly offered undue advantages to several Petroecuador officials in order for them to secure the six Esmeraldas

---

[730]    Petroecuador's Memorandum in Support of its 28 U.S.C. § 1782(a) Discovery Application, Sworn Statement of Marco Emilio Prado Jiménez, pp. 31-32 (**R-2**).

[731]    *Bank Melli Iran and Bank Saderat Iran v. Kingdom of Bahrain*, PCA Case No. 2017-25, Award, November 9, 2021, para. 376 (**RLA-301**).

[732]    *Bank Melli Iran and Bank Saderat Iran v. Kingdom of Bahrain*, PCA Case No. 2017-25, Award, November 9, 2021, para. 365 (**RLA-301**).

Refinery Complementary Agreements for Worley. The Claimant did so over a period of several years, in a deliberate manner and benefitting from a successful fraudulent scheme. The Tribunal considers it amply recognized that grave and reprehensible conduct of this sort, which can be readily characterized as bribery, is in breach of international public policy.[733] Therefore, to the extent the Claimant's claims are based on the Esmeraldas Refinery Complementary Agreements, they originate in serious and widespread illegal conduct and are therefore, according to a majority of the Tribunal, are rendered inadmissible, and according to Arbitrator Stern must be dismissed, as based on a non-protected investment.

488.    The ensuing question is whether Worley's corrupt conduct bears a close relationship to the Claimant's claims as a whole. In the instant case, the Claimant's claims concern three different sets of facts: (i) the alleged non-payment of amounts due under the Agreements by RDP and Petroecuador in the wake of the Presidential Communication and the ensuing Petroecuador Memorandum, which categorized the Claimant as a company "related to" Tecnazul; (ii) a "harassment campaign" against the Claimant conducted by the Comptroller General and the Prosecutor General; and (iii) unwarranted tax liabilities allegedly threatened by the SRI against the Claimant. Ultimately, however, the entirety of the Claimant's claims refer to a tightly circumscribed triggering event: Ecuador's alleged initial decision to halt all payments to Worley under the Agreements, which, in the Claimant's submission, was arbitrary and rested upon finding Worley "guilty by association" for Tecnazul's corruption. In the Claimant's own words:

> Ecuador invited Worley to invest and act as project management consultant in Ecuador's most strategic projects. In reliance on the State's support for these projects, Worley invested in Ecuador and complied with its obligations to Ecuador's satisfaction. While Ecuador's payments were at times irregular, Ecuador reassured Worley that payment would be forthcoming and thereby induced, Worley to continue advancing the works. Once one of the projects was completed, and the other underway, Ecuador halted all payments to Worley. *The order to suspend payments came in the form of a letter from the Presidency and was based on a handwritten note adding Worley as a "related company" to a subcontractor that was involved in a bribery scheme with various highly ranked Ecuador officials.*

> From that point forward, Ecuador undertook a concerted campaign against Worley. A driving force in this campaign was Ecuador's Office of the Comptroller General, which has issued administrative orders with findings of civil liability … subsequently confirmed by resolutions … fabricating almost US\$ 200 million in liabilities against Worley, based on its post facto reinterpretation of the underlying agreements. The Comptroller General's administrative proceedings also triggered a series of criminal investigations intended to harass Worley's officers. Ecuador's actions are in violation of Worley's BIT-protected rights and its legitimate expectations, as the next paragraphs explain.

---

[733]    *See Bank Melli Iran and Bank Saderat Iran v. Kingdom of Bahrain*, PCA Case No. 2017-25, Award, November 9, 2021, para. 376 (**RLA-301**); *World Duty Free Company Limited v. Republic of Kenya*, ICSID Case No. ARB/00/7, Award, October 4, 2006, para. 157 (**RLA-126**); *Churchill Mining PLC and Planet Mining Pty Ltd v. Republic of Indonesia*, ICSID Case No. ARB/12/14 and 12/40, Award, December 6, 2016, paras. 507-508 (**RLA-132**).

PCA Case No. 2019-15
Final Award

…

Petroecuador's corruption scandal, and the President's subsequent orders, marked the beginning of a relentless harassment campaign against Worley in which the State—through the Office of the Comptroller General … ordered the repudiation of investment obligations toward Worley, and has pursued Kafkaesque audits. Those audits, in turn, resulted in baseless resolutions that fabricated almost US$ 200 millions in liabilities against Worley as well as equally groundless criminal proceedings against the company's officers. Even though the State's audits and investigations did not relate to, or result in, allegations of corruption against Worley, the State continued to deny Worley payment, availing itself of a new excuse, namely, the contingencies fabricated by the Comptroller General against Worley.

The administrative proceedings maintained by the Comptroller General against Worley fall into two categories. *First*, the Comptroller General seeks payment from Worley corresponding to work that Worley already performed and that the State already received, but that according to the Comptroller General, corresponds to defective complementary agreements with Petroecuador. *Second*, the Comptroller General seeks payment from Worley for the alleged mistakes of Petroecuador or other contractors, on performing work in projects where Worley was acting as PMC. None of the administrative proceedings relate to Tecnazul or allegations of corruption.

Contrary to the Comptroller General's assumptions, Worley's critical, but limited, role as PMC did not equate to a safety net for the State to impute responsibility on Worley for the acts of third parties engaged by the State. Worley devoted substantial resources to defend itself in these proceedings; however, the Comptroller General has ignored the underlying facts and the law, and has created a contingency against Worley amounting to almost US$ 200 million. This amount is likely to increase as the Comptroller General continues to issue resolutions from ongoing audits.

Another powerful weapon in Ecuador's arsenal has been the Prosecutor General's Office. Since 2016, Ecuador has initiated a myriad of unwarranted criminal investigations against Worley's officers. Virtually all of these investigations stem from referrals by the Comptroller General and the SRI in connection with the administrative proceedings and tax audits against Worley, which are unrelated to the corruption scandal. Prosecutors have not found any evidence of wrongdoing by Worley's employees. Of the 18 criminal investigations that Worley knows have been initiated against its employees, only three passed the investigation phase and resulted in formal charges against Worley's Program Manager Raymond Falcon, and all three were dismissed because they lacked any merit. The rest remain open at the pre-indictment stage in order to exert pressure on Worley. Recently, however, Petroecuador filed a §1782 Application against Worley in U.S. courts, in which it threatened that this may change now, over three years after the corruption scandal was uncovered.

*Thus, after exploiting all of the expertise and know-how Worley had to offer, Ecuador opportunistically found Worley "guilty by association" without any factual or legal basis, in order to avoid its payment obligations. This escalated into a full-fledged harassment campaign against Worley. The administrative proceedings, criminal investigations and tax audits, are all self-serving tactics to avoid paying Worley.*[734]

489.   Thus, the absence of corruption on the part of Worley lies at the heart of the Claimant's case. However, as established above, the Claimant did engage in serious corrupt activities during the operation of its investment. The Tribunal need not embark upon a detailed analysis of the Treaty violations asserted by the Claimant to conclude that the fact of corruption impacts every aspect of the Claimant's claims. In particular, the Tribunal notes that the Claimant's proven corruption

---

[734]   Statement of Claim, paras. 4-5, 14-18 (emphasis by the Tribunal).

*prima facie* renders faulty the two main prongs of the Claimant's case: (i) the argument that "Ecuador opportunistically found Worley 'guilty by association' without any factual or legal basis, in order to avoid its payment obligations"; and (ii) the ensuing argument that the "administrative proceedings, criminal investigations and tax audits, are all self-serving tactics to avoid paying Worley".[735] Accordingly, the illegal activities in the instant case bear a close relationship to the claims in the arbitration as per *Bank Melli*.

490.   In light of this conclusion, and in view of the severity and pervasiveness of the corrupt conduct committed by the Claimant, a majority of the Tribunal determines that the Claimant's claims are inadmissible, and Arbitrator Stern considers that they must be dismissed. This conclusion, by itself, is dispositive of the Claimant's claims.

491.   In spite of this conclusion, the Tribunal considers it appropriate also to analyze the second ground of illegality during the operation of the investment invoked by the Respondent, concerning Worley's willful blindness towards Tecnazul's corruption.

## 2)   The Claimant's "Willful Blindness" towards Tecnazul's Corruption

492.   The Respondent's argument of "willful blindness" is made in connection with Tecnazul's proven corruption. It is undisputed that, during the performance of the Claimant's investment, Tecnazul paid more than US$ 1.2 million in bribes to the very same Petroecuador employees who oversaw the operation of several of the Claimant's Agreements – including, chiefly, Mr. Pareja, Mr. Bravo, Mr. A. Escobar and Mr. Reyes.[736]

---

[735]   Statement of Claim, para. 18.

[736]   *See* USD $163,143.00 Offshore Wire Transfer from S. Calero to GRIBRA, S.A. (owned by A. Bravo), August 8, 2014 (**R-81**); USD $17,970.00 Offshore Wire Transfer from S. Calero to GIRBRA, S.A. (owned by A. Bravo), November 10, 2014 (**R-82**); USD $17,970.00 Offshore Wire Transfer from S. Calero to GIRBRA, S.A. (owned by C. Pareja), November 12, 2014 (**R-83**); USD $326,366.00 Offshore Wire Transfer from H. Guarderas to GIRBRA, S.A. (owned by A. Bravo), April 3, 2014 (**R-84**); USD $129,828.31 Offshore Wire Transfer from H. Guarderas to GIRBRA, S.A. (owned by A. Bravo), May 9, 2014 (**R-85**); USD $209,980.00 Offshore Wire Transfer from Operadora BLC, S.A. (owned by W. Phillips) to GIRBRA, S.A. (owned by A. Bravo), October 31, 2013 (**R-86**); USD $65,000.00 Offshore Wire Transfer from Operadora BLC, S.A. (owned by W. Phillips) to GIRBRA, S.A. (owned by A. Bravo), September 23, 2014 (**R-87**); USD $195,000.00 Offshore Wire Transfer from Operadora BLC, S.A. (owned by A. Bravo), November 10, 2014 (**R-88**); USD $154,980.00 Offshore Wire Transfers from Operadora BLC, S.A. (owned by W. Phillips) to GIRBRA, S.A. (owned by A. Bravo), February 9, 2015 (**R-89**); USD $150,000.00 Offshore Wire Transfers from Operadora BLC, S.A. (owned by W. Phillips) to GIRBRA, S.A. (owned by A. Bravo), March 11, 2015 (**R-90**); USD $199,980.00 Offshore Wire Transfers from Operadora BLC, S.A. (owned by W. Phillips) to GIRBRA, S.A. (owned by A. Bravo), December 11, 2015 (**R-91**); Offshore Wire Transfers from Operadora BLC, S.A. (owned by W. Phillips) to ESCART, S.A. (owned by A. Escobar), 2013-2016 (**R-92**); Composite Offshore Wire Transfers from Operadora BLC (owned by W. Phillips) to Employees Overseeing the Esmeraldas Refinery Project (undated) (**R-93**). *See also* Statement of Claim, para. 11; Statement of Defense, paras. 239-249.

493.   Against this backdrop, and relying principally on *Churchill Mining v. Indonesia*, the Respondent argues that the Tribunal should declare the Claimant's claims to be inadmissible in view of Worley's failure to (i) monitor Tecnazul's compliance with anti-corruption legislation; (ii) investigate Tecnazul's corruption after being put on notice by a public blog and former employee; and (iii) stop cooperating with Tecnazul even after Tecnazul's corruption was established in the Panama Papers. In the Respondent's submission, Worley's "scheming" with Tecnazul to misrepresent compliance with the 30% subcontracting limit, as well as several of the events corruptly organized by Worley for Petroecuador employees, as described above, also amount to "red flags" signaling Worley's willful blindness.[737]

494.   The Claimant denies the proposition that the Tribunal may under international law apply a strict liability or negligence standard with respect to third-party illegalities; in its view, such illegalities might be relevant only where the claimant itself was willfully blind to the illegality or failed to correct known illegality.[738] On the facts, the Claimant observes that RDP, Petroecuador or the Attorney General all failed to terminate or nullify the Agreements as a result of such corruption.[739] In any event, the Claimant states that it acted diligently, as Worley (i) selected a subcontractor with notable significant experience; (ii) required Tecnazul to comply with anticorruption laws and policies; (iii) investigated online posts regarding Tecnazul's corruption; and (iv) terminated the relationship with Tecnazul after the publication of the Panama Papers.[740]

495.   As noted by the Parties, the question of willful blindness has been addressed by no less than two investment tribunals. The *Minnotte v. Poland* tribunal postulated that "[t]here may be circumstances in which the deliberate closing of eyes to evidence of serious misconduct or crime, or an unreasonable failure to perceive such evidence, would indeed vitiate a claim."[741] This proposition was elaborated upon by the *Churchill Mining* tribunal as laying out the standard of willful blindness, conscious disregard or deliberate ignorance in an admissibility context, whereby "a claimant knew or should have known of third-party wrongdoing in connection with an investment and still chose to do nothing (as opposed to just failing to take due care)."[742]

---

[737]   Respondent's PHB, paras. 104-105; 120.

[738]   Claimant's PHB, para. 132.

[739]   Claimant's PHB, para. 133.

[740]   Claimant's PHB, para. 134.

[741]   *David Minnotte & Robert Lewis v. Republic of Poland,* ICSID Case No. ARB (AF)/10/1, Award, May 16, 2014, para. 163 (**CLA-362**).

[742]   *Churchill Mining PLC and Planet Mining Pty Ltd v. Republic of Indonesia*, ICSID Case No. ARB/12/14 and 12/40, Award, December 6, 2016, para. 504 (**RLA-132**).

496.  The Tribunal is prepared to adopt the *Churchill Mining* standard for present purposes. In the circumstances of this case, in order to ascertain whether the Claimant was willfully blind to Tecnazul's corruption, the Tribunal must assess (i) the "level of institutional control and oversight deployed" by the Claimant vis-à-vis Tecnazul; (ii) whether the Claimant was put on notice by evidence of corruption "that a reasonable investor … should have investigated"; and (iii) whether the Claimant "took appropriate corrective steps."[743]

497.  The second element of the *Churchill Mining* standard – whether the Claimant was put on notice of Tecnazul's corruption – is particularly determinative in view of the Tribunal's conclusions earlier in this Final Award regarding the illegalities committed by the Claimant both at the making and during the operation of its investment.

498.  First, the Claimant received an early sign that Tecnazul was engaged in illegal activities no later than July 2011, when, as stated above, Mr. Phillips and Mr. Guarderas of Tecnazul pressured Mr. Elizondo of Worley to misrepresent compliance with the 30% subcontracting limit in the bid for the Esmeraldas Refinery Agreement.[744] Worley's own involvement in organizing events and trips in 2012 together with Tecnazul, which were meant corruptly to curry favor with Petroecuador officials, confirms that Worley must have been aware by that time that Tecnazul was involved at the very least in some form of scheming.[745]

499.  In any event, it is unlikely that Worley's subsequent winning of the six Esmeraldas Refinery Complementary Agreements between 2012 and 2015, in non-competitive proceedings, could have taken place without Worley's knowledge of Tecnazul's illegal bribery scheme. As the Claimant's chosen subcontractor, Tecnazul stood to win just as much as Worley from obtaining work from Petroecuador and likely played a key part in seeing that Petroecuador, through Mr. Pareja and Mr. Bravo, would corruptly award those agreements to Worley. Indeed, as noted above, the addenda were extremely valuable – they had a combined value of more than US$ 140 million – and were obtained in blatant disregard of Article 87 of the Public Procurement Law.[746] Even assuming that Worley was completely unaware of Tecnazul's bribery scheme until the second Esmeraldas Complementary Agreement was concluded in August 2013 (by which time the 70% limit was surpassed)[747] the staggering breach of the 70% limit could not have gone

---

[743]  *Churchill Mining PLC and Planet Mining Pty Ltd v. Republic of Indonesia*, ICSID Case No. ARB/12/14 and 12/40, Award, December 6, 2016, para. 504 (**RLA-132**).

[744]  *See* paras. 366-371 above.

[745]  *See, e.g.*, Formula 1 Trip (paras. 448-452 above); NBA game (paras. 453-455 above).

[746]  *See* paras. 478-484 above.

[747]  *See* paras. 460-461 above.

unnoticed by the internal compliance mechanisms of Worley, a sophisticated PMC company. Faced with these circumstances, any reasonable investor should have initiated an investigation to ensure that its investment was not being used as a platform for a criminal enterprise.

500. As admitted by Mr. Parker during cross-examination, Worley also failed to investigate public allegations of corruption against Tecnazul that started to surface on internet blogs around November 2015.[748] Even after the Panama Papers were published in April 2016, Mr. Parker did not hesitate to seek Tecnazul's assistance to secure a meeting with the Vice President of Ecuador in May 2016.[749] Worley only terminated its relationship with Tecnazul under the Esmeraldas Refinery and Pacific Refinery Agreements on August 25, 2016 – that is, five months after the Panama Papers came to light.[750]

501. During all these years, Worley was required to exercise a high level of control and oversight over Tecnazul. In particular, under the Esmeralda Refinery and Pacific Refinery Agreements, the Claimant was required to oversee and ensure Tecnazul's compliance with the laws of Ecuador, including anti-corruption legislation, and initiate procedures in case of non-compliance.[751] For instance, the Pacific Refinery Agreement stated that the Claimant "shall comply, and shall cause all of the Subcontractors to comply" with Ecuadorian laws.[752] Both Agreements also bound the Claimant to ISO 9004:2000.[753] Under the ISO standard, the Claimant was required to implement monitoring and control of subcontractors regarding compliance with statutory and regulatory requirements within its quality management system.[754]

502. Against this background, Worley's declared attempts to prevent corruption during the relevant period strike the Tribunal as inconsequential. The fact that the Claimant organized mandatory trainings for Tecnazul personnel about corruption or communicated the applicable anticorruption policies to Tecnazul is immaterial.[755] The dispositive question is whether the Claimant took the appropriate corrective steps to address Tecnazul's bribery scheme once its existence came to

---

[748] Hearing Transcript, Day 2, 350:7-351:7.

[749] C. Parker email to R. Falcon, May 2, 2016 (**R-428**); Hearing Transcript, Day 2, 358:5-12.

[750] Letter form Worley to Tecnazul terminating RDP contracts, August 25, 2016 (**C-817**); Letter from Worley to Tecnazul, August 25, 2016 (**C-942**).

[751] Esmeraldas Refinery Agreement, Annex 3, Clause 5.1 (**C-3**); Pacific Refinery Agreement, Clauses 2.14, 2.7.9(d), 16.2 and Exhibit A, Clauses 5.1(f),(l),(s), 5.5.1 (**C-8**).

[752] Pacific Refinery Agreement, Clause 2.14 (**C-8**).

[753] Esmeraldas Refinery Agreement, Annex 3, Clause 5.4 (**C-3**); Pacific Refinery Agreement, Clause 5.5.1 (**C-8**).

[754] BRG Report, paras. 194-201 (**RER-3**); ISO 9004:2000 Quality Management Systems - Guidelines for improvement, Sections 5.2.3, 7.4.2, 8.2.1.2, 8.2.4 (**BRG R-012**)

[755] Claimant's PHB, para. 134.

Worley's knowledge no later than 2013. As already concluded, Worley failed to do so for years in spite of its far-reaching monitoring obligations under several of the Agreements.

503. The Tribunal is thus satisfied, on the basis of the record before it, that the Claimant willfully ignored Tecnazul's corruption and failed to take appropriate corrective steps, per the *Churchill Mining* standard. In doing so, it allowed its investment to be used as a platform for Tecnazul's criminal enterprise for years. This amounts to a serious and widespread illegality for the purposes of the *Bank Melli* admissibility standard or for the conclusion of Arbitrator Stern that the investment is not a protected investment.[756]

504. Similarly, for analogous reasons as the ones stated at paragraphs 488 and 489 above, this illegal conduct bears a close relationship with the Claimant's claims in this arbitration, particularly in view of the fact that while Tecnazul carried out its criminal enterprise it also acted as a subcontractor under the Pacific Refinery, Esmeraldas Refinery and Machala Plant Projects, covering almost the entire breadth of the Claimant's investment.

505. For these reasons, a majority of the Tribunal determines that the Claimant's willful blindness towards Tecnazul's corruption independently renders the Claimant's claims inadmissible as per *Bank Melli*, or according to Arbitrator Stern renders the Claimant's investment an investment which deserves no protection under the Treaty with the consequence that its claims must be dismissed.

### 4. THE TRIBUNAL'S CONCLUSION ON JURISDICTION AND ADMISSIBILITY

506. In sum, for the reasons stated above, the Tribunal dismisses the Claimant's claims in their entirety on three independent grounds: (i) the existence of a widespread pattern of illegality and bad faith affecting the centerpieces of the Claimant's investment from their inception, depriving the Tribunal of jurisdiction;[757] (ii) the Claimant's corruption during the operation of its investment, rendering the Claimant's claims inadmissible according to the majority of the Tribunal or dismissed according to Arbitrator Stern;[758] and (iii) the Claimant's willful blindness towards Tecnazul's corruption during the operation of the Claimant's investment, independently rendering the Claimant's claims inadmissible according to the majority of the Tribunal or dismissed according to Arbitrator Stern.[759]

---

[756] *See* para. 486 above.
[757] *See* para. 419 above.
[758] *See* para. 490 above.
[759] *See* para. 505 above.

## VII.  COSTS

### 1.  THE CLAIMANT'S POSITION

507. The Claimant requests that the Tribunal order the Respondent to bear the Claimant's legal fees and costs, "including those relating to the baseless audits, investigations, and proceedings that the State continues to pursue … in violation of its Treaty obligations to Worley and the [§1782 Proceedings], as well as all the fees and expenses of the Tribunal members and the [PCA]."[760] The Claimant further requests that the Respondent be ordered to pay interest on such costs at a rate the Tribunal deems appropriate.[761] The Claimants' claimed costs total US$ 29,898,915, itemized as follows[762]:

| | Total (US$) |
|---|---|
| **I. Legal Fees & Expenses** | |
| A. BIT – White & Case Fees | 15,540,387 |
| B. BIT – White & Case Expenses<br>   1. E-Discovery Data Hosting / Storage: 364,005<br>   2. Translation Service: 89,297<br>   3. Other: 447,841 | 901,143 |
| C. BIT – Ferrere/Robalino Fees and Expenses<br>   1. Fees: 1,162,355<br>   2. Translation Service: 17,955 | 1,180,310 |
| D. BIT – Experts Fees and Expenses<br>   1. Mr. Douglas E. Branch/PwC: 1,568,691<br>   2. Mr. Christopher J. Sullivan: 392,966<br>   3. Mr. Ramiro A. Mendoza: 146,444 | 2,108,101 |
| E. 1782 Proceedings<br>   1. Legal Fees White & Case: 2,134,988<br>   2. Legal Fees Ferrere / Robalino: 13,551<br>   3. Experts: 9,750 | 2,158,289 |
| F. Unlawful Ecuadorian Proceedings<br>   1. White & Case: 709,837<br>   2. Ferrere / Robalino Abogados: 3,923,973<br>   3. Criminal Defense Lawyers: 2,105,816<br>   4. Local Experts: 101,836<br>   5. Translation Services: 216,223 | 7,057,685 |
| **II. PCA/Tribunal Fees Advances** | 953,000 |
| Total Fees, Expenses, and Costs | 29,898,915 |

---

[760]   Claimant's Statement on Costs, para. 2.

[761]   Claimant's Statement on Costs, para. 25(b).

[762]   Claimant's Statement on Costs, Annex A.

508.  Noting that the Treaty is silent on the question of allocation of costs, the Claimant refers to Article 40 of the UNCITRAL Rules as the governing rule. In the Claimant's reading, such provision grants discretion to the Tribunal to allocate costs guided by the default principle of "costs follow the event."[763] Accordingly, the Claimant proposes the application of three factors that have been used by previous tribunals when performing such analysis, including those rendering awards against Ecuador under the UNCITRAL Rules and the Treaty:[764] "(i) a party's relative success in the arbitration, (ii) the seriousness of the treaty breach, and (iii) the use of procedural tactics that unreasonably increase time and costs."[765]

509.  Against this background, says the Claimant, full accountability requires that compensation for the harm caused to the Claimant and its investment encompass the cost of this proceeding.[766] In this respect, the Claimant states that at the moment of filing of its Statement on Costs, the breach amounts to US$ 141.3 million not compensated to Worley for its contributions to the Ecuadorian projects and US$ 325 million in civil liabilities.[767]

510.  In any event, the Claimant asserts that the Respondent should bear all costs of the arbitration because its conduct increased the costs of the dispute – referring, in particular, to purportedly baseless allegations and instances of procedural misconduct during the proceedings.[768]

511.  Citing to *Gavrilovic v. Croatia* and *Karkey Karadeniz v. Pakistan*, the Claimant states that tribunals can consider a party's decision to raise baseless allegations for costs allocation

[763]  Claimant's Statement on Costs, paras. 3-4; UNCITRAL Rules, Article 40(1)-(2).

[764]  Claimant's Statement on Costs, paras. 4-5; *Chevron Corporation and Texaco Petroleum Company v. Republic of Ecuador (I)*, PCA Case No. 2007-02, Final Award, August, 31 2011, para. 376 (**CLA-25**); *Murphy Exploration v. Republic of Ecuador [II]*, PCA Case No. 2012-16, Partial Final Award, May 6, 2016, para. 546 (**CLA-83**); *Occidental Exploration and Production Co. v. Republic of Ecuador*, LCIA Case No. UN 3467, Final Award, July 1, 2004, para. 216 (**CLA-88**); *Oxus Gold Plc v. Republic of Uzbekistan*, ad hoc, Final Award, December 17, 2015, paras. 1041-1045 (**RLA-172**).

[765]  Claimant's Statement on Costs, para. 4; *ADC Affiliate Ltd. et al. v. Republic of Hungary*, ICSID Case No. ARB/03/16, Award, October 2, 2006, para. 536 (**CLA-3**); *Valeri Belokon v. Kyrgyz Republic*, ad hoc, Award, October 24, 2014, para. 335 (**CLA-127**); *Yukos Universal Limited (Isle of Man) v. Russian Federation*, PCA Case No. 2005-04, Final Award, July 18, 2014, para. 1869 (**CLA-247**); *Mesa Power Group, LLC v. Canada*, PCA Case No. 2012-17, Award, March 24, 2016, para. 703 (**CLA-253**); *Luigiterzo Bosca v. Republic of Lithuania*, PCA Case No. 2011-05, Award, May 17, 2013, para. 326 (**CLA-255**); *Achmea B.V. (formerly Eureko B.V.) v. Slovak Republic [I]*, PCA Case No. 2008-13, Final Award, December 17, 2012, para. 349 (**CLA-351**); *BG Group Plc v. Republic of Argentina*, Ad Hoc, Final Award, December 24, 2007, paras. 458-460, 467 (**RLA-207**).

[766]  Claimant's Statement on Costs, para. 5.

[767]  Claimant's Statement on Costs, para. 5.

[768]  Claimant's Statement on Costs, para. 5.

144

purposes.[769] On this basis, it requests that the Tribunal allocate all costs to the Respondent as it "raised a bulk of baseless arguments and objections, which it knew had no merit", including (i) "an ever-changing corruption defense that significantly increased Worley's costs";[770] (ii) a fork-in-the-road defense that "ignored" the Treaty's text and prevailing authority;[771] and (iii) the argument that "illiquidity" caused the non-payment.[772] Additionally, it claims that the Respondent deliberately failed to engage on the merits, thus causing a waste of resources throughout the proceedings.[773]

512. Regarding the Respondent's alleged procedural misconduct, the Claimant contends that it increased the complexity of the arbitration – and, therefore, its costs – and thus should be considered when awarding costs.[774] It cites as examples (i) the § 1782 Proceedings;[775] (ii) the document production phase, during which the Respondent submitted "incessant requests" for documents, including confidential and privileged ones;[776] (iii) the Respondent's request for bifurcation, which prolonged the arbitration by more than one year and culminated with the Tribunal rejecting the Preliminary Objections; and (iv) the Respondent's submission of a "standing" objection based on one of the already dismissed Preliminary Objections.[777] According to the Claimant, the Respondent also engaged in conduct in Ecuador that aggravated the dispute, such as launching and continuing to pursue "baseless" audits, investigations, and proceedings against Worley.[778]

---

[769] Claimant's Statement on Costs, para. 6; *Karkey Karadeniz Elektrik Uretim A.S. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/13/1, Award, August 22, 2017, paras. 1063-1069 (**CLA-65**); *Georg Gavrilovic and Gavrilovic d.o.o. v. Republic of Croatia*, ICSID Case No. ARB/12/39, Award, July 26, 2018, paras. 1316-1320 (**CLA-450**).

[770] Claimant's Statement on Costs, paras. 7-9.

[771] Claimant's Statement on Costs, para. 10.

[772] Claimant's Statement on Costs, para. 11.

[773] Claimant's Statement on Costs, para. 12.

[774] Claimant's Statement on Costs, paras. 13-14, 21; *Karkey Karadeniz Elektrik Uretim A.S. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/13/1, Award, August 22, 2017, paras. 1063-1069 (**CLA-65**); *Mesa Power Group, LLC v. Canada*, PCA Case No. 2012-17, Award, March 24, 2016, paras. 704-705 (**CLA-253**).

[775] Claimant's Statement on Costs, para. 15; Letter from Claimant to Tribunal, September 22, 2021; Letter from Respondent to the Tribunal, June 18, 2021, paras. 1, 3, 4; Letter from Claimant to the Tribunal, June 25, 2021, paras. 4-6; Letter from the Attorney General to the State Prosecutor No. 13023, 16 March 2021 (**C-732**).

[776] Claimant's Statement on Costs, para. 16; Procedural Order No. 4; Procedural Order No. 5; Procedural Order No. 6; Letter from Respondent to Claimant, January 13, 2022; Letter from Claimant to Respondent, February 7, 2022; Letter from Respondent to Tribunal, February 18, 2022, para. 3; Letter from Claimant to Tribunal, February 25, 2022; Letter from Respondent to Tribunal, March 23, 2022, para. 2.

[777] Claimant's Statement on Costs, paras. 17-18; Partial Award, March 18, 2021.

[778] Claimant's Statement on Costs, para. 19.

513. Lastly, the Claimant submits that its claim for costs is reasonable, considering the amount in dispute (nearly US$ 470 million), the amount and extent of factual and expert evidence adduced (9 witness statements, 10 expert reports, and over 1,700 exhibits), the conduct of the Parties during the proceedings and the fact that efforts across multiple jurisdictions and extensive travel arrangements were needed.[779] It concludes that:

> Claimant's costs are reasonable in view of Ecuador's abusive conduct, the complexity of the dispute with Ecuador, the length of the proceedings, the issues in dispute, and the extent of Claimant's damages caused by Respondent's breaches. Moreover, Claimant's costs are lower than those spent by claimants in other investment arbitrations, including against Ecuador.[780]

## 2. THE RESPONDENT'S POSITION

514. The Respondent submits that the Claimant should be required to bear all costs of this arbitration.[781] Specifically, the Respondent requests full indemnity of US$ 6,158,161.65 and interest on such costs in an amount to be determined by the Tribunal.[782] The costs declared by the Respondent are as follows[783]:

|  | Total (US$) |
|---|---|
| Counsel legal fees | 3,901,951.84 |
| Counsel expenses | 89,664.81 |
| Travel expenses and costs of representatives of the Procuraduría General del Estado of Ecuador | 16,874.42 |
| Cost of the time devoted by representatives of the Procuraduría General del Estado of Ecuador assigned to this case | 155,917.27 |
| Fees Dr. Fabián Andrade Narváez | 85,000.00 |
| Costs Dr. Fabián Andrade Narváez | 4,247.67 |
| Fees Mr. Tiago Duarte-Silva | 399,482.00 |
| Costs Mr. Tiago Duarte-Silva | 4,782.87 |
| Fees Berkeley Research Group | 537,150.50 |
| Costs Berkeley Research Group | 5,233.47 |
| Travel expenses for Mr. José Herrera | 3,654.99 |

---

[779] Claimant's Statement on Costs, paras. 22-23; *Murphy Exploration & Production Company International v. Republic of Ecuador [II]*, PCA Case No. 2012-16, Partial Final Award, May 6, 2016, paras. 536-541 (**CLA-83**).

[780] Claimant's Statement on Costs, para. 23.

[781] Respondent's Statement on Costs, para. 3.

[782] Respondent's Statement on Costs, para. 31.

[783] Respondent's Statement on Costs, Schedule A.

| Travel expenses for Mr. Mauro Tejada | 4,201.81 |
| Deposit payments | 950,000.00 |
| Total | 6,158,161.65 |

515. According to the Respondent, Article 40 of the UNCITRAL Rules grants the Tribunal discretion to allocate both the costs of the arbitration and of legal representation.[784] Accordingly, the Respondent requests the Tribunal to order the Claimant to bear all costs based on (i) the "loser pays" principle, and (ii) the proposition that a party whose conduct has inflated the costs of the proceedings should bear them regardless of the outcome on the merits.[785]

516. The Respondent asserts that its claimed costs are reasonable on three separate grounds.

517. First, to the extent the Claimant argues that its costs are reasonable and such costs are higher than those claimed by the Respondent, the Respondent asserts that its own costs are "concededly reasonable" *par force*.[786]

518. Second, the Respondent asserts that it managed to keep its costs reasonable despite the importance of the resolution of the case for Ecuador and its exceptional and complex nature, which it asserts was exacerbated by the "proven" corruption by the Claimant.[787]

519. Third, given the Claimant's request for more than US\$ 141.3 million in damages, and noting that it benefited from advice from experienced international arbitration counsel, the Respondent considers that the Claimant could have reasonably expected to bear costs in the amount claimed by the Respondent if it was ultimately unsuccessful.[788]

520. Furthermore, regardless of the outcome of the case, the Respondent requests the Tribunal to award it its costs based on how the Claimant litigated its case, which it states "unjustifiably and significantly" raised the costs of the proceedings.[789] Such purported conduct includes: (i) bringing

---

[784]  Respondent's Statement on Costs, paras. 3-4; Article 40(1)-(2) of the UNCITRAL Rules.

[785]  Respondent's Statement on Costs, para. 4-5; Article 40(2) of the UNCITRAL Rules; *Yukos Universal Limited (Isle of Man) v. Russian Federation*, PCA Case No. 2005-04, Final Award, July 18, 2014, para. 1876 (**CLA-247**); *Apotex Inc. v. United States of America*, ICSID Case No. UNCT/10/2, Award on Jurisdiction and Admissibility, June 14, 2013, paras. 339-340 (**RLA-90**); *Vestey Group Ltd v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/06/4, Award, April 15, 2016, paras. 470-471 (**CLA-414**).

[786]  Respondent's Statement on Costs, para. 8.

[787]  Respondent's Statement on Costs, paras. 10-12.

[788]  Respondent's Statement on Costs, para. 13; Claimant's Closing Statement Presentation, p. 76 (**CD-7**).

[789]  Respondent's Statement on Costs, paras. 14, 24; *Quiborax S.A. and Non Metallic Minerals S.A. v. Plurinational State of Bolivia*, ICSID Case No. ARB/06/2, Award, September 16, 2015, para. 624 (**RLA-166**).

the claim against the Respondent when the dispute arose out of contracts of which it is neither a party nor a guarantor;[790] (ii) mischaracterizing evidence;[791] (iii) raising three failed applications to exclude relevant and material evidence of corruption consisting of the Claimant's internal e-mails and records;[792] (iv) being uncooperative during the document production phase, which required the Tribunal to step in several times, even issuing three procedural orders on the matter;[793] and (v) failing to abide by the established procedural rules during the bifurcated phase of the arbitration.[794]

### 3.   THE TRIBUNAL'S ANALYSIS

521.   The Parties have each requested that the other Party be ordered to bear all costs of this arbitration, plus interest at a rate to be determined by the Tribunal.[795]

522.   The Tribunal notes that the Treaty is silent on the issue of costs. The Tribunal will therefore apply the rules on costs set out in the UNCITRAL Rules.

#### 1)   Allocation of Costs

523.   Pursuant to Article 38 of the UNCITRAL Rules, the Tribunal must fix the costs of arbitration in this Final Award. The term "costs" includes only:

> (a) The fees of the arbitral tribunal to be stated separately as to each arbitrator and to be fixed by the tribunal itself in accordance with article 39;
>
> (b) The travel and other expenses incurred by the arbitrators;
>
> (c) The costs of expert advice and of other assistance required by the arbitral tribunal;
>
> (d) The travel and other expenses of witnesses to the extent such expenses are approved by the arbitral tribunal;
>
> (e) The costs for legal representation and assistance of the successful party if such costs were claimed during the arbitral proceedings, and only to the extent that the arbitral tribunal determines that the amount of such costs is reasonable;

---

[790]   Respondent's Statement on Costs, paras. 15-16.

[791]   Respondent's Statement on Costs, para. 18.

[792]   Respondent's Statement on Costs, para. 19; Procedural Order No. 2; Procedural Order No. 4, paras. 7-14; Letter from the Tribunal to the Parties, October 1, 2021.

[793]   Respondent's Statement on Costs, paras. 20-22.

[794]   Respondent's Statement on Costs, para. 23; Preliminary Objections Hearing Transcript, Day 2, 184:2–190:2; 198:3–199:7; Letter from the Claimant to the Tribunal, November 17, 2020; Letter from the Respondent to the Tribunal, November 13, 2020; Communication from the Respondent to the Tribunal, November 18, 2020; Letter from the Respondent to the Tribunal, November 26, 2020.

[795]   Claimant's Statement on Costs, para. 25; Respondent's Statement on Costs, para. 31.

(f) Any fees and expenses of the appointing authority as well as the expenses of the Secretary-General of the Permanent Court of Arbitration at The Hague.

524.   The allocation of costs is governed by Article 40 of the UNCITRAL Rules, which provides in relevant part:

> 1. Except as provided in paragraph 2, the costs of arbitration shall in principle be borne by the unsuccessful party. However, the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.
>
> 2. With respect to the costs of legal representation and assistance referred to in article 38, paragraph (e), the arbitral tribunal, taking into account the circumstances of the case, shall be free to determine which party shall bear such costs or may apportion such costs between the parties if it determines that apportionment is reasonable.

525.   For the purposes of costs allocation, Article 40 of the UNCITRAL Rules draws a distinction between the costs of arbitration (comprising items (a), (b), (c), (d) and (f) in Article 38) and costs for legal representation and assistance (item (e) in Article 38).

526.   In accordance with Article 40(1) of the UNCITRAL Rules, the costs of arbitration as defined in the preceding paragraph shall in principle be borne by the unsuccessful party. Having considered all relevant circumstances and both Parties' assent to the application of the default rule in Article 40,[796] the Tribunal sees no reason to deviate from the "costs follow the event" principle. Therefore, in view of its decision to dismiss the Claimant's claims, the Tribunal determines that the Claimant shall bear the costs of arbitration.

527.   With respect to the Parties' costs of legal representation and assistance, Article 40(2) of the UNCITRAL Rules grants discretion to the Tribunal to determine which Party shall bear such costs or how to apportion those costs as between the Parties, provided that such costs are reasonable (Article 38(e)). The Tribunal considers that the prevailing Party in this arbitration should also be awarded its costs of legal representation and accordingly determines that the Claimant shall bear the Respondent's reasonable costs of legal representation.

**2)   Quantification of Costs and Determination on Costs**

528.   The fees and expenses incurred by the members of the Tribunal and by the PCA (in its capacity administering institution of the arbitration) are as follows:

---

[796]   Claimant's Statement on Costs, para. 4; Respondent's Statement on Costs, para. 4.

|  | **Fees** | **Expenses** |
|---|---|---|
| **Dr. Andrés Rigo Sureda** | US$ 309,400.00 | US$ 9,044.55 |
| **Prof. Bernard Hanotiau** | US$ 366,566.68 | US$ 10,900.47 |
| **Prof. Brigitte Stern** | US$ 289,800.00 | US$ 14,263.54 |
| **PCA** | US$ 240,743.26 | US$ 28,819.32 |

529.   Other administrative costs (including banking, catering, courier, hearing facilities, court reporting, IT/AV, interpretation, translation, printing and telecommunication costs) amount to US$ 411,080.90. Consequently, the total costs of the proceedings amount to US$ 1,680,618.72.

530.   The Parties made deposits towards these costs in the amount of US$ 1,900,000 (US$ 950,000 each). US$ 1,680,618.72 were paid from the deposit managed by the PCA. The unused balance thus totals US$ 219,381.28. Pursuant to Section 11.4 of the Terms of Appointment, the Tribunal directs the PCA to return this amount to the Parties in equal shares (*i.e.* US$ 109,690.64 each). The PCA will render an accounting of the case deposit to the Parties after the issuance of this Final Award.

531.   Accordingly, the Tribunal fixes the costs of the arbitration (excluding the legal and other costs incurred by the Parties under Article 38(d) and (e) of the UNCITRAL Rules) at US$ 1,680,618.72, also including the EUR 3,000 administrative fee paid directly by the Claimant to the PCA to act as appointing authority (Article 38(f) of the UNCITRAL Rules), which shall be borne by the Claimant.[797] The Tribunal orders the Claimant to pay to the Respondent US$ 840,309.36 for the costs met from the Respondent's share of the deposit.

532.   In accordance with its determinations at paragraphs 526-527 above, the Tribunal further orders the Claimant to reimburse US$ 5,208,161.65 to the Respondent towards its legal fees and expenses and travel and other expenses of witnesses (Article 38(d) and (e) of the UNCITRAL Rules). To the extent this figure represents costs of legal representation and assistance as defined in Article 38(e) of the UNCITRAL Rules, the Tribunal considers such amount to be reasonable

---

[797]   *See* Letter from the Claimant to the PCA, June 18, 2019.

in the circumstances of this case and thus determines that it must be awarded in full to the Respondent.[798]

533. In sum, the Claimant shall reimburse a total of US$ 6,048,471.01 to the Respondent towards its costs in this arbitration.

**3) Interest on Costs**

534. The Respondent has requested that the Tribunal order the Claimant to pay interest on costs in an amount to be determined by the Tribunal. It has nonetheless failed to provide a legal basis on which the Tribunal may award interest on costs. Nor has the Respondent proposed an appropriate interest rate or a basis on which the Tribunal could determine such rate. For these reasons, the Tribunal rejects the Respondent's request to order payment of interest on costs.

---

[798] For a full breakdown of the Respondent's claimed costs *see* para. 514 above.

## VIII. DECISION

535.  For the reasons set out above, the Tribunal finds, declares and awards as follows:

(i)      The Claimant's claims are dismissed;

(ii)     The Claimant is ordered to bear the costs of arbitration;

(iii)    The Claimant is ordered to reimburse US$ 6,048,471.01 to the Respondent towards its costs in this arbitration; and

(iv)     All other requests for relief are dismissed.

[*signature page follows*]

PCA Case No. 2019-15
Final Award

Seat of the arbitration: Paris, France

Date: December 22, 2023

The Arbitral Tribunal

_____
**Prof. Bernard Hanotiau**

_____
**Prof. Brigitte Stern**

_____
**Dr. Andrés Rigo Sureda**
**(Presiding Arbitrator)**

**Caso CPA Núm. 2019-15**


**EN EL CASO DE UN ARBITRAJE DE CONFORMIDAD CON EL TRATADO ENTRE LA
REPÚBLICA DEL ECUADOR Y LOS ESTADOS UNIDOS DE AMÉRICA SOBRE
PROMOCIÓN Y PROTECCIÓN DE INVERSIONES, FIRMADO EL 27 DE AGOSTO DE
1993 Y ENTRADO EN VIGOR EL 11 DE MAYO DE 1997**

**- y -**


**EL REGLAMENTO DE ARBITRAJE DE LA COMISIÓN DE LAS NACIONES UNIDAS
PARA EL DERECHO MERCANTIL INTERNACIONAL DE 1976
(el "Reglamento CNUDMI")**


**- entre -**


**WORLEY INTERNATIONAL SERVICES INC. (EE. UU.)**

**(la "Demandante" o "Worley")**


**- y -**


**LA REPÚBLICA DEL ECUADOR**

**(la "Demandada", y conjuntamente con la Demandante, las "Partes")**


_____


**LAUDO FINAL**

_____


**El Tribunal Arbitral**

Dr. Andrés Rigo Sureda (Árbitro Presidente)
Prof. Bernard Hanotiau
Prof. Brigitte Stern

**Secretario del Tribunal**

Sr. José Luis Aragón Cardiel
*Corte Permanente de Arbitraje*


**22 de diciembre de 2023**

*Esta página se ha dejado intencionadamente en blanco.*

# ÍNDICE

| | | |
|---|---|---|
| **I.** | **INTRODUCCIÓN** ........................................................................................................ **1** | |
| 1. | Las Partes ............................................................................................................... 1 | |
| 2. | La controversia ....................................................................................................... 3 | |
| **II.** | **ANTECEDENTES PROCESALES** ............................................................................ **5** | |
| 1. | Decisión sobre las solicitudes de exhibición de documentos (Orden Procesal No. 4) ................ 5 | |
| 2. | Decisión sobre la Solicitud de Subsanación (Orden Procesal No. 5) ........................................... 6 | |
| 3. | Segunda decisión sobre la Solicitud de Subsanación (Orden Procesal No. 6) .............................. 7 | |
| 4. | Los escritos ............................................................................................................. 8 | |
| 5. | Audiencia ................................................................................................................ 9 | |
| 6. | Asuntos post-audiencia ......................................................................................... 12 | |
| **III.** | **ANTECEDENTES FÁCTICOS** ............................................................................... **13** | |
| 1. | Las Partes y otras entidades relacionadas ........................................................... 13 | |
| | 1) | La Demandante y las entidades relacionadas ............................................. 13 |
| | 2) | La Demandada y las entidades relacionadas .............................................. 14 |
| | 3) | Otras entidades ........................................................................................... 15 |
| 2. | Los Proyectos ....................................................................................................... 15 | |
| | 1) | Introducción ............................................................................................... 15 |
| | 2) | El Proyecto de la Refinería del Pacífico .................................................... 16 |
| | 3) | El Proyecto de la Refinería Esmeraldas ..................................................... 19 |
| | 4) | El Proyecto de la Planta Machala ............................................................... 23 |
| | 5) | El Proyecto Monteverde .............................................................................. 24 |
| 3. | La suspensión de los pagos a Worley ................................................................... 25 | |
| 4. | Los procedimientos judiciales y administrativos que involucraron a las Partes ...................... 30 | |
| | 1) | La Contraloría General fiscaliza los Proyectos de Worley en Ecuador ............................ 31 |
| | 2) | El SRI audita las declaraciones del impuesto a la renta de Worley ................................. 32 |
| | 3) | Procedimientos penales en contra de Worley en Ecuador ................................................ 34 |
| | 4) | Procedimientos civiles incoados en contra de Worley ante tribunales de los Estados Unidos ................................................................................................. 35 |
| 5. | Las alegaciones de corrupción e ilegalidad ......................................................... 36 | |
| | 1) | Información de los Papeles de Panamá y las investigaciones de la Demandada ............. 36 |
| | | i.    Tecnazul ................................................................................................... 36 |
| | | ii.   MMR Group ............................................................................................ 41 |
| | | iii.  OSS ......................................................................................................... 41 |
| | | iv.   Galileo .................................................................................................... 42 |
| | | v.    Odebrecht ............................................................................................... 43 |

i

2)  Presunta corrupción e ilegalidad en el inicio de la inversión ............................................. 43

i.  Tráfico de información confidencial .......................................................... 44

ii.  Manifestación falsa de cumplimiento con el límite del 30% a la subcontratación..... 45

3)  Presunta corrupción e ilegalidad durante la operación de la inversión ............................ 48

i.  Junio de 2012 .................................................................................. 50

ii.  Agosto y septiembre de 2012 ................................................................. 50

iii.  Octubre de 2020 .............................................................................. 52

iv.  Marzo de 2013 ................................................................................ 54

v.  Abril de 2013 .................................................................................. 55

vi.  Mayo de 2013 ................................................................................. 56

vii.  Septiembre de 2013 ........................................................................... 56

viii.  Septiembre a diciembre de 2014 .............................................................. 57

ix.  Agosto de 2013 a mayo de 2015 .............................................................. 58

x.  Diciembre de 2011 a febrero de 2016 ......................................................... 59

**IV.  PETITORIOS** ..................................................................................... **62**

1.  El petitorio de la Demandante ..................................................................... 62

2.  El petitorio de la Demandada ...................................................................... 64

**V.  JURISDICCIÓN Y ADMISIBILIDAD** .................................................... **66**

1.  La posición de la Demandada ...................................................................... 67

1)  Derecho ecuatoriano ......................................................................... 68

2)  Derecho francés / Orden público internacional ............................................... 71

3)  Derecho internacional ........................................................................ 73

4)  Legislación estadounidense ................................................................... 75

5)  Directiva Ejecutiva de Worley sobre Obsequios .............................................. 76

6)  La corrupción como motivo de inadmisibilidad ............................................... 77

2.  La posición de la Demandante ..................................................................... 78

1)  Estándar aplicable ........................................................................... 78

2)  Pruebas de corrupción ....................................................................... 80

3)  Marco jurídico aplicable ..................................................................... 82

4)  La corrupción como motivo de inadmisibilidad ............................................... 87

**VI.  EL ANÁLISIS DEL TRIBUNAL SOBRE JURISDICCIÓN Y ADMISIBILIDAD** ........... **88**

1.  Cuestiones preliminares ........................................................................... 88

1)  Cumplimiento con la ley del país receptor .................................................... 88

2)  El momento de la ilegalidad y sus consecuencias ............................................ 90

2.  Ilegalidad en la realización de la inversión ......................................................... 93

1)  Tráfico de información confidencial .......................................................... 93

i.  Introducción ................................................................................. 93

ii.   Cronología ............................................................................................ 94

iii.  Análisis ................................................................................................. 100

2)   Manifestación falsa sobre el límite del 30% a la subcontratación ................................. 104

i.   Introducción ......................................................................................... 104

ii.   Contrato de la Refinería Esmeraldas ................................................... 106

iii.  Contrato de la Planta Machala I ........................................................... 114

iv.  Violaciones efectivas del límite del 30% a la subcontratación .............................. 117

3)   Conclusiones sobre ilegalidad en la realización de la inversión .................................... 121

3.   La ilegalidad durante la de la operación de la inversión ........................................................ 124

1)   Los Contratos Complementarios de la Refinería Esmeraldas y el soborno conexo ....... 125

i.   El estándar probatorio aplicable a alegaciones de corrupción ............................... 126

ii.   Conducta que constituye corrupción ................................................... 127

iii.  Cronología ........................................................................................... 128

iv.  Análisis de las pruebas sobre corrupción ............................................ 137

v.   Conclusión ........................................................................................... 143

2)   La "ignorancia deliberada" de la Demandante respecto de la corrupción de Tecnazul .. 147

4.   La conclusión del Tribunal sobre jurisdicción y admisibilidad ................................................ 151

**VII.  COSTAS** ........................................................................................................................ **153**

1.   La posición de la Demandante ................................................................................................. 153

2.   La posición de la Demandada ................................................................................................... 156

3.   El análisis del Tribunal ............................................................................................................ 158

1)   Asignación de las costas .................................................................................. 159

2)   Cuantificación de las costas y decisión sobre costas ...................................... 160

3)   Intereses sobre costas ...................................................................................... 161

**VIII.  DECISIÓN** .................................................................................................................... **162**

Caso CPA Núm. 2019-15
Laudo Final

## TÉRMINOS DEFINIDOS

| | |
|---|---|
| **Acta de Constitución** | El Acta de Constitución, adoptada el 1 de noviembre de 2019. |
| **Audiencia** | Audiencia sobre jurisdicción, fondo y cuantía celebrada entre el 8 y el 16 de diciembre de 2022. |
| **CNUCC** | Convención de las Naciones Unidas contra la Corrupción |
| **Contestación** | El Escrito de Contestación de la Demandada, del 7 de septiembre de 2021. |
| **Contraloría General** | La Contraloría General del Estado de la República del Ecuador. |
| **Contrato de la Planta Machala I** | Contrato entre Petroecuador y Worley para servicios de asesoría técnica especializada para el Proyecto Machala, del 5 de marzo de 2014. |
| **Contrato de la Planta Machala II** | Contrato entre Petroecuador y Worley para la provisión de asistencia técnica especializada para el Proyecto Machala, del 6 de junio de 2015. |
| **Contrato de la Refinería del Pacífico** | Contrato de Servicios de Asesoría para el Gerenciamiento de Proyectos entre RDP y Worley, del 22 de noviembre de 2011. |
| **Contrato de la Refinería Esmeraldas** | Contrato entre Petroecuador y Worley para fiscalización y gerenciamiento del programa de rehabilitación de la Refinería Esmeraldas, del 14 de noviembre de 2011. |
| **Contratos** | Contratos entre Petroecuador, RDP y Worley para la Refinería del Pacífico, la Refinería Esmeraldas, la Planta de Licuefacción Machala y el Proyecto Monteverde suscritos entre noviembre de 2011 y abril de 2015. |
| **Contratos Complementarios de la Planta Machala** | Contratos Complementarios al Contrato de la Planta Machala I, del 1 de agosto y el 14 de noviembre de 2014. |
| **Contratos Complementarios de la Refinería Esmeraldas** | Contratos complementarios al Contrato de la Refinería Esmeraldas, suscritos entre septiembre de 2012 y octubre de 2015. |

Caso CPA Núm. 2019-15
Laudo Final

| | |
|---|---|
| **Contratos de la Planta Machala** | Contrato de la Planta Machala I y Contrato de la Planta Machala II |
| **CPA** | Corte Permanente de Arbitraje. |
| **Declaración de Elizondo** | Declaración testimonial del Sr. Carlos Elizondo, del 4 de noviembre de 2019 (CWS-1). |
| **Declaración de Falcon I** | La primera declaración testimonial de Raymond Falcon, del 4 de noviembre de 2019 (CWS-2). |
| **Declaración de Falcon II** | La segunda declaración testimonial de Raymond Falcon, del 18 de enero de 2022 (CWS-5). |
| **Declaración de Falcón III** | La tercera declaración testimonial de Raymond Falcon, del 12 de octubre de 2022 (CWS-7). |
| **Declaración de Herrera** | Declaración testimonial de José R. Herrera Falcones, del 5 de septiembre de 2021 (RWS-1). |
| **Declaración de Parker II** | La segunda declaración testimonial del Sr. Christopher Parker, del 18 de enero de 2022 (CWS-4). |
| **Declaración de Tejada** | Declaración testimonial de Mauro R. Tejeda, del 2 de septiembre de 2021 (RWS-2). |
| **Demandada** o **Ecuador** | La República del Ecuador. |
| **Demandante** o **Worley** | Worley International Services Inc. (antiguamente WorleyParsons International Inc.). |
| **Directiva Ejecutiva** | Directiva Ejecutiva de Worley sobre Obsequios. |
| **Dúplica** | La Dúplica y la Réplica sobre Jurisdicción de la Demandada, del 25 de junio de 2022. |
| **Dúplica sobre Jurisdicción** | La Dúplica sobre Jurisdicción de la Demandante, del 12 de octubre de 2021. |
| **EPA de la Demandada** | Escrito Post-Audiencia de la Demandada, del 28 de febrero de 2023. |
| **EPA de la Demandante** | Escrito post-audiencia de la Demandante, del 28 de febrero de 2023. |

Caso CPA Núm. 2019-15
Laudo Final

| | |
|---|---|
| **ESCART** | ESCART, S.A. |
| **Escrito de Demanda** | El Escrito de Demanda de la Demandante, del 4 de noviembre de 2019. |
| **Escrito sobre Costas de la Demandada** | El Escrito sobre Costas de la Demandada, del 26 de mayo de 2023. |
| **Escrito sobre Costas de la Demandante** | El Escrito sobre Costas de la Demandante, del 26 de mayo de 2023. |
| **FCPA** | La Ley de los Estados Unidos sobre Prácticas Corruptas en el Extranjero, Título 15 Sección 78dd-1(a) del Código de los Estados Unidos. |
| **Fiscalía del Estado** | La Fiscalía del Estado de la República del Ecuador. |
| **Galileo** | GalileoEnergy, S.A. |
| **GIRBRA** | GIRBRA, S.A. |
| **Giro Específico del Negocio** | Procedimiento de compras públicas llamado giro específico del negocio conforme al cual se adjudicaron el Contrato de la Refinería Esmeraldas, el Contrato de la Refinería del Pacífico y los Contratos de la Planta Machala. |
| **Grupo Azul** | Grupo Azul, el grupo societario que integra Tecnazul. |
| **Guía de la FCPA** | Guía de recursos para la FCPA, publicada por la División Penal del Departamento de Justicia de los EE. UU. y la División de Cumplimiento de la Comisión de Bolsa y Valores de los EE. UU. |
| **Informe de Andrade I** | El primer informe pericial de Fabián Andrade Narváez, del 5 de septiembre de 2021 (RER-1). |
| **Informe de Andrade II** | El segundo informe pericial de Fabián Andrade Narváez, del 25 de junio de 2022 (RER-4). |
| **Informe de Branch** | El primer informe pericial de Douglas E. Branch, CPA/ABV/CFF de PriceWaterhouseCoopers, del 4 de noviembre de 2019 (CER-2). |

vi

| | |
|---|---|
| **Laudo Parcial** | Laudo Parcial sobre Objeciones Preliminares, emitido por el Tribunal el 18 de marzo de 2021. |
| **Ley de Contratación Pública** | Ley Orgánica del Sistema Nacional de Contratación Pública del Ecuador. |
| **Memorando de Petroecuador** | Un memorando del 28 de octubre de 2016, emitido por el Superintendente de la Refinería Esmeraldas conforme al Oficio 16-624 (es decir, el Oficio de la Presidencia). |
| **MMR Group** | MMR Group, Inc. |
| **Objeciones Preliminares** | Objeciones preliminares *ratione personae* y ratione *materiae* de la Demandada. |
| **Odebrecht** | Constructora Norberto Odebrecht, S.A. |
| **Oficio de la Presidencia** | Oficio 16-624, emitido por la Presidencia de la República del Ecuador, por el que se ordenó la interrupción de los pagos por los órganos del Gobierno y las entidades del Estado a ciertas empresas durante la vigencia de las "medidas provisionales". |
| **OSS** | Oil Services & Solutions, S.A. |
| **Papeles de Panamá** | 11,5 millones de documentos filtrados del estudio jurídico panameño Mossack-Fonseca que fueron dados a conocer por el Consorcio Internacional de Periodistas de Investigación en abril de 2016. |
| **Partes** | La Demandante y la Demandada. |
| **PDVSA Ecuador** | PDVSA Ecuador, S.A. |
| **Petroecuador** | Empresa pública de petróleo y gas de la Demandada, Empresa Pública de Hidrocarburos del Ecuador EP Petroecuador. |
| **PMC** | Asesoría para el Gerenciamiento de Proyectos |
| **Procedimiento bajo la § 1782** | Procedimiento iniciado por una solicitud *ex parte* presentada por Petroecuador el 26 de agosto de 2019 ante la Corte de Distrito de los EE. UU. para el Distrito Sur de Texas (División de Houston) al |

amparo del título 28 Sección 1782 del Código de los EE. UU.

**Procurador General**  El Procurador General del Estado de la República del Ecuador.

**Proyecto de la Isla Tolita**  Proyecto de USD 2,7 millones en la Isla Tolita Pampa de Oro que, según la Demandante, era un proyecto benéfico para reconstruir una escuela y un muelle.

**Proyecto de la Planta Machala**  Proyecto para la inspección técnica y fiscalización de las obras realizadas en la planta de gas natural licuado ubicada en Bajo Alto, Provincia de El Oro (Ecuador)

**Proyecto de la Refinería del Pacífico**  Proyecto para la construcción de una refinería de petróleo con una capacidad de procesamiento de 300.000 barriles de crudo por día en El Aromo, provincia de Manabí (Ecuador)

**Proyecto de la Refinería Esmeraldas**  Proyecto para rehabilitar la Refinería Esmeraldas en la provincia de Esmeraldas (Ecuador).

**Proyecto Monteverde**  Proyecto para la construcción de un complejo dedicado a la recepción, el almacenamiento, el transporte y la distribución de gas natural licuado en la provincia de Santa Elena (Ecuador).

**Proyectos**  Proyecto de la Refinería Esmeraldas, Proyecto de la Planta Machala, Proyecto Monteverde y Proyecto de la Refinería del Pacífico.

**RDP**  Empresa pública de petróleo y gas de la Demandada, Refinería del Pacífico RDP Compañía de Economía Mixta.

**Reglamento CNUDMI**  Reglamento de arbitraje de la Comisión de las Naciones Unidas para el Derecho Mercantil Internacional de 1976

**Reglamento de Contratación Pública**  Reglamento General de la Ley Orgánica del Sistema Nacional de Contratación Pública de Ecuador

**Réplica**  La Réplica sobre el Fondo y la Respuesta sobre Jurisdicción de la Demandante, del 18 de enero de 2022.

viii

| | |
|---|---|
| **Resoluciones de la Contraloría General** | Varios pronunciamientos de la Contraloría General a partir de 2016 en los que se estipula que la Demandante debe responder por ciertas acciones y omisiones relacionadas con su cumplimiento de los Contratos. |
| **Respuesta y Solicitud de Subsanación de la Demandante** | La respuesta de la Demandante a la solicitud de subsanación de la Demandada y su solicitud para que el Tribunal ordene a la Demandada subsanar las deficiencias en su exhibición de documentos, del 25 de febrero de 2022. |
| **Shaw** | Shaw Consultants International. |
| **Solicitud de Subsanación de la Demandada** | Solicitud de la Demandada para que el Tribunal ordene a la Demandante cumplir plenamente la Orden Procesal No. 4 y subsanar las deficiencias en su exhibición de documentos, del 18 de febrero de 2022. |
| **SRI** | El Servicio de Rentas Internas de la República del Ecuador. |
| **Tecnazul** | Tecnazul Cia. Ltda. |
| **Tratado** | Tratado entre la República del Ecuador y los Estados Unidos de América sobre Promoción y Protección de Inversiones, suscrito el 27 de agosto de 1993 y entrado en vigor el 11 de mayo de 1997. |
| **Viaje de la Fórmula 1** | Viaje de cuatro días de duración que tuvo lugar en octubre de 2013 y al que asistieron varios empleados de Petroecuador para asistir al Campeonato de Fórmula Uno 2012 en Austin (Texas). |
| **Viaje del Rodeo** | Viaje de dos días de duración al que concurrieron los Sres. Pareja, Bravo y Reyes, así como sus cónyuges, para presenciar el Espectáculo de Ganadería y el Rodeo de Houston, en Houston (Texas), en marzo de 2013. |
| **Worley SPVI** | Worley SPVI Pty, Ltd. |
| **WorleyParsons Ecuador** | WorleyParsons Ecuador S.A. |
| **WorleyParsons US** | WorleyParsons US Holding Corporation. |

Caso CPA Núm. 2019-15
Laudo Final

## DRAMATIS PERSONAE

**Baquerizo, Juan Andrés**        Juan Andrés Baquerizo, propietario de OSS.

**Bock, Gabriela**               Gabriela Bock, Administradora de la Oficina y Gerente de Relaciones Públicas de Worley.

**Bravo, Álex**                  Álex Bravo, Coordinador de Proyectos de Petroecuador para el Proyecto de la Refinería Esmeraldas en la Gerencia de Refinación de 2011 a 2015, y Gerente General, entre noviembre de 2015 y abril de 2016, Administrador de Contratos para todos los Contratos Complementarios de la Refinería Esmeraldas y propietario de GIRBRA.

**Calvopiña, Marco**             Marco Calvopiña, Gerente General de Petroecuador en la fecha en la que se adjudicó a Worley el Contrato de la Refinería Esmeraldas.

**Céli de la Torre, Pablo**      Pablo Céli de la Torre, Contralor General del Ecuador de 2017 a 2021.

**Elizondo, Carlos**            Carlos Elizondo, Vicepresidente y Director de Proyectos de Worley.

**Escobar, Arturo**             Arturo Escobar, Coordinador General de Gestión Empresarial en la Gerencia de Refinación de Petroecuador entre marzo de 2012 y septiembre de 2014, Asesor de Servicios Compartidos entre mayo y noviembre de 2013 y Asesor de la Gerencia de Refinación entre noviembre de 2013 y septiembre de 2014; y propietario de ESCART.

**Faidutti Navarrette, Carlos**  Carlos Faidutti Navarrette, presunto empleado a tiempo completo del Proyecto de la Refinería Esmeraldas.

**Falcon, Raymond**             Raymond Falcon, Gerente de Programas de Worley y Director de Proyectos en el Proyecto de la Refinería Esmeraldas desde 2012.

**Glas, Jorge**                 Jorge Glas, antiguo vicepresidente y Ministro de Coordinación de los Sectores Estratégicos del Ecuador.

**Guarderas, Humberto**         Humberto Guarderas, Director de Tecnazul.

**Guerrero, Alejandro**         Alejandro Guerrero, empleado de Worley, subordinado del Sr. Falcon.

**Hooper, Robert**              Robert Hooper, Gerente de Worley, superior del Sr. Falcon.

| | |
|---|---|
| **Luque, Ramiro** | Ramiro Luque, propietario de Galileo. |
| **Merizalde, Pedro** | Pedro Merizalde, antiguo Gerente General de RDP, antiguo Gerente General de Petroecuador y antiguo Ministro de Recursos Naturales no Renovables de Ecuador. |
| **Pareja, Carlos** | Carlos Pareja, Gerente de la Gerencia de Refinación de Petroecuador, entre marzo de 2012 y julio de 2015 y Gerente General, entre julio de 2015 y noviembre de 2015; antiguo Ministro de Hidrocarburos del Ecuador y propietario de CAPAYA, S.A. |
| **Pareja, Carlos Andrés** | Carlos Andrés Pareja, hijo del Sr. Pareja. |
| **Pareja, Yolanda Rosa** | Yolanda Rosa Pareja, esposa del Sr. Pareja. |
| **Park, Guillermo** | Guillermo Park, Administrador de Contratos para el Contrato de la Refinería del Pacífico. |
| **Parker, Christopher** | Christopher Parker, Director del Grupo de Worley para Grandes Proyectos desde 2014 y Director Gerente Regional para las Américas de 2015 a 2017. |
| **Phillips, William** | William Phillips, propietario de Tecnazul. |
| **Pinzón, Arturo** | Arturo Pinzón, Director de MMR Group. |
| **Plummer, George** | George Plummer, Consultor Ejecutivo Principal de Shaw. |
| **Pólit, Carlos** | Carlos Pólit, Contralor General del Ecuador entre 2007 y 2017. |
| **Reyes, Marcelo** | Marcelo Reyes, antiguo coordinador jurídico (*in-house*) de Petroecuador y Coordinador General de Contratos para la Gerencia de Refinación entre marzo de 2012 y mayo de 2013. |
| **Tapia, Diego** | Diego Tapia, Gerente de la Gerencia de Refinación de 2015 a 2016 y Gerente de Operaciones. |
| **Villegas, Mauricio** | Mauricio Villegas, Gerente de Desarrollo Comercial en Worley. |

*Esta página se ha dejado intencionadamente en blanco.*

## I.   INTRODUCCIÓN

### 1.   LAS PARTES

1.   La Demandante es Worley International Services Inc. (antiguamente WorleyParsons International Inc.) (la "**Demandante**" o "**Worley**"), una sociedad organizada y en operación conforme a las leyes del Estado de Delaware (Estados Unidos de América)[1]. La Demandante está representada en el presente arbitraje por:

> **Silvia Marchili**
> White & Case LLP
> 609 Main Street, Suite 2900
> Houston, TX 770002
> Estados Unidos de América

> **Estefanía San Juan**
> **Michael García**
> White & Case LLP
> South Biscayne Boulevard, Suite 4900
> Miami, FL 33131-2352
> Estados Unidos de América

> **Andrea Menaker**
> White & Case LLP
> 5 Old Broad Street
> Londres, EC2N 1DW
> Reino Unido

> **Jonathan Ulrich**
> White & Case LLP
> 701 13th St NW,
> Washington, DC 20005
> Estados Unidos de América

> **Javier Robalino**
> **Paola Gachet**[2]
> Robalino Law
> Avenida 12 de Octubre No. 26-48, y Lincoln Edificio Mirage, Piso 16
> Quito, 170525, Ecuador

---

[1]   La Demandante afirma que se constituyó originalmente como Parsons E&C International, Inc. el 4 de enero de 2002. El 15 de junio de 2005, la Demandante enmendó su certificado de constitución a fin de cambiar su denominación a WorleyParsons International, Inc. El 12 de junio de 2019, la Demandante enmendó una vez más su certificado de constitución para modificar su denominación a Worley International Services, Inc. Certificado de Constitución de Parsons E&C International Inc., 4 de enero de 2002, y Certificado de Enmienda del Certificado de Constitución, 15 de junio de 2005 (**C-11**); Estado de Delaware, Certificado de Cambio de Denominación, 12 de junio de 2019 (**C-53**).

[2]   Ya no integra este despacho de abogados.

1

2.    La Demandada en el presente arbitraje es la República del Ecuador, un Estado soberano ("**Ecuador**" o la "**Demandada**", y junto con la Demandante, las "**Partes**"). La Demandada está representada en el presente arbitraje por:

**Ab. Juan Carlos Larrea Valencia**
Procurador General del Estado

**Dra. Ana María Larrea**
Directora Nacional de Asuntos Internacionales y Arbitraje

**Ab. Lily Díaz Granados**
Subdirectora de Asuntos Internacionales y Arbitraje

**Dra. Amparo Miranda**
Abogada de Asuntos Internacionales

**Ab. Nicole Vásconez**
Abogada de Asuntos Internacionales
Procuraduría General del Estado
Av. Amazonas No 39-123 y Arizaga,
Edificio Amazonas Plaza
Quito, 170135
Ecuador

**Raúl B. Mañón**
**Digna B. French**
**María Gómez**
Squire Patton Boggs (US) LLP
200 South Biscayne Boulevard
Suite 3400
Miami, FL 33131
Estados Unidos de América

**Rostislav Pekař**
**David Seidl**
Squire Patton Boggs (UK) LLP
7 rue du Général Foy
París, 75008
Francia

**Francisco J. Batlle**
Squire Patton Boggs Peña Prieto Gamundi
Av. Pedro Henríquez Ureña No. 157
Santo Domingo, 10108
República Dominicana

2.   **LA CONTROVERSIA**

3.   La controversia surge de las presuntas acciones y omisiones de la Demandada, así como de varios de sus organismos y entidades, en relación con varios contratos para el desarrollo de cuatro proyectos de infraestructura de petróleo y gas en Ecuador (conjuntamente, los "**Contratos**"), conocidos como el Proyecto de Rehabilitación de la Refinería Esmeraldas (el "**Proyecto de la Refinería Esmeraldas**"), el Proyecto de la Refinería del Pacífico Eloy Alfaro (el "**Proyecto de la Refinería del Pacífico**"), la Planta de Licuefacción de Gas Machala (el "**Proyecto de la Planta Machala**") y el Proyecto Santa Elena Monteverde (el "**Proyecto Monteverde**", y junto con los otros proyectos, los "**Proyectos**").

4.   Según la Demandante, las citadas acciones y omisiones comprenden: (i) la supuesta falta de pago de las cantidades adeudadas bajo los Contratos por las empresas públicas de petróleo y gas de la Demandada, a saber, Empresa Pública de Hidrocarburos del Ecuador EP Petroecuador ("**Petroecuador**") y Refinería del Pacífico Eloy Alfaro RDP Compañía de Economía Mixta ("**RDP**"), a raíz de un escándalo de corrupción que implicó a una tercera empresa llamada Tecnazul Cia. Ltda. ("**Tecnazul**") (subcontratista para los Contratos); (ii) una "campaña de hostigamiento" contra la Demandante emprendida por la Contraloría General del Estado de Ecuador (la "**Contraloría General**"); y (iii) la presunta amenaza del Servicio de Rentas Internas (el "**SRI**") de imponer injustificadamente ciertas cargas tributarias a la Demandante[3].

5.   La Demandante afirma que, por medio de estas acciones y omisiones, la Demandada incumplió sus obligaciones en el marco del Tratado entre la República del Ecuador y los Estados Unidos de América sobre Promoción y Protección de Inversiones, suscrito el 27 de agosto de 1993 y entrado en vigor el 11 de mayo de 1997 (el "**Tratado**").

6.   La Demandada ha planteado varias objeciones a la jurisdicción del Tribunal y a la admisibilidad de las pretensiones de la Demandante, conforme se describe en mayor detalle más adelante[4]. Respecto del fondo, la Demandada niega cualquier incumplimiento del Tratado a grandes rasgos sobre la base de que: (i) la Demandante ha planteado sus pretensiones contra la parte equivocada, dado que Ecuador no responde por las acciones de Petroecuador o RDP; (ii) la pretensión de la Demandante es de naturaleza comercial y contractual y, como tal, es ajena al ámbito de los

---

[3]   Escrito de Demanda, párrs. 196, 212-216.

[4]   *Véase* párr. 241 *infra*.

tratados de inversión; (iii) hubo problemas con el desempeño de la Demandante en el marco de los Contratos; y (iv) la pretensión por daños y perjuicios de la Demandante es infundada[5].

7. El 18 de marzo de 2021, el Tribunal emitió el Laudo Parcial sobre Objeciones Preliminares (el "**Laudo Parcial**"), en el cual rechazó dos objeciones preliminares planteadas por la Demandada (las "**Objeciones Preliminares**"). En el presente Laudo Final, y por los motivos expuestos más adelante, el Tribunal desestima en su totalidad las pretensiones de la Demandante.

---

[5]    Dúplica, párrs. 10-16.

Caso CPA Núm. 2019-15
Laudo Final

## II.   ANTECEDENTES PROCESALES

8.   En aras del buen orden y para referencia del lector, el Tribunal reproduce a continuación la información básica del arbitraje:

(i)   El Tribunal está compuesto por el Prof. Bernard Hanotiau, nacional belga (nombrado por la Demandante el 14 de febrero de 2019); la Prof. Brigitte Stern, nacional francesa (nombrada por la Demandada el 18 de marzo de 2019) y el Dr. Andrés Rigo Sureda, nacional español (nombrado árbitro presidente por el Secretario General de la Corte Permanente de Arbitraje (la "**CPA**") el 31 de julio de 2019).

(ii)   Conforme a la sección 3.1 del Acta de Constitución adoptada por las Partes el 1 de noviembre de 2019 (el "**Acta de Constitución**"), el presente arbitraje se rige por el Reglamento CNUDMI de 1976 (el "**Reglamento CNUDMI**").

(iii)   De conformidad con la sección 3.2 del Acta de Constitución, el Secretario General de la CPA actúa como la autoridad nominadora en el presente arbitraje para todos los efectos del Reglamento CNUDMI.

(iv)   Conforme a la sección 6.2 del Acta de Constitución, la sede legal del arbitraje es París (Francia).

(v)   Conforme a la sección 8.1 del Acta de Constitución, la Corte Permanente de Arbitraje (la "**CPA**") administra el presente procedimiento. El Sr. José Luis Aragón Cardiel, Consejero Legal de la CPA, fue designado Registrador y Secretario del Tribunal.

(vi)   Conforme a la sección 3.1 de la Orden Procesal No. 1, los idiomas del arbitraje son el inglés y el español. De conformidad con la sección 3.3 de dicha orden, el presente Laudo Final se emite simultáneamente en inglés y español.

9.   Los antecedentes procesales previos a la emisión del Laudo Parcial se narran en ese Laudo y no se repetirán aquí. En aras de la simplicidad, el Tribunal incorpora en el presente por referencia la Sección II del Laudo Parcial y detalla a continuación los antecedentes de este procedimiento posteriores a la emisión del Laudo Parcial.

### 1.   Decisión sobre las solicitudes de exhibición de documentos (Orden Procesal No. 4)

10.   El 22 de septiembre de 2021, la Demandante presentó una solicitud sobre ciertos anexos documentales adjuntos a la Solicitud de exhibición de documentos de la Demandada, que fue

enviada por la Demandada a la Demandante mediante una comunicación *inter partes* el 21 de septiembre de 2021. El 29 de septiembre de 2021, la Demandada solicitó al Tribunal que rechazara la solicitud de la Demandante.

11. El 1 de octubre de 2021, el Tribunal desestimó por prematura la solicitud presentada por la Demandante el 21 de septiembre de 2021, recordando a la vez a las Partes "que toda solicitud de una orden de exhibición documental debe ajustarse al procedimiento y el formato establecidos en la Sección 5 de la Orden procesal No. 1" y recordó su decisión que consta en el párrafo 28(ii) de la Orden Procesal No. 2, conforme a la cual "los documentos obtenidos por medio de procedimientos de exhibición distintos de los previstos en la sección 5 de la Orden Procesal No. 1, de ser presentados en el presente procedimiento, estarán sujetos a los requisitos de dicha Orden Procesal".

12. El 1 de noviembre de 2021, el Tribunal emitió la Orden Procesal No. 4 en la que se pronunció sobre: (i) la solicitud de la Demandante del 21 de septiembre de 2021; y (ii) las solicitudes pendientes de las Partes sobre exhibición documental contenidas en los Cronogramas Redfern/Stern de las Partes presentados ante el Tribunal el 18 de octubre de 2021.

13. El 10 de noviembre de 2021, la Demandante solicitó la venia del Tribunal para presentar una lista en la que se identificarían los documentos en respuesta a la solicitud de exhibición de documentos de la Demandada no. 14 (otorgada por el Tribunal en su Orden Procesal No. 4) en lugar de exhibir esos documentos a la Demandada.

14. El 16 de noviembre de 2021, la Demandada presentó sus comentarios sobre la solicitud de la Demandante del 10 de noviembre de 2021.

15. El 19 de noviembre de 2021, el Tribunal aceptó la solicitud de la Demandante del 10 de noviembre de 2021.

**2.   DECISIÓN SOBRE LA SOLICITUD DE SUBSANACIÓN (ORDEN PROCESAL NO. 5)**

16. El 18 de febrero de 2022, la Demandada solicitó al Tribunal que ordenara a la Demandante que "cumpli[era] plenamente con la [Orden Procesal No. 4]" y subsanase ciertas "deficiencias en su exhibición documental" descritas en mayor detalle en dicha solicitud (la "**Solicitud de subsanación de la Demandada**").

17. El 25 de febrero de 2022, por invitación del Tribunal, la Demandante: (i) solicitó al Tribunal que ordenara a la Demandada que "subsan[ase] las deficiencias en su exhibición documental"

descritas en su solicitud; y (ii) presentó sus comentarios sobre la Solicitud de subsanación de la Demandada (la "**Respuesta y Solicitud de subsanación de la Demandante**").

18. El 4 de marzo de 2022, por invitación del Tribunal, la Demandada presentó sus comentarios al a la solicitud de la Demandante de que el Tribunal ordenara a la Demandada que "subsana[se] las deficiencias en su exhibición documental".

19. El 14 de marzo de 2022, el Tribunal emitió la Orden Procesal No. 5, adoptando su decisión sobre la Solicitud de Subsanación de la Demandada y la Respuesta y Solicitud de Subsanación de la Demandante.

20. El 18 y el 25 de marzo de 2022, la Demandante envió comunicaciones adicionales sobre la exhibición de documentos según se ordenó en la Orden Procesal No. 5, a las que la Demandada respondió el 23 de marzo de 2022.

21. El 28 de marzo de 2022, el Tribunal envió una carta a las Partes en la que: (i) tomó nota de la explicación de la Demandada sobre el motivo por el cual no tenía en su poder ciertas comunicaciones internas de Petroecuador abarcadas por las órdenes de exhibición contenidas en la Orden Procesal No. 4; y (ii) otorgando la solicitud de la Demandante de que se exhibieran ciertas "comunicaciones con funcionarios de Petroecuador" en bloque y sin categorizar.

22. El 4 de abril de 2022, la Demandada solicitó que la Demandante exhibiese las "comunicaciones con funcionarios de Petroecuador" antes mencionadas y sus adjuntos en formato de archivos nativos, incluidos los metadatos asociados a ellas.

23. El 7 de abril de 2022, la Demandante presentó sus comentarios a la solicitud de la Demandada del 4 de abril de 2022.

24. El 14 de abril de 2022, el Tribunal ordenó a la Demandante que exhibiera las "comunicaciones con funcionarios de Petroecuador" antes mencionadas en su formato nativo.

**3. Segunda decisión sobre la Solicitud de Subsanación (Orden Procesal No. 6)**

25. El 29 de abril de 2022, la Demandada solicitó al Tribunal que ordenase a la Demandante que exhibiera de una serie de documentos que habían sido retenidos por razones de privilegio legal y/o confidencialidad y que subsanara las supuestas deficiencias en la exhibición documental de la Demandante requerida por la Orden Procesal No. 5.

26. El 6 de mayo de 2022, la Demandante presentó su respuesta a la solicitud de la Demandada del 29 de abril de 2022.

27. El 10 de mayo de 2022, la Demandada presentó una comunicación: (i) constatando que confiaba en que el Tribunal estuviera "lo suficientemente informado sobre las cuestiones en disputa" según lo expuesto en la solicitud de la Demandada y la respuesta de la Demandante; y (ii) proporcionando algunos comentarios sobre ciertas observaciones de la Demandante en su respuesta respecto al contacto que ocurrió entre un abogado de la Demandada y un antiguo empleado de Worley.

28. El 13 de mayo de 2022, la Demandante presentó su respuesta a la comunicación de la Demandada del 10 de mayo de 2022.

29. El 20 de mayo de 2022, el Tribunal emitió la Orden Procesal No. 6, en la que se pronunció sobre la solicitud de la Demandada del 29 de abril de 2022.

**4.   LOS ESCRITOS**

30. Si bien las Partes han presentado otros escritos en el presente arbitraje durante la fase de Objeciones Preliminares que culminó con el Laudo Parcial, los escritos listados a continuación abordan las cuestiones específicas que se deciden en este Laudo Final.

31. El 4 de noviembre de 2019, la Demandante presentó su Escrito de Demanda (el "**Escrito de Demanda**").

32. El 7 de septiembre de 2021, la Demandada presentó su Contestación (el "**Escrito de Contestación**").

33. El 18 de enero de 2022, la Demandante presentó su Réplica sobre el Fondo y Respuesta sobre Jurisdicción (la "**Réplica**").

34. El 25 de junio de 2022, la Demandada presentó su Dúplica y Réplica sobre Jurisdicción (la "**Dúplica**").

35. El 12 de octubre de 2022, la Demandante presentó su Dúplica sobre Jurisdicción (la "**Dúplica sobre Jurisdicción**").

36. El 28 de febrero de 2023, la Demandante y la Demandada presentaron sus Escritos Post-Audiencia (el "**EPA de la Demandante**" y el "**EPA de la Demandada**", respectivamente).

**5.** **AUDIENCIA**

37. El 28 de abril de 2021, el Tribunal reservó el período entre el 12 y el 20 de diciembre de 2022 para celebrar una audiencia sobre todas las cuestiones de jurisdicción, fondo y cuantía pendientes (la "**Audiencia**") y confirmó Miami (Florida) como lugar de la Audiencia.

38. El 25 de marzo de 2022, tras varios intercambios con las Partes, el Tribunal reprogramó la Audiencia para el período del 8 al 16 de diciembre de 2022 (excluyendo el fin de semana entre ambas semanas).

39. El 19 de agosto de 2022, el Tribunal decidió que la Audiencia se celebraría en el Hotel Mandarin Oriental de Miami (Florida).

40. El 11 de octubre de 2022, el Tribunal distribuyó un borrador de la Orden Procesal No. 7, mediante la cual se convocaría a la Audiencia y se abordarían los demás aspectos técnicos y accesorios de la misma, e invitó a las Partes a presentar comentarios sobre el borrador.

41. El 22 de octubre de 2022, las Partes presentaron sus comentarios sobre el borrador de la Orden Procesal No. 7.

42. El 24 de octubre de 2022, el Tribunal, las Partes y la CPA celebraron una conferencia previa a la audiencia.

43. El 1 de noviembre de 2022, el Tribunal distribuyó una versión actualizada del borrador de la Orden Procesal No. 7, revisado por el Tribunal tras la conferencia previa a la audiencia, haciendo notar que las Partes debían considerar su contenido como final sujeto a la determinación del cronograma para la Audiencia.

44. El 2 de noviembre de 2022, las Partes notificaron sus listas respectivas de testigos y peritos citados para su contrainterrogatorio en la Audiencia.

45. El 3 de noviembre de 2022, las Partes indicaron el orden de comparecencia de sus respectivos testigos y peritos para su interrogatorio.

46. El 11 de noviembre de 2022, las Partes distribuyeron sus respectivas propuestas para el cronograma de la Audiencia.

47. El 16 de noviembre de 2022, el Tribunal emitió la Orden Procesal No. 7.

48.    La Audiencia se celebró entre el 8 y el 16 de diciembre de 2022 (excluyendo el fin de semana entre ambas semanas) en el Hotel Mandarin Oriental (500 Brickell Key Dr. Miami, FL 33131) y simultáneamente por videoconferencia. A continuación se indican los asistentes a la Audiencia:

**El Tribunal**

Dr. Andrés Rigo Sureda (Árbitro Presidente)
Profesor Bernard Hanotiau
Profesora Brigitte Stern

**La Demandante**

Fabiola Céspedes
Larry Kalban
(*representantes de Parte*)

Silvia M. Marchili
Andrea Menaker
Michael García
Jonathan Ulrich
Estefanía San Juan
Isabella Bellera Landa
Patty García-Linares
Julieta Monteroni
Jacob Bachmaier
Nils Ivars
Arianna Talaie
Dara Jeffries
Erodita Herrera
Patricio Varela Laso
Guillermo Cuevas
Carlos Canellas
Raul Valdez
(*White & Case LLP*)

Javier Robalino
Paola Gachet
Skary Francisco Yépez (*en remoto*)
(*Robalino Law*)

Fernando Escobar
Christopher Parker
Raymond Falcon
(*Testigos*)

Ramiro Mendoza
Pedro Aguerrea
Douglas Branch
Amy Meyer
Christopher Sullivan
Jacob Hammond (*en remoto*)
(*Peritos*)

**La Demandada**

Juan Carlos Larrea Valencia
Claudia Salgado Levy
Mauricio Guim
Lily Díaz Granados (*en remoto*)
Nicole Vásconez (*en remoto*)
Amparo Miranda (*en remoto*)
(*Procuraduría General del Estado de la República del Ecuador*)

Raúl B. Mañón
Rostislav Pekař
Digna B. French
Francisco Batlle
David Seidl
María Gómez
Carmen Haché
Joseph Rosa
Alexis Martinez (*en remoto*)
Fëllënza Limani (*en remoto*)
Paweł Bukiel (*en remoto*)
(*Squire Patton Boggs LLP*)

José R. Herrera Falcones
Mauro R. Tejada
(*Testigos*)

Fabián Andrade Narváez
Tiago Duarte-Silva
Isabel Serrano Salas (*en remoto*)
Bradley D. Wolf
Andrés Alva
(*Peritos*)

**Corte Permanente de Arbitraje**

José Luis Aragón Cardiel
Javier René Comparini-Cuetto
Luis Popoli (*en remoto*)

**Estenógrafos**

David A. Kasdan
(*Worldwide Reporting*)

Dante Rinaldi (*en remoto*)
(*D-R Esteno*)

**Intérpretes**

Silvia Colla
Daniel Giglio

**Apoyo técnico**

Nicholas Wilson
Kurt Dilweg
Iffat Nawaz (*en remoto*)
Andrew Ramero (*en remoto*)
(*Law in Order*)

**6.     ASUNTOS POST-AUDIENCIA**

49.     El 23 de diciembre de 2022, las Partes: (i) comunicaron su acuerdo sobre las fechas en las cuales las Partes debían presentar sus propuestas de corrección a las transcripciones de la Audiencia; y (ii) indicaron sus respectivas posturas sobre el formato y el plazo para la presentación de los Escritos Post-Audiencia.

50.     El 2 de enero de 2023, el Tribunal: (i) confirmó el acuerdo de las Partes respecto del procedimiento para la corrección de las transcripciones de la Audiencia; y (ii) dictó instrucciones para la presentación de los Escritos Post-Audiencia. Como ya se ha mencionado, el Escrito Post-Audiencia de la Demandante y el Escrito Post-Audiencia de la Demandada se presentaron el 28 de febrero de 2023.

51.     El 12 de mayo de 2023, el Tribunal invitó a las Partes a presentar escritos sobre costas.

52.     El 26 de mayo de 2023, las Partes presentaron sus escritos sobre costas (respectivamente, el "**Escrito sobre Costas de la Demandante**" y el "**Escrito sobre Costas de la Demandada**").

12

## III.  ANTECEDENTES FÁCTICOS

54.  Los eventos descritos a continuación constituyen un resumen los antecedentes fácticos de la controversia conforme han sido descritos por las Partes en sus alegatos. No constituyen conclusiones sobre los hechos por parte del Tribunal. El resumen que sigue tampoco tiene por objeto reflejar todos los hechos según fueron alegados por las Partes o todos los alegatos de las Partes, sino que busca exclusivamente poner el Laudo Final del Tribunal en su debido contexto. Los hechos objeto de controversia serán destacados a medida que vayan surgiendo.

## 1.  LAS PARTES Y OTRAS ENTIDADES RELACIONADAS

### 1)  La Demandante y las entidades relacionadas

55.  La Demandante se constituyó en el Estado de Delaware (Estados Unidos) el 4 de enero de 2002[6]. La Demandante es parte de Worley Group, proveedor global de servicios de consultoría para la gestión de proyectos ("**PMC**" por sus siglas en inglés)[7].

56.  La Demandante es propiedad total de Worley Group, Inc., empresa constituida en el Estado de Delaware[8]. Worley Group, Inc. es propiedad íntegra de WorleyParsons Corporation, también constituida en el Estado de Delaware[9]. WorleyParsons Corporation, a su vez, es propiedad íntegra de WorleyParsons US Holding Corporation ("**WorleyParsons US**"), también constituida en Delaware[10]. Por último, WorleyParsons US es propiedad de Worley Limited, empresa constituida en Australia[11].

57.  WorleyParsons Ecuador S.A. ("**WorleyParsons Ecuador**") se constituyó en Ecuador, el 15 de julio de 2014, siendo propiedad en un 99% de WorleyParsons South America Holdings Pty

---

[6]  Certificado de Constitución de Parsons E&C International Inc., 4 de enero de 2002, y Certificado de Enmienda del Certificado de Constitución, 15 de junio de 2005 (**C-11**); Estado de Delaware, Certificado de Cambio de Denominación, 12 de junio de 2019 (**C-53**).

[7]  What We Do, Worley (**C-55**).

[8]  Informe del Secretario de Estado de Texas para Worley Group, Inc., 27 de marzo de 2020 (**R-10**); Informe del Secretario de Estado de Texas sobre las denominaciones anteriores de Worley Group, Inc., 27 de marzo de 2020 (**R-11**); Informe público de 2019 sobre el impuesto de franquicia de Texas para WPI, 14 de mayo de 2019 (**R-12**); Informe de DNBi Risk Management para WPI, 21 de noviembre de 2019, pág. 4 (**R-31**).

[9]  Informe del Secretario de Estado de Texas para WorleyParsons Corporation, 26 de marzo de 2020 (**R-13**); Informe público de 2019 sobre el impuesto de franquicia de Texas para WorleyParsons Corporation, 14 de mayo de 2019 (**R-14**); Informe de DNBi Risk Management para WPI, 21 de noviembre de 2019, pág. 4 (**R-31**).

[10]  Informe público de 2019 sobre el impuesto de franquicia de Texas para WorleyParsons US Holding Corporation, 14 de mayo de 2019 (**R-15**).

[11]  Informe público de 2019 sobre el impuesto de franquicia de Texas para WorleyParsons US Holding Corporation, 14 de mayo de 2019 (**R-15**).

Limited y en un 1% de Worley SPVI Pty Ltd ("**Worley SPVI**")[12]. Worley Limited es propietaria directa de Worley SPVI[13].

58.     Según indica su escritura de constitución, el objeto social de WorleyParsons Ecuador es la provisión de toda clase de servicios profesionales y técnicos a industrias dedicadas a la generación y distribución de energía, la extracción y el procesamiento de recursos naturales, el desarrollo de infraestructura y la gestión y protección medioambiental[14].

### 2)   La Demandada y las entidades relacionadas

59.     **Petroecuador** es una empresa pública que gestiona los recursos naturales no renovables del Ecuador, constituida en virtud del Decreto Ejecutivo No. 315 del Ecuador, del 6 de abril de 2010[15].

60.     **RDP** es una compañía de economía mixta organizada y constituida conforme a las leyes del Ecuador, el 51% de la cual es propiedad de Petroecuador y el 49% restante de PDVSA Ecuador, S.A. ("**PDVSA Ecuador**"), filial ecuatoriana y propiedad íntegra de Petróleos de Venezuela S.A., la empresa petrolífera estatal de Venezuela[16]. La actividad primaria de RDP es el diseño, la construcción, la operación y el mantenimiento de refinerías de petróleo y la producción de productos petroquímicos[17].

61.     El **Contralor General** es un funcionario de la República del Ecuador cuya función es fiscalizar las finanzas del Estado, incluyendo la tramitación de procedimientos administrativos para auditar a entidades que hacen uso o que se benefician del uso de fondos públicos[18].

---

[12]     Documentos de constitución de WorleyParsons Ecuador, 16 de julio de 2014, págs. 1-18 (**R-1(a)**); Documentos de constitución de WorleyParsons Ecuador, 9 de agosto de 2014, pág. 1 (**R-1(b)**).

[13]     Worley Limited, 2019 Informe anual, 2019, pág. 109 (**R-9**); Informe de OneStop para Worley Limited, 11 de noviembre de 2019, págs. 21-22 (**R-30**).

[14]     Escritura pública de constitución de WorleyParsons Ecuador, 16 de julio de 2014, Primer capítulo, artículo 4 (**R-1(a)**).

[15]     Contrato de la Refinería Esmeraldas, pág. 23 (**C-3**).

[16]     Constitución de la compañía "Refinería del Pacífico RDP Compañía de Economía Mixta", Escritura pública No, 2.732, 15 de julio de 2008 (**C-79**); PDVSA Ecuador, Acta de junta universal de accionistas, 15 de mayo de 2008 (**C-80**).

[17]     Estatuto de RDP, 15 de julio de 2008 (**R-116**).

[18]     Ley Orgánica de la Contraloría General del Estado, publicada en el Registro Oficial Suplemento No. 595, 12 de junio de 2022, artículos 1, 6, 18 (**C-177**).

62.   La **Fiscalía General del Estado** es un órgano de la República del Ecuador encargado de incoar acciones penales en nombre de la Demandada. Se trata de un órgano autónomo creado en el marco de la Constitución del Ecuador y goza de independencia administrativa, económica y financiera[19].

63.   La **Procuraduría General del Estado** es un órgano de la República del Ecuador que representa al Ecuador en procedimientos judiciales, incluyendo el presente arbitraje. No cumple funciones de fiscalización o de policía[20].

64.   El **SRI** (Servicio de Rentas Internas) es una agencia administrativa de la República del Ecuador que recauda impuestos y vela por el cumplimiento de las leyes tributarias del país[21].

### 3)  Otras entidades

65.   Tecnazul es una empresa constituida en Ecuador que fue contratada por la Demandante como subcontratista para la mayoría de los Contratos, según se describe más adelante en mayor detalle.

## 2.   LOS PROYECTOS

### 1)  Introducción

66.   En los años previos a la llegada de Worley a Ecuador, por medio de una iniciativa conocida como el Plan Nacional de Desarrollo, Ecuador puso en marcha políticas económicas para desarrollar ciertos sectores que se consideraban estratégicos, como petróleo y gas, minería y energía. Al concentrarse en estos sectores, Ecuador pretendía aumentar su control sobre sus recursos energéticos y propulsar el desarrollo en otros ámbitos en aras de la soberanía energética[22]. Uno de los Proyectos organizados en el ámbito de esta iniciativa fue la construcción de la Refinería del Pacífico y la rehabilitación de la Refinería Esmeraldas.

67.   La Refinería del Pacífico en El Aromo, provincia de Manabí (Ecuador), con un coste de USD 12.000 millones, se diseñó con una capacidad de producción de 300.000 barriles de crudo por día. El petróleo procesado en la Refinería del Pacífico se usaría en la producción de derivados

---

[19]     Constitución de la República del Ecuador, artículo 194 (**RLA-216**).
[20]     Constitución de la República del Ecuador, artículo 237 (**RLA-216**).
[21]     Contestación, párr. 269.
[22]     Escrito de Demanda, párrs. 6, 24-31; Réplica, párrs. 9, 56-73.

del petróleo para la venta[23]. Petroecuador y PDVSA Ecuador constituyeron RDP con el objeto de desarrollar este proyecto[24]. La construcción comenzó en marzo de 2009[25].

68.     Con la rehabilitación de la Refinería Esmeraldas se pretendía renovar y prolongar la vida de la refinería más grande del Ecuador, que se había deteriorado y tenía un nivel de producción que rondaba entre el 80 y el 85% de su capacidad[26].

69.     A fin de realizar estos proyectos de manera efectiva, Ecuador inició un proceso de licitación internacional para la contratación de un inversor extranjero con experiencia en el sector energético para que se desempeñara como gerente de proyecto y preparase estudios de ingeniería y asistencia técnica[27].

### 2)   El Proyecto de la Refinería del Pacífico

70.     El 13 de septiembre de 2010, RDP invitó a Worley a participar en la licitación para actuar como gerente de proyecto en la construcción de la Refinería del Pacífico[28]. RDP también invitó a Jacobs Engineering Group Inc., SNC Lavalin Group Inc. y KBR Inc. a presentar ofertas[29].

71.     Worley presentó su oferta en enero de 2011[30]. Worley planeaba completar el proyecto en conjunto con Tecnazul, empresa ecuatoriana con experiencia previa en ingeniería y construcción y con otras empresas internacionales activas en Ecuador en los sectores de energía y minería[31].

---

[23]     Ministerio de Energía y Recursos Naturales no Renovables, *Refinería del Pacífico (video)*, 28 de febrero de 2011, en 00:01:49-00:02:45, 00:04:33-00:05:34 (**C-70**); Miriam Lucero, "*Refinería del Pacífico Eloy Alfaro*," *Primer complejo refinador y petroquímico del Ecuador*, Acta Oceanográfica del Pacífico. Vol. 17, No. 1, 2012, 3 de agosto de 2015 (**C-73**).

[24]     Constitución de la compañía "Refinería del Pacífico RDP Compañía de Economía Mixta", Escritura pública No, 2.732, 15 de julio de 2008 (**C-79**).

[25]     Invitación de RDP a manifestar interés en Contrato de PMC, 13 de septiembre de 2010 (**C-90**).

[26]     Escrito de Demanda, párrs. 8, 32, 40, 42; Réplica, párrs. 13, 15; Plan Nacional para el Buen Vivir 2009-2013, págs. 114, 264-265 (**C-57**); Petroecuador, Plan Maestro para 2009-2015, marzo de 2010, pág. 81 (**C-360**).

[27]     Escrito de Demanda, párr. 9; Réplica, párr. 18.

[28]     Escrito de Demanda, párr. 45; Invitación de RDP a manifestar interés en Contrato de PMC, 13 de septiembre de 2010 (**C-90**); Declaración de Elizondo, párrs. 11-12 (**CWS-1**).

[29]     Escrito de Demanda, párr. 45; Contrato de la Refinería del Pacífico, pág. 141 (**C-8**).

[30]     Escrito de Demanda, párr. 46; Propuesta comercial presentada para el Contrato de la Refinería del Pacífico, Programa 4: Coste de movilización, removilización y desmovilización, 21 de junio de 2011 (**C-31**).

[31]     Escrito de Demanda, párr. 46; Declaración de Elizondo, párr. 14 (**CWS-1**).

72.   El 5 de marzo de 2011, el presidente del Ecuador anunció públicamente la selección de Worley como gerente de proyecto para el Proyecto de la Refinería del Pacífico[32]. La oferta de Worley había recibido la puntuación acumulada más alta de todas las presentadas ante Ecuador[33].

73.   El 22 de noviembre de 2011, RDP y la Demandante celebraron un contrato de servicios para el gerenciamiento de proyectos de conformidad con un procedimiento de licitación del Gobierno llamado giro específico del negocio (el "**Giro Específico del Negocio**")[34]. De conformidad con el mencionado contrato (el "**Contrato de la Refinería del Pacífico**"), la Demandante acordó "suministrar todos los servicios de gerenciamiento necesarios para la ejecución adecuada de la [construcción de la Refinería del Pacífico[35]".

74.   En particular, la función de Worley como gerente del proyecto entrañaba las siguientes responsabilidades: gerenciamiento del proyecto, control del proyecto, gerenciamiento de ingeniería, gestión de calidad, gerenciamiento de sanidad, seguridad y ambiente; administración del contrato, gerenciamiento de adquisiciones, gerenciamiento de las órdenes de cambio, gerenciamiento de la construcción y gerenciamiento de la puesta en servicio[36]. Sin embargo, Worley no gestionaba el presupuesto del proyecto ni actuaba como garante de los trabajos realizados por terceras partes contratadas por RDP durante la vida del proyecto[37].

75.   Conforme a lo exigido por el Contrato de la Refinería del Pacífico, Worley realizó estas actividades en dos etapas[38]. La primera etapa comprendió el período transcurrido desde la adjudicación y celebración del Contrato de la Refinería del Pacífico hasta la conclusión del diseño y el inicio de las obras[39]. Cuando se incorporó Worley, ya había varios contratistas involucrados

---

[32]   Escrito de Demanda, párr. 47; República del Ecuador, Discurso presidencial No. 211 (video), en 2:22:24 (**C-144**).

[33]   Escrito de Demanda, párr. 48; Contrato de la Refinería del Pacífico, pág. C_8_175 (**C-8**).

[34]   Contrato de la Refinería del Pacífico, págs. C_8_005 -006 -006 (**C-8**).

[35]   Contrato de la Refinería del Pacífico, Anexo A, sección 5.1 (**C-8**) (traducción del Tribunal).

[36]   Escrito de Demanda, párr. 60; Contrato de la Refinería del Pacífico, Anexo A, cláusulas 5.1, 5.2. 5.4-5.11 (**C-8**).

[37]   Escrito de Demanda, párr. 60; Dúplica sobre Jurisdicción, párr. 127; Contrato de la Refinería del Pacífico, cláusula 2.1 y Anexo A, párrs. 214, 237 (**C-8**); Memorando de Petroecuador N.º 00944-PRY-DPP-TRA-2014, 15 de agosto de 2014 (**C-1111**); Lista de verificación de la auditoría de calidad, Contrato No. 2011030, 25 de agosto de 2015 (**C-1157**); Carta de Worley a Petroecuador No. 408005-00445-00-PM-LTR-WPI-EPP-5081, 2 de julio de 2014 (**C-1175**); Carta de Worley a Tesca 408005-00445-93.2-PC-LTR-WPI-TES-8656, 2 de junio de 2015 (**C-1176**); Informe de transferencia (pasaje), 22 de junio de 2016 (**C-1177**); Informe de transferencia (pasaje), 30 de junio de 2016 (**C-1178**); Carta de Worley a Petroecuador a la que se adjuntan los Informes de transferencia (pasaje), 6 de junio de 2016 (**C-1179**); Informe de transferencia (pasaje), 18 de mayo de 2016 (**C-1194**).

[38]   Escrito de Demanda, párr. 61; Contrato de la Refinería del Pacífico, cláusula 2,1 (**C-8**).

[39]   Escrito de Demanda, párr. 61; Declaración de Elizondo, párr. 19 (**CWS-1**).

en la primera fase, entre ellos SK, Linde y Shaw Consultants International ("**Shaw**")[40]. El alcance del trabajo para la segunda fase incluía ingeniería, suministro, construcción y apoyo para la etapa previa a la puesta en servicio, la puesta en servicio y el arranque[41]. En su carácter de único gerente de contrato, Worley prestaba apoyo a la Refinería del Pacífico para seleccionar contratistas para la segunda etapa y revisaba y comentaba sobre los entregables de los contratistas[42].

76.   La Refinería del Pacífico debía pagar a la Demandante por sus labores sobre la base de tarifas horarias convenidas con un precio contractual máximo de aproximadamente USD 205.574.772,20[43]. La Demandante afirma que también tiene derecho a que se le reembolsen todos los costes directos en que incurrió el personal de Worley en la ejecución de actividades del proyecto[44].

77.   Según la Demandante, Worley cumplió con las obligaciones estipuladas en el Contrato de la Refinería del Pacífico de manera oportuna y conforme a lo pactado[45]. La Demandante sostiene que la Demandada no expresó insatisfacción alguna sobre los resultados de Worley o duda alguna sobre si Worley debía ser remunerada en ningún momento durante la ejecución del Contrato de la Refinería del Pacífico[46].

78.   El 10 de enero de 2017, RDP notificó a la Demandante la suspensión del Contrato de la Refinería del Pacífico de conformidad con su cláusula 10.6 (Suspensión por propietario por conveniencia)[47].

79.   El 24 de julio de 2018, la Superintendencia de Compañías, Valores y Seguros de Ecuador ordenó la disolución y liquidación de RDP por no haber presentado balances generales de operaciones aprobados por los accionistas durante dos años consecutivos[48].

80.   El 22 de marzo de 2019, Guillermo Park ("**Sr. Park**"), Administrador del Contrato de la Refinería del Pacífico, suscribió con Worley un documento titulado "Acta de Determinación de Valores Facturados, Pendientes por Facturar y Pendientes de Pago del Contrato 'Project Management

---

[40]   Escrito de Demanda, párr. 61; Instrucciones de la Refinería del Pacífico a los licitadores, 17 de diciembre de 2010, párr. 1.1 (**C-87**).
[41]   Escrito de Demanda, párr. 61; Declaración de Elizondo, párr. 19 (**CWS-1**).
[42]   Escrito de Demanda, párr. 61; Declaración de Elizondo, párr. 19 (**CWS-1**).
[43]   Escrito de Demanda, párr. 63; Contrato de la Refinería del Pacífico, cláusulas 4.1, 4.1.3 (**C-8**).
[44]   Escrito de Demanda, párr. 63; Contrato de la Refinería del Pacífico, cláusula 4.1.2 (**C-8**).
[45]   Escrito de Demanda, párr. 64.
[46]   Escrito de Demanda, párrs. 64-67.
[47]   Oficio No. RDP-GGE-WPR-2017-0017-OFI de RDP a Worley, 10 de enero de 2017 (**C-111**); Carta de Worley a RDP, No. RDP-WPR-ADC-2017-1266-0Fl, 12 de enero de 2017 (**C-112**).
[48]   Resolución No. SCVS-IRP-2018-00006404, 24 de julio de 2018 (**R-238**).

Consultancy (PMC) Support Service Agreement'", por medio del cual RDP supuestamente reconocía las cantidades adeudadas a Worley en el marco del Contrato de la Refinería del Pacífico[49]. Ecuador alega que el Sr. Park carecía de la autoridad para vincular a RDP al contenido de ese documento[50]. En este momento, según Ecuador, el liquidador de RDP era el único que ostentaba dicha autoridad[51].

81.   El 23 de abril de 2019, Worley presentó una solicitud en el proceso de liquidación de RDP, conforme a lo exigido por la Ley de Compañías y la resolución de liquidación de RDP[52]. Worley envió su solicitud a un domicilio de RDP en Quito, no a la oficina principal en el cantón de Manta, que, según la Demandada, era lo previsto en la resolución de liquidación de RDP[53]. Por este motivo, de acuerdo con la Demandada, las deudas de Worley no tienen preferencia en el proceso de liquidación[54].

### 3)   El Proyecto de la Refinería Esmeraldas

82.   El 29 de abril de 2011, Petroecuador solicitó la aprobación del Instituto Nacional de Contratación Pública del Ecuador para usar la calificación del Giro Específico del Negocio para la contratación de un gerente de proyecto para el Proyecto de la Refinería Esmeraldas[55], la cual obtuvo el 6 de junio de 2011[56].

83.   El 5 de julio de 2011, Petroecuador envió un oficio a la Demandante invitándola a participar, junto con SNC Lavalin, KBR y Jacobs Engineering, en el proceso licitatorio para la adjudicación de un contrato de gerenciamiento para el Proyecto de la Refinería Esmeraldas[57].

---

[49]   Acta de determinación de valores de RDP, 22 de marzo de 2019 (**C-117**).

[50]   Contestación, párr. 97; Declaración de Herrera, párrs. 10-11 (**RWS-1**); Informe de Andrade I, párrs. 51-53 (**RER-1**).

[51]   Contestación, párr. 97; Ley de Compañías del Ecuador, artículos 367, 369 (**RLA-72**); Declaración de Herrera, párr. 11 (**RWS-1**); Informe de Andrade I, párrs. 51-53 (**RER-1**).

[52]   Carta de Worley a RDP, RDP-WPR-ADC-2019-005-0H, 23 de abril de 2019 (**C-167**); Resolución de liquidación para la Refinería del Pacífico, 12 de marzo de 2019, pág. 2 (**R-95**); Ley de Compañías, artículos 362-364 (**RLA-72**).

[53]   Contestación, párr. 103; Resolución de liquidación para la Refinería del Pacífico, 12 de marzo de 2019 (**R-95**).

[54]   Contestación, párr. 104.

[55]   Contrato de la Refinería Esmeraldas, cláusula 1.2 (**C-3**).

[56]   Evaluación de Oferta para el Contrato de la Refinería Esmeraldas, Memorando No. 25155-RCTR-CTE-2011, 20 de septiembre de 2011, párr. 1.6 (**C-93**).

[57]   Evaluación de Oferta para el Contrato de la Refinería Esmeraldas, Memorando No. 25155-RCTR-CTE-2011, 20 de septiembre de 2011, párr. 1.7 (**C-93**); Oficio No. 1327-RGER-CTR-2011, 5 de julio de 2011 (**C-294**).

84. El 2 de agosto de 2011, Worley presentó su propuesta[58], en la que la Demandante detallaba su plan de colaboración con Tecnazul como subcontratista ecuatoriano[59].

85. El 20 de septiembre de 2011, la Comisión Técnica de Petroecuador a cargo del proceso de evaluación determinó que la oferta de Worley satisfacía todos los requisitos legales, técnicos y económicos para el desarrollo del proyecto[60]. Sobre esta base, la Comisión Técnica recomendó a Petroecuador que adjudicase el contrato a Worley[61].

86. El 14 de noviembre de 2011, de conformidad con el Giro Específico del Negocio, la Demandante y Petroecuador suscribieron un contrato para la fiscalización y gerenciamiento del Programa de rehabilitación de la Refinería Esmeraldas (el "**Contrato de la Refinería Esmeraldas**")[62]. La Demandante aceptó así prestar los servicios indicados en su oferta en un plazo de 24 meses contados a partir de la fecha de celebración del contrato[63].

87. Los servicios prestados por Worley conforme al Contrato de la Refinería Esmeraldas incluyeron el gerenciamiento de las obras de ingeniería, procura y construcción[64]. Worley también contrató a un gerente del proyecto, un auditor, un supervisor de procura, un gerente de ingeniería y un gerente de construcción, entre otros[65]. Además, Worley debía transferir información y capacitar al personal local[66].

88. Como contraprestación por los servicios antes mencionados, Petroecuador debía pagar a la Demandante una cantidad estimada en USD 38.600.764 más una serie de costes reembolsables[67]. Según el Contrato de la Refinería Esmeraldas, se contemplaba también el reembolso a Worley por los gastos de traslado incurridos por el personal de Worley, como viajes de negocios, comidas en viajes de negocios y ciertos gastos de subsistencia[68].

---

[58]   Evaluación de Oferta para el Contrato de la Refinería Esmeraldas, Memorando No. 25155-RCTR-CTE-2011, 20 de septiembre de 2011, párr. 1.24 (**C-93**).

[59]   Propuesta comercial para el Contrato de Esmeraldas, 26 de julio de 2011, págs. R-28_350-395 (**R-28**).

[60]   Evaluación de Oferta para el Contrato de la Refinería Esmeraldas, Memorando No. 25155-RCTR-CTE-2011, 20 de septiembre de 2011, sección 2 (**C-93**).

[61]   Evaluación de Oferta para el Contrato de la Refinería Esmeraldas, Memorando No. 25155-RCTR-CTE-2011, 20 de septiembre de 2011, sección 3 (**C-93**).

[62]   Contrato de la Refinería Esmeraldas, cláusula 1.4 (**C-3**).

[63]   Contrato de la Refinería Esmeraldas, cláusulas 4, 7.1 (**C-3**).

[64]   Contrato de la Refinería Esmeraldas, pág. C_3_068 (**C-3**).

[65]   Escrito de Demanda, párr. 71; Contrato de la Refinería del Pacífico, pág. C_3_277 (**C-3**).

[66]   Escrito de Demanda, párr. 71; Contrato de la Refinería del Pacífico, pág. C_3_274 (**C-3**).

[67]   Contrato de la Refinería Esmeraldas, cláusulas 15-16 (**C-3**); Contrato Complementario del Programa de Rehabilitación No. 2014051, 17 de octubre de 2014, cláusula 1 (**C-23**).

[68]   Escrito de Demanda, párr. 73; Contrato de la Refinería Esmeraldas, Anexo 1, cláusulas 3.3, 4.1 (**C-3**).

89.     En su función como gerente del proyecto, Worley no gestionaba el presupuesto del proyecto ni actuaba como garante de los trabajos realizados por terceras partes contratadas por Petroecuador[69]. Según la Demandante, conforme a lo previsto en el Contrato de la Refinería Esmeraldas[70] y el derecho ecuatoriano[71], Petroecuador debía designar a un administrador del contrato, quien velaría por el cabal y oportuno cumplimiento en la ejecución de las obras y, en caso de incumplimiento, impondría multas y sanciones.

90.     El Contrato de la Refinería Esmeraldas prohibía a Worley subcontratar todos o parte de sus servicios sin "previa autorización por escrito" de Petroecuador y toda subcontratación, cuando se autorizara, "no exced[ería] del 30% del valor total del contrato principal[72]". Para cualquier obra que se subcontratara válidamente, Worley seguía siendo "el único responsable ante [Petroecuador] por los actos u omisiones de sus subcontratistas y de las personas directa o indirectamente empleadas por ellos[73]".

91.     El Contrato de la Refinería Esmeraldas también disponía que las partes podían celebrar contratos complementarios si fuese necesario por causas imprevistas o técnicas[74]. Las Partes así lo hicieron en seis ocasiones entre septiembre de 2012 y octubre de 2015 (los "**Contratos Complementarios de la Refinería Esmeraldas**")[75]. El objeto declarado de estos contratos complementarios fue:

    (i)      Realizar trabajos complementarios, entre ellos control de calidad, seguridad industrial, gerenciamiento e ingeniería, revisión de la organización e inspección de equipos críticos, estimados en USD 25,5 millones[76];

---

[69]    Escrito de Demanda, párr. 72; Contrato de la Refinería Esmeraldas, cláusula 20 y Anexo 3 (**C-3**).

[70]    Contrato de la Refinería Esmeraldas, cláusulas 20, 21 (**C-3**).

[71]    Reglamento de Contratación Pública, artículo 121 (**C-179**).

[72]    Contrato de la Refinería Esmeraldas, cláusula 21 (**C-3**).

[73]    Contrato de la Refinería Esmeraldas, cláusula 21 (**C-3**).

[74]    Contrato de la Refinería Esmeraldas, cláusula 15 (**C-3**).

[75]    Escrito de Demanda, párr. 79; Contrato Complementario del Programa de rehabilitación No. 2012036, 28 de septiembre de 2012, cláusulas 3, 4.1 (**C-19**); Contrato Complementario del Programa de Rehabilitación No. 2013027, 28 de agosto de 2013, cláusulas 3, 4 (**C-20**); Contrato Complementario del Programa de Rehabilitación No. 2014015, 2 de abril de 2014, cláusulas 3, 4 (**C-21**); Contrato Complementario del Programa de Rehabilitación No. 2014048, 9 de octubre de 2014, cláusulas 3, 4 (**C-22**); Contrato Complementario del Programa de Rehabilitación No. 2014051, 17 de octubre de 2014, cláusula 3 (**C-23**); Contrato Complementario del Programa de Rehabilitación No. 2015205, 29 de octubre de 2015, cláusulas 3, 4 (**C-24**).

[76]    Escrito de Demanda, párr. 79; Contrato Complementario del Programa de Rehabilitación No. 2012036, 28 de septiembre de 2012, cláusulas 3, 4.1 (**C-19**).

(ii)     Supervisar los contratos suscritos entre Petroecuador y las compañías Tesca, KBC Eagleburgmann y suministrar un plan para mejorar los combustibles en la Refinería, estimado en USD 37 millones[77];

(iii)    Gestionar y fiscalizar el plan de mejoramiento eléctrico y un estudio de la calidad del asfalto producido en la refinería, estimado en USD 12,5 millones[78];

(iv)    Gestionar y fiscalizar proyectos adicionales, como la disposición de residuos peligrosos, el mantenimiento de tanques para el almacenamiento de crudo, el diseño y la construcción de un chatarrero y una planta de tratamiento de material peligroso, estimado en USD 19,7 millones[79]; y

(v)     Gestionar y fiscalizar los proyectos nuevos y existentes relacionados con cuestiones operativas, mantenimiento y criterios técnicos que exigieran horas-hombre y empleados, por un valor estimado en USD 57,4 millones[80].

92.    Cinco de los seis contratos complementarios antes mencionados implicaban la ampliación del alcance de las obras por las que la Demandante era responsable. Conjuntamente, los contratos complementarios incrementaron el valor del Contrato de la Refinería Esmeraldas en aproximadamente USD 150 millones[81].

93.    El Proyecto de la Refinería Esmeraldas se concluyó el 17 de diciembre de 2015, con la reapertura de la Refinería Esmeraldas a máxima capacidad[82]. Mediante oficios del 30 de junio de 2016 y el

---

[77]   Escrito de Demanda, párr. 79; Contrato Complementario del Programa de Rehabilitación No. 2013027, 28 de agosto de 2013, cláusulas 3, 4 (**C-20**).

[78]   Escrito de Demanda, párr. 79; Contrato Complementario del Programa de Rehabilitación, 2 de abril de 2014 No. 2014015, cláusulas 3, 4 (**C-21**).

[79]   Escrito de Demanda, párr. 79; Contrato Complementario del Programa de Rehabilitación No. 2014048, 9 de octubre de 2014, cláusulas 3, 4 (**C-22**).

[80]   Escrito de Demanda, párr. 79; Contrato Complementario del Programa de Rehabilitación No. 2015205, 29 de octubre de 2015, cláusulas 3, 4 (**C-24**).

[81]   Contrato No. 2014187 entre Petroecuador y la Demandante para el Estudio de la Reingeniería y Construcción del Sistema de Drenajes de los Efluentes Líquidos de Refinería Esmeraldas, 25 de julio de 2014 (**C-4**); Contrato No. 2014070 para la Contratación de la Ingeniería de Detalle para Merox 200, Merox 300 y Aguas Amargas Z3, 20 de diciembre de 2014 (**C-5**); Contrato Complementario del Programa de Rehabilitación No. 2012036, 28 de septiembre de 2012, cláusula 3.1 (**C-19**); Contrato Complementario del Programa de Rehabilitación No. 2013027, 28 de agosto de 2013, cláusula 4 (**C-20**); Contrato Complementario del Programa de Rehabilitación No. 2014015, 2 de abril de 2014, cláusula 4 (**C-21**); Contrato Complementario del Programa de Rehabilitación No. 2014048, 9 de octubre de 2014, cláusula 4 (**C-22**); Contrato Complementario del Programa de Rehabilitación No. 2015205, 29 de octubre de 2015, cláusula 4 (**C-24**); Contrato Complementario del Sistema de Drenajes No. 2015449, 26 de noviembre de 2015 (**C-25**); Contrato Complementario para Merox No. 2015197, 20 de octubre de 2015 (**C-26**).

[82]   El Comercio, "*Refinería Esmeraldas, a máxima capacidad tras 7 años de rehabilitación*", 18 de diciembre de 2015 (**C-85**).

15 de julio de 2016, Petroecuador y la Demandante convinieron en terminar el Contrato de la Refinería Esmeraldas y sus Contratos Complementarios[83].

### 4) El Proyecto de la Planta Machala

94. El Proyecto de la Planta Machala está ubicado en Bajo Alto, provincia de El Oro, en el noroeste del Ecuador. Suministra gas de petróleo licuado a tres de las ciudades más grandes del Ecuador[84].

95. Conforme a la Resolución No. 396-ARCH-2013 de la Agencia de Regulación y Control Hidrocarburífero del Ecuador, Petroecuador debía ejecutar una inspección técnica y fiscalización de los trabajos realizados en el Proyecto de la Planta Machala[85].

96. En febrero de 2014, Petroecuador preseleccionó e invitó a Worley a presentar una oferta para un contrato de inspección técnica y fiscalización de los trabajos en el Proyecto de la Planta Machala en nombre de Petroecuador[86]. Worley presentó su oferta el 20 de febrero de 2014[87].

97. El 5 de marzo de 2014, mediante el Giro Específico del Negocio, Petroecuador y Worley suscribieron un contrato conforme al cual Worley suministraría los servicios antes mencionados (el "**Contrato de la Planta Machala I**")[88]. En el marco del Contrato de la Planta Machala I, Petroecuador aceptó remunerar a la Demandante por las actividades realizadas mensualmente, con un precio máximo del contrato de aproximadamente USD 1.057.286[89].

98. El Contrato de la Planta Machala I disponía que las partes contratantes podían suscribir contratos complementarios por causas justificadas[90]. En virtud de esta disposición, Petroecuador y la Demandante suscribieron dos contratos complementarios el 1 de agosto y el 14 de noviembre de 2014 (los "**Contratos Complementarios de la Planta Machala**"), en los que se estipuló un

---

[83]   Oficio No. 18396-CCI-OSC-2016 de Petroecuador a Worley, 30 de junio de 2016 (**C-168**); Carta de Worley a Petroecuador, No. 408005-00445-00.0-PM-LTR-WPI-EPP-13055, 15 de julio de 2016 (**C-169**).

[84]   La Hora, "Bajo Alto cuenta con la primera Planta de Licuefacción en Latinoamérica", 21 de enero de 2011 (**C-128**).

[85]   Contrato de la Planta Machala I, cláusulas 1.4-1.5 (**C-6**); La Hora, "*Bajo Alto cuenta con la primera Planta de Licuefacción en Latinoamérica*", 21 de enero de 2011 (**C-128**).

[86]   Contrato de la Planta Machala I, cláusula 21 (**C-6**); Pliegos para la Asesoría Técnica Especializada para la Planta de Gas Natural Licuado, RE-005-EPP-OSC-S-14, 20 de febrero de 2014, págs. C-127_005-009 (**C-127**).

[87]   Propuesta comercial de Worley para la Asesoría Técnica Especializada para la Planta de Gas Natural Licuado, 20 de febrero de 2014, pág. 1 (**C-129**).

[88]   Contrato de la Planta Machala I, cláusula 4 (**C-6**).

[89]   Contrato de la Planta Machala I, cláusulas 5-6 (**C-6**).

[90]   Contrato de la Planta Machala I, cláusula 17,1 (**C-6**).

aumento de la remuneración de la Demandante en USD 250.740,00 y USD 489.169,84, respectivamente[91].

99. El 3 de julio de 2018, Petroecuador y la Demandante firmaron un acta por la que confirmaban la recepción definitiva de los servicios técnicos prestados por la Demandante de conformidad con el Contrato de la Planta Machala I y sus Contratos Complementarios[92].

100. El 6 de junio de 2015, al amparo del Giro Específico del Negocio[93], Petroecuador y la Demandante suscribieron un segundo contrato para la prestación de asesoría técnica especializada en la Planta de Licuefacción (el "**Contrato de la Planta Machala II**" y, junto con el Contrato de la Planta Machala I, los "**Contratos de la Planta Machala**")[94]. El Contrato de la Planta Machala II preveía un plazo de ejecución de 365 días y un precio contractual máximo de USD 1.799.660,00[95].

101. El 25 de junio de 2018, Petroecuador y la Demandante firmaron un acta en la que confirmaban la recepción definitiva de los servicios técnicos prestados por la Demandante de conformidad con el Contrato de la Planta Machala II[96].

### 5) El Proyecto Monteverde

102. El Proyecto Monteverde, localizado en la provincia de Santa Elena, implicó la construcción de una terminal de gas con un muelle para la descarga de propano y butano[97].

103. El 13 de agosto de 2015, Worley presentó una propuesta a Petroecuador en la que detallaba las obras que serían necesarias para finalizar el proyecto[98].

---

[91]  Convenio de Pago de Machala No. 2015006, 4 de diciembre de 2015 (**C-9**); Contrato Complementario de la Planta Machala I No. 2014191, 1 de agosto de 2014, cláusulas 2-4 (**C-27**); Contrato Complementario de la Planta Machala I No. 2014286, 14 de noviembre de 2014, cláusulas 2-3 (**C-28**).

[92]  Acta Entrega Recepción Definitiva de la Planta Machala I, 3 de julio de 2018 (**C-173**).

[93]  Contrato de la Planta Machala II, cláusulas 1.4-1.8, 1.12-1.15 (**C-7**).

[94]  Contrato de la Planta Machala II (**C-7**).

[95]  Contrato de la Planta Machala II, cláusula 1.24 (**C-7**).

[96]  Acta de recepción definitiva de la Planta Machala II, 25 de junio de 2018 (**C-174**).

[97]  Ekosnegocios.com, "Sistema de GLP, Monteverde-Chorrillo, Una megaobra que beneficia a todo el Ecuador", noviembre de 2014, pág. C-18_31 (**C-18**).

[98]  Carta de Worley a Petroecuador, 13 de agosto de 2018, págs. 35-40 (**C-10**).

104. El 27 de agosto de 2015, Petroecuador aceptó la propuesta de Worley y le solicitó que presentase un formulario de Autorización de Ingreso de Personal, en el que se identificaría al personal que participaría en el Proyecto Monteverde[99].

105. A pesar de la participación de la Demandante en este proyecto entre diciembre de 2015 y abril de 2016[100], Worley y Petroecuador nunca celebraron un contrato formal para fijar los plazos y las condiciones del contrato. Según la Demandante, no se adoptó ningún acuerdo por escrito porque Petroecuador ignoró reiteradamente las solicitudes de Worley en tal sentido[101]. La Demandada refuta que no se celebró ningún contrato por escrito porque la Demandante no obtuvo el consentimiento de un empleado autorizado a obligar a Petroecuador[102].

106. La Demandante sostiene que sus obras para el Proyecto Monteverde se interrumpieron de forma prematura el 29 de abril de 2016 a solicitud de Petroecuador[103].

107. Según la Demandante, se adeuda cerca de USD 615.000 a Worley por la prestación de sus servicios en relación con el Proyecto Monteverde[104].

## 3.   LA SUSPENSIÓN DE LOS PAGOS A WORLEY

108. En abril de 2016, el Consorcio Internacional de Periodistas de Investigación emitió un informe con conclusiones extraídas de un caudal de 11,5 millones de documentos filtrados del estudio jurídico panameño Mossack Fonseca (los "**Papeles de Panamá**")[105]. En el informe se identificaba a entidades panameñas y a otras entidades en el extranjero que eran propiedad de funcionarios de Petroecuador, incluyendo a Carlos Pareja ("**Sr. Pareja**") y Álex Bravo ("**Sr. Bravo**")[106].

109. A partir de abril de 2016, la Asamblea Nacional del Ecuador inició investigaciones en relación con el escándalo de corrupción que se derivó de los Papeles de Panamá.

110. El 21 de octubre de 2016, el Secretario General Jurídico de la Presidencia de la República del Ecuador envió una comunicación al Gerente General de Petroecuador, Pedro Merizalde

---

[99]   Carta de Worley a Petroecuador, 13 de agosto de 2018, págs. 35, 59 (**C-10**).

[100]   Escrito de Demanda, párr. 97.

[101]   Escrito de Demanda, párr. 95.

[102]   Dúplica, párr. 297.

[103]   Escrito de Demanda, párr. 124; Informe Final de Cierre en Monteverde, 5 de mayo de 2016, pág. 4 (**C-175**).

[104]   Carta de Worley a Petroecuador, 13 de agosto de 2018, pág. 5 (**C-10**).

[105]   Consorcio Internacional de Periodistas de Investigación, *The Panama Papers: Exposing the Rogue Offshore Finance Industry*, 21 de agosto de 2019 (**R-207**); The Guardian, *What You Need to Know About the Panama Papers*, 5 de abril de 2016 (**R-208**).

[106]   Contestación, párr. 234.

("**Sr. Merizalde**"), en la que describía medidas cautelares dictadas por un tribunal ecuatoriano en procedimientos penales por corrupción seguidos en contra de antiguos funcionarios de Petroecuador y, en virtud de ello, solicitaba que instruyese a los funcionarios a su cargo que se abstuvieran de realizar pagos a favor de las entidades que se listaban en la comunicación o sus "empresas vinculadas" (el **Oficio de la Presidencia**")[107]. Tecnazul era una de las empresas listadas. A fin de explicar la decisión de interrumpir el pago a varios contratistas, entre ellos Tecnazul, tras la publicación de los Papeles de Panamá, las Partes describen la información que salió a la luz sobre estos contratistas, la cual se resume en la sección siguiente[108].

111. El 27 de octubre de 2016, Petroecuador notificó a la Demandante la suspensión de todo trámite de negociación y pagos también a Worley, más concretamente que la suspensión afectaría a los pagos en virtud del Contrato de la Refinería Esmeraldas y sus Contratos Complementarios[109]. Petroecuador basó esta decisión en el Oficio de la Presidencia, así como en una decisión del Superintendente de la Refinería Esmeraldas, la cual identificaba a la Demandante en la categoría de empresa "relacionada con" Tecnazul[110].

112. Si bien el nombre de Worley no figuraba en el Oficio de la Presidencia, se agregó a mano a una copia impresa de ese oficio (el "**Memorando de Petroecuador**")[111]. La Demandante sostiene que no se ha dado ninguna explicación sobre la adición del nombre de Worley, los criterios utilizados para determinar que Worley estaba "relacionada con" Tecnazul, o el motivo por el cual una relación semejante justificaba la interrupción de los pagos[112].

113. La Demandada sostiene que desconoce el motivo por el que se añadió a mano el nombre de Worley a la lista de entidades a las que no podía realizarse pagos pero sostiene que la decisión de agregar el nombre de Worley fue producto de una "interpretación unilateral" del Superintendente de la Refinería Esmeraldas, más que de una influencia indebida ejercida por la Presidencia[113].

---

[107]   Oficio No. T.J.901-SGJ-16-624 de Alexis Mera, 21 de octubre de 2016 (**C-36**).

[108]   Contestación, párrs. 236-268.

[109]   Correo electrónico de Leoncio Córdova (Petroecuador) a Azdrubal Calero, Alejandro Guerrero, 27 de octubre de 2016 (**C-149**).

[110]   Informe del Contrato Complementario del Programa de Rehabilitación, Memorando No. 00261-OPE-REE-MAN-PMR-2017, 30 de marzo de 2017, págs. 25-26 (**C-38**); Correo electrónico de Leoncio Córdova (Petroecuador) a Azdrubal Calero, Alejandro Guerrero, 27 de octubre de 2016 (**C-149**).

[111]   Memorando de Petroecuador No. 00402-RREF-REE-IRE-2016, 28 de octubre de 2016 (**C-406**).

[112]   Escrito de Demanda, párrs. 106, 112; Réplica, párr. 268; Dúplica sobre Jurisdicción, párr. 88.

[113]   Dúplica, párrs. 316-317.

Worley responde que la Demandada no ha probado que ningún funcionario escribiera el nombre de Worley en el memorando, a pesar de que el memorando provenía de la Superintendencia[114].

114. La Demandante afirma que los siguientes pagos por servicios prestados siguen pendientes como consecuencia Del Oficio de la Presidencia:

    (i)     Los pagos adeudados a tenor del Contrato de la Refinería del Pacífico representan cerca de USD 37.000.000[115].

    (ii)    Los pagos pendientes en relación con el Proyecto de la Refinería Esmeraldas superan los USD 40.000.000[116].

    (iii)   Los pagos pendientes a tenor de los Contratos de la Planta de Licuefacción Machala suman USD 2.048.424[117].

    (iv)   El pago por las obras realizadas para el Proyecto Monteverde excede los USD 615.000[118].

115. Las Partes discrepan en cuanto a si el Oficio de la Presidencia es la causa del presunto impago y la responsabilidad que emana del mismo.

116. La Demandante sostiene que la emisión del Oficio de la Presidencia desencadenó la interrupción de los pagos a Worley por parte de RDP y Petroecuador en el marco de los Contratos entre las partes, con lo cual Ecuador debe responder por el impago[119].

117. En primer lugar, según la Demandante, el Oficio de la Presidencia instruyó a Petroecuador y a RDP que se abstuvieran de realizar pagos a Worley[120]. En su opinión, la Demandada no ha aportado prueba de que la decisión de no remunerar a Worley fuera producto de la interpretación unilateral del Superintendente de la Refinería Esmeraldas (según se expresa en el Memorando de Petroecuador) y no de las órdenes del Presidente de la República[121]. De hecho, afirma Worley,

---

[114]    Réplica, párr. 269.

[115]    Notificación de Arbitraje, párr. 30; Escrito de Demanda, párr. 117; Acta de Determinación de Valores de RDP, 22 de marzo de 2019, cláusula 3 (**C-117**).

[116]    Escrito de Demanda, párr. 121; Informe de Branch, párr. 6 (**CER-2**).

[117]    Escrito de Demanda, párrs. 122-123; Acta Entrega Recepción Definitiva de la Planta Machala I, pág. 3 (**C-173**); Acta de Recepción Definitiva de la Planta Machala II, 25 de junio de 2018, pág. 3 (**C-174**).

[118]    Escrito de Demanda, párr. 124; Informe de Branch, párr. 6 (**CER-2**).

[119]    Escrito de Demanda, párrs. 106-125; Réplica, párrs. 265-276.

[120]    Escrito de Demanda, párrs. 106-125; Réplica, párr. 267; Dúplica sobre Jurisdicción, párr. 3; Oficio No. T.J.901-SGJ-16-624 de Alexis Mera, 21 de octubre de 2016 (**C-36**).

[121]    Réplica, párr. 269.

varios documentos prueban que Petroecuador y RDP interpretaron el Oficio de la Presidencia como una orden de interrupción de pagos[122].

118. En segundo lugar, para la Demandante, la mal llamada supuesta "falta de liquidez" que sufrieron RDP y Petroecuador, que la Demandada cita como el motivo central de la falta de pago ya mencionada, se desprende presuntamente de la negativa del Ministerio de Finanzas a desembolsar fondos anteriormente aprobados y asignados para remunerar a Worley[123].

119. En último lugar, en lo concerniente a la responsabilidad, la Demandante sostiene que la Demandada mantiene control *de facto* sobre RDP y Petroecuador, de modo que la Demandada puede ser obligada a responder por sus deudas[124].

120. La Demandada discrepa con la Demandante[125]. Para la Demandada, la omisión del nombre de Worley del Oficio de la Presidencia implica que Worley intenta erróneamente responsabilizar al Ecuador por la interpretación independiente que realizó Petroecuador del Oficio[126]; en su opinión, ninguno de los documentos presentados por la Demandante expresa orden alguna de interrumpir los pagos a Worley[127].

---

[122] Escrito de Demanda, párrs. 109-110, 112; Réplica, párrs. 270-273; Informe Final Técnico Económico del Contrato para el Programa de Rehabilitación, Memorando No. 00518-OPE-REE-MAN-PMR-2017, 1 de agosto de 2017, pág. 29 (**C-34**); Informe del Contrato y Complementarios del Programa de Rehabilitación, Memorando No. 00261-OPE-REE-MAN-PMR-2017, 30 de marzo de 2017, párrs. 25-26 (**C-38**); Intercambio de correos electrónicos de WorleyParsons con el asunto del Oficio No. T.J.901-SGJ-16-624, 10 de noviembre de 2016, Correo electrónico de Worley (**R-231**); Memorando de Petroecuador No. 00010-RREF-REE-IRE-2017, 9 de enero de 2017, pág. 4 (**R-262**); Memorando de Petroecuador No. 00402-RREF-REE-IRE-2016, 28 de octubre de 2016 (**C-406**); Informe Contrato y Complementarios del Programa de Rehabilitación, Memorando No. 00794-OPE-REE-MAN-PMR-2017, 4 de diciembre de 2017, pág. 25 (**C-576**); Informe de Gestión - Rendición de Cuentas de Petroecuador 2018, 2018, pág. 61 (**C-691**); Memorando de Petroecuador, 8 de noviembre de 2016 (**C-835**).

[123] Réplica, párrs. 228-230; Acta Resolutiva No. 008, 14 de abril de 2016 (**C-500**); Estados Financieros Auditados de Petroecuador para 2017 y 2018, 23 de diciembre de 2018, pág. 31 (**C-690**); El Universo, "Pese a que Ecuador ofreció el petróleo como garantía, no se redujeron las tasas de interés", 11 de diciembre de 2017 (**C-874**); Declaración de Parker II, párr. 25 (**CWS-4**).

[124] Escrito de Demanda, párrs. 276-300.

[125] Contestación, párrs. 393-400; Dúplica, párrs. 229-243, 309-325.

[126] Dúplica, párr. 315.

[127] Dúplica, párrs. 319-321; Intercambio de correos electrónicos de WorleyParsons con el asunto *Oficio No. T.J.901-SGJ-16-624*, 11 de noviembre de 2016 (**R-231**); Certificación de Petroecuador sobre el Oficio 16-624 y el Memorando del Superintendente, 30 de mayo de 2022, págs. 1, 2, 4 (**R-409**); Informe Final Técnico Económico del Contrato para el Programa de Rehabilitación, 1 de agosto de 2017, pág. 29 (**C-34**); Informe del Contrato y Complementarios del Programa de Rehabilitación, Memorando No. 00261-OPE-REE-MAN-PMR-2017, 30 de marzo de 2017, pág. 26 (**C-38**); Informe del Contrato y Complementarios del Programa de Rehabilitación, Memorando No. 00794-OPE-REE-MAN-PMR-2017, 4 de diciembre de 2017, pág. 26 (**C-576**); Memorando de Petroecuador, 8 de noviembre de 2016, págs. 1, 2 (**C-835**).

121.   En primer lugar, la Demandada observa que RDP realizó un pago por USD 5 millones a Worley en enero de 2017 (es decir, meses después de que se dictase el Oficio de la Presidencia)[128]. Ecuador reflexiona que si el Oficio de la Presidencia hubiese ordenado realmente detener todos los pagos a Worley, Petroecuador no habría buscado negociar con Worley un medio mutuamente aceptable para liquidar el contrato[129].

122.   En segundo lugar, la Demandada sostiene también que los motivos para la suspensión de los pagos no guardaron relación con el Oficio de la Presidencia: el motivo principal del impago de las deudas a Worley por parte de RDP y Petroecuador es que ambas entidades tienen y han tenido problemas de liquidez, que eran de conocimiento de Worley[130]. La Demandada observa que unos cinco meses antes de que se dictara el Oficio de la Presidencia, Petroecuador recomendó liquidar el Contrato de la Refinería Esmeraldas debido a su "incapacidad para aceptar trabajo adicional por encima del presupuesto del contrato durante el año 2016[131]". Conforme a la Demandada, esta liquidación habría implicado la suspensión de los pagos a Worley[132].

123.   A este respecto, la Demandada considera infundada la insinuación de la Demandante de que la negativa del Ministerio de Finanzas a desembolsar fondos a Petroecuador y RDP fuera la causa de la supuesta falta de liquidez e, incluso si hipotéticamente el Ministerio de Finanzas hubiese suministrado tales fondos, no podría haber controlado la manera en que Petroecuador los utilizó[133].

124.   La Demandada cita otros motivos por el impago, tales como: (i) el incumplimiento por parte de la Demandada de los requisitos obligatorios para obtener el pago[134]; (ii) la superación en varios de los Contratos del límite de subcontratación máximo conforme a la Ley Orgánica del Sistema Nacional de Contratación Pública del Ecuador (la "**Ley de Contratación Pública**")[135]; (iii) la subcontratación de Tecnazul por parte de Worley sin la autorización previa de Petroecuador[136];

---

[128]   Contestación, párr. 397; Dúplica, párr. 232; Declaración de Elizondo, párrs. 22, 24 (**CWS-1**).

[129]   Dúplica, párr. 325; Informe de Andrade II, párrs. 107-108 (**RER-4**).

[130]   Dúplica, párr. 217.

[131]   Contestación, párr. 157; Dúplica, párr. 311; Memorando No. 00356-OPE-REE-MAN-PMR-2016 de Petroecuador, 24 de mayo de 2016, pág. 7 (**R-151**) (traducción del Tribunal).

[132]   Dúplica, párr. 311.

[133]   Dúplica, párrs. 225-227, 300; Recibos bancarios de RDP que muestran la fuente del pago de USD 5 millones a Worley, 3 de octubre de 2017 (**R-479**).

[134]   Dúplica, párrs. 244-249, 259.

[135]   Dúplica, párr. 291; Ley de Contratación Pública, artículo 79 (**RLA-52**).

[136]   Dúplica, párr. 291; Contrato de la Planta Machala I, cláusula 13.1 (**C-6**); Carta de Worley a Petroecuador, 13 de agosto 2018, pág. C-10_31 (**C-10**); Informe de Auditoría No. DASE-0066-2015 de la Contraloría General del Estado, 18 de diciembre de 2015, pág. 34 (**R-62**); Contrato de la Planta Machala II, cláusula 12.1 (**R-186**).

(iv) la solicitud de pago por parte de la Demandante por servicios que estaban fuera del alcance de los Contratos o para los cuales no hay registro de nóminas[137]; y (v) la inexistencia de un derecho a pago hasta la resolución de toda controversia relativa a cantidades adeudadas mediante el procedimiento obligatorio previsto en la Ley de Contratación Pública[138].

125. En último lugar, la Demandada observa que el Oficio de la Presidencia no tiene fuerza de ley en el derecho ecuatoriano, por lo que RDP y Petroecuador no estaban obligados a cumplirlo[139]. En todo caso, la Demandada sostiene que no era una de las partes de los Contratos de Worley y que los actos de RDP o Petroecuador no le son atribuibles; por ende, Ecuador no podía cumplir las obligaciones contractuales de esas entidades ni responder por sus actos[140].

### 4. LOS PROCEDIMIENTOS JUDICIALES Y ADMINISTRATIVOS QUE INVOLUCRARON A LAS PARTES

126. La Demandante alega que la Demandada encaró una "campaña de hostigamiento" en su contra mediante procedimientos e investigaciones iniciadas por la Contraloría General, la Fiscalía General y el SRI[141]. Según la Demandante, esos actos representan incumplimientos de varios estándares consagrados en el Tratado, tales como trato justo y equitativo —artículo II.3 a) —[142] la prohibición de la expropiación ilegal —artículo III.1—[143] protección y seguridad plenas —artículo III.3 a)—[144] y obligación de no menoscabar —artículo II.3 b)—[145]. La Demandada rechaza la descripción de la Demandante de los acontecimientos subyacentes y de cada uno de los citados procedimientos[146].

127. Los acontecimientos surgidos en torno a dichos procedimientos y los procedimientos conexos de exhibición documental (*discovery*) iniciados por Petroecuador contra Worley ante las autoridades judiciales de los Estados Unidos se resumen a continuación.

---

[137]  Dúplica, párrs. 261, 287.

[138]  Dúplica, párr. 289.

[139]  Contestación, párr. 395; Informe de Andrade I, párr. 103 (**RER-1**).

[140]  Contestación, párr. 468; Dúplica, párrs. 192-195, 198-199, 201-204, 208, 250-254, 307; Estatutos de RDP, 15 de julio de 2008, artículos 13, 16, 19(2)-(3), (8), 39 (**R-116**); Oficio No. 00104-RDP-2011 de RDP, 26 de enero de 2011 (**R-125**); Decreto Ejecutivo No. 315, artículo 1 (**R-143**); Decreto Ejecutivo 1221, artículo 1 (**R-144**); Contrato de la Refinería RDP, pág. C_8_173 (**C-8**); Plan Nacional de Desarrollo 2007-2010, pág. 42 (**C-56**); Informe de Andrade I, párr. 16 (**RER-1**).

[141]  Escrito de Demanda, párrs. 171, 186, 215-216, 251-255, 329; Réplica, párrs. 39, 575, 624.

[142]  Escrito de Demanda, párr. 259; Réplica, párrs. 612-617.

[143]  Escrito de Demanda, párrs. 311, 329.

[144]  Escrito de Demanda, párrs. 351-352; Réplica, párr. 703.

[145]  Escrito de Demanda, párrs. 363-364; Réplica, párrs. 714, 720.

[146]  Contestación, párrs. 366-373, 407-410, 438, 484-501; Dúplica, párr. 562.

**1) La Contraloría General fiscaliza los Proyectos de Worley en Ecuador**

128.  A partir de 2016, la Contraloría General del Ecuador dictó una serie de resoluciones en las que establecía que la Demandante debía responder por ciertas acciones y omisiones relacionadas con su cumplimiento de los Contratos con RDP y Petroecuador (las "**Resoluciones de la Contraloría General**")[147].

129.  Según la Demandante, las resoluciones de la Contraloría General confirmaron la responsabilidad civil de Worley por millones de dólares por los siguientes motivos, entre otros: (i) una categoría de trabajo adjudicada por Petroecuador en uno de los Contratos Complementarios de la Refinería Esmeraldas ya estaba contemplada en el alcance del Contrato de la Refinería Esmeraldas[148]; (ii) el precio de un contrato para obras de ingeniería en relación con las plantas de aguas en la Refinería Esmeraldas era superior al presupuesto estimado para las obras complementarias en el proyecto estipulado en dicho documento[149]; (iii) Worley recomendó a contratistas externos que, previa aprobación y contratación, cobraron por encima del presupuesto previsto por Petroecuador para los servicios prestados[150]; y (iv) Worley no cumplió correctamente su función como administrador del contrato con respecto a la supervisión de los subcontratistas[151].

130.  En términos generales, la Demandante critica estos procedimientos[152]. Según la Demandante, la Contraloría General inició estos procesos como pretexto para permitir que Ecuador dejara de cumplir con sus obligaciones de pago respecto de Worley, si bien la Demandante sostiene que no hay fundamento legal que sustente la suspensión de las obligaciones de pago derivadas de un contrato a raíz de una auditoría o investigación en curso[153]. Del mismo modo, la Demandante

---

[147]  Escrito de Demanda, párrs. 126-164.

[148]  Escrito de Demanda, párr. 136; Resolución de la Contraloría General No. 15447, 21 de noviembre de 2018 (**C-186**); Resolución de la Contraloría General No. 15446, 21 de noviembre de 2018 (**C-216**).

[149]  Resolución de la Contraloría General No. 15339, 15 de noviembre de 2018 (**C-185**).

[150]  Resolución de la Contraloría General No. 15112, 24 de octubre de 2018 (**C-49**); Resolución de la Contraloría General No. 15346, 15 de noviembre de 2018 (**C-181**); Resolución de la Contraloría General No. 15615, 26 de diciembre de 2018, pág. 3 (**C-184**); Resolución de la Contraloría General No. 5438, 21 de noviembre de 2018 (**C-341**); Resolución de la Contraloría General No. 5437, 21 de noviembre de 2018 (**C-342**); Resolución de la Contraloría General No. 20834, 4 de noviembre de 2021 (**C-543**).

[151]  Resolución de la Contraloría General No. 15346, 15 de noviembre de 2018 (**C-181**).

[152]  Dúplica sobre Jurisdicción, párr. 278.

[153]  Escrito de Demanda, párrs. 126-127; Oficio No. RDP-ADC-WPR-111011-0509-OFI de RDP a Worley, 29 de enero de 2019 (**C-166**).

menciona que los Contralores Generales que aprobaron las contingencias para Worley, Carlos Pólit y Pablo Céli de la Torre, han sido investigados y enjuiciados por corrupción[154].

131. Respecto del fondo de las resoluciones de la Contraloría General, la Demandante afirma que la mayor parte de las conclusiones de responsabilidad ignoran los plazos impuestos por el derecho ecuatoriano[155]. Asimismo, sostiene que la Contraloría General no analizó la causalidad ni los daños y perjuicios, sino que fijó responsabilidades arbitrarias infundadas[156].

132. La Demandada considera que las pretensiones de Worley son "selectivas"[157]. Indica que se auditaron los contratos y servicios de muchos otros contratistas de RDP y Petroecuador[158]. La Demandada observa también que la Demandante impugnó ante los tribunales ecuatorianos las resoluciones de la Contraloría General y recibió fallos a su favor en dos casos[159]. En último lugar, la Demandada menciona que, en una auditoría, la Contraloría General concluyó que se adeudaban USD 10,3 millones adicionales a Worley[160].

### 2) El SRI audita las declaraciones del impuesto a la renta de Worley

133. El SRI auditó las declaraciones de impuestos de Worley para los ejercicios fiscales 2012, 2014, 2015 y 2016[161]. Si bien en la primera auditoría el SRI concluyó que Worley había declarado correctamente sus gastos y tenía derecho a percibir un crédito tributario[162], en las últimas tres concluyó que la Demandante era responsable y emitió las multas correspondientes[163]. Se

---

[154] Escrito de Demanda, párrs. 102, 133, 194, 252; Réplica, párr. 310; El Universo, "No se instaló audiencia evaluatoria y preparatoria de juicio en el caso Las Torres; hubo pedidos de abogados", 21 de septiembre de 2021 (**C-417**); El Universo, "Procuraduría pidió la ejecución de la sentencia por concusión en contra del excontralor Carlos Pólit", 8 de agosto de 2021 (**C-591**); Associated Press, "Contralor ecuatoriano renuncia desde prisión", 5 de julio de 2021 (**C-592**); El Comercio, "Fiscal Salazar anuncia que hay 18 investigaciones contra excontralor Pablo Céli", 24 de julio de 2021 (**C-593**).

[155] Réplica, párrs. 284, 300 y 303; Corte Nacional de Justicia de Ecuador, Resolución No. 10-2021, 29 de septiembre de 2021, artículos 2, 3 (**C-514**).

[156] Escrito de Demanda, párr. 141 (traducción del Tribunal); Réplica, párr. 306.

[157] Dúplica, párr. 341.

[158] Contestación, párr. 226.

[159] Contestación, párr. 231.

[160] Contestación, párr. 100; Informe de la Contraloría General del Estado No. DAPyA-0005-2016, 22 de enero de 2016, pág. 43 (**R-138**).

[161] Acta de Determinación del SRI No. 17201524900942704, 10 de julio de 2015 (**C-188**); Acta de Determinación del SRI No. 17201824901226744, 6 de noviembre de 2018 (**C-190**); Acta Borrador de Determinación Complementaria del SRI No. DZ9-DEVABCC20-00000003-M, 6 de marzo de 2020 (**C-453**); Acta de Determinación del SRI No. 17201924902740585, 24 de diciembre de 2019 (**R-230**).

[162] Acta de Determinación del SRI No. 17201524900942704, 10 de julio de 2015, pág. C-188_18 (**C-188**); Acta de Determinación del SRI No. 17201824901226744, 6 de noviembre de 2018 (**C-190**); Acta de Determinación del SRI No. 17201924902740585, 24 de diciembre de 2019 (**R-230**); Declaración de Tejada, párrs. 14-15 (**RWS-2**).

[163] Acta de Determinación del SRI No. 17201824901226744, 6 de noviembre de 2018, pág. C-190_068 (**C-190**).

estableció que Worley adeudaba USD 40,5 millones a Ecuador en impuestos y multas impagados[164]. A raíz del interés que se ha acumulado sobre esas obligaciones, la Demandante ahora debe USD 63 millones[165].

134.   Worley afirma que estas auditorías fueron "sospechosas" y decisivas para sus dificultades en la obtención del pago de sus servicios, dado que ocurrieron después de la emisión del Oficio de la Presidencia[166]. Sostiene que el SRI pasó por alto injustificadamente las pruebas presentadas[167].

135.   La Demandante afirma también que la Demandada no cumplió las órdenes del Tribunal en relación con la exhibición de documentos relativos a la decisión del SRI de auditar a Worley. En particular, Worley solicitó y aduce que no recibió: (i) documentos en los que se explique la manera en la que el SRI seleccionó a los contribuyentes que serían objeto de auditorías; (ii) documentos en los que se indique la tasa impositiva correcta aplicable a Worley para los ejercicios fiscales 2011-2016; y (iii) el informe final emitido por el SRI al cierre de una auditoría de las declaraciones tributarias de Worley que se realizó en 2012[168]. Según la Demandante, la negativa a exhibir estos documentos obstaculiza la interpretación del Tribunal de las cuestiones pertinentes[169].

136.   La Demandada sostiene que no hay pruebas de colusión de ningún tipo entre el SRI y otros órganos del Gobierno[170] y afirma que el proceso de auditoría siguió los procedimientos normales del SRI[171]. Según la Demandada, el SRI no ignoró prueba alguna, sino que meramente discrepó con Worley en cuanto al peso que debía dárseles[172].

---

[164]   Acta de Determinación del SRI No. 17201824901226744, 6 de noviembre de 2018 (**C-190**); Acta de determinación del SRI No. 17201924902740585, 24 de diciembre de 2019 (**R-230**); Acta Borrador de Determinación Complementaria del SRI No. DZ9-DEVABCC20-00000003-M, 6 de marzo de 2020 (**C-453**).

[165]   Consulta de Worley sobre transacción impugnada, 17 de enero de 2022 (**C-948**).

[166]   Escrito de Demanda, párr. 181; Réplica, párrs. 322, 324, 327.

[167]   Escrito de Demanda, párrs. 184-185; Réplica, párr. 322; Acta de Determinación de SRI No. 17201824901226744, 6 de noviembre de 2018, pág. C-190_74 (**C-190**).

[168]   Réplica, párrs. 328-329; Orden Procesal No. 4, párrs. 144, 147, 149, 150.

[169]   Réplica, párr. 329.

[170]   Dúplica, párr. 327.

[171]   Escrito de Contestación, párrs. 272-273; Acta de Determinación del SRI No. 17201824901226744, 6 de noviembre de 2018 (**C-190**); Acta de Determinación del SRI No. 17201924902740585, 24 de diciembre de 2019 (**R-230**).

[172]   Dúplica, párr. 334.

### 3) Procedimientos penales en contra de Worley en Ecuador

137. El Fiscal General del Ecuador inició una serie de investigaciones penales contra la Demandante y sus empleados en relación con un presunto abuso y malversación de fondos del Estado[173]. La Demandante sostiene que Ecuador inició al menos 24 investigaciones penales contra los funcionarios de Worley, entre ellos el Gerente de Programas de Worley International Services Inc., Raymond Falcon ("**Sr. Falcon**"), para quien las autoridades ecuatorianas solicitaron a Interpol una notificación roja[174].

138. La Demandante afirma que el único motivo por el cual se ha puesto al Sr. Falcon en el punto de mira es por ser el representante legal de Worley en Ecuador, no porque haya quebrantado la ley[175]. Worley aduce además que, si bien cuatro de las investigaciones penales contra el Sr. Falcon ya se han archivado y el único caso en el que se presentaron cargos en su contra se desestimó, la vida del Sr. Falcon "se ha visto alterada seriamente" y existe la amenaza inminente de nuevas investigaciones[176].

139. El Fiscal General también inició varias investigaciones penales basadas todas en los informes de "indicios de responsabilidad penal" emitidos por la Contraloría General tras sus auditorías y resoluciones, y en informes del SRI y el Consejo Transitorio de Participación Ciudadana y Control Social[177].

140. Worley sostiene que estas investigaciones, muchas de las cuales aún siguen abiertas, "ni remotamente cumplían con el debido proceso" y estuvieron desprovistas de cualquier tipo de base fáctica o jurídica[178]. Asimismo, la Demandante afirma que la Demandada y sus entidades estatales intentan transformar controversias contractuales en cuestiones penales e imputar responsabilidad

---

[173]   Boleta de Notificación de la Fiscalía General a Raymond Falcon, 23 de marzo de 2017 (**C-50**); Notificación de la Función Judicial respecto de la decisión del Fiscal General en relación con Raymond Falcon, 26 de julio de 2017 (**C-51**).

[174]   Escrito de Demanda, párrs. 165, 169; Dúplica sobre Jurisdicción, párr. 84; Boleta de Notificación de la Fiscalía General a Raymond Falcon, 23 de marzo de 2017 (**C-50**).

[175]   Escrito de Demanda, párr. 169.

[176]   Escrito de Demanda, párr. 169 (traducción del Tribunal); Réplica, párr. 315; Boleta de Notificación de la Fiscalía General a Raymond Falcon, 23 de marzo de 2017 (**C-50**); Notificación de la Función Judicial respecto de la decisión del Fiscal General en relación con Raymond Falcon, 26 de julio de 2017 (**C-51**); Auto de Sobreseimiento dictado a favor de Raymond Falcon por el Juzgado de Garantías Penales, Juicio No. 17294-2017-00003, 2 de agosto de 2017 (**C-443**).

[177]   Escrito de Demanda, párrs. 166, 170-171; Réplica, párr. 314.

[178]   Escrito de Demanda, párrs. 166, 174-175; Réplica, párr. 315.

a Worley por las acciones o las omisiones de otras partes, incluidos terceros contratistas, respecto de los cuales Worley carecía de control[179].

141. Según la Demandada, gran parte de la información relacionada con estas investigaciones penales es confidencial bajo el derecho ecuatoriano, por lo que la Demandada tiene capacidad limitada para responder a las acusaciones de la Demandante[180].

**4) Procedimientos civiles incoados en contra de Worley ante tribunales de los Estados Unidos**

142. El 26 de agosto de 2019, Petroecuador inició un procedimiento judicial contra la Demandante mediante una solicitud *ex parte* ante la Corte de Distrito de los Estados Unidos para el Distrito Sur de Texas (División de Houston) en virtud del título 28 § 1782 del Código de los EE. UU. (el "**Procedimiento bajo la §1782**")[181]. Petroecuador solicitó una orden instruyendo a la Demandante a prestar testimonio y exhibir documentos para uso en "procedimientos e investigaciones en curso en Ecuador relativos a un entramado complejo, transfronterizo e ilegal de corrupción y cohecho perpetrado contra Petroecuador[182]".

143. Como resultado de la solicitud de Petroecuador bajo la § 1782, la Corte de Distrito dictó una orden de exhibición de documentos contra Worley, que el Procurador General del Ecuador describió como una "sentencia favorable para el Estado"[183].

144. La Demandante sostiene que la Demandada intentó obtener acceso a dichos documentos no para los fines propios del Procedimiento bajo la § 1782, sino para fortalecer su posición en el presente arbitraje[184]. Asimismo, recuerda que varios de los anexos documentales introducidos por la Demandada en el presente arbitraje se obtuvieron por medio del Procedimiento bajo la § 1782; en la medida en que la Demandada utiliza dichos documentos para alegar que Worley fue partícipe de la corrupción, la Demandante sostiene que se descontextualizan los documentos[185].

145. Durante la tramitación del presente arbitraje, la Demandante ha descrito el Procedimiento bajo la § 1782 en varias ocasiones como "una *fishing expedition* y acoso" contra la Demandante y en tal

---

[179] Escrito de Demanda, párrs. 167-168.

[180] Contestación, párr. 233.

[181] Solicitud de Worley sobre *discovery* al amparo del título 28 U.S.C. § 1782, 26 de agosto de 2019, pág. C-52_002 (**C-52**).

[182] Solicitud de Worley sobre *discovery* al amparo del título 28 U.S.C. § 1782, 26 de agosto de 2019 (**C-52**) (traducción del Tribunal). (traducción del Tribunal).

[183] Procuraduría General del Estado, Rendición de Cuentas 2020, 2020, sección 2.2.1.2 (**C-729**).

[184] Réplica, párr. 35.

[185] Réplica, párr. 386.

sentido ha solicitado que el Tribunal ordene a la Demandada "que se abstenga de agravar la controversia". En respuesta a tales solicitudes, el Tribunal ha instruido a las Partes en varias ocasiones que eviten agravar su disputa[186], reservándose a la vez su decisión sobre si el recurso continuado a dicho procedimiento infringe esta instrucción[187].

5.   **LAS ALEGACIONES DE CORRUPCIÓN E ILEGALIDAD**

146.   La Demandada destaca varias instancias de actos corruptos e ilegales presuntamente cometidos por Worley, que la Demandante niega. Según se detalla más adelante en la Sección V *infra*, estas alegaciones forman la base de: (i) la objeción de la Demandada a la jurisdicción del Tribunal sobre la base de que las supuestas inversiones de la Demandante están viciadas por corrupción, fraude y mala fe y, por ello, no están protegidas por el Tratado; y (ii) la objeción de la Demandada a la admisibilidad de las pretensiones de la Demandante también sobre la base de la presunta conducta corrupta de la Demandante.

147.   En esta sección se resume primero la información que salió a la luz como resultado de los Papeles de Panamá y las investigaciones de la Demandada que derivaron en la interrupción de los pagos a varias entidades por razones de corrupción. Le sigue una descripción de los hechos subyacentes a la supuesta corrupción e ilegalidad de la Demandante *al momento de realizar* la supuesta inversión y continúa con los hechos que respaldan la alegación de conducta corrupta *durante la operación* de la citada inversión.

1)   **Información de los Papeles de Panamá y las investigaciones de la Demandada**

148.   Tras la publicación de los Papeles de Panamá, la Demandada inició investigaciones contra varias entidades con presencia en Ecuador por motivos de corrupción. Según la Demandada, como se indica en mayor detalle más adelante, dichas entidades están vinculadas de maneras relevantes con la Demandante, uno o más de sus representantes u otros empleados de Worley.

i.   Tecnazul

149.   Según la Demandada, las investigaciones que siguieron a la publicación de los Papeles de Panamá revelaron que Tecnazul utilizó cuentas en el extranjero en Panamá y Suiza para pagar más de

---

[186]   Orden Procesal No. 2, 13 de enero de 2020, párr. 28(i); Orden Procesal No. 4, 1 de noviembre de 2021, párrs. 13-14; Orden Procesal No. 5, 14 de marzo de 2022, párr. 127(iv); Laudo Parcial, párr. 243(iii).

[187]   Orden Procesal No. 4, 1 de noviembre de 2021, párrs. 13-14.

USD 1 millón en sobornos a varios antiguos funcionarios de Petroecuador, entre los que se encontraban[188]:

(i)      El **Sr. Pareja**, Gerente de la Gerencia de Refinación entre 2012 y 2015, quien negoció y aprobó el Contrato de la Refinería Esmeraldas de Worley y firmó cinco de los Contratos Complementarios[189].

(ii)     El **Sr. Bravo**, Coordinador de Proyectos de la Gerencia de Refinación entre 2011 y 2015. El Sr. Bravo fue el "administrador del contrato" para la Refinería Esmeraldas y sus Contratos Complementarios[190].

(iii)    Marco Calvopiña ("**Sr. Calvopiña**"), Gerente General de Petroecuador en noviembre de 2011, momento en el cual se adjudicó a Worley el Contrato de la Refinería Esmeraldas[191].

(iv)     Diego Tapia ("**Sr. Tapia**"), Gerente de la Gerencia de Refinación, quien firmó el quinto contrato complementario al Contrato de la Refinería Esmeraldas de Worley[192] y los Contratos de la Planta Machala[193].

(v)      Arturo Escobar ("**Sr. A. Escobar**"), Coordinador General de Gestión Empresarial en la Gerencia de Refinación entre marzo de 2012 y septiembre de 2014[194].

150.   La Demandada sostiene que Tecnazul transfirió fondos de entidades en otros países que eran propiedad de sus directores a otras entidades que eran propiedad o que estaban bajo el control de los citados funcionarios de Petroecuador. Las entidades que presuntamente recibieron los sobornos fueron: (i) GIRBRA, entidad panameña propiedad del Sr. Bravo ("**GIRBRA**"); y (ii) ESCART, S.A., entidad panameña propiedad del Sr. A. Escobar ("**ESCART**")[195].

---

[188]    Contestación, párr. 239.
[189]    Contestación, párr. 240.
[190]    Contestación, párr. 240.
[191]    Contestación, párr. 240.
[192]    Contestación, párr. 240.
[193]    Contestación, párr. 240.
[194]    Contestación, párr. 240.
[195]    Contestación, párr. 241.

151. Según la Demandada, las investigaciones posteriores también determinaron que la empresa del Sr. Bravo, GIRBRA, transfirió parte de los fondos que recibió. Alega que, entre 2013 y 2015, GIRBRA realizó las siguientes transferencias desde su cuenta en Helm Bank en Panamá[196]:

   (i)     USD 375.500 a Carlos Andrés Pareja (hijo del Sr. Pareja) a una cuenta de Bank of America.

   (ii)    USD 462.500 a Yolanda Rosa Pareja (esposa del Sr. Pareja) a una cuenta en Bank of America.

   (iii)   USD 50.000 a CAPAYA, S.A., entidad propiedad del Sr. Pareja, a una cuenta de Capital Bank de Panamá;

   (iv)    USD 676.500 a ESCART a una cuenta en Capital Bank de Panamá; y

   (v)     USD 3,9 millones a la otra cuenta bancaria de GIRBRA en Capital Bank de Panamá.

152. En agosto de 2016, Worley interrumpió el pago a Tecnazul por sus servicios subcontratados en el marco de los Contratos sobre la base de que "Tecnazul [i]ncumplió [s]ustancialmente el [s]ubcontrato al [incurrir] en prácticas corruptas[197]". Si bien no había cargos pendientes contra Tecnazul en Ecuador, Worley citó las "alegaciones de la participación de [Tecnazul] en el escándalo de corrupción[198]". Posteriormente, Worley aceptó reanudar los pagos a Tecnazul si declaraba que había "cumplido plenamente con el Código de Conducta de Worley[199]".

153. El 22 de marzo de 2017, Tecnazul inició un arbitraje contra Worley en el que reclamaba USD 34 millones "en concepto de compensación por el trabajo realizado por Tecnazul de conformidad con el Subcontrato de la Refinería del Pacífico, el Subcontrato de la Refinería Esmeraldas, los Subcontratos de Machala y el Subcontrato por la construcción del sistema de drenajes[200]". De esta cantidad, USD 10,8 millones eran por trabajos supuestamente realizados para el Proyecto de la Refinería del Pacífico, mientras que los restantes USD 23,2 millones eran para trabajos realizados

---

[196]   Contestación, párr. 243.

[197]   Notificación de arbitraje de Tecnazul, 22 de marzo de 2017, párr. 9 (**R-284**); Contestación de WorleyParsons, 22 de julio de 2019, párr. 65 (**R-285**).

[198]   Contestación de WorleyParsons, 22 de julio de 2019, párrs. 36-37 (**R-285**) (traducción del Tribunal).

[199]   Contestación de WorleyParsons, 22 de julio de 2019, párr. 36 (**R-285**).

[200]   Notificación de arbitraje de Tecnazul, 22 de marzo de 2017, párr. 16(a) (**R-284**) (traducción del Tribunal).

en los otros proyectos[201]. Según la Demandada, Worley logró la desestimación por causales jurisdiccionales de las pretensiones relativas a los proyectos de Petroecuador[202].

154.  En el arbitraje contra Worley, Tecnazul sostuvo que USD 7,9 millones de los aproximadamente USD 10,8 millones de la pretensión relativa a la Refinería del Pacífico están en disputa en este arbitraje[203]. Si Tecnazul está en lo correcto, dice la Demandada, Worley busca el pago en este arbitraje de al menos USD 7,9 millones que se niega a pagar a Tecnazul en conexión con el Proyecto de la Refinería del Pacífico. Tecnazul sostuvo además que RDP ya pagó a Worley la diferencia entre ambas cantidades: USD 2,9 millones[204].

155.  En respuesta a la descripción de Ecuador de las prácticas corruptas en las que participó Tecnazul, así como de los supuestos vínculos de Tecnazul con Worley, la Demandante sostiene que Ecuador erróneamente ignoró muchas décadas de experiencia laboral de Tecnazul en proyectos de infraestructura en Ecuador, así como con otras sociedades multinacionales[205].

156.  La Demandante observa que en ningún momento del proceso licitatorio ninguno de los órganos, las agencias o los organismos del Estado objetó a la selección de Tecnazul como subcontratista. Al contrario, según la Demandante, en las instrucciones a los oferentes de RDP y Petroecuador se mencionaba la participación de Tecnazul como una "empresa miembro[206]". De igual manera, observa que las comisiones técnicas en RDP y Petroecuador examinaron sus propuestas y recomendaron la adjudicación de los Contratos a Worley, sin plantear ninguna inquietud respecto de Tecnazul[207].

157.  La Demandante también rechaza la tesis de que Tecnazul no contaba con experiencia en el momento de su contratación. Según Worley, los medios de prueba presentados por la propia Demandada muestran que Worley, en su propuesta a RDP, presentó más de 70 páginas en las que describía la experiencia previa del Grupo Azul, así como una carta del representante legal del

---

[201]  Escrito de Demanda de Tecnazul, 6 de mayo de 2019, párr. 70 (**R-286**).

[202]  Contestación, párr. 248.

[203]  Réplica de Tecnazul, 6 de diciembre de 2019, párr. 92 (**R-287**).

[204]  Contestación, párr. 249.

[205]  Réplica, párrs. 104-110.

[206]  Réplica, párr. 104; Contrato de la Refinería Esmeraldas, págs. C_3_056, 208, 214, 268, 275 (**C-3**); Contrato de la Refinería del Pacífico, cláusula 16.19 (**C-8**); Instrucciones de RDP a los Oferentes, 17 de diciembre de 2010, párrs. 3.1.1.5, 3.5  (**C-87**); Propuesta Comercial para el Proyecto de la Rehabilitación de Esmeraldas, 26 de julio de 2011, págs. R-28_325-395 (**R-28**); Propuesta Comercial para el Contrato de RPD (pasaje), 28 de enero de 2011, pág. 3 (**R-60**); RDP Instrucciones a los Oferentes, 17 de diciembre de 2010, cláusulas 3.1.1.5, 3.5 (**R-136**).

[207]  Contrato de la Refinería del Pacífico, págs. C_8_141, 175 (**C-8**); Informe de la Comisión Técnica para RDP, febrero de 2011 (**C-375**).

Grupo Azul adjunta a dicha propuesta, en la que reflexionaba sobre el Grupo Azul como el proveedor más grande de Ecuador para los sectores de energía, minería e infraestructura y su participación como contratista local en la mayoría de los proyectos de infraestructura de gran envergadura realizados en Ecuador[208]. La experiencia previa del Grupo Azul, según la Demandante, incluía construcción y exploración en tres de los campos petrolíferos más grandes de Ecuador, ingeniería en una destacada planta energética, construcción de caminos de acceso, campos y plataformas para grandes pozos, y la expansión y el servicio de los oleoductos más grandes de Ecuador[209].

158. Asimismo, la Demandante hace alusión a la relación preexistente entre Tecnazul y Petroecuador[210]. De acuerdo con Worley, en el momento en el que comenzó a trabajar en Ecuador, Petroecuador ya había celebrado varios contratos con Tecnazul y otras empresas del Grupo Azul[211]. De hecho, en 2011, Petroecuador consideraba que Tecnazul era el principal licitador técnico y le adjudicó un contrato para realizar estudios de oleoductos con el objetivo de aumentar

---

[208]   Azul, Descripción de la Empresa, Bnamericas, 13 de noviembre de 2018 (**C-748**); Propuesta Comercial para el Proyecto de la Rehabilitación de Esmeraldas, 26 de julio de 2011, págs. R-28_325-395 (**R-28**); Propuesta Comercial para el Contrato de RPD (pasaje), 28 de enero de 2011, pág. 5 (**R-60**).

[209]   Propuesta Técnica de Worley para Servicios de Asesoría para el Gerenciamiento de Proyectos de RDP, 31 de enero de 2011, págs. 251-445 (**C-457**); *Currículum vítae* de William W. Phillips, pág. 1 (**C-470**); Administración de Información sobre la Energía de los EE. UU., Análisis del ejecutivo en el país, Administración de Información sobre la Energía de los EE. UU. (EIA), 17 de septiembre de 2021 (**C-471**); Presentación del Grupo Azul (**C-522**); Proyectos de Azul, 7 de octubre de 2021 (**C-728**); Azul, Descripción de la Empresa, Bnamericas, 13 de noviembre de 2018 (**C-748**).

[210]   Réplica, párr. 108; Certificado de Conduto Ecuador S.A. otorgado a Azulec S.A., 11 de diciembre de 2009 (**C-384**); Certificado de Petroecuador de Terminación de Trabajos de la Construcción del Terminal de Productos Limpios de Riobamba, Contrato No. 2008187 entre Petroecuador y Azulec-Tesca, 15 de junio de 2010 (**C-385**); Certificado de Petrobras otorgado a Urazul S.A. respecto del Proyecto CPF Palo Azul 40KBOPD de Ecuador TLC S.A., julio de 2005 - diciembre de 2006 (**C-386**); Certificado de Perenco Ecuador LTD otorgado a Urazul S.A., 24 de noviembre de 2008 (**C-387**); Certificado de Occidental Exploration and Production Company de Completacion Contrato No. CO1232, 3 de abril de 2003 (**C-388**); Certificado de AEC Ecuador LTD otorgado a Urazul S.A., 17 de diciembre de 2002 (**C-389**); Certificado de Repsol-YPF Ecuador Inc. otorgado a Urazul S.A., 21 de junio de 2001 (**C-390**); Certificado de Agip Oil Ecuador B.V. otorgado a Urazul S.A, 25 de octubre de 2000 (**C-391**); Certificados de Arco Oriente Inc. otorgados a Azul para el Proyecto de Desarrollo de Villano (Instalaciones de Proceso Villano y Terminal Baeza), 12 de junio de 2007 (**C-394**); Certificado de SK E&C Consultadores S.A. otorgado a Tecnazul, 22 de noviembre de 2010 (**C-472**); Certificado de Repsol-YPF otorgado a Urazul S.A., 31 de enero de 2006 (**C-473**); Certificado de Pérez Compac Ecuador otorgado a Azul, 22 de octubre de 2002 (**C-474**); Certificado de Kerr-McGee Ecuador Energy Corp. otorgado a Urazul S.A., 6 de febrero de 2012 (**C-475**); Certificado de Williams Brothers Engineering Company otorgado a Azul, 24 de marzo de 1999 (**C-476**); Certificado de City Investing Company Ltd. otorgado a Urazul S.A., 18 de marzo de 1999 (**C-477**); Certificado de Oryx Ecuador Energy Company otorgado a Urazul S.A., 21 de noviembre de 1997 (**C-478**); Certificado de Petrolera Santa Fe (Ecuador) Ltd. otorgado a Urazul S.A., 20 de junio de 1997 (**C-479**); Certificado de Triton Ecuador Inc, LLC otorgado a Urazul S.A., 16 de junio de 1997 (**C-480**).

[211]   Certificado de Petroecuador de Terminación de Trabajos de la Construcción del Terminal de Productos Limpios de Riobamba, Contrato No. 2008187 entre Petroecuador y Azulec-Tesca, 15 de junio de 2010 (**C-385**); *Tecnazul Lands Pipeline System Studies Contract*, BN Americas, 29 de septiembre de 2011 (**C-483**); Oficio No. 2231-PAM-CON-2009 de Petroamazonas y Petroecuador a Grupo Azul, 30 de junio de 2009 (**C-927**).

la capacidad de los oleoductos Libertad-Pascuales Guayas, Libertad-Manta Guayas Manabí y Tres Bocas-Pascuales[212].

    ii.    MMR Group

159.    Según la Demandada, las investigaciones desencadenadas por los Papeles de Panamá demostraron que MMR Group, Inc. ("**MMR Group**"), uno de los contratistas invitado y recomendado para su contratación por la Demandante, pagó cerca de USD 500.000 en sobornos al Sr. Bravo y a otros en Petroecuador[213].

160.    Worley fiscalizaba las actividades de adquisiciones en relación con el subcontrato de Petroecuador con MMR Group, las cuales incluían "revisar y comentar", "ejecutar" y "aprobar […] la[s] Lista[s] de Vendedores, Solicitudes de materiales, evaluaciones técnicas de vendedores [y] proporcionar recomendaciones para los vendedores[214]".

161.    La Demandada observa que, en varias ocasiones, Worley aprobó los servicios y las facturas de MMR y recomendó su pago por parte de Petroecuador[215]. La Demandante discrepa y sostiene que simplemente estaba cumpliendo su deber como prestadora de servicios de PMC para realizar evaluaciones técnicas de proveedores, según las cuales no se le conocían a MMR antecedentes de corrupción con anterioridad a los Papeles de Panamá y era una empresa internacional de gran renombre[216].

    iii.    OSS

162.    Oil Services & Solutions, S.A. ("**OSS**") es una sociedad ecuatoriana propiedad de Juan Andrés Baquerizo ("**Sr. Baquerizo**"). Entre diciembre de 2013 y diciembre de 2015, Petroecuador adjudicó contratos a OSS por USD 43,4 millones, gran parte de lo cual la Demandada afirma que se realizó bajo la fiscalización y supervisión de Worley[217].

---

[212]   *Tecnazul Lands Pipeline System Studies Contract*, BN Americas, 29 de septiembre de 2011 (**C-483**).

[213]   La República, "Detienen en Panamá a otro contratista de Petroecuador", 11 de noviembre de 2016 (**R-214**); Transferencias extranjeras de Arturo Pinzón (ejecutivo de MMR Group, Inc.) a GIRBRA, S.A. (propiedad de A. Bravo), 2015 (**R-94**).

[214]   Contrato de la Refinería Esmeraldas, Anexo 3 (**C-3**).

[215]   Contestación, párr. 253.

[216]   Dúplica sobre Jurisdicción, párr. 124; MMR Group designado Contratista especializado del año 2013 por ENR Texas & Luisiana, 3 de septiembre de 2013 (**C-1081**); Informe de Worley de evaluación de propuesta de MMR International para la Refinería Esmeraldas (No. 408005-00445-00-REP-WPI-EPP-0199), 24 de septiembre de 2013, págs. 8, 45-50 (**R-448**).

[217]   Contestación, párr. 254.

163.   Según la Demandada, los Papeles de Panamá permitieron al Fiscal General descubrir un contrato de agencia entre una sociedad ficticia propiedad del Sr. Baquerizo y GIRBRA, la empresa del Sr. Bravo[218]. En el marco de este contrato, el Sr. Baquerizo presuntamente aceptó pagar al Sr. Bravo USD 600.000 y "una comisión del 10% [...] de la cantidad bruta de las facturas de cada contrato[219]". El Fiscal General también dice haber descubierto que OSS pagó más de USD 300.000 en sobornos al Sr. Bravo por medio de GIRBRA[220].

    iv.    Galileo

164.   GalileoEnergy, S.A. ("**Galileo**") es una sociedad ecuatoriana propiedad de Ramiro Luque ("**Sr. Luque**") constituida en mayo de 2012[221]. Entre diciembre de 2012 y agosto de 2015, Petroecuador adjudicó a Galileo USD 38,8 millones en contratos, la mayoría de los cuales se ejecutaron bajo la fiscalización y supervisión de Worley[222].

165.   Según la Demandada, el Sr. Luque pagó USD 796.000 al Sr. Bravo[223]. Ecuador agrega además que el procedimiento local concluyó que Galileo obtuvo los citados contratos presentándose como "el representante de" dos filiales de la multinacional francesa SARPI-Veolia[224]. En el procedimiento local también se llegó a la conclusión de que Galileo cobró una cifra adicional superior a los USD 21,7 millones en virtud de los tres contratos más cuantiosos[225]. Galileo recibió USD 26,4 millones por medio de esos contratos, pero presuntamente subcontrató todos esos servicios a otros a un coste menor[226].

---

[218]   Contestación, párr. 256; Contrato de Agencia entre Baquerizo y Bravo, 10 de febrero de 2014 (**R-216**).

[219]   Contestación, párr. 256 (traducción del Tribunal); Contrato de Agencia entre Baquerizo y Bravo, 10 de febrero de 2014, artículo 6(1) (**R-216**).

[220]   Contestación, párr. 257.

[221]   *Estados Unidos c. Luque*, Información Penal, 6 de octubre de 2017, párrs. 5, 17 (**R-217**).

[222]   Oficio No. 20571-RGER-RCTR-2013 de Petroecuador, 27 de junio de 2013 (**R-218**); Contrato de GalileoEnergy No. 2012065, 26 de diciembre de 2012 (**R-219**); Contrato Complementario de GalileoEnergy No. 2013023, 10 de junio de 2013 (**R-220**); Contrato Complementario de GalileoEnergy No. 2014012, 12 de marzo de 2014 (**R-221**); Contrato Complementario de GalileoEnergy No. 2015043, 16 de septiembre de 2015 (**R-222**).

[223]   Contestación, párr. 259.

[224]   Contrato de GalileoEnergy No. 2012065, 26 de diciembre de 2012, pág. 1 (**R-219**); Contrato Complementario de GalileoEnergy No. 2013023, 10 de junio de 2013 (**R-220**); Contrato Complementario de GalileoEnergy No. 2014012, 12 de marzo de 2014, pág. 1 (**R-221**); Contrato Complementario de GalileoEnergy, No. 2015043 16 de septiembre de 2015 (**R-222**) (traducción del Tribunal).

[225]   Informe de la Contraloría General del Estado DASE-0008-2017, 9 de febrero de 2017, pág. 46 (**R-225**).

[226]   Informe de la Contraloría General del Estado DASE-0008-2017, 9 de febrero de 2017, pág. 46 (**R-225**).

v.    Odebrecht

166.  En 2012, Constructora Norberto Odebrecht, S.A. ("**Odebrecht**") obtuvo un contrato por una cuantía de USD 229.995.260 con RDP para preparar y construir el emplazamiento donde se erigiría la Refinería del Pacífico. El 25 de septiembre de 2013, Odebrecht obtuvo un contrato separado por USD 259,9 millones con RDP para construir el acueducto Represa La Esperanza[227], el cual suministraría agua a la Refinería del Pacífico y a la comunidad aledaña[228].

167.  En marzo de 2014, las autoridades brasileñas comenzaron a investigar actividades de supuesto lavado de dinero en lavaderos de automóviles y gasolineras[229]. Dichas investigaciones finalmente llevaron al descubrimiento de una trama de sobornos por la que Odebrecht pagaba sobornos a los funcionarios de la petrolera propiedad del Estado brasileño, Petróleo Brasileiro, S.A.[230]. Los sobornos provenían de un departamento de Odebrecht específicamente creado para tal fin, conocido como la División de Operaciones Estructuradas, que financiaba los sobornos para la mayoría de los proyectos de Odebrecht a nivel mundial[231].

168.  Las investigaciones en Ecuador y en los Estados Unidos establecieron que Odebrecht pagó sobornos en relación con el Contrato de la Refinería del Pacífico y durante el período en el que Worley actuaba como el Gerente del proyecto al amparo de dicho contrato[232].

**2)  Presunta corrupción e ilegalidad en el inicio de la inversión**

169.  Las alegaciones de corrupción e ilegalidad en el inicio de la inversión guardan relación con dos conjuntos de hechos diferentes que se resumen a continuación: (**i**) el supuesto tráfico de información confidencial por parte de la Demandante; y (**ii**) su supuesta manifestación falsa de su intención de cumplir con el límite del 30% a la subcontratación estipulado en el Contrato de la Refinería Esmeraldas.

---

[227]  Carta de RDP a Odebrecht, 27 de diciembre de 2013 (**R-96**).

[228]  Réplica, párrs. 23, 124; Tele Ciudadana, Inauguración del Acueducto Esperanza – Refinería del Pacífico (video), 15 de diciembre de 2016, en 22:20-24:00 (**C-401**); Gobierno del Encuentro, Vicepresidente del Ecuador, Sr. Glas, inauguró el acueducto multipropósito La Esperanza, un paso más hacia la Refinería del Pacífico, 2016 (**C-823**).

[229]  The Guardian, *Operation Car Wash: Is this the biggest corruption scandal in history?*, 1 de junio de 2017 (**R-226**).

[230]  The Guardian, *Operation Car Wash: Is this the biggest corruption scandal in history?*, 1 de junio de 2017 (**R-226**).

[231]  The Guardian, *Operation Car Wash: Is this the biggest corruption scandal in history?*, 1 de junio de 2017 (**R-226**).

[232]  Contestación, párr. 266; *Estados Unidos c. F. Chatburn*, Caso No. 18-CR-20312, Dist. Ct. S.D. Fla., Acusación Sustitutiva (*Superseding Indictment*), 13 de diciembre de 2018, párr. 9 (**R-79**).

i.   Tráfico de información confidencial

170. La Demandada sostiene que la Demandante incumplió el derecho ecuatoriano al momento de invertir al traficar con información confidencial[233].

171. Ecuador afirma que se adjudicó a Worley el Proyecto de la Refinería del Pacífico porque recibió ayuda externa de George Plummer ("**Sr. Plummer**"), un ejecutivo consultor sénior de Shaw, que prestaba servicios de asesoría sobre el proceso licitatorio para el Proyecto de la Refinería del Pacífico[234]. Sostiene que el Sr. Plummer suministró información confidencial a Worley e influyó en las negociaciones de la licitación y el contrato; a cambio de este "tráfico de información", la Demandada sostiene que Worley adjudicó a Shaw un contrato por USD 1,2 millones[235].

172. La Demandante responde aduciendo que la Demandada ha tergiversado documentos y niega haber recibido la asistencia del Sr. Plummer o intercambiado información confidencial alguna; sostiene que el intercambio de información pertinente ocurrió después de que se le adjudicara el contrato, respecto de lo cual reitera que obtuvo la puntuación más alta en todas las ofertas[236]. La Demandante añade que la Demandada describe incorrectamente el contrato que Worley suscribió con Shaw, cuya firma tuvo lugar un año y medio después del intercambio de la llamada "información confidencial", solo después de que RDP así lo solicitara y que no contiene referencia alguna a la cantidad presuntamente reclamada de USD 1,2 millones[237].

---

[233]   EPA de la Demandada, párr. 130.

[234]   Dúplica, párr. 21.

[235]   Dúplica, párrs. 21-30, 365 (traducción del Tribunal); Correo electrónico de G. Plummer a Worley, 13 de septiembre de 2010 (**R-304**); Correo electrónico de M. Villegas a G. Plummer, 11 de octubre de 2010 (**R-305**); Correo electrónico de M. Villegas a G. Plummer, 24 de mayo de 2011 (**R-308**); Correo electrónico de M. Villegas a G. Plummer, 24 de mayo de 2011 (**R-310**); Correo electrónico de G. Plummer a M. Villegas, 8 de junio de 2011 (**R-311**); Propuesta de Shaw a Worley, 8 de agosto de 2012, pág. 4 (**R-319**).

[236]   Dúplica sobre Jurisdicción, párrs. 99-104; EPA de la Demandante, párr. 113; RDP, Informe de la Comisión *ad-hoc* sobre Evaluación Total de las Ofertas para Selección del PMC, 25 de febrero de 2011, pág. 7 (**C-645**); Acta de Directorio de la RDP No. 002-DIR-2011-RDPEA, 1 de abril de 2011, pág. 3 (**C-780**); Oficio No. 00104-RDP-2011 de RDP, 26 de enero de 2011 (**R-125**); Correo electrónico de G. Plummer a M. Villegas, 8 de abril de 2011 (**R-307**); Correo electrónico de M. Villegas a G. Plummer, 24 de mayo de 2011 (**R-310**); Correo electrónico de G. Plummer a M. Villegas, 8 de junio de 2011 (**R-311**); Correo electrónico de G. Plummer a M. Villegas, 21 de julio de 2011 (**R-315**); Correo electrónico de G. Plummer a M. Villegas, 25 de julio de 2011 (**R-317**).

[237]   Dúplica sobre Jurisdicción, párr. 104; Correo electrónico de C. Elizondo de WorleyParsons a P. Merizalde, 26 de diciembre de 2013 (**R-301**); Propuesta de Shaw a Worley, 8 de agosto de 2012 (**R-319**); Contrato de Consultoría entre Worley y Shaw, 19 de septiembre de 2012, pág. 1 (**R-318**); Correo electrónico de G. Plummer a P. Merizalde, 20 de abril de 2012 (**R-326**); Correo electrónico de C. Elizondo a G. Plummer, 6 de agosto de 2012 (**R-499**); 003-DIR-2012-RDP Acta de Directorio de la RDP, 9 de mayo de 2012, pág. 4 (**C-751**).

ii.    Manifestación falsa de cumplimiento con el límite del 30% a la subcontratación

173. La Demandada sostiene que Worley quebrantó también el derecho ecuatoriano antes de la celebración de los Contratos dado que realizó manifestaciones falsas ante Petroecuador y RDP sobre su intención de cumplir con el límite del 30% a la subcontratación previsto en la Ley de Contratación Pública, el cual incumplió posteriormente[238].

174. Como cuestión de derecho, si bien la Demandante reconoce que los contratos adjudicados al amparo del Giro Específico del Negocio, por lo general, no están sujetos a un límite a la subcontratación, observa que el Contrato de la Refinería Esmeraldas hace referencia a la Ley de Contratación Pública[239]. En tal sentido, la Demandada explica que el artículo 79 de la Ley de Contratación Pública, aplicable a los Contratos y mencionada en ellos, prohíbe que la subcontratación exceda el 30% del valor de un "contrato principal" sin aprobación previa por escrito de Petroecuador y RDP[240].

175. Además, la Demandante señala que si bien el artículo 79 de la Ley de Contratación Pública del Ecuador (que rige los servicios de consultoría) prevé un límite del 30% a la subcontratación[241], no se prevé un límite semejante en el artículo 35 del Reglamento General de la Ley Orgánica del Sistema Nacional de Contratación Pública (el "**Reglamento de Contratación Pública**") (que rige los servicios de apoyo a la consultoría)[242]. La Demandada rebate que el artículo 35 del Reglamento no elimina el límite del 30% estipulado en el artículo 79 de la ley[243]. Bajo la lectura de la Demandada, el artículo 35 solo se aplica a contratos de consultoría que abarquen "servicios de apoyo que no puedan ser provistos de manera directa por el consultor", lo que significa que los servicios provistos por Tecnazul no se ubican en esta categoría[244]. La Demandada sostiene, además, que la "diferencia artificial" que traza Worley invalidaría el límite del 30% a la subcontratación al permitirle a cualquier contratista externalizar trabajo superando el límite del 30% y, de forma posterior, declarar falsamente que parte de ese trabajo constituye "servicios de apoyo"[245].

---

[238]    EPA de la Demandada, párr. 42.

[239]    Réplica, párr. 174 y nota de pie de página 535; Dúplica sobre Jurisdicción, párrs. 109; Contrato de la Refinería Esmeraldas, cláusulas 1.3, 21 (**C-3**); Ley de Contratación Pública, artículo 79 (**C-64**).

[240]    EPA de la Demandada, párr. 40 y nota de pie de página 118; Ley de Contratación Pública, artículo 79 (**RLA-52**); Reglamento de Contratación Pública, artículo 120 (**C-179**).

[241]    Ley Contratación Pública, artículo 79 (**C-64**).

[242]    Reglamento de Contratación Pública, artículo 35 (**C-179**).

[243]    Informe de Andrade II, párr. 91 (**RER-4**).

[244]    Dúplica, párrs. 35, 72(ii); Reglamento de Contratación Pública, artículo 35 (**C-179**).

[245]    Dúplica, párr. 72(ii).

176. Como cuestión de hecho, si bien la Demandada sostiene que Worley no habría obtenido *ninguno* de los Contratos si no fuese por la manifestación falsa de cumplimiento con el límite del 30% a la subcontratación de conformidad con el derecho ecuatoriano[246], se centra específicamente en las pruebas de presuntas manifestaciones falsas durante las negociaciones para el Contrato de la Refinería Esmeraldas y los Contratos de la Planta Machala[247]. Afirma que Worley conspiró con Tecnazul para distorsionar su participación real[248]. Así, Ecuador plantea que el incumplimiento posterior del requisito por parte de Worley fue intencional[249] y premeditado,[250] según revela la correspondencia entre Worley y Tecnazul.

177. En particular, Ecuador considera que varios correos electrónicos entre el personal de Worley y Tecnazul[251] confirman que la Demandante:

> (*i*) entendió el límite del 30% a la subcontratación; (*ii*) siempre tuvo la intención de subcontratar los servicios de Tecnazul superando el límite del 30%; (*iii*) sabía que tal subcontratación infringiría el derecho ecuatoriano; y (*iv*) conspiró con Tecnazul para ocultar el nivel de participación de Tecnazul y declararlo incorrectamente a Petroecuador[252].

178. La Demandante plantea que la Demandada tergiversa estos correos electrónicos porque, en realidad, estos muestran la intención y confirmación de cumplir el límite a la subcontratación[253];

---

[246] EPA de la Demandada, párr. 188.

[247] EPA de la Demandada, párrs. 49-51, 188.

[248] EPA de la Demandada, párr. 49.

[249] Dúplica, párrs. 4, 31-73; Carta de Worley PC-2014047-LTR-WPI-EPP-0146, 8 de julio de 2015 (**R-191**); Correo electrónico de M. Sandoval a R. Falcon, 16 de junio de 2014 (**R-332**); Correo electrónico de M. Sandoval a R. Falcon, 20 de noviembre de 2014 (**R-333**); Correo electrónico de M. Sandoval a R. Falcon, 14 de mayo de 2015 (**R-334**); Correo electrónico de R. Falcon a W. Phillips, 28 de mayo de 2015 (**R-335**); Correo electrónico de M. Sandoval a R. Falcon, 18 de junio de 2015, pág. 336_001-005 (**R- 336**); Correo electrónico de M. Sandoval a W. Garcia, 30 de junio de 2015, págs. R-337_001-003, 011-012 (**R-337**); Plantilla de Excel con el desglose de las horas hombre, 25 de junio de 2015 (**R-338**); Correo electrónico de W. Garcia a M. Sandoval, 7 de julio de 2015, pág. C-339_002 (**R-339**).

[250] Dúplica, párrs. 4, 31-73. La Demandada cita las siguientes comunicaciones como evidencia de premeditación en el incumplimiento: Correo electrónico de C. Elizondo de WorleyParsons al Grupo Azul, 21 de julio de 2011 (**R-300**); Correo electrónico de H. Guarderas a C. Elizondo, 21 de julio de 2011 (**R-327**); Correo electrónico de H. Guarderas a C. Elizondo, 27 de julio de 2011 (**R-328**); Correo electrónico de C. Elizondo a H. Guarderas, 27 de julio de 2011 (**R-329**); Correo electrónico de R. Falcon a W. Phillips, 24 de febrero de 2014 (**R-330**); Correo electrónico de J. Bennet a W. Phillips, 24 de febrero de 2014 (**R-331**).

[251] EPA de la Demandada, párrs. 49-50; Correo electrónico de H. Guarderas a C. Elizondo, 28 de julio de 2011 (**R-289-1**); Correo electrónico de C. Elizondo de WorleyParsons al Grupo Azul, 21 de julio de 2011 (**R-300**); Correo electrónico de H. Guarderas a C. Elizondo, 21 de julio de 2011 (**R-327**); Correo electrónico de H. Guarderas a C. Elizondo, 27 de julio de 2011 (**R-328**); Correo electrónico de C. Elizondo a H. Guarderas, 27 de julio de 2011 (**R-329**); Correo electrónico de R. Falcon a W. Phillips, 24 de febrero de 2014 (**R-330**); Correo electrónico de J. Bennet a W. Phillips, 24 de febrero de 2014 (**R-331**).

[252] EPA de la Demandada, párr. 51 (traducción del Tribunal).

[253] EPA de la Demandante, párr. 116; Transcripción en inglés de la Audiencia, día 7, 1374:5-1375:1 (traducción del Tribunal); Correo electrónico de C. Elizondo de WorleyParsons al Grupo Azul, 21 de julio de 2011 (**R-300**); Correo electrónico de H. Guarderas a C. Elizondo, 27 de julio de 2011 (**R-328**); Correo electrónico de C. Elizondo a H. Guarderas, 27 de julio de 2011 (**R-329**).

representan, en el mejor de los casos, una fotografía confusa y aislada —centrada fundamentalmente en conversaciones en torno al Contrato de la Planta Machala I—, lo cual no es útil para evaluar el cumplimiento general[254].

179.   En opinión de la Demandada, la superación del límite del 30% a la subcontratación por parte de Worley en la ejecución del Contrato de la Refinería del Pacífico, el Contrato de la Planta Machala I y el Contrato de la Refinería del Pacífico valida su argumento sobre las manifestaciones falsas. La Demandada sostiene que "no hay una controversia genuina" en torno a que Worley subcontrató más del 30% del valor de los tres Contratos, incumpliendo así el artículo 35 de la Ley de Contratación Pública y las disposiciones de los Contratos que estipulan el mismo límite a la subcontratación[255]. En particular, la Demandada afirma que Worley subcontrató a Tecnazul el 172,9% del precio original del Contrato de la Refinería Esmeraldas, el 49% del precio original del Contrato de la Planta Machala I y el 32,9% del Contrato de la Refinería del Pacífico[256].

180.   La Demandante niega haber infringido el límite a la subcontratación, mucho menos intencionadamente, y sostiene que el argumento de premeditación es solo un intento de la Demandada de aproximar sus alegaciones al inicio de la inversión[257]. Según Worley, no es posible que exista una trama para formular manifestaciones falsas para incumplir los límites a la subcontratación sin una transgresión real[258]. En consecuencia, afirma que el argumento de la Demandada no puede prosperar porque el límite de subcontratación bien era inaplicable, bien no fue superado o bien el exceso fue aceptado por Petroecuador de modo implícito[259]. En todo caso, la Demandada indica que el porcentaje de superación del límite es marginal (19% para el Contrato

---

[254]   EPA de la Demandante, párr. 118.

[255]   Dúplica, párr. 70; EPA de la Demandada, párr. 42; Oficio de Petroecuador 05332-OPE-REE-MAN-PMR-2017, 22 de febrero de 2017 (**R-167**); Subcontrato del Contrato de la Planta Machala I con Tecnazul (**C-686**).

[256]   EPA de la Demandada, párr. 42.

[257]   Dúplica sobre Jurisdicción, párrs. 105-108; Correo electrónico de C. Elizondo de WorleyParsons al Grupo Azul, 21 de julio de 2011 (**R-300**); Correo electrónico de C. Elizondo a H. Guarderas, 27 de julio de 2011 (**R-329**).

[258]   EPA de la Demandante, párr. 118.

[259]   Réplica, párr. 173; Dúplica sobre Jurisdicción, párrs. 109-110; EPA de la Demandante, párr. 117; Contrato de la Refinería Esmeraldas, cláusulas 2.5.21, 3.1.1.3 y págs. C_3_056, 208, 214, 268, 275 (**C-3**); Contrato de la Refinería del Pacífico, pág. C_8_207 (**C-8**); Informe Final Técnico Económico del Contrato para el Programa de Rehabilitación, Memorando No. 00518-OPE-REE-MAN-PMR-2017, 1 de agosto de 2017, pág. 1 (**C-34**); Informe del Contrato y Complementarios del Programa de Rehabilitación, Memorando No. 00261-OPE-REE-MAN-PMR-2017, 30 de marzo de 2017, págs. 27-28 (**C-38**); Ley de Contratación Pública, artículos 6.8, 6.30, 79 (**C-64**); Oficio No. 3217-RREFREE-IRE-2016 de Petroecuador a la Contraloría General, 18 de noviembre de 2016, pág. 4 (**C-1184**); Propuesta Comercial para el Programa de Rehabilitación de Esmeraldas, 26 de julio de 2011, págs. R-28_325-395 (**R-28**).

de la Planta Machala I, 4,99% para el Contrato de la Refinería Esmeraldas y 2,94% para el Contrato de la Refinería del Pacífico)[260].

### 3) Presunta corrupción e ilegalidad durante la operación de la inversión

181. Según la Demandada, durante la operación de los Contratos Worley también cometió actos corruptos e ilegales. En particular, destaca las conexiones entre los sobornos realizados por Tecnazul a funcionarios de Petroecuador y RDP y la adjudicación del Contrato de la Refinería Esmeraldas y de sus seis Contratos Complementarios sin ningún proceso competitivo u otro proceso licitatorio por los mismos funcionarios que recibieron obsequios y viajes de Worley (entre ellos los Sres. Pareja y Bravo)[261].

182. Además, la Demandada sostiene que los Sres. Pareja y Bravo, que fueron condenados en Ecuador por corrupción en Tecnazul, recibieron con frecuencia beneficios indebidos de Worley[262]. Conforme a la Demandada, esta conducta quebrantó las leyes aplicables contra la corrupción, las políticas corporativas y los Contratos mismos[263].

183. Por el contrario, la Demandante observa que la Demandada no alega que Worley pagara sobornos[264]. Por consiguiente, Worley sostiene que sus credenciales impresionantes —no el soborno— fueron lo que le llevó a recibir la adjudicación de los Contratos de la Refinería Esmeraldas y del Pacífico y que no recurrió a medios indebidos para obtener contratos adicionales[265]. La Demandante defiende que estos beneficios presuntos no son nada más que actividades empresariales habituales que no son ni inusuales ni ilegales[266]. En particular, destaca que Worley siempre tuvo la intención de ser reembolsado por RDP y Petroecuador —con lo cual

---

[260]   EPA de la Demandante, párrs. 55, 115, 119.

[261]   EPA de la Demandada, párrs. 52, 206; Transcripción de la Audiencia, Día 1, 139:11-140:1, 211:10-20; Contrato Complementario del Programa de Rehabilitación No. 2012036, 28 de septiembre de 2012, cláusula 3.1 (**C-19**); Contrato Complementario del Programa de Rehabilitación No. 2013027, 28 de agosto de 2013, cláusula 4 (**C-20**); Contrato Complementario del Programa de Rehabilitación No. 2014015, 2 de abril de 2014, cláusula 4 (**C-21**); Contrato Complementario del Programa de Rehabilitación No. 2014048, 9 de octubre de 2014, cláusula 4 (**C-22**); Contrato Complementario del Programa de Rehabilitación No. 2015205, 29 de octubre de 2015, cláusula 4 (**C-24**); Presentación de Alegatos de Apertura de la Demandada, pág. 157 (**RD-1**).

[262]   EPA de la Demandada, párr. 55.

[263]   Contestación, párr. 20; Dúplica, párrs. 74-134.

[264]   EPA de la Demandante, párr. 121.

[265]   EPA de la Demandante, párr. 121.

[266]   Dúplica sobre Jurisdicción, párrs. 134-141.

era imposible conferir un beneficio— y que la Demandada no puede describir como obsequios su negativa a reembolsar los gastos[267].

184.    Además, Ecuador sostiene que el valor del Contrato de la Refinería Esmeraldas aumentó de USD 38,6 millones a 145,9 millones debido a todos los contratos complementarios obtenidos ilegalmente[268]. Considera que lo anterior vulneró el artículo 87 de la Ley de Contratación Pública, según el cual el valor de los contratos complementarios no puede exceder el 70% del valor del contrato principal[269].

185.    La Demandante explica que el artículo 87 de la Ley de Contratación Pública exime específicamente a los contratos en el sector de los hidrocarburos de las limitaciones a la subcontratación, observando que el Contrato de la Refinería Esmeraldas se refiere explícitamente a esa disposición[270]. Incluso si tal disposición fuese aplicable, la Demandante considera que la aprobación por parte de Petroecuador de las certificaciones presupuestarias para cada contrato complementario y las opiniones jurídicas que confirman el cumplimiento de los requisitos de compras públicas desvirtúan toda alegación de Ecuador sobre el incumplimiento del límite del 70%[271].

---

[267]    Dúplica sobre Jurisdicción, párrs. 135-137; Contrato de la Refinería Esmeraldas, cláusula 2.5 (**C-3**). Contrato de la Refinería del Pacífico, cláusula 4.1.2 (**C-8**); Memorando No. 00473-PPRO-RASC-2012 de Petroecuador, 16 de octubre de 2012 (**C-976**); Correos electrónicos de RDP, 2 de octubre de 2018 (**C-1095**); Memorando No. 00698-RREF-REE-IRE-2015 de Petroecuador, 4 de noviembre de 2015 (**C-1096**); Informe Evaluación Técnica-Económica elaborado por Petroecuador de la Oferta presentada por Worley para Fiscalización y Gerenciamiento del Proyecto Rehabilitación de Refinería Esmeraldas, Período enero-diciembre 2016, 2016 (**C-1108**); Declaración de Falcon III, párrs. 23-24 (**CWS-7**).

[268]    EPA de la Demandada, párrs. 52, 206; Transcripción de la Audiencia, Día 1 139:11-140:1, 211:10-20; Contrato Complementario del Programa de Rehabilitación No. 2012036, 28 de septiembre de 2012, cláusula 3.1 (**C-19**); Contrato Complementario del Programa de Rehabilitación No. 2013027, 28 de agosto de 2013, cláusula 4 (**C-20**); Contrato Complementario del Programa de Rehabilitación No. 2014015, 2 de abril de 2014, cláusula 4 (**C-21**); Contrato Complementario del Programa de Rehabilitación No. 2014048, 9 de octubre de 2014, cláusula 4 (**C-22**); Contrato Complementario del Programa de Rehabilitación No. 2015205, 29 de octubre de 2015, cláusula 4 (**C-24**).

[269]    EPA de la Demandada, párr. 52; Ley de Contratación Pública, artículos 85, 87 (**C-64**).

[270]    EPA de la Demandante, párr. 139; Contrato de la Refinería Esmeraldas, cláusula 15 (**C-3**); Ley de Contratación Pública, artículo 87 (**C-64**).

[271]    EPA de la Demandante, párrs. 139-140; Certificación Presupuestaria Contrato 2012036, 13 de septiembre de 2011 (**C-583**); Certificación Presupuestaria Contrato 2014015, 29 de enero de 2014 (**C-584**); Certificación Presupuestaria Contrato 2014187, 26 de junio de 2014 (**C-585**); Certificación Presupuestaria 2014048, 28 de julio de 2014 (**C-586**); Certificación Presupuestaria 2014070, 29 de noviembre de 2014 (**C-587**); Certificación presupuestaria 2015197, 14 de agosto de 2015 (**C-588**); Certificación Presupuestaria 2015205, 29 de octubre de 2015 (**C-589**); Memorando 0253-PPRO-RASC-2013 de Petroecuador, 10 de julio de 2013 (**C-761**); Certificación Presupuestaria 2015449, 24 de noviembre de 2015 (**C-783**).

186. En las siguientes secciones se describen en mayor detalle los "medios ilícitos" a los que recurrió presuntamente la Demandante para obtener contratos complementarios adicionales vulnerando la limitación del 70%, junto con las posiciones respectivas de las Partes.

     i.    Junio de 2012

187. Según la Demandada, en junio de 2012, Worley pagó para que el Sr. Merizalde y otros funcionarios de RDP volaran en primera clase a Pekín (China) para reunirse con representantes de la Corporación Nacional del Petróleo China[272]. Solo en lo que respecta a vuelos, los costes conocidos incurridos para los funcionarios de RDP presuntamente excedieron los USD 20.000[273]. Se dice que Worley cobró ese monto a RDP como un gasto reembolsable[274].

188. La Demandante explica que en estas reuniones se procuró analizar planes para la financiación y el desarrollo del Proyecto de la Refinería del Pacífico, lo que significa que los viajes se realizaron en apoyo a los servicios prestados[275]. Afirma que RDP aprobó y reembolsó estos gastos, en los que la Demandante aduce se incurrió para asistir con la coordinación del viaje[276].

     ii.    Agosto y septiembre de 2012

189. Según la Demandada, Worley pagó dos viajes de fin de semana a Miami y Miami Beach para funcionarios de Petroecuador, entre ellos los Sres. Bravo, A. Escobar y Marcelo Reyes ("**Sr. Reyes**"), abogado interno y Coordinador General de Contratos de Petroecuador[277]. La Demandada sostiene que Worley facturó a Petroecuador estos gastos aunque no tenían un fin comercial legítimo[278]

---

[272] Dúplica, párr. 92; Correo Electrónico de C. Elizondo a la Agencia de Viajes de Worley, 27 de junio de 2011 (**R-351**); Correo Electrónico de C. Elizondo a L. Han, 28 de junio de 2012 (**R-353**).

[273] Dúplica, párr. 92; Información de American Express sobre el itinerario de viaje para Rafael Alexis Poveda Bonilla, 25 de junio de 2012 (**R-349**); Estado de cuenta de American Express con listado de viajes ejecutivos, 1 de agosto de 2012 (**R-350**); Estado de cuenta de American Express con arreglos de viaje para Luis Rafael Bocigalupo Alava, 27 de junio de 2012 (**R-352**).

[274] Dúplica, párr. 92; Correo Electrónico de C. Elizondo a L. Han, 29 de junio de 2011 (**R-353**); Correo Electrónico de C. Elizondo a la agencia de viajes de Worley, 27 de junio de 2012 (**R-351**).

[275] Dúplica sobre Jurisdicción, párr. 137.

[276] Dúplica sobre Jurisdicción, párr. 137; Oficio No. RDP-ADC-CGE-111011-0075-OFI de RDP a la Contraloría General, 23 de agosto de 2018, pág. 13 (**C-614**); Carta de Worley a RDP, 24 de marzo de 2015 (**C-718**); Correo Electrónico del Ministerio de Sectores Estratégicos, 25 de junio de 2012 (**C-969**); Carta de Worley a RDP, 8 de abril de 2015 (**C-1087**); Declaración de Elizondo, párr. 22 (**CWS-1**).

[277] EPA de la Demandada, párr. 58.

[278] Dúplica, párrs. 82.

190. El primer viaje de los empleados a Miami supuestamente tuvo lugar durante el fin de semana del 31 de agosto al 2 de septiembre de 2012, en primera clase[279]. Worley niega que se realizara el viaje y aclara que se pospuso y pasó a ser lo que Ecuador llama el segundo viaje[280].

191. El segundo viaje a Miami presuntamente tuvo lugar durante el fin de semana del 7 al 9 de septiembre de 2012[281]. En esta ocasión, la Demandada dice que los empleados viajaron en clase *business*[282]. El Sr. Falcon de Worley envió un correo electrónico al hotel en Miami Beach en el que se hospedaron los funcionarios solicitando cubrir todos los gastos de los Sres. Bravo y A. Escobar[283]. La Demandada sostiene que Worley más adelante facturó a Petroecuador estos gastos como una "Visita a Contratista de Buenas Prácticas"[284]. Sin embargo, destaca la Demandada, nadie asistió a las entrevistas en representación de Worley y el Sr. Falcon desconoce los nombres de los contratistas entrevistados o incluso si se realizaron las entrevistas[285].

192. La Demandante afirma que este fue un viaje de negocios legítimo con el fin de entrevistar a contratistas en Miami[286]. Como señaló Worley en su informe de gastos y factura a Petroecuador, se trató de "Personal - Visita a Contratista de Buenas Prácticas" para la cual la Demandante indica que Petroecuador realizó reembolsos[287]. Si bien Worley no participó, entiende que se celebraron reuniones[288].

---

[279] Dúplica, párr. 83; Correo Electrónico de A. Guerrero a A. Bravo, 20 de agosto de 2012 (**R-405**); El Universo, *El excoordinador jurídico de Petroecuador, Marcelo Reyes, fue el "contacto" para sobornos, según juicio que se siguió en Estados Unidos*, 16 de febrero de 2021 (**R-424**).

[280] EPA de la Demandante, párr. 130; Transcripción de la Audiencia, Día 3, 472:5-9 (Falcon); Informe de Gastos SCV-IE673517 de Worley, 24 de octubre de 2012 (**R-354**); Confirmaciones de gestiones de viaje para A. Escobar y A. Bravo, 27-28 de agosto de 2012 (**R-355**); Informe de gastos SVC-IE661969 de Worley, 2 de octubre de 2012 (**R-356**); Correo Electrónico de R. Falcon a A. Bravo, 8 de septiembre de 2012 (**R-406**); Proforma R-11, 29 de noviembre de 2012 (**C-932**); Comprobante de egreso No. 0006890 de Petroecuador, 30 de noviembre de 2012 (**C-980**).

[281] Dúplica, párr. 84; EPA de la Demandada, párr. 60.

[282] Informe de gastos SVC-IE661969 de Worley, 2 de octubre de 2012 (**R-356**); Confirmaciones de gestiones de viaje para A. Escobar y A. Bravo, 27-28 de agosto de 2012 (**R-355**).

[283] Dúplica, párr. 84; Correo Electrónico de R. Falcon a A. Bravo, 8 de septiembre de 2012 (**R-406**).

[284] Dúplica, párr. 85; Informe de gastos SVC-IE661969 de Worley, 2 de octubre de 2012 (**R-356**).

[285] EPA de la Demandada, párrs. 61-62; Transcripción de la Audiencia, Día 3, 474:9-14, 474:21-25, 475:22-25, 476:1-4 (Falcon).

[286] EPA de la Demandante, párr. 137; Transcripción de la Audiencia, Día 3, 469:22-470:9 (Falcon).

[287] Dúplica sobre Jurisdicción, párr. 137; Informe de gastos SVC-IE661969 de Worley, 2 de octubre de 2012, pág. 1 (**R-356**); Comprobante de egreso No. 0006890 de Petroecuador, 30 de noviembre de 2012, págs. 1, 209, 216-219 (**C-980**).

[288] EPA de la Demandante, párr. 125; Transcripción de la Audiencia, Día 3, 474:4-475:8, 476:5-11 (Falcon).

     iii.    Octubre de 2020

193.    La Demandada sostiene que Worley adquirió pasajes para que el Sr. Bravo viajara a Las Vegas el 24 de octubre de 2012 y luego facturó a Petroecuador estos pasajes como costes incurridos en conexión con servicios prestados a Ecuador[289]. Asimismo, según la Demandada, Worley gastó al menos USD 22.391 en octubre de 2012 para que ciertos funcionarios de Petroecuador (los Sres. Pareja, Reyes y Bravo), así como algunas de sus parejas, volaran desde Quito hasta Miami y, de allí, a Houston para asistir durante tres días a una carrera en el Campeonato de Fórmula 1 en Austin (Texas) (el "**Viaje de la Fórmula 1**")[290]. El viaje en sí duró cuatro días[291].

194.    La Demandada afirma que los funcionarios de Petroecuador que recibieron este beneficio estaban a cargo de los Contratos y adjudicaron sin concurso a la Demandante más de USD 148,34 millones en contratos y contratos complementarios adicionales entre 2012 y 2015[292]. Presuntamente, también controlaban el pago de los USD 45,4 millones en facturas pendientes a Worley en el marco de los dos contratos que habían sido adjudicados en ese momento[293].

195.    Los USD 22.391 que Worley presuntamente gastó en este viaje incluyen entradas prémium a los tres días del evento y cuatro noches de alojamiento en un hotel designado para el evento[294]. No incluye lo que Tecnazul gastó en pasajes para los funcionarios de Petroecuador o gastos para cenas, comidas y entretenimiento durante la estancia de cuatro días en Austin[295].

196.    La Demandante rechaza el argumento sobre el viaje a Las Vegas, sosteniendo que la Demandada trata las solicitudes de itinerarios, cotizaciones y otra información como viajes reales, incluso

---

[289]    Dúplica, párr. 88.

[290]    Contestación, párr. 3; Dúplica, párr. 103; Correo Electrónico de R. Falcon, 13 de octubre de 2012 (**R-269**); Correo Electrónico de H. Guarderas a R. Falcon, 31 de octubre de 2012 (**R-410**); Informe de gastos SVC-IE673983 de Worley, 24 de octubre de 2012, págs. 1, 12 (**C-719**); Declaración de Falcon III, párr. 26 (**CWS-7**).

[291]    Contestación, párr. 3; Dúplica, párr. 105.

[292]    Dúplica, párr. 104; Contrato Complementario del Programa de Rehabilitación No. 2012036, 28 de septiembre de 2012, cláusulas 3, 4.1 (**C-19**); Contrato Complementario No. 2013027, 28 de agosto de 2013 (**C-20**); Contrato Complementario del Programa de Rehabilitación No. 2014015, 2 de abril de 2014 (**C-21**); Contrato Complementario del Programa de Rehabilitación No. 2014048, 9 de octubre de 2014 (**C-22**); Contrato Complementario del Programa de Rehabilitación No. 2014051, 17 de octubre de 2014 (**C-23**); Contrato Complementario del Programa de Rehabilitación No. 2015205, 29 de octubre de 2015 (**C-24**); Contrato Complementario del Sistema de Drenajes No. 2015449, 26 de noviembre de 2015 (**C-25**); Contrato Complementario No. 2015197 para Merox, 20 de octubre de 2015 (**C-26**); Contrato Complementario de la Planta Machala I No. 2014191, 1 de agosto de 2014, cláusulas 2-4 (**C-27**); Contrato Complementario de la Planta Machala I No. 2014191, 1 de agosto de 2014 (**C-28**).

[293]    Dúplica, párr. 104; Liquidación Económica del Contrato 2011030, 18 de abril de 2016 (**R-495**); Liquidación Económica del Contrato Complementario 2012036, 19 de mayo de 2016 (**R-496**).

[294]    Informe de gastos SVC-IE673983 de Worley, 24 de octubre de 2012, págs. 3, 7-8 (**C-719**).

[295]    Correo Electrónico de R. Falcon, 13 de octubre de 2012 (**R-269**).

cuando los registros de la Demandante confirman que no hay pruebas de un viaje a Las Vegas o de que Worley lo haya pagado[296].

197.   En relación con el Viaje de la Fórmula 1, la Demandante afirma que se trató de un evento "de contacto con clientes, patrocinado por la empresa", en el que había participado durante varios años[297].

198.   Worley observa que dado que ya había entregado entradas de "nivel Gold" a otros clientes para este evento y no había otras entradas disponibles a ese nivel, adquirió entradas menos costosas para los funcionarios de Petroecuador y RDP que asistieron al evento[298]. De acuerdo con la Demandante, el Sr. Falcon de Worley solicitó y recibió la aprobación de sus superiores para realizar este gasto[299] y presentó el gasto como "*Teambuilding* (desarrollo del equipo) del Proyecto Esmeraldas con el cliente Petroecuador y Ministro de Refinación y Comercialización"[300].

199.   La Demandante señala también que este evento se realizó después de que Worley invirtiera en Ecuador, lo que permite descartar que se tratara de un *quid pro quo*[301]. Worley deduce que si hubiese existido una intención de obtener beneficios en años posteriores habría invitado a Petroecuador más de una vez, ya que organiza el evento anualmente para varios clientes[302].

200.   En respuesta, Ecuador sostiene que lo determinante no es si Worley adquirió la opción más o menos costosa, sino si confirió un beneficio indebido a los empleados de Petroecuador en primer lugar[303]. La Demandada rechaza el argumento de que se trató de un evento para desarrollar el equipo o fortalecer las relaciones, dado que no hay pruebas de ningún contacto entre funcionarios de Petroecuador y Worley[304]. Sin perjuicio de lo anterior, Ecuador también sostiene que las intenciones de Worley respecto de este viaje (esto es, que se trataba de "un evento para interactuar con los clientes" y una "actividad para desarrollar el equipo") y su disposición a invitar a otros

---

[296]   Dúplica sobre Jurisdicción, párr. 140; EPA de la Demandante, párr. 130; Declaración de Falcon II, párr. 33 (**CWS-5**); Correo Electrónico de A. Guerrero a R. Falcon y R. Hooper, 16 de octubre de 2012 (**R-359**); Correo Electrónico de A. Bravo a A. Guerrero, 17 de octubre de 2012 (**R-360**); Correo Electrónico de R. Hooper a W. Phillips, 2 de abril de 2013 (**R-433**).

[297]   Réplica, párr. 392; Dúplica sobre Jurisdicción, párr. 139; Invitaciones de Worley para el Viaje de la Fórmula 1, 2013 (**C-721**).

[298]   Réplica, párr. 392; Declaración de Falcon II, párr. 33 (**CWS-5**).

[299]   Réplica, párr. 392; Correo Electrónico de Worley, 22 de octubre de 2012 (**C-736**).

[300]   Réplica, párr. 392; Informe de gastos SVC-IE673983 de Worley, 24 de octubre de 2012 (**C-719**).

[301]   Réplica, párr. 392; Declaración de Falcon II, párr. 33 (**CWS-5**).

[302]   EPA de la Demandante, párr. 127.

[303]   Dúplica, párr. 107.

[304]   EPA de la Demandada, párrs. 65-68; Transcripción de la Audiencia, Día 2, 328:18-25, 332:1-4 (Falcon).

clientes son irrelevantes[305]. Según la Demandada, el derecho ecuatoriano no reconoce estas justificaciones para conferir beneficios materiales en el contexto de una relación contractual[306].

201. En último lugar, en respuesta a la insistencia de la Demandante de que no hubo un *quid pro quo*, Ecuador sostiene que tras el viaje en cuestión Worley recibió más de USD 100 millones en contratos adicionales con Petroecuador. Presuntamente, los empleados que visitaron Houston continuaron a cargo de los Contratos de Worley y los pagos en el marco de aquellos[307].

   iv.   Marzo de 2013

202. Según la Demandada, el 14 de marzo de 2013 Worley adquirió seis entradas para un partido de la NBA entre los Spurs de San Antonio y los Mavericks de Dallas que se jugó ese mismo día en San Antonio (Texas)[308]. Sostiene que las entradas estaban destinadas para los Sres. Bravo y Reyes, un amigo personal de cada uno y dos personas no identificadas[309]. Según la Demandada, este viaje carecía de justificación comercial y ni siquiera contó con la participación de alguien de Worley[310].

203. El viaje supuestamente se programó para dos días, del 14 al 16 de marzo de 2013[311]. El Sr. Falcon confirmó que Worley pagó solo las entradas para el partido[312]. La Demandada sostiene que Worley también compró pasajes en clase *business* para el Sr. Bravo y sus invitados para volar a San Antonio desde Ecuador y de regreso[313]. La Demandada indica también que Worley ofreció pagar la estancia de dos días del Sr. Bravo en el hotel[314].

204. De igual modo, la Demandada afirma que Worley gastó USD 8.063,60 en entradas para que los Sres. Pareja, Bravo y Reyes, funcionarios de Petroecuador, así como sus cónyuges, asistieran al Espectáculo de Ganadería y el Rodeo en Houston de 2013 los días 16 y 17 de marzo de dicho año

---

[305]   Dúplica, párr. 109.

[306]   Dúplica, párr. 109.

[307]   Dúplica, párr. 153.

[308]   Dúplica, párrs. 89, 111 y nota de pie de página 193; Informe de gastos de Worley presentado por R. Falcon, 7 de febrero de 2013 (**R-416**); Informe de gastos SVC-IE729098 de Worley, 13 de febrero de 2013 (**R-417**); Informe de gastos SVC-IE745047 de Worley, 21 de marzo de 2013 (**R-418**).

[309]   Dúplica, párr. 113; Correo Electrónico de H. Guarderas a R. Falcon, 14 de marzo de 2013 (**R-412**).

[310]   EPA de la Demandada, párr. 76; Transcripción de la Audiencia, Día 3, 502:4-11 (Falcon).

[311]   Dúplica, párr. 90.

[312]   Transcripción de la Audiencia, Día 3, 501:24- 504:22 (Falcon).

[313]   Dúplica, párrs. 90, 114; Correo Electrónico de R. Falcon a R. Hooper, 14 de marzo de 2013 (**R-370**); Correo Electrónico de A. Bravo a R. Falcon, 28 de febrero de 2013 (**R-425**).

[314]   Dúplica, párr. 91; Correo Electrónico de R. Hooper a W. Phillips, 11 de marzo de 2013 (**R-426**).

(el "**Viaje del Rodeo**")[315]. Para el Viaje del Rodeo, Worley supuestamente gastó USD 1.244,91 en comidas, incluyendo cenas, y el transporte al evento[316].

205.   La Demandada alega que ninguno de los gastos de Worley incurridos en relación con el Viaje del Rodeo se incluyeron en su registro de obsequios, conforme se estipula normalmente en las directivas internas[317].

206.   La Demandante aclara que Worley obtuvo las entradas para esos eventos para funcionarios de Petroecuador que se encontraban en los Estados Unidos con motivo de una reunión del proyecto en Houston y que ellos mismos organizaron y pagaron su propio viaje y reservas de hotel[318]. El Sr. Falcon afirmó que el partido de la NBA cumplió un fin legítimo de desarrollo del equipo y que los funcionarios de Worley no asistieron porque los funcionarios de Petroecuador no habían podido sumarse al partido original al que planeaban asistir juntos[319].

v.   Abril de 2013

207.   Según la Demandada, en abril de 2013 el Sr. Pareja solicitó a Worley, por correo electrónico privado, que contratara al Sr. Carlos Faidutti Navarrete ("**Sr. Faidutti**"), quien sería "cargado al contrato de WP" y percibiría un sueldo de USD 5.000, pero dependería del Sr. Pareja[320]. La planilla del formulario de Autorización de Ingreso de Personal (PAAF, por sus siglas en inglés) para el Proyecto de la Refinería Esmeraldas, en la que se listan los individuos asignados a ese proyecto, refleja que el Sr. Faidutti fue empleado a tiempo completo durante ocho meses, entre el 9 de abril de 2013 y el 31 de diciembre de 2014[321].

208.   La Demandante sostiene que no tiene registros de la contratación del Sr. Faidutti ni del pago de su salario[322]. Sin embargo, observa que, el 9 de abril de 2013, Worley escribió al Sr. Bravo para

---

[315]   Dúplica, párr. 116; Informe de gastos de Worley presentado por R. Falcon, 7 de febrero de 2013 (**R-416**); Informe de gastos SVC-IE729098 de Worley, 13 de febrero de 2013 (**R-417**).

[316]   Dúplica, párr. 117; Informe de gastos SVC-1E745047 de Worley, 17 de marzo de 2013 (**R-418**).

[317]   Dúplica, párr. 117; Directiva Ejecutiva (**C-746**).

[318]   Dúplica sobre Jurisdicción, párr. 139; Declaración de Falcon III, párr. 26 (**CWS-7**).

[319]   Transcripción de la Audiencia, Día 3, 505:24- 506:12 (Falcon).

[320]   Contestación, párr. 10; Dúplica, párr. 118; EPA de la Demandada, párr. 78; Correo Electrónico de R. Hooper a W. Phillips, 2 de abril de 2013 (**R-433**).

[321]   Dúplica, párr. 121; Formulario para Autorización de Asignación de Personal 408005-00431 Modernización de Refinería Esmeraldas de Petroecuador – Planilla PAAF, pág. 5 (**C-551**).

[322]   Réplica, párr. 395; Dúplica sobre Jurisdicción, párr. 140; Formulario para Autorización de Asignación de Personal 408005-00431 Modernización de Refinería Esmeraldas de Petroecuador – Planilla PAAF, pág. 5 (**C-551**); Carta de Worley a Petroecuador No. 408005-00445-00-AD-LTR-WPI-EPP-1672, 9 de abril de 2013, pág. 1 (**C-552**); Carta de Worley a Ecuador, 7 de febrero de 2022, párr. 12 (**R-435**).

solicitar autorización a fin de cargar al Sr. Faidutti como "Consultor de electricidad"[323]. Según la Demandada, el Sr. Faidutti, economista por formación, no estaba cualificado para ocupar ese cargo, dado que no contaba con un título en ingeniería[324].

209. La Demandada sostiene también que Worley contrató a Gabriela Bock ("**Sra. Bock**") como "Oficial de Relaciones Públicas" a raíz de su "amistad" con el Sr. Pareja. La Demandante rechaza esta aserción: explica que desconocía que la Sra. Bock tuviera ninguna relación con Petroecuador y que, por el contrario, se la contrató como Administradora de Oficina y Gerente de Relaciones Públicas debido a que su perfil coincidía con las necesidades de Worley[325].

 vi. Mayo de 2013

210. Según la Demandada, durante el período entre el 6 y el 10 de mayo de 2013, Worley sufragó el viaje a Houston del antiguo vicepresidente del Ecuador, Jorge Glas, y de los Sres. Calvopiña, Pareja, Bravo, Tapia y Reyes para asistir a una conferencia sobre tecnología extranjera[326]. Worley presuntamente obtuvo seis entradas para la conferencia y gastó USD 11.150 en seis habitaciones de hotel de ocupación doble durante cuatro noches[327]. La Demandada sostiene que Worley cargó estos gastos (pero no ningún otro relacionado con el mismo viaje) a Petroecuador como un coste por la prestación de sus servicios[328].

 vii. Septiembre de 2013

211. El 18 de septiembre de 2013, Worley sufragó una cena en Ecuador para celebrar el cumpleaños del Sr. Calvopiña[329]. Según la Demandada, ningún empleado de Worley asistió a este evento[330].

---

[323] Carta de Worley a Petroecuador No. 408005-00445-00-AD-LTR-WPI-EPP-1672, 9 de abril de 2013, págs. 1, 19 (**C-552**).

[324] Dúplica, párr. 120; Carta de Worley a Petroecuador No. 408005-00445-00-AD-LTR-WPI-EPP-1672, 9 de abril de 2013, pág. 20 (**C-552**).

[325] Dúplica sobre Jurisdicción, párr. 140; Declaración de Falcon III, párr. 19 (**CWS-7**).

[326] Dúplica, párr. 100; Correo Electrónico de R. Falcon a C. Stoltz, 3 de abril de 2013 (**R-378**).

[327] Dúplica, párr. 102; Correo Electrónico de R. Falcon a C. Stoltz, 3 de abril de 2013 (**R-378**); Correo Electrónico de R. Falcon a A. Bravo, 8 de abril de 2013 (**R-381**).

[328] Dúplica, párr. 102; Correo Electrónico de A. Guerrero a A. Bravo, 4 de abril de 2013 (**R-380**).

[329] Informe de gastos SVC-IE829315 de Worley, 23 de septiembre de 2013 pág. 1 (**R-420**); Correo Electrónico de R. Falcon a A. Guerrero, 19 de septiembre de 2013 (**R-421**).

[330] Dúplica, párr. 133; Correo Electrónico de R. Falcon a A. Guerrero, 19 de septiembre de 2013 (**R-421**).

212. La Demandante confirma que la única cena de cumpleaños que pagó fue en un restaurante de Quito, para 20 comensales, y que gastó un total de USD 1.314.94 incluidos impuestos y propina[331].

       viii.     Septiembre a diciembre de 2014

213. Según la Demandada, Worley obsequió numerosas obras de arte y otros objetos de valor a funcionarios de Petroecuador[332].

214. En septiembre y octubre de 2014, Worley obsequió "[obras de] arte originales de [un] artista ecuatoriano", cada una valorada en USD 600, a funcionarios de Petroecuador: los Sres. Pareja, Calvopiña, Marcelo Robalino y Gonzalo Flores[333].

215. En diciembre de 2014, Worley obsequió "estatuas[s] de caballos talladas a mano" a 16 funcionarios de Petroecuador, cada una valuada en USD 275, llevando a un gasto total de USD 4.400[334].

216. La Demandante aclara que las obras de arte local, que se inscribieron como obsequios, se presentaron como obsequios para las fiestas de fin de año o, en el caso de los adornos de escritorio, debido a la imposibilidad de emplearlos para su fin original[335].

217. La Demandada cita un correo electrónico del Sr. Falcon como prueba de que estos no son los únicos obsequios que Worley entregó a funcionarios de Petroecuador y RDP, sino meramente los más recientes[336].

---

[331] Dúplica sobre Jurisdicción, párr. 139; Informe de gastos SVC-IE829315 de Worley, 23 de septiembre de 2013 pág. 1 (**R-420**); Correo Electrónico de R. Falcon a A. Guerrero, 19 de septiembre de 2013 (**R-421**).

[332] Dúplica, párr. 129.

[333] Correo Electrónico de R. Falcon a W. Gurry, al que se adjunta la Lista de Obsequios de Worley para 2014, 8 de mayo de 2017 (**R-444**) (traducción del Tribunal).

[334] Correo Electrónico de R. Falcon a W. Gurry, al que se adjunta la Lista de Obsequios de Worley para 2014, 8 de mayo de 2017 (**R-444**) (traducción del Tribunal).

[335] Dúplica sobre Jurisdicción, párr. 139; Declaración de Falcon III, párr. 29 (**CWS-7**); Correo Electrónico de R. Falcon a W. Gurry, al que se adjunta la Lista de Obsequios de Worley para 2014, 8 de mayo de 2017 (**R-444**). La Demandante aclara que obsequió las obras de arte local, que consistían en adornos de escritorio, porque originalmente estaban destinadas a ser obsequiadas en celebración de la inauguración de una oficina local de Worley en Quito, algo que nunca se materializó.

[336] Dúplica, párr. 131; Correo Electrónico de R. Falcon a W. Gurry, al que se adjunta la Lista de Obsequios de Worley para 2014, 8 de mayo de 2017 (**R-444**).

ix.    Agosto de 2013 a mayo de 2015

218.  Según la Demandada, durante este período Worley obsequió numerosas obras de arte y otros objetos de valor a funcionarios de Petroecuador[337].

219.  Asimismo, la Demandada pone en entredicho el rol de Worley al recomendar a Petroecuador la contratación de MMR Group, que la Demandada sostiene que guarda relación con corrupción en Ecuador[338]. En particular, observa que Worley respaldó a MMR Group como el único oferente para tres contratos de Petroecuador, los cuales tenían un valor total de USD 133,5 millones[339]. De acuerdo con la Demandada, a cambio de la contratación de MMR Group, los Sres. Pareja y Bravo de Petroecuador recibieron cerca de USD 500.000 en sobornos del director de MMR Group, el Sr. Arturo Pinzón ("**Sr. Pinzón**")[340].

220.  La Demandada menciona el siguiente encuentro como prueba de la supuesta relación inapropiada entre Worley y MMR Group: después de que MMR Group obtuviera su primer contrato por USD 98 millones, el Sr. Pinzón intentó entregar obsequios al Sr. Falcon de Worley, quien había ayudado a MMR Group a obtener trabajo de Petroecuador. El Sr. Falcon no estaba en su oficina en ese momento por lo que Alejandro Guerrero, su subordinado, recibió la entrega y envió a otro empleado a colocar los obsequios en el apartamento personal del Sr. Falcon[341].

221.  En octubre de 2013, Worley realizó una oferta al Sr. Pareja para iniciar un proyecto por valor de USD 2,7 millones en la Isla Tolita Pampa de Oro (el "**Proyecto Isla Tolita**"), donde el Sr. Pareja tenía la "hacienda" de su familia[342]. De acuerdo con la Demandada, Worley prometió financiar el proyecto e intentó obtener un "compromiso" de MMR Group para completar la construcción necesaria[343]. Después de que Worley recibiera más trabajo de Petroecuador y MMR Group recibió

---

[337]    Dúplica, párrs. 129-131.

[338]    Réplica, párr. 191 y nota de pie de página 594; Informe 409070-00005-94.1-EG-REP-WPI-EPP-0003 de Worley, 10 de diciembre de 2015 (**R-177**).

[339]    Contrato No. 2014027 de MMR Group, 30 de julio de 2014 (**R-212**); Contrato No. 2015029 complementario al contrato de MMR Group, 16 de junio de 2015 (**R-213**); Contrato No. 2015161 de MMR Group, 10 de diciembre de 2015 (**R-277**).

[340]    Dúplica, párr. 135.

[341]    Dúplica, párr. 136; Correo Electrónico de R. Falcon a A. Guerrero, 16 de octubre de 2014 (**R-454**).

[342]    Correo Electrónico de G. Bock a A. Guerrero, 5 de diciembre de 2014 (**R-441**); Correo Electrónico de C. Pareja a R. Hooper, 25 de octubre de 2013 (**R-455**); El Telégrafo, "Horamen revela el vacío y colapso de la historia", 6 de junio de 2017 (**R-456**); El Universo, "Tolita Pampa de Oro, histórico y olvidado", 15 de agosto de 2002 (**R-458**).

[343]    Correo Electrónico de C. Pareja a R. Hooper, 25 de octubre de 2013 (**R-455**).

su contrato por USD 98 millones, dice la Demandada, el Proyecto Isla Tolita se tornó más ambicioso. Con el tiempo, el presupuesto presuntamente alcanzó los USD 6 millones[344].

222. Según la Demandada, en mayo de 2015, Worley y MMR Group fletaron un avión y una embarcación privados para llevar al Sr. Pareja al Proyecto Isla Tolita a ver el avance realizado[345]. Robert Hooper ("**Sr. Hooper**") de Worley y el Sr. Pinzón presuntamente se sumaron también al viaje[346].

223. En respuesta a las alegaciones de Ecuador de que la relación de Worley con MMR Group y su recomendación eran inadecuadas, la Demandante destaca que en el momento en el que hizo la recomendación no estaba al tanto de los vínculos con la corrupción de MMR Group. La Demandante indica que la Demandada "habla con el beneficio de la retrospección[347]".

x.   Diciembre de 2011 a febrero de 2016

224. La Demandada alega que, durante la ejecución de sus Contratos con Petroecuador y RDP, Worley compró varias veces vuelos a Houston para sus contactos en esas empresas[348]. Sostiene que esos viajes siguieron hasta principios de febrero de 2016 e incluyeron gastos de vuelos, hoteles, comidas y otras formas de entretenimiento[349].

225. Los registros de la Demandada muestran que se realizaron al menos 29 viajes entre diciembre de 2011 y febrero de 2016, pero la Demandada sostiene que probablemente se realizaran viajes adicionales, sobre los cuales no se reveló información debido a deficiencias en la exhibición de documentos[350]. Ecuador considera que Worley gastó al menos USD 128.261,13 en estos viajes, que luego cargó a Petroecuador y RDP como gastos reembolsables por sus servicios[351].

226. La Demandada observa que los funcionarios de Petroecuador invitados a Houston viajaban con frecuencia con sus esposas o "amigos", Worley pagaba los gastos incurridos por esas personas y los gastos de los funcionarios mismos y luego cargaba estos gastos a Petroecuador en concepto de gastos incurridos por sus servicios[352]. Ecuador alega que los empleados de Worley asistieron

---

[344]   Correo Electrónico de G. Bock a A. Guerrero, 5 de diciembre de 2014 (**R-441**).

[345]   Dúplica, párr. 141; Correo Electrónico de J. Courville a R. Hooper, 29 de mayo de 2015 (**R-457**).

[346]   Correo Electrónico de R. Hooper, 29 de mayo de 2015 (**R-457**).

[347]   Réplica, nota al pie 594.

[348]   Dúplica, párr. 93.

[349]   Dúplica, párr. 93.

[350]   Dúplica, párr. 95.

[351]   Dúplica, párr. 96.

[352]   Dúplica, párr. 98.

con sus respectivas a la cena con funcionarios de Petroecuador durante la estadía de estos últimos en Houston; los gastos de las cenas se facturaron posteriormente a Petroecuador[353].

227.  Según la Demandante, no hay nada "llamativo" ni "ilícito" sobre estos viajes y los gastos relacionados[354]. La Demandante afirma que era natural que la mayoría de los viajes ocurriesen en Houston (Texas), donde se encontraban Worley y otros contratistas, y que estos viajes tenían fines comerciales legítimos[355]. Worley sostiene además que ni las leyes de Ecuador ni las de los Estados Unidos prohíben el pago de gastos de negocios razonables a funcionarios públicos con fines comerciales legítimos, tales como "reuniones de proyecto"[356]. La Demandante supuestamente preveía que Petroecuador y RDP reembolsarían los gastos incurridos por estos viajes y observa que RDP, por ejemplo, así lo hizo[357].

228.  La Demandante defiende también como correctos los gastos específicos en relación con cada uno de los viajes listados a continuación para funcionarios de Petroecuador y RDP a Houston[358]:

    (i)    Viaje en septiembre de 2012 de los Sres. Pareja y Tapia. La Demandante los describe como gastos de hotel y transporte.

    (ii)    Viaje de cinco días en enero de 2013 del Sr. Pareja. La Demandante describe este viaje como "intrascendente" y "legítimo".

    (iii)    Viaje de tres días en febrero de 2013 del Sr. Bravo y Pareja. La Demandante defiende su elección de alojamiento para los funcionarios visitantes.

    (iv)    Viaje del Sr. Castro en noviembre de 2013. La Demandante defiende los gastos relacionados con este viaje con el fundamento de que su cliente los aprobó proactivamente.

---

[353]  Dúplica, párr. 99; Informe de gastos SVC-IE608142 de Worley, 19 de junio de 2012 (**R-415**); Correo Electrónico de R. Hooper a R. Falcon, 4 de julio de 2013 (**R-419**).

[354]  Réplica, párr. 393.

[355]  Dúplica sobre Jurisdicción, párr. 137; Correos electrónicos de Worley, 13 de febrero de 2013 (**C-981**); Actas de reunión entre Worley, Petroecuador, SK y otros, 20-21 de marzo de 2013 (**C-1086**); Resúmenes de las reuniones entre Petroecuador, Worley, Azul, SK, UOP, 24 de mayo de 2012 (**R-348**).

[356]  Réplica, párr. 393 (traducción del Tribunal); FCPA (**C-887**).

[357]  Declaración de Falcon II, párr. 34 (**CWS-5**); Proforma R-11, 29 de noviembre de 2012, págs. 36, 47 (**C-932**); Contrato No. 2011030, Planilla General Reembolsos - enero de 2013, enero de 2013 (**C-724**); Worley, Gastos de viajes no laborales (EE. UU.) para período enero - diciembre de 2013, Proyecto Complejo Petroquímico RDP, 24 de marzo de 2013 (**C-933**); Worley, Informe de gastos, pág. C-939_7 (**C-939**).

[358]  Réplica, párr. 393.

229.  En último lugar, la Demandante responde a la cita que hace Ecuador de un correo electrónico con copia a personal de Worley, en el que un empleado de Tecnazul sugirió la imputación de los gastos de viaje como horas hombre trabajadas. La Demandante sostiene que las únicas horas hombre facturadas en este viaje correspondieron al "trabajo efectivamente realizado"[359].

230.  Fabián Andrade Narváez ("**Sr. Andrade**"), el perito jurídico de la Demandada, opina que el objeto comercial declarado de estos viajes a Houston (es decir, "reuniones de proyecto"): (i) no les confiere carácter legal en el derecho administrativo ecuatoriano; (ii) no habilita a Worley a imputar gastos incurridos a los Proyectos con RDP y Petroecuador; y (iii) no exime a Worley de responsabilidad administrativa[360].

---

[359]  Réplica, párr. 393 y nota al pie 1132; Solicitud Redfern de la Demandada No. 7; Orden procesal N.º 4; Planilla No. 25 del contrato 2011030, enviada en la carta No. 2013408005-0045-00-PC-LTR-WP1-EPP-3406, 17 de diciembre de 2013, pág. 259 (**C-429**); Planilla No. 15 del contrato 2012035, que se incluyó en la solicitud de pago contenida en la carta 408005-0045-00.0-PC-LTR-WP1-EPP-4101 3637, 24 de enero de 2014, pág. 3 (**C-430**); Factura de la nómina de Azul No. 0002412, 4 de febrero de 2014 (**C-431**); Planilla No. 17 del Contrato 2012036 del Contrato 2012035, 28 de febrero de 2014, pág. 123 (**C-432**).

[360]  Dúplica, párr. 97; Informe de Andrade II, párrs. 52-53, 57-58 (**RER-4**).

## IV.   PETITORIOS

### 1.   EL PETITORIO DE LA DEMANDANTE

231. En su Escrito de Demanda, la Demandante formula el siguiente petitorio:

> Por los motivos expuestos en el presente, Worley solicita que se dicte un laudo por el que se le conceda el siguiente resarcimiento:

> - Una declaración en el sentido de que la diferencia se encuentra dentro de la jurisdicción y competencia del Tribunal;

> - Una declaración en el sentido de que Ecuador violó el Tratado, los acuerdos de inversión y el derecho internacional en lo que respecta a la inversión de Worley;

> - Una declaración en el sentido de que los actos y omisiones del Ecuador que son objeto del presente, como así también los actos y omisiones de sus organismos y entidades, por los que Ecuador es internacionalmente responsable, omitieron brindar un trato justo y equitativo; omitieron cumplir obligaciones asumidas en relación con la inversión de Worley; constituyeron una expropiación o medidas equivalentes a una expropiación sin indemnización pronta, adecuada y efectiva; omitieron brindar protección y seguridad plenas; menoscabaron la inversión de Worley a través de medidas arbitrarias y omitieron proporcionar medios eficaces para hacer valer los derechos asociados a la inversión de Worley y los acuerdos de inversión, en violación de los artículos II.3, II.7 y III.1 del Tratado, además de incumplir los Contratos, que califican como "acuerdos de inversión";

> - Una orden dirigida a que Ecuador cese sus actos ilícitos, desista de continuar con sus actos ilícitos y restablezca la situación existente antes de su comisión de los actos ilícitos;

> - Una orden a favor de Worley a efectos de la restitución o del pago del equivalente pecuniario por todos los daños causados a su inversión, conforme se señala en la Sección VI, los cuales podrán ser objeto de mayor análisis y cuantificación en el transcurso del presente procedimiento, incluidos el daño moral y daños punitivos;

> - El otorgamiento de intereses anteriores y posteriores al laudo hasta la fecha de pago íntegro y efectivo por parte del Ecuador;

> - El otorgamiento a Worley de todos los costes en que ha incurrido en este procedimiento y en los procedimientos ilícitos del Ecuador, incluidos los honorarios y gastos de abogados, y

> - Cualquier otro resarcimiento que el Tribunal estime justo y apropiado[361].

232. En su Réplica, la Demandante formula el siguiente petitorio:

> Por los motivos expuestos en el presente, Worley solicita que se dicte un laudo por el que se le conceda el siguiente resarcimiento:

> - Una declaración en el sentido de que la diferencia se encuentra dentro de la jurisdicción y competencia del Tribunal;

---

[361] Escrito de Demanda, párr. 418 (traducción del Tribunal).

▪ Una declaración en el sentido de que Ecuador violó el Tratado, los acuerdos de inversión y el derecho internacional en lo que respecta a la inversión de Worley;

▪ Una declaración en el sentido de que los actos y omisiones del Ecuador que son objeto del presente, como así también los actos y omisiones de sus organismos y entidades, por los que Ecuador es internacionalmente responsable, omitieron brindar un trato justo y equitativo; omitieron cumplir obligaciones asumidas en relación con la inversión de Worley; constituyeron una expropiación o medidas equivalentes a una expropiación sin indemnización pronta, adecuada y efectiva; omitieron brindar protección y seguridad plenas; menoscabaron la inversión de Worley a través de medidas arbitrarias y omitieron proporcionar medios eficaces para hacer valer los derechos asociados a la inversión de Worley y los acuerdos de inversión, en violación de los artículos II.3, II.7 y III.1 del Tratado, además de incumplir los Contratos, que califican como "acuerdos de inversión";

▪ Una orden dirigida a que Ecuador cese sus actos ilícitos, desista de continuar con sus actos ilícitos y restablezca la situación existente antes de su comisión de los actos ilícitos;

▪ Una orden a favor de Worley a efectos de la restitución o del pago del equivalente pecuniario por todos los daños causados a su inversión, conforme se señala en la Sección V, los cuales podrán ser objeto de mayor análisis y cuantificación en el transcurso del presente procedimiento, incluidos el daño moral y daños punitivos;

▪ El otorgamiento de intereses anteriores y posteriores al laudo hasta la fecha de pago íntegro y efectivo por parte del Ecuador:

▪ El otorgamiento a Worley de todos los costes en que ha incurrido en este procedimiento y en los procedimientos ilícitos del Ecuador, incluidos los honorarios y gastos de abogados, y

▪ Una orden dirigida a que Ecuador deje de agravar la controversia; y

▪ Cualquier otro resarcimiento que el Tribunal estime justo y apropiado[362].

233.   En su Dúplica sobre Jurisdicción, la Demandante formula el siguiente petitorio:

Por los motivos expuestos en el presente y en sus escritos anteriores, Worley solicita respetuosamente al Tribunal que dicte un laudo por el que se conceda el siguiente resarcimiento:

▪ Una declaración en el sentido de que la diferencia se encuentra dentro de la jurisdicción y competencia del Tribunal;

▪ Una orden dirigida a que la Demandada cese de agravar la controversia, especialmente inventando acusaciones de corrupción;

▪ Una orden dirigida a que la Demandada pague todas las costas de este arbitraje, incluidos, sin limitación, los costes legales de la Demandante, los costes de abogados internos y honorarios periciales, así como los honorarios y gastos del Tribunal; y

▪ Cualquier otro resarcimiento que el Tribunal estime justo y apropiado[363].

---

[362] Réplica, pág. 456 (traducción del Tribunal).
[363] Dúplica sobre Jurisdicción, párr. 160 (traducción del Tribunal).

234. En su Escrito Post-Audiencia, la Demandante formula el siguiente petitorio:

Por los motivos expuestos en el presente y en sus escritos anteriores, Worley solicita respetuosamente al Tribunal que dicte un laudo por el que se conceda el siguiente resarcimiento:

a)   Una declaración en el sentido de que la diferencia se encuentra dentro de la jurisdicción y competencia del Tribunal;

b)   Una declaración de que Ecuador incumplió el Tratado, los acuerdos de inversión y el derecho internacional en lo que respecta a la inversión de Worley;

c)   Una orden a favor de Worley a efectos de la restitución y todos los daños causados a su inversión, y el otorgamiento de intereses anteriores y posteriores al laudo hasta la fecha de pago íntegro y efectivo por parte del Ecuador;

d)   Una orden dirigida a que la Demandada pague todos los costes de este arbitraje; y

e)   Cualquier otro resarcimiento que el Tribunal estime justo y apropiado[364].

235. En su Escrito sobre Costas, la Demandante formula el siguiente petitorio:

Por los motivos expuestos en el presente, la Demandante solicita que el Tribunal incluya en su laudo una orden para que:

(a)   La Demandada reembolse las costas del arbitraje de la Demandante, incluidos, sin carácter limitativo, los costes jurídicos de la Demandante, los honorarios de los peritos, los honorarios y gastos del Tribunal, y los costes de la CPA, así como los relacionados con las auditorías infundadas, investigaciones y procedimientos que el Estado sigue llevando adelante en contra de Worley en Ecuador y el Procedimiento bajo la Sección 1782, conforme se detalla en el Escrito sobre Costas adjunto a esta presentación como Anexo A;

(b)   La Demandada pague interés sobre las costas que el Tribunal conceda a la tasa que este último considere conveniente; y

(c)   Adjudique toda medida resarcitoria adicional a la que el Tribunal considere que la Demandante tiene un derecho probado[365].

## 2.   EL PETITORIO DE LA DEMANDADA

236. En su Contestación, la Demandada formula el siguiente petitorio:

Por los motivos antes expresados, Ecuador solicita respetuosamente las siguientes medidas resarcitorias:

(i)   Una declaración en el sentido de que WorleyParsons no se encuentra protegida por el Tratado entre EE. UU. y Ecuador porque incurrió en corrupción en relación con funcionarios ecuatorianos.

---

[364]   EPA de la Demandante, párr. 168 (traducción del Tribunal).

[365]   Escrito sobre Costas de la Demandante, párr. 25 (traducción del Tribunal).

(ii)     La desestimación de las pretensiones de WorleyParsons.

(iii)    Una orden para que WorleyParsons sufrague las costas del presente procedimiento arbitral, incluyendo el coste del Tribunal Arbitral y los costes legales y cualesquier otros costes incurridos por Ecuador, sobre la base de una indemnización total.

(iv)    Una orden para que WorleyParsons pague intereses sobre las costas concedidas al Ecuador, por una cantidad que será determinada por el Tribunal[366].

237.   En su Dúplica, la Demandada formula el siguiente petitorio:

Por los motivos antes expresados, Ecuador solicita respetuosamente las siguientes medidas resarcitorias:

(A)    Una declaración en el sentido de que Worley no se encuentra protegida por el Tratado entre EE. UU. y Ecuador porque incurrió en corrupción en relación con funcionarios ecuatorianos.

(B)    La desestimación de las pretensiones de Worley.

(C)    Una orden para que Worley sufrague las costas del presente procedimiento arbitral, incluyendo el coste del Tribunal Arbitral y los costes legales y cualesquier otros costes incurridos por Ecuador, sobre la base de una indemnización total.

(D)    Una orden para que Worley pague intereses sobre las costas concedidas al Ecuador, por una cantidad que será determinada por el Tribunal[367].

238.   En su Escrito Post-Audiencia, la Demandada formula el siguiente petitorio:

Por los motivos antes mencionados y las pruebas y fuentes jurídicas que constan en el expediente, Ecuador solicita respetuosamente al Tribunal que emita un laudo que contemple las medidas resarcitorias indicadas en la Dúplica del Ecuador en los párrafos 730–31[368].

239.   En su Escrito sobre Costas, la Demandada formula el siguiente petitorio:

Por los motivos antes expresados, Ecuador solicita las siguientes medidas resarcitorias:

a)     Una orden para que Worley sufrague las costas del procedimiento arbitral, incluyendo el coste del Tribunal Arbitral y los costes legales y cualesquier otros costes incurridos por Ecuador, sobre la base de una indemnización total, por una cantidad total de USD 6.158.161,65; y

b)     Intereses sobre todas los costas concedidas a Ecuador, por una cantidad que será determinada por el Tribunal[369].

---

[366]   Escrito de Contestación, párr. 576 (traducción del Tribunal).

[367]   Dúplica, párr. 730 (traducción del Tribunal).

[368]   EPA de la Demandada, párr. 217 (traducción del Tribunal).

[369]   Escrito sobre Costas de la Demandada, párr. 31 (traducción del Tribunal).

## V.   JURISDICCIÓN Y ADMISIBILIDAD

240.   En su Laudo Parcial, el Tribunal rechazó las Objeciones Preliminares que se habían bifurcado para ser abordadas de modo preliminar, a saber: (i) la objeción de la Demandada a la jurisdicción *ratione personae* del Tribunal bajo el artículo I.2 del Tratado; y (ii) el argumento de la Demandada de que las presuntas inversiones de la Demandante no pueden calificarse como "inversiones" bajo el artículo I.1 a) del Tratado porque "no [son] propiedad ni está[n] controladas[s] directa o indirectamente por nacionales o sociedades de la otra Parte" y, en consecuencia, el Tribunal carece de jurisdicción *ratione materiae* para decidir las pretensiones de la Demandante.

241.   Las restantes objeciones a la jurisdicción de la Demandada son las siguientes:

    (i)   El Tribunal carece de jurisdicción *ratione personae* respecto de todas las pretensiones porque Worley está controlada por una sociedad australiana que no está protegida por el Tratado, la cual ostenta la propiedad efectiva de la inversión;

    (ii)   El Tribunal carece de jurisdicción *ratione materiae* porque la Demandante no realizó una "inversión" en el sentido dado a este término por el Tratado y el derecho internacional consuetudinario y, por ello, no existe una controversia en relación con un "acuerdo de inversión" o "con respecto a una inversión" en el sentido del artículo I.1 y el artículo VI.1 del Tratado[370];

    (iii)   Incluso si el Tribunal determinase que la Demandante realizó una inversión protegida en Ecuador, esas inversiones estuvieron viciadas de ilegalidad, corrupción, fraude y mala fe y, en consecuencia, no están protegidas por el Tratado;

    (iv)   Respecto de la admisibilidad de las pretensiones de la Demandante:

        a)   Las pretensiones de la Demandante relativas a las auditorías fiscales y los procedimientos administrativos del SRI, las resoluciones de la Contraloría General y el impago en virtud del Contrato de la Refinería Esmeraldas se plantearon ante un foro diferente y, por ende, su consideración se encuentra vedada en virtud del artículo VI.2 del Tratado;

        b)   El Tribunal también carece de jurisdicción *ratione voluntatis* porque las pretensiones relativas a TJE, PSP y la cláusula sobre la obligación de no

---

370   Solicitud de Bifurcación, párrs. 49, 51.

menoscabar guardan relación con medidas fiscales y, por ello, quedan excluidas en virtud del artículo X.2 del Tratado;

c)   A la Demandante se le impide invocar la cláusula paraguas del artículo II.3 c) del Tratado citando supuestos incumplimientos de los Contratos porque estos últimos fueron celebrados por RDP y Petroecuador, que se encuentran fuera del ámbito de la protección del Tratado; y

d)   En el supuesto de que el Tribunal decida que ostenta jurisdicción, la Demandada sostiene que los sobornos y actuaciones de mala fe de la Demandante llevarían en todo caso a que sus pretensiones se tornen inadmisibles.

242.   Por los motivos expuestos a continuación, el Tribunal ha decidido aceptar las objeciones de la Demandada a la jurisdicción del Tribunal y a la admisibilidad de las pretensiones de la Demandante sobre la base de la existencia de corrupción e ilegalidad. En consecuencia, no resulta necesario que el Tribunal adopte una decisión sobre las restantes objeciones de la Demandada relativas a jurisdicción y admisibilidad o sobre el fondo de las pretensiones de la Demandante. Por motivos de economía arbitral, el Tribunal opta por no abordar estas cuestiones. Analizará a continuación las objeciones de la Demandada a la jurisdicción y la admisibilidad basadas en la existencia de corrupción e ilegalidad.

## 1.   LA POSICIÓN DE LA DEMANDADA

243.   A juicio de la Demandada, incluso si el Tribunal determinase que la Demandante realizó una inversión protegida en Ecuador, esas inversiones estuvieron viciadas por corrupción, fraude y mala y, en consecuencia, no gozan de la protección del Tratado[371].

244.   En particular, según la Demandada, la conducta supuestamente corrupta de la Demandante, descrita en la Sección III.5 *supra*, infringió de manera independiente el derecho internacional y las leyes de Ecuador, Francia y los Estados Unidos, así como las políticas y los procedimientos internacionales de Worley y Petroecuador[372]. Partiendo de estas alegaciones de ilegalidad, la Demandada afirma que la corrupción de la Demandante priva al Tribunal de su jurisdicción en virtud del Tratado o, como mínimo, vuelve inadmisibles todas las pretensiones de la Demandante[373].

---

[371]   Contestación, párr. 294, Dúplica, párr. 347.
[372]   Dúplica, párr. 142.
[373]   Dúplica, párr. 348.

245. Independientemente de las determinaciones de corrupción que implican a la Demandante, la Demandada solicita al Tribunal que rechace su jurisdicción con motivo de los actos de corrupción cometidos por los subcontratistas de la Demandante y los incumplimientos de la Demandante de la Ley de Contratación Pública[374].

### 1) Derecho ecuatoriano

246. En primer lugar, la Demandada sostiene que la conducta de la Demandante en relación con su supuesta inversión en Ecuador constituye un incumplimiento del derecho ecuatoriano.

247. La Demandada se remite principalmente al dictamen pericial del Sr. Andrade para sostener que Worley incumplió el derecho administrativo ecuatoriano[375]. En respuesta al argumento de la Demandante de que nunca tuvo la intención de incurrir en corrupción ni obtener un beneficio indebido, la Demandada sostiene que el derecho administrativo ecuatoriano no requiere que exista una intención corrupta ni un *quid pro quo* para que concurra un incumplimiento sancionable del derecho administrativo[376].

248. El Sr. Andrade opina que la conducta de Worley tuvo tanto una causa ilícita como un objeto ilícito, lo cual entraña la nulidad de pleno derecho de los contratos subyacentes[377].

249. Según la Demandada, la conducta de la Demandante constituyó también un incumplimiento del artículo 233 de la Constitución del Ecuador, que reza:

> Las servidoras o servidores públicos y los delegados o representantes a los cuerpos colegiados de las instituciones del Estado estarán sujetos a las sanciones establecidas por delitos de peculado, cohecho, concusión y enriquecimiento ilícito. La acción para perseguirlos y las penas correspondientes serán imprescriptibles y, en estos casos, los juicios se iniciarán y continuarán incluso en ausencia de las personas acusadas. Estas normas también se aplicarán a quienes participen en estos delitos, aun cuando no tengan las calidades antes señaladas[378].

250. Asimismo, a juicio de la Demandada, la conducta de la Demandante infringió el artículo 280 del Código Penal de Ecuador[379], el cual estipula:

> La persona que bajo cualquier modalidad ofrezca, dé o prometa a una o a un servidor público un donativo, dádiva, promesa, ventaja o beneficio económico indebido u otro bien de orden material para hacer, omitir, agilitar, retardar o condicionar cuestiones relativas a sus funciones

---

[374] Dúplica, párr. 348. Con respecto a los supuestos incumplimientos de la Ley de Contratación Pública de Ecuador *véase* la Sección III.5.2)(ii) *supra*.

[375] Dúplica, párrs. 143-145.

[376] Dúplica, párr. 143; Informe de Andrade II, párrs. 9, 27 (**RER-4**).

[377] Dúplica, párrs. 144-145; Informe de Andrade II, párrs. 8, 10 (**RER-4**).

[378] Dúplica, párrs. 146; Constitución de la República del Ecuador, artículo 233 (**RLA-216**).

[379] Dúplica, párrs. 146-150.

o para cometer un delito, será sancionada con las mismas penas señaladas para los servidores públicos[380].

251. La Demandada cita también como pertinente el artículo 369 del Código Penal del Ecuador, que sanciona la concertación entre dos o más personas para formar un grupo "con el propósito de cometer uno o más delitos" y que "tenga como objetivo final la obtención de beneficios económicos". El artículo 370 del Código sanciona además una "asociación ilícita", es decir, una asociación en la que "dos o más personas se asocien con el fin de cometer delitos"[381].

252. La Demandada observa además que el derecho ecuatoriano permite el uso de la prueba indiciaria para probar la comisión de un delito[382]. La prueba indiciaria se ha utilizado presuntamente para dictar condenas por corrupción, organización delictiva y asociación ilícita. Según la Demandada, los tribunales y fiscales ecuatorianos no pueden ignorar la prueba indiciaria ante el riesgo de que la conducta ilegal se mantenga impune[383].

253. En segundo lugar, y también dentro del ámbito del derecho ecuatoriano, la Demandada sostiene que la conducta de la Demandante vulneró los Contratos —todos ellos regidos por el derecho ecuatoriano— y el Código de Ética de Petroecuador[384].

254. En primer lugar, en relación con los Contratos, la Demandada afirma que Worley infringió las disposiciones contractuales siguientes al conferir beneficios a funcionarios de RDP y Petroecuador[385].

255. La Demandada hace referencia primero a la cláusula sobre "prácticas corruptas" del Contrato de la Refinería del Pacífico, conforme a la cual Worley se comprometió a:

> [T]omar todas las medidas necesarias a fin de garantizar que ningún Representante del Consultor otorgue, autorice, prometa ni ofrezca ningún obsequio, bonificación, comisión, soborno, compensación, dádiva, dinero o algo de valor directa o indirectamente a (i) un funcionario del gobierno o a un partido político o candidato a un puesto político o (ii) un intermediario externo, como un agente o representantes de ventas, con el fin de influir en cualquier acto o decisión oficial, inducir a dicho funcionario a usar su influencia o quebrantar el deber, obtener alguna ventaja indebida para asistir a cualquier persona o entidad a obtener

---

[380] Código Orgánico Integral Penal de Ecuador, artículo 280 (**RLA-225**); Dúplica, párr. 147, nota al pie 247.

[381] Dúplica, párr. 148.

[382] Dúplica, párr. 149; Corte Nacional de Justicia, Sala Especializada de lo Penal, Penal Militar, Penal Policial y Tránsito, *Resolución en casación No. 1323-2017*, 16 de agosto de 2017, pág. 136 (**RLA-339**).

[383] Dúplica, párr. 149; E. Alvear Tobar, *La validez de la prueba indiciaria en el proceso penal* (2020), pág. 89 (**RLA-338**).

[384] Dúplica, párrs. 150, 367.

[385] Dúplica, párr. 164-167; Contrato de la Refinería Esmeraldas, cláusula 11.1 (**C-3**); Contrato de la Refinería del Pacífico, Cláusulas 16.2.2, 16.2.3 (**C-8**). La disposición se reprodujo textualmente en cada contrato complementario.

o retener un negocio o influencia o afectar a las obligaciones del propietario o consultor al amparo del presente Contrato[386].

256. La Demandante se comprometió además "por cuenta propia, a defender, indemnizar y eximir de responsabilidad" a Petroecuador y sus "Filiales […] y cesionarios, respecto y en contra de los daños y perjuicios que se establezcan en su contra o que hayan sufrido como resultado de" cualquier "incumplimiento de una manifestación estipulada en esta Sección 16.2", ya sea por la Demandante o sus "Subcontratistas y los empleados o los contratistas independientes de cualquiera de ellos[387]".

257. Conforme a los Contratos, Worley también se comprometió a prestar sus servicios en cumplimiento del derecho ecuatoriano y las buenas prácticas del sector[388].

258. En tal sentido, según la Demandada, el Código de Ética de Petroecuador prohíbe a sus empleados que acepten cualquier obsequio o beneficio, independientemente de la intención subyacente[389]. Como parte de su compromiso con la "integridad", los funcionarios de Petroecuador están obligados a "no dar oportunidad para prácticas corruptas de cualquier naturaleza: soborno, fraude, recibir prebendas, uso abusivo de recursos públicos, entre otros[390]".

259. Partiendo de lo anterior, la Demandada afirma que la Constitución y el Código Penal de Ecuador configuran un marco jurídico integral que prohíbe la corrupción por funcionarios del Gobierno nacional así como por cualquier persona que realice transacciones comerciales en Ecuador[391]. Sobre esta base, la Demandada sostiene que la Demandante aceptó prestar servicios a RDP de conformidad con las leyes administrativas y penales de Ecuador[392], y posteriormente incumplió

---

[386] Contrato de la Refinería del Pacífico, cláusula 16.2.2 (**C-8**) (traducción del Tribunal); Dúplica, párr. 164.

[387] Contrato de la Refinería del Pacífico, cláusula 16.2.3 (**C-8**) (traducción del Tribunal).

[388] Contrato de la Refinería Esmeraldas, cláusula 11.1 (**C-3**); Contrato No. 2014187 entre Petroecuador y la Demandante para Estudios para el Proyecto de reingeniería y construcción del sistema de drenajes de los efluentes líquidos de Refinería Esmeraldas, 25 de julio de 2014, cláusula 13.14 (**C-4**); Contrato No. 2014070 para la contratación de la ingeniería de detalle amargas para Merox 200, Merox 300 y aguas amargas Z3, 20 de diciembre de 2014, cláusula 16.3 (**C-5**); Contrato de la Planta Machala I, cláusula 27. 2 (**C-6**); Contrato complementario del Programa de rehabilitación No. 2012036, 28 de septiembre de 2012, cláusula 7 (**C-19**); Contrato complementario del Programa de rehabilitación No. 2013027, 28 de agosto de 2013, cláusula 8 (**C-20**); Contrato complementario del Programa de rehabilitación No. 2014015, 2 de abril de 2014, cláusula 7 (**C-21**); Contrato complementario del Programa de rehabilitación No. 2014048, 9 de octubre de 2014, cláusula 8 (**C-22**); Contrato complementario del Programa de rehabilitación No. 2014051, 17 de octubre de 2014, cláusula 3 (**C-23**); Contrato complementario del Programa de rehabilitación No. 2015205, 29 de octubre de 2015, cláusula 9 (**C-24**); Contrato de la Planta Machala II, cláusula 25.2 (**R-175**).

[389] Dúplica, párr. 166; Código de Ética de Petroecuador, 14 de octubre de 2013, artículo 8(q) (**R-460**).

[390] Código de Ética de Petroecuador, 14 de octubre de 2013, artículo 4(d) (**R-460**).

[391] Contestación, párrs. 299-301; Constitución de la República del Ecuador, artículos 3(8), 83 (**C-62**).

[392] Contestación, párr. 302; Contrato de la Refinería del Pacífico, cláusulas 16.2, 16.2.3 y Anexo A, párr. 5.1(l) (**C-8**).

estas leyes al suministrar regalos y trato especial a los funcionarios de Petroecuador y RDP que adjudicaron los Contratos, aprobaban los pagos y supervisaban sus servicios[393].

260. Independientemente de las determinaciones de corrupción que atañen a la Demandante, la Demandada sostiene que el Tribunal debería rechazar su jurisdicción con motivo de los actos de corrupción cometidos por los subcontratistas de la Demandante y los incumplimientos de la Ley de Contratación Pública de Ecuador por parte de la propia Demandada[394]. La Demandada afirma que no resulta controvertido que Tecnazul pagó sobornos a Petroecuador y RDP en relación con los Contratos: por consiguiente, la Demandante es responsable, en virtud de los Contratos y el derecho ecuatoriano, frente a RDP y Petroecuador[395], dado que la Demandante tenía la obligación de fiscalizar y controlar la conducta de sus subcontratistas en el marco de los Contratos[396].

261. La Demandada se remite a la decisión del tribunal en *Churchill Mining c. Indonesia* para sustanciar su afirmación de que un aspecto importante de la debida diligencia es que los inversores garanticen en sus inversiones el cumplimiento de las leyes y el principio de buena fe[397]. Por ende, la Demandada sostiene que, como mínimo, la Demandante es responsable de los actos corruptos de Tecnazul y MMR Group habida cuenta de su relación directa[398].

### 2) Derecho francés / Orden público internacional

262. Por referencia al derecho francés —el derecho de la sede del presente arbitraje[399]— la Demandada sostiene asimismo que cualquier laudo a favor de la Demandante será imposible de ejecutar en virtud del orden público internacional a raíz de la conducta corrupta de la Demandante[400].

263. Según la Demandada, el derecho francés exige al Tribunal que pondere la conducta supuestamente ilegal de Worley conforme a los principios del orden público internacional. Sostiene en particular que el derecho francés estipula que los tribunales deben ejercer un "control

---

[393]   Dúplica, párr. 364-367.

[394]   Dúplica, párr. 390.

[395]   Dúplica, párr. 393; Contrato de la Refinería Esmeraldas, Anexo 3, cláusula 26.1 (**C-3**); Ley de Contratación Pública, artículo 79 (**RLA-52**).

[396]   Contestación, párrs. 317-319.

[397]   Contestación, párrs. 314-315; *Churchill Mining PLC y Planet Mining Pty Ltd c. República de Indonesia*, Caso CIADI No. ARB/12/14 y 12/40, Laudo, 6 de diciembre de 2016, párrs. 504-508 (**RLA-132**). La Demandada sostiene que el tribunal concluyó que el principio de buena fe en el derecho internacional y el orden público internacional son fundamentos suficientes para rechazar estas pretensiones basados en la ilicitud de un socio comercial, independientemente de si la ilicitud es atribuible en forma efectiva al socio.

[398]   Contestación, párrs. 318-318.

[399]   Dúplica, párr. 154.

[400]   Contestación, párrs. 303-308.

maximalista" al abordar alegaciones de corrupción en un arbitraje[401]. Afirma que, en consecuencia, los tribunales franceses han decidido reiteradamente que todo laudo arbitral que menoscabe el objetivo de luchar contra la corrupción y el blanqueo de capitales debe ser anulado por vulnerar el orden público internacional de Francia según el artículo 1520(5) del Código de Procedimiento Civil francés[402]. La Demandada sostiene que un análisis de la jurisprudencia de los tribunales revela sus amplias facultades para investigar y, por ende, no se ven vinculados por la decisión arbitral subyacente al analizar laudos en los que se abordan contratos viciados por fraude y corrupción[403].

264. Por ejemplo, la Demandada cita un caso en el que la *Cour de Cassation* francesa ratificó una decisión de la Corte de Apelaciones en la que se anulaba un laudo arbitral contra Kirguistán por motivos de orden público internacional. La Demandada interpreta que la decisión del tribunal original, que determinó que Kirguistán no había probado suficientemente sus alegaciones de fraude y blanqueo de capitales, fue revocada por la Corte de Apelaciones, la cual consideró pruebas extrínsecas conocidas solo tras la emisión del laudo. La *Cour de Cassation* dictó sentencia sobre la base de que los tribunales no se deben limitar a analizar los medios de prueba que se presentaron para consideración del tribunal arbitral, o sus conclusiones[404].

265. La Demandada también sostiene que el derecho francés no permite el uso de argumentos de "renuncia" cuando se abordan alegaciones de corrupción[405]. En respaldo de lo anterior, cita *SORELEC c. Libia*, donde la Corte de Apelaciones de París sostuvo que el derecho francés exige a los tribunales que analicen la conformidad de un laudo con el orden público internacional

---

[401] Contestación, párr. 305.

[402] Contestación, párr. 304; Dúplica, párr. 154; J. Jourdan-Marques, *Chronique d'arbitrage: compétence et corruption – le recours en annulation à rude épreuve*, 24 de diciembre de 2020, pág. 23 (**RLA-123**).

[403] Contestación, párrs. 304-305; *Société MK Group c. Société Financial Iniciative Onix*, Corte de Apelaciones de París, No. 15/21703, Sentencia, 16 de enero de 2018, págs. 5-6 (**RLA-117**); *Valeriy Belokon c. República Kirguisa*, Corte de Apelaciones de París, No. 15/01650, Sentencia, 21 de febrero de 2017, pág. 7 (**RLA-118**); *Alstom Transport SA & Alstom Network UK LTD c. Alexander Brothers Ltd*, Corte de Apelaciones de París, No. 16/11182, Sentencia, 28 de mayo de 2019, págs. 6-7 (**RLA-122**); *Webcor ITP Limited & Grand Marche De c. República Gabonesa*, Corte de Apelaciones de París, Cámara Internacional, No. 18/18708, Sentencia, 25 de mayo de 2021, págs. 9-11 (**RLA-124**). La Demandada sostiene además que la jurisprudencia revela que la prueba indiciaria sólida, en lugar de prueba directa, es suficiente para que la Corte anule un laudo por corrupción. *Samwell International Holdings Limited c. Airbus Helicopters*, Corte de Apelaciones de París, No. 19/09058, Sentencia, 15 de septiembre de 2020, párrs. 27-46 (**RLA-119**); *Sorelec c. Estado de Libia*, Corte de Apelaciones de París, No. 18/02568, Sentencia, 17 de noviembre de 2020, pags. 6-10 (**RLA-120**); *Securiport c. Benín*, Corte de Apelaciones de París, No. 19/04177, Sentencia, 27 de octubre de 2020, págs. 6-9 (**RLA-121**).

[404] Contestación, párr. 306; Dúplica, párr. 155; *Valeriy Belokon c. República Kirguisa*, Corte de Apelaciones de París, No. 15/01650, Sentencia, 21 de febrero de 2017, pág. 7 (**RLA-118**).

[405] Dúplica, párr. 156.

incluso si una parte deja de plantear intencionadamente una objeción de corrupción en el arbitraje[406].

### 3) Derecho internacional

266.    En tercer lugar, la Demandada se remite a varios instrumentos del derecho internacional[407] y a laudos arbitrales como *World Duty Free c. Kenia*[408] en respaldo de la tesis de que la corrupción infringe el orden público internacional. Según la Demandada, los tribunales constituidos en virtud de tratados de inversión también han extendido este principio a inversiones viciadas por las prácticas corruptas de un tercero cuya conducta fue ignorada irrazonablemente por el inversor al evaluar la conducta de los inversores según un "criterio de ignorancia deliberada[409]". La Demandada afirma que algunos tribunales arbitrales han concluido que los actos ilícitos cometidos por un socio comercial constituyen un fundamento suficiente para rechazar jurisdicción, mientras que otros tribunales arbitrales han hecho hincapié en que una práctica de inversión prudente exige que cualquier inversor practique la debida diligencia antes de invertir[410].

---

[406]    Dúplica, párr. 156; *Sorelec c. Estado de Libia,* Corte de Apelaciones de París*,* No. 18/02568, Sentencia, 17 de noviembre de 2020, págs. 7-9 (**RLA-333**).

[407]    Contestación, párrs. 295-298; Dúplica, párrs. 368-371. En particular, la Demandada menciona los instrumentos a continuación: la CNUCC (ratificada por Ecuador en 2005); la Convención Interamericana contra la Corrupción; la Convención de la OCDE para Combatir el Cohecho de Servidores Públicos Extranjeros en Transacciones Comerciales Internacionales, y el Marco Uniforme para Prevenir y Combatir el Fraude y la Corrupción.

[408]    Contestación, párr. 309-312; Dúplica, párrs. 371-373; *Inceysa Vallisoletana S.L. c. República de El Salvador*, Caso CIADI No. ARB/03/26, Laudo, 2 de agosto de 2006, párrs. 245-252 (**RLA-22**); *Gustav F W Hamester GmbH & Co KG c. República de Ghana,* Caso CIADI No. ARB/07/24, Laudo, 18 de junio de 2010, párrs. 123-124 (**RLA-23**); *Phoenix Action, Ltd. c. República Checa*, Caso CIADI No. ARB/06/5, Laudo, 15 de abril de 2009, párrs. 100, 106 (**RLA-88**); *World Duty Free Company Limited c. República de Kenia*, Caso CIADI No. ARB/00/7, Laudo, 4 de octubre de 2006, párrs. 105-106, 142, 157 (**RLA-126**); Caso CCI No. 1110, Laudo, XXI YCA 47 (1996), párrs. 20, 23 (**RLA-127**); *SAUR International SA c. República Argentina,* Caso CIADI No. ARB/04/4, Decisión sobre Jurisdicción y sobre Responsabilidad, 6 de junio de 2012, párr. 308 (**RLA-128**); *Cortec Mining Kenya Limited, Cortec (Pty) Limited y Stirling Capital Limited c. República de Kenia*, Caso CIADI No. ARB/15/29, Laudo, 22 de octubre de 2018, párr. 333(a) (**RLA-129**); *Littop Enterprises Limited, Bridgemont Ventures Limited y Bordo Management Limited c. Ucrania*, Caso CCE No. V 2015/092, Laudo Final, 4 de febrero de 2021, párrs. 442, 485 (**RLA-131**); *Wena Hotels Ltd. c. República Árabe de Egipto*, Caso CIADI No. ARB/98/4, Laudo, 8 de diciembre de 2000, párr. 111 (**CLA-133**).

[409]    Contestación, párrs. 313-316 (traducción del Tribunal); *Alasdair Ross Anderson et al. c. República de Costa Rica*, Caso CIADI No. ARB(AF)/07/03, Laudo, 19 de mayo de 2010, párrs. 58-59 (**RLA-21**); *Littop Enterprises Limited, Bridgemont Ventures Limited y Bordo Management Limited c. Ucrania*, Caso CCE No. V 2015/092, Laudo Final, 4 de febrero de 2021, párr. 654 (**RLA-131**); *Churchill Mining PLC y Planet Mining Pty Ltd c. República de Indonesia*, Caso CIADI No. ARB/12/14 y 12/40, Laudo, 6 de diciembre de 2016, párrs. 504-506, 508 (**RLA-132**).

[410]    Contestación, párr. 315 y nota al pie 572; *Alasdair Ross Anderson et al. c. República de Costa Rica*, Caso CIADI No. ARB(AF)/07/03, Laudo, 19 de mayo de 2010, párrs. 58-59 (**RLA-21**); *Littop Enterprises Limited, Bridgemont Ventures Limited y Bordo Management Limited c. Ucrania*, Caso CCE No. V 2015/092, Laudo Final, 4 de febrero de 2021, párrs. 448-449, 654 (**RLA-131**).

267. La Demandada rechaza el argumento de la Demandante de que los tratados internacionales de inversión protegen las inversiones realizadas de mala fe en ausencia de una cláusula de legalidad expresa, citando la jurisprudencia arbitral que respalda la tesis de que las inversiones no están protegidas si vulneran el derecho interno del Estado receptor y el principio de buena fe[411]. Por el contrario, la Demandada afirma que el requisito implícito de legalidad se aplica con mayor razón cuando el inversor comete actos corruptos y, a este respecto, la Demandada objeta a la remisión que hace la Demandante a *Fraport c. Filipinas* porque dicho tribunal aplicó un tratado que contiene una formulación distinta a una forma menos grave de ilegalidad que la corrupción[412]. Si bien la Demandada reconoce que los tribunales de inversión tienden a diferenciar entre ilegalidad cometida durante la realización de una inversión —que despoja al tribunal de jurisdicción— e ilegalidad cometida durante la operación de la inversión —lo cual afecta al fondo de las pretensiones relativas a la inversión— sostiene no obstante que en el presente caso existió corrupción en cada etapa de la inversión[413]. Como consecuencia de la naturaleza censurable de la corrupción, la Demandada afirma que el Tratado no abarca controversias dimanadas de inversiones que han sido viciadas por corrupción en cualquiera de las etapas de la existencia de la inversión, como se ha indicado en otros casos[414].

268. Por ende, la Demandada sostiene que el soborno de funcionarios ecuatorianos por diversos subcontratistas supervisados por la Demandante satisface la definición de corrupción en el derecho internacional[415]. Además, arguye que dado que RDP y Petroecuador delegaron en la Demandante la función de fiscalización y control de las actividades de adquisiciones, la

---

[411] Dúplica, párrs. 377-380; *Gustav F W Hamester GmbH & Co KG c. República de Ghana*, Caso CIADI No. ARB/07/24, Laudo, 18 de junio de 2010, párrs. 123-124 (**RLA-23**); *Plama Consortium Limited c. República de Bulgaria*, Caso CIADI No. ARB/03/24, Laudo, 27 de agosto de 2008, párr. 138 (**RLA-24**); *SAUR International SA c. República Argentina*, Caso CIADI No. ARB/04/4, Decisión sobre Jurisdicción y sobre Responsabilidad, 6 de junio de 2012, párrs. 306-308 (**RLA-128**); *Phoenix Action, Ltd. c. República Checa*, Caso CIADI No. ARB/06/5, Laudo, 15 de abril de 2009, párrs. 101 (**CLA-178**); *Liman Caspian Oil BV y NCL Dutch Investment BV c. República de Kazajstán*, Caso CIADI No. ARB/07/14, Laudo (pasaje), 22 de junio de 2010, párr. 193-194 (**CLA-208**).

[412] Dúplica, párrs. 382, 389; G. Bottini, *Legality of Investment under ICSID Jurisprudence*, en M. Waibel, A. Kaushal *et al.* (eds.), *The Backlash Against Investment Arbitration* (2010), págs. 298-299 (**RLA-130**); *Littop Enterprises Limited, Bridgemont Ventures Limited y Bordo Management Limited c. Ucrania*, Caso CCE No. V 2015/092, Laudo Final, 4 de febrero de 2021, párr. 442 (**RLA-131**); *Fraport AG Frankfurt Airport Services Worldwide c. República de Filipinas (II)*, Caso CIADI No. ARB/11/12, Laudo, 10 de diciembre de 2004, párrs. 321-338 (**CLA-342**).

[413] Dúplica, párrs. 384-385. La Demandada hace referencia específica a la búsqueda de información confidencial durante el proceso licitatorio de RDP, la conspiración con Tecnazul para incumplir el límite de subcontratación y los obsequios continuos y abundantes entregados a lo largo de la evolución de los Proyectos.

[414] Dúplica, párrs. 386-387; CNUCC, artículo 16 (**RLA-112**); *Littop Enterprises Limited, Bridgemont Ventures Limited y Bordo Management Limited c. Ucrania*, Caso CCE No. V 2015/092, Laudo Final, 4 de febrero de 2021, párr. 442 (**RLA-131**).

[415] Contestación, párr. 320.

Demandante debe asumir responsabilidad por no denunciar la corrupción[416]. Del mismo modo, la Demandada afirma que los sobornos pagados por los subcontratistas de la Demandante para obtener contratos constituyen corrupción en el derecho internacional[417].

### 4) Legislación estadounidense

269. En cuarto lugar, la Demandada considera que la legislación de los Estados Unidos y, en particular, la Ley de los Estados Unidos de Prácticas Corruptas en el Extranjero (la "**FCPA**", por sus siglas en inglés) contribuye a esclarecer la naturaleza censurable de la conducta de Worley[418].

270. La Demandada constata que la FCPA sanciona el acto de "otorgar algo de valor", con la observación de que la ley no fija una cantidad como umbral mínimo[419]. La Demandada cita el siguiente texto de la norma: "Aquello que se podría considerar un pago modesto en los Estados Unidos podría ser una cantidad más considerable y mucho más importante en otro país[420]". Ecuador también señala que varias acciones de ejecución de la FCPA entrañaron casos por el pago de gastos de viaje y entretenimiento[421].

271. En particular, la Demandada se remite a la Guía de Recursos de la FCPA (la "**Guía de la FCPA**"), en la que el Departamento de Justicia de los EE. UU. también brinda ejemplos de pagos de "Viajes y entretenimiento indebidos"[422]. La Demandada sostiene que los pagos cuestionados en este arbitraje son análogos a los ilustrados por el Departamento de Justicia en sus documentos de orientación[423], como, en particular, la participación de funcionarios de Petroecuador y RDP del Viaje de la Fórmula 1[424] y el viaje de funcionarios de Petroecuador y RDP a Las Vegas[425].

272. La Demandada opina que la Demandante también infringió la legislación estadounidense en materia de conspiración para cometer un delito (Título 18, § 371 del Código de los EE. UU.) cuando aceptó conferir beneficios a varios funcionarios de Petroecuador[426].

---

[416] Contestación, párrs. 317-319. La Demandada alega que la Demandante tenía conocimiento de la corrupción en virtud de su decisión de interrumpir los pagos a Tecnazul para el Proyecto de la Refinería del Pacífico por ese motivo.

[417] Contestación, párr. 318.

[418] Contestación, párr. 8; Réplica, párr. 393; Dúplica, párr. 157.

[419] FCPA, Sección 78dd-1(a) (traducción del Tribunal).

[420] Dúplica, párr. 157; Guía de la FCPA, pág. R-459_024 (**R-459**) (traducción del Tribunal).

[421] Guía de la FCPA, pág. R-459_024 (**R-459**).

[422] Guía de la FCPA, pág. R-459_025 (**R-459**) (traducción del Tribunal).

[423] Dúplica, párr. 159.

[424] Dúplica, párrs. 160-161.

[425] Dúplica, párr. 163.

[426] Guía de la FCPA, pág. R-459_043 (**R-459**).

### 5) Directiva Ejecutiva de Worley sobre Obsequios

273. En quinto y último lugar, la Demandada afirma que si bien la Demandante se remite a su Directiva Ejecutiva sobre Obsequios (la "**Directiva Ejecutiva**") para justificar los gastos incurridos con respecto a "viajes para reuniones de proyecto", la Directiva en realidad ilustra el carácter censurable de los actos de Worley[427].

274. La Demandada cita como pertinentes los siguientes pasajes y disposiciones de la Directiva Ejecutiva[428]:

    (i)    La Directiva Ejecutiva "no distingue entre regalos, entretenimiento u hospitalidad", todos los cuales "se tratan como la misma cosa"[429].

    (ii)    En la sección que aborda "obsequios excesivos, poco razonables o inaceptables", la Directiva Ejecutiva observa que "los obsequios, entretenimiento y hospitalidad pueden ser sobornos, o percibirse como tales, en ciertas circunstancias" y requiere que los empleados "sean especialmente cautos con los Obsequios a funcionarios públicos. Remitirse a las cláusulas 11 y 12[430]".

    (iii)    La cláusula 11 dispone: "Muchos países tienen una normativa especial en materia de obsequios, entretenimiento y hospitalidad para funcionarios del Gobierno porque los obsequios, el entretenimiento y la hospitalidad pueden constituir sobornos, o percibirse como tales, en determinadas circunstancias[431]". Asimismo, estipula que los empleados de Worley "deben solicitar asesoramiento local para cerciorarse de que tales obsequios, entretenimiento y hospitalidad estén permitidos por ley[432]".

    (iv)    La Directiva Ejecutiva "exige que todos los Obsequios ofrecidos a […] un funcionario del Gobierno" estén "permitidos por ley en la jurisdicción local", sean "de un valor y naturaleza adecuados habida cuenta de la tradición local y de todas las circunstancias", y que se "inscriban en el registro de obsequios de [Worley] […] si el valor estimado o real supera los USD 200 por persona[433]".

---

[427] Dúplica, párr. 169.

[428] Dúplica, párrs. 170-171.

[429] Directiva Ejecutiva, Sección 4 (**C-746**) (traducción del Tribunal).

[430] Directiva Ejecutiva, Sección 16 (**C-746**); Código de Conducta de Worley, 2014, págs. 8-9 (**R-251**) (traducción del Tribunal).

[431] Directiva Ejecutiva, Sección 11 (**C-746**) (traducción del Tribunal).

[432] Directiva Ejecutiva, Sección 11 (**C-746**) (traducción del Tribunal).

[433] Directiva Ejecutiva, Sección 11 (**C-746**) (traducción del Tribunal).

(v)     La Directiva Ejecutiva advierte a los empleados de que "un incumplimiento de [estas reglas] puede redundar en una acción de la gerencia en relación con el desempeño[434]".

275.    La Demandada sostiene que "no hay pruebas" de que Worley y sus empleados solicitaran "asesoramiento local para cerciorarse de que los obsequios, el entretenimiento y la hospitalidad [estuviesen] permitidos por ley" y que este nivel de precaución era especialmente necesario en relación con obsequios de un "valor sustancial o que no eran parte de las actividades comerciales cotidianas[435]".

276.    Según la Demandada, tampoco hay pruebas de que Worley o sus empleados anotaran los beneficios antes mencionados en el registro de obsequios de Worley, como requiere la Directiva Ejecutiva cuando, al igual que en este caso, el valor de la mayoría de los beneficios superaba el umbral de los USD 200[436].

277.    En último lugar, la Demandada sostiene que Worley nunca adoptó medidas disciplinarias contra los funcionarios que confirieron los beneficios antes mencionados, por lo que tampoco cumplió la Directiva Ejecutiva[437].

### 6)  La corrupción como motivo de inadmisibilidad

278.    En el supuesto de que el Tribunal ratifique su jurisdicción, la Demandada sostiene que los actos de soborno y mala fe de la Demandante entrañarían en todo caso la inadmisibilidad de las pretensiones[438]. La Demandada cita la jurisprudencia y otras fuentes que indican que el incumplimiento por parte de un inversor de "reglas fundamentales del derecho nacional o del orden público internacional" durante la vida de la inversión conlleva la inadmisibilidad de la pretensión, en especial frente a actos como soborno y fraude[439]. Asimismo, la Demandada sostiene que los tribunales de inversión han determinado que los inversores no pueden emplear

---

[434]    Directiva Ejecutiva, Sección 26 (**C-746**) (traducción del Tribunal).

[435]    Dúplica, párr. 172 (traducción del Tribunal).

[436]    Dúplica, párr. 173 (traducción del Tribunal).

[437]    Dúplica, párr. 174.

[438]    Dúplica, párr. 397.

[439]    Dúplica, párrs. 398-403 (traducción del Tribunal); *Plama Consortium Limited c. República de Bulgaria*, Caso CIADI No. ARB/03/24, Laudo, 27 de agosto de 2008, párr. 143 (**RLA-24**); *Churchill Mining PLC y Planet Mining Pty Ltd c. República de Indonesia*, Caso CIADI No. ARB/12/14 y 12/40, Laudo, 6 de diciembre de 2016, párrs. 488, 508 (**RLA-132**); *Bank Melli Irán y Bank Saderat Irán c. Reino de Bahréin*, Caso CPA No. 2017-25, Laudo, 9 de noviembre de 2021, párrs. 365, 368 (**RLA-301**); Z. Douglas, *The Plea of Illegality in Investment Treaty Arbitration*, 29 (1) ICSID Review 155, pág. 180 (**RLA-302**); Z. Douglas, *The International Law of Investment Claims* (2009), págs. 53-54 (**CLA-296**).

los actos ilícitos que ellos mismos han cometido como base para plantear sus pretensiones, es decir, en referencia a la *unclean hands doctrine*[440].

## 2.   LA POSICIÓN DE LA DEMANDANTE

279. La Demandante sostiene que las "falsas preocupaciones sobre corrupción" de la Demandada no encuentran asidero en los hechos que constan en el expediente y son contrarias a principios consagrados en el derecho internacional; en opinión de la Demandante no son nada más que una "estrategia de litigación" orquestada por la Demandada para evadir sus obligaciones bajo el Tratado[441]. La Demandante hace hincapié en que la Demandada no ha logrado presentar cargos y mucho menos probar que la Demandante haya participado en algún acto de corrupción[442].

### 1)   Estándar aplicable

280. Como cuestión preliminar, la Demandante aclara que tanto Petroecuador como RDP son órganos del Estado o, como mínimo, entidades estatales que ejercen cierta potestad estatal, lo que supone que los actos de Petroecuador y RDP son atribuibles a Ecuador en la medida en que se relacionan con las pretensiones de la Demandante[443].

281. Con respecto al estándar probatorio aplicable a las alegaciones de corrupción de la Demandada, la Demandante rechaza la aserción de la Demandada de que el estándar es uno de "certeza razonable" o "preponderancia de la prueba": afirma que esta es una "postura minoritaria" que muchos tribunales han rechazado y que, cabe destacar, también ha sido rechazada por los Estados Unidos y Ecuador[444]. Por el contrario, la Demandante identifica un gran consenso entre los tribunales internacionales con respecto a la necesidad de aplicar un estándar de prueba alto en

---

[440]   Dúplica, párrs. 404-406; *Plama Consortium Limited c. República de Bulgaria*, Caso CIADI No. ARB/03/24, Laudo, 27 de agosto de 2008, párr. 143 (**RLA-24**); *Hesham Talaat M. Al-Warraq c. República de Indonesia, ad hoc*, Laudo Final, 15 de diciembre de 2014, párrs. 645-646 (**RLA-304**).

[441]   Réplica, párrs. 366-367, 390 (traducción del Tribunal).

[442]   Réplica, párr. 385.

[443]   Réplica, párr. 365.

[444]   Dúplica sobre Jurisdicción, párrs. 75-77; *Karkey Karadeniz Elektrik Uretim A.S. c. República Islámica de Pakistán*, Caso CIADI No. ARB/13/1, Laudo, 22 de agosto de 2017, párr. 492 (**CLA-65**); M. Hwang y K. Lim, *Corruption in Arbitration - Law and Reality*, 8 (1) Asian International Arbitration Journal 1, pág. 24 (**CLA-399**); A. Llamzon y A. Charles Sinclair, *Investor Wrongdoing in Investment Arbitration: Standards Governing Issues of Corruption, Fraud, Misrepresentation and Other Investor Misconduct*, en A. Van den Berg (ed.), *Legitimacy: Myths, Realities, Challenges*, 18 ICCA Congress Series 451, págs. 492-493 (**CLA-400**); *Merck Sharpe & Dohme (I.A.) LLC c. República del Ecuador*, Caso CPA No. 2012-10, Dúplica de la Demandada, 20 de febrero de 2015, párrs. 324, 331, 338, 341, 344, 613 (**CLA-401**); *Bridgestone Licensing Services, Inc. y Bridgestone Americas, Inc. c. República de Panamá*, Caso CIADI No. ARB/16/34, Transcripción de la Audiencia sobre el Fondo, Día 1 (Alegatos de apertura de la representación letrada de los Estados Unidos), 29 de julio de 2019, 24:19-25:19 (**CLA-423**).

casos de corrupción[445], observando que ciertos tribunales aplican un estándar de prueba "clara y convincente[446]" mientras que otros tribunales aplican un estándar de prueba "más riguroso" análogo al empleado en procedimientos penales[447]. En tal sentido, la Demandante sostiene que los tribunales arbitrales se han negado a concluir que existe corrupción sobre la sola base de acusaciones generalizadas, para lo cual citan varios casos en los que, a su entender, una parte presentó pruebas de un peso considerablemente mayor para fundamentar sus alegaciones de corrupción pero el tribunal finalmente concluyó que no hubo corrupción[448]. Por otra parte, la Demandante afirma que la Corte de Apelaciones de París ha dictaminado que los indicios de corrupción deben ser "suficientemente serios, precisos y concordantes" para justificar la anulación de un laudo por motivos de orden público[449]. Finalmente, la Demandante considera que

---

[445]   Réplica, párr. 401; Karkey Karadeniz Elektrik Uretim A.S. c. República Islámica de Pakistán, Caso CIADI No. ARB/13/1, Laudo, 22 de agosto de 2017, párr. 492 (**CLA-65**); Sanum Investments Limited c. República Democrática Popular Lao, Caso CPA No. 2013-13, Laudo, 6 de agosto de 2019, párr. 108 (**CLA-341**).

[446]   Réplica, párr. 401; Dúplica sobre Jurisdicción, párrs. 73, 75; *EDF (Services) Ltd. c. Rumania,* Caso CIADI No. ARB/05/13, Laudo, 8 de octubre de 2009, párr. 221 (**CLA-39**); *Karkey Karadeniz Elektrik Uretim A.S. c. República Islámica de Pakistán,* Caso CIADI No. ARB/13/1, Laudo, 22 de agosto de 2017, párr. 492 (**CLA-65**); *Waguih Elie George Siag y Clorinda Vecchi c. República Árabe de Egipto,* Caso CIADI No. ARB/05/15, Laudo, 1 de junio de 2009, párr. 326 (**CLA-131**); *Sanum Investments Limited c. República Democrática Popular Lao,* Caso CPA No. 2013-13, Laudo, 6 de agosto de 2019, párr. 108 (**CLA-341**); *Fraport AG Frankfurt Airport Services Worldwide c. República de Filipinas (II),* Caso CIADI No ARB/11/12, Laudo, 10 de diciembre de 2004, párr. 481 (**CLA-342**).

[447]   Réplica, párr. 401; Dúplica sobre Jurisdicción, párr. 75; African Holding Company of America, Inc. y Société Africaine de Construction au Congo S.A.R.L. c. República Democrática del Congo, Caso CIADI No. ARB/05/21, Decisión sobre Jurisdicción y Admisibilidad, 29 de julio de 2008, párrs. 52, 55 (**CLA-273**); Fraport A.G. Frankfurt Airport Services Worldwide c. República de Filipinas (I), Caso CIADI No. ARB/03/25, Laudo, 16 de agosto de 2007, párr. 399 (**CLA-343**).

[448]   Réplica, párrs. 402-405; Dúplica sobre Jurisdicción, párr. 79; *Karkey Karadeniz Elektrik Uretim A.S. c. República Islámica de Pakistán,* Caso CIADI No. ARB/13/1, Laudo, 22 de agosto de 2017, párrs. 512-517 (**CLA-65**); *African Holding Company of America, Inc. y Société Africaine de Construction au Congo S.A.R.L. c. República Democrática del Congo, Caso CIADI No. ARB/05/21,* Decisión sobre Jurisdicción y Admisibilidad, 29 de julio de 2008, párr. 53 (**CLA-273**); *Sanum Investments Limited c. República Democrática Popular Lao,* Caso CPA No. 2013-13, Laudo, 6 de agosto de 2019, párrs. 122, 134-138, 147, 153-161 (**CLA-341**); *ECE Projektmanagement International GmbH y Kommanditgesellschaft PANTA Achtundsechzigste Grundstückgesellschaft mbH & Co c. República Checa,* Caso CPA No. 2010-05, Laudo, 19 de septiembre de 2013, párr. 4.879 (**CLA-344**); *Jan Oostergetel and Theodora Laurentius c. República Eslovaca,* ad hoc, Laudo Final, 23 de abril de 2012, párrs. 302-303 (**CLA-345**); *Niko Resources (Bangladesh) Ltd. c. Bangladesh Petroleum Exploration & Production Company Limited ("Bapex") y Bangladesh Oil Gas and Mineral Corporation ("Petrobangla"),* Caso CIADI No. ARB/10/18, Decisión sobre la Pretensión de Corrupción, 25 de febrero de 2019, párrs. 8-2004 (**CLA-346**); *Sistem Mühendislik Inşaat Sanayi ve Ticaret A. Ş. c. República Kirguisa,* Caso CIADI No. ARB(AF)/06/1, Laudo, 9 de septiembre de 2009, párr. 43 (**CLA-361**); *Gustav F W Hamester GmbH & Co KG c. República de Ghana,* Caso CIADI No. ARB/07/24, Laudo, 18 de junio de 2010, párrs. 134-135 (**RLA-23**).

[449]   Réplica, párr. 406; Dúplica, párr. 154.

la propuesta de la Demandada de un traslado de la carga de la prueba no está sustanciada y es contraria a lo que muchos tribunales e incluso Ecuador han declarado[450].

### 2) Pruebas de corrupción

282. Aplicando un criterio de prueba "clara y convincente" a los medios de prueba presentados por la Demandada, la Demandante sostiene que la objeción de corrupción de la Demandada no puede prosperar desde el punto de vista de los hechos[451].

283. Según la Demandante, una cuestión probatoria relevante que otros tribunales de inversión han identificado como pertinente son los esfuerzos realizados por el Estado demandado para investigar y llevar a los tribunales la corrupción que se alega en el marco del arbitraje de inversión[452]. En tal sentido, la Demandante afirma que Ecuador ha invertido una gran cantidad de recursos en la investigación de los Proyectos de la Refinería del Pacífico y la Refinería Esmeraldas, pero no ha presentado ninguna prueba de ilicitud[453]. De hecho, observa que la Demandada no ha aportado pruebas de soborno que impliquen a la Demandante a pesar de todas las pruebas y condenas derivadas de las investigaciones y los enjuiciamientos llevados a cabo por Ecuador desde 2016, así como el Procedimiento bajo la § 1782, iniciado en los Estados Unidos[454].

---

[450] Dúplica sobre Jurisdicción, párr. 78; Orden Procesal No. 1, párr. 5; Reglamento CNUDMI, artículo 24; *Liman Caspian Oil BV y NCL Dutch Investment BV c. República de Kazajstán*, Caso CIADI No. ARB/07/14, Laudo (pasaje), 22 de junio de 2010, párr. 194 (**CLA-208**); *Quiborax S.A., Non Metallic Minerals S.A. y Allan Fosk Kaplún c. Estado Plurinacional de Bolivia*, Caso CIADI No. ARB/06/2, Decisión sobre Jurisdicción, 27 de septiembre de 2012, párr. 259 (**CLA-294**); *Tethyan Copper Company Pty Limited c. República Islámica de Pakistán*, Caso CIADI No. ARB/12/1, Decisión sobre la Solicitud de la Demandada para desestimar las pretensiones (con motivación), 10 de noviembre de 2017, párr. 318 (**CLA-403**); *Vito G. Gallo c. Canadá*, Caso CPA No. 2008-03, Laudo, 15 de septiembre de 2011, párr. 277 (**CLA-404**); *Merck Sharpe & Dohme (I.A.) LLC c. República del Ecuador*, Caso CPA No. 2012-10, Memorial de contestación de la Demandada, 27 de febrero de 2014, párr. 279 (**CLA-406**).

[451] Réplica, párr. 411.

[452] Réplica, párr. 407; *Glencore International A.G. y C.I. Prodeco S.A. c. República de Colombia*, Caso CIADI No. ARB/16/6, Laudo, 27 de agosto de 2019, párr. 738 (**CLA-53**); *Karkey Karadeniz Elektrik Uretim A.S. c. República Islámica de Pakistán*, Caso CIADI No. ARB/13/1, Laudo, 22 de agosto de 2017, párr. 537-539 (**CLA-65**); *Niko Resources (Bangladesh) Ltd. c. Bangladesh Petroleum Exploration & Production Company Limited ("Bapex") y Bangladesh Oil Gas y Mineral Corporation ("Petrobangla")*, Caso CIADI No. ARB/10/18, Decisión sobre Jurisdicción, 19 de agosto de 2013, párrs. 425-426 (**CLA-350**).

[453] Réplica, párr. 408; Dúplica sobre Jurisdicción, párr. 73; Solicitud de Worley sobre *discovery* al amparo del título 28 U.S.C. § 1782, 26 de agosto de 2019, párrs. 2-3 (**C-52**); Oficio No. 13023 del Procurador General al Fiscal General del Estado, 16 de marzo de 2021 (**C-732**); Carta de Worley a la Fiscal General del Estado, 7 de mayo de 2021 (**C-745**); Oficio No. 14057 del Procurador General del Estado al Fiscal General del Estado, 27 de mayo de 2021 (**C-941**).

[454] Réplica, párrs. 383-390, 408; Dúplica sobre Jurisdicción, párrs; 80, 82-85, 88, 132, 153; Solicitud de Worley sobre *discovery* al amparo del título 28 U.S.C. § 1782, 26 de agosto de 2019, pág. C-52_31 (**C-52**); Carta del representante legal de Worley al representante legal de Ecuador en el procedimiento bajo la § 1782 en referencia a los volúmenes de exhibición de documentos, 17 de diciembre de 2021 (**C-1015**); Correo Electrónico del representante legal de Worley al representante legal de Ecuador en referencia a los volúmenes de exhibición de documentos, 27 de mayo de 2022 (**C-1019**).

284. En relación con las pruebas que efectivamente salieron a la luz en realidad y en las que la Demandada basa sus alegaciones de corrupción —incluidos los supuestos obsequios de la Demandante a funcionarios de Petroecuador y RDP, gastos por viajes de negocios para funcionarios ecuatorianos y otras acusaciones "falsas", surgidas principalmente del Procedimiento bajo la § 1782— la Demandante afirma que se tergiversaron o utilizaron indebidamente con el fin de implicar a la Demandante, como ya se ha mencionado[455].

285. Además, la Demandante sostiene que las investigaciones de la Demandada respecto de los informes de la Contraloría General que contienen supuestos "indicios de responsabilidad penal" contra Worley, así como la conducta posterior del Estado que se desprende de esas investigaciones, deben ser tratadas como elementos de un incumplimiento del Tratado y no pueden servir como base para impedir que se adopte una decisión sobre dichos incumplimientos[456]. La Demandante considera que la Demandada "minimiza" sus violaciones del Tratado con acusaciones calumniosas de corrupción en su contra. Reconociendo que la corrupción es contraria al estado de derecho y el desarrollo económico, la Demandante sostiene que es un inversor de buena fe que adoptó políticas contra la corrupción e impartió capacitación anticorrupción a Tecnazul. La Demandante también hace referencia a las medidas que tomó al tomar conocimiento del escándalo de corrupción en 2016 a raíz de los Papeles de Panamá: rescindió sus subcontratos con Tecnazul, interrumpió los pagos a Tecnazul después de que dicha empresa no fuera capaz de demostrar que no había sido partícipe de la ilicitud e inició el Procedimiento bajo la § 1782 para obtener pruebas que utilizaría en el procedimiento de anulación en Chile de los dos laudos arbitrales dictados a favor de Tecnazul[457].

286. En resumen, la Demandante sostiene que Ecuador usó indebidamente los poderes de policía del Estado para promover su estrategia de litigio, lo cual confirma que sus preocupaciones sobre corrupción son "falsas"[458]. La Demandante detalla además los esfuerzos de Ecuador —

---

[455]   Réplica, párrs. 391-397; Dúplica sobre Jurisdicción, párrs. 134-141; *véase* la Sección III.5.3) *supra*.

[456]   Réplica, párrs. 375, 411.

[457]   Réplica, párrs. 369-370, 373-374; Dúplica sobre Jurisdicción, párrs. 116, 119-120; *Consultora Tecnazul Cía. Ltda. c. WorleyParsons International, Inc.*, Centro de Arbitraje y Mediación de la Cámara de Comercio de Quito, Proceso Arbitral No. 044-20, Laudo, 23 de diciembre de 2021 (**C-413**); *Consultora Tecnazul Cía. Ltda. c. Worley International Services, Inc.*, Caso CPA No. 2017-39, Laudo Final, 27 de abril de 2021 (**C-414**); Solicitud de Worley sobre *discovery* al amparo del título 28 U.S.C. § 1782, 5 de octubre de 2021, pág. 2 (**C-694**); Solicitud de Worley para la anulación del laudo de Tecnazul, Honorable Corte de Apelaciones de Santiago, 9 de julio de 2021, págs. 2, 11 (**C-794**); Correo Electrónico de Worley, 7 de febrero de 2013 (**C-983**); Invitación al entrenamiento antisoborno, 11 de diciembre de 2014 (**C-997**); Mensajes electrónicos de Worley, 26 de diciembre de 2014 (**C-1038**); Declaración de Parker II, párrs. 20-22 (**CWS-4**); Declaración de Falcon III, párrs. 9, 11 (**CWS-7**); Código de Conducta de Worley, 2014, págs. 8-9 (**R-251**).

[458]   Réplica, párr. 376.

concretados en investigaciones, auditorías, procesamientos judiciales y procesos administrativos— para "fabricar" pruebas de participación de la Demandante en actos de corrupción[459].

287. Como corolario, la Demandante solicita al Tribunal que rechace la alegación de la Demandada sobre retención de pruebas y la solicitud correspondiente para que trace inferencias adversas en contra de Worley dado que la Demandante actuó de buena fe y de manera transparente en todo el procedimiento[460].

### 3) Marco jurídico aplicable

288. Como cuestión de derecho, la Demandante sostiene que la objeción jurisdiccional de la Demandada basada en corrupción tampoco puede prosperar. Como cuestión preliminar, la Demandante destaca que el Tratado no contiene ninguna cláusula que se refiera al cumplimiento de las leyes del Estado receptor u otras leyes ni exige dicho cumplimiento como condición para que una inversión se considere protegida[461]. A este respecto, la Demandante cita jurisprudencia arbitral que respalda la tesis de que no debe permitirse la inserción de requisitos no contenidos en el texto del tratado[462]. Si bien la Demandante reconoce la aplicabilidad de una objeción

---

[459]   Réplica, párrs. 376-382; Dúplica sobre Jurisdicción, párr. 88. En particular, la Demandante hace referencia a los siguientes eventos: (i) las investigaciones penales iniciadas por Ecuador en 2016 no habían implicado a la Demandada en el escándalo de corrupción de Petroecuador cuando la Demandante presentó su notificación de arbitraje; (ii) la Demandada presentó la Solicitud bajo la 1782 seis meses después para la obtención de pruebas al estilo estadounidense a fin de fabricar sus pretensiones; (iii) las investigaciones penales iniciadas por Ecuador constituyen un intento por responsabilizar a la Demandante indirectamente en los proyectos en los que actuaba como PMC y, por ende, comprenden controversias contractuales que no guardan relación con sobornos o cargos conexos; (iv) la Procuraduría General de Ecuador instruyó a los fiscales ecuatorianos a iniciar investigaciones penales contra la Demandante; y (v) las solicitudes de exhibición de documentos de Ecuador relevantes para establecer corrupción, ilegalidad o mala fe.

[460]   Dúplica sobre Jurisdicción, párr. 87; *Metal-Tech Ltd. c. República de Uzbekistán*, Caso CIADI No. ARB/10/3, Laudo, 4 de octubre de 2013, párrs. 263-265 (**CLA-363**); T. Mitra y K. Duggal, *Adverse Inference*, JUS MUNDI, 17 de marzo de 2022 (última actualización), párr. 11 (**CLA-396**); *Indian Metals & Ferro Alloys Ltd c. República de Indonesia*, Caso CPA No. 2015-40, Laudo, 29 de marzo de 2019, párrs. 238-239 (**CLA-397**); J. Sharpe, *Drawing Adverse Inferences from Non-Production of Evidence*, 2(4) Arb. Intl. 549, pág. 557 (2006) (**CLA-398**); *H.A. Spalding, Inc. c. Ministerio de Carreteras y Transporte de la República Islámica de Irán y la República Islámica de Irán*, Caso IUSCT No. 437, Laudo No. 212-437-3, 24 de febrero de 1986, párr. 29 (**CLA-451**).

[461]   Réplica, párr. 413; Dúplica sobre Jurisdicción, párr. 90.

[462]   Réplica, párr. 413; Dúplica sobre Jurisdicción, párr. 90; *Anatolie Stati, Gabriel Stati, Ascom Group SA y Terra Raf Trans Traiding Ltd c. República de Kazajstán*, Caso CCE No. V 116/2010, Laudo, 19 de diciembre de 2013, párr. 812 (**CLA-9**); *Saba Fakes c. República de Türkiye*, Caso CIADI No. ARB/07/20, Laudo, 14 de julio de 2010, párrs. 114, 119 (**CLA-295**); *Achmea B.V. (Antiguamente Eureko B.V.) c. República Eslovaca [I]*, Caso CPA No. 2008-13, Laudo Final, 7 de diciembre de 2012, párrs. 168, 170 (**CLA-351**); *MNSS B.V. y Recupero Credito Acciaio N.V. c. Montenegro*, Caso CIADI No. ARB(AF)/12/8, Laudo, 4 de mayo de 2016, párrs. 211-212 (**CLA-352**); *Capital Financial Hldgs. Luxembourg S.A. c. República de Camerún*, Caso CIADI No. ARB/15/18, Laudo, 22 de junio de 2017, párr. 467 (**CLA-353**); *Bear Creek Mining Corporation c. República del Perú*, Caso CIADI No. ARB/14/21, Laudo, 30 de noviembre de 2017, párr. 320 (**CLA-378**).

jurisdiccional fundada en la ilegalidad de una inversión, rechaza la postura de la Demandada sobre su gran alcance. Por el contrario, la Demandante sostiene que la objeción está limitada "únicamente" a la ilegalidad que ocurre en la "realización o adquisición inicial" de la inversión, como se deriva de las propias autoridades legales de la Demandada[463], así como de casos en los que el tratado en cuestión contenía una cláusula por la que se exigía el cumplimiento del derecho del Estado receptor[464]. La Demandante considera que debe darse un peso mucho mayor a este supuesto consenso entre los tribunales arbitrales que a la referencia que hace la Demandada a pasajes fragmentados de la decisión del tribunal en *Littop c. Ucrania*[465]. La Demandante destaca que las "acusaciones condenatorias generales" no vienen respaldadas por pruebas creíbles de actos de soborno realizados por la Demandante en cualquier momento en el curso de la inversión y específicamente no durante su inversión inicial en 2011[466].

289. Del mismo modo, la Demandante sostiene que la Demandada recurre a generalidades y argumentos sin fundamento en cuanto al supuesto efecto de una inversión "viciada" por la corrupción, contrariamente al principio bien establecido en la jurisprudencia arbitral según el cual

---

[463] Réplica, párrs. 414-415; Dúplica sobre Jurisdicción, párrs. 73, 90; *Bernhard von Pezold y otros c. República de Zimbabwe*, Caso CIADI No. ARB/10/15, Laudo, 28 de julio de 2015, párr. 420 (**CLA-12**); *Khan Resources Inc., Khan Resources B.V., y Cauc Holding Company Ltd. c. el Gobierno de Mongolia*, Caso CPA No. 2011-09, Decisión sobre Jurisdicción, párrs. 383-384 (**CLA-335**); *Hulley Enterprises Limited (Chípre) c. Federación Rusa*, Caso CPA No. 2005-05, Laudo Final, 18 de julio de 2014, párrs. 1364-1365 (**CLA-356**); *David R. Aven, et al. c. República de Costa Rica*, Caso UNCT No. UNCT/15/3, Laudo final, 18 de septiembre de 2018, párr. 342 (**CLA-357**); *Vannessa Ventures Ltd. c. República Bolivariana de Venezuela*, Caso CIADI No. ARB(AF)04/6, Laudo, 16 de enero de 2013, párr. 167 (**CLA-358**); *Urbaser S.A. y Consorcio de Aguas Bilbao Bizkaia, Bilbao Biskaia Ur Partzuergoa c. República Argentina*, Caso CIADI No. ARB/07/26, Decisión sobre Jurisdicción, 19 de diciembre de 2012, párr. 260 (**CLA-359**); *Alasdair Ross Anderson et al. c. República de Costa Rica*, Caso CIADI No. ARB(AF)/07/03, Laudo, 19 de mayo de 2010, párr. 57 (**RLA-21**); *Oxus Gold c. República de Uzbekistán, ad hoc*, Laudo Final, 17 de diciembre de 2015, párr. 707 (**RLA-172**); *Infinito Gold Ltd. c. República de Costa Rica*, Caso CIADI No. ARB/14/5, Laudo, 3 de junio de 2021, párr. 180 (**RLA-212**); *Quiborax S.A., Non Metallic Minerals S.A. y Allan Fosk Kaplún c. Estado Plurinacional de Bolivia*, Caso CIADI No. ARB/06/2, Laudo, 16 de septiembre de 2015, párr. 129 (**RLA-276**).

[464] Réplica, párrs. 416-419; Dúplica sobre Jurisdicción, párrs. 73, 90, 129; *Copper Mesa Mining Corporation c. Ecuador*, Caso CPA No. 2012-02, Laudo, 15 de marzo de 2016, párrs. 5.29-5.30, 5.54-5.55, 5.59, 5.64 (**CLA-159**); *Cairn Energy PLC y Cairn UK Holdings Limited (CUHL) c. República de la India*, Caso CPA No. 2016-07, Laudo, 21 de diciembre de 2020, párrs. 675-676, 710-711, 713 (**CLA-221**); *Teinver S.A., Transportes de Cercanías S.A. y Autobuses Urbanos del Sur S.A. c. República Argentina*, Caso CIADI No. ARB/09/1, Decisión sobre Jurisdicción, 21 de diciembre de 2012, párrs. 294-295, 325-326 (**CLA-271**); *Fraport AG Frankfurt Airport Services Worldwide c. República de Filipinas (II)*, Caso CIADI No. ARB/11/12, Laudo, 10 de diciembre de 2004, párrs. 471-481 (**CLA-342**).

[465] Réplica, párrs. 421-422; Dúplica sobre Jurisdicción, párr. 92; *Littop Enterprises Limited, Bridgemont Ventures Limited y Bordo Management Limited c. Ucrania*, Caso CCE No. V 2015/092, Laudo Final, 4 de febrero de 2021, párrs. 363-390, 442, 455, 486-488, 492-535 (**RLA-131**).

[466] La Demandante plantea además que los tribunales arbitrales desde hace tiempo han desaconsejado tales acusaciones infundadas de corrupción y la Demandada no intentó probar un vínculo causal entre el presunto acto de corrupción y el beneficio atribuido a la Demandante. Réplica, párr. 424; *ECE Projektmanagement International GmbH y Kommanditgesellschaft PANTA Achtundsechzigste Grundstücksgesellschaft mbH y Co c. República Checa*, Caso CPA No. 2010-05, Laudo, 19 de septiembre de 2013, párr. 4.879 (**CLA-344**).

la ilegalidad de una inversión anula la jurisdicción solo si se concreta en violaciones graves por parte del inversor en el momento en que realizó la inversión inicial[467]. Las dos únicas alegaciones que formula la Demandada relativas al inicio de la inversión —el supuesto tráfico de información confidencial con el Sr. Plummer y el incumplimiento del límite del 30% a la subcontratación— no solo son infundadas sino que no invalidarían la jurisdicción, en opinión de la Demandante, dado que no alcanzan el nivel de gravedad que exige la jurisprudencia arbitral[468].

290. Según la Demandante, la Demandada no toma en consideración que los actos ilícitos cometidos por terceros no son relevantes para realizar determinaciones jurisdiccionales, excepto en circunstancias extraordinarias en las que se atribuye al demandante ignorancia intencionada o desconocimiento deliberado de esa ilicitud[469]. Más específicamente, la Demandante considera que se requieren "omisiones significativas y deliberadas" por parte de un demandante respecto de la conducta ilícita de terceros para privarlo de las protecciones del tratado. Al respecto, la Demandante rechaza el argumento de la Demandada de que la objeción de jurisdicción se extiende a instancias en las que el inversor actuó "injustificadamente" respecto de las prácticas corruptas de un tercero[470]. La Demandante sostiene que cuando se consideran las pruebas desde la óptica de este umbral más alto, estas no respaldan una conclusión que la Demandante actuó con "ignorancia deliberada" o "indiferencia deliberada" frente a actos conocidos de corrupción[471].

---

[467] Réplica, párr. 425; Dúplica sobre Jurisdicción, párr. 93.

[468] Dúplica sobre Jurisdicción, párr. 93-97; *Bank Melli Iran y Bank Saderat Iran c. Reino de Bahréin*, Caso CPA No. 2017-25, Laudo, 9 de noviembre de 2021, párrs. 376-379, 453, 504-507 (**RLA-301**); *Infracapital F1 S.à r.l. e Infracapital Solar B.V. c. Reino de España*, Caso CIADI No. ARB/16/18, Decisión sobre Jurisdicción, Responsabilidad e Instrucción sobre Cuantía, 13 de septiembre de 2021, párrs. 468, 473, 476-477 (**CLA-319**); *ECE Projektmanagement International GmbH y Kommanditgesellschaft PANTA Achtundsechzigste Grundstückgesellchaft mbH & Co c. República Checa*, Caso CPA No. 2010-05, Laudo, 19 de septiembre de 2013, párrs. 3.169-3.171 (**CLA-344**); *Vladislav Kim y otros c. República de Uzbekistán*, Caso CIADI No. ARB/13/6, Decisión sobre Jurisdicción, 8 de marzo de 2017, párrs. 394, 541 (**CLA-407**); *Álvarez y Marín Corporación S.A. y otros c. República de Panamá*, Caso CIADI No. ARB/15/14, Laudo, 12 de octubre de 2018, párrs. 151, 156 (**CLA-410**).

[469] Dúplica sobre Jurisdicción, párrs. 73, 111-114; FCPA, Sección 78dd-2(h)(3)(A) (**C-1079**); Guía de la FCPA, pág. R-459_024, pág. R-459_23 (**R-459**).

[470] Réplica, párrs. 426-431; Dúplica, párr. 111; *Alasdair Ross Anderson et al. c. República de Costa Rica*, Caso CIADI No. ARB(AF)/07/03, Laudo, 19 de mayo de 2010, párrs. 22-24, 57-59 (**RLA-21**); *Churchill Mining PLC y Planet Mining Pty Ltd c. República de Indonesia*, Caso CIADI No. ARB/12/14 y 12/40, Laudo, 6 de diciembre de 2016, párrs. 504, 510, 515-527 (**RLA-132**); *David Minnotte & Robert Lewis c. República de Polonia*, Caso CIADI No. ARB (AF)/10/1, Laudo, 16 de mayo de 2014, párr. 128, 135, 139, 163 (**CLA-362**).

[471] Réplica, párr. 432; Dúplica, párr. 112. La Demandante observa además que esto se aplica a las acusaciones infundadas de la Demandada en el sentido de que la Demandante no fiscalizó ni inspeccionó correctamente a terceros contratado por las empresas de petróleo y gas para los Proyectos, en violación de los Contratos.

Además, la Demandante afirma que no se la puede responsabilizar por los actos de terceros con los que no tenía relación contractual[472].

291. La Demandante añade que muchas de las fuentes de derecho citadas por la Demandada, en particular otros tratados y leyes locales de diferentes países, no tienen incidencia en el asunto que nos ocupa[473]. La Demandante afirma que en los tratados multilaterales que definen la corrupción se exige que exista un *quid pro quo* que nunca se materializó en ninguna de las acciones de Worley[474]. Como se indica en mayor detalle en los párrafos siguientes, la Demandante sostiene que bajo una interpretación "correcta y completa" de la ley de Ecuador, la ley de Francia y la ley de los Estados Unidos no es posible que la Demandada pruebe ningún tipo de corrupción[475].

292. En primer lugar, la Demandante sostiene que las leyes de Ecuador no "prohíben el pago de gastos de negocios razonables para funcionarios públicos con fines comerciales legítimos[476]". Worley afirma también que Ecuador no ha probado que exista una conexión entre la supuesta conducta problemática y un *quid pro quo* o ventaja comercial desleal[477].

293. En relación con la ley penal ecuatoriana, la Demandante afirma además que el estándar jurídico que debe satisfacerse para llevar a una condena por corrupción requiere prueba "más allá de toda duda razonable", es decir, que la prueba indiciaria por sí sola no es suficiente para demostrar que exista corrupción[478]. Del mismo modo, en relación con la ley penal, la Demandante recuerda que si bien la Demandada está acusando a la Demandante de violar su propia ley penal, el Gobierno no ha presentado ningún cargo en contra de Worley[479].

---

[472]   Dúplica sobre Jurisdicción, párrs. 124-127 (C-8); Memorando N.º 00944-PRY-DPP-TRA-2014 de Petroecuador, 15 de agosto de 2014 (**C-1111**); Lista de verificación de la auditoría de calidad, Contrato No. 2011030, 25 de agosto de 2015 (**C-1157**); Carta de Worley a Petroecuador No. 408005-00445-00-PM-LTR-WPI-EPP-5081, 2 de julio de 2014 (**C-1175**); Carta de Worley a Tesca 408005-00445-93.2-PC-LTR-WPI-TES-8656, 2 de junio de 2015 (**C-1176**); Informe de transferencia (pasaje), 22 de junio de 2016 (**C-1177**); Informe de transferencia (pasaje), 30 de junio de 2016 (**C-1178**); Carta de Worley a Petroecuador a la que se adjuntan los Informes de transferencia (pasaje), 6 de junio de 2016 (**C-1179**); Informe de transferencia (pasaje), 18 de mayo de 2016 (**C-1194**); Acta No. RDP-GE-2013-DIR-AC-0003-0 de la Reunión del Directorio de RDP, 28 de agosto de 2013, párrs. 6-8 (**C-756**).

[473]   Dúplica sobre Jurisdicción, párrs. 142, 157.

[474]   Dúplica sobre Jurisdicción, párrs. 143-144; CNUCC, artículo 16 (**RLA-112**); Convención de la OCDE para Combatir el Cohecho de Servidores Públicos Extranjeros en Transacciones Comerciales Internacionales, artículo 1(1) (**RLA-114**); Convención Interamericana contra la Corrupción, artículo VI(1)(a) (**RLA-113**).

[475]   Dúplica sobre Jurisdicción, párrs. 145-156.

[476]   Réplica, párr. 393; Dúplica sobre Jurisdicción, párr. 151; Ley Orgánica del Servicio Público de Ecuador, artículo 24 (**RLA-221**); Ley Orgánica de la Contraloría General del Estado, artículo 45 (**C-177**); Ley de Contratación Pública, reformada por la Ley 0, 14 de octubre de 2013, artículo 99 (**C-1067**).

[477]   Réplica, párr. 398; Dúplica sobre Jurisdicción, párr. 151.

[478]   Dúplica sobre Jurisdicción, párr. 152; Código Orgánico Integral Penal, artículos 5(3), 280 (**C-202**).

[479]   Dúplica sobre Jurisdicción, párr. 153.

294. En segundo lugar, con respecto a la ley francesa, la Demandante afirma que "la Corte de Apelaciones de París, en reiteradas ocasiones, dictaminó que los indicios de corrupción deben ser 'suficientemente serios, precisos y concordantes' para justificar la anulación de un laudo por motivos de orden público[480]". En opinión de la Demandante, la Demandada no ha satisfecho este alto nivel de prueba[481].

295. En tercer lugar, la Demandante afirma que las leyes de Ecuador no "prohíben el pago de gastos de negocios razonables para funcionarios públicos con fines comerciales legítimos" [482]. Critica "la cita textual parcial sumamente engañosa" tomada por la Demandante de la FCPA, la cual prohíbe el otorgamiento en forma corrupta de cualquier objeto de valor "con el fin de […] influir en cualquier acto o decisión de dicho funcionario extranjero que actúe a título oficial, (ii) inducir a dicho funcionario extranjero a que realice u omita algún acto en infracción de su deber legítimo, u (iii) obtener alguna ventaja indebida[483]". La Demandante recuerda que la misma disposición definitoria confirma que los gastos razonables y de buena fe (tales como gastos de viajes de negocios y otros gastos que la Demandada ha identificado) no vulneran la FCPA[484]. En opinión de la Demandante, las "salvaguardias" dispuestas en la Guía de la FCPA para determinar si un gasto en particular es apropiado conducen a la misma conclusión[485].

296. En último lugar, la Demandante rechaza que haya vulnerado la Directiva Ejecutiva como afirma la Demandada. Según la Demandante, únicamente era necesario anotar los obsequios locales en el registro de obsequios, mientras que las comidas de negocios con funcionarios del Gobierno solo debían anotarse en el registro de obsequios si excedían los USD 200 por persona[486].

297. En conclusión, la Demandante considera que el caso de corrupción de la Demandada, que abarca la conducta ilegal de sus propios funcionarios del Estado, está ideado como una objeción jurisdiccional para evadir su responsabilidad por los incumplimientos del Tratado, que atañen al fondo del caso[487]. La Demandante, al igual que otros tribunales, expresa su inquietud en el sentido de que la objeción de corrupción busca preservar los beneficios que ya percibió de la Demandante

---

[480]   Réplica, párr. 406; Dúplica sobre Jurisdicción, párr. 154.

[481]   Réplica, párr. 424; Dúplica sobre Jurisdicción, párrs. 154-156.

[482]   Réplica, párr. 393; Dúplica sobre Jurisdicción, párrs. 147-148; FCPA, Secciones 78dd-1(a)(1), 1(c) (**C-1079**); Guía de la FCPA, págs. R-459_015-018, 025 (**R-459**).

[483]   Dúplica sobre Jurisdicción, párr. 146; FCPA, Sección 78dd-1(a)(1) (**C-1079**).

[484]   Dúplica sobre Jurisdicción, párr. 147; FCPA, Sección 78dd-1(c) (**C-1079**).

[485]   Dúplica sobre Jurisdicción, párrs. 148-149; Guía de la FCPA, pág. R-459_024, pág. R-459_25 (**R-459**).

[486]   Dúplica sobre Jurisdicción, nota al pie 414; Directiva Ejecutiva, Secciones 11, 12, 15 (**C-746**); Declaración de Falcon III, párr. 29 (**CWS-7**).

[487]   Réplica, párr. 433; Dúplica sobre Jurisdicción, párrs. 2, 159.

y evitar pagar —lo cual se ve exacerbado aún más por el hecho de que los propios funcionarios de Ecuador fueron partícipes de la corrupción—[488]. De acuerdo con la Demandante, esto contradice el principio firmemente asentado de que solo la ilegalidad al inicio de una inversión puede privar de jurisdicción a un tribunal, mientras que la ilegalidad durante la operación de la inversión es una cuestión que debe analizarse como parte del fondo del caso[489].

### 4) La corrupción como motivo de inadmisibilidad

298. La Demandante sostiene que la Demandada ha presentado extemporáneamente la cuestión de ilegalidad como una nueva objeción a la admisibilidad en su Dúplica[490]. A la vista de que las objeciones a la admisibilidad se deben plantear tan pronto como resulte posible, la Demandante afirma que se ha renunciado a esta objeción y que por ello se debe rechazar[491].

299. En cualquier caso, la Demandante considera que esta objeción es una táctica infundada planteada con el único propósito de ampliar su objeción de ilegalidad a la vida entera de la inversión de

---

[488]   Réplica, párrs. 434-435; Dúplica sobre Jurisdicción, párrs. 3, 123, 157-159; *En ref. Empresa Pública de Hidrocarburos del Ecuador*, Tribunal de Apelaciones del Onceavo Circuito, Decisión sobre la petición de Mandamus al Tribunal de Distrito de los Estados Unidos para el Distrito Sur de Florida, 2020 U.S. App. LEXIS 16722 (**C-454**); *Estados Unidos c. Juan Andres Baquerizo Escobar*, Tribunal de Distrito Sur de Florida, ECF No. 97 (**C-574**); *En ref. Empresa Pública de Hidrocarburos*, Tribunal del Onceavo Circuito, 2020 U.S. App. 16721 (**C-861**); *Karkey Karadeniz Elektrik Uretim A.S. c. República Islámica de Pakistán*, Caso CIADI No. ARB/13/1, Laudo, 22 de agosto de 2017, párr. 534 (**CLA-65**); *Niko Resources (Bangladesh) Ltd. c. Bangladesh Petroleum Exploration & Production Company Limited ("Bapex") y Bangladesh Oil Gas y Mineral Corporation ("Petrobangla")*, Caso CIADI No. ARB/10/18, Decisión sobre el Reclamo de Corrupción, 25 de febrero de 2019, párr. 2008 (**CLA-346**); *Sistem Mühendislik Inşaat Sanayi ve Ticaret A. Ş. c. República Kirguisa*, Caso CIADI No. ARB(AF)/06/1, Laudo, 9 de septiembre de 2009, párr. 45 (**CLA-361**); *Metal-Tech Ltd. c. República de Uzbekistán*, Caso CIADI No. ARB/10/3, Laudo, 4 de octubre de 2013, párr. 389 (**CLA-363**); Guía Técnica de la CNUCC, Naciones Unidas, págs. 109-110 (**CLA-418**); CNUCC, artículo 34 (**RLA-112**).

[489]   Réplica, párr. 433; Dúplica sobre Jurisdicción, párrs. 73, 90, 129; *Copper Mesa Mining Corporation c. República del Ecuador*, Caso CPA No. 2012-02, Laudo, 15 de marzo de 2016, párr. 5.65 (**CLA-159**); *Khan Resources Inc., Khan Resources B.V., y Cauc Holding Company Ltd. c. Mongolia*, Caso CPA No. 2011-09, Decisión sobre Jurisdicción, párrs. 383-384 (**CLA-335**); *Hulley Enterprises Limited (Chipre) c. Federación Rusa*, Caso CPA No. 2005-05, Laudo Final, 18 de julio de 2014, párrs. 1355, 1633 (**CLA-356**); *Vladislav Kim y otros c. República de Uzbekistán*, Caso CIADI No. ARB/13/6, Decisión sobre Jurisdicción, 8 de marzo de 2017, párr. 553 (**CLA-407**); *Infinito Gold Ltd. c. República de Costa Rica*, Caso CIADI No. ARB/14/5, Laudo, 3 de junio de 2021, párr. 180 (**CLA-415**).

[490]   Dúplica sobre Jurisdicción, párrs. 128.

[491]   Dúplica sobre Jurisdicción, párrs. 128; *Copper Mesa Mining Corporation c. República del Ecuador*, Caso CPA No. 2012-02, Laudo, 15 de marzo de 2016, párrs. 5.63-5.64 (**CLA-159**); G. Zeiler, *Jurisdiction, Competence, and Admissibility*, en C. Binder *et al*., *International Investment Law for the 21st Century* (2009), pág. 89 (**CLA-411**); *Mohamed Abdel Raouf Bahgat c. República Árabe de Egipto (I)*, Caso CPA No. 2012-07, Orden Procesal No. 5 (sobre la solicitud de la Demandante para declarar inadmisible las nuevas objeciones jurisdiccionales de la Demandada) (pasaje), 17 de mayo de 2017, párrs. 39-46 (**CLA-456**).

Worley, posición que los tribunales han rechazado[492]. Si bien los casos citados por la Demandada basaron sus conclusiones en el texto del tratado y la existencia de ilegalidad grave y sistemática, la Demandante concluye que el Tratado no incluye ninguna disposición en materia de ilegalidad, los hechos alegados por la Demandada no alcanzan el mismo nivel de gravedad, y ninguna de esas alegaciones viene respaldada por pruebas[493].

## VI.   EL ANÁLISIS DEL TRIBUNAL SOBRE JURISDICCIÓN Y ADMISIBILIDAD

### 1.   CUESTIONES PRELIMINARES

300.   Los alegatos de las Partes sobre ilegalidad suscitan cuestiones preliminares respecto de: (i) la aplicabilidad del requisito de que una inversión cumpla con la ley del país receptor; y (ii) el momento en el que tiene lugar cualquier supuesta ilegalidad de cara a la realización de una inversión y las consecuencias que derivan de ello. El Tribunal abordará estas cuestiones antes de analizar el fondo de los argumentos de las Partes sobre ilegalidad.

### 1)   Cumplimiento con la ley del país receptor

301.   Las Partes difieren en cuanto a si un tratado de inversión debe estipular expresamente un requisito de cumplimiento de la inversión con la ley del país receptor a fin de que dicho requisito sea aplicable o, por el contrario, si dicho requisito se aplica incluso cuando el tratado no contiene una cláusula de legalidad expresa, como ocurre en el presente caso.

302.   La Demandada cita *Plama c. Bulgaria y Phoenix c. República Checa* como sustento del principio de que las inversiones realizadas en inobservancia de los requisitos legales nacionales pueden quedar excluidas del alcance de la protección del tratado aplicable, incluso si no hay una disposición expresa en el tratado que exija que las inversiones se realicen de manera legal o de buena fe. La Demandada dice que, por implicación necesaria, dicha protección solo está disponible para inversiones realizadas de acuerdo con la ley nacional y de buena fe[494]. El tribunal de *SAUR c. Argentina* llegó a una conclusión similar: el que el tratado de inversión aplicable

---

[492]   Dúplica sobre Jurisdicción, párrs. 129-131; *Vladislav Kim y otros c. República de Uzbekistán*, Caso CIADI No. ARB/13/6, Decisión sobre Jurisdicción, 8 de marzo de 2017, párr. 553 (**CLA-407**); *Vestey Group Ltd. c. República Bolivariana de Venezuela*, Caso CIADI No. ARB/06/4, Laudo, 15 de abril de 2016, párrs. 131-132, 140-141, 147, 149, 150 (**CLA-414**); *Infinito Gold Ltd. c. República de Costa Rica*, Caso CIADI No. ARB/14/5, Laudo, 3 de junio de 2021, párr. 180-501 (**CLA-415**); *Hesham Talaat M. Al-Warraq c. República de Indonesia, ad hoc*, Laudo Final, 15 de diciembre de 2014, párrs. 631, 634-648 (**RLA-304**).

[493]   Dúplica sobre Jurisdicción, párr. 131.

[494]   Dúplica, párrs. 377-380; *Plama Consortium Limited c. República de Bulgaria*, Caso CIADI No. ARB/03/24, Laudo, 27 de agosto de 2008, párr. 138 (**RLA-24**); *Phoenix Action, Ltd. c. República Checa*, Caso CIADI No. ARB/06/5, Laudo, 15 de abril de 2009, párr. 101 (**CLA-178**).

contenga o no una cláusula de legalidad expresa es irrelevante, pues la condición de que el inversor no incurra en una violación grave del ordenamiento jurídico es inherente a todo tratado de inversión:

> [El tribunal] entiende que la finalidad del sistema de arbitraje de inversión radica en proteger únicamente inversiones legales y *bona fide*. El hecho de que el APRI entre Francia y Argentina mencione o deje de mencionar la exigencia de que el inversor haya actuado en conformidad con la legislación interna, no constituye un factor relevante. El requisito de no haber incurrido en una violación grave del ordenamiento jurídico es una condición tácita, ínsita en todo APRI, pues no se puede entender en ningún caso que un Estado esté ofreciendo el beneficio de la protección mediante arbitraje de inversión, cuando el inversor, para alcanzar esa protección, haya incurrido en una actuación antijurídica[495].

303.   La Demandante rechaza que se pueda insertar un requisito de legalidad en el Tratado como parte de un ejercicio interpretativo. Se remite a varias decisiones en las que los tribunales determinaron que, en ausencia de "lenguaje expreso en el tratado, la ilegalidad de la inversión no puede operar como un impedimento a la jurisdicción"[496]. Según argumenta la Demandante, "en la medida en que pueda inferirse del Tratado un requisito implícito de legalidad, se reconoce ampliamente que las conductas supuestamente ilícitas solo pueden tener un impacto en la jurisdicción si se produjeron al realizarse la inversión […]"[497].

304.   En opinión del Tribunal, la pregunta crucial no es si se debe inferir un requisito de legalidad del Tratado, sino si un tribunal debería asumir que un Estado habría dado su consentimiento al arbitraje para proteger inversiones que violaran su propia ley. Esta pregunta claramente se debe responder de forma negativa:

> No hay duda de que el requisito de la conformidad con la ley es importante respecto del acceso a disposiciones sustantivas sobre la protección del inversor bajo el TBI. Este acceso se puede denegar en una decisión sobre el fondo. Sin embargo, si es manifiesto que la inversión se realizó infringiendo la ley, es acorde con la economía judicial no asumir jurisdicción[498].

305.   El tribunal de *Inceysa c. El Salvador* llegó a la misma conclusión:

> Precisados los lineamientos anteriores, es necesario atender concretamente a la argumentación en la que El Salvador funda su objeción la cual sostiene que las diferencias

---

[495]   *SAUR International SA c. República Argentina,* Caso CIADI No. ARB/04/4, Decisión sobre Jurisdicción y sobre Responsabilidad, 6 de junio de 2012, párr. 308 (**RLA-128**).

[496]   Dúplica sobre Jurisdicción, párr. 90 (traducción del Tribunal); *Anatolie Stati c. Kazajstán*, Caso CCE No. V 116/2010, Laudo, 19 de diciembre de 2013, párr. 812 (**CLA-9**); *Saba Fakes c. República de Turquía*, Caso CIADI No. ARB/07/20, Laudo, 14 de julio de 2010, párrs. 114, 119 (**CLA-295**); *Achmea B.V. (antiguamente Eureko B.V.) c. República Eslovaca [I]*, Caso CPA No. 2008-13, Laudo Final, 7 de diciembre de 2012, párrs. 168, 170 (**CLA-351**); *Bear Creek Mining Corporation c. República del Perú*, Caso CIADI No. ARB/14/21, Laudo, 30 de noviembre de 2017, párr. 320 (**CLA-378**).

[497]   Dúplica sobre Jurisdicción, párr. 90 (traducción del Tribunal).

[498]   *Phoenix Action, Ltd. c. República Checa*, Caso CIADI No. ARB/06/5, Laudo, 15 de abril de 2009, párr. 104 (**CLA-178**) (traducción del Tribunal).

surgidas de una inversión realizada de manera ilegal no están sometidas a la jurisdicción del Centro, pues no están comprendidas en los supuestos para los cuales se otorgó el consentimiento […]

Por lo anterior, a continuación este Tribunal de Arbitraje analizará si, en efecto, el consentimiento de los Estados signatarios del APPRI se limita a aquellas controversias que surgen de inversiones realizadas de acuerdo con la legislación del Estado receptor. En consecuencia, este Tribunal resuelve que aquellas controversias que deriven de una inversión realizada de manera ilegal quedan fuera del consentimiento otorgado por las partes y, en consecuencia, no están sometidas a la jurisdicción del Centro ni este Tribunal tiene competencia para resolverlas, por no darse los supuestos del Artículo 25 del Convenio ni los del APPRI[499].

306. Y, de igual manera, el tribunal de *Plama* resolvió —si bien no como una cuestión relativa a la jurisdicción— que las protecciones sustantivas del TCE no se aplican a las inversiones que se realizan en forma contraria a la ley:

A diferencia de ciertos tratados bilaterales de inversión, el TCE no contiene una disposición por la que se exija la conformidad de la Inversión con una ley en particular. Sin embargo, esto no significa que las protecciones dispuestas por el TCE cubran cualquier tipo de inversión, como las que son contrarias a la ley nacional o internacional […]

De conformidad con la nota introductoria al TCE "[e]l objetivo fundamental del Tratado sobre la Carta de la Energía es fortalecer el Estado de derecho en cuestiones energéticas [ ... ]". En consecuencia, el TCE debe interpretarse de manera congruente con el objeto de alentar el Estado de derecho. El Tribunal Arbitral concluye que las protecciones sustantivas del TCE no se pueden aplicar a las inversiones que se realizan en forma contraria a la ley[500].

307. Por consiguiente, el Tribunal concluye que la ausencia de una cláusula de legalidad expresa en el Tratado no impide un análisis de si la supuesta inversión de la Demandante cumplió con la ley. Cualquier ilegalidad de este tipo puede incidir en la resolución de esta controversia de varias maneras. En particular, una ilegalidad puede llegar a privar a la supuesta inversión de la Demandante de las protecciones sustantivas del Tratado o —como se explica en mayor detalle en la siguiente sección—, privar de jurisdicción al Tribunal o conllevar la inadmisibilidad de las pretensiones de la Demandante.

## 2) El momento de la ilegalidad y sus consecuencias

308. Habiendo determinado que el Tribunal cuenta con la facultad para analizar la conformidad de la presunta inversión de la Demandante con la ley, la siguiente pregunta que debe abordar es si las actividades ilegales entrañan consecuencias distintas según la etapa en la que se cometieron —al realizarse la inversión o en un momento posterior, durante la operación de la inversión—.

---

[499] *Inceysa Vallisoletana S.L. c. República de El Salvador*, Caso CIADI No. ARB/03/26, Laudo, 2 de agosto de 2006, párrs. 182, 207 (**RLA-22**) (traducción del Tribunal).

[500] *Plama Consortium Limited c. República de Bulgaria*, Caso CIADI No. ARB/03/24, Laudo, 27 de agosto de 2008, párrs. 138-139 (**RLA-24**) (traducción del Tribunal).

309. Las Partes coinciden en que una ilegalidad puede tener un impacto sobre la jurisdicción si ocurre en el momento en que se realiza una inversión[501]. Sin embargo, respecto de las ilegalidades que ocurren *después* de realizarse la inversión, la Demandante afirma que constituyen una cuestión que debe resolverse como parte del fondo[502], mientras que la Demandada afirma que pueden traducirse tanto en la inadmisibilidad de las pretensiones de la Demandante[503] como en privar de jurisdicción al Tribunal "porque la corrupción anula la jurisdicción siempre que se comete"[504].

310. El Tribunal considera ampliamente reconocido que una ilegalidad que afecta la realización de la inversión puede privar de jurisdicción a un tribunal constituido bajo un tratado de inversión[505]. Sin embargo, debe recordar que solo las ilegalidades de una naturaleza particularmente seria son capaces de alcanzar este umbral:

> Las Partes debatieron extensamente el grado en el que la ilegalidad relacionada con una inversión podría afectar a la jurisdicción de un Tribunal para adoptar una decisión sobre una pretensión en términos más generales, incluso en ausencia de lenguaje expreso en el tratado bilateral de inversión pertinente que exija cumplir con la ley nacional. Sin embargo, al analizar los casos en los que los tribunales determinaron que carecían de jurisdicción a raíz de ilegalidad revela que todos abordaban una ilegalidad de una naturaleza particularmente seria, tal como corrupción o fraude, vinculada con la realización inicial de la inversión[506].

311. En el presente caso, la Demandada hace referencia a dos instancias de ilegalidad al inicio de la presunta inversión: (i) el supuesto tráfico de información confidencial por parte del Sr. Plummer en la etapa previa a la adjudicación del Contrato de la Refinería del Pacífico a Worley; y (ii) la presunta manifestación falsa por parte de Worley de su intención de cumplir con el límite del 30% a la subcontratación previsto por la ley ecuatoriana durante la licitación de los Contratos de la Refinería Esmeraldas, la Planta Machala y la Refinería del Pacífico[507]. La Demandante también considera que estas alegaciones son "relativas al inicio de la inversión"[508].

---

[501] EPA de la Demandante, párr. 106; EPA de la Demandada, párr. 126.

[502] Dúplica sobre Jurisdicción, párr. 129.

[503] Dúplica, párrs. 398-400.

[504] EPA de la Demandada, párr. 126 (traducción del Tribunal).

[505] *Véase, por ejemplo, Fraport AG Frankfurt Airport Services Worldwide c. República de Filipinas (II)*, Caso CIADI No. ARB/11/12, Laudo, 10 de diciembre de 2014, párr. 473 (**CLA-342**); *Littop Enterprises Limited, Bridgemont Ventures Limited y Bordo Management Limited c. Ucrania*, Laudo, 4 de febrero de 2021, párr. 442 (**RLA-131**).

[505] *ECE Projektmanagement International GmbH y Kommanditgesellschaft PANTA Achtundsechzigste Grundstücksgesellschaft mbH y Co c. República Checa*, Caso CPA No. 2010-05, Laudo, 19 de septiembre de 2013, párrs. 3.169 (**CLA-344**) (traducción del Tribunal). *Véase también Plama Consortium Limited c. República de Bulgaria*, Caso CIADI No. ARB/03/24, Laudo, 27 de agosto de 2008, párr. 143 (**RLA-24**).

[507] *Véase* la Sección III.5.2 *supra*.

[508] Dúplica sobre Jurisdicción, párr. 93 (traducción del Tribunal).

312.  Por lo tanto, la pregunta que debe responder el Tribunal respecto de estas dos instancias de presunta ilegalidad es si son de una naturaleza lo suficientemente seria como para privar de jurisdicción al Tribunal. El Tribunal realizará este análisis en la Sección VI.2 *infra*.

313.  Sin embargo, el Tribunal recuerda que las alegaciones de ilegalidad planteadas por la Demandada no se limitan a conducta que surja estrictamente al inicio de la inversión de la Demandante. La Demandada alega además que Worley actuó de forma ilegal durante la operación de la inversión mediante la obtención de los seis Contratos Complementarios de la Refinería Esmeraldas en contravención del artículo 87 de la Ley de Contratación Pública, conforme al cual el valor de los contratos complementarios al Contrato de la Refinería Esmeraldas no podía exceder el 70% del valor del contrato principal. La Demandada hace alusión también a una trama de corrupción más amplia consistente en el soborno de funcionarios de Petroecuador por Worley y Tecnazul[509].

314.  A este respecto, el Tribunal observa que las ilegalidades que puedan haberse dado durante la vida de la inversión de la Demandante también pueden condicionar la resolución de sus pretensiones. Si bien toda ilegalidad de este tipo se puede abordar como parte del fondo de una pretensión, a juicio de una mayoría del Tribunal, las ilegalidades especialmente graves que constituyan violaciones del orden público internacional pueden conllevar la inadmisibilidad de las pretensiones. Según explicó el tribunal de *Bank Melli*:

> la justificación para la restricción temporal de la objeción jurisdiccional de legalidad, que consiste en no otorgar la protección del tratado a una inversión realizada ilegalmente, no es aplicable a una defensa de admisibilidad según las doctrinas del orden público internacional y *unclean hands*. El motivo por el que infracciones graves como un quebrantamiento del orden público internacional pueden derivar en la inadmisibilidad de las pretensiones es que los órganos internacionales de resolución de controversias tienen el deber de no abordar pretensiones viciadas por incumplimientos de ciertas normas aceptadas universalmente conforme a los principios generales de buena fe y *nemo auditur propriam turpitudinem allegans*.

> [...]

> Si bien en el arbitraje de inversión el orden público internacional se ha invocado en el contexto de ilegalidades que afectan a la realización de la inversión, la razón de ser subyacente también es aplicable a ilegalidades posteriores, si son serias y vician las pretensiones del arbitraje. Según Douglas, un inversor cuyas pretensiones están viciadas por un incumplimiento del orden público internacional no debe ser "asistido de ninguna manera por el proceso arbitral"[510].

---

[509]  *Véase* la Sección III.5.3 *supra*

[510]  *Bank Melli Iran y Bank Saderat Iran c. Reino de Bahréin*, Caso CPA No. 2017-25, Laudo, 9 de noviembre de 2021, párrs. 365, 367 (**RLA-301**) (traducción del Tribunal). *Véase también Churchill Mining PLC y Planet Mining Pty Ltd c. República de Indonesia*, Caso CIADI No. ARB/12/14 y 12/40, Laudo, 6 de diciembre de 2016, párrs. 507-508 (**RLA-132**).

315. *Bank Melli* estableció requisitos adicionales para que una conducta ilegal pueda derivar en la inadmisibilidad de las pretensiones: la actividad ilícita en cuestión debe: (i) ser seria y generalizada; y (ii) guardar una relación estrecha con las pretensiones:

> Aún en ese caso, no toda actividad ilícita entrañará la inadmisibilidad de las pretensiones de un inversor en la resolución de controversias internacionales. Para desplegar este efecto, la conducta ilegal debe: (i) ser seria y generalizada y (ii) guardar una relación estrecha con las pretensiones. Por un lado, las violaciones esporádicas y superficiales de la ley no desencadenarán la inadmisibilidad de las pretensiones. Por otro lado, el hecho de que un inversor haya cometido violaciones graves de la ley no significa que se deba denegar el acceso a dicho inversor al arbitraje internacional al amparo de tratados como una medida generalizada, incluso en una situación en la que no surjan pretensiones específicas de estas actividades ilegales. Para justificar una sanción tan drástica como la inadmisibilidad de las pretensiones, los dos requisitos de seriedad y conexidad se deben satisfacer cumulativamente[511].

316. En opinión de la árbitro Stern, si bien el resultado final es el mismo, las ilegalidades que hayan tenido lugar durante la operación de la inversión de la Demandante se deben abordar más bien como parte del fondo de una pretensión. Si el Tribunal resuelve que hay corrupción o ilegalidades graves, debe desestimar la pretensión porque la inversión no es una inversión protegida. La admisibilidad debe ser un concepto limitado a los vicios procesales de una pretensión susceptibles de ser subsanados, mientras que una pretensión que se fundamenta en una inversión viciada por corrupción nunca es subsanable.

317. El Tribunal determinará si las alegaciones de ilegalidad de la Demandada satisfacen el umbral de *Bank Melli* en la Sección VI.3 *infra*.

## 2. ILEGALIDAD EN LA REALIZACIÓN DE LA INVERSIÓN

318. El Tribunal abordará ahora las dos instancias de presunta ilegalidad al momento de realizarse la inversión por la Demandante: (**1**) el supuesto tráfico de información confidencial por parte de Worley; y (**2**) la supuesta manifestación falsa de la intención de cumplir con el límite del 30% a la subcontratación previsto en el derecho ecuatoriano en la licitación de varios de los Contratos.

### 1) Tráfico de información confidencial

#### i. Introducción

319. En esencia, el denominado tráfico de información confidencial por parte de Worley se refiere a ciertos intercambios de información entre la Demandante y el Sr. Plummer de Shaw, una empresa

---

[511] *Bank Melli Iran y Bank Saderat Iran c. Reino de Bahréin*, Caso CPA No. 2017-25, Laudo, 9 de noviembre de 2021, párr. 376 (**RLA-301**) (traducción del Tribunal).

de consultoría con operaciones en Ecuador, mientras que el Sr. Plummer asistía simultáneamente a RDP con la selección de un PMC para el Proyecto de la Refinería del Pacífico y seguidamente con la negociación de las condiciones del Contrato de la Refinería del Pacífico. La Demandante finalmente contrató a Shaw como consultor después de que se le adjudicara a Worley el Contrato de la Refinería del Pacífico —supuestamente, como resultado del "tráfico" del Sr. Plummer—.

320. La Demandante niega estas alegaciones de tráfico de información confidencial. Según la Demandante:

> (i) estas alegaciones se refieren a un período meses **después** de que RDP ya hubiera seleccionado a Worley como PMC, de modo que **no** pudo incidir de ninguna manera en la decisión de adjudicar el contrato a Worley; (ii) RDP era muy consciente de que el Sr. Plummer actuó como un intermediario entre RDP y Worley, según se revela en varios correos electrónicos; (iii) Shaw celebró el contrato con Worley solo después de que **RDP le instruyera** a hacerlo; (iv) el subcontrato se celebró **dieciocho meses después** del supuesto "tráfico"; (v) los correos electrónicos no revelan que el Sr. Plummer remitiera **ningún** correo electrónico confidencial a Worley; y (vi) Worley **no realizó pagos** en el marco del subcontrato porque nunca se emitieron órdenes de trabajo[512].

321. El Tribunal evaluará las alegaciones de "tráfico" de información confidencial planteadas por la Demandada sobre la base de los documentos contemporáneos que reflejan los intercambios entre el Sr. Plummer y Worley e ilustran su contexto más amplio.

ii.   Cronología

322. *13 de septiembre de 2010*: RDP invitó a Worley a participar en la licitación para actuar como gerente de proyecto para la construcción de la Refinería del Pacífico[513]. La invitación fue enviada por el Sr. Plummer en su calidad de Consultor Ejecutivo Principal de Shaw. En su correo electrónico de presentación explicó que "Shaw Consultants International asiste a la Refineria del Pacific [*sic*] y remite la invitación adjunta a solicitud de esta"[514].

323. Tras recibir la invitación a licitar del Sr. Shaw, el Sr. Doug Eberhart de Worley escribió en un correo electrónico interno ese mismo día: "Veo que nos interesaría realizar una presentación sobre nuestras capacidades de PMC pero, con suerte, podremos recabar información antes de gastar $ en una licitación". También escribió: "Shaw parece estar involucrado pero ¿no queda claro cómo?"[515].

---

[512]   EPA de la Demandante, párr. 113 (énfasis del original) (traducción del Tribunal).

[513]   Invitación de RDP a manifestar interés en Contrato de PMC, 13 de septiembre de 2010 (**C-90**).

[514]   Correo electrónico de G. Plummer a Worley, 13 de septiembre de 2010 (**R-304**) (traducción del Tribunal).

[515]   Correo electrónico de D. Eberhart a M. Villegas, 13 de septiembre de 2020 (**R-306**) (traducción del Tribunal).

324.   *Enero de 2011:* Worley presentó su oferta para el Proyecto de la Refinería del Pacífico[516].

325.   *5 de marzo de 2011*: el presidente del Ecuador anunció públicamente la selección de Worley como PMC para el Proyecto de la Refinería del Pacífico[517]. La comisión técnica de RDP que se constituyó para asesorar a RDP durante el proceso licitatorio —integrada, entre otros, por Shaw[518]— otorgó a Worley la puntuación acumulada más alta entre todos los oferentes[519]. Durante este proceso, Shaw había participado en la redacción de los términos de referencia para el proceso licitatorio para contratar a Worley y había analizado también la propuesta de Worley[520].

326.   *8 de abril de 2011*: el Sr. Plummer, en representación de RDP, invitó a Worley "a reunirse con RDP en su oficina de Manta, Ecuador, el 19 y 20 de abril de 2011 para analizar [su] reciente propuesta"[521].

327.   *13 de mayo de 2011*: RDP constituyó una comisión para negociar los términos del Contrato de la Refinería del Pacífico con Worley, la cual también estuvo integrada por Shaw[522].

328.   *24 y 25 de mayo de 2011:* en un intercambio de correos electrónicos, Mauricio Villegas ("**Sr. Villegas**"), Gerente de Desarrollo Comercial de Worley, discutió con el Sr. Plummer, sin poner en copia a nadie más, ciertos borradores de documentos destinados a RDP. En particular, el 24 de mayo de 2011, el Sr. Villegas envió al Sr. Plummer "nuestro borrador de la carta con la NTP ["Notificación para Proceder" por sus siglas en inglés] para su revisión y comentarios". El Sr. Plummer rápidamente envió "sugerencias de modificaciones" ese mismo día. Estas fueron agradecidas por el Sr. Villegas, "en especial, la de los impuestos". El Sr. Plummer respondió: "¡No hay problema – me debes una cerveza (o un Cuba Libre si alguna vez nos encontramos en Venezuela!)"[523].

329.   El Tribunal carece de elementos para determinar el alcance exacto de las modificaciones propuestas por el Sr. Plummer a los documentos de Worley sobre la sola base de las pruebas presentadas. Sin embargo, la única referencia a "impuestos" en el borrador final de la Notificación

---

[516]   Declaración de Elizondo, párr. 13 (**CWS-1**).

[517]   República del Ecuador, *Discurso presidencial No. 211* (video), en 2:22:24 (**C-144**).

[518]   Réplica, párr. 80; Dúplica, párr. 23.

[519]   Contrato de la Refinería del Pacífico, pág. 141 (**C-8**).

[520]   Réplica, párr. 80; Dúplica, párr. 21.

[521]   Correo electrónico de G. Plummer a M. Villegas, 8 de abril de 2011 (**R-307**) (traducción del Tribunal).

[522]   Contrato de la Refinería del Pacífico, pág. 167 (**C-8**); Informe de la Comisión de Negociación de RDP de la oferta de Worley para contratación del PMC, 3 de junio de 2011, pág. 3 (**C-824**).

[523]   Correo electrónico de M. Villegas a G. Plummer, 24 de mayo de 2011 (**R-308**) (traducción del Tribunal); Correo electrónico de M. Villegas a G. Plummer, 24 de mayo de 2011 (**R-310**) (traducción del Tribunal).

para Proceder mencionada en el intercambio anterior (que permitiría a Worley iniciar los trabajos "mientras la finalización del contrato formal continuara pendiente") se encuentra en una disposición sobre el pago de un adelanto de costes. En su parte pertinente, dicha disposición determina que *RDP, sin coste alguno para Worley*, pagaría todos los impuestos ecuatorianos en relación con este trabajo —una inserción sustancial que favorecía en la práctica a Worley—:

> La Refinería del Pacifico Eloy Alfaro CEM autoriza a WorleyParsons a facturar un máximo de ochocientos setenta y cinco mil dólares estadounidenses USD ($875.000) en concepto de servicios y costes reembolsables relacionados que atañen al desempeño del Alcance del Trabajo según se describe en el Anexo 1 - "Plan de ejecución a 60 días". *Para evitar dudas, esta suma excluye todos los impuestos ecuatorianos y cualquiera de dichos impuestos ecuatorianos que guarde relación con este trabajo serán pagados por Refinería del Pacifico Eloy Alfaro CEM sin coste alguno para WorleyParsons*[524]

330. Al día siguiente, el Sr. Villegas solicitó una vez más que el Sr. Plummer comentase sobre "el paquete final a ser enviado a RDP". El Sr. Villegas sugirió que, una vez que el paquete estuviese "listo" (es decir, después de la incorporación de los comentarios del Sr. Plummer) este debía ser enviado al Sr. Plummer y no a RDP, dado que el Sr. Plummer "[es] la parte neutral". Una vez más, el Sr. Plummer cumplió con lo solicitado porque "no podía resistirse a realizar modificaciones", pero aconsejó a Worley que enviara el paquete directamente a RDP. Algunas de las sugerencias adicionales del Sr. Plummer guardaban relación con la división de tareas entre Worley y Tecnazul: "Pero ten cuidado cuando muestres la división con Azul en caso de que complique la cuestión tributaria. Qué ocurre si RDP desea facturas separadas de Azul porque ellos pagan impuestos ecuatorianos. Preguntad a Azul sobre esto o quizás no defináis las horas que corresponderán a Azul". El Sr. Villegas solicitó a su equipo que tomara en consideración el comentario formulado por el Sr. Plummer, que "[tenía] cierto mérito"[525]. En esta correspondencia no se puso en copia a funcionarios de RDP.

331. Según la Demandante, en estos intercambios el Sr. Plummer meramente "[r]ecomienda que Worley envíe un paquete de documentos directamente a RDP y efectúa sugerencias no sustanciales sobre los borradores de la documentación, como, por ejemplo, la inclusión de una planilla"[526]. El Tribunal discrepa con esta caracterización. Evidentemente, el Sr. Plummer realizó aportes sustanciales con miras a mejorar los materiales de Worley que se enviarían a RDP, tales como sugerencias sobre la potencial reacción de RDP a ciertos elementos de la propuesta de Worley. Es evidente que Worley, en gran medida, aceptó los comentarios del Sr. Plummer y solo

---

[524]   Carta de Worley a RDP por la que se transmite la Notificación para Proceder, 24 de mayo de 2011, pág. 3 (**R-309**) (énfasis y traducción del Tribunal).

[525]   Correo electrónico de M. Villegas a G. Plummer, 24 de mayo de 2011 (**R-308**) (traducción del Tribunal); Correo electrónico de M. Villegas a G. Plummer, 24 de mayo de 2011 (**R-310**) (traducción del Tribunal).

[526]   Dúplica sobre Jurisdicción, párr. 102 (traducción del Tribunal).

después presentó un "paquete" a RDP para negociar, cuyo contenido seguramente habría sido diferente sin los aportes del Sr. Plummer. Lo indebido de esta conducta radica en el rol simultáneo del Sr. Plummer como miembro de la comisión que asistía a RDP en la misma negociación con Worley —una presunta "parte neutral", según lo describe el Sr. Villegas en su correo electrónico del 25 de mayo de 2011, que evidentemente no era el caso—. En efecto, el tono familiar y la disposición que se advierten en la correspondencia del Sr. Plummer ya detallada, que no cambian en comunicaciones posteriores analizadas en los párrafos siguientes, sugieren que el Sr. Plummer realizó con regularidad aportes sustantivos similares a Worley, como mínimo en el ámbito de las negociaciones del Contrato de la Refinería del Pacífico.

332. *Junio de 2011*: de forma similar, antes de una reunión entre Worley y RDP, el Sr. Villegas envió un borrador de agenda al Sr. Plummer en el que solicitó que agregara "esos puntos que RDP desearía analizar a fin de reflejar puntos de ambos lados". En respuesta, el Sr. Plummer envió al Sr. Villegas "un documento que [él] compartió en la [reunión] de RDP la semana pasada cuando estaban pensando en los temas a ser analizados", con la esperanza de que le daría a Worley "alguna idea de lo que tenían en mente ahora". En particular, el Sr. Plummer indicó al Sr. Villegas que una de las preocupaciones de RDP respecto de la Demandante era su "capacidad para aceptar este trabajo y ¿¿¿¿su gente aún está disponible????"[527].

333. El Tribunal considera que es sumamente inusual que una "parte neutral" en una negociación proporcione a una parte documentos deliberativos internos que reflejan el estado mental de la otra parte con antelación a una reunión. No existe indicación de que el Sr. Plummer compartiese esta información a petición o con la aprobación de RDP.

334. *29 de junio de 2011*: dos semanas después, el Sr. Plummer agradeció al Sr. Villegas un "buen almuerzo", y le envió sus "mejores deseos para una confirmación rápida de su contrato y todo el éxito en este intento por guiar a RDP por el camino de la sabiduría"[528].

335. *30 de junio de 2011*: al día siguiente, el Sr. Plummer suministró a los Sres. Villegas y Carlos Elizondo, vicepresidente y director de proyectos de Worley ("**Sr. Elizondo**"), cierta información interna que había recibido de un funcionario de Petroecuador llamado Hugo en relación con el Proyecto de la Refinería Esmeraldas, cuya licitación se estaba realizando en paralelo. El Sr. Plummer seguramente se refiriera al Sr. Hugo Espinosa, ingeniero de Petroecuador, quien

---

527    Correo electrónico de G. Plummer a M. Villegas, 8 de junio de 2011 (**R-311**) (traducción del Tribunal).

528    Correo electrónico de G. Plummer a M. Villegas, 29 de junio de 2011 (**R-312**) (traducción del Tribunal).

junto con varios empleados de Shaw había sido nombrado para integrar una comisión técnica de RDP a cargo de evaluar las ofertas para el Proyecto de la Refinería del Pacífico[529].

336. La información compartida por el Sr. Plummer en este correo electrónico sobre el Proyecto de la Refinería Esmeraldas incluía: (i) la fecha prevista en la que Petroecuador enviaría invitaciones a licitar (ITBs por sus siglas en inglés) (4 de julio) y la fecha de presentación prevista (25 de julio), haciendo hincapié en que el período de presentación de ofertas sería breve; (ii) quién era el oferente contra el que competía (KBR); y (iii) ciertos requisitos que se anticipaban para la oferta y algunas "prioridades" internas sobre el desempeño previsto del PMC ganador, listados como elementos (a) a (c).

337. El Sr. Elizondo comunicó esta información a su equipo, mencionando que las observaciones del Sr. Plummer "nos ayudarán a preparar una propuesta sólida y confirman que los puntos (a) a (c) a continuación son críticos para dar a PetroEcuador una buena idea de que entendemos la tarea que nos ocupa"[530]. En opinión del Tribunal, lo anterior confirma la naturaleza valiosa de la información suministrada por el Sr. Plummer a Worley. Más allá de la información sobre los requisitos sustanciales para la oferta, la advertencia temprana del Sr. Plummer le dio a Worley una ventaja de 4 días para preparar su oferta para el Proyecto de la Refinería Esmeraldas, lo cual fue vital en vista del breve período previsto para la presentación.

338. *11 de julio de 2011*: Worley notificó su intención de presentar una oferta para el Proyecto de la Refinería Esmeraldas[531].

339. *21 de julio de 2011*: en un correo electrónico con asunto "Esmeralda", el Sr. Elizondo de Worley informó al Sr. Plummer, con copia al Sr. Villegas, de que había "escuchado un rumor de que habían invitado a otras empresas coreanas a ofertar [pero] no podía confirmarlo". El Sr. Plummer prometió que "haría algunas averiguaciones sobre el mítico oferente coreano"[532]. Ese día, el Sr. Plummer escribió por separado al Sr. Villegas con la observación de que al empleado de Petroecuador Hugo "le preocupa mucho que vuestra oferta para Esmeraldas cumpla todos los requisitos […] si no ponéis todos los puntos sobre las 'íes' tal vez se vea obligado a ignorar vuestra oferta dado que KBR se ha retirado y ahora vosotros sois el único oferente"[533].

---

[529] Oficio No. 00104-RDP-2011 de RDP, 26 de enero de 2011 (**R-125**).

[530] Correo electrónico de G. Plummer a Worley, 5 de julio de 2011 (**R-313**) (traducción del Tribunal).

[531] Evaluación de propuesta para el Contrato de la Refinería Esmeraldas, Memorando No. 25155-RCTR-CTE-2011, 20 de septiembre de 2011, párr. 1.12 (**C-93**).

[532] Correo electrónico de C. Elizondo a G. Plummer, 21 de julio de 2011 (**R-314**) (traducción del Tribunal).

[533] Correo electrónico de G. Plummer a M. Villegas, 21 de julio de 2011 (**R-315**) (traducción del Tribunal).

340.  *25 de julio de 2011*: el Sr. Plummer informó al Sr. Villegas de que no "se había otorgado ninguna prórroga" —presumiblemente, para la presentación de la oferta de Worley en el Proyecto de la Refinería Esmeraldas—. El Sr. Plummer indicó además que "a los jefes de Hugo les preocupa que no hayáis hecho ninguna pregunta […] le explicamos a Hugo que […] no nos llamaba la atención que no hubieseis hecho muchas preguntas y que preveíamos que vuestra oferta estaría completa"[534].

341.  *2 de agosto de 2011*: Worley presentó su oferta para el Proyecto de la Refinería del Pacífico[535].

342.  *20 de septiembre de 2011*: la Comisión Técnica constituida para evaluar las ofertas para el Proyecto de la Refinería Esmeraldas recomendó a Petroecuador que adjudicara el contrato a Worley[536].

343.  *Noviembre de 2011*: el 14 de noviembre de 2011 se suscribió finalmente el Contrato de la Refinería Esmeraldas[537]. El Contrato de la Refinería del Pacífico se suscribió pocos días después, el 22 de noviembre de 2011[538].

344.  *19 de septiembre de 2012*: Aproximadamente un año después, Worley celebró un "Contrato de Consultoría" con Shaw, conforme al cual Shaw "prestaría servicios de Consultoría Técnica y Empresarial […] de conformidad con una o más de las órdenes de trabajo […] emitidas puntualmente por [Worley]"[539]. Si bien este contrato no estipulaba una cuantía de pago específica a cambio de los servicios de Shaw —dado que la cantidad adeudada se debía fijar en cada orden de trabajo individual[540]— la propuesta del contrato original presentada por el Sr. Plummer al Sr. Elizondo preveía el pago de USD 1.000.000 en honorarios profesionales y USD 200.000 en gastos de viaje[541]. El correo electrónico en el que se presentó la propuesta indicaba que los servicios de Shaw estaban diseñados "para el apoyo técnico continuo al Proyecto de la Refinería del Pacífico (RDP) en Ecuador"[542].

---

[534]  Correo electrónico de G. Plummer a M. Villegas, 25 de julio de 2011 (**R-316**) (traducción del Tribunal).

[535]  Evaluación de propuesta para el Contrato de la Refinería Esmeraldas, Memorando No. 25155-RCTR-CTE-2011, 20 de septiembre de 2011, párr. 1.24 (**C-93**).

[536]  Evaluación de propuesta para el Contrato de la Refinería Esmeraldas, Memorando No. 25155-RCTR-CTE-2011, 20 de septiembre de 2011, párr. 3 (**C-93**)

[537]  Contrato de la Refinería Esmeraldas (**C-3**).

[538]  Contrato de la Refinería del Pacífico (**C-8**).

[539]  Contrato de Consultoría entre Worley y Shaw Consultants, 19 de septiembre de 2012, pág. 1 (**R-318**) (traducción del Tribunal).

[540]  Contrato de Consultoría entre Worley y Shaw Consultants, 19 de septiembre de 2012, párr. 3.1 (**R-318**).

[541]  Propuesta de Shaw a Worley, 8 de agosto de 2012, pág. 4 (**R-319**).

[542]  Propuesta de Shaw a Worley, 8 de agosto de 2012, pág. 1 (**R-319**) (traducción del Tribunal).

iii.    Análisis

345. Habiendo analizado estas pruebas, al Tribunal no le resulta posible concluir que el rol de Shaw durante el proceso que llevó a la suscripción del Contrato de la Refinería del Pacífico fuera el de un mero intermediario, como la Demandante parece insinuar. En particular, el Tribunal no es capaz de conciliar la caracterización que hace la Demandante del Sr. Plummer como una "parte neutral"[543] entre RDP y Worley con: (i) los aportes sustanciales propuestos (y eventualmente incorporados) por el Sr. Plummer a los documentos preparados por Worley para mandar a RDP en el contexto de las negociaciones del Contrato de la Refinería del Pacífico[544]; y (ii) la facilitación de documentos internos de RDP a Worley por parte del Sr. Plummer antes de una reunión con la intención de brindarle a Worley "cierta idea de lo que pensaban [los funcionarios de RDP] ahora" respecto de los términos del Contrato de la Refinería del Pacífico que se estaban discutiendo en ese momento[545].

346. Si bien el Tribunal es consciente de que ya se había seleccionado a Worley como PMC para el Proyecto de la Refinería del Pacífico cuando tuvieron lugar estos intercambios, aún se estaban negociando los términos del Contrato de la Refinería del Pacífico. El Sr. Plummer proporcionó activamente asistencia sustancial a Worley en el contexto de esas negociaciones al ofrecer, entre otras cosas, información interna de RDP. Las reacciones de los empleados de Worley destacando la utilidad de esta información respaldan fuertemente la conclusión de que Worley obtuvo alguna forma de ventaja como resultado. La participación simultánea de Shaw como miembro de la comisión que asistía a RDP en el contexto de estas mismas negociaciones pone de relieve la naturaleza inapropiada de las interacciones privadas del Sr. Plummer con Worley[546]. Por estos motivos, el Tribunal concluye que las negociaciones del Contrato de la Refinería del Pacífico no fueron una transacción en igualdad de condiciones. Es dudoso que RDP hubiera accedido en última instancia a formalizar el Contrato de la Refinería del Pacífico si hubiese tenido conocimiento del intercambio de información interna por parte del Sr. Plummer.

347. La participación del Sr. Plummer en paralelo en la licitación del Contrato de la Refinería Esmeraldas merece ser analizada separadamente, pues, a diferencia de RDP, no hay ninguna

---

[543]   Correo electrónico de M. Villegas a G. Plummer, 24 de mayo de 2011 (**R-308**) (traducción del Tribunal); Correo electrónico de M. Villegas a G. Plummer, 24 de mayo de 2011 (**R-310**) (traducción del Tribunal). *Véase también* EPA de la Demandante, nota al pie 453.

[544]   Correo electrónico de M. Villegas a G. Plummer, 24 de mayo de 2011 (**R-308**); Correo electrónico de M. Villegas a G. Plummer, 24 de mayo de 2011 (**R-310**).

[545]   Correo electrónico de G. Plummer a M. Villegas, 8 de junio de 2011 (**R-311**) (traducción del Tribunal).

[546]   Contrato de la Refinería del Pacífico, pág. 167 (C-8); Informe de la Comisión de Negociación de RDP sobre la oferta de Worley para contratación del PMC, 16 de junio de 2011, pág. 3 (**C-824**).

indicación en el expediente de que Shaw o el Sr. Plummer formasen parte de una comisión dentro de Petroecuador para analizar las propuestas de Worley para el Proyecto de la Refinería Esmeraldas. Sin embargo, los intercambios del Sr. Plummer durante el proceso licitatorio de la Refinería Esmeraldas ilustran un patrón de intercambio de información interna con el propósito de lograr una ventaja para Worley, lo que avala aún más la conclusión de que el Sr. Plummer prestó asistencia del mismo tipo a Worley durante las negociaciones del Contrato de la Refinería del Pacífico, como ya se ha explicado.

348. En particular, el correo electrónico del Sr. Plummer del 30 de junio de 2011 a Worley contiene información vital sobre la oferta para el Proyecto de la Refinería Esmeraldas obtenida de un funcionario de Petroecuador ("Hugo"), incluida la identidad del otro oferente (KBR) y la planificación interna de Petroecuador de los plazos para la concesión del proyecto y el alcance de las obras. El Sr. Elizondo de Worley consideró que las observaciones del "[Sr. Plummer]" "[les] serían útiles en la preparación de una propuesta sólida"[547]. Asimismo, los correos electrónicos posteriores del Sr. Plummer del 21 de julio[548] y 25 de julio de 2011[549] pretendían compartir elementos del proceso de deliberación interna de Petroecuador en vísperas de la adjudicación del Contrato de la Refinería Esmeraldas más adelante ese año, en septiembre de 2011. Una vez más, estas son instancias en las que el Sr. Plummer proporcionó información interna de carácter sustancial a Worley durante un proceso de contratación pública.

349. Si bien resulta patente que el Sr. Plummer prestó asistencia indebida a Worley, el Tribunal carece de elementos para concluir que Worley tuviera la intención de que el "Contrato de Consultoría" fuese un *quid pro quo* por el apoyo del Sr. Plummer, como la Demandada parece insinuar[550].

350. De entre los intercambios que constan en el expediente sobre los antecedentes del Contrato de Consultoría[551], un correo electrónico del 6 de agosto de 2012 del Sr. Plummer a Worley es especialmente ilustrativo. En dicha comunicación el Sr. Plummer le propuso a Worley que

---

[547] Correo electrónico de G. Plummer a Worley, 5 de julio de 2011 (**R-313**) (traducción del Tribunal).

[548] Correo electrónico de G. Plummer a M. Villegas, 21 de julio de 2011 (**R-315**).

[549] Correo electrónico de G. Plummer a M. Villegas, 25 de julio de 2011 (**R-316**).

[550] Dúplica, párr. 30: "[la contratación de Shaw] cerró el círculo. El Sr. Plummer y Shaw pasaron de asesorar a RDP en un proceso licitatorio y sus negociaciones con Worley —mientras asistían activamente a Worley en esas negociaciones y ofrecían información clave— a ser contratados luego por Worley como subcontratistas para el mismo proyecto que anteriormente habían ayudado a licitar y conducido hacia Worley" (traducción del Tribunal).

[551] *Véase, por ejemplo*, Correo electrónico de P. Merizalde a C. Elizondo, 5 de abril de 2012 (**R-321**); Correo electrónico de G. Plummer a C. Elizondo, 3 de mayo de 2012 (**R-326**); Correo electrónico de C. Elizondo a G. Plummer, 9 de mayo de 2012 (**R-322**); Acta de Directorio de RDP No. 003-DIR-2012-RDP, 9 de mayo de 2012, pág. 4 (**C-751**); Correo electrónico de C. Elizondo a G. Plummer, 25 de junio de 2012 (**C-1071**); Propuesta de Shaw a Worley, 8 de agosto de 2012, pág. 4 (**R-319**).

contratase a Shaw como subcontratista para el Proyecto de la Refinería del Pacífico después de tratar el asunto con RDP:

> Seguramente ya sabrás que Shaw Consultants International y RDP no firmaron un contrato cuando Pedro estuvo de visita el lunes pasado. Nuestros "amigos" en Ecuador decidieron que los términos contractuales utilizados para los contratos anteriores ya no son aceptables y Sabrina nos envió un contrato totalmente nuevo. Internamente, Shaw Consultants pasó a otra división de Shaw tras la venta de Shaw Energy y Chemical a Technip. Se juntaron estos dos eventos y, como le mencioné a Pedro, requerirá mucho tiempo educar a los abogados, etc. para seguir adelante con un contrato entre Shaw Consultants y RDP. (Ignoré cualquier efecto del anuncio de que CB&I adquirirá al Grupo Shaw. Eso está muy distante en el futuro como para afectar a nuestras operaciones del día a día.) Pedro entendió el dilema. El martes, recibí noticias de Quito y se me pidió considerar que trabajara como subcontratista de W-P como parte del contrato que tenéis con RDP. Se me pidió que analizara el asunto con Freddy dado que técnicamente él y el equipo de PDVSA son los administradores de ese contrato[552].

351. El Sr. Plummer continúa:

> Para ponerte al día, la idea de que Shaw Consultants trabaje como subcontratista de W-P para el proyecto de RDP es aceptable. No estamos compitiendo y nuestros esfuerzos son complementarios. Entendemos que la intención de RDP de usar la figura del subcontrato es un intento de minimizar los retrasos[553].

352. Finalmente, el Sr. Plummer explica la justificación de esta "decisión comercial", manifestando su expectativa de que dicho arreglo no genere complicaciones prácticas "dada la naturaleza de nuestros servicios y la buena relación de trabajo que hemos desarrollado desde que sumamos a W-P [WorleyParsons] a la lista de ofertas para PMC":

> Freddy y Pedro me garantizaron que no perciben ningún inconveniente financiero para W-P dado que su contrato prevé una compensación por los impuestos de Ecuador, de modo que nuestros costes son esencialmente una transferencia. Sin embargo, entiendo que W-P pueda tener cierta reticencia. Lo único que puedo decir es que, en una situación similar, PDVSA solicitó tanto a JGC como a Toyo que aceptaran estos mismos términos y condiciones y contrataran a Shaw Consultants para servicios de apoyo similares. Ambos contratistas aceptaron los términos y condiciones estándar de Shaw y firmaron un subcontrato con nosotros como un servicio al Cliente. No hubo controversias contractuales en ninguno de los casos, realizamos el trabajo, mantuvimos informados a JGC y Toyo y todos quedaron satisfechos. Espero que W-P pueda tomar una "decisión comercial" similar para su cliente, RDP. En términos prácticos, cualquier riesgo para W-P a partir de las diferencias en obligaciones o recursos legales es mínimo dada la naturaleza de nuestros servicios y la buena relación de trabajo que hemos desarrollado desde que sumamos a W-P a la lista de ofertas para PMC[554].

353. El "Contrato de Consultoría" se suscribió en septiembre de 2012, un mes después del envío de la comunicación descrita en los párrafos anteriores. La Demandante observa que nunca se

---

[552] Correo electrónico de C. Elizondo a G. Plummer, 6 de agosto de 2012 (**R-499**) (traducción del Tribunal).

[553] Correo electrónico de C. Elizondo a G. Plummer, 6 de agosto de 2012 (**R-499**) (traducción del Tribunal).

[554] Correo electrónico de C. Elizondo a G. Plummer, 6 de agosto de 2012 (**R-499**) (traducción del Tribunal).

presentaron órdenes de trabajo en el marco del contrato, lo que significa que nunca se realizó ningún pago a Shaw en virtud del mismo[555].

354. En resumen, tras no lograr renovar un contrato de consultoría directamente con RDP, Shaw se dirigió a Worley y propuso un arreglo alternativo por el que Worley subcontrataría a Shaw y sus costes serían "una transferencia" —es decir que RDP, en calidad de cliente, terminaría pagando los servicios de Shaw—. El Sr. Plummer propuso el arreglo después de obtener el consentimiento de RDP y esgrimió varios argumentos para convencer a Worley de que aceptara el trato. De entre ellos, un argumento decisivo es la referencia del Sr. Plummer a la "buena relación de trabajo que hemos desarrollado desde que sumamos a W-P a la lista de ofertas para PMC"[556], lo cual podría constituir un posible motivo por el que el Sr. Plummer prestó asistencia indebida a Worley en primer lugar —buscó congraciarse con un PMC de renombre con operaciones en Ecuador que podría llegar a generar negocio para Shaw—. Sin embargo, en última instancia, el Tribunal carece de los elementos para realizar esta inferencia en particular o una inferencia más general de intención deshonesta. No consta que Worley buscase conferir o efectivamente confiriera un beneficio al Sr. Plummer mediante la suscripción del "Contrato de Consultoría". Si bien este es un conjunto de circunstancias poco habitual, no despliega las características distintivas de un acuerdo de corrupción. No obstante, esto no incide en la naturaleza indebida de la conducta del Sr. Plummer conforme se ha descrito con anterioridad.

355. Globalmente, los medios probatorios en el expediente respaldan la inferencia de que el Sr. Plummer asistió indebidamente a Worley al menos durante la fase de negociación del Contrato de la Refinería del Pacífico. Si bien el Tribunal carece de los elementos para determinar las ventajas específicas que Worley obtuvo como consecuencia de lo anterior, el Tribunal infiere que Worley probablemente obtuviera condiciones más favorables en el Contrato de la Refinería del Pacífico que las que habría obtenido en una transacción en igualdad de condiciones.

356. El Tribunal abordará la incidencia de esta conclusión en su jurisdicción sobre las pretensiones de la Demandante en la Sección VI.2.3) *infra*. En la siguiente sección, el Tribunal analizará la segunda alegación de ilegalidad en la realización de la inversión planteada por la Demandada.

---

[555]   EPA de la Demandante, párr. 113.

[556]   Correo electrónico de C. Elizondo a G. Plummer, 6 de agosto de 2012 (**R-499**) (traducción del Tribunal).

**2)  Manifestación falsa sobre el límite del 30% a la subcontratación**

    i.    Introducción

357.  La segunda causal de ilegalidad al momento de realizarse la inversión que invoca la Demandada es la presunta manifestación falsa de su intención de cumplir con el límite impuesto en el artículo 79 de la Ley de Contratación Pública del Ecuador, que prohíbe la subcontratación por encima del 30% de la cuantía de un contrato público[557]. En la Audiencia, la Demandada explicó que el propósito de esta disposición es garantizar que el ganador de la licitación suministre una parte sustancial de los servicios acordados contractualmente, lo cual es particularmente importante en el ámbito de los contratos de consultoría:

> Este no es un requisito caprichoso que se introdujo en la legislación ecuatoriana. El fin de este es que, cuando yo contrato a un consultor, obviamente estoy interesado en la calidad de los servicios suministrados por dicho Consultor. Los servicios de consultoría conllevan un componente personal o componente organizacional muy importante cuando se trata de una organización grande con procesos y calidad de su *know-how*. Obviamente, no deseo perder ese beneficio al permitir a ese Contratista convertirse en un vehículo para el trabajo de otros consultores[558].

358.  El Reglamento de Contratación Pública, que las Partes también citan como pertinente, complementa la Ley de Contratación Pública. El artículo 35 del Reglamento de Contratación Pública rige la subcontratación para servicios de consultoría e introduce una excepción al límite establecido para la subcontratación en relación con la ejecución de servicios de apoyo que no puedan ser prestados de manera directa por un consultor, sin que haya un límite para ello[559]. A la

---

[557]    Ley de Contratación Pública, artículo 79, párr. 3 (**RLA-52**) ("Las subcontrataciones no se las podrá realizar con personas inhabilitadas para contratar de acuerdo con esta Ley, ni podrán superar el treinta (30%) por ciento del monto del contrato reajustado."). Según el Sr. Andrade, perito en derecho de la Demandada, la referencia a un contrato "reajustado" en el tercer párrafo de esta disposición se remite al sistema de reajuste de los precios de los contratos públicos según una fórmula preestablecida estipulada en los artículos 126 a 143 de la Ley de Contratación Pública. El Sr. Andrade explica que el cumplimiento de toda subcontratación propuesta con la norma prevista en el artículo 79 de la Ley de Contratación Pública debe ser verificado en la fecha en que la la entidad pública contratante autoriza cualquier tipo de subcontratación. Si un contratista no obtiene tal autorización, dice el Sr. Andrade, infringiría el artículo 79 *ab initio*, lo cual significa que cualquier violación del límite del 30% no incidiría en la situación del contratista en cuestión, quien ya estaría en incumplimiento de la ley. *Véase* Informe de Andrade II, párrs. 92-100 (**RER-4**).

[558]    Transcripción en inglés de la Audiencia, Día 7, 1318:13-24 (traducción del Tribunal).

[559]    Reglamento de Contratación Pública, artículo 35 (**C-179**). ("Subcontratación en consultoría.— En los contratos de consultoría que prevean la ejecución de servicios de apoyo que no puedan ser provistos de manera directa por el consultor, éstos podrán ser subcontratados en los porcentajes previstos en la negociación, sin que haya límite para ello.")

vez, el artículo 120 del Reglamento de la Ley de Contratación Pública requiere que las entidades contratantes públicas aprueben por escrito previamente cualquier subcontratación[560].

359.   El Tribunal observa, para contextualizar, que el Contrato de la Refinería Esmeraldas estipula que toda subcontratación se debe realizar de conformidad con lo establecido en el artículo 79 de la Ley de Contratación Pública y también incluye una restricción similar: la subcontratación en el marco del Contrato se realizará "siempre que el monto de la totalidad de lo subcontratado no exceda el 30% del valor del contrato principal"[561]. El Contrato de la Planta Machala I está sujeto igualmente de forma expresa a una limitación del 30% a la subcontratación[562].

360.   Además, el Contrato de la Refinería Esmeraldas y los Contratos de la Planta Machala contienen una disposición sobre la necesidad de contar con la autorización previa de Petroecuador para subcontratar cualquier servicio, replicando el artículo 120 del Reglamento de la Ley de Contratación Pública[563].

361.   Sin embargo, el Contrato de la Refinería del Pacífico no contiene disposiciones similares[564]. En relación con este Contrato, la Demandante se remite a un oficio del INCOP (Instituto Nacional de Contratación Pública) adjunto al Contrato de la Refinería del Pacífico que, según el entender de la Demandante, "confirmó expresamente que el límite legal de 30% a la subcontratación no resulta aplicable" al Contrato[565]. La Demandada controvierte esta afirmación remitiéndose al informe pericial del Sr. Andrade, para quien: (i) todos los Contratos estaban sujetos al artículo 79 de la Ley de Contratación Pública; y (ii) ni Petroecuador ni RDP podían obviar esa limitación legal[566].

---

[560]   Reglamento de Contratación Pública, artículo 120 (**C-179**) ("Subcontratación. — Conforme al Artículo 79 de la Ley, el contratista podrá subcontratar con terceros, registrados y habilitados en el RUP, parte de sus prestaciones, siempre y cuando la entidad contratante apruebe por escrito previamente la subcontratación. La aprobación será efectuada por la máxima autoridad, su delegado o por el funcionario que cuente con facultades suficientes para ello.")

[561]   Contrato de la Refinería Esmeraldas, cláusula 21 (**C-3**).

[562]   Contrato de la Planta Machala I, cláusula 13.1 (**C-6**).

[563]   Contrato de la Refinería Esmeraldas, cláusula 21 (**C-3**); Contrato de la Planta Machala I, cláusula 13.1 (**C-6**); Contrato de la Planta Machala II, cláusula 12.1 (**C-7**).

[564]   Réplica, párrs. 144, 192.

[565]   Réplica, párr. 143 (traducción del Tribunal); Contrato de la Refinería del Pacífico, pág. 207 (**C-8**). "es posible que los contratistas subcontraten con proveedores nacionales las obras, bienes y servicios (incluyendo consultoría) que sean necesarios para cumplir el objeto social de Refinería del Pacífico Eloy Alfaro RDP CEM, más allá del límite previsto en el artículo 79 de la LOSNCP [*es decir*, la Ley de Contratación Pública] en el caso de bienes, obras v servicios que no sean de consultoría … el efecto práctico de utilizar el procedimiento de contratación de giro específico del negocio es la no sujeción a las normas precontractuales de la LOSNCP".

[566]   Dúplica, párr. 35; Informe de Andrade II, párr. 87 (**RER-4**).

362. A efectos del presente análisis, el Tribunal no necesita decidir si el Contrato de la Refinería del Pacífico estaba sujeto al artículo 79 de la Ley de Contratación Pública. Si bien la Demandada sostiene que Worley infringió el límite del 30% a la subcontratación durante la ejecución de varios de los Contratos, sus pruebas sobre manifestaciones falsas al realizarse la inversión conciernen principalmente los procesos de licitación del Contrato de la Refinería Esmeraldas y del Contrato de la Planta Machala I. El Tribunal observa que la Demandante no niega que el límite del 30% a la subcontratación resulte de aplicación a estos Contratos[567]. Por ende, el análisis del Tribunal se centrará en los acontecimientos pertinentes que llevaron a la suscripción de estos dos Contratos.

363. En esencia, el argumento de la Demandada sobre manifestaciones falsas es que, antes de la celebración de los Contratos, Worley entendía la necesidad de cumplir con el límite del 30% a la subcontratación previsto en la legislación ecuatoriana y conspiró con Tecnazul para infringirlo sin el conocimiento de Petroecuador o RDP. Desde la perspectiva de la Demandada, dicha "manifestación falsa" constituye un incumplimiento grave de la ley ecuatoriana porque Worley no habría sido considerado como un oferente elegible para la adjudicación de los Contratos si hubiese revelado sus intenciones reales[568]. La Demandante niega haber manifestado falsamente su intención de cumplir con el límite a la subcontratación o haber infringido posteriormente dicho límite y sostiene que, de cualquier forma, una infracción de este tipo no sería lo suficientemente grave como para privar de jurisdicción al Tribunal[569].

364. El Tribunal abordará en primer lugar las pruebas sobre manifestaciones falsas en relación con el Contrato de la Refinería Esmeraldas, seguidas de aquellas relativas al Contrato de la Planta Machala I.

ii.    Contrato de la Refinería Esmeraldas

365. El Tribunal recuerda, para aportar contexto, que Petroecuador invitó a Worley a participar en el proceso licitatorio para el Proyecto de la Refinería Esmeraldas el 5 de julio de 2011[570]. Worley presentó posteriormente su oferta el 2 de agosto de 2011[571]. Los intercambios descritos a

---

[567]   Réplica, párr. 174.

[568]   Transcripción en inglés de la Audiencia, Día 7, 1317:6-1322:10 (traducción del Tribunal).

[569]   Dúplica sobre Jurisdicción, párrs. 105-110; Transcripción en inglés de la Audiencia, Día 7, 1268:18-1273:12 (traducción del Tribunal).

[570]   Evaluación de propuesta para el Contrato de la Refinería Esmeraldas, Memorando No. 25155-RCTR-CTE-2011, 20 de septiembre de 2011, párr. 1.11 (**C-93**); Oficio No. 1327-RGER-CTR-2011, 5 de julio de 2011 (**C-294**).

[571]   Evaluación de propuesta para el Contrato de la Refinería Esmeraldas, Memorando No. 25155-RCTR-CTE-2011, 20 de septiembre de 2011, párr. 1.24 (**C-93**).

continuación tuvieron lugar en el interludio entre la invitación de Petroecuador y la oferta posterior de Worley.

366. *21 de julio de 2011*: en un correo electrónico con asunto "*Rumores REE PE Licitación*" —que el Tribunal interpreta como una referencia a la licitación de Petroecuador (PE) para el Proyecto de la Refinería Esmeraldas (REE) — el propietario de Tecnazul, William Phillips ("**Mr. Phillips**") alertó al Sr. Elizondo, entonces vicepresidente y director de Proyectos de Worley, que otras empresas podrían estar interesadas en presentar ofertas para el Proyecto de la Refinería Esmeraldas. Insistió en que lo que presentase Worley debía seguir los términos de la oferta al pie de la letra de manera que Petroecuador no pudiera encontrar un pretexto para que Petroecuador no les adjudicase el contrato ("en la presentación cumplir a pie de la letra con todito lo que pida las bases de la licitación […] nodar ningún pretexto por no ajudicarnos" [*sic*]). Después indicó que era importante "pintar" su propuesta de manera que no pareciera que Azul fuera a "hacer un contrato" por más del 30% del valor total porque se podría interpretar como ilegal ("es importante pintarlo de alguna manera que en la oferta no parece que Azul va hacer un contrato de más de 30% del valor total porque este puede ser interpretado como illegal" [*sic*])[572]. El uso del término "pintarlo" en español es significativo. En su contexto, "pintar" significa manifestar falsamente que el "contrato" con Azul no excederá el 30% del valor total del contrato final para el Proyecto de la Refinería Esmeraldas.

367. En un correo electrónico respondiendo ese mismo día, el Sr. Elizondo manifestó estar sumamente de acuerdo con que no deberían dar excusas para que Petroecuador declarase desierta la licitación de la Refinería Esmeraldas ("Estamos sumamente de acuerdo […] no vamos a dar excusas a PetroEcuador para que declaren este proceso desierto"). Afirmó que Worley "chequear[ía] los números" a fin de asegurarse de mantenerse dentro del 30% del valor total del contrato pero advirtió que las obras asignadas a Azul podrían en última instancia superar el 30% del total de horas-hombre ("El lunes chequearemos los números para estar dentro de 30% del valor pero es posible que Azul tenga más de 30% de las horas."). Indicó que había recibido el mismo consejo por el Sr. Plummer ("Recibimos un correo de George Plummer dando nos [*sic*] los mismos consejos")[573].

368. Más tarde ese mismo día, en un correo electrónico en respuesta al intercambio anterior entre los Sres. Elizondo y Phillips, el Sr. Humberto Guarderas ("**Sr. Guarderas**"), director de Tecnazul, afirmó: "Al momento declaramos de manera que no tengamos problemas con la licitación". El

---

[572] Correo electrónico de C. Elizondo de WorleyParsons al Grupo Azul, 21 de julio de 2011 (**R-300**).

[573] Correo electrónico de C. Elizondo de WorleyParsons al Grupo Azul, 21 de julio de 2011 (**R-300**).

Tribunal entiende que, leído en su contexto correcto, el mensaje del Sr. Guarderas comunica que la oferta de Worley y Tecnazul debe contener cualquier manifestación que resulte necesaria para garantizar la adjudicación del Proyecto de la Refinería Esmeraldas a estas empresas. El Sr. Guarderas indicó además que "este problema" (es decir, la necesidad de manifestar a Petroecuador en la etapa licitatoria que Worley cumpliría con el límite del 30% a la subcontratación) se podría manejar durante la ejecución del Proyecto ("Durante la ejecución del Proyecto resolveremos este problema, hay varias alternativas")[574].

369. El Tribunal extrae varias conclusiones de estos intercambios. En primer lugar, tanto los Sres. Phillips y Guarderas de Tecnazul como el Sr. Elizondo de Worley coincidieron en que la oferta de Worley para el Proyecto de la Refinería Esmeraldas debía manifestar que se respetaría el límite del 30% a la subcontratación.

370. En segundo lugar, los Sres. Phillips y Guarderas —si bien no necesariamente el Sr. Elizondo— insistieron en que tales manifestaciones se debían realizar independientemente de si se respetaría el límite de subcontratación de modo efectivo durante la ejecución del Proyecto. A juicio del Tribunal, el correo electrónico del Sr. Elizondo se refiere solamente a los porcentajes a ser indicados para la subcontratación *en la oferta para el Proyecto* (que se reducirían al 30% del valor del contrato) y para las horas-hombre correspondientes (que *podrían* llegar a superar el 30% de la cantidad total de horas-hombre). Él no insinúa —ni rechaza la posibilidad de— que el límite del 30% sería superado durante la ejecución del Contrato de la Refinería Esmeraldas.

371. En tercer lugar, los Sres. Phillips y Guarderas comunican con una certeza razonable que el límite de subcontratación del 30% no se respetaría *de facto*. En efecto, de otro modo, no habría razón para describir la necesidad de respetar el límite del 30% como un "problema" que, para resolverse, debía "pintarse" de un cierto modo.

372. *27 de julio de 2011*: en un correo electrónico con asunto "*PMC REE: Subcontratación*" el Sr. Guarderas proporciona al Sr. Elizondo cierta información que este había solicitado sobre el límite del 30% a la subcontratación ("De acuerdo a tu llamada telefonica, te envio la información solicitada con respecto de porque solo debemos poner 30% para el subcontratista" [*sic*])[575]. La información en cuestión incluye, en primer lugar, una copia de la página 151 del anuncio de licitación para el Proyecto de la Refinería Esmeraldas, donde se prevé la inserción de una cláusula

---

[574]   Correo electrónico de H. Guarderas a C. Elizondo, 21 de julio de 2011, pág. 1 (**R-327**).

[575]   Correo electrónico de H. Guarderas a C. Elizondo, 27 de julio de 2011 (**R-328**).

en el contrato final exigiendo cumplir con el artículo 79 de la Ley de Contratación Pública y el artículo 120 del Reglamento de la Ley de Contratación Pública:

> 26.1 El presente contrato es intransferible y no podrá cederse a terceras personas ni total ni parcialmente, en conformidad con lo que disponen los artículos 78 de la LOSNCP. La subcontratación podrá efectuarse de conformidad con lo previsto en el inciso segundo del artículo 79 de la Ley Ibídem y 120 del Reglamento General.[576]

373.  En segundo lugar, el Sr. Guarderas adjuntó una copia de la Ley de Contratación Pública para el Sr. Elizondo[577]. En el correo electrónico al que adjuntaba la misma reprodujo el texto del artículo 79 de la Ley, que rige el límite del 30% a la subcontratación[578].

374.  Para concluir, el Sr. Guarderas destacó una vez más que el "tema" —es decir, el límite del 30% a la subcontratación — podía manejarse durante la fase de ejecución ("Te recalco que durante la ejecución, este tema es manejable")[579].

375.  Más tarde ese día, el Sr. Elizondo respondió al Sr. Guarderas de la siguiente manera:

> Necesito presentar a mi gerencia lo que se le presentará al cliente; en consecuencia, vamos a pasar horas-hombre para generar una división del 70/30 y tras la adjudicación del contrato se puede poner sobre la mesa una formulación del plan de ejecución y la concurrencia con las horas adicionales de PetroEcuador a una tasa inferior para que PetroEcuador decida si quieren el ahorro que traerá una mayor participación de Azul sin disminuir las responsabilidades de WorleyParsons al tener el Contrato principal[580].

376.  Aquí, el Sr. Elizondo confirmó que Worley trasladaría horas-hombre en la oferta que se presentaría al cliente (es decir, Petroecuador) para generar una división del 70/30 por ciento como sugirió en un inicio en su correo electrónico del 21 de julio de 2011. Luego sugiere una solución: una vez que se adjudique a Worley el contrato, la empresa "puede poner sobre la mesa" una propuesta para Petroecuador a fin de que se asignasen horas adicionales a Azul, lo cual llevaría a una tasa inferior en comparación con las horas ejecutadas por el personal de Worley.

377.  Según la Demandante, "Worley aclaró que estaba cumpliendo con el límite a la subcontratación en los proyectos de Petroecuador y explicó en ese correo electrónico que, si a Tecnazul se le asignaban horas adicionales a una tarifa menor, podría llegar a completar más horas sin superar el 30% de la cuantía del contrato"[581]. La interpretación de la Demandada de este correo

---

[576]   Correo electrónico de H. Guarderas a C. Elizondo, 27 de julio de 2011, pág. R-328_0039 (**R-328**).

[577]   Correo electrónico de H. Guarderas a C. Elizondo, 27 de julio de 2011, pág. R-328_0002-0037 (**R-328**).

[578]   Correo electrónico de H. Guarderas a C. Elizondo, 27 de julio de 2011, pág. R-328_0001 (**R-328**).

[579]   Correo electrónico de H. Guarderas a C. Elizondo, 27 de julio de 2011, pág. R-328_0001 (**R-328**).

[580]   Correo electrónico de C. Elizondo a H Guarderas, 27 de julio de 2011, pág. R-328_0001 (**R-329**) (traducción del Tribunal).

[581]   Dúplica sobre Jurisdicción, párr. 107 (traducción del Tribunal).

electrónico es simplemente que "el Sr. Elizondo respondió con un claro entendimiento del límite del 30% a la subcontratación"[582].

378. En respuesta al Sr. Elizondo, el Sr. Marcelo Asanza de Tecnazul ("**Sr. Asanza**") escribió:

> A fin de cumplir las leyes para los subcontratistas (LOSNCP), proponemos incluir una nota al pie en cada hoja de cálculo afectada, como se muestra en el archivo adjunto (se resalta en rojo / amarillo). El texto propuesto es el siguiente: *"Parte del personal seleccionado corresponde a la nómina de WP a ser contratado en Ecuador, con las mismas tarifas del subcontratista local (Azul)"*.
>
> En tal caso, WP no necesita trasladar la hoja de cálculo de Horas-Hombre. En el cuadro que resume la oferta comercial, WP cambia las cantidades que reflejan la proporción 70/30, incluida la misma nota al pie.
>
> Analicen esto y hágannos llegar sus comentarios para preparar los documentos como corresponde[583].

379. Según la lectura del Tribunal de este correo electrónico, el Sr. Asanza propone que Worley manifieste falsamente que los empleados de Tecnazul son propios e indique que las horas de esos empleados se cobrarán a las tasas de Tecnazul —no de Worley—. Esto permitiría a Worley dejar sin modificaciones la distribución de las horas-hombre planeadas en un inicio ("En tal caso, WP no necesita trasladar la hoja de cálculo de Horas-Hombre").

380. El Sr. Elizondo respondió a la propuesta anterior del Sr. Asanza de la siguiente manera:

> No puedo incluir esta nota a menos que discuta internamente con WorleyParsons que esto podría ser una posibilidad. En consecuencia, hemos reducido el número de horas de ingeniería para WorleyParsons en Korea y Azul para lograr el resultado previsto[584].

381. El Tribunal entiende que el correo electrónico del Sr. Elizondo indica que no incluirá la nota al pie propuesta por el Sr. Asanza en la oferta de Worley —necesitaría "discutirla internamente" con Worley para evaluar si "podría ser una posibilidad"— y en su lugar indicó que habían "reducido el número de horas de ingeniería para WorleyParsons en […] Azul para lograr el resultado previsto"[585].

382. Unas horas más tarde, el Sr. Guarderas respondió al correo electrónico del Sr. Elizondo y explicó que el cumplimiento del límite del 30% era solo un tema de presentación: al final, todo el personal

---

[582]   Dúplica, párr. 43 (traducción del Tribunal).

[583]   Correo electrónico de H. Guarderas a C. Elizondo, 28 de julio de 2011, págs. 1-2 (**R-289-1**) (traducción del Tribunal con excepción del extracto en cursiva, que se encuentra en español en el original). *Véase también* la planilla de cálculo de Excel adjunta (**R-289-2**).

[584]   Correo electrónico de H. Guarderas a C. Elizondo, 28 de julio de 2011, pág. 1 (**R-289-1**) (traducción del Tribunal).

[585]   Correo electrónico de H. Guarderas a C. Elizondo, 28 de julio de 2011, pág. 1 (**R-289-1**) (traducción del Tribunal).

durante la fase de ejecución sería empleado por Tecnazul ("Como te dije, este es un tema de presentación, durante la ejecución toda la gente será de Azul"). Insistió en que la oferta debía cumplir con el límite del 30% a la subcontratación para evitar la descalificación ("Debemos cuidar de cumplir con los requisitos para que no nos descalifiquen"). En lugar de insertar la nota al pie propuesta, sugirió que en los "cuadros de *manpower*" donde el Sr. Asanza había propuesto insertar la nota al pie se identificara en su lugar al personal asignado al sitio del proyecto de manera indistinta como "Contratista Constructor – Sitio WorleyParsons/Azul". De esta manera, indicó, no se les asignaría una calificación y podrían afirmar en su lugar que la parte de las obras asignada a Tecnazul no excedería el 30% ("De esta manera no tenemos calificación y podemos decir que Azul solo tiene el 30%")[586].

383.    En el expediente no consta ninguna comunicación adicional que responda directamente a estos intercambios con anterioridad a la presentación de la oferta de Worley para el Proyecto de la Refinería Esmeraldas seis días después.

384.    *2 de agosto de 2011*: en esa fecha, Worley presentó su oferta final para el Proyecto de la Refinería Esmeraldas[587]. El Tribunal ha intentado verificar si el documento de la oferta incluyó finalmente la nota al pie propuesta por el Sr. Asanza[588] o el título propuesto por el Sr. Guarderas para los cuadros de *manpower* mezclando el personal de WorleyParsons y Tecnazul[589]. El Tribunal no ha podido verificar este extremo: en la versión de la oferta presentada ante el Tribunal faltan las páginas pertinentes.

385.    A este respecto, el Tribunal observa que la versión en PDF del documento de la oferta que se presentó en el arbitraje tiene 683 páginas, incluidos sus numerosos anexos. Sin embargo, la paginación del documento original termina en la página 726[590], lo que significa que la versión del documento presentada al Tribunal omite páginas que existían en el documento original. Los "cuadros de *manpower*" en cuestión se encuentra en las páginas 480 a 486 de la versión en PDF del documento[591]. Sin embargo, las hojas de cálculo afectadas donde los Sres. Asanza y Guarderas propusieron insertar información falsa, tituladas "Contratista Constructor – Sitio Azul" y "Contratista Constructor – Sitio WP" (como se muestra en la hoja de Excel que presentó el Sr.

---

[586]    Correo electrónico de H. Guarderas a C. Elizondo, 28 de julio de 2011, pág. 1 (**R-289-1**).

[587]    *Véase* Propuesta comercial para el Contrato de la Refinería Esmeraldas, 26 de julio de 2011 (**R-28**).

[588]    *Véase* párr. 378 *supra*.

[589]    *Véase* párr. 382 *supra*.

[590]    Propuesta comercial para el Contrato de la Refinería Esmeraldas, 26 de julio de 2011, pág. R-28_683 (**R-28**).

[591]    *Véase* Propuesta comercial para el Programa de rehabilitación de Esmeraldas, 26 de julio de 2011, págs. R-28_480-486 (**R-28**).

Asanza el 27 de julio 2011)[592] se omiten en la versión en PDF del documento. En su lugar, en el archivo se repiten varias páginas de los "cuadros de *manpower*"[593].

386. El Tribunal considera que esta omisión en el expediente probatorio es preocupante. El Tribunal recuerda que el documento con la oferta de Worley para la Refinería Esmeraldas fue presentado en este arbitraje por la Demandada (no por Worley) el 4 de abril de 2020, durante la fase de Objeciones Preliminares del procedimiento[594]. La Demandada, no obstante, no ha abordado esta omisión en sus escritos. Al mismo tiempo, no obstante, la Demandante ha tenido numerosas oportunidades para presentar las páginas que faltan a fin de probar que las manifestaciones falsas propuestas por los Sres. Asanza y Guarderas nunca se implementaron. Tampoco lo ha hecho.

387. A pesar de este vacío probatorio, el expediente contiene las actas de reuniones entre Petroecuador y Worley durante la evaluación de la oferta de Worley, las cuales aportan una visión parcial del contenido del documento de la oferta. En particular, en una reunión celebrada el 17 de agosto de 2011, Petroecuador indicó que "no tenía claridad" respecto del organigrama del personal propuesto que se adjuntó a la oferta. Solicitó aclaraciones al respecto y, en particular, una garantía de que todos los directores y gerencia de nivel medio asignados al Proyecto serían empleados de Worley, mientras que el personal restante podría provenir de Tecnazul. Worley insistió en contratar a ciertos empleados de nivel medio de las filas de Tecnazul, pero finalmente aceptó presentar un organigrama revisado[595]. Las aclaraciones que solicitó Petroecuador sugieren, si bien no de manera concluyente, que la oferta de la Demandante no diferenciaba claramente entre el personal de Worley y el de Tecnazul, siguiendo la estela de las manifestaciones falsas propuestas por los Sres. Guarderas y Asanza.

---

[592] Correo electrónico de H. Guarderas a C. Elizondo, 28 de julio de 2011, págs. 1-2 (**R-289-1**) (traducción del Tribunal). *Véase también* la hoja de cálculo de Excel adjunta (**R-289-2**).

[593] Las páginas que se repiten en el documento corresponden a las páginas del documento 510 (páginas 480 y 484 del PDF), 511 (páginas 481 y 485 del PDF) y 512 (páginas 482 y 486 del PDF). Estas páginas repetidas parecen reemplazar las páginas 514, 515 y 516 del documento original, que faltan en la versión de PDF y parecerían corresponder con la programación para "Contratista para la Construcción – Sitio Azul" y "Contratista para la Construcción – Sitio WP" —las hojas de cálculo centrales en las que los Sres. Guarderas y Asanza buscaron insertar modificaciones—.

[594] Memorial sobre Objeciones Preliminares – Lista consolidada de anexos, 3 de abril de 2020, pág. 4.

[595] Evaluación de oferta para el Contrato de la Refinería Esmeraldas, No. 25155-RCTR-CTE-2011, 20 de septiembre de 2011, pág. 13, punto 2 (**C-93**): "Gerencia de Refinación al no tener claridad sobre el organigrama solicitó clarificar el organigrama y presentó un organigrama que se acople a las necesidades de Gerencia de Refinación y aplicable para las contratistas EPC. Gerencia de Refinación solicita que las Gerencias y Mandos medios deben ser necesariamente personal de W.P. y el personal restante puede ser Azul … W.P. expuso las razones por las que determinó el organigrama propuesto. W.P. insiste que analizarán que para algunos mandos medios deben ser personal de Azul … W.P. debe presentar un nuevo organigrama en función del organigrama propuesto por la Gerencia de Refinación y de la clarificación del alcance del proyecto".

388.   El Tribunal ha verificado que los "cuadros de *manpower*" adjuntos a la versión final del Contrato de la Refinería Esmeraldas no incluyeron las manifestaciones falsas propuestas por los Sres. Asanza o Guarderas[596]. Sin embargo, no brindan información adicional sobre si Worley manifestó efectivamente una intención de cumplir con el límite del 30% a la subcontratación a sabiendas de su falsedad.

389.   *Análisis*: En resumen, con base en estas pruebas contemporáneas, el Tribunal ha verificado con suficiente certeza que Worley y Tecnazul comprendieron claramente que no se adjudicaría el Proyecto de la Refinería Esmeraldas a Worley a menos que los términos de la oferta de Worley cumplieran con el límite del 30% a la subcontratación previsto en el artículo 79 de la Ley de Contratación Pública. El expediente también revela el entendimiento inequívoco de Tecnazul de que dicho límite se superaría ampliamente —como se evidencia en particular en el correo electrónico del 28 de julio de 2011 del Sr. Guarderas en el que indicaba que durante la ejecución del Proyecto de la Refinería Esmeraldas *todo* el personal sería provisto por Tecnazul[597]. Este es el motivo por el que Tecnazul propuso varias estrategias a Worley para manifestar falsamente que se cumpliría con el límite del 30% en la oferta de la Refinería Esmeraldas, dejando la puerta abierta a que la participación de Tecnazul excediera ese límite durante la fase de ejecución del Proyecto.

390.   Si bien la intención de Tecnazul de manifestar falsamente que se cumpliría con el límite del 30% a la subcontratación se ha probado más allá de toda duda razonable, el Tribunal es reticente a llegar a la misma conclusión con respecto a *Worley* sobre la sola base de los documentos contemporáneos antes mencionados. Varios correos electrónicos del Sr. Elizondo denotan una cierta reticencia a ejecutar los variados planes de Tecnazul para manifestar falsamente el cumplimiento con el límite a la subcontratación.

391.   Sin embargo, al mismo tiempo, al Tribunal le resulta preocupante que el Sr. Elizondo no rechazara de forma tajante las propuestas claramente deshonestas de Tecnazul. En su lugar, afirmó que necesitaría consultar con sus superiores en Worley para evaluar si las manifestaciones falsas propuestas por Tecnazul "podrían ser una posibilidad"[598]. El Tribunal considera también que es altamente improbable que Tecnazul hubiese insistido una y otra vez en manifestar falsamente su nivel de participación en el Proyecto de la Refinería Esmeraldas a menos que la participación previamente acordada para personal de Tecnazul por parte de Worley y Tecnazul superara en

---

[596]   Contrato de la Refinería Esmeraldas, págs. 302-308 (**C-3**).

[597]   Correo electrónico de H. Guarderas a C. Elizondo, 28 de julio de 2011, pág. 1 (**R-289-1**).

[598]   Correo electrónico de H. Guarderas a C. Elizondo, 28 de julio de 2011, pág. 1 (**R-289-1**) (traducción del Tribunal).

realidad el límite del 30% a la subcontratación por un margen considerable —como sugiere de manera contundente la afirmación del Sr. Guarderas de que todo el personal durante la fase de ejecución sería empleado por Tecnazul—[599]. Por último, Worley no ha presentado las páginas pertinentes del documento con la oferta que podrían haber probado que las manifestaciones falsas propuestas por los Sres. Guarderas y Asanza —o cualquier otra forma de manifestación falsa— no quedaron reflejadas en los documentos en última instancia. Sin embargo, las actas contemporáneas de las reuniones entre representantes de Petroecuador y Worley respaldan esa inferencia.

392. Por ende, de modo global, el Tribunal necesitaría pruebas adicionales para confirmar si Worley decidió en última instancia manifestar falsamente que cumpliría con el límite a la subcontratación al presentar su oferta para el Proyecto de la Refinería Esmeraldas. No obstante, tales pruebas concluyentes se encuentran en los intercambios entre Worley y Tecnazul en relación con el Proyecto de la Planta Machala, como se detalla en la siguiente sección.

    iii.    Contrato de la Planta Machala I

393. El Tribunal analizará ahora el argumento de la Demandada sobre manifestaciones falsas en relación con el Proyecto de la Planta Machala. Worley presentó su primera oferta para este proyecto el 20 de febrero de 2014[600] y, el 5 de marzo de 2014, se le adjudicó el Contrato de la Planta Machala I[601].

394. El 24 de febrero de 2014 (es decir, después de que Worley presentara su oferta, pero antes de que se le adjudicara el Contrato de la Planta Machala I) en un correo electrónico con asunto "Machala", el Sr. Falcon de Worley solicitó discutir por teléfono varios temas con el Sr. Phillips de Tecnazul, uno de los cuales era el límite del 30% a la subcontratación —más concretamente, el hecho de que la cotización de Worley para el proyecto superaba con creces ese límite—: "El contrato limita la participación de un subcontratista (Azul) al 30%. Cotizamos sobre la base de una participación de Azul más cercana al 60%"[602].

395. Ese mismo día, el Sr. Phillips respondió que estaba en una reunión, entre otros, con el Sr. Elizondo —quien, como ya se ha mencionado, también había estado involucrado en la preparación de la

---

[599]    Correo electrónico de H. Guarderas a C. Elizondo, 28 de julio de 2011, pág. 1 (**R-289-1**).

[600]    Propuesta comercial de Worley para la asesoría técnica especializada para la planta de gas natural licuado, 20 de febrero de 2014, pág. 1 (**C-129**).

[601]    Contrato de la Planta Machala I, cláusula 4 (**C-6**).

[602]    Correo electrónico de J. Bennet a W. Phillips, 24 de febrero de 2014 (**R-331**) (traducción del Tribunal).

oferta de Worley para el Proyecto de la Refinería Esmeraldas. El Sr. Phillips dijo: "todos de acuerdo y antes de que sea demasiado tarde"[603].

396.  Más allá de describir esta correspondencia como una "fotografía aislada", la Demandante no ha aportado explicación alguna sobre la afirmación del Sr. Falcon[604]. Si bien es verdad que las pruebas sobre manifestaciones falsas en relación con el Proyecto de la Planta Machala se circunscriben a este intercambio, el Tribunal se encuentra en posición de analizar esta correspondencia desde la perspectiva de los intercambios anteriores relativos al proceso de contratación para el Proyecto de la Refinería Esmeraldas, que atañen a la misma materia e implican a varias de las mismas personas (el Sr. Phillips de Tecnazul y los Sres. Elizondo y Falcon de Worley, quien el Tribunal recuerda que había fungido como Director del Proyecto de la Refinería Esmeraldas)[605].

397.  Esos intercambios, que tuvieron lugar menos de tres años antes de que Worley presentara su oferta para el Proyecto de la Planta Machala y mientras el Proyecto de la Refinería Esmeraldas aún estaba en curso[606], constituyen prueba del conocimiento previo de Worley y Tecnazul sobre el límite del 30% a la subcontratación en la legislación ecuatoriana —y, de manera crucial, sobre el hecho de que declarar el cumplimiento de tal límite en los documentos de la licitación era una condición necesaria para obtener el contrato—.

398.  Así, la afirmación del Sr. Falcon de que Worley "[co]tiz[ó] sobre la base de una participación de Azul más cercana al 60%" para el Proyecto de la Planta Machala significa, en su contexto, que Worley manifestó falsamente su intención de cumplir con el límite del 30% a la subcontratación en su oferta para el Contrato de la Planta Machala I —que, según indicó el Sr. Falcon, quedó

---

[603]  Correo electrónico de J. Bennet a W. Phillips, 24 de febrero de 2014 (**R-331**) (traducción del Tribunal).

[604]  EPA de la Demandante, párr. 118 (traducción del Tribunal). *Véase también* Transcripción de la Audiencia, día 1, 220:7-21, donde el abogado de la Demandada observa: "Febrero de 2014. Febrero de 2014. Esto fue antes de la inversión, pero respecto de un contrato diferente. El contrato de Machala 1, y en ese correo electrónico, y esto tiene que ver con una cadena de correos electrónicos de febrero de 2014, Worley presenta una oferta para Machala 1 y el correo electrónico reconoce que el contrato incluye la limitación del 30 por ciento y que se estructuró la cotización "según un 60 por ciento de participación de Azul". Esto inequívocamente indica, señores miembros del Tribunal, que cuando presentó su oferta para Machala 1, Worley tergiversó su oferta en su contrato en cuanto a la participación que iba a tener en Azul. en cuanto a la participación que iba a tener en Azul".

[605]  *Véase por ejemplo*, Carta de Worley a Petroecuador No.408005-00445-00.0-PC-LTR-WPI-EPP-10010, 4 de septiembre de 2015 (**C-803**), en la que el Sr. Falcon firma como Director del Proyecto Esmeraldas.

[606]  El trabajo de Worley en el Proyecto de la Refinería Esmeraldas concluyó el 30 de junio de 2016. *Véase* Informe del Contrato del Programa de Rehabilitación y Contratos Complementarios, Memorando No. 00261-OPE-REE-MAN-PMR-2017, 30 de marzo de 2017, pág. 7 (**C-38**).

registrada en los documentos de la licitación pertinentes[607]— y pidió consejo al Sr. Phillips sobre cómo abordar esta circunstancia antes de suscribir formalmente el Contrato.

399.  De manera crucial, como se adelantó en el párrafo 392 *supra*, las afirmaciones del Sr. Falcon en su correo electrónico del 24 de febrero de 2014 brindan una base concluyente para inferir que Worley había manifestado falsamente y de modo exitoso su intención de cumplir con el límite del 30% a la subcontratación en 2011 en relación con el Contrato de la Refinería Esmeraldas, motivo por el cual la adopción de la misma estrategia para el Proyecto de la Planta Machala continuaba siendo viable a parecer de Worley en 2014. De hecho, el cumplimiento de Worley con el límite del 30% a la subcontratación en la ejecución de los Contratos no fue objeto de examinación por las autoridades competentes al menos hasta 2015[608].

400.  En resumen, el Tribunal concluye que la Demandante manifestó falsamente y de modo deliberado su intención de cumplir con el límite del 30% a la subcontratación previsto en el artículo 79 de la Ley de Contratación Pública en relación con el Contrato de la Refinería Esmeraldas y el Contrato de la Planta Machala I. Procedió con el claro entendimiento de que, de otro modo, no se le habrían adjudicado los contratos para esos proyectos. El Tribunal considera que esta conducta engañosa representa un incumplimiento claro del principio de buena fe en el derecho internacional.

401.  Otros tribunales de inversión han llegado a conclusiones similares en escenarios análogos. Por ejemplo, el tribunal de *Inceysa* resolvió:

> Entre las violaciones de Inceysa al principio de buena fe, que han quedado demostradas en el capítulo IV del presente laudo, el Tribunal consigna las siguientes: (i) la presentación de información financiera falsa por Inceysa como parte de la oferta que hizo para participar en la licitación; (ii) la realización de manifestaciones falsas, durante el proceso de licitación, en relación con la experiencia y capacidad necesarias para cumplir con los términos del Contrato, particularmente en lo que se refiere a su supuesto socio estratégico; (iii) la falsedad de los documentos mediante los que Inceysa pretendió probar el grado profesional del señor Antonio Felipe Martínez Lavado, en cuya trayectoria basaba, en gran medida, su supuesta idoneidad para desempeñar las funciones que le fueron encomendadas al ganar la licitación; y (iv) el hecho de haber ocultado la vinculación existente entre Inceysa y la empresa ICASUR, en franca violación de uno de los pilares fundamentales de las base de la licitación.

> Las conductas antes mencionadas constituyen una obvia violación al principio de buena fe que debe imperar en toda relación jurídica. Este Tribunal considera que esas transgresiones a

---

[607]  Pliegos para la asesoría técnica especializada para la planta de gas natural licuado, RE-005-EPP-OSC-S-14, 20 de febrero de 2014, cláusula 13.01 (**C-127**). *Véase también* Contrato de la Planta Machala I, cláusula 13.1 (**C-6**).

[608]  *Véase por ejemplo*, Correo electrónico de R. Falcon a W. Phillips, 28 de mayo de 2015 (**R-335**): "Como sabes, las horas de Azul en Machala rondan el 50% o más del total. Estoy complacido con la cooperación y el equipo que brindamos. Sin embargo, el contrato estipula que WP solo puede subcontratar hasta el 30% de las horas. La Contraloría pide una explicación" (traducción del Tribunal). *Véase también* Carta de Worley a la Contraloría General, 5 de octubre de 2016, págs. 2-3 (**C-580**); Carta de Worley a la Contraloría General No. 408005-00445-00-0-PC-LTR-WPI-CGE-13587, 18 de noviembre de 2016, pág. 32 (**C-403**).

ese principio cometidas por Inceysa representan violaciones a las bases fundamentales de la licitación que hizo posible que ella hiciera la inversión que generó la controversia que hoy nos ocupa. Para este Tribunal resulta claro que, de haberse conocido las citadas violaciones de Inceysa, el Estado huésped, en este caso, El Salvador, no hubiera permitido que ella hiciera su inversión[609].

402.  De modo similar, el tribunal de *Plama* afirmó:

En el presente caso, la Demandante solicita que el Tribunal le conceda a su inversión en Bulgaria las protecciones dispuestas por el TCE. Sin embargo, el Tribunal ha decidido que la inversión se obtuvo mediante conducta engañosa en violación de la ley de Bulgaria. El Tribunal considera que otorgar las protecciones del TCE a la inversión de la Demandante sería contrario al principio *nemo auditur propriam turpitudinem allegans* antes invocado. También sería contrario a la noción básica del orden público internacional —que un tribunal no debe dar efecto a un contrato obtenido por medios ilícitos (manifestación fraudulenta)—.

El Tribunal concluye que la conducta de la Demandante es contraria al principio de buena fe que es parte no solo de la ley de Bulgaria —como se indicó anteriormente en los párrafos 135-136— sino también del derecho internacional, como observó el tribunal en el caso de Inceysa. El principio de buena fe abarca, entre otras cosas, la obligación del inversor de suministrar al Estado receptor información pertinente y sustancial sobre el inversor y la inversión. Esta obligación es particularmente importante cuando la información es necesaria para obtener la aprobación de la inversión por parte del Estado.

La Demandante sostuvo que no tenía obligación de revelar a la Demandada la identidad de sus accionistas reales. Esto puede resultar aceptable en algunos casos pero no en las circunstancias actuales en las que se requería la aprobación de la inversión por el Estado como una cuestión de derecho y conforme a las cualificaciones financieras y técnicas del inversor. Si ocurría un cambio material en la participación accionaria de manera tal que pudiera tener un efecto en la aprobación por el Estado receptor, en virtud del principio de buena fe, el inversor estaba obligado a informar al Estado receptor de dicho cambio. Por ende, la retención intencional de esta información es contraria al principio de buena fe[610].

iv.   Violaciones efectivas del límite del 30% a la subcontratación

403.  El Tribunal ha concluido que Worley manifestó falsa y deliberadamente su intención de cumplir con el límite del 30% a la subcontratación previsto en el artículo 79 de la Ley de Contratación Pública en relación con el Contrato de la Refinería Esmeraldas y el Contrato de la Planta Machala I. No obstante, la Demandante niega que pueda haber una "'manifestación falsa' con respecto a una 'conspiración' para violar los límites a la subcontratación sin una violación real"[611].

404.  Sin embargo, se puede trazar una distinción entre incumplir el límite del 30% a la subcontratación durante la ejecución de estos Contratos —lo que en sí es un cuestión de incumplimiento contractual o de regulaciones de contratación pública que no incide en la jurisdicción del

---

[609]  *Inceysa Vallisoletana S.L. c. República de El Salvador*, Caso CIADI No. ARB/03/26, Laudo, 2 de agosto de 2006, párrs. 236-237 (**RLA-22**) (traducción del Tribunal).

[610]  *Plama Consortium Limited c. República de Bulgaria,* Caso CIADI No. ARB/03/24, Laudo, 27 de agosto de 2008, párrs. 143-145 (**RLA-24**) (traducción del Tribunal).

[611]  EPA de la Demandante, párr. 118 (traducción del Tribunal).

Tribunal— y realizar manifestaciones falsas y deliberadas durante la etapa de licitación sobre la participación planeada de Tecnazul en la ejecución de los Proyectos, asegurándose así de mala fe una ventaja injusta en la licitación. En la medida en que dicha manifestación falsa fue una condición necesaria para que Worley obtuviese el Contrato de la Refinería Esmeraldas y el Contrato de la Planta Machala I —y el Tribunal ya ha concluido que fue así— constituye una ilegalidad seria que impacta directamente sobre la realización de la inversión de la Demandante en Ecuador y, por ello, sobre la jurisdicción del Tribunal, como se explica en mayor detalle más adelante.

405. En cualquier caso, en la medida en que una transgresión real pudiera ser relevante para el análisis del Tribunal, el Tribunal está convencido de que Worley incumplió el límite de subcontratación del 30% de manera significativa durante la ejecución del Contrato de la Refinería Esmeraldas y el Contrato de la Planta Machala I. Para los propósitos del presente análisis, el Tribunal no necesita determinar el grado preciso de las infracciones del límite a la subcontratación: solo pretende confirmar la intención inicial de Worley de exceder el límite.

406. En primer lugar, en relación con el *Contrato de la Planta Machala I*, en un correo electrónico de Mario Sandoval de Worley ("**Sr. Sandoval**") al Sr. Falcon del 16 de junio de 2014 —tres meses después de la adjudicación del Contrato a Worley— se afirma expresamente que el porcentaje contemporáneo de subcontratación había alcanzado un nivel abrumador del 77,5%. El correo electrónico del Sr. Sandoval, por lo demás, habla por sí mismo:

> Hoy durante el viaje de regreso a casa desde la planta, Efren Vintimilla, asesor principal de Rafael Poveda, Ministro Coordinador de Sectores Estratégicos, llamó imprevistamente a Guillermo para preguntarle sobre la composición del equipo de WP en el Proyecto Machala LNG. Guillermo le indicó que en el equipo solo había un profesional de WP, el gerente del proyecto, y que el resto era de Ecuador y de Azul. Guillermo mencionó que WP solo tenía personal extranjero y que todos los locales (ecuatorianos) que participaban en sus proyectos eran personal de Azul. La conversación fue breve.
>
> Esa información no era correcta, dado que el equipo del proyecto ha empleado una diversidad de recursos, muchos de los cuales eran de WP. No obstante, la mayor parte de los recursos utilizados en el proyecto eran de Azul.
>
> El contrato establece un máximo de 30% de recursos no pertenecientes a WP. La cantidad actual es del 77,5% (a mediados de junio) y ha sido muy alta en todo momento. Sobre esa base, estoy tratando de obtener más apoyo de nuestros recursos de Esmeralda pero la tendencia es aportar personal de Azul en lugar de personal de WP (por ejemplo, Guido Bedón).
>
> Dime si este es un tema importante que se debe manejar a fin de mantener el porcentaje a un nivel determinado.
>
> De cualquier manera, creo que WP está realzando en gran medida la imagen de Azul a nivel local y transfiriendo prácticas comerciales y *know how* y no me sorprendería que en algún momento en el corto plazo Azul sea un competidor y no un socio. Ciertamente, no estoy al tanto de la historia de esta relación y el motivo por el que se prefirió esta distribución en lugar

de establecer una operación local completamente funcional. Sin embargo, me parece que en consecuencia la presencia de WP en Ecuador podría ser frágil y depender en gran medida de Azul[612].

407.  De modo similar, en mayo de 2015 el Sr. Falcon informó al Sr. Phillips de que la Contraloría General había solicitado una explicación sobre el nivel de subcontratación contemporáneo de Worley. Indicó: "Las horas de Azul en Machala rondan por el 50% o más del total [...] Sin embargo, según el contrato, WP [es decir, WorleyParsons] solo puede subcontratar hasta el 30% de las horas [...] ¿Nos puedes indicar cómo abordar esto con la Contraloría [es decir, la Contraloría General]?"[613]. En otro correo electrónico, un mes después, se reporta un nivel de subcontratación del 52%[614].

408.  En una comunicación posterior, del 18 de junio de 2015, el Sr. Sandoval explicó al Sr. Falcon que "la cantidad a facturar a EPP para el trabajo de Azul supera el límite del 30%"[615]. Después comunicó la estrategia que Tecnazul había propuesto para dar respuesta a la situación: manifestar que la parte del personal correspondiente a Tecnazul eran servicios de apoyo en el sentido del Reglamento de Contratación Pública, que no fija ningún límite para la subcontratación de tales servicios[616]. Una consecuencia negativa de este modo de proceder, según observó el Sr. Sandoval, "es que el cliente ha venido considerando que estas horas eran en general horas para trabajo de consultoría"[617] —lo cual, en opinión del Tribunal, es indicativo de una manifestación falsa—. La sección pertinente de este correo electrónico reza:

> Con respecto al segundo tema, Azul sostiene que no hay límite para la subcontratación de servicios de apoyo (artículo 120 del reglamento de ley) pero hay un límite del 30% para la subcontratación de servicios de consultoría (artículo 35 del Reglamento). En consecuencia, Azul propone identificar a algunos de sus empleados que actuaron como apoyo [...] y deducirlos del total. De esa manera, el 29% del valor representa los servicios de consultoría y el 23%, los servicios de apoyo. Una consecuencia negativa de este modo de proceder es que el cliente ha estado considerado que estas horas eran en general horas para trabajo de consultoría. Si sumamos el porcentaje indicado del 23% en servicios de apoyo al porcentaje de gerenciamiento del proyecto de WP (32% del valor total o 10 meses por 160 horas por mes por USD 360 por hora), nos da que el 55% del contrato sería servicios de gerenciamiento o apoyo y el 45%, consultoría. Por ello, hay algunos riesgos si comunicamos este mensaje.

---

[612]  Correo electrónico de M. Sandoval a R. Falcon, 16 de junio de 2014, pág. R-332_0001 (**R-332**) (traducción del Tribunal).

[613]  Correo electrónico de R. Falcon a W. Phillips, 28 de mayo de 2015 (**R-335**) (traducción del Tribunal).

[614]  *Véase por ejemplo,* Correo electrónico de M. Sandoval a R. Falcon, 18 de junio de 2015, pág. R-336_0005 (**R-336**) (traducción del Tribunal).

[615]  Correo electrónico de M. Sandoval a R. Falcon, 18 de junio de 2015, págs. R-336_0001-0002 (**R-336**) (traducción del Tribunal).

[616]  *Véase* párr. 358 *supra*.

[617]  Correo electrónico de M. Sandoval a R. Falcon, 18 de junio de 2015, págs. R-336_0001-0002 (**R-336**) (traducción del Tribunal).

Además, Gabriel Velasco considera que el artículo 120 del Reglamento de la Ley dice "conforme al Artículo 79 de la Ley" que contiene el límite del 30%. En consecuencia, el límite existe en todos los casos. Sin embargo, tal vez no haya un límite para la subcontratación de servicios de apoyo que no se facturen directamente al cliente (por ejemplo, contabilidad, transporte, logística, etc.).

Según Gabriel, hay un riesgo no insignificante de que la Contraloría recomiende la terminación unilateral en el informe de la semana que viene. Mi percepción es que EPP procedería rápidamente si esta fuera la recomendación. Entiendo, según indicó Humberto, que es altamente improbable. Baja probabilidad, consecuencias muy severas configuran un escenario de riesgo medio alto, lo cual no es aceptable si no se controla[618].

409. En otras comunicaciones que constan en el expediente, varios empleados de Worley y Tecnazul exploraron fórmulas similares para abordar la situación[619]. El Tribunal entiende que en estas comunicaciones se analizan justificaciones posibles *ex post facto* para el incumplimiento evidente de Worley del límite del 30% a la subcontratación una vez que las autoridades ecuatorianas competentes habían iniciado una investigación.

410. En segundo lugar, respecto del porcentaje real de subcontratación bajo el *Contrato de la Refinería Esmeraldas*, la Demandante se apoya en una carta preparada por el Sr. Falcon en nombre de Worley, del 5 de octubre de 2016, en respuesta a una consulta planteada por la Contraloría General respecto del cumplimiento de Worley con el límite del 30% a la subcontratación. El Sr. Falcon comunica un nivel de subcontratación del orden del 20,71% al separar las cantidades correspondientes a servicios "de apoyo" de Tecnazul y "de consultoría técnica". En el informe se explica que los servicios de apoyo de Tecnazul están sujetos al artículo 35 del Reglamento de Contratación Pública, por lo que no se deben tomar en consideración para valorar el cumplimiento con el límite del 30% a la subcontratación previsto en el artículo 79 de la Ley de Contratación Pública[620].

411. El Tribunal duda que el nivel de subcontratación comunicado por el Sr. Falcon refleje la realidad. Reproduce la misma justificación *ex post facto* para la transgresión del límite a la subcontratación contenido en el correo electrónico del Sr. Sandoval al Sr. Falcon mismo sobre el Proyecto de la

---

[618] Correo electrónico de M. Sandoval a R. Falcon, 18 de junio de 2015, págs. R-336_0001-0002 (**R-336**) (traducción del Tribunal).

[619] Correo electrónico de M. Sandoval a R. Falcon, 18 de junio de 2015, págs. R-336_0002-0007 (**R-336**) (traducción del Tribunal); Correo electrónico de M. Sandoval a W. Garcia, 30 de junio de 2015 (**R-337**) (traducción del Tribunal).

[620] Carta de Worley a la Contraloría General, 5 de octubre de 2016, pág. 3 (**C-580**): "Como se desprende del cuadro que antecede, los servicios de consultoría que subcontrató WorleyParsons con Consultora Tecnazul Cía. Ltda., están en el orden del 20.71% en relación al monto total de los contratos, con lo cual hemos cumplido con lo dispuesto en el artículo 79 Ley Orgánica del Sistema Nacional de Contratación Pública; no se puede considerar a los servicios de apoyo a la Consultoría para este porcentaje, ya que la [*sic*] estos no se encuentran dentro del límite de la norma, cuya subcontratación no tiene límite de conformidad a la disposición contenida en el artículo 35 del Reglamento a la Ley Orgánica del Sistema Nacional de Contratación Pública".

Planta Machala, que aparece reproducido en el párrafo 408 *supra*. En opinión del Tribunal, la cifra que comunicó el Sr. Falcon se basa con alta probabilidad en una aplicación indebida del artículo 35 del Reglamento de Contratación Pública y, por ello, no representa la cantidad real de servicios de consultoría subcontratados bajo el Contrato de la Refinería Esmeraldas. Seguramente, todo, o al menos una parte muy significativa, del trabajo reportado por Tecnazul en el marco del Contrato constituyó en realidad servicios de consultoría.

412. A este respecto, el Tribunal observa que la cuantía total de los servicios notificados de Tecnazul indicada en la carta del Sr. Falcon, sin diferenciar entre servicios de consultoría y de apoyo (USD 66.753.678,68), representa aproximadamente el 38% del valor total facturado del Contrato indicado en ese informe (USD 175.233.488,37)[621]. Como ya se ha mencionado, una parte muy considerable de este 38% del trabajo de Tecnazul seguramente represente servicios de consultoría. Ello aproximaría esta cifra a la que presenta el perito de la Demandada, BRG (34,99%), que se calcula asumiendo que todos los servicios de Tecnazul constituyen servicios subcontratados para los fines del artículo 79 de la Ley de Contratación Pública (USD 66.753.678,68) en referencia a una cuantía contractual más alta medida varios meses después, en marzo de 2017 (USD 190.795.445,85)[622]. Si bien estas cifras se traducen en un incumplimiento aparentemente marginal del límite a la subcontratación, concretado en un 4,99%, también se traducen en una cantidad subcontratada muy significativa, en términos absolutos, que supera el límite (USD 9.515.044,93)[623]. El Tribunal considera que esta cifra es una aproximación razonable a la violación real de Worley del límite del 30% a la subcontratación bajo el Contrato de la Refinería Esmeraldas.

413. En suma, la conclusión del Tribunal de que Worley manifestó falsa y deliberadamente su voluntad de cumplir con el límite del 30% a la subcontratación previsto en el artículo 79 de la Ley de Contratación Pública en relación con el Contrato de la Refinería Esmeraldas y el Contrato de la Planta Machala I queda confirmada por la transgresión efectiva de dicho límite por parte de Worley durante la ejecución de estos Contratos.

### 3)  Conclusiones sobre ilegalidad en la realización de la inversión

414. En las secciones precedentes, el Tribunal ha llegado a las siguientes conclusiones:

---

[621]   Carta de Worley a la Contraloría General, 5 de octubre de 2016, pág. 3 (**C-580**).

[622]   Informe de BRG, párr. 187 y Anexo 8, pág. 12 (**RER-3**); Transcripción en inglés de la Audiencia, Día 5, 973:17.

[623]   Informe de BRG, párr. 187 (**RER-3**).

(i)   En relación con el Contrato de la Refinería del Pacífico, el Tribunal ha determinado que Worley buscó y aceptó la asistencia del Sr. Plummer de mala fe durante la fase de negociación del Contrato de la Refinería del Pacífico, con lo cual seguramente obtuviera condiciones más favorables en el Contrato de la Refinería del Pacífico que las que habría obtenido en una transacción en igualdad de condiciones.

(ii)   Con respecto al Contrato de la Refinería Esmeraldas y el Contrato de la Planta Machala I, el Tribunal ha concluido que la manifestación falsa y deliberada de Worley respecto de la participación planificada de Tecnazul en la etapa licitatoria fue una condición necesaria para que se le adjudicasen estos Contratos a Worley.

415.   Si bien las conclusiones de ilegalidad a las que ha llegado el Tribunal se circunscriben a los dos puntos anteriores, en las circunstancias especiales de este caso el Tribunal considera que estas ilegalidades privan de jurisdicción al Tribunal respecto de la totalidad de las pretensiones de la Demandante en este arbitraje.

416.   En primer lugar, el Tribunal considera especialmente pertinente que tanto el Contrato de la Refinería Esmeraldas como el Contrato de la Refinería del Pacífico estén viciados por ilegalidades *ab initio*. Estos dos Contratos representan la mayor parte de la inversión de la Demandante en Ecuador: el Contrato de la Refinería del Pacífico tenía un precio máximo del contrato que superaba los USD 205 millones[624], mientras que el valor estimado del Contrato de la Refinería Esmeraldas (incluso excluyendo sus Contratos Complementarios) superaba los USD 38 millones[625]. En comparación, los Contratos de la Planta Machala, los Contratos Complementarios de la Planta Machala y las pretensiones de Worley relativas al Proyecto Monteverde tienen un valor acumulado inferior a los USD 10 millones[626].

417.   El Contrato de la Refinería Esmeraldas y el Contrato de la Refinería del Pacífico también representan el inicio de la inversión de la Demandante en Ecuador. Como afirmó la Demandante, todos los Contratos restantes que forman la base de su inversión fluyen en última instancia de estos dos contratos:

> Como cuestión fáctica, Worley realizó inicialmente su inversión en Ecuador a más tardar al suscribir los Contratos de Esmeraldas y RDP en noviembre de 2011. Esos dos contratos principales son los que llevaron a Worley a Ecuador, en respuesta a la invitación de Ecuador. Los contratos fueron objeto de licitación, adjudicación y negociación en paralelo y se suscribieron con una diferencia de días entre ellos. Todos los contratos posteriores suscritos durante los cinco años siguientes, incluidos varios contratos complementarios, dimanaron de

---

[624]   Contrato de la Refinería del Pacífico, cláusula 4.1.3 (**C-8**).

[625]   Contrato de la Refinería Esmeraldas, cláusula 5.1 (**C-3**).

[626]   *Véase* la Sección III.2 *supra*.

esos primeros contratos y los servicios de PMC que Worley prestó satisfactoriamente en el marco de los mismos. Los Contratos de Esmeraldas y RDP forman así el cimiento, el precedente necesario, para todas las inversiones posteriores de Worley. Son las inversiones iniciales para los fines la objeción de ilegalidad de Ecuador[627].

418.  Por ende, los dos Contratos que forman la base de la totalidad de la inversión de la Demandante en Ecuador son precisamente los que están viciados por ilegalidad y mala fe, si bien por motivos diferentes. Los contratos posteriores suscritos por Worley también están viciados de ilegalidad desde su inicio: como ya se ha concluido, la adjudicación del Contrato de la Planta Machala I también se fundó en una manifestación falsa y deliberada de Worley sobre la participación planeada para Tecnazul durante la fase de ejecución del Proyecto. Los dos Contratos Complementarios de la Planta Machala se suscribieron sobre la base de la cláusula de los contratos complementarios al Contrato de la Planta Machala I y, por ello, también están viciados de ilegalidad *ab initio*[628]. Se puede llegar a una conclusión similar respecto de los Contratos Complementarios de la Refinería Esmeraldas, pues tienen su origen en otro contrato —el Contrato de la Refinería Esmeraldas— que Worley obtuvo también partiendo de una manifestación falsa[629].

419.  En consecuencia, el Tribunal tiene ante sí un patrón generalizado de ilegalidad y mala fe que afecta al núcleo mismo de la inversión de la Demandante desde su origen y que se extiende a las inversiones posteriores de la Demandante en Ecuador. A juicio del Tribunal, dicha circunstancia es lo suficientemente seria como para privarlo de jurisdicción. Esta conclusión trae como consecuencia la desestimación de la totalidad de las pretensiones de la Demandante.

420.  El Tribunal podría concluir su análisis en este punto. Sin embargo, también se han planteado extensamente ante el Tribunal alegatos sobre corrupción durante la operación de la inversión de la Demandante que, según la Demandada, torna inadmisibles las pretensiones de Worley en virtud del orden público internacional independientemente del momento en el que se materializase la transgresión[630]. A la luz de la seriedad de estas alegaciones, y en aras de la exhaustividad, el Tribunal también abordará esos argumentos en este Laudo Final.

---

[627]   EPA de la Demandante, párr. 107 (traducción del Tribunal).

[628]   Contrato de la Planta Machala I, cláusula 17.1 (**C-6**); Contrato Complementario al Contrato de la Planta Machala I No. 2014191, 1 de agosto de 2014, cláusula 1.1 (**C-27**); Contrato Complementario al Contrato de la Planta Machala I No. 2014286, 14 de noviembre de 2014, cláusula 1.1 (**C-28**).

[629]   Contrato Complementario del Programa de Rehabilitación No. 2012036, 28 de septiembre de 2012, cláusula 1.1 (**C-19**); Contrato Complementario del Programa de Rehabilitación No. 2013027, 28 de agosto de 2013, cláusula 1 (**C-20**); Contrato Complementario del Programa de Rehabilitación No. 2014015, 2 de abril de 2014, cláusula 1 (**C-21**); Contrato Complementario del Programa de Rehabilitación No. 2014048, 9 de octubre de 2014, cláusula 1 (**C-22**); Contrato Complementario del Programa de Rehabilitación No. 2014051, 17 de octubre de 2014, cláusula 1 (**C-23**); Contrato Complementario del Programa de Rehabilitación No. 2015205, 29 de octubre de 2015, cláusula 1.1 (**C-24**).

[630]   EPA de la Demandada, párrs. 135, 136.

**3. LA ILEGALIDAD DURANTE LA DE LA OPERACIÓN DE LA INVERSIÓN**

421. El Tribunal pasa a abordar ahora las alegaciones de la Demandada sobre ilegalidad durante la operación de la inversión de la Demandante, que abarcan tres conjuntos de hechos:

> (i) La adjudicación a la Demandante de los seis Contratos Complementarios de la Refinería Esmeraldas en presunto incumplimiento del artículo 87 de la Ley de Contratación Pública, conforme a la cual el valor de los contratos complementarios al Contrato de la Refinería Esmeraldas no podía exceder el 70% del valor del contrato principal;

> (ii) El supuesto soborno por parte de la Demandante de ciertos funcionarios de Petroecuador entre 2012 y 2015; y

> (iii) La "ignorancia deliberada" de la Demandante respecto de los actos de corrupción de Tecnazul con respecto a funcionarios de Petroecuador[631].

422. Como ya se ha mencionado, a diferencia de las ilegalidades serias que surgen *en la realización* de la inversión, el Tribunal no considera que las tres instancias anteriores de ilegalidad *durante la operación* de la inversión sean capaces de afectar la jurisdicción del Tribunal. Sin embargo, una mayoría del Tribunal está dispuesta a abordar estas alegaciones como cuestiones de *admisibilidad* de las pretensiones de la Demandante desde la óptica del criterio acuñado en *Bank Melli c. Irán*, según el cual las ilegalidades particularmente graves que constituyan violaciones del orden público internacional conllevan la inadmisibilidad de las pretensiones independientemente del momento en el que se cometan, mientras que la árbitro Stern está dispuesta a abordar estas alegaciones a fin de decidir si se deben rechazar las pretensiones porque la inversión no constituye una inversión protegida en el marco del Tratado[632]. Sin embargo, para que estas pretensiones sean inadmisibles o se desestimen, la conducta ilegal en cuestión debe: (i) ser seria y generalizada; y (ii) guardar una relación estrecha con las pretensiones[633].

423. Antes de analizar las alegaciones de ilegalidad de la Demandada de acuerdo con este criterio, el Tribunal abordará el argumento de la Demandante de que la Demandada renunció a su derecho a presentar sus objeciones a la admisibilidad sobre la base de ilegalidad y corrupción por no haberlas planteado hasta la presentación de su Dúplica[634]. Si bien el Tribunal concuerda con el

---

[631] EPA de la Demandada, párrs. 52-119.

[632] *Véase* párrs. 314-315 *supra*; *Bank Melli Iran y Bank Saderat Iran c. Reino de Bahréin*, Caso CPA No. 2017-25, Laudo, 9 de noviembre de 2021, párrs. 365, 367 (**RLA-301**).

[633] *Véase* párrs. 314-315 *supra*; *Bank Melli Iran y Bank Saderat Iran c. Reino de Bahréin*, Caso CPA No. 2017-25, Laudo, 9 de noviembre de 2021, párr. 376 (**RLA-301**).

[634] Dúplica sobre Jurisdicción, párr. 128.

principio de que cualquier objeción a la jurisdicción o admisibilidad se debe plantear tan pronto como sea posible, en esta ocasión las objeciones a la admisibilidad de la Demandada se fundan en las mismas bases fácticas que las objeciones jurisdiccionales sobre ilegalidad y corrupción, las cuales se presentaron dentro de plazo con la Contestación[635]. En otras palabras, las objeciones a la admisibilidad de la Demandada constituyen un análisis jurídico superpuesto a sus objeciones a la jurisdicción y, como tal, son admisibles. En cualquier caso, la Demandante no ha sufrido perjuicio alguno como resultado de esta presentación supuestamente tardía: tuvo amplia oportunidad de abordar la objeción en su Dúplica sobre Jurisdicción, en la Audiencia y más adelante en su Escrito Post-Audiencia. Por consiguiente, el Tribunal rechaza este argumento.

424. Con ese preámbulo, el Tribunal pasa a abordar las alegaciones de la Demandada sobre ilegalidad y corrupción cometidas por Worley durante la operación de la inversión. Bajo este encabezado, el Tribunal examinará de modo conjunto la supuesta obtención indebida por parte de Worley de los seis Contratos Complementarios de la Refinería Esmeraldas y el soborno de funcionarios de Petroecuador en la Sección VI.3.1) *infra*. La "ignorancia deliberada" de la Demandante respecto de la corrupción por Tecnazul de Petroecuador se abordará por separado en la Sección VI.3.2).

**1) Los Contratos Complementarios de la Refinería Esmeraldas y el soborno conexo**

425. Según la Demandada, la adjudicación a Worley de los seis Contratos Complementarios de la Refinería Esmeraldas y su soborno a funcionarios de Petroecuador durante ese mismo período están vinculados. Como afirmó el Procurador General del Ecuador en la Audiencia:

> Por otro lado, Tecnazul, el subcontratista seleccionado por Worley y con quien conspiró para violar la ley de 30 por ciento, pagó millones de dólares en sobornos a empleados de Petroecuador y RDP. Estos sobornos coinciden en la misma línea temporal de los contratos complementarios que Worley obtuvo de Petroecuador y que elevaron su contrato original de 38 millones a más de 184,5 millones de dólares. Con el agravante de que todos esos contratos complementarios se otorgaron sin procesos de contratación competitivos y se otorgaron por esos mismos funcionarios que disfrutaron de esos viajes y de esos regalos[636].

426. En relación con estos argumentos, la Demandada también sostiene que la adjudicación a Worley de los seis Contratos Complementarios de la Refinería Esmeraldas violó el artículo 87 de la Ley de Contratación Pública, conforme al cual la suma total de las cuantías de los contratos complementarios no puede exceder del 70 % del valor del contrato principal[637].

427. La Demandante niega todas las alegaciones de corrupción y describe los supuestos actos de corrupción como la "organización de viajes de negocios reembolsables y de un número limitado

---

635   Dúplica, párr. 397.
636   Transcripción de la Audiencia, Día 1, 146:9-21.
637   Ley de Contratación Pública, artículo 87 (**RLA-52**).

de eventos deportivos y comidas"[638]. Con respecto al presunto incumplimiento del límite del 70% al valor de los contratos complementarios, la Demandante sostiene que: (i) el artículo 87 de la Ley de Contratación Pública no se aplica a contratos en el sector hidrocarburífero, incluido el Contrato de la Refinería Esmeraldas; y (ii) Petroecuador validó contemporáneamente todos los contratos complementarios, con lo cual se desmiente cualquier alegación *ex post facto* sobre una violación[639].

428. Los argumentos de las Partes plantean interrogantes preliminares sobre (i) el estándar probatorio aplicable a alegaciones de corrupción; y (ii) qué tipo de conducta puede constituir corrupción. El Tribunal abordará estas preguntas antes de analizar: (iii) el fondo de las alegaciones de la Demandada sobre corrupción; y (iv) sus conclusiones generales bajo este encabezado.

i.     El estándar probatorio aplicable a alegaciones de corrupción

429. En gran medida, los argumentos de la Demandada se fundamentan en alegaciones de conducta corrupta por parte de la Demandante y de terceros. Las Partes concuerdan en que la Demandada tiene la carga de probar estas alegaciones de corrupción[640]. Sin embargo, difieren en cuanto al estándar probatorio aplicable —es decir, si una determinación sobre la base del criterio de preponderancia de la prueba es suficiente o si se debe probar la corrupción bajo el estándar más exigente de "evidencia clara y convincente"—.

430. El Tribunal adopta el estándar más equilibrado que se establece en *Sanum c. Laos*:

> En opinión del Tribunal, no se requiere de "evidencia clara y convincente" para cada uno de los elementos de cada una de las alegaciones de corrupción, sino que la "evidencia clara y convincente" que exista debe ser claramente indicativa de corrupción. En consecuencia, se debe evaluar qué elementos del presunto acto de corrupción han quedado demostrados por prueba clara y convincente y qué elementos que quedan sujetos a inferencias razonables y, en su conjunto, si el presunto acto de corrupción se ha demostrado sobre la base de un criterio más elevado que el de preponderancia de la prueba pero inferior al criterio de más allá de toda duda razonable, si bien, por supuesto, la prueba más allá de toda duda razonable sería concluyente. Este enfoque refleja la tesis general de que "cuanto más grave es la acusación, más debe poder confiarse en las pruebas que la sustentan"[641].

---

[638]   EPA de la Demandante, párr. 121.

[639]   EPA de la Demandante, párr. 139.

[640]   Dúplica, párrs. 361-362; Dúplica sobre Jurisdicción, párr. 78.

[641]   *Sanum Investments Limited c. República Democrática Popular Lao*, Caso CPA No. 2013-13, Laudo, 6 de agosto de 2019, párr. 108 (**CLA-341**).

ii.   Conducta que constituye corrupción

431.   En sus escritos, la Demandada citó varias fuentes de derecho en materia de prácticas corruptas —
incluyendo las políticas internas de la Demandante— que, en su opinión, respaldan el
planteamiento de que la conducta de Worley durante la operación de la inversión constituye
corrupción. La Demandante sostiene que ninguna de esas fuentes es pertinente en el presente caso
en virtud del derecho internacional y que, de cualquier forma, ninguna de ellas puede "rescatar la
fallida objeción de ilegalidad de Ecuador"[642].

432.   Varias de las fuentes que consideran las Partes pueden asistir al Tribunal en su análisis para
esclarecer si la conducta de la Demandante fue la correcta. En última instancia, sin embargo, las
conclusiones del Tribunal sobre corrupción se erigirán sobre la base del Tratado y el derecho
internacional.

433.   En primer lugar, las Partes se han referido al artículo 16 de la Convención de las Naciones Unidas
contra la Corrupción ("**CNUCC**"), el cual define el soborno de funcionarios públicos extranjeros
como:

> cuando se cometan intencionalmente la promesa, el ofrecimiento o la concesión, en forma
> directa o indirecta, a un funcionario público extranjero o a un funcionario de una organización
> internacional pública, de un beneficio indebido que redunde en su propio provecho o en el de
> otra persona o entidad con el fin de que dicho funcionario actúe o se abstenga de actuar en el
> ejercicio de sus funciones oficiales para obtener o mantener alguna transacción comercial u
> otro beneficio indebido en relación con la realización de actividades comerciales
> internacionales[643].

434.   Para establecer el elemento de intencionalidad, el artículo 28 de la CNUCC dispone:

> El conocimiento, la intención o el propósito que se requieren como elemento de un delito
> tipificado con arreglo a la presente Convención podrán inferirse de circunstancias fácticas
> objetivas[644].

435.   Las Partes también han hecho referencia a la FCPA, que se aplica directamente a empresas con
sede en los EE. UU, como la Demandante. En la sección 78dd-1 de la FCPA se dispone:

> Será ilícito que cualquier emisor que tenga una clase de valores registrados conforme a la
> sección 78l del presente título o que deba presentar informes en virtud de la sección 78o(d)
> del presente título, o que cualquier funcionario, director, empleado o agente de dicho emisor,
> o cualquier accionista de dicho emisor que actúe en su nombre, utilice el correo o cualquier
> medio o instrumento de comercio interestatal en forma corrupta a fin de promover una oferta,

---

[642]   Dúplica sobre Jurisdicción, párr. 142.

[643]   CNUCC, artículo 16 (**RLA-112**) (traducción del Tribunal).

[644]   CNUCC, artículo 28 (**RLA-112**) (traducción del Tribunal).

un pago, una promesa de pago o autorización del pago de cualquier suma, oferta, regalo, promesa de dar o autorización de dar cualquier cosa de valor a:

(1) cualquier funcionario extranjero con el fin de

(A) (i) influir en cualquier acto o decisión de dicho funcionario extranjero que actúe a título oficial, (ii) inducir a dicho funcionario extranjero a que realice u omita algún acto en infracción de su deber legítimo, o (iii) obtener alguna ventaja indebida; o

(B) inducir a dicho funcionario extranjero a que influya en un gobierno extranjero o instrumento del mismo para afectar un acto o decisión de dicho gobierno o instrumento, o influir en él,

con el fin de ayudar a dicho emisor a obtener o retener algún negocio para alguna persona, o con ella, o para encaminar algún negocio hacia alguna persona [.][645]

436. Por último, el Código Penal del Ecuador también es particularmente pertinente en el presente caso, dado que la presunta conducta corrupta atañe a funcionarios de Petroecuador —quienes indiscutiblemente son también funcionarios del Estado—[646]. El artículo 280 del Código Penal dispone en su parte relevante:

La persona que bajo cualquier modalidad ofrezca, dé o prometa a una o a un servidor público un donativo, dádiva, promesa, ventaja o beneficio económico indebido u otro bien de orden material para hacer, omitir, agilitar, retardar o condicionar cuestiones relativas a sus funciones o para cometer un delito, será sancionada con las mismas penas señaladas para los servidores públicos.[647]

437. En su conjunto, estos materiales respaldan la tesis de que la conducta corrupta está definida por tres características centrales: (i) una promesa, ofrecimiento o concesión de un beneficio indebido (por ejemplo, un regalo, donación, etc.); (ii) que se hace a un funcionario público; (iii) con el fin de que actúe o se abstenga de actuar en el ejercicio de sus funciones oficiales para obtener o retener una transacción comercial o un beneficio indebido.

438. El Tribunal determinará ahora si estas características están presentes en la conducta que subyace a las alegaciones de la Demandada sobre corrupción.

iii.   Cronología

439. Las alegaciones de corrupción de la Demandada abarcan incidentes que se inician después de la suscripción de los Contratos de la Refinería Esmeraldas y la Refinería del Pacífico en 2011 y culminan en 2015. Varios individuos fueron partícipes en estos incidentes, entre ellos,

[645]   FCPA, Sección 78dd-1 (**C-1079**) (traducción del Tribunal).

[646]   Réplica, párr. 521; Transcripción de la Audiencia, Día 1, 252:6–254:7; Código de Ética de Petroecuador, 14 de octubre de 2013, Glosario (**R-460**); Ley Orgánica de Empresas Públicas de Ecuador (LOEP), artículo 18 (**RLA-218**); Ley Orgánica del Servicio Público de Ecuador, artículo 4 (**RLA-221**).

[647]   Código Orgánico Integral Penal de Ecuador, artículo 280 (**RLA-225**).

principalmente, funcionarios de Petroecuador que tenían contacto frecuente y directo con empleados de Worley, particularmente en el ámbito del Proyecto de la Refinería Esmeraldas.

440. De acuerdo con la Demandada, varios de esos individuos también han sido condenados por corrupción en Ecuador en el marco de un entramado de sobornos ilegales en Petroecuador, por medio del cual Tecnazul les pagó más de USD 1,2 millones en sobornos mientras fungía como subcontratista para los Contratos de Worley[648]. La Demandante no cuestiona la existencia de este entramado ilegal en la medida en que implica a Tecnazul[649].

441. Para referencia del lector, los funcionarios de Petroecuador implicados en el entramado de sobornos de Tecnazul son:

   (i)    El Sr. Carlos Pareja, Gerente de la Gerencia de Refinación de Petroecuador de 2012 a 2015, y Gerente General de julio a noviembre de 2015 (y más adelante Ministro de Hidrocarburos), quien negoció y aprobó el Contrato de la Refinería Esmeraldas con Worley y suscribió cinco de sus contratos complementarios[650]. Fue condenado por corrupción en Ecuador[651].

   (ii)   El Sr. Alex Bravo, Coordinador de Proyectos de la Gerencia de Refinación de 2011 a 2015 y Gerente General de noviembre de 2015 a abril de 2016. El Sr. Bravo era el "administrador del contrato" para el Contrato de la Refinería Esmeraldas y sus Contratos Complementarios[652]. Fue condenado por corrupción en Ecuador[653].

   (iii)  El Sr. Marco Calvopiña, Gerente General de Petroecuador en noviembre de 2011, momento en el cual se adjudicó a Worley el Contrato de la Refinería Esmeraldas[654]. Fue condenado por corrupción en Ecuador[655].

   (iv)   El Sr. Diego Tapia, Gerente de la Gerencia de Refinación de Petroecuador de 2015 a 2016 y Gerente de Operaciones, quien suscribió el quinto contrato complementario al

---

[648]   Contestación, párrs. 237-246.

[649]   Réplica, párr. 33.

[650]   Escrito de Contestación, párr. 240.

[651]   Memorando de Petroecuador en respaldo de su solicitud sobre *discovery* al amparo del título 28 U.S.C. § 1782(a), págs. 10-11 (**R-2**).

[652]   Contestación, párr. 240.

[653]   Memorando de Petroecuador en respaldo de su solicitud sobre *discovery* al amparo del título 28 U.S.C. § 1782(a), págs. 10-11 (**R-2**).

[654]   Contestación, párr. 240.

[655]   El Comercio, *Exgerente de Petroecuador sentenciado por corrupción dejó la cárcel; el resto de su condena la pagará en libertad*, 12 de febrero de 2021 (**R-209**).

Contrato de la Refinería Esmeraldas de Worley[656] y los Contratos de la Planta Machala[657]. Fue condenado a 20 meses de cárcel en Ecuador[658].

(v)   El Sr. Marcelo Reyes, antiguo coordinador jurídico en Petroecuador[659]. Según la Demandada, fue condenado en los Estados Unidos por el blanqueo de dinero producto de los sobornos[660].

442.  El Tribunal abordará ahora en orden cronológico instancias específicas de presunto soborno que, en su opinión, son lo suficientemente graves como para constituir corrupción según los criterios antes mencionados. A fin de aportar contexto, el Tribunal también marcará en esta cronología la suscripción de los contratos pertinentes obtenidos por la Demandante durante este período.

**2012**

443.  *7 al 9 de septiembre de 2012*: los Sres. Bravo, Escobar y Reyes volaron de Houston a Miami en un viaje pagado y facturado por la Demandante por un valor de USD 3.637,81[661]. Como se evidencia en el informe de gastos pertinente, durante el fin de semana del 7 al 9 de septiembre de 2012, se alojaron en un hotel en Miami Beach. El viaje fue facturado como "Personal - Visita a Contratista de Buenas Prácticas", dado que supuestamente tenía el objeto de ayudar a Petroecuador a entrevistar a potenciales contratistas para un proyecto[662]. La Demandante cobró a Petroecuador estos gastos reembolsables, lo cual, en el marco del Contrato de la Refinería Esmeraldas, era admisible solo en la medida en que fueran "directamente necesarios para la prestación de sus servicios"[663].

444.  El Tribunal no encuentra fundamento para la tesis de que este viaje de fin de semana a Miami Beach fuese un viaje de negocios legítimo directamente necesario para prestar los servicios de Worley en el marco del Contrato de la Refinería Esmeraldas.

445.  En primer lugar, el Sr. Falcon declaró en la Audiencia que ningún empleado de Worley: (i) asistió ni prestó ningún servicio en conexión con esas entrevistas; (ii) conocía los nombres de los

---

[656]   Contestación, párr. 240.
[657]   Contestación, párr. 240.
[658]   Contestación, párr. 240.
[659]   EPA de la Demandada, párr. 58.
[660]   El Universo, *El excoordinador jurídico de Petroecuador, Marcelo Reyes, fue el "contacto" para sobornos, según juicio que se siguió en Estados Unido*s, 16 de febrero de 2021 (**R-424**).
[661]   Informe de gastos de Worley SVC-IE661969, 2 de octubre de 2012 (**R-356**).
[662]   Informe de gastos de Worley SVC-IE661969, 2 de octubre de 2012 (**R-356**).
[663]   Contrato de la Refinería Esmeraldas, cláusula 2.5, 13 (**C-3**).

contratistas que se entrevistarían; (iii) sabía si las entrevistas se realizaron en realidad; o (iv) sabía si algún proceso de licitación activo en aquel entonces requería que se entrevistaran subcontratistas, como exige el derecho ecuatoriano[664]. Si este hubiese sido un viaje de negocios legítimo, el Tribunal habría esperado que hubiera empleados de Worley presentes en alguna entrevista con potenciales contratistas o, como mínimo, que recabaran la información pertinente de estos funcionarios de Petroecuador y estuvieran en posición de compartir esa información con el Tribunal en este momento, incluida su conexión precisa con el Contrato de la Refinería Esmeraldas. La incapacidad de la Demandante para hacerlo menoscaba sus explicaciones.

446. El contraargumento de la Demandante de que Petroecuador en última instancia reembolsó los gastos de viaje también carece de fundamento[665]: hay pruebas creíbles de que, como argumenta la Demandada, "Worley tenía muy escasa información sobre el viaje y actuó meramente como un conducto para facilitar una escapada de fin de semana con todos los gastos pagados para los empleados corruptos"[666].

447. *28 de septiembre de 2012*: un mes después del viaje a Miami, Worley suscribió el primer Contrato Complementario de la Refinería Esmeraldas con Petroecuador, por un valor cercano a los USD 25,5 millones, sin un proceso licitatorio ni competitivo. El Sr. Pareja, en nombre y representación de Petroecuador, firmó el contrato complementario[667]. El Sr. Bravo, en calidad de administrador del Contrato de la Refinería Esmeraldas, había recomendado la aprobación de este contrato complementario unos pocos meses antes, en agosto de 2012[668].

448. *16 al 18 de noviembre de 2012*: unas pocas semanas después, los Sres. Bravo, Reyes y Pareja, junto con el Sr. Guarderas de Tecnazul y el Sr. Hooper de Worley (y, en algunos casos, sus esposas), asistieron al Viaje de la Fórmula 1 en Austin, Texas. La Demandante registró los costes de este viaje como un gasto de entretenimiento no reembolsable para *Teambuilding* ("Fomento del trabajo en equipo"), pagando más de USD 22.000 solo para el evento[669]. El evento de "Desarrollo Comercial" incluyó alojamiento, transporte y hotelería[670]. Christopher Parker ("**Sr. Parker**"), Director del Grupo de Grandes Proyectos de Worley y Director Gerente Regional para

---

[664] Transcripción en inglés de la Audiencia, Día 3, 474:2-476:16.

[665] Dúplica sobre Jurisdicción, párr. 137; EPA de la Demandante, párr. 125.

[666] EPA de la Demandada, párr. 60 (traducción del Tribunal).

[667] Contrato Complementario del Programa de Rehabilitación No. 2012036, 28 de septiembre de 2012, pág. 4 (**C-19**).

[668] Contrato Complementario del Programa de Rehabilitación No. 2012036, 28 de septiembre de 2012, cláusula 1.4 (**C-19**).

[669] Informe de gastos de Worley SVC-IE673983, 24 de octubre de 2012 (**C-719**).

[670] Informe de gastos de Worley SVC-IE673983, 24 de octubre de 2012, pág. 7 (**C-719**).

las Américas, explicó durante su contrainterrogatorio que el objeto de este viaje fue "sobre todo conocer personas y forjar relaciones"[671].

449. Un correo electrónico contemporáneo del Sr. Falcon a otro empleado de Worley, del 22 de octubre de 2012, ayuda a esclarecer el supuesto propósito de este viaje:

> Solo quería hacerte saber que estamos planeando un fin de semana para el fomento del trabajo en equipo con PetroEcuador y el Ministro (5 personas). Queremos pasar el fin de semana con ellos en el Gran Premio de Fórmula 1 en Austin dado que no les interesan tanto los deportes de los EE. UU.
>
> Azul contribuirá al pago de los costes.
>
> ¿Crees que hay algún problema con esto? ¿Necesito solicitar autorización especial? Esto es lo único que se nos ocurrió que los entusiasma y que nosotros podríamos apoyar[672].

450. Varios aspectos del viaje menoscaban la caracterización de la Demandante de este evento como un viaje de negocios. En primer lugar, la Demandante no tiene oficinas en Austin donde se pudiesen celebrar reuniones de negocios o presentaciones al margen del evento de Fórmula 1[673]. En segundo lugar, los Sres. Bravo y Reyes llevaron a sus esposas, cuyos gastos también fueron pagados[674]. En tercer lugar, Tecnazul pagó los pasajes de avión, incluidos los de las esposas, a pesar de que no existía un motivo comercial aparente para ello[675]. En cuarto lugar, el coste del viaje (más de USD 22.000), sin incluir los costes pagados por Tecnazul, indica extravagancia.

451. De forma reveladora, este patrón guarda una estrecha similitud con a una situación hipotética que se describe en la Guía de la FCPA para identificar obsequios indebidos que representan actos corruptos:

> Hace dos años, la Compañía A ganó un contrato de largo plazo para proveer bienes y servicios a una Comisión de Electricidad en el País Extranjero. La Comisión de Electricidad es propiedad, controlada y operada al 100% por el País Extranjero y los empleados de la Comisión de Electricidad están sujetos a las leyes locales antisoborno del País Extranjero. […]
>
> […] la Compañía A proporciona capacitaciones periódicas para los empleados de la Comisión de Electricidad en las instalaciones de la compañía en Michigan. Las capacitaciones son pagadas por la Comisión de Electricidad como parte del contrato. Unos funcionarios sénior de la Comisión de Electricidad informan a la Compañía A de que quieren inspeccionar las instalaciones para asegurarse de que la capacitación esté funcionando bien. La Compañía A

---

[671]   Transcripción en inglés de la Audiencia, Día 2, 336:11-12 (traducción del Tribunal).

[672]   Correo electrónico de Worley, 22 de octubre de 2012 (**C-736**) (traducción del Tribunal).

[673]   Transcripción en inglés de la Audiencia, Día 2, 335:14-19.

[674]   Correo electrónico de R. Falcon, 13 de octubre de 2012 (**R-269**); Correo electrónico de H. Guarderas a R. Falcon, 31 de octubre de 2012 (**R-410**); Informe de gastos de Worley SVC-IE673983, 24 de octubre de 2012, pág. 12 (**C-719**).

[675]   Correo electrónico de R. Falcon, 13 de octubre de 2012 (**R-269**); Informe de gastos de Worley SVC-IE673983, 24 de octubre de 2012, pág. 12 (**C-719**).

paga los pasajes de avión, hoteles y transporte para los funcionarios sénior de la Comisión de Electricidad para que viajen a Michigan para inspeccionar las instalaciones de la Compañía A. Puesto que es un largo viaje internacional, la Compañía A acepta pagar la tarifa área de clase *business*, a lo cual sus propios empleados también tienen derecho para viajes largos. Los funcionarios extranjeros visitan Michigan durante varios días, durante los cuales los funcionarios sénior llevan a cabo una inspección apropiada. Los ejecutivos de la Compañía A llevan a los funcionarios a una cena con precios moderados, un partido de béisbol y una obra de teatro. ¿Alguna de estas acciones ha violado el FCPA?

No […]

*¿Sería diferente este análisis si la Compañía A pagara para que los funcionarios sénior viajaran en primera clase con sus esposos/as en un viaje con todos los gastos pagos por una semana a Las Vegas, donde la Compañía A no tiene instalaciones?*

*Sí. Esta conducta casi con total seguridad viola la FCPA porque es indicativa de una intención corrupta. Aquí, el viaje no parece haber sido diseñado con un propósito comercial legítimo, es extravagante, incluye gastos para los/as esposos/as de los funcionarios, y por lo tanto parece haber sido diseñado para congraciarse corruptamente con los funcionarios extranjeros. Asimismo, si el viaje queda registrado en libros como un gasto comercial legítimo —por ejemplo, para ofrecer capacitación en sus instalaciones— la Compañía A también violaría las disposiciones de contabilidad de la FCPA. Además, esta conducta sugiere deficiencias en los controles internos de la Compañía A*[676].

452.   A la luz de lo anterior, el Tribunal solo puede concluir que el Viaje de la Fórmula 1 representa un beneficio indebido conferido por Worley a empleados de Petroecuador que resulta indicativo de una intención de corrupción.

**2013**

453.   *14 de marzo de 2013*: el Sr. Bravo, por medio del Sr. Guarderas, solicitó que Worley adquiriese 6 entradas para un partido de la NBA en San Antonio, Texas, que se jugaba esa misma noche[677]. Poco después, el Sr. Falcon envió las entradas al Sr. Bravo con el mensaje "¡A la orden! ¡Disfruten!"[678]. Los asistentes incluían a los Sres. Reyes y Bravo, "un amigo" y otras dos personas no identificadas[679]. El Sr. Guarderas de Tecnazul, quien había coordinado la compra, permaneció al final en Houston[680]. En la Audiencia, el Sr. Falcon confirmó que ningún empleado de Worley asistió al partido[681]. Explicó que en un principio se había invitado a estos funcionarios de Petroecuador a un partido en Houston, al que asistirían funcionarios de Worley, pero los Sres.

---

[676]   Guía de la FCPA, pág. R-459_0025 (**R-459**) (énfasis y traducción del Tribunal).

[677]   Correo electrónico de R. Falcon a H. Guarderas, 14 de marzo de 2013 (**R-413**).

[678]   Correo electrónico de A. Bravo, 14 de marzo de 2013 (**R-411**).

[679]   Correo electrónico de R. Falcon a H. Guarderas, 14 de marzo de 2013 (**R-413**).

[680]   Correo electrónico de A. Bravo a R. Hooper, 14 de marzo de 2013 (**R-431**).

[681]   Transcripción en inglés de la Audiencia, Día 3, 508:3-5.

Bravo y Reyes finalmente no podrían asistir. Así, Worley compró las entradas para el partido en San Antonio en su lugar[682].

454.  La Demandante, remitiéndose al testimonio del Sr. Falcon, afirma que compró las entradas para que los funcionarios de Petroecuador pudiesen asistir al partido de la NBA durante una visita a Houston para celebrar reuniones de coordinación con Worley y UOP, otro contratista de Petroecuador con sede en los Estados Unidos. La Demandante afirma que Petroecuador realizó sus propios arreglos de viaje y reservas de hotel[683]. Sobre esta base, la Demandante afirma que este evento tuvo el fin de fomentar el trabajo en equipo[684].

455.  Una vez más, los hechos no sustentan la caracterización de este evento realizada por la Demandante. La ausencia de funcionarios de Worley en el partido, el hecho de que un "amigo" de los Sres. Pareja y Bravo estuviese presente y otros factores ya descritos hablan por sí mismos: la compra de estas entradas representa un beneficio indebido conferido por Worley a funcionarios de Petroecuador que resulta indicativo de una intención de corrupción.

456.  *2 de abril de 2013*: el Sr. Bravo escribió a la Demandante pidiendo que contratara al Sr. Faidutti, quien había trabajado en Petroecuador del 2011 al 2012[685]. La Demandante niega que exista registro alguno de empleo[686].

457.  Las pruebas en el expediente revelan una situación seriamente cuestionable. El Sr. Bravo solicitó que el Sr. Faidutti reportara directamente al Sr. Pareja de Petroecuador pero que, no obstante, Worley le pagase un salario mensual de USD 5.000[687]. En un correo electrónico al Sr. Phillips de Tecnazul, el Sr. Hooper de Worley compartió sus reparos sobre este arreglo:

> Bill, mira la cadena de mensajes electrónicos que sigue. Por lo general, no tendría un problema con esto pero el correo electrónico indica que él [el Sr. Faidutti] reportará al Sr. Pareja pero formará parte de la nómina de WorleyParsons. No entiendo por qué no te hablaron directamente sobre esto, pero en todo caso, ¿podrías preguntarle a Legal solo para asegurarnos de que ni Pareja ni WorleyParsons estén infringiendo la ley? Gracias[688].

---

[682]   Transcripción en inglés de la Audiencia, Día 3, 505:16-506:4 (traducción del Tribunal).

[683]   Dúplica sobre Jurisdicción, párr. 139; Declaración de Falcon III, párr. 26 (**CWS-7**).

[684]   EPA de la Demandante, párr. 127.

[685]   Correo electrónico de Petroecuador a Azul y Worley, 2 de abril de 2013 (**C-940**).

[686]   Réplica, párr. 395; Dúplica sobre Jurisdicción, párr. 140; EPA de la Demandante, párr. 130.

[687]   Correo electrónico de R. Hooper a W. Phillips, 2 de abril de 2013 (**R-433**).

[688]   Correo electrónico de R. Hooper a W. Phillips, 2 de abril de 2013 (**R-433**) (traducción del Tribunal).

458. A pesar de las inquietudes expresadas por el Sr. Hooper, la Demandante en última instancia solicitó autorización para asignar al Sr. Faidutti al Proyecto de la Refinería Esmeraldas[689]. En calidad de "consultor eléctrico", el Sr. Faidutti "prestaría apoyo en el Contrato de WP, bajo la instrucción del Director de Proyectos de WP"[690]. Sorprendentemente, el Sr. Faidutti era economista por formación y no tenía un título de ingeniería[691]. La Planilla PAAF para el Proyecto de la Refinería Esmeraldas confirma que el Sr. Faidutti estuvo autorizado para trabajar a tiempo completo en tal calidad durante más de un año y medio[692].

459. El Tribunal ha quedado convencido de que las circunstancias dudosas de esta contratación conllevan una ausencia de toda justificación comercial razonable y son parte íntegra de la conducta corrupta general de la Demandante.

460. *28 de agosto de 2013*: en esta fecha, la Demandante y Petroecuador suscribieron el segundo Contrato Complementario de la Refinería Esmeraldas, una vez más, mediante un proceso no licitatorio. El valor agregado del primer (USD 25,5 millones) y del segundo (USD 34 millones) Contrato Complementario de la Refinería Esmeraldas excedió el valor del propio Contrato de la Refinería Esmeraldas (USD 38 millones)[693].

461. Al igual que el primer Contrato Complementario de la Refinería Esmeraldas, este segundo Contrato Complementario llevaba la firma del Sr. Pareja en nombre y representación de Petroecuador. El Sr. Bravo, en calidad de administrador del contrato, había solicitado autorización para suscribir este contrato el 13 de mayo y el 12 de junio de 2013[694].

462. *18 de septiembre de 2013*: el Sr. Bravo solicitó al Sr. Falcon que pagara una cena para celebrar el cumpleaños del Sr. Calvopiña con otras 20 personas[695]. La Demandante aceptó y pagó una cena en Quito, que incluyó comidas, un pastel de cumpleaños y botellas de alcohol de alto valor, por

---

[689]   Carta de Worley a Petroecuador No. 408005-00445-00-AD-LTR-WPI-EPP-1672, 9 de abril de 2013, pág. 2 (**C-552**).

[690]   Carta de Worley a Petroecuador No. 408005-00445-00-AD-LTR-WPI-EPP-1672, 9 de abril de 2013, pág. 19 (**C-552**) (traducción del Tribunal).

[691]   Correo electrónico de Petroecuador a Azul y Worley, 2 de abril de 2013, págs. C-940_003-005 (**C-940**).

[692]   Formulario para autorización de asignación de personal 408005-00431 Modernización de Refinería Esmeraldas de Petroecuador – Planilla PAAF, pág. 5 (**C-551**).

[693]   Contrato Complementariodel Programa de Rehabilitación No. 2013027, 28 de agosto de 2013, cláusulas 1, 4 (**C-20**).

[694]   Contrato Complementario del Programa de Rehabilitación No. 2013027, 28 de agosto de 2013, cláusula 1 (**C-20**).

[695]   Correo Electrónico de R. Falcon a A. Guerrero, 19 de septiembre de 2013 (**R-421**).

una cantidad aproximada de USD 1.200[696]. Solo asistieron a la fiesta de cumpleaños 20 funcionarios de Petroecuador y sus cónyuges; ningún empleado de Worley estuvo presente[697].

463. De acuerdo con la Demandante, esta no fue una fiesta lujosa sino una cena de negocios[698]. El Sr. Falcon explicó que la intención detrás de la cena era que el Sr. Calvopiña (que era el Gerente General de Petroecuador en ese momento) se reuniera con otros altos funcionarios del Gobierno para alinear sus intereses y discutir el gerenciamiento de riesgos en el Proyecto de la Refinería Esmeraldas y otros asuntos para los cuales consideraba que "se estaban quedando sin tiempo"[699]. El Sr. Falcon pagó la comida y supuestamente se marchó antes de que llegara alguien dado que estaba cansado y preocupado de que no asistiese nadie[700].

464. Los Sres. Falcon y Parker reconocieron durante su contrainterrogatorio que la Demandante no podía pagar a un funcionario del gobierno una comida que no fuese por negocios[701]. Sobre la base de las pruebas que se le han facilitado, el Tribunal concluye que esto es exactamente lo que ocurrió. El cumpleaños del Sr. Calvopiña es otra instancia en la que Worley confirió un beneficio indebido a un funcionario, lo cual resulta indicativo de una intención de corrupción.

**2014**

465. *2 de abril de 2014*: en esta fecha, la Demandante y Petroecuador suscribieron el Contrato Complementario de la Refinería Esmeraldas mediante un proceso no licitatorio por un precio de aproximadamente USD 11,5 millones, sin incluir IVA ni costes reembolsables[702]. El contrato fue propuesto por el Sr. Bravo en calidad de administrador del contrato y firmado por el Sr. Pareja en nombre y representación de Petroecuador[703].

466. *9 de octubre de 2014*: en esta fecha, la Demandante y Petroecuador suscribieron el cuarto Contrato Complementario de la Refinería Esmeraldas mediante un proceso no licitatorio por un valor de

---

[696]   Informe de gastos de Worley SVC-IE829315, 23 de septiembre de 2013 (**R-420**); Correo electrónico de R. Falcon a A. Guerrero, 19 de septiembre de 2013 (**R-421**).

[697]   Correo electrónico de R. Falcon a A. Guerrero, 19 de septiembre de 2013 (**R-421**).

[698]   Dúplica sobre Jurisdicción, párr. 139.

[699]   Transcripción en inglés de la Audiencia, Día 3, 501:24-503:17 (traducción del Tribunal).

[700]   Correo electrónico de R. Falcon a A. Guerrero, 19 de septiembre de 2013 (**R-421**); Transcripción en inglés de la Audiencia, Día 3, 504:4-22 (traducción del Tribunal).

[701]   Transcripción en inglés de la Audiencia, Día 2, 314:1-3; Transcripción en inglés de la Audiencia, Día 3, 501:9-17.

[702]   Contrato Complementario del Programa de Rehabilitación No. 2014015, 2 de abril de 2014, cláusula 4 (**C-21**).

[703]   Contrato Complementario del Programa de Rehabilitación No. 2014015, 2 de abril de 2014, cláusulas 1, 8 (**C-21**).

aproximadamente USD 17,5 millones, sin incluir IVA ni costes reembolsables[704]. El contrato fue propuesto por el Sr. Bravo en calidad de administrador del contrato y fue firmado por el Sr. Pareja en nombre y representación de Petroecuador[705].

467.  *17 de octubre de 2014*: en esta fecha, la Demandante y Petroecuador suscribieron el quinto Contrato Complementario de la Refinería Esmeraldas. Las partes acordaron enmendar el Contrato de la Refinería Esmeraldas para incluir una provisión de USD 1.939.226 en concepto de gastos reembolsables[706]. El contrato fue propuesto por el Sr. Bravo en calidad de administrador del contrato y firmado por el Sr. Pareja en nombre y representación de Petroecuador[707].

**2015**

468.  *29 de octubre de 2015*: en esta fecha, la Demandante y Petroecuador suscribieron el sexto Contrato Complementario de la Refinería Esmeraldas por un valor de aproximadamente USD 52 millones, sin incluir IVA ni costes reembolsables[708]. El contrato fue propuesto por el Sr. Bravo en calidad de administrador del contrato y firmado por el Sr. Tapia en nombre y representación de Petroecuador[709].

iv.     Análisis de las pruebas sobre corrupción

469.  Habiendo analizado los hechos descritos en la cronología anterior, así como otras circunstancias pertinentes, el Tribunal considera que en este caso están presentes todas las características distintivas de la corrupción.

470.  En primer lugar, como ya se ha indicado, el expediente está repleto de ejemplos en los que Worley confiere beneficios indebidos a funcionarios de Petroecuador —quienes, como ya se ha mencionado, son también funcionarios del Estado—. Para llegar a esta conclusión, el Tribunal considera útil la siguiente pauta de la Guía de la FCPA:

---

[704]   Contrato Complementario del Programa de Rehabilitación No. 2014048, 9 de octubre de 2014, cláusula 4 (**C-22**).

[705]   Contrato cCmplementario del Programa de Rehabilitación No. 2014048, 9 de octubre de 2014, cláusulas 1, 9 (**C-22**).

[706]   Contrato Complementario del Programa de Rehabilitación No. 2014051, 17 de octubre de 2014, cláusula 1 (**C-23**).

[707]   Contrato Complementario del Programa de Rehabilitación No. 2014051, 17 de octubre de 2014, cláusulas 1, 5 (**C-23**).

[708]   Contrato Complementario del Programa de Rehabilitación No. 2015205, 29 de octubre de 2015, cláusula 3.1 (**C-24**).

[709]   Contrato Complementario del Programa de Rehabilitación No. 2015205, 29 de octubre de 2015, cláusulas 1.2, 9.1 (**C-24**).

> En resumen, aunque ciertos gastos probablemente generen más preocupación que otros, estos no darán lugar a imputaciones penales si son: (1) razonables, (2) de buena fe, y (3) están directamente relacionados con (4) la promoción, demostración, o explicación de productos o servicios o la ejecución o cumplimiento de un contrato[710].

471.   Ninguno de los viajes y eventos analizados en la cronología anterior satisface estos requisitos. No fueron diseñados para ningún fin comercial legítimo. No hay conexión obvia ni implícita entre los beneficios conferidos a los funcionarios de Petroecuador, en algunos casos extravagantes, y el cumplimiento de Worley con sus obligaciones contractuales o planes de desarrollo comercial. La misma conclusión es aplicable a la contratación sumamente cuestionable del Sr. Faidutti por parte de Worley, para la cual la Demandante no ha aportado una explicación.

472.   También hay un patrón de manifestaciones falsas de los gastos antes mencionados en los registros de la Demandante con la intención de sugerir falsamente un fin comercial legítimo. El viaje a Miami se registró como "Personal - Visita a Contratista de Buenas Prácticas"[711]. El Viaje de la Fórmula 1 se rotuló como un "ejercicio para el fomento del trabajo en equipo"[712]. El Sr. Faidutti fue contratado como "consultor eléctrico"[713]. Como ya se ha explicado, ninguna de estas manifestaciones es cierta, lo cual respalda la inferencia de que estos eran beneficios indebidos[714]. Puede llegarse a la misma conclusión partiendo de que Worley no ha aportado los registros de ninguno de los gastos de entretenimiento ya descritos, como exige su Directiva Ejecutiva, de conformidad con la cual todo regalo, comida, entretenimiento y hotelería que tenga como

---

[710]   Guía de la FCPA, pág. R-459_033 (**R-459**) (traducción del Tribunal).

[711]   Informe de gastos de Worley SVC-IE661969, 2 de octubre de 2012 (**R-356**) (traducción del Tribunal).

[712]   Informe de gastos de Worley SVC-IE673983, 24 de octubre de 2012 (**C-719**) (traducción del Tribunal).

[713]   Carta de Worley a Petroecuador No. 408005-00445-00-AD-LTR-WPI-EPP-1672, 9 de abril de 2013, pág. 19 (**C-552**) (traducción del Tribunal).

[714]   Guía de la FCPA, págs. R-459_0032-0033 (**R-459**). "A mayor detalle, cuando los gastos, de buena fe o no, son caracterizados indebidamente en los libros y registros de una compañía, o si ocurren gastos no autorizados o indebidos a raíz de la falta de implementación de controles internos adecuados, también pueden constituir violaciones a las disposiciones de contabilidad del FCPA. La caracterización indebida intencional de gastos puede también, por supuesto, indicar una intención de corrupción a" (traducción del Tribunal).

beneficiario a funcionarios del Gobierno se debe anotar en un registro específico para obsequios si el valor estimado o real supera los USD 200 por persona[715].

473. De modo similar, la aceptación de los beneficios antes descritos contraviene varios instrumentos legales que rigen la conducta de los funcionarios de Petroecuador, lo cual resalta aún más su naturaleza indebida. Entre otros, el Tribunal observa que la Ley Orgánica de Empresas Públicas del Ecuador prohíbe a los funcionarios públicos ecuatorianos que acepten cualquier regalo o beneficio en razón de su puesto, sin importar la intención subyacente[716]. El Código de Ética de Petroecuador contiene una prohibición similar dirigida específicamente a funcionarios de Petroecuador[717].

474. En segundo lugar, las pruebas que obran en el expediente sustentan también la tesis de que Worley pretendió "obtener o mantener alguna transacción comercial u otro beneficio indebido" mediante el otorgamiento de beneficios a funcionarios de Petroecuador.

475. A este respecto, el Tribunal observa que no es necesario que exista un nexo causal directo entre el otorgamiento de un beneficio a un funcionario público y la recepción posterior de un beneficio para establecer la existencia de una intención de corrupción de parte de Worley. Un conjunto de circunstancias fácticas objetivas pueden dar lugar a esa inferencia[718]. Esto es particularmente cierto en casos en los que, al igual que aquí, los beneficios se confieren durante un período extenso

---

[715]   Directiva Ejecutiva, Sección 11 (**C-746**). En la parte pertinente, reza: "Muchos países tienen normativas especiales en materia de obsequios, entretenimiento y hotelería para funcionarios del gobierno porque los obsequios, el entretenimiento y la hotelería pueden constituir sobornos, o percibirse como tales, en determinadas circunstancias. Debe solicitar el asesoramiento local para cerciorarse de que tales obsequios, entretenimiento y hotelería estén permitidos por ley en el lugar en el que usted se encuentra. WorleyParsons requiere que todos los Obsequios ofrecidos u otorgados por un funcionario del gobierno satisfagan lo siguiente: a) estén permitidos por la legislación de la jurisdicción local, no constituyan un pago de facilitación y no se traten solo de costumbre local; b) tengan un fin comercial apropiado; c) no pretendan influir en el funcionario del gobierno y no se puedan percibir como un intento por influir en el funcionario público; d) sean de un valor y una naturaleza apropiados considerando la costumbre local y todas las circunstancias, y no dañen la reputación de WorleyParsons; e) se asienten en el registro de obsequios o en el registro de obsequios de ExCo, incluidas todas las comidas de negocios conforme a la cláusula 12 más abajo, si el valor estimado o real supera los USD 200 por persona; y f) cumplan por lo demás con esta directiva ejecutiva y el Código de Conducta".

[716]   Ley Orgánica de Empresas Públicas de Ecuador (LOEP), artículo 31(5) (**RLA-218**): "Además de las prohibiciones previstas en la Codificación del Código de Trabajo, que se aplicarán a los servidores de carrera y obreros de la empresa pública, se establecen las siguientes… 5. Solicitar, aceptar o recibir, de cualquier manera, dádivas, recompensas, regalos o contribuciones en especies, bienes o dinero, privilegios y ventajas en razón de sus labores, para sí, sus superiores o de manos de sus subalternos".

[717]   Código de Ética de Petroecuador, 14 de octubre de 2013, artículo 8(q) (**R-460**): "Las servidoras y los servidores públicos de la EP PETROECUADOR en el ejercicio de su trabajo, deben comprometerse en observar las siguientes reglas generales:… q) No aceptar regalos de terceras personas, a excepción de aquellos obsequios sin valor comercial significativo. En el caso de objetos con valor que no puedan ser devueltos, serán incorporados como activo de la EP PETROECUADOR".

[718]   CNUCC, artículo 28 (**RLA-112**).

para congraciarse con funcionarios del gobierno, por lo que la existencia de un *quid pro quo* podría no ser evidente. Como indicó el tribunal en *Sistem c. Kirguistán*:

> En algunas circunstancias, puede ocurrir que unos pagos regulares a lo largo de un período de tiempo "compren" efectivamente la buena voluntad a largo plazo del receptor, de modo que resulte difícil establecer un nexo causal entre el soborno y el beneficio que este adquiere[719].

476.   Varios elementos del presente caso sustentan una fuerte inferencia de que Worley pretendió "comprar" la buena voluntad a largo plazo de varios funcionarios de Petroecuador para asegurar un beneficio indebido. El principal es el hecho de que los mismos funcionarios de Petroecuador que supervisaban la operación del Contrato de la Refinería Esmeraldas y tenían la autoridad para suscribir contratos complementarios en nombre de Petroecuador (los Sres. Pareja, Bravo y Tapia) fueron condenados por recibir sobornos de Tecnazul, el mismo subcontratista contratado por Worley en el Proyecto de la Refinería Esmeraldas. Si bien no hay pruebas de que Worley realizara pagos ilícitos del mismo modo que Tecnazul, el Tribunal ya ha concluido que los beneficios indebidos conferidos por Worley a esas personas durante la operación del Proyecto de la Refinería Esmeraldas resultan indicativos de una intención de corrupción. Asimismo, en palabras de la Demandada, los hechos de corrupción "[e]n este caso precisamente [] coincide[n] con esta línea continua de contratos"[720], habiéndose suscrito todos ellos sin un procedimiento de licitación pública. Este conjunto de circunstancias es claramente indicativo de corrupción en la suscripción de los Contratos Complementarios de la Refinería Esmeraldas.

477.   Sobre esta base, el Tribunal infiere que el otorgamiento prolongado y repetido por parte de la Demandante de beneficios indebidos a funcionarios de Petroecuador durante la ejecución del Contrato de la Refinería Esmeraldas sirvió para congraciarse con esos funcionarios y tuvo el efecto último de obtener un beneficio indebido para Worley: la adjudicación de los seis Contratos Complementarios de la Refinería Esmeraldas mediante un proceso de contratación pública no competitivo.

478.   Otro factor clave que refuerza esta inferencia de intención de corrupción es el hecho de que los seis Contratos de la Refinería Esmeraldas fueron adjudicados por Petroecuador en flagrante incumplimiento del artículo 87 de la Ley de Contratación Pública, conforme al cual la suma total de la cuantía de cualquier contrato complementario a contratos de consultoría no puede superar el 70% del valor del contrato principal:

---

[719]   *Sistem Mühendislik Inşaat Sanayi ve Ticaret A. Ş. c. República Kirguisa*, Caso CIADI No. ARB(AF)/06/1, Laudo, 9 de septiembre de 2009, párr. 44 (**CLA-361**).

[720]   Presentación de Alegatos de Apertura de Ecuador, págs. 59, 157, 201, 205, 214, 240, 272 (**RD-1**); Transcripción de la Audiencia, Día 1, 177:7-9.

La suma total de las cuantías de los contratos complementarios referidos en los artículos 85 y 86, excepto en los contratos de consultoría y del sector hidrocarburífero, no podrán exceder del treinta y cinco (35%) por ciento del valor actualizado o reajustado del contrato principal a la fecha en que la Entidad Contratante resuelva la realización del contrato complementario. Esta actualización se hará aplicando la fórmula de reajuste de precios que consten en los respectivos contratos principales. *El valor de los contratos complementarios de consultoría no podrá exceder del setenta (70%) por ciento del valor actualizado o reajustado del contrato principal*[721].

479.  La Demandante niega que el artículo 87 de la Ley de Contratación Pública se aplique al Contrato de la Refinería Esmeraldas. Se remite a: (i) el texto del artículo 87 que, bajo su entendimiento, excluye a los contratos en el sector hidrocarburífero del límite del 70%; (ii) la decisión de eliminar una referencia al límite del 70% de un borrador del Contrato de la Refinería Esmeraldas durante su negociación; y (iii) el hecho de que Petroecuador aprobase contemporáneamente las certificaciones presupuestarias y los dictámenes jurídicos respecto de cada uno de los Contratos Complementarios de la Refinería Esmeraldas[722].

480.  El Tribunal discrepa con la interpretación de la Demandante de esta disposición. Los términos claros del artículo 87 de la Ley de Contratación Pública introducen una excepción para contratos de consultoría *y* contratos en el sector hidrocarburífero del límite del 35% sobre el valor del contrato total establecido en la primera oración de esta disposición. Por lógica, la doble excepción en la primera oración del artículo 87 no se puede aplicar a la última oración de la misma disposición, la cual específicamente *requiere* la aplicación de un límite del 70% a una de las categorías del contrato incluidas en la excepción: los contratos de consultoría.

481.  Debe entenderse, por lo tanto, que en la medida en que el Contrato de la Refinería Esmeraldas exige el cumplimiento con el artículo 87 "con relación al sector hidrocarburífero" al momento de suscribir contratos complementarios, se está haciendo referencia a la excepción del límite del 35% que se indica en la primera oración de esta disposición. La referencia al artículo 87 en el Contrato de la Refinería Esmeraldas, por lo demás, confirma la aplicabilidad del límite del 70% a este Contrato[723].

---

[721]  Ley de Contratación Pública, artículo 87 (**RLA-52**) (énfasis del Tribunal). Según la Demandada, "[e]l motivo detrás de la limitación del 70 por ciento es evitar que Petroecuador adjudique contratos y que un proveedor se beneficie de Alcances de Servicios adicionales sin que medie un proceso de contratación pública". Transcripción de la Audiencia, Día 7, 1296:2-11 (traducción del Tribunal).

[722]  EPA de la Demandante, párr. 139.

[723]  Contrato de la Refinería Esmeraldas, cláusula 15 (**C-3**): "Se aplicará lo establecido por la LOSNCP en el Artículo 87, con relación al sector hidrocarburífero. En todos los casos, en forma previo a la suscripción de los contratos complementarios, se requerirá la certificación presupuestaria correspondiente; y de ser del caso LA CONTRATISTA deberá rendir garantías adicionales de conformidad con la Ley Orgánica del Sistema de Contratación Pública."

482.  Habiendo establecido que el límite del 70% en el artículo 87 de la Ley de Contratación Pública resulta de aplicación al Contrato de la Refinería Esmeraldas, el Tribunal debe destacar la asombrosa violación de este límite. El valor original del Contrato de la Refinería Esmeraldas era de USD 38.600.764[724]. Los seis Contratos Complementarios de la Refinería Esmeraldas se otorgaron respectivamente por las siguientes cuantías, sin incluir IVA: USD 25.462.312,29[725], USD 34.053.531,55[726], USD 11.505.070,31[727], USD 17.488.133,36[728], USD 1.939.226[729] y USD 57.433.404,38, por un total de USD 147.881.677,89. En consecuencia, el valor de los contratos complementarios representa cerca del 380% del valor del Contrato principal de la Refinería Esmeraldas —es decir, un 310% por encima del límite impuesto en el artículo 87, lo que se traduce en una cantidad aproximada de USD 120 millones por encima del límite en términos absolutos—.

483.  Como cuestión práctica, un incumplimiento de esta magnitud extraordinaria solo podría haber pasado desapercibido en una empresa petrolera sofisticada como Petroecuador gracias a un entramado de corrupción complejo que afectase múltiples niveles de la organización y estuviese diseñado para evadir controles internos. Esto es congruente con la descripción que realizó bajo juramento el Director de Litigios de Petroecuador en el contexto del Procedimiento bajo la § 1782 en relación con el entramado subyacente:

> Las investigaciones en curso y los procedimientos judiciales en el Ecuador descritos más adelante han confirmado que la implementación del fraude requirió una cercana coordinación entre las empresas contratistas y los ex empleados involucrados para burlar y evadir los controles internos de la empresa. Entre otras cosas, se abusó del Régimen Especial de contratación mediante el uso indebido e injustificado del procedimiento excepcional de contratación de giro específico del negocio en casi todas las contrataciones. Este es el caso para la gran mayoría de los contratos adjudicados a proveedores sobre los cuales se han comprobado pagos de sobornos, como es el caso de Galileo, OSS, Tecnazul y MMR Group.

---

[724]  Contrato de la Refinería Esmeraldas, cláusula 5.1 (**C-3**).

[725]  Contrato Complementario del Programa de Rehabilitación No. 2012036, 28 de septiembre de 2012, cláusula 4.1 (**C-19**).

[726]  Contrato Complementario del Programa de Rehabilitación No. 2013027, 28 de agosto de 2013, cláusula 4 (**C-20**).

[727]  Contrato Complementario del Programa de Rehabilitación No. 2014015, 2 de abril de 2014, cláusula 4 (**C-21**).

[728]  Contrato Complementario del Programa de Rehabilitación No. 2014048, 9 de octubre de 2014, cláusula 4 (**C-22**).

[729]  Contrato Complementario del Programa de Rehabilitación No. 2014051, 17 de octubre de 2014, cláusulas 1, 3 (**C-23**). El Tribunal observa que, a diferencia de los otros contratos complementarios, el quinto Contrato Complementario de la Refinería Esmeraldas no concierne la prestación de un servicio, sino que tiene como objeto modificar el contrato principal para incluir una provisión de USD 1.939.226 para gastos reembolsables. En aras de la exhaustividad, el Tribunal reflejó esta cantidad en su determinación de la transgresión del límite del 70% según el artículo 87 de la Ley de Contratación Pública. Los valores indicados para los contratos complementarios restantes en este párrafo excluyen las provisiones para gastos reembolsables.

Abusando del régimen especial de giro específico de negocio, el Sr. Pareja Yannuzzelli, entonces Gerente de Refinación, y Bravo Panchano, entonces Coordinador de Proyectos en la Gerencia de Refinación, como ordenadores de gastos y personas encargadas de todas las contrataciones con dicha Gerencia de Refinación hasta el monto máximo de USD $50 millones, escogían libremente a los proveedores de su preferencia y les solicitaban ofertas para participar en un seudo concurso a puertas cerradas. Para asegurarse el éxito de la trama, designaban a los tres miembros de las comisiones técnicas encargadas de revisar y evaluar las ofertas de los proveedores predeterminados y, habiéndose seleccionado al proveedor de su preferencia, aprobaban la adjudicación de los contratos, asegurándose no superar el umbral de los USD $50 millones para contrato principal. Un monto superior a los USD $50 millones para los contratos principales requería aprobación del Gerente General de la empresa, aunque dicha limitación a esa fecha no aplicaba a los contratos complementarios al contrato principal.

Al fin de cubrir su accionar y facilitar la continuidad del fraude, los ex empleados corruptos designaron los fiscalizadores y administradores de los contratos amañados. Con ello, se coadyuvó a mantener el control absoluto sobre la ejecución de los contratos y facilitaron el ocultamiento del fraude de los organismos internos de control de la empresa. Además, según lo anteriormente dicho, los pagos de sobornos fueron recibidos por los ex empleados corruptos a través de cuentas en el exterior de sus empresas *offshore*, facilitando así el ocultamiento del esquema y asegurado su continuidad.

Este esquema fue implementado en la mayoría de los contratos adjudicados a empresas contratistas involucradas en la trama de corrupción[730].

484. Por ende, la adjudicación de los seis Contratos Complementarios de la Refinería Esmeraldas a Worley no habría sido posible de no ser por el entramado de corrupción puesto en funcionamiento por los Sres. Pareja y Bravo. Cabe asumir que, en circunstancias normales, los controles internos de Petroecuador habían detectado y corregido cualquier violación potencial o efectiva del límite del 70% del artículo 87 de la Ley de Contratación Pública. Así, por implicación necesaria, el Tribunal confirma su conclusión inicial de que los Contratos Complementarios de la Refinería Esmeraldas son producto de un arreglo corrupto.

485. En resumen, por los motivos antes expresados, el Tribunal concluye que la Demandante ofreció corruptamente beneficios indebidos a los Sres. Pareja, Bravo, Calvopiña y Reyes a fin de que los Sres. Pareja y Bravo obtuviesen los Contratos Complementarios de la Refinería Esmeraldas para Worley. Esta conducta es de una naturaleza particularmente seria a la luz de su conexión con un entramado fraudulento mucho más generalizado dentro de Petroecuador, sin el cual no se le hubieran adjudicado a la Demandante más de USD 120 millones en contratos complementarios.

v.   Conclusión

486. Como ya se ha indicado, la pregunta determinante es si las actividades ilegales de la Demandante: (i) son serias y generalizadas (a diferencia de esporádicas y superficiales); y (ii) guardan una

---

[730] Memorando de Petroecuador en respaldo de su solicitud de *discovery* al amparo del título 28 U.S.C. § 1782(a), Declaración bajo juramento de Marco Emilio Prado Jiménez, págs. 44-45 (**R-2**).

relación estrecha con las pretensiones[731]. Según indicó el tribunal en *Bank Melli*, "[e]l motivo por el que infracciones graves como un quebrantamiento del orden público internacional conllevan la inadmisibilidad de las pretensiones es que los órganos internacionales de resolución de controversias tienen el deber de no abordar pretensiones viciadas por incumplimientos de ciertas normas aceptadas universalmente conforme a los principios generales de buena fe y *nemo auditur propiam turpitudinem allegans*"[732].

487.  Anteriormente en este Laudo Final, el Tribunal ha concluido que la Demandante ofreció corruptamente beneficios indebidos a varios funcionarios de Petroecuador a fin de que estos aseguraran la adjudicación de seis Contratos Complementarios de la Refinería Esmeraldas a Worley. La Demandante procedió de esta manera durante varios años, de modo deliberado y beneficiándose de un exitoso entramado fraudulento. El Tribunal considera ampliamente reconocido que una conducta grave y censurable de este tipo, que puede caracterizarse sin reservas como un soborno, es una violación del orden público internacional[733]. En consecuencia, en la medida en la que las pretensiones de la Demandante se basan en los Contratos Complementarios de la Refinería Esmeraldas, se originan en conducta ilegal seria y generalizada y, por ello, a juicio de la mayoría del Tribunal, son inadmisibles, y, para la árbitro Stern, se deben desestimar en tanto que nacen de una inversión no protegida.

488.  La pregunta siguiente es si la conducta corrupta de Worley guarda una relación estrecha con las pretensiones de la Demandante entendidas como un todo. En el presente caso, las pretensiones de la Demandante atañen a tres conjuntos diferentes de hechos: (i) el presunto incumplimiento en el pago por RDP y Petroecuador de cantidades adeudadas bajo los Contratos tras el Oficio de la Presidencia y el posterior Memorando de Petroecuador, que categorizaron a la Demandante como una empresa "vinculada" con Tecnazul; (ii) una "campaña de acoso" contra la Demandante emprendida por la Contraloría General y el Fiscal General; y (iii) las cargas tributarias injustificadas con las que presuntamente amenazaba el SRI a la Demandante. Sin embargo, en última instancia, la totalidad de las pretensiones de la Demandante parte de un evento desencadenante circunscrito de modo preciso: la presunta decisión inicial de Ecuador de

---

[731]  *Bank Melli Iran y Bank Saderat Iran c. Reino de Bahréin*, Caso CPA No. 2017-25, Laudo, 9 de noviembre de 2021, párr. 376 (**RLA-301**).

[732]  *Bank Melli Iran y Bank Saderat Iran c. Reino de Bahréin*, Caso CPA No. 2017-25, Laudo, 9 de noviembre de 2021, párr. 365 (**RLA-301**).

[733]  *Bank Melli Iran y Bank Saderat Iran c. Reino de Bahréin*, Caso CPA No. 2017-25, Laudo, 9 de noviembre de 2021, párr. 376 (**RLA-301**); *World Duty Free Company Limited c. República de Kenia*, Caso CIADI No. ARB/00/7, Laudo, 4 de octubre de 2006, párr. 157 (**RLA-126**); *Churchill Mining PLC y Planet Mining Pty Ltd c. República de Indonesia*, Caso CIADI No. ARB/12/14 y 12/40, Laudo, 6 de diciembre de 2016, párrs. 507-508 (**RLA-132**).

suspender todos los pagos a Worley bajo los Contratos, lo cual, según la Demandante, fue arbitraria y se basó en la determinación de que Worley era "culpable por extensión" de la corrupción de Tecnazul. En palabras de la propia Demandante:

> Ecuador invitó a Worley a invertir y desempeñarse como consultora de gestión del proyecto en los proyectos más estratégicos del país. Confiada en el apoyo del Estado a dichos proyectos, Worley invirtió en Ecuador y cumplió sus obligaciones a satisfacción de aquel. Si bien en ocasiones los pagos de Ecuador se efectuaban con irregularidad, éste le aseguró a Worley que le pagaría y, con ello, la indujo a seguir avanzando con sus trabajos. Una vez concluido uno de los proyectos y con el otro en curso, Ecuador suspendió todos los pagos a Worley. *La orden de suspender los pagos se dio mediante un oficio de la Presidencia y se basó en una nota escrita a mano en la que se añadía a Worley como "empresa vinculada" a un subcontratista que estuvo involucrado en una trama de sobornos con varios altos funcionarios ecuatorianos.*

> De allí en más, Ecuador llevó adelante una campaña concertada contra Worley. Una de las fuerzas impulsoras de esta campaña fue la Contraloría General del Estado de Ecuador, que emitió glosas administrativas con determinaciones de responsabilidad civil [...], luego confirmadas mediante resoluciones [...] inventando obligaciones por responsabilidad por casi USD 200 millones contra Worley, sobre la base de una reinterpretación *post facto* de los acuerdos subyacentes. Los procesos administrativos tramitados por la Contraloría General también dieron lugar a una serie de investigaciones penales concebidas para acosar a funcionarios de Worley. Los actos de Ecuador conllevan la violación de los derechos de ésta protegidos por el TBI y sus expectativas legítimas, tal como se explica en los párrafos siguientes.

> [...]

> El escándalo por corrupción en Petroecuador y las resoluciones que en consecuencia dictó el Presidente marcaron el inicio de una campaña incesante de acoso contra Worley en la que el Estado—por intermedio de la Contraloría General del Estado [...] —ordenó el desconocimiento de las obligaciones de inversión frente a la empresa y encaró auditorías kafkianas. A su vez, dichas auditorías generaron resoluciones infundadas en las que se inventaron obligaciones por prácticamente USD 200 millones contra Worley, así como procesos penales igualmente infundados contra funcionarios de la empresa. Si bien las auditorías e investigaciones del Estado no guardaron relación con alegaciones de corrupción contra Worley ni generaron alegaciones tales, el Estado siguió negándole el pago, para lo cual se escudó en una nueva excusa, a saber, las contingencias inventadas contra la empresa por la Contraloría General.

> Los procesos administrativos tramitados por la Contraloría General contra Worley encajan en dos categorías. *Primero*, la Contraloría General pretende cobrarle a Worley por trabajos que ésta ya realizó y el Estado ya aceptó pero que, según aquel organismo, corresponden a contratos complementarios viciados celebrados con Petroecuador. *Segundo*, la Contraloría General pretende cobrarle a Worley por los supuestos errores de Petroecuador u otros contratistas en la realización de trabajos en proyectos en los que Worley se desempeñó en carácter de PMC. Ninguno de los procesos administrativos guarda relación con Tecnazul o alegaciones de corrupción.

> Contrariamente a los presupuestos en que se apoya la Contraloría General, la función crítica pero limitada de Worley en carácter de PMC no equivalía a una red de seguridad para que el Estado le pueda imputar a ésta la responsabilidad por los actos de terceros contratados por el Estado. Worley dedicó considerables recursos a defenderse en estos procesos; no obstante, la Contraloría General ha hecho caso omiso de los hechos subyacentes y el derecho y ha generado una contingencia contra Worley por prácticamente USD 200 millones. Es probable que dicho monto se incremente a medida que la Contraloría General sigue dictando resoluciones en las auditorías en curso.

Otra poderosa arma en el arsenal de Ecuador viene dada por la Fiscalía General del Estado. Desde 2016, Ecuador ha iniciado una enorme cantidad de investigaciones penales injustificadas contra autoridades de Worley. Prácticamente todas estas investigaciones derivan de remisiones de la Contraloría General y el SRI en relación con los procesos administrativos y las auditorías impositivas contra Worley, que no guardan relación con el escándalo por corrupción. Los fiscales no han encontrado pruebas de delitos por parte de empleados de Worley. De las 18 investigaciones penales que la empresa sabe se han iniciado contra sus empleados, solamente tres superaron la etapa de instrucción y generaron cargos formales contra el gerente de Programa de Worley, Raymond Falcon, y los tres se archivaron por falta de mérito. El resto siguen abiertas en etapa de instrucción para presionar a Worley. Sin embargo, recientemente Petroecuador presentó contra Worley una Solicitud bajo la §1782 ante la Justicia estadounidense en la que amenazó con la posibilidad de que ahora se modifique esa situación, más de tres años después de descubierto el escándalo por corrupción.

*Así pues, después de explotar toda la experiencia y los conocimientos técnicos que Worley tenía para ofrecer, Ecuador determinó de forma oportunista que la empresa era "culpable por extensión" sin ningún fundamento fáctico o jurídico, para eludir sus obligaciones de pago. Ello se intensificó hasta convertirse en una campaña acabada de acoso contra Worley. Los procesos administrativos, las investigaciones penales y las auditorías impositivas son todos tácticas interesadas para evitar pagarle a Worley*[734].

489. Por lo tanto, la ausencia de corrupción de parte de Worley es un elemento central del caso de la Demandante. Sin embargo, como ya se ha concluido, la Demandante participó en actividades corruptas serias durante la operación de su inversión. El Tribunal no precisa adentrarse en un análisis detallado de los incumplimientos del Tratado que alega la Demandante para concluir que la existencia de corrupción impacta todas las facetas de las pretensiones de la Demandante. En particular, el Tribunal observa que la corrupción probada de la Demandante *prima facie* torna defectuosos los dos pilares principales de su caso: (i) el argumento de que "Ecuador determinó de forma oportunista que Worley era 'culpable por extensión' sin ningún fundamento fáctico o jurídico, para eludir obligaciones de pago"; y (ii) el argumento derivado del anterior de que los "procesos administrativos, las investigaciones penales y las auditorías impositivas son todos tácticas interesadas para evitar pagarle a Worley"[735]. Por consiguiente, las actividades ilegales en el presente caso guardan una relación estrecha con las pretensiones en el arbitraje bajo la óptica de *Bank Melli*.

490. A la luz de esta conclusión, y considerando la gravedad y la ubicuidad de la conducta corrupta de la Demandante, una mayoría del Tribunal determina que las pretensiones de la Demandante son inadmisibles y la árbitro Stern considera que se deben desestimar. Esta conclusión, por sí misma, trae como consecuencia la desestimación de las pretensiones de la Demandante.

---

[734]   Escrito de Demanda, párrs. 4-5, 14-18 (énfasis y traducción del Tribunal).
[735]   Escrito de Demanda, párr. 18.

491. A pesar de esta conclusión, el Tribunal estima pertinente también analizar la segunda causal de ilegalidad durante la operación de la inversión invocada por la Demandada, relativa a la ignorancia deliberada de Worley respecto de la corrupción de Tecnazul.

### 2) La "ignorancia deliberada" de la Demandante respecto de la corrupción de Tecnazul

492. El argumento de la Demandada de "ignorancia deliberada" se esgrime en conexión con la corrupción probada de Tecnazul. No es objeto de controversia que, durante la operación de la inversión de la Demandante, Tecnazul pagó más de USD 1,2 millones en sobornos a los mismos funcionarios de Petroecuador que supervisaban la operación de varios de los Contratos de la Demandante —entre ellos, principalmente, los Sres. Pareja, Bravo, A. Escobar y Reyes—[736].

493. En este contexto, y sustentándose principalmente en *Churchill Mining c. Indonesia*, la Demandada alega que el Tribunal debe declarar inadmisibles las pretensiones de la Demandante en vista de que Worley realizó las siguientes omisiones: (i) no verificó la observancia de Tecnazul con la legislación anticorrupción; (ii) no investigó la corrupción de Tecnazul después de que se le alertara sobre ella por un blog público y un antiguo empleado; y (iii) no detuvo su cooperación con Tecnazul incluso después de que se probara la corrupción de Tecnazul en los Papeles de Panamá. Según la Demandada, las "confabulaciones" de Worley con Tecnazul para manifestar falsamente el cumplimiento del límite del 30% a la subcontratación, así como varios de los eventos organizados corruptamente por Worley para funcionarios de Petroecuador ya descritos,

---

[736] *Véase* Transferencia bancaria *offshore* por USD 163.143,00 de S. Calero a GRIBRA, S.A. (propiedad de A. Bravo), 8 de agosto de 2014 (**R-81**); Transferencia bancaria *offshore* por USD 17.970,00 de S. Calero a GIRBRA, S.A. (propiedad de A. Bravo), 10 de noviembre de 2014 (**R-82**); Transferencia bancaria *offshore* por USD 17.970,00 de S. Calero a GIRBRA, S.A. (propiedad de C. Pareja), 12 de noviembre de 2014 (**R-83**); Transferencia bancaria *offshore* por USD 326.366,00 de H. Guarderas a GRIBRA, S.A. (propiedad de A. Bravo), 3 de abril de 2014 (**R-84**); Transferencia bancaria *offshore* por USD 129.828,31 de H. Guarderas a GIRBRA, S.A. (propiedad de A. Bravo), 9 de mayo de 2014 (**R-85**); Transferencia bancaria *offshore* por USD 209.980,00 de Operadora BLC, S.A. (propiedad de W. Phillips) a GIRBRA, S.A. (propiedad de A. Bravo),31 de octubre de 2013 (**R-86**); Transferencia bancaria *offshore* por USD 65.000,00 de Operadora BLC, S.A. (propiedad de W. Phillips) a GIRBRA, S.A. (propiedad de A. Bravo), 23 de septiembre de 2014 (**R-87**); Transferencia bancaria *offshore* por USD 195.000,00 de Operadora BLC, S.A. (Propiedad de W. Phillips) a GIRBRA, S.A. (propiedad de A. Bravo), 10 de noviembre de 2014 (**R-88**); Transferencias bancarias *offshore* por USD 154.980,00 de Operadora BLC, S.A. (propiedad de W. Phillips) a GIRBRA, S.A. (propiedad de A. Bravo), 9 de febrero de 2015 (**R-89**); Giros bancarios internacional por USD 150.000,00 de Operadora BLC, S.A. (propiedad de W. Phillips) a GIRBRA, S.A. (propiedad de A. Bravo) 11 de marzo de 2015 (**R-90**); Transferencias bancarias *offshore* por USD 199.980,00 de Operadora BLC, S.A. (propiedad de W. Phillips) a GIRBRA, S.A. (propiedad de A. Bravo) 11 de diciembre de 2015 (**R-91**); Giros bancarios internacionales de Operadora BLC, S.A. (propiedad de W. Phillips) a ESCART, S.A. (propiedad de A. Escobar) 2013-2016 (**R-92**); Transferencias bancarias compuestas *offshore* de Operadora BLC (propiedad de W. Phillips) a funcionarios fiscalizadores del Proyecto de la Refinería Esmeraldas (sin fecha) (**R-93**). *Véase también*, Escrito de Demanda, párr. 11; Contestación, párrs. 239-249.

también constituyen "banderas rojas" (*red flags*) que constituyen indicios de la ignorancia deliberada de Worley[737].

494. La Demandante niega la tesis de que el Tribunal, amparado en el derecho internacional, pueda aplicar un criterio de responsabilidad objetiva o de negligencia con respecto a las ilegalidades cometidas por terceros; en su opinión, tales ilegalidades serían pertinentes solo cuando la demandante ignora deliberadamente la ilegalidad o deja de corregir una ilegalidad conocida[738]. En cuanto a los hechos, la Demandante observa que ni RDP, ni Petroecuador ni el Procurador General rescindieron o anularon los Contratos como motivo de dicha corrupción[739]. En cualquier caso, la Demandante afirma que actuó en forma diligente, dado que Worley: (i) seleccionó a un subcontratista con experiencia significativa y destacable; (ii) solicitó a Tecnazul que cumpliera con las leyes y políticas anticorrupción; (iii) investigó las publicaciones en internet relativas a la corrupción de Tecnazul; y (iv) terminó la relación con Tecnazul después de la publicación de los Papeles de Panamá[740].

495. Como han observado las Partes, la cuestión de la ignorancia deliberada ha sido abordada por al menos dos tribunales de inversión. El tribunal de *Minnotte c. Polonia* postuló que "pueden darse circunstancias en las que fingir no tener conocimiento de pruebas de conducta indebida o de un crimen, o dejar de tener conocimiento injustificadamente de tales pruebas, en efecto viciaría una pretensión"[741]. Este planteamiento fue desarrollado por el tribunal de *Churchill Mining* como una determinación del estándar de ignorancia deliberada, inobservancia consciente o ceguera selectiva en un contexto de admisibilidad, conforme al cual "una demandante conocía o debería haber conocido la ilicitud de un tercero en relación con una inversión y aun así optó por no hacer nada (a diferencia de únicamente dejar de conducirse con el debido cuidado)"[742].

496. El Tribunal está dispuesto a adoptar el criterio de *Churchill Mining* para fines del presente análisis. En las circunstancias de este caso, para determinar si la Demandante ignoró deliberadamente la corrupción de Tecnazul, el Tribunal debe evaluar: (i) el "nivel de control institucional y fiscalización desplegado" por la Demandante de cara a Tecnazul; (ii) si la

---

[737] EPA de la Demandada, párrs. 104-105; 120.

[738] EPA de la Demandante, párr. 132.

[739] EPA de la Demandante, párr. 133.

[740] EPA de la Demandante, párr. 134.

[741] *David Minnotte & Robert Lewis c. República de Polonia,* ICSID Case No. ARB (AF)/10/1, Laudo, 16 de mayo de 2014, párr. 163 (**CLA-362**).

[742] *Churchill Mining PLC y Planet Mining Pty Ltd c. República de Indonesia*, Caso CIADI No. ARB/12/14 y 12/40, Laudo, 6 de diciembre de 2016, párr. 504 (**RLA-132**).

Demandante fue alertada por pruebas de corrupción "que un inversor razonable […] debería haber investigado"; y (iii) si la Demandante "tomó las medidas correctivas adecuadas"[743].

497.   El segundo elemento del estándar de *Churchill Mining* —si la Demandante fue alertada sobre la corrupción de Tecnazul— es especialmente determinante en vista de las conclusiones anteriores del Tribunal en este Laudo Final respecto de las ilegalidades cometidas por la Demandante en la realización de la inversión y durante la operación de la inversión.

498.   Primero, la Demandante recibió un primer indicio de que Tecnazul participaba en actividades ilegales no más tarde de julio de 2011, cuando, como se mencionó anteriormente, los Sres. Phillips y Guarderas de Tecnazul presionaron al Sr. Elizondo de Worley para manifestar falsamente el cumplimiento del límite del 30% a la subcontratación en la oferta para el Contrato de la Refinería Esmeraldas[744]. La participación de la propia Worley en la organización de los eventos y los viajes en 2012 junto con Tecnazul, a efectos de congraciarse corruptamente con los funcionarios de Petroecuador, confirma que Worley debía haber tomado conocimiento para entonces de que Tecnazul participaba como mínimo en alguna forma de confabulación[745].

499.   De cualquier forma, es improbable que la adjudicación posterior a Worley de los seis Contratos Complementarios de la Refinería Esmeraldas, entre 2012 y 2015, en procedimientos no competitivos, pudiese haber ocurrido sin que Worley hubiera tomado conocimiento del entramado ilegal de sobornos de Tecnazul. Siendo la subcontratista escogida por la Demandante, Tecnazul tenía la posibilidad de sacar tanto provecho como Worley de obtener trabajo de Petroecuador y seguramente desempeñó una función clave en asegurarse de que Petroecuador, por medio de los Sres. Pareja y Bravo, adjudicara corruptamente esos contratos a Worley. En efecto, como ya se ha mencionado, los contratos complementarios eran sumamente valiosos —tenían un valor combinado de más de USD 140 millones— y se obtuvieron en inobservancia flagrante del artículo 87 de la Ley de Contratación Pública[746]. Incluso asumiendo que Worley no tuviera ningún conocimiento del entramado de sobornos de Tecnazul hasta la suscripción del segundo Contrato Complementario de Esmeraldas en agosto de 2013 (momento para el cual se había superado el límite del 70%)[747] el incumplimiento asombroso del límite del 70% no podría haber sido pasado por alto por los mecanismos internos de cumplimiento de Worley, una empresa sofisticada de

---

[743]   *Churchill Mining PLC y Planet Mining Pty Ltd c. República de Indonesia*, Caso CIADI No. ARB/12/14 y 12/40, Laudo, 6 de diciembre de 2016, párr. 504 (**RLA-132**).

[744]   *Véanse* los párrs. 366-371 *supra*.

[745]   *Véase por ejemplo*, el Viaje de la Fórmula 1 (párrs. 448-452 *supra*); el partido de la NBA (párrs. 453-455 *supra*).

[746]   *Véanse* los párrs. 478-484 *supra*.

[747]   *Véanse* los párrs. 460-461 *supra*.

PMC. Ante estas circunstancias, cualquier inversor razonable debería haber iniciado una investigación para asegurarse de que su inversión no se estuviese usando como plataforma para una organización delictiva.

500. Como admitió el Sr. Parker durante su contrainterrogatorio, Worley también omitió investigar acusaciones públicas de corrupción en contra de Tecnazul que comenzaron a salir a la luz en blogs de internet alrededor de noviembre de 2015[748]. Incluso tras la publicación de los Papeles de Panamá en abril de 2016, el Sr. Parker no dudó en buscar la asistencia de Tecnazul para organizar una reunión con el vicepresidente del Ecuador en mayo de 2016[749]. Worley solo terminó su relación con Tecnazul bajo los Contratos de la Refinería Esmeraldas y la Refinería del Pacífico el 25 de agosto de 2016 —es decir, cinco meses después de que los Papeles de Panamá salieran a la luz—[750].

501. Durante todos estos años, Worley tuvo la obligación de ejercer un alto nivel de control y fiscalización sobre Tecnazul. En particular, de conformidad con los Contratos de la Refinería Esmeralda y la Refinería del Pacífico, la Demandante debía fiscalizar y garantizar el cumplimiento las leyes del Ecuador por Tecnazul, incluida la legislación anticorrupción, e iniciar procedimientos en caso de incumplimiento[751]. Por ejemplo, el Contrato de la Refinería del Pacífico estipulaba que la Demandante "cumplirá y hará cumplir a todos los subcontratistas" las leyes ecuatorianas[752]. Ambos contratos también obligaban a la Demandante a observar la norma ISO 9004:2000[753]. Según la mencionada norma, la Demandante debía implementar la medición y control del cumplimiento de requisitos legales y reglamentarios por parte de los subcontratistas como parte de su sistema de gestión de calidad[754].

502. En este contexto, los intentos declarados de Worley para evitar la corrupción durante el período en cuestión resultan intrascendentes para el Tribunal. El hecho de que la Demandante organizase capacitaciones obligatorias sobre corrupción para el personal de Tecnazul o comunicase a

---

[748]   Transcripción en inglés de la Audiencia, Día 2, 350:7-351:7.

[749]   Correo electrónico de C. Parker a R. Falcon, 2 de mayo de 2016 (**R-428**); Transcripción en inglés de la Audiencia, Día 2, 358:5-12.

[750]   Carta de Worley a Tecnazul por la que rescinde los contratos de RDP, 25 de agosto de 2016 (**C-817**); Carta de Worley a Tecnazul, 25 de agosto de 2016 (**C-942**).

[751]   Contrato de la Refinería Esmeraldas, Anexo 3, cláusula 5.1 (**C-3**); Contrato de la Refinería del Pacífico, cláusulas 2.14, 2.7.9(d), 16.2 y Apéndice A, cláusulas 5.1(f), (l), (s), 5.5.1 (**C-8**).

[752]   Contrato de la Refinería del Pacífico, cláusula 2.14 (**C-8**) (traducción del Tribunal).

[753]   Contrato de la Refinería Esmeraldas, Anexo 3, cláusula 5.4 (**C-3**); Contrato de la Refinería del Pacífico, cláusula 5.5.1 (**C-8**).

[754]   Informe de BRG, párrs. 194-201 (**RER-3**); ISO 9004:2000 Sistemas de gestión de la calidad - Directrices para la mejora del desempeño, Secciones 5.2.3, 7.4.2, 8.2.1.2, 8.2.4 (**BRG R-012**)

Tecnazul las políticas anticorrupción aplicables es irrelevante[755]. La pregunta determinante es si la Demandante tomó las medidas correctivas apropiadas para abordar el entramado de sobornos de Tecnazul una vez que Worley tuvo conocimiento de su existencia a más tardar en 2013. Como ya se ha concluido, Worley omitió actuar de este modo durante años a pesar de sus extensas obligaciones de fiscalización en el marco de varios de los Contratos.

503. Por ende, el Tribunal está convencido, sobre la base del expediente, de que la Demandante ignoró deliberadamente la corrupción de Tecnazul y no tomó las medidas correctivas apropiadas conforme al criterio acuñado en *Churchill Mining*. Al actuar así, permitió que su inversión se utilizara durante años como plataforma para la organización delictiva de Tecnazul. Lo anterior constituye una ilegalidad grave y generalizada para los fines del criterio de admisibilidad de *Bank Melli* o para la conclusión de la árbitro Stern de que la inversión no es una inversión protegida[756].

504. De igual manera, por motivos análogos a los indicados en los párrafos 488 y 489 *supra*, esta conducta ilegal guarda una relación estrecha con las pretensiones de la Demandante en este arbitraje, en particular en vista del hecho de que mientras Tecnazul llevaba a cabo sus actividades delictivas también actuaba como subcontratista en los Proyectos de la Refinería del Pacífico, la Refinería Esmeraldas y la Planta Machala, que abarcaban prácticamente la totalidad de la inversión de la Demandante.

505. Por estos motivos, una mayoría del Tribunal concluye que la ignorancia deliberada de la Demandante respecto de la corrupción de Tecnazul vuelve por sí sola inadmisibles las pretensiones de la Demandante, conforme al criterio de *Bank Melli*, o, de acuerdo con la árbitro Stern, torna la inversión de la Demandante en una inversión que no merece protección alguna bajo el Tratado con la consecuencia de que se deben desestimar sus pretensiones.

### 4. LA CONCLUSIÓN DEL TRIBUNAL SOBRE JURISDICCIÓN Y ADMISIBILIDAD

506. En resumen, por las razones antes indicadas, el Tribunal desestima las pretensiones de la Demandante en su totalidad por tres motivos independientes: (i) la existencia de un patrón de ilegalidad y mala fe generalizado que afecta al núcleo de la inversión de la Demandante desde su inicio, lo cual priva de jurisdicción al Tribunal[757]; (ii) la corrupción de la Demandante durante la operación de la inversión, que vuelve inadmisibles las pretensiones de la Demandante a juicio de

---

[755] EPA de la Demandante, párr. 134.

[756] *Véase* párr. 486 *supra*.

[757] *Véase* párr. 419 *supra*.

la mayoría del Tribunal o lleva a su desestimación según la árbitro Stern[758]; y (iii) la ignorancia deliberada de la Demandante respecto de la corrupción de Tecnazul durante la operación de la inversión de la Demandante, que también por sí sola vuelve inadmisibles las pretensiones de la Demandante según la mayoría del Tribunal o lleva a su desestimación según la árbitro Stern[759].

---

[758] *Véase* párr. 490 *supra.*

[759] *Véase* párr. 505 *supra.*

## VII.  COSTAS

### 1.  LA POSICIÓN DE LA DEMANDANTE

507.  La Demandante solicita que el Tribunal ordene a la Demandada que asuma sus honorarios y gastos legales, "incluidos los de auditorías, investigaciones y procedimientos infundados que el Estado sigue realizando […] en quebrantamiento de sus obligaciones al amparo del Tratado ante Worley y el Procedimiento bajo la [§1782], así como todos los honorarios y gastos de los miembros del Tribunal y la [CPA]"[760]. La Demandante solicita además que se ordene a la Demandada a pagar intereses sobre tales costas a una tasa que el Tribunal considere apropiada[761]. Las costas de la Demandante ascienden a un total de USD 29.898.915, desglosado de la siguiente manera[762]:

| | Total (USD) |
|---|---|
| **I. Honorarios y gastos legales** | |
| A. TBI – Honorarios de White & Case | 15.540.387 |
| B. TBI – Gastos de White & Case<br>    1. Alojamiento y almacenamiento electrónico de datos para *discovery*: 364.005<br>    2. Servicio de traducción: 89.297<br>    3. Otro: 447.841 | 901.143 |
| C. TBI – Honorarios y gastos de Ferrere/Robalino<br>    1. Honorarios: 1.162.355<br>    2. Servicio de traducción: 17.955 | 1.180.310 |
| D. TBI – Honorarios y gastos de peritos<br>    1. Sr. Douglas E. Branch/PwC: 1.568.691<br>    2. Sr. Christopher J. Sullivan: 392.966<br>    3. Sr. Ramiro A. Mendoza: 146.444 | 2.108.101 |
| E. Procedimiento bajo la §1782<br>    1. Honorarios de White & Case: 2.134.988<br>    2. Honorarios de Ferrere / Robalino: 13.551<br>    3. Peritos: 9.750 | 2.158.289 |
| F. Procedimientos ecuatorianos ilegales<br>    1. White & Case: 709.837<br>    2. Ferrere / Robalino Abogados: 3.923.973<br>    3. Abogados de la defensa penal: 2.105.816<br>    4. Peritos locales: 101.836<br>    5. Servicios de traducción: 216.223 | 7.057.685 |
| **II. Adelantos de los honorarios de la CPA y del Tribunal** | 953.000 |
| Honorarios, gastos y costes totales | 29.898.915 |

---

[760]  Escrito sobre Costas de la Demandante, párr. 2 (traducción del Tribunal).

[761]  Escrito sobre Costas de la Demandante, párr. 25(b).

[762]  Escrito sobre Costas de la Demandante, Anexo A (traducción del Tribunal).

508.   Observando que el Tratado guarda silencio en materia de asignación de las costas, la Demandante
       se remite al artículo 40 del Reglamento CNUDMI como la norma aplicable. Bajo la lectura de la
       Demandante, dicha disposición otorga discreción al Tribunal para asignar costas guiado por el
       principio por defecto de que "el vencido paga"[763]. Por consiguiente, la Demandante propone la
       aplicación de tres factores que han sido utilizados previamente por tribunales al realizar dicho
       análisis, incluidos tribunales que dictaron laudos en contra de Ecuador al amparo del Reglamento
       CNUDMI y el Tratado[764]: "(i) el éxito relativo de una parte en el arbitraje, (ii) el nivel de gravedad
       del incumplimiento del tratado, y (iii) el uso de tácticas procesales que incrementaron
       irrazonablemente el tiempo y los costes"[765].

509.   En este contexto, la Demandante dice que la rendición total de cuentas exige incluir el coste del
       presente procedimiento en la compensación por el daño ocasionado a la Demandante y su
       inversión[766]. A este respecto, la Demandante afirma que en el momento de presentación de su
       Escrito sobre Costas la violación ascendía a USD 141,3 millones no indemnizados a Worley por
       sus contribuciones a los proyectos ecuatorianos y USD 325 millones en obligaciones civiles[767].

510.   En cualquier caso, la Demandante afirma que la Demandada debe asumir las costas del arbitraje
       porque su conducta aumentó los costes de la controversia—en referencia, en particular, a
       alegaciones presuntamente infundadas e instancias de conducta procesal indebida durante el
       procedimiento—[768].

---

[763]   Escrito sobre Costas de la Demandante, párrs. 3-4 (traducción del Tribunal); Reglamento CNUDMI,
        artículo 40.1-2.

[764]   Escrito sobre Costas de la Demandante, párrs. 4; *Chevron Corporation y Texaco Petroleum Corporation c.
        República del Ecuador (I)*, Caso CPA No. 2007-02, Laudo Final, 31 de agosto de 2011, párr. 376 (**CLA-
        25**); *Murphy Exploration c. República del Ecuador [II]*, Caso CPA No. 2012-16, Laudo Parcial, 6 de mayo
        de 2016, párr. 546, (**CLA-83**); *Occidental Exploration and Production Company c. República del Ecuador*,
        Caso LCIA No. UN 3467, Laudo Final, 1 de julio de 2004, párr. 216 (**CLA-88**); *Oxus Gold Plc c. República
        de Uzbekistán,* ad hoc, Laudo Final, 17 de diciembre de 2015, párrs. 1041-1045 (**RLA-172**).

[765]   Escrito sobre Costas de la Demandante, párr. 4 (traducción del Tribunal); *ADC Affiliate Ltd. et al. c.
        República de Hungría*, Caso CIADI No. ARB/03/16, Laudo, 2 de octubre de 2006, párr. 536 (**CLA-3**);
        *Valeri Belokon c. República Kirguisa*, ad hoc, Laudo, 24 de octubre de 2014, párr. 335 (**CLA-127**); *Yukos
        Universal Limited (Isla de Man) c. Federación Rusa*, Caso CPA No. 2005-04, Laudo Final, 18 de julio de
        2014, párr. 1869 (**CLA-247**); *Mesa Power Group LLC c. Canadá*, Caso CPA No. 2012-17, Laudo, 24 de
        marzo de 2016, párr. 703; (**CLA-253**); *Luigiterzo Bosca c. República de Lituania,* Caso CPA No. 2011-05,
        Laudo, 17 de mayo de 2013, párr. 326 (**CLA-255**); *Achmea B.V. (antiguamente Eureko B.V.) c. República
        Eslovaca [I]*, Caso CPA No. 2008-13, Laudo Final, 17 de diciembre de 2012, párr. 349 (**CLA-351**)*; BG
        Group Plc c. República Argentina,* ad hoc, Laudo Final, 24 de diciembre de 2007, párrs. 458-460, 467
        (**RLA-207**).

[766]   Escrito sobre Costas de la Demandante, párr. 5.

[767]   Escrito sobre Costas de la Demandante, párr. 5.

[768]   Escrito sobre Costas de la Demandante, párr. 5.

511. Con cita a *Gavrilovic c. Croatia* y *Karkey Karadeniz c. Pakistán*, la Demandante afirma que los tribunales pueden tomar en consideración la decisión de una parte de plantear alegaciones infundadas para fines de la asignación de las costas[769]. Sobre esta base, solicita que el Tribunal asigne todas las costas a la Demandada dado que "planteó un cúmulo de argumentos y objeciones infundados, que sabía que carecían de fundamento", incluyendo: (i) "una objeción de corrupción siempre cambiante que aumentó significativamente los costes de Worley";[770] (ii) una objeción sobre elección de foro que "ignoró" el texto del Tratado y las autoridades legales prevalecientes[771]; y (iii) el argumento de que la "falta de liquidez" provocó el incumplimiento en el pago[772]. Además, sostiene que la Demandada dejó de abordar intencionadamente el fondo del caso, con lo cual provocó el desperdicio de recursos en todo el procedimiento[773]

512. En relación con la supuesta conducta procesal indebida de la Demandada, la Demandante sostiene que incrementó la complejidad del arbitraje —y, consecuentemente, su coste— y por ello se debe tener en cuenta al momento de adoptar una decisión sobre la condena en costas[774]. Cita como ejemplos: (i) el Procedimiento bajo la § 1782[775]; (ii) la fase de exhibición de documentos, durante la cual la Demandada presentó "solicitudes incesantes" de documentos, incluidos documentos confidenciales y sujetos a privilegio legal[776]; (iii) la solicitud de bifurcación planteada por la Demandada, que prolongó el arbitraje por más de un año y culminó con el rechazo de las Objeciones Preliminares por parte del Tribunal; y (iv) la presentación de la Demandada de una objeción de "legitimación activa" sobre la base de una de las Objeciones Preliminares ya

---

[769]  Escrito sobre Costas de la Demandante, párr. 6; *Karkey Karadeniz Elektrik Uretim A.S.c. República Islámica de Pakistán*, Caso CIADI No. ARB/13/1, Laudo, 22 de agosto de 2017, párrs. 1063-1069 (**CLA-65**); *Georg Gavrilovic y Gavrilovic d.o.o. c. República de Croacia*, Caso CIADI No. ARB/12/39, Laudo, 26 de julio de 2018, párrs. 1316-1320 (**CLA-450**).

[770]  Escrito sobre Costas de la Demandante, párrs. 7-9.

[771]  Escrito sobre Costas de la Demandante, párr. 10.

[772]  Escrito sobre Costas de la Demandante, párr. 11 (traducción del Tribunal).

[773]  Escrito sobre Costas de la Demandante, párr. 12.

[774]  Escrito sobre Costas de la Demandante, párrs. 13-14, 21; *Karkey Karadeniz Elektrik Uretim A.S. c. República Islámica de Pakistán*, Caso CIADI No. ARB/13/1, Laudo, 22 de agosto de 2017, párrs. 1063-1069 (**CLA-65**); *Mesa Power Group LLC c. Canadá*, Caso CPA No. 2012-17, Laudo, 24 de marzo de 2016, párr. 704-705 (**CLA-253**).

[775]  Escrito sobre Costas de la Demandante, párr. 15; Carta de la Demandante al Tribunal, 22 de septiembre de 2021; Carta de la Demandada al Tribunal, 18 de junio de 2021, párrs. 1, 3, 4; Carta de la Demandante del Tribunal, 25 de junio de 2021, párrs. 4-6; Oficio No. 13023 del Procurador General al Fiscal General del Estado, 16 de marzo de 2021 (**C-732**).

[776]  Escrito sobre Costas de la Demandante, párr. 16; Orden Procesal No. 4; Orden Procesal No. 5; Orden Procesal No. 6; Carta de la Demandada al Demandante, 13 de enero de 2022; Carta de la Demandante a la Demandada, 7 de febrero de 2022; Carta de la Demandada al Tribunal, 18 de febrero de 2022, párr. 3; Carta de la Demandante al Tribunal, 25 de febrero de 2022; Carta de la Demandada al Tribunal, 23 de marzo de 2022, párr. 2.

desestimadas[777]. A juicio de la Demandante, la Demandada también incurrió en conductas en Ecuador que agravaron la controversia, como la iniciación y continuación de auditorías, investigaciones y procedimientos "infundados" contra Worley[778].

513.   Por último, la Demandante sostiene que su solicitud de costas es razonable considerando la cuantía en disputa (cerca de USD 470 millones), la cantidad y el alcance de las pruebas fácticas y periciales aducidas (9 declaraciones testimoniales, 10 informes periciales y más de 1.700 anexos documentales), la conducta de las Partes durante el procedimiento y el hecho de que se necesitaran labores en múltiples jurisdicciones y arreglos de viajes extensivos[779]. Concluye que:

> Los costes de la Demandante son razonables en vista de la conducta abusiva de Ecuador, la complejidad de la controversia con Ecuador, la duración del procedimiento, las cuestiones en disputa y el alcance de los daños y perjuicios de la Demandante ocasionados por los incumplimientos de la Demandada. Además, los costes de la Demandante son inferiores a los incurridos por demandantes en otros arbitrajes de inversión, incluidos contra Ecuador[780].

## 2.   LA POSICIÓN DE LA DEMANDADA

514.   La Demandada sostiene que la Demandante debe asumir todas las costas del presente arbitraje[781]. En particular, la Demandada solicita una indemnización plena por una cantidad de USD 6.158.161,65 e intereses sobre dichas costas a una tasa que deberá ser determinada por el Tribunal[782]. Las costas declaradas por la Demandada son las siguientes[783].

|  | Total (USD) |
|---|---|
| Honorarios de abogados | 3.901.951,84 |
| Gastos de los abogados | 89.664,81 |
| Gastos de viajes y costes de los representantes de la Procuraduría General del Estado del Ecuador | 16.874,42 |
| Coste del tiempo dedicado por representantes de la Procuraduría General del Estado del Ecuador asignados a este caso | 155.917,27 |
| Honorarios del Dr. Fabián Andrade Narváez | 85.000,00 |

---

[777]   Escrito sobre Costas de la Demandante, párrs. 17- 18; Laudo Parcial, 18 de marzo de 2021.

[778]   Escrito sobre Costas de la Demandante, párr. 19.

[779]   Escrito sobre Costas de la Demandante, párrs. 22-23; *Murphy Exploration c. La República del Ecuador [II]*, Caso CPA No. 2012-16, Laudo Final Parcial, 6 de mayo de 2016, párrs. 536-541 (**CLA-83**).

[780]   Escrito sobre Costas de la Demandante, párr. 23 (traducción del Tribunal).

[781]   Escrito sobre Costas de la Demandada, párr. 3.

[782]   Escrito sobre Costas de la Demandada, párr. 31.

[783]   Escrito sobre Costas de la Demandada, Lista A (traducción del Tribunal).

| Gastos del Dr. Fabián Andrade Narváez | 4.247,67 |
| Honorarios del Sr. Tiago Duarte-Silva | 399.482,00 |
| Gastos del Sr. Tiago Duarte-Silva | 4.782,87 |
| Honorarios de Berkeley Research Group | 537.150,50 |
| Gastos de Berkeley Research Group | 5.233,47 |
| Gastos de viaje del Sr. José Herrera | 3.654,99 |
| Gastos de viaje del Sr. Mauro Tejada | 4.201,81 |
| Pagos de depósito | 950.000,00 |
| Total | 6.158.161,65 |

515.  Según la Demandada, el artículo 40 del Reglamento CNUDMI otorga discreción al Tribunal para asignar tanto las costas del arbitraje y como los gastos de representación legal[784]. Por consiguiente, la Demandada solicita al Tribunal que ordene a la Demandante que asuma todas las costas sobre la base de: (i) el principio de que "el vencido paga"; y (ii) el principio de que la Parte cuya conducta haya inflado el coste del proceso debe soportarlo independientemente del desenlace sobre el fondo[785].

516.  La Demandada afirma que las costas que reclama son razonables por tres motivos independientes.

517.  En primer lugar, en la medida en que la Demandante sostiene que sus costas son razonables y tales costas son superiores a las reclamadas por la Demandada, la Demandada afirma que sus propias costas son "reconocidamente razonables" por fuerza[786].

518.  En segundo lugar, la Demandada afirma que logró mantener sus costes en un grado razonable a pesar de la importancia de la resolución del caso para Ecuador y de su naturaleza excepcional y compleja, que afirma que fue exacerbada por la corrupción "demostrada" en la que incurrió la Demandante[787].

519.  En tercer lugar, dada la solicitud de la Demandante de más de USD 141,3 millones en daños y perjuicios, y observando que se benefició del asesoramiento de abogados con experiencia en

---

[784]  Escrito sobre Costas de la Demandada, párrs. 3-4; artículo 40.1-2 del Reglamento CNUDMI.

[785]  Escrito sobre Costas de la Demandada, párr. 4-5; artículo 40.2 del Reglamento CNUDMI; *Yukos Universal Limited (Isla de Man) c. Federación Rusa*, Caso CPA No. 2005-04, Laudo Final, 18 de julio de 2014, párr. 1876 (**CLA-247**); *Apotex Holdings Inc. y Apotex Inc. c. Estados Unidos de América*, Caso CIADI No. UNCT(AF)/10/2, Laudo sobre Jurisdicción y Admisibilidad, 14 de junio de 2013, párr. 339 (**RLA-90**); *Vestey Group Ltd. c. República Bolivariana de Venezuela*, Caso CIADI No. ARB/06/4, Laudo, 15 de abril de 2016, párrs. 470-471 (**CLA-414**).

[786]  Escrito sobre Costas de la Demandada, párr. 8.

[787]  Escrito sobre Costas de la Demandada, párrs. 10-12.

arbitraje internacional, la Demandada considera que la Demandante podría haber previsto razonablemente que tendría que asumir la cantidad de costas reclamadas por la Demandada si resultara vencida en última instancia[788].

520. Además, independientemente del desenlace del caso, la Demandada solicita que el Tribunal condene en costas a la Demandante a la vista de la manera en que esta ha litigado su caso, que, en su opinión, aumentó las costas del proceso "injustificada y significativamente"[789]. Tal conducta presunta incluye: (i) plantear su pretensión contra la Demandada cuando la controversia surgió de contratos de los cuales no es ni parte ni garante[790]; (ii) tergiversar las pruebas[791]; (iii) plantear tres solicitudes fallidas para excluir pruebas relevantes y sustanciales de corrupción consistentes en los correos electrónicos y los registros internos de la Demandante[792]; (iv) no cooperar durante la fase de exhibición de documentos, lo que requirió que el Tribunal interviniera en varias ocasiones, incluso emitiendo tres órdenes procesales sobre el asunto[793]; y (v) no respetar las reglas de procedimiento establecidas durante la fase bifurcada del arbitraje[794].

### 3. EL ANÁLISIS DEL TRIBUNAL

521. Cada una de las Partes ha solicitado que se ordene a la otra Parte que asuma todas las costas de este arbitraje más intereses a una tasa a ser determinada por el Tribunal[795].

522. El Tribunal observa que el Tratado guarda silencio en materia de costas. Por consiguiente, el Tribunal aplicará las disposiciones sobre costas establecidas en el Reglamento CNUDMI.

---

[788] Escrito sobre Costas de la Demandada, párr. 13; Presentación de Alegatos de Cierre de la Demandante, pág. 76 (**CD-7**).

[789] Escrito sobre Costas de la Demandada, párrs. 14, 24; *Quiborax S.A. y Non Metallic Minerals S.A. c.Estado Plurinacional de Bolivia*, Caso CIADI No. ARB/06/2, Laudo, 16 de septiembre de 2015, párr. 624 (**RLA-166**).

[790] Escrito sobre Costas de la Demandada, párrs. 15-16.

[791] Escrito sobre Costas de la Demandada, párr. 18.

[792] Escrito sobre Costas de la Demandada, párr. 19; Orden Procesal No. 2; Orden Procesal No. 4, párrs. 7-14; Carta del Tribunal a las Partes, 1 de octubre de 2021.

[793] Escrito sobre Costas de la Demandada, párrs. 20-22.

[794] Escrito sobre Costas de la Demandada, párr. 23; Transcripción en inglés de la Audiencia sobre Objeciones Preliminares, Día 2, 184:2–190:2; 198:3–199:7; Carta de la Demandante al Tribunal, 17 de noviembre de 2020; Carta de la Demandada al Tribunal, 13 de noviembre de 2020; Comunicación de la Demandada al Tribunal, 18 de noviembre de 2020; Carta de la Demandada al Tribunal, 26 de noviembre de 2020.

[795] Escrito sobre Costas de la Demandante, párr. 25; Escrito sobre Costas de la Demandada, párr. 31.

**1) Asignación de las costas**

523. De conformidad con el artículo 38 del Reglamento CNUDMI, el Tribunal fijará las costas del arbitraje en este Laudo Final. El término "costas" comprende únicamente lo siguiente:

(a) Los honorarios del tribunal arbitral, que se indicarán por separado para cada árbitro y que fijará el propio tribunal de conformidad con el artículo 39;

(b) Los gastos de viaje y las demás expensas razonables realizadas por los árbitros;

(c) El costo del asesoramiento pericial o de cualquier otra asistencia requerida por el tribunal arbitral;

(d) Los gastos de viaje y otras expensas realizadas por los testigos, en la medida en que dichos gastos y expensas sean aprobados por el tribunal arbitral;

(e) El costo de la representación y la asistencia de letrados de la parte vencedora si se hubiera reclamado dicho costo durante el procedimiento arbitral y sólo en la medida en que el tribunal arbitral decida que el monto de ese costo es razonable;

(f) Cualesquiera honorarios y gastos de la autoridad nominadora, así como los gastos del Secretario General del Tribunal Permanente de Arbitraje de La Haya.

524. La asignación de las costas está regida por el artículo 40 del Reglamento CNUDMI, que en su parte pertinente dispone:

1. Salvo lo dispuesto en el párrafo 2, en principio, las costas del arbitraje serán a cargo de la parte vencida. Sin embargo, el tribunal arbitral podrá prorratear cada uno de los elementos de estas costas entre las partes si decide que el prorrateo es razonable, teniendo en cuenta las circunstancias del caso.

2. Respecto del costo de representación y de asistencia de letrados a que se refiere el inciso e) del artículo 38, el tribunal arbitral decidirá, teniendo en cuenta las circunstancias del caso, qué parte deberá pagar dicho costo o podrá prorratearlo entre las partes si decide que el prorrateo es razonable.

525. Para los fines de la asignación de costas, el artículo 40 del Reglamento CNUDMI traza una distinción entre las costas del arbitraje (que comprenden los puntos a), b), c), d) y f) del artículo 38) y el coste de representación y de asistencia de letrados (punto e) del artículo 38).

526. De conformidad con el artículo 40.1 del Reglamento CNUDMI, las costas del arbitraje, según se definen en el párrafo precedente, en principio serán a cargo de la parte vencida. Habiendo tomado en consideración todas las circunstancias pertinentes y la aceptación por ambas Partes de la aplicación de la regla predispuesta en el artículo 40[796], el Tribunal no ve ningún motivo para desviarse del principio por defecto según el cual "el vencido paga". En consecuencia, a la luz de

---

[796] Escrito sobre Costas de la Demandante, párr. 4; Escrito sobre Costas de la Demandada, párr. 4.

su decisión de desestimar las pretensiones de la Demandante, el Tribunal determina que la Demandante deberá asumir todas las costas del arbitraje.

527. Con respecto a los costes de representación y de asistencia legal de las Partes, el artículo 40.2 del Reglamento CNUDMI otorga discreción al Tribunal para decidir qué Parte deberá asumir dicho coste o cómo prorratearlo entre las Partes, siempre que tal coste sea razonable (artículo 38 e)). El Tribunal considera que también deberán incluirse en la condena a la Parte vencida los gastos de representación legal de la Parte vencedora en este arbitraje y, por ende, decide que la Demandante deberá asumir los costes razonables de representación legal de la Demandada.

### 2) Cuantificación de las costas y decisión sobre costas

528. Los honorarios y los gastos incurridos por los miembros del Tribunal y por la CPA (en su calidad de institución administradora del arbitraje) son los siguientes:

|  | **Honorarios** | **Gastos** |
|---|---|---|
| **Dr. Andrés Rigo Sureda** | USD 309.400,00 | USD 9.044,55 |
| **Prof. Bernard Hanotiau** | USD 366.566,68 | USD 10.900,47 |
| **Prof. Brigitte Stern** | USD 289.800,00 | USD 14.263,54 |
| **CPA** | USD 240.743,26 | USD 28.819,32 |

529. Otros costes administrativos (incluidos costes bancarios, servicio de comidas, mensajería, instalaciones para la audiencia, estenógrafos, servicios informáticos y audiovisuales, interpretación, traducción, impresión y telecomunicaciones) suman USD 411.080,90. En consecuencia, los costes totales del procedimiento ascienden a USD 1.680.618,72.

530. Las Partes realizaron depósitos para sufragar estos costes por un importe de USD 1.900.000 (USD 950.000 cada una). Se pagaron USD 1.680.618,72 del depósito gestionado por la CPA. El saldo no utilizado asciende a USD 219.381,28. De conformidad con la Sección 11.4 del Acta de Constitución, el Tribunal instruye a la CPA a devolver esta cantidad a las Partes en proporciones iguales (es decir, USD 109.690,64 cada una). La CPA proporcionará a las Partes un estado de cuentas del depósito después de la emisión de este Laudo Final.

531. Por consiguiente, el Tribunal fija las costas del arbitraje (excluidos los costes legales y otros costes incurridos por las Partes conforme a los artículos 38 d) y e) del Reglamento CNUDMI) en

USD 1.680.618,72, incluyendo también la tasa administrativa de EUR 3.000 pagada directamente por la Demandante a la CPA para que actuara como autoridad nominadora (artículo 38 f) del Reglamento CNUDMI), que será soportada por la Demandante[797]. El Tribunal ordena a la Demandante que pague a la Demandada USD 840.309,36 en concepto de las costas que se sufragaron con la parte del depósito aportada por la Demandada.

532. De conformidad con sus determinaciones en los párrafos 526-527 *supra*, el Tribunal ordena además a la Demandante que reembolse un importe de USD 5.208.161,65 a la Demandada en concepto de honorarios y gastos legales y gastos de viaje y de otro tipo de los testigos (artículos 38 d) y e) del Reglamento CNUDMI). En la medida en que esta cifra representa costes de representación y asistencia legal, según se definen en el artículo 38 e) del Reglamento CNUDMI, el Tribunal considera que dicha suma es razonable en las circunstancias del presente caso y decide por lo tanto que debe reembolsarse en su totalidad a la Demandada[798].

533. En resumen, la Demandante deberá reembolsar un total de USD 6.048.471,01 a la Demandada en concepto de costas en el presente arbitraje.

### 3) Intereses sobre costas

534. La Demandada ha solicitado al Tribunal que ordene a la Demandante a pagar intereses sobre las costas a una tasa a ser determinada por el Tribunal. Sin embargo, no ha aportado ningún fundamento legal que sirva al Tribunal como base para imponer intereses sobre las costas. La Demandada tampoco ha propuesto una tasa de interés adecuada o una base conforme a la cual el Tribunal pueda determinar tal tasa. Por estos motivos, el Tribunal rechaza la solicitud de la Demandada de ordenar el pago de intereses sobre las costas.

---

[797] *Véase* Carta de la Demandante a la CPA, 18 de junio de 2019.

[798] Para un desglose completo de las costas reclamadas por la Demandada *véase* el párr. 514 *supra*.

Caso CPA Núm. 2019-15
Laudo Final

## VIII. DECISIÓN

535.  Por los motivos antes expuestos, el Tribunal decide, declara y resuelve lo siguiente:

(i)      Se desestiman las pretensiones de la Demandante;

(ii)      Se ordena a la Demandante que asuma las costas del arbitraje;

(iii)      Se ordena a la Demandante que reembolse a la Demandada USD 6.048.471,01 en concepto de sus costas en el presente arbitraje; y

(iv)      Se desestima la totalidad de las pretensiones restantes.

*[firmas a continuación]*

Caso CPA Núm. 2019-15<br>Laudo Final

Sede del arbitraje: París, Francia

Fecha: 22 de diciembre de 2023

El Tribunal Arbitral

_____            _____
      **Prof. Bernard Hanotiau**                                  **Prof. Brigitte Stern**

_____
      **Dr. Andrés Rigo Sureda**
        **(Árbitro Presidente)**